**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EDWARD ELMORE,** | : | |
| | : | |
| Plaintiff, | : | No. 2:25-cv-02076-JHS |
| | : | |
| v. | : | |
| | : | |
| **FALLS TOWNSHIP** | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF MATERIAL FACTS**

Plaintiff Edward Elmore ("Elmore"/ "Plaintiff"), hereby submits this response to Defendant Falls Township's ("Township"/ "Defendant") Statement of Material Facts:

1.      Plaintiff, Edward Elmore (DOB 1/7/1977), began his employment with the Falls Township Police Department ("FTPD") as a patrol officer in the Spring of 2000. *See* Plaintiff Dep. Transcript at 25: 13-17, attached hereto as **Exhibit A**.

**Plaintiff's Response**: Admitted.

2.      Plaintiff was assigned as a part-time Special Weapons and Tactics ("SWAT") officer for about sixteen (16) years and as a K-9 officer for ten (10) years. Id. at 25: 1-17; 29: 5-9.

**Plaintiff's Response**: Admitted.

3.      Plaintiff's responsibilities as a K-9 officer were parallel to any duties that would arise as a patrol officer and a member of the SWAT team. Id. at 37: 14-25.

**Plaintiff's Response:** Admitted.

4.    Plaintiff remained a K-9 officer until a month before he was terminated on February 28, 2024.

**Plaintiff's Response:** Admitted.

**Material Fact that Defendant does not disclose:** Plaintiff's Dog Monty was retired, and Plaintiff was not assigned a new dog. **Pl. Ex. 1, Elmore Dep 43:1-17**.

5.    Nelson Whitney (hereinafter "Whitney" or "Chief Whitney") began his employment with the Township as a patrol officer in 1988. *See* Whitney Dep. Transcript, attached hereto as **Exhibit B** at 13: 16-17.

**Plaintiff's Response:** Admitted.

6.    After spending ten years as a patrol officer, he served in various roles in the detective division, including both as a rank and file detective, a corporal, a sergeant, and then a lieutenant as the division commander for patrol. In 2021, Whitney was promoted to Chief of Police. Id. at 13: 17-23.

**Plaintiff's Response:** Admit in part and denied in part. Admit what is stated is accurate, but deny it accurately states Whitney's roles at the Township. On September 1, 2020, Nelson Whitney was appointed Acting Chief of Police, and he assumed the role full-time in January 2021. **Pl. Ex. 2, Whitney Dep. 13:11-14:19**.

7.    Matthew Takita (hereinafter "Takita") began his employment with the

Township as the Director of Code Enforcement before becoming Township Manager approximately four years ago. *See* Takita Dep. Transcript, attached hereto as **Exhibit C** at 11: 5-16.

**Plaintiff's Response:** Admitted.

8.    Takita was hired as Township Manager with the understanding that he would serve in an interim capacity until a full-time manager was appointed. As such, he served as the Township Manager in 2022, 2023, and 2024, but ceased being the Manager after a full-time manager was hired. Takita currently serves as the Director of Code Enforcement and Zoning Administration. Id.
at 12: 11-25; 13:1-4.

**Plaintiff's Response:** Admitted.

9.    In his position as Township Manager, all department heads reported to him, including the Chief of Police. Id. at 13: 12-18.

**Plaintiff's Response**: Admit in part and deny in part. Admit that, according to the Township's Organizational Chart, the department heads report to the Township Manager. Deny that the Township operated in that manner during the period when Matthew Takita served as Township Manager. Erin Mullen, a member of the Board of Supervisors, testified that she served as a "liaison" between the Board of Supervisors and Chief of Police Nelson Whitney, including direct telephone conversations and emails with Chief Whitney. **Pl. Ex. 3, Mullen Dep. 7:25-8:25; 26:14-27:8, 29:17-20.** While Jeffry Dence, President of the Township Supervisor, testified that

A. At the time, Nelson Whitney had the ear of multiple supervisors, at least three other supervisors, who would talk to him, you know, by way of phone calls or text messages or what-have-you.

**Pl. Ex. 4, Dence Dep. 98:1-5.**

10.     Takita reported to the Board of Supervisors. Id. at 13: 8-11.

**Plaintiff's Response:** Admitted.

11.     The Municipal Police Officers Education and Training Committee ("MPOETC") sets the standard for training an inactive in-service K-9. This includes sixteen (16) hours of training per month—eight (8) hours related to patrol work, tracking, apprehensions, and the remaining eight (8) hours related to the dog's specialty, either typically drugs or explosives**. Exhibit A** at 104: 15-24.

**Plaintiff's Response:** Admitted that MPOETC sets the standard for training **an active in-service K-9.** It appears that there is a typographical error in this sentence.

12.     Plaintiff's canine partner Monty was trained for explosive detection. Id. at 110: 24- 25.

 **Plaintiff's Response:** Admitted.

13. On February 25, 2022, MPOETC had an eight-hour training day scheduled for the K-9s and the Bucks County District Attorney's Office had scheduled their mandatory "scent certification" on the same day upon the officers' request. Id. at 105-107.

**Plaintiff's Response**: Admitted.

14.     The training began that day at 9 a.m. *See* Obermayer Memorandum, 2/14/24 at 17, attached hereto as **Exhibit D**.

**Plaintiff's Response**: Denied. On the morning of February 25, 2022, the Plaintiff and his fellow K-9 Officers initially reported to Bristol Township shortly after 7 a.m. to prep their dogs before the County certification began at a different location. Once the prep was done, the officer drove to the site where the County officials were conducting the certification. Elmore arrived before the training/certification began because he brought the explosive that the County would use to test the K-9 **Pl. Ex. 10, Plaintiff's ¶¶13,14; Pl. Ex. 1, Elmore Dep**. **111-112**.

15.     Each officer had to wait their turn to run the course with the instructor, which would last approximately ten (10) to fifteen (15) minutes. Id. at 17.  All officers attending the training departed the training facility by 12:28 p.m. Id. at 17.

**Plaintiff's Response**: Admit in part and denied in part. Admit that it took each officer ten to 15 minutes to run the course to be certified.

Deny that all the officers departed at 12:28 p.m. The Defendant relies solely on hearsay statements from Obermayer Law Firm's February 14, 2024, report to support this assertion. The Obermayer report does **NOT** cite the source of this information, e.g., interviews, or documents, timecards, etc. Thus, the Defendant has provided NO evidence to support this assertion. **Pl. Ex. 11, 2/14/24 Obermayer Report at Pg 17**.

16.     According to the Collective Bargaining Agreement ("CBA"), an officer must be in training for a minimum of eight (8) hours to be excused from a twelve (12) hour

shift and mark it as a "School Day". Id. at 17.

**Plaintiff's Response**: Admitted.

17.    On February 25, 2022, Plaintiff and the other FTPD K-9 officers claimed eight hours of overtime for their attendance despite the fact that the training only lasted for three and a half hours. Id. at 17.

**Plaintiff's Response**: Denied. Plaintiff was scheduled to work the **day shift** on February 25, 2022, and therefore **did not** claim overtime for the training session that day. After the morning session ended, Elmore returned to the Falls Township Police Station, as documented on video. **Pl. Ex. 1, Elmore Dep. 106:19-108:21; Pl. Ex. 12, 2/14/2023 Email from Harran to Takita; Pl. Ex. 10, Plaintiff's Affidavit ¶18.**

Additionally, the Defendant relies solely on the Obermayer report to support this assertion. The Obermayer report does **NOT** cite any documents or testimony that support this assertion. Thus, the Defendant has provided NO evidence to support this assertion. **Pl. Ex. 11, 2/14/24 Obermayer Report at Pg. 17**.

18.    Falls Township submitted the overtime costs to the County for reimbursement as this was a County-sponsored training. Bucks County Detectives raised concerns about the overtime claims and contacted the Township to investigate. Id. at 17.

**Plaintiff's Response**: Deny. The Defendant relies solely on the Obermayer report to support this assertion. The Obermayer report does **NOT** cite any documents or testimony that support this assertion. Thus, the Defendant has provided NO evidence to support this assertion. **Pl. Ex. 11, 2/14/24 Obermayer Report**.

Deny that Elmore had any role in the incorrect submission of the overtime pay request to the County. Elmore was scheduled to work a regular shift on February 25, 2022, so he did NOT submit an overtime request for the training day. **Pl. Ex. 10, Plaintiff's Affidavit¶18; Pl. Ex. 5, Takita Dep. 34:23-35:9**.

19.    Chief Whitney directed Lt. Henry Ward to open an administrative investigation into the discrepancy in overtime claims. This investigation began on March 17, 2022, and included interviews of Plaintiff, Officer Brian Fisher, and Officer Thomas Lundquist on March 30, 2022. Lt. Ward's investigation revealed that the officers had utilized an eight-hour School Day to attend the training that lasted for a mere four (4) hours, including lunch and break time. Critically, these officers were explicitly instructed not to engage in this practice at a staff meeting held on July 7, 2021. Id. at 18.

**Plaintiff's Response**: Admit in part and denied in part. Admit that Lt. Henry Ward investigated and that he interviewed Mr. Elmore.

Deny that the evidence showed Elmore did anything wrong on February 25, 2025. The Board of Supervisors hired outsider Frederick Harran to review Lt. Ward's findings because "We [the board] didn't trust Henry Ward doing these investigations." **Pl. Ex. 4, Dence Dep. 40:18-41:7**.

After the Board of Supervisors received Mr. Harran's investigation report, which concluded that no discipline was warranted against Elmore, the Board "determined no disciplinary action is warranted for the incident on February 25, 2022, involving the misuse of time." **Pl. Ex. 13, 4/5/2023 Harran's Memo to Takita RE: K9 Investigation 02.25.22; Pl. Ex. 56, 4/7/2023 Email from Takita to Elmore; and Pl. Ex. 5, Takita Dep. 106:10-22.**

20.     Lt. Ward recommended dismissal of all three (3) officers due to the serious breaches of Township policies in question, and the labor counsel agreed with the recommendation of termination. Id. at 18.

**Plaintiff's Response**: Admit.

21.     In April 2022, Plaintiff was made aware of potential disciplinary action, including possible termination for the training time theft and lying during the investigation. Id. at 18.

**Plaintiff's Response**: Denied.

The Defendant has presented no evidence to support this assertion. The Township relies solely on hearsay statements in the February 14, 2024, report by the Obermayer law firm to support its assertion that Elmore was made aware that he faced possible termination in April 2022. **Pl. Ex. 11, 2/14/24 Obermayer Report Pg 18**.

On December 2, 2022, Chief Whitney sent Elmore a Loudermill Notice informing him that he faced disciplinary action for "K9 Incident – misuse of time." **Pl. Ex. 14, 12/2/2022 Email from Whitney to Elmore with the Loudermill Notice attached**.

22.     On April 25, 2022, the Police Association of Falls Township ("PAFT") submitted a letter to the Township outlining concerns regarding Chief Whitney's alleged misconduct while serving as Chief of Police. Plaintiff was President of PAFT at the time.

**Plaintiff's Response**: Admitted.

23.     This Vote of No Confidence Letter, which was primarily authored by the

Plaintiff, resulted in Chief Whitney being placed on administrative leave from April 26, 2022 to September 12, 2022, and delayed finalization of Plaintiff's termination. Id. at 18.

**Plaintiff's Response**: Admit in part and deny in part. Admit that the Township Supervisors placed Chief Whitney on Administrative Leave after receiving the "no confidence" letter from the police officers, and that the leave occurred from April 26, 2022, to September 12, 2022.

Deny that Elmore "primarily authored" the letter. The members of the Police Association of Falls Township (PAFT) held a vote of no confidence, with the following results: No-Confidence 40 votes, Disagree 8 votes, and Abstain 1 vote. Elmore, along with the Vice President, Raymond Fanelli, and Union Counsel, wrote a letter to the Board of Supervisors. **Pl. Ex. 10, Plaintiff's Affidavit ¶20.**

Deny that Whitney's administrative leave delayed anything. When Whitney was on administrative leave in April 2022, Lt. Ward served as acting chief and had full authority as chief of police. **Pl. Ex. 5, Takita Dep. 25:12-23**.

The Defendant has presented no evidence to support this assertion. The Township relies solely on hearsay statements in the February 14, 2024, report by the Obermayer law firm to support its assertion that Elmore was made aware that he faced possible termination in April 2022. **Pl. Ex. 11, 2/14/24 Obermayer Report at Pg 18**.

24.    A third-party law firm, Campbell Durrant P.C., investigated the allegations against Chief Whitney and determined there was no wrongdoing on the part of the Chief. *See* Campbell Durrant, P.C. Memorandum, 8/16/22, attached hereto as **Exhibit E.**

**Plaintiff's Response**: Denied. According to Mr. Dence, Board of Supervisors

Chair, Campbell Durrant "found there were all kinds of problems in our police department, but it also found that they said Nelson Whitney didn't specifically do anything overly terrible. … It didn't say that [he] did nothing wrong. He has his own issues. There was supposed to be training done for him and other officers that never took place." **Pl. Ex. 4, Dence Dep. 28:10-29:1**.

25.     When Chief Whitney returned from administrative leave, he provided the Board of Supervisors with a detailed report supporting the discipline recommended against Plaintiff, and Fred Harran, from Solutions 180, LLC., was hired to further investigate the matter. While Fred Harran provided a brief summary recommending that no discipline be imposed on Plaintiff, this recommendation was contradicting that of the FTPD command staff and labor counsel. *See* Fred Harran Recommendation, attached hereto as **Exhibit F.**

**Plaintiff's Response:** Admit in part and deny in part. Admit that Fred Harran did not recommend terminating Elmore.

Deny Chief Whitney returned from administrative leave on September 12, 2022, and provided the Board of Supervisors with a report recommending Elmore's termination. Chief Whitney submitted the report to the Board of Supervisors on January 27, 2023, four months after returning from administrative leave and **after** Elmore made complaints of discrimination in the hiring process to the Township Manager, Mr. Takita, and the Assistant Township Manager, Richard. Dippolito, on October 6, 2022, October 12, 2022, and October 27, 2022, and Mr. Elmore's handout, which he planned to provide to his fellow officers at the December union meeting, concerning racism and sexism in the police department. **Pl. Ex. 55, 1/27/2023 Memo from Whitney to Board of Supervisors; Pl. Ex. 5, Takita Dep. 52:3-21; Pl. Ex. 1,**

**Elmore Dep. 157:11-20; Pl. Ex. 15, 10/27/2022 Email from Elmore to Takita and Dippolito**.

Elmore's handout said:

"Falls Township Deserves Better" "The Officers of the Falls Township Police Department and residents of Falls Township have a right to a Police Department that is free of racism and sexism. The township has now effectively purged 75% of the female officer from its ranks and refuses to address deeply troubling racial incidents including:

Chief Whitney posing with George Floyd's convicted murderer (Derek Chauvin) while on duty in uniform at the Black Live Matter rally in Bristol.".. 

Lieutenant Ward assaulting an African-American prisoner held in his custody in the police jail before sending him to prison for assaulting police'.

**Pl. Ex. 16, Elmore's Handout "Fall Township Deserves Better."**

Chief Whitney's letter to the Board of Supervisors also follows Elmore's December 7, 2022, email to Mr. Takita, Mr. Dippolito, and Jeff Dence, Chair of the Board of Supervisors, in which Elmore reports that Chief Whitney threatened to terminate him for "addressing deeply troubling issues with racism and sexism within our department and how that has affected our members and our working conditions." **Pl. Ex. 17**, **12/7/2022 Email from Elmore to Takita, Dippolito, and Dence.**

The Board of Supervisors hired Frederick Harran on or around December 16, 2022, over a month before Chief Whitney provided his January 27, 2023, letter to the Board of Supervisors requesting Elmore be terminated. **Pl. Ex. 18, 12/16/22 Email from Lauren Gallagher, Township Solicitor to Harran**.

Deny. Mr. Harran provided a "brief summary recommending that no discipline be imposed on Plaintiff." He also provided the Township with multiple memos outlining his findings and updates throughout his investigation. **Pl. Ex. 13, 4/5/2023, Harran's Investigation Report of "K9 Investigation 02.25.22"; Pl. Ex. 19, 4/5/2023, Harran's Investigation Report of "Elmore Harassment Complaint"; Pl. Ex. 20, 4/26/2023,**

Harran's "K9 Investigation 02.25.22 Summarization"; Pl. Ex. 21, 5/24/2023, Harran

Memo to Atkins "Elmore Post Psychological Evaluation/Harassment"; Pl. Ex. 12,

February and March 2023 Emails between Harran and Lauren Gallagher, the

Township Solicitor.

26.     Ultimately, the Board of Supervisors determined that no disciplinary action

was warranted for the incident involving misuse of time, and Plaintiff was notified of the same

on April 7, 2023, *See* Email Correspondence from Takita to Plaintiff, attached hereto as

**Exhibit G.**

    **Plaintiff's Response:** Admitted.

27.     In 2021, Plaintiff was approached by then Sergeant Christopher Clark (now,

Lieutenant Clark) to join the new hire interview panel or the Oral Examination Board ("OEB').

The OEB consisted of Lt. Clark, Plaintiff, and Sgt. Anthony Fanelli. Exhibit A at 48: 6-12; 58:

24-25; 59: 1-3.

    **Plaintiff's Response**: Admitted.

28.     Plaintiff testified that when he was asked to be on the OEB by Lt. Clark, Lt.

Clark allegedly told Plaintiff that he did not intend to hire any female or minority applicants.

This conversation allegedly took place between Lt. Clark and Plaintiff in the hallway at police

headquarters when no one else was around. Id. at 57: 17-25; 58: 14-23; 59: 4-10.

    **Plaintiff's Response**: Deny that Elmore "allegedly" said anything. Defendant has not

provided any evidence to dispute Plaintiff's testimony. Admit that, as Defendant has cited, Elmore

testified that when Lt. Clark asked him to be on the OEB, Lt. Clark told Plaintiff that he did not intend to hire any female or minority applicants.

29.    Plaintiff testified that he did not say anything in response to Lt. Clark when he allegedly shared his intentions to discriminate against female and minority applicants, nor did he make a complaint regarding this conversation when it happened. Id. at 59: 21-25; 60:1-20; 64: 18-23.

**Plaintiff's Response**: Deny that Elmore "allegedly" said anything. Defendant has not provided any evidence to dispute Plaintiff's testimony. Admit that, as Defendant has cited, Elmore testified that when Lt. Clark asked him to be on the OEB, Lt. Clark told Plaintiff that he did not intend to hire any female or minority applicants.

30.    Despite the fact that Plaintiff believed Lt. Clark had the intention to discriminate against female and minority applicants, Plaintiff agreed to serve on the OEB for three cycles because "he [Lt. Clark] was going to do that [discriminate against female applicants] regardless of who was with him." Id. at 65: 2-8; 17-18; 69: 24-25.

**Plaintiff's Response**: Admitted Elmore testimony is accurately cited. Deny that this is a material fact. The undisputed material fact is that Elmore reported discriminatory hiring practices on October 6, 2022; October 11, 2022; October 27, 2022; December 4, 2022; December 7, 2022; and May 3, 2023. ***See* Plaintiff's Response to ¶ No. 25 and ¶32.**

31.    Instead of raising these concerns at any point while on the OEB, the first time that Plaintiff raised this issue was not until October 6, 2022 in a meeting with Takita (Township Manager),and Rich Dippolito (Assistant Township Manager). This meeting took

place *after* Plaintiff was made aware of potential disciplinary action for theft of time and lying during the investigation. Exhibit A at 155-157.

**Plaintiff's Response**: Denied. The first time Elmore was notified that he was facing disciplinary action for alleged misuse of time and alleged lying during the investigation in March 2022 was in the Loudermill Hearing Notice for "K9 Unit Recommendations.pdf" that he received on December 2, 2022, which is after Elmore's October and November complaints of dicrimination. **Pl. Ex. 14**, **12/2/2022 Email from Whitney to Elmore Notifying Elmore of Loudermill Hearing with 3/29/2022 Memo from Lt. Ward attached (Pl. Ex. 39)**.

32.    On May 3, 2023, a few days *after* Lt. Clark issued Plaintiff a negative performance review on April 27, 2023, Plaintiff sent an email to Takita, Dippolito, and Jeffrey Dence (the Chairman of the Township's Board of Supervisors), re-iterating his prior allegations of discriminatory hiring procedures. *See* Obermayer Memorandum, 1/18/24, attached hereto as **Exhibit H.**

**Plaintiff's Response:** Admit in part and deny in part. Admit that on May 3, 2023, Plaintiff sent an email to Takita, Dippolito, and Jeffry Dence (the Chairman of the Township's Board of Supervisors), reiterating his prior allegations of discriminatory hiring practices by the police department. However, Defendant fails to disclose that, in the same email, Elmore also asserted that he had been retaliated against by Chief Whitney and Lt. Clark for making those complaints. **Pl. Ex. 36**, **5/3/2023 Email from Elmore to Takita and Dippolito**.

On April 28, 2022, both Chief Whitney and Lt. Clark issued and signed the

negative performance evaluation, assigning a very low overall score of 51, and substituted their evaluation for the evaluation filled out on April 19, 2022, that had already been completed by Elmore's direct supervisor and gave Elmore a very high overall score of 90. **Pl. Ex. 22, Sgt. Fanelli's 4/19/2023 Performance Evaluation; Pl. Ex. 23, 4/28/2023 Elmore's Performance Evaluation by Clark and Whitney.**

33. Falls Township retained the law firm Obermayer Rebmann Maxwell & Hippel LLP ("Obermayer") to investigate Plaintiff's complaint that the FTPD, at the direction of then Sergeant Christopher Clark, had engaged in illegal, discriminatory hiring practices to avoid hiring qualified candidates for positions within the Department. *See* Exhibit H.

**Plaintiff's Response**: Admit, Falls Township hired Obermayer in July 2023 to investigate the discrimination in the hiring process that Elmore had been reporting since October 6, 2022, but according to the Township Manager, Matthew Takita, the Township not investigate Elmore's complaint of retaliation in his May 3, 2022 email. **Pl. Ex. 5, Takita Dep. 112:18-115:17.**

34. Plaintiff filed his first Charge of Discrimination with the Equal Employment Opportunity Commission on September 20, 2023, alleging Title VII Retaliation and Age Discrimination based on the same underlying facts, i.e., discriminatory hiring practices. Plaintiff alleged that because he had reported Lt. Clark's plan, he was subjected to discrimination because of his age and retaliation in the form of not being allowed to work light duty after suffering an injury on duty, and being placed on administrative leave for his behavior at his colleague's Loudermill hearing discussed on page 11 of this Memorandum. *See* EEOC Charge No. 530-2023-07610, attached hereto as **Exhibit I.**

**Plaintiff's Response:** Admit in part and deny in part. Admit that Elmore filed a Charge of Discrimination with the Equal Employment Opportunity Commission on September 20, 2023, asserting Title VII Retaliation and Age Discrimination. Deny the Defendant's summary of the Charge is accurate. Elmore asserted that he was subjected to retaliation for reporting discrimination on October 6, 12, and 27, 2022. Elmore's EEOC Charge identified the following action of retaliation by Chief Whitney:

a. On November 7, 2022, Chief Whitney had him removed from light duty, after being on it since September 22, 2022, and prohibited from working.

b. On December 12, 2022, Chief Whitney placed him on administrative leave, which among other things made it impossible for Elmore to earn overtime wages. He remained on administrative leave without any explanation for 5.5 months.

c. On April 28, 2023, Whitney and Clark altered his overall Performance Evaluation Score from 90 to 51, preventing Elmore from being promoted to Corporal.

d. On July 27, 2023, Elmore was denied promotion to Corporal

**Pl. Ex. 24, Elmore's 9/20/2023 EEOC Charge of Discrimination.**

35.    In order to reach its conclusion:

Obermayer was provided with applications from prospective employees, interview notes dating back to November 23, 2020, and the identifies of all police officers hired since February 28 2020. Obermayer was further provided with versions of oral examination prompts, score sheets used during this period, and correspondence related to updates to the scoring system and scenarios posed to applicants. Lastly, on September 8, 2023, the following individuals were interviewed: Officer Elmore, Lt. Clark, Sgt. Anthony Fanelli and Sgt. Michael Callahan. All interviews were recorded stenographically.

Exhibit H at 2.

**Plaintiff's Response**: Denied. Elmore was questioned by the Obermayer attorney in September 2023 and was shown the revised interview scoring form that Lt. Clark had directed Elmore and Sergeant A. Fanelli to create in August of 2021. Obermayer did not have the original interview scoring forms that had been filled out by the interview panel. **Pl. Ex. 10, Elmore's Affidavit ¶30**.

Deny that this is a material fact. This report was not discussed in Obermayer's February 14, 2024, report. **Pl. Ex. 11, 2/14/2024 Obermayer Report**.

36.    After a thorough investigation, Obermayer produced a Memorandum on January 18, 2024, determining that Plaintiff's claims were unsubstantiated. The investigation cited numerous reasons for its conclusion, one of which was wholly related to Plaintiff's lack of credibility. Specifically, the Investigator noted that the timing of Plaintiff's accusations could not be overlooked, as Plaintiff made his claim regarding sex discrimination shortly after Lt. Clark testified against him in an arbitration, and Plaintiff's follow up May 3, 2023 email to the Township followed shortly after Lt. Clark issued him a negative performance review. Beyond the suspicious timing, Plaintiff's statements during the interview were inconsistent with his May 3, 2023 email to Takita, Dippolito, and Dence. Id. at 18.

> In the email, he [Plaintiff] claims he was explicitly told that it was Lt. Clark's goal to avoid hiring women, whereas in his interview he claimed it was merely his "understanding" that no females would progress beyond the OEB. . . It is difficult to fathom that Officer Elmore would discuss EEOC issues with Chief Whitney and fail to raise the fact that he had purportedly been expressly told of Lt. Clark's allegedly discriminatory objections when invited to join the OEB, but it is even more difficult to justify Officer Elmore's statement that he did not think it was something Chief Whitney would even want to know about. Even more troubling is Officer Elmore's contention that he was directed to, and did in fact fabricate scoring rubrics long after interviews had been completed. This would amount to an admission that he himself participated in the supposed wrongdoing.

Id. at 18-19.

**Plaintiff's Response:** Admit that the quote is accurately cited. Admit that the memo purported to make all credibility findings against Elmore. Deny that the statements quoted from the memo are statements of fact and assert that they are alleged statements of opinion.

This statement of opinion is being offered by the Obermayer law firm, which we have asserted is biased, and which had sought to have Elmore terminated twice in recent months and was in the process of preparing another report seeking Elmore's termination yet again for a third time in less than twelve months.

37.    The Investigator concluded that the various inconsistencies and holes in Plaintiff's logic, along with his "established history of timing his complaints to coincide with potential adverse employment actions," cast doubt on the sincerity of Plaintiff's allegations as a whole. Id. at 19.

**Plaintiff's Response**: Admit in part and deny in part. Admit that the Obermayer investigators' purported conclusions are as stated. Deny that this is a material fact. This report was not discussed in Obermayer's February 14, 2024, report, which led to Elmore's termination. **Pl. Ex. 11, 2/14/2024 Obermayer Report**.

Deny that Obermayer was in any position to assess Mr. Elmore's credibility, given that, in the nine months before this investigation began, Obermayer twice advised the Township to terminate Mr. Elmore, advice the Township did not follow. **Pl. Ex. 11, 2/14/2024 Obermayer Report at Pg. 18 ¶3; Pl. Ex. 25, 6/12/2023 Obermayer Memo to Falls Township Supervisors.**

Additionally, the evidence set forth above in ¶25 shows that the adverse employment actions Elmore suffered **followed each time** he complained of discrimination, not the other way

around, as Obermayer states in its report. Notably, Obermayer knew this when it wrote the report because:

a. According to the Township Manager Takita, "If we received a complaint about discrimination, I would always send it to [Obermayer] and ask, you know, what, if anything, needed to be done with that." **Pl. Ex. 5, Takita Dep. 25:24-25:10**.

b. According to Takita, he forwarded Elmore's October 6, 2022, discrimination complaint regarding hiring practices to Obermayer. **Pl. Ex. 5, Takita Dep. 52:3-24**.

c. Elmore sent an email on October 27, 2022, complaining about discriminatory practices by the Chief regarding Officer Stephanie Metterle (female). **Pl. Ex. 15, 10/27/2022 Email from Elmore to Takita and Dippolito**. According to Takita, this complaint would have been forwarded to Obermayer as well. **Pl. Ex. 5, Takita Dep. 25:24-25:10.**

d. Obermayer knew that Elmore was removed from light duty in the first week of November because Thomas Hearn, a partner at Obermayer, was included on Sherry McGovern's email correspondence requesting that Delaware Valley Trust disapprove of Elmore's light-duty work while recovering from an injury. Takita testified that he forwarded the matter of removing Elmore's light-duty status to Obermayer. **Pl. Ex. 26, Emails between McGovern and Delaware Valley Trust; Pl. Ex. 5, Takita Dep. 68:9-17**.

e. Obermayer knew that Elmore had a handout for his fellow officers on discrimination within the Falls Township Police Department because Chief Whitney reached out to Obermayer to review the press release Obermayer drafted in case the memo went public. **Pl. Ex. 37, 12/6/2022 Email from Whitney to Obermayer.**

f. Obermayer also knew that Elmore's December 7, 2022, email to Takita, Dippolito, and Dence reported Chief Whitney's threats to terminate him for reporting racism and sexism

within the department. Both documents were sent to Obermayer's attorneys, and Obermayer was asked to write the notice placing Elmore on Administrative Leave on December 12, 2022. **Pl. Ex. 17, 12/7/2022 Email from Takita to Obermayer**

38.     Against a backdrop of misconduct issues and ongoing concerns regarding Plaintiff's integrity, yet another incident occurred that ultimately resulted in Plaintiff's termination. In late November 2023, after Chief Whitney generally inquired about the suitability of Plaintiff's dog, Monty, for active duty, he learned from Lt. Steven Lagan that Plaintiff had received two dogs as "donations" during the summer from Bob Kent and was training one of the dogs, Oakley, to replace Monty. Exhibit D at 7.

**Plaintiff's Response**: Denied. There was no "backdrop of misconduct issues". As of August 8, 2023, Elmore had a clean disciplinary record. **Pl. Ex. 5, Takita Dep. 143:1-8.**

**Additionally, Lt. Langan testified at an arbitration hearing concerning his conversation with Chief Whitney in late November:**

No one got anything from this.  Eddie
 rescued a dog from a person that is a friend and
friend of the department, that he was going to take
to the pound and the dog was potentially going to be
put down from there.

**Pl. Ex. 72, 7/8/2025 Transcript of Elmore's Arbitration Hearing Langan Testimony at 21:21-25.**

39.     After Chief Whitney questioned the appropriateness of the donation, he informed Lt. Langan of FTPD policy that required the Township to report donations, including the specifics of how the dog was acquired, and mandated that the transaction must be reviewed and approved by the Chief and Township officials. *Id*.

**Plaintiff's Response**: Denied. Kent did not "donate" a dog to the Township. **Pl. Ex. 38, 12/8/2023 Letter from Kent**. Only after Lt. Langan told Chief Whitney that Elmore would likely **not** be willing to give up his family dog to the Township for assignment as a K9 to another officer as its handler did the Chief accuse Elmore and Langan of accepting a bribe – the two dogs from Kent. **Pl. Ex. 72, 7/8/2025 Transcript of Elmore's Arbitration Hearing, Langan Testimony at 21:21-25**.

40.    Lt. Langan expressed to the Chief that he disagreed that the donation of a dog violated the policy. Id. at 8.

**Plaintiff's Response**: Admit that the Defendant correctly sites what is stated in the Obermayer Report.

41.    In an email dated December 15, 2023, Takita requested an investigation by Obermayer surrounding the "donation" of the Belgian Malinois, a dog breed that is used by FTPD K-9 officers, to Plaintiff and whether this "donation" violated any FTPD policies or ethical concerns. See Obermayer Memorandum, 2/14/24 at 3.

**Plaintiff's Response**: Admit that on December 15, 2023, Takita requested Obermayer investigate what he described as at the time as a donation.

Subsequently, Takita testified that when he sent the email to Obermayer's Melissa Atkins and Thomas Hearn on December 15, 2023, asking that the "donation" of the dogs be investigated, he did not know whether the dogs had been donated to Elmore; in fact, he didn't know how Elmore had obtained the dogs. The only thing he knew was "from what Chief Whitney would have relayed to [him]." **Pl. Ex. 5, Takita Dep. 166:14-167:3.**

Neither Takita nor Chief Whitney ever asked Elmore about how he got the two dogs from Robert Kent. Elmore never told either Mr. Takita or Chief Whitney that the dogs were a "donation." **Pl. Ex. 5, Takita Dep. 166:2-9; Pl. Ex. 2, Whitney Dep. 125:23-126:3; Pl. Ex. 28, Plaintiff's Request for Admissions; Pl. Ex. 29, Defendant's Answers to Plaintiff's Request for Admission ¶85**

Mr. Takita also admitted that he heard Elmore **rescued** the dogs from Mr. Kent, and yet he advised Obermayer that the dogs were donated simply because that is what the Chief told him. **Pl. Ex. 5, Takita Dep. 152:2-7; 166:14-167:3.**

Kent sent a letter to the Township regarding the two dogs he gave to Elmore. And nowhere in the letter does he say he donated the dogs to Elmore or the Township. **Pl. Ex. 38, 12/8/2023 Robert Kent Letter.**

42.    On January 4, 2024, Obermayer was "instructed to investigate further whether the circumstances surrounding the 'donation' of the dog, including the intent to allow Officer Elmore to use it as a replacement for Monty, was an isolated incident or another example of the consistent course of conduct for both Lt. Langan and Officer Elmore." Id. at 3.

**Plaintiff's Response**: Denied. Deny that the Board of Supervisors gave such an instruction. Supervisor Brian Galloway testified he sent a text message to Mr. Takita, without discussing it with his fellow Supervisors, to expand Obermayer's investigation. **Pl. Ex. 8, Galloway Dep. 77:20-78:10**. On January 5, 2024, Takita sent Thomas Hearn a text quoting Galloway's instruction, making clear that it was from one Township Supervisor. **Pl. Ex. 75, 1/5/2024 Text Message from Takita to Thomas Hearn**.

Strangely, Thomas Hearn, the attorney at Obermayer who received the text message

and was supposed to conduct an independent, neutral investigation, responded to Takita by attaching a *heart emoji* to Takita's text message. **Pl Ex. 75, 1/5/2024 Text Message from Takita to Hearn forwarding Galloway's original text message to Takita**.

43.     Given that this request had expanded the scope of the investigation, Obermayer conducted a comprehensive review of the past and current conduct of Plaintiff that may have constituted a violation of Township policies. This review is set forth in Section IV of the Memorandum, entitled "Prior Incidents Involving Officer Edward Elmore." Exhibit D at 17-20. This section included an analysis of Plaintiff's theft of overtime for K-9 training and the Vote of No Confidence against Chief Whitney as discussed above.

**Plaintiff's Response**: Denied. See Plaintiff's Response to ¶ 42; the Board of Supervisors did not agree to expand the investigation; this was done by an individual Board Member acting on his own.

Deny that Obermayer "conducted a comprehensive review" of Elmore's past conduct. Rather, it recycled past recommendations for Elmore's termination that the Board of Supervisors had already expressly rejected. **Pl. Ex. 11, 2/14/2024 Obermayer Report, Pgs. 17-21, and Pl. Ex. 25, 6/12/2023, Obermayer Memo to Falls Township Supervisors**.

44.     The Investigators, composed of Melissa K. Atkins, Esq., Thomas T. Hearn, Esq., and Brian M. Rhodes, Esq., also made note of two additional examples of Plaintiff's misconduct. Specifically, they discussed Plaintiff's involvement in Loudermill hearings for then Corporal Langan. On November 15, 2022, Chief Whitney emailed Cpl. Langan to schedule his Loudermill hearing for November 21, 2022 for a matter unrelated to time theft.

After this email was sent, Plaintiff contacted Township Manager Matthew Takita, Assistant Township Manager Richard Dippolito, and Board of Supervisors Chairman Jeffry Dence via email in an attempt to postpone the Loudermill hearings and call into question Lt. Ward's credibility, the officer who had conducted the investigation into Cpl. Langan's conduct. Id. at 20.

**Plaintiff's Response**: Deny that Obermayer found "additional examples" of prior misconduct. Rather, Obermayer recycled and repeated its prior recommendations for Elmore's termination from June 2023, which had already been submitted to and rejected by the Board of Supervisors. **See Ex. Pl. Ex. 25, 6/12/2023 Obermayer Memo to Falls Township Supervisors; Pl. Ex. 5, Takita Dep. 175:15-20**.

45.    When Cpl. Langan's Loudermill hearing proceeded as planned, Plaintiff attended the hearing wearing a t-shirt he had made with a picture of Chief Whitney next to a picture of Derek Chauvin. Plaintiff again wore this t-shirt to a shift change on November 23, 2022. Id. at 21.

**Plaintiff's Response**: Admitted.

46.    In another instance:

> Officer Elmore was distributing documents that contained emails between the Township's solicitor's office and the Board of Supervisors that Chairman Jeffry Dence emailed to Cpl. Langan. Immediately, following this incident, Officer Elmore uploaded video surveillance footage of the "cell block incident" to a Google Drive with a QR code for access to the footage, a picture of the [Derek Chavin] t-shirt, and a post that read "Falls Township Deserves Better." However, after Chief Whitney issued several written orders to remove the video and QR code, Officer Elmore complied and removed it. Later, Chief Whitney charged Officer Elmore with engaging in conduct unbecoming of a

police officer, insubordination, and disobedience.

Exhibit D, Obermayer Memorandum, 2/14/24 at 20.

**Plaintiff's Response**: Deny that Obermayer found "additional examples" of prior misconduct. Rather, Obermayer recycled and repeated its June 2023 recommendations for Elmore's termination, which had already been expressly rejected by the Board of Supervisors. **Pl. Ex. 25, 6/12/2023 Obermayer Memo to Falls Township Board of Supervisors, Pl. Ex. 5, Takita Dep. 143:1-8; Pl. Ex. 56, 4/7/2023 Email from Takita to Elmore.**

Elmore denied distributing any emails among the Township Solicitor's office, the Board of Supervisors, and the Chairman. Elmore provided union members the opportunity to review documents from the Union's own file regarding a legal matter involving the Union. More specifically, the Union and the Township had been sued by two officers for defamation. The two officers had been accused of misappropriating money from the Union. Emore shared documents with fellow officers to reassure them that their Union's funds had not been improperly taken by the former officers. **Pl. Ex. 10, Plaintiff's Affidavit ¶¶23, 25**.

47.     The Investigators held multiple in-person interviews at FTPD's temporary headquarters to determine the events that culminated in the "donation", specifically an incident from July 26, 2022 that involved Bob Kent, the individual who had "donated" the dogs to Plaintiff. Investigators interviewed Chief Whitney, Lt. Clark, Sgt. Stephen Reeves, Lt. Langan, and Plaintiff, and determined that all witnesses were credible other than Lt. Langan and Plaintiff. Obermayer Memorandum, 2/14/24 at 6. According to the witnesses who were deemed credible, on or about July 26, 2022, Lawrence Bell, a Business Agent of the International Union of Operating Engineers, ("IUOE") went to Bob Kent's business. Id. at 5.

**Plaintiff's Response**: Admit in part and deny in part. Admitted that on or about July 26, 2022, Lawrence Bell, a Business Agent of the International Union of Operating Engineers ("IUOE"), went to Bob Kent's business.

Deny Bob Kent donated the dogs to Elmore. **Pl. Ex. 1, Elmore Dep. 212:4-12**.

Deny Obermayer's assertion that all the witnesses were credible except for two people, Elmore and Lt. Langan, both of whom the Obermayer attorneys and Chief Whitney had sought to terminate over the past year and a half, and which is documented in the record. **Pl. Ex. 11, 2/14/2024 Obermayer Report at Pg. 18 ¶3; Pl. Ex. 25, 6/12/2023 Obermayer Memo to Falls Township Supervisors; Pl. Ex. 55, 1/27/2023 Memo from Whitney to Board of Supervisors; Pl. Ex. 14, 12/2/2022 Email from Whitney to Elmore with Loudermill Notice.**

48.     An argument ensued between the two men, 911 was called, and Plaintiff responded to the scene. Before Plaintiff arrived, Kent blocked Bell's car on the property so he could not leave. Plaintiff met with both Kent and Bell and ultimately arrested Bell and charged him with harassment, physical contact, defiant trespass, simple assault, and terroristic threats. Id. at 5.

**Plaintiff's Response**: Denied. Mr. Kent called 911. Elmore responded. Elmore and the two men discussed the situation. Mr. Kent said he told Mr. Bell numerous times to leave his property, but Mr. Bell refused. Mr. Bell hit Kent's arm, striking the visor he was wearing and blocking his vision. Mr. Kent said he feared a further assault was imminent. While still on the scene with Mr. Kent, Elmore watched Mr. Bell leave the scene and then drive by and make

a shooting gun gesture over the roof of his car. **Pl. Ex. 30, 7/26/2022 Falls Township Incident Report regarding Bell and Kent**.

49.     Plaintiff submitted a Police Incident Report and an unsigned/undated Affidavit of Probable Cause which was provided to the Investigators. Critically, these documents contained several concerning omissions:

> Although Kent confirmed that Officer Elmore met with Bell for a period of time (Officer Elmore estimated between 15 and 20 minutes during this interview), neither the Form nor the Affidavit contains any information from Bell concerning his perspective of what occurred, including Kent preventing Bell from leaving by blocking in his car. However, Officer Elmore included in both documents that Bell made a finger gun motion, which Kent did not mention to Lt. Clark and Sgt. Reeves as having occurred.

Id. at 11.

**Plaintiff's Response**: Denied. The original Affidavit of Probable Cause was filled out, signed, and dated and given to the Criminal Clerk at the Courthouse. The unsigned/undated Affidavit for Probable Cause that Obermayer reviewed was likely generated by the Falls Township Police Department's record system, where the document was created and saved, but it was unsigned because that occurs at the District Court in front of the Criminal Clerk. **Pl. Ex. 10, Elmore Affidavit ¶34**.

On the day Mr. Elmore wrote the report, Mr. Bell did not assert any counterclaims. The only issue Mr. Bell was concerned with was his right and ability to return to Mr. Kent's property and continue his efforts to recruit for the union. This had nothing to do with the criminal offenses Elmore was investigating. **Pl. Ex. 10, Elmore Affidavit ¶33.**

The Investigators noted that these omissions carried significant implications and could be seen as Plaintiff intentionally favoring Kent and his employees which raised concerns about his impartiality and adherence to professional standards. Id. at 12. Additionally, it left "open

whether the arrest was an attempt to dissuade Bell from meeting with Kent's workers and protect Kent's business from being organized." Id. at 12.

**Plaintiff's Response**: Denied. Nothing was omitted from the report. Mr. Bell did not make any counterclaims on the day the report was written. Mr. Bell appeared at his first preliminary hearing with an attorney and a written complaint against Mr. Kent. Elmore referred Mr. Bell and his attorney to the Assistant District Attorney assigned to his case, and the ADA asked to postpone the preliminary hearing so he could investigate Mr. Bell's allegations against Mr. Kent.  An investigation was conducted, all charges were left in place, and a new preliminary hearing was set. Eventually, Mr. Bell pled guilty to the same charges at a reduced grading. **Pl. Ex. 11, Elmore Affidavit ¶35.**

50.    Not only was the behavior alarming given the transparency expected of law enforcement, it was also a clear violation of township policies. Falls Township Police Department Policy #2.4.18 states, in its entirety, that:

> **A.** No member or employee, regardless of position or rank, will accept any bribes (money or gifts) or gratuities that are meant to alter your judgment and conduct, to neglect your duty, resulting in the furtherance of, or overlooking of, any criminal act or acts, or hindering any investigation into criminal activity or further received to give one favored treatment or special attention.
>
> **B.** Any member solicited to receive or be given any bribe or gratuity must report that offer or solicitation,  in writing by the filing of a police report to be forwarded promptly to the divisional commander and the Chief of Police/Director.
>
> **C.** Any member knowing of another member or employee, sworn or civilian, who has received or accepted any bribe or gratuity or is engaged in any criminal activity, must report those circumstances immediately to the divisional command officer and the Chief of Police/Director.

Id. at 16. Section A.2 of Falls Township Police Department Policy #3.6.1 states in relevant part:

> Canines will be obtained from a kennel or other supplied with a verifiable record of satisfactory performance in providing dogs and training to other law enforcement agencies. Any canine that is approved for purchase by the department will, prior to acceptance, have a certificate or letter of good health issued by a licensed veterinarian authorized to conduct examinations and certify the physical and emotional condition of the dog.

Id. at 16. Section G.1 states in relevant part:

> Certain requirements must be met in order to ensure that the [K-9] team meets a high level of service readiness before a canine team is placed on operational status. The certification process will be conducted by a law enforcement dog trainer with at least three (3) years of experience and having completed a forty-hour course dog training and evaluation. This certification process should be performed at least annually during the service life of the canine team.

Id. at 16.

**Plaintiff's Response**: Admit the Policies are accurately cited.

Deny Department Policy #2.4.18 was violated by Elmore. Elmore has stated from the very beginning he rescued the two dogs from Kent so that they would not be sent to a shelter and ultimately euthanized. **Pl. Ex. 1, Elmore Dep. 212:4-12.**

Denied Elmore violated Section A.2 of Falls Township Police Department Policy #3.6.1. Defendant **admitted** that Elmore **did not** violate Section A.2 of Falls Township Police Department Policy #3.6.1. **Pl. Ex. 28, Plaintiff's Request for Admission ¶101; Pl. Ex. 29, Defendant's Response to Plaintiff's Request for Admission ¶101**.

51.    The Investigators concluded that by their actions and failure to report, Lt. Langan and Plaintiff had violated Township Police Department Policies, specifically Policy #2.4.18 on Gratuities and Bribery and Policy #3.6.1 regarding the K-9 Unit.

> Furthermore, it is important to consider the issue of lying during the investigation. Throughout the investigation, the narrative surrounding how Officer Elmore acquired the dog has continuously changed. Initially, Lt. Langan agreed with Kent's letter to the Township, which stated that the dog was donated. Kent also confirmed this during conversations with Lt. Clark and Sgt. Reeves, affirming that Oakley was indeed a donation with a value between $8,500 and $11, 500. However, as Lt. Langan realized that accepting and not reporting the donation violated policy, he began referring to the dog as a gift to alter the perception. During Officer Elmore's interview, he characterized Oakley as a rescue for the first time. These shifting explanations and attempts to manipulate the truth demonstrate a pattern of misconduct and deception, which is consistent with past inappropriate behavior.

*Id.* at 24.

**Plaintiff's Response**: Admit in part and deny in part. Admit that the Obermayer Report is accurately quoted, but fails to identify who lied.

Deny that Elmore lied to the investigators. Elmore spoke to the Obermayer attorneys only once on January 2, 2024, about how he acquired the two dogs. **Pl. Ex. 11, 2/14/2024 Obermayer Report at Pg. 13**. The report states:

> Although he did not say it, Officer Elmore characterized taking Oakley as a "rescue". Officer Elmore's characterization of how he got the dog was the third version the Investigators had heard of how Oakley came to Officer Elmore. Investigators were first told that Kent "donated" a dog to Officer Elmore in the summer of 2023. Then, Investigators were told the dog was a gift. Kent sent a letter to the Township confirming he had made a donation.
> In addition to characterizing Oakley as a rescue, Officer Elmore reiterated that a dog like Oakley is of little to no value until it is trained. In short, Officer Elmore implied that there was nothing to report because he rescued Oakley, which was of no value until he trained it.

*Id*.

Additionally, Melissa Atkins, the attorney from Obermayer who investigated Elmore and wrote the February 14, 2024, report cited by the Defendant, testified that nowhere in the report does it state

that Elmore changed his story about rescuing the dogs from Kent.**Pl. Ex. 71, 6/4/2025 Elmore's Arbitration Part I Melissa Atkins, Esq. Testimony at 48:1-20.**

**Atkins has also admitted that** nowhere in the report does it say that Elmore described receiving Oakley as a donation. *Id.* at **49:8-14**. She also testified that nowhere in Obermeyer's report does it say Elmore during his interview he said that Oakley was a gift. *Id.* **at 49:15-22**. Atkins also admitted that the report nowhere states that Elmore lied during the investigation. *Id.* **at 51:23-52:2**.

Deny Elmore violated Falls Township Police Department Policy #3.6.1. The Defendant states in its answers to Plaintiff's Request for Admission that Elmore **did not** violate Section A.2 of Falls Township Police Department Policy #3.6.1. **Pl. Ex. 28, Plaintiff's Request for Admission ¶101; Pl. Ex. 29, Defendant's Response to Plaintiff's Request for Admission ¶101.**

Deny that Oakley was valued at $8,500 to $11,500 when Elmore rescued him. This was a fact Obermayer made up, as demonstrated by testimony from attorney Melissa Atkins. According to Atkins, Obermayer's attorneys did not inspect the dogs Elmore rescued or have them valued. **Pl. Ex. 71, 6/4/2025 Elmore's Arbitration Part I Melissa Atkins, Esq. Testimony at 40:20-24**. Atkins admitted that when Elmore rescued the dog known as Oakley, "he was not a trained police dog." *Id*. **at 41:1-5**.

52.     The Investigators concluded that the "donation" of the dog was not an isolated incident, and that both Lt. Langan and the Plaintiff had previously lied or ignored policies when it served their purposes. Additionally, they noted that when confronted with the violation or untruthful statements, both individuals would refuse to acknowledge or appreciate the gravity of their misconduct. "Based on a comprehensive review of all available

information, including witness interviews, documents, video evidence, correspondence, and policy analysis", Obermayer recommended that Plaintiff be terminated. Id. at 26.

**Plaintiff's Response**: Denied. The evidence shows that the Obermayer review was not comprehensive, that Obermayer ignored key issues and failed to interview key witnesses, in particular Kent and Bell. **Pl. Ex. 11, 2/14/2024 Obermayer Report**. The Obermayer Report is contradicted by testimony provided by Township Manager Mathew Takita. Mr. Takita admitted that, as of August 2023, Elmore had a clear record and that the investigation was supposed to be just about the dogs. Takita testified:

Q. Right. So this investigation should only be about the canines, it shouldn't have been about any previous issues or any previous write-ups that Mr. Elmore had had, because those were all clear, correct?
A. Correct. Yes.
Q. Right. So they shouldn't be expanding their investigation beyond how they got the dogs, correct?
MR. HATCHETT: Objection to the form of the question.
BY MS. BENFER:
Q. Well, was it your understanding that they shouldn't be expanding the investigation beyond how these dogs were obtained by Mr. Elmore?
A. My understanding is the investigation was supposed to be on the canine incident, the donations incident.

Q. That's it?
A. Correct.

**Pl. Ex. 5, Takita Dep. 175:6-177:2**.

53.    On February 20, 2024, Chief Whitney provided Plaintiff with timely notice

of the potential for disciplinary action against him in the form of a Loudermill Notice. See Loudermill Notice 2/20/24, attached hereto as Exhibit J.

**Plaintiff's Response**: Admitted Elmore received his Loudermill Notice from Chief Whitney on February 20, 2024.

54.     The purpose of the letter was to describe the evidence obtained during the Township's investigation, and to provide Plaintiff with the opportunity to offer any and all information that would cause the Township to reconsider recommending discipline or cause it to consider a lesser penalty that the one being contemplated. The Notice described in detail the investigation involving the acquisition of Oakley, Plaintiff's prior conduct that warranted discipline, and a list of FTPD Discipline Code and Policies that Plaintiff was alleged to have violated. Id.

**Plaintiff's Response**: Denied. The letter does not describe the investigation in detail. The Investigation Report is 25 pages, while the Loudermill notice was 3 pages. **Pl. Ex. 11, 2/14/2024 Obermayer Report; Pl. Ex. 40, 2/20/2024 Elmore's Loudermill Notice**.

The Loudermill Notice issued by Chief Whitney contains numerous false and misleading statements, such as the following:

**Paragraph 1** accused Elmore of giving varying accounts of how he obtained the dogs, including "donated the dog to the FTPD," "a gift," and "rescue." As discussed above in Elmore's response to **¶52**, Investigator Melissa Atkins stated that Elmore did not provide varying accounts. Elmore said the dogs were rescued. Whitney's statement in the Loudermill Notice is FALSE. *See* **Plaintiff's Response to ¶52**.

**Paragraph 1** Kent asserted that donating Oakley saved the Township $10,000.

Kent's letter to the Township regarding the dogs does not state this, and Obermayer never inquired into the dogs' value when Elmore rescued them. **Pl. Ex. 38, 12/8/2023 Robert Kent's Letter, undated.** See above, Elmore's Response to **¶52,** discussing the investigators never having Oakley's value assessed.

Paragraph 2. Elmore is accused of omitting the incident on Bob Kent's property involving Robert Kent and Lawrence Bell on 7/26/2022; however, Chief Whitney never spoke to Elmore about the incident. **Pl. Ex. 30, 7/26/2022 Falls Township Incident Report regarding Bell and Kent; Pl. Ex. 2, Whitney Dep. 213:20-214:1**. Obermayer attorneys did not speak to Lawrence Bell. *Id.* Notably, Lawrence Bell ultimately pled guilty. **Pl. Ex. 2, Whitney Dep. 223:19-23.** Chief Whitney testified that his knowledge of how Elmore handled the incident involving Kent and Bell came from a conversation with Lt. Clark that did not occur until many months after Bell's guilty plea. *Id.* **at 221:17-24; 224:3-14.**

Lt. Clark attended Mr. Bell's preliminary hearing on February 28, 2023. **Pl. Ex. 28, Plaintiff's Request for Admission ¶62; Pl. Ex. 29, Defendant's Response to Plaintiff's Request for Admission ¶62**. Plaintiff's Request for Admission ¶63 asks the Defendant to "Admit that between February 28, 2023, and December 2023, Lieutenant Clark did not raise any issues with Plaintiff's arrest report of Lawrence Bell on July 26, 2022." While Defendant did not admit this fact, it stated, "As of this Response, Defendant's Representatives [Chief Nelson Whitney] and Matthew Takita] do not have an independent recollection of whether Lt. Clark raised any issues with Plaintiff's arrest report of Lawrence Bell on July 27, 2022." Chief Nelson Whitney signed the Verifications of the Defendant's Answer to Plaintiff's Request for Admission. **Pl. Ex. 28, Plaintiff's Request for Admission ¶63; Pl. Ex. 29, Defendant's Response to Plaintiff's Request for Admission ¶63.**

The Defendant admits it never took disciplinary action against Elmore for his handling of the incident involving Kent and Bell on July 26, 2022. **Pl. Ex. 28, Plaintiff's Request for Admission ¶66; Pl. Ex. 29, Defendant's Responses to Plaintiff's Request for Admission ¶66**.

**Paragraph 3** accuses Elmore of making statements to the media that contradict facts in an unidentified incident report and his inclusion in the last round of promotional exams in June 2023. The cited article demonstrates that both of Chief Whitney's allegations are false. The Township clearly agreed, because after Elmore was terminated in February 2024, the Township Newsletter published the article in the Falls Township Spring/Summer 2024 Newsletter. **Pl. Ex. 31, 1/8/2024 Levittown Article; Pl. Ex. 32, Falls Township Spring/Summer 2024 Newsletter**.

The Loudermill Notice also identifies Prior Similar Misconduct. However, this was a violation of Falls Township Police Department Policy #2.8.1, which sets forth a guide "in administering fair and uniform penalties for violations and policies of Falls Township Rules and Regulations." **Pl. Ex. 33, Falls Township Police Department Policy #2.8.1**. Notably, the policy includes a "Reckoning Period" that states, "The same type of offense committed after the Reckoning Period expires, counts as a first offense." As of August 8, 2023, Elmore had a clear record. **Pl. Ex. 5, Takita Dep. 175:15-20**.

- Theft of Time – The Board of Supervisors cleared Elmore of this Allegation on April 7, 2023. **Pl. Ex. 56, 4/7/2023 Email from Takita to Elmore**.

- Traffic Ticket Quota – Chief Whitney Nelson was investigated for implementing an illegal traffic quota as part of the investigation of the No Confidence Vote in 2022 by the Falls Township Police Officers. **Pl. Ex.**

**34, PAFT Letter of No Confidence to the Board of Supervisors**.

- August 8, 2023: Counseled for Inappropriate Harassing. Mr. Harran investigated the allegations. On August 8, no disciplinary action was brought. As of August 8, 2023, Elmore had a clean record according to Township Manager Matthew Takita. **Pl. Ex. 5, Takita Dep 175:15-20**.

55.      On February 23, 2024, Plaintiff provided a written response to the Notice. See Plaintiff Loudermill Response, 2/23/24, attached hereto as Exhibit K.

   **Plaintiff's Response**: Admitted.

56.      That same day, Plaintiff filed another Charge of Discrimination with the EEOC and Pennsylvania Human Relations Commission ("PHRC"), asserting retaliation and discrimination because he had filed a Charge of Discrimination in September 2023. Regarding the investigation involving the dogs, Plaintiff wrote: "The subject of this investigation is so preposterous that it is difficult to believe anyone could think that I engaged in wrongdoing when I adopted two dogs that otherwise would have gone to a shelter." See Charge of Discrimination, 2/23/2024, attached hereto as Exhibit L.

   **Plaintiff's Response**: Admit the quote was included in the Plaintiff's Second Charge of Discrimination he filed against the Township for retaliation.

57.      On February 26, 2024, Obermayer presented its "Final Investigation Report" to the Township's Board of Supervisors during an Execution Session. See John Palmer Dep. Transcript at 91: 1-6, attached hereto as Exhibit M.

**Plaintiff's Response**: Admitted.

58.     The Chief of Police or the Township Manager do not have the authority to terminate a police officer. Terminating a police officer requires a decision made by an elected body, the Board of Supervisors, at a public meeting. Id. at 10: 7-14.

**Plaintiff's Response**: Admit in part and deny in part. Admit the Board of Supervisors voted on the Chief of Police's recommendation. Deny the Chief didn't have any role in Elmore's termination. According to the Obermayer Report, the Chief of Police was the Complainant, resulting in the complaint being brought before the Board of Supervisors for consideration of termination. **Pl. Ex. 11, Obermayer Report at Pg. 5**, **Pl. Ex. 40, 2/20/2024 Loudermill Notice from Whitney to Elmore.**

59.     On February 26, John Palmer, Jeffry Boraski, Erin Mullen, and Brian Galloway all voted in favor of terminating Plaintiff. *See* Exhibit M**,** John Palmer Dep. Transcript at 82: 2-4; Jeffry Boraski Dep. Transcript at 37: 22-24, attached hereto as **Exhibit N,** Erin Mullen Dep. Transcript at 75: 22-24, attached hereto as **Exhibit O.**

**Plaintiff's Response:** Admitted.

60.     Jeffry Dence was the sole vote against termination. Jeffry Dence Dep. Transcript at 96: 14-15, attached hereto as **Exhibit P.**

**Plaintiff's Response:** Admitted.

61.     On February 28, 2024, Takita notified Plaintiff of his termination. *See*

Termination Letter, 2/8/26, attached hereto as **Exhibit Q.**

       **Plaintiff's Response:** Admitted.

                                            Respectfully submitted,

                                            **HARDWICK BENFER, LLC**

                                            */s/ Tiffanie C. Benfer*
                                            Tiffanie C. Benfer (PA 202096)
tbenfer@hardwickbenfer.com
2003 S. Easton Road
Doylestown, PA 18901
(215) 230-1912

Mark Risk, PC
*/s/ Mark Risk*
Mark Risk (Pro Hac Vice /NY 1980474)
mdr@mrisklaw.com
60 East 42nd Street
47th Floor
New York, NY 10165
(212)682-4100
*Attorneys for Plaintiff*

Dated: <u>July 20, 2026</u>