IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD ELMORE,                    :

          Plaintiff(s),     : No. 2:25-cv-02076

          vs.                     :

FALLS TOWNSHIP, NELSON      :
WHITNEY FALLS TOWNSHIP
(Individual Capacity)       :
and MATTHEW TAKITA
FALLS TOWNSHIP              :
(Individual Capacity),

                                  :

          Defendant(s).     :


                     — — —

                  May 19, 2026
                     — — —


     Deposition testimony of EDWARD MICHAEL ELMORE,

taken stenographically before ANGELA NOVAK, a Court

Reporter and Notary Public of the Commonwealth of

Pennsylvania, taken at Marshall Dennehey, PC, 2000

Market Street, Suite 2300, Philadelphia, PA,

commencing at 9:57 a.m.



                     — — —

               U.S. Legal Support
          1818 Market Street, Suite 1400
          Philadelphia, Pennsylvania 19103
                  877-479-2484

Exhibit 1

Page 2

APPEARANCES:

HARDWICK BENFER, LLC

BY:  TIFFANIE C. BENFER, ESQUIRE

  2003 S. Easton Road

  Suite 308

  Doylestown, Pennsylvania 18901

  Tbenfer@hardwickbenfer.com

  Representing the Plaintiff(s)

MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

BY:  JAHLEE J. HATCHETT, ESQUIRE

  2000 Market Street

  Suite 2300

  Philadelphia, Pennsylvania 19103

  215-575-2787

  Jjhatchett@mdwcg.com

  Representing the Defendant(s)

Page 3

INDEX

WITNESS                                    PAGE

EDWARD MICHAEL ELMORE

  EXAMINATION BY MR. HATCHETT        4


EXHIBITS


ID              DESCRIPTION           PAGE

Elmore Exhibit 1   Amended Complaint      99

Elmore Exhibit 2   Memo                  148

Elmore Exhibit 3   Memorandum            167

Elmore Exhibit 4   DEF_ESI_00753         170

Elmore Exhibit 5   Memorandum Defense 0699   179

                   -0700

       (EXHIBITS ATTACHED HERETO)

Page 4

(It is stipulated by and among counsel for representative parties that the reading, signing, sealing, and certification are waived, and that all objections of any nature except as to form of the question are reserved until the time of trial.)

— — —

EDWARD MICHAEL ELMORE, 330 Laurel Mountain Road, Madisonville, TN 37354, having been first duly sworn, testified as follows:

EXAMINATION BY MR. HATCHETT:

Q.    Mr. Elmore, good morning.  How are you?

A.    I'm okay.

Q.    And I'm sorry if I just missed it, but can you put your full name on the record?

A.    Edward Michael Elmore.

Q.    And, Mr. Elmore, how old are you currently?

A.    Currently 49.

Q.    What's your date of birth?

A.    January 7th of 1977.

Q.    Mr. Elmore, today you understand that you are here for a deposition in a lawsuit that you filed against Falls Township?

A.    Yes.

Page 5

Q.    As you sit here today, are you under the influence of anything that would prevent you from understanding what's going on today?

A.    No.

Q.    Are you under the influence of anything generally, medications or anything otherwise?

A.    No.

Q.    Prior to today, or even today, have you done anything to prepare for your deposition?

A.    What window are we looking at?

Q.    Just, say, today or prior.

So have you done anything specifically to prepare for the deposition?

A.    I spoke with counsel previously before some of the other depositions, nothing recently though.

Q.    Okay.  And I'm never going to ask you about anything that you and your attorney discussed.  I just want to put that out there.

Have you been part of a deposition in the past?

A.    I have.

Q.    So you understand that the way a deposition works is I'm going to be asking you

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 6

some questions.  Your attorney may or may not ask you questions.  For the purpose of the record, we have to try to speak one at a time so we have a clear record.

Do you understand that?

A.    Yes.

Q.    If I ask you a question that you don't understand, I just need you to let me know that you don't understand the question.  Otherwise, if you provide a response, we all will assume that you understood the question and the response that was given was the response you intended to have on the record.

Do you understand that?

A.    Yes.

Q.    If at any point in time -- I don't know if we'll be terribly long today, Mr. Elmore -- but if at any point in time you need a break, just let me know and we'll take a break.  I'll just ask that if there's a question that you haven't answered yet, please answer the question before we go on the break.

Do you understand that?

A.    Yes.

Q.    Any problems with that?

Page 7

A.    No.

Q.    Are you currently employed, Mr. Elmore?

A.    I am not.

Q.    When was the last time that you were employed?

A.    When I was terminated by Falls Township.

Q.    So that would have been back in 2024?

A.    Yes.

Q.    Do you recall the last date of your employment with Falls Township?

A.    I believe it was the end of February.

Q.    Since February '24 -- does that sound right?

A.    Sounds about right.

Q.    I wouldn't hold you to that.

A.    If that's the date that you have.

Q.    Yeah.  Have you done anything since February of 2024 to search for employment?

A.    Well, after February of '24, we had a grievance process to restore my employment with Falls Township.  During that time, I was fully

Page 8

certain that I would be restored to employment at Falls Township.  After the grievance process ended, then, yes, I did begin to search for other employment.

Q.    Let's get this clear.  As it relates to the arbitration, you were not successful at the arbitration; is that right?

A.    The issues were never addressed in the arbitration and then I was not returned to Falls Township; correct.

Q.    So the arbitration wasn't in your favor; correct?

A.    It was -- yeah, it didn't help me out any.

Q.    So what you are saying is the arbitration didn't discuss the substance of whatever your grievance was?

A.    Yes.

Q.    I'm sorry, Mr. Elmore.  I just want to go back for a moment and get more biographical information about you.

For the purpose of the record, how do you identify racially?

A.    White male, Caucasian.

Q.    Are you married?

Page 9

A.    I am married.

Q.    Do you have any dependents?

A.    Children?

Q.    Yes.

A.    Yes.

Q.    Or anything that you consider dependents.  Sometimes there are adult dependents.

A.    Adult children, yes.

Q.    How many children do you have?

A.    I have three children.

Q.    Can you tell me their ages?

A.    My son, Michael, is the youngest; he's 14.  Amanda is my middle child; she recently turned 16.  And Ashley is my oldest; she is 16.

Q.    Does your significant other work?

A.    She does.

Q.    What does she do?

A.    She does -- it's a medical chart review.  I believe it's CDI.  I don't know what the abbreviation stands for; it's clinical something investigation or something.

Q.    Where's that located?

A.    She works for a company based out of Florida and I believe she's currently contracted out to Wyoming or New York.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 10

Q. Do you live together?

A. We do.

Q. Have you since -- well, throughout your marriage, have you lived together?

A. Yes.

Q. I'm not trying to get too deep, but just trying to understand in terms of the finances of the household, so these questions are guided toward that.

Do you understand?

A. I do.

Q. So you said you and your significant other have been married throughout the entire marriage?

A. Yes, we've been married since we've been married.

Q. No. Have you been living together throughout the entire marriage?

A. Yes. To be accurate, there were times during transitions of moving where we didn't live together for a period of time.

Q. So let me narrow that down. Going forward to about let's say 2022 up until today, were you both habitating together?

A. There was a period of time after I

Page 11

was fired by Falls that we lost our home. So -- I'm sorry.

Q. Take your time.

A. There was a period of time that we were preparing to sell our house that she and the children had moved down to where we would end up living ahead of me and keep the house maintained for showings.

Q. That's the only period since 2022 that you all would not have been habitating together?

A. There were periods of time when we were purchasing our current home where I would go down ahead and receive deliveries, unpack some furniture, prepare for the rest of the family to move down. So I was back and forth during that time, as well.

Q. I'm going to put it like this: Since 2022 until today, you and your wife were never separated, were you?

A. (No verbal response.)

Q. Legally separated?

A. No.

Q. Your wife, since going back to that 2022 period, was she employed at that point in

Page 12

time or did she have to get a job after you were terminated?

A. No, she was employed.

Q. Was that the same job that she is currently doing?

A. The nature of her work was contract work, so I don't know the specifics of the different contracts she was contracted for. It was the same nature of work throughout the same time, but I don't know that I can say the same company or the same contracts. I don't have that at hand.

Q. That's fine. But, nonetheless, gainfully employed since 2022?

A. Yes.

Q. Now, I was asking you about whether or not you were able to find employment since 2024 when you were terminated, and your response was no; is that correct?

A. That's correct.

Q. I was just wondering what, if anything, have you been doing to seek additional employment?

A. I've applied for and participated in different testing processes for police work in

Page 13

Montgomery County, in Bucks County, and also down in Tennessee in Monroe County. And then I've also recently applied for non-law-enforcement work down in Tennessee.

Q. Can you tell me briefly or vaguely the dates when you submitted any applications?

A. The consortium tests would have been whenever they were posted to open for Montgomery and Bucks. Bucks was recently. I don't want to guess at dates.

Q. You can ballpark it.

MS. BENFER: I'm going to instruct the witness not to guess.

MR. HATCHETT: You can ballpark, though.

MS. BENFER: If you can have the ability to do so.

THE WITNESS: I would say, again, not having the information in front of me, within the last year-ish, give or take.

BY MR. HATCHETT:

Q. Within the last year, you would have submitted all of the applications you just mentioned?

A. Again, I know if I looked at the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 14

email correspondence, I could find dates; but I don't have that in front of me.

Q.    You just mentioned email correspondences.  Is this in connection with job applications, the email correspondences?

A.    Some of them will send emails saying thank you for your submission.

Q.    Did you provide those to your attorneys in this case?

A.    I don't recall.

Q.    Mr. Elmore, I'm going to ask that you give a good faith effort to look for any emails that you just mentioned or referenced and give those over to your attorney as soon as you can.

Is that okay?

A.    Sure.

Q.    Other than email correspondences that you mentioned, do you have anything else regarding any other applications that you would have submitted for any other jobs?

A.    As far as documents?

Q.    Documents.  Applications, documents, or just generally trying to find a job.

A.    I believe there was some sort of a

Page 15

web form or web --

Q.    Based?

A.    -- based application.

Q.    Correct me if I'm wrong, but it seems like out of all of the applications that you submitted, all but one of them was for law enforcement.

Is that fair to say?

A.    Yes.  I just recently applied for non law enforcement.

Q.    Have you been outright rejected or are you still going through a hiring process?

MS. BENFER:  I'm going to object to the form of the question.

MR. HATCHETT:  Based on what?

MS. BENFER:  What job are you referring to?

MR. HATCHETT:  Any of the jobs.

Mr. Elmore, I'll remind you, your attorney may object and that's fine.  For the most part, I don't think I will ask you anything that is going to implicate a privilege or a privacy right, but if you don't understand a question, you just let me know.

BY MR. HATCHETT:

Page 16

Q.    So now, again, I was trying to ask you in terms of the applications that you submitted for any of them that you referenced in the past year, do you know if you were outright rejected or if you are still waiting?

A.    I do know one that I have been outright rejected for, yes.

Q.    The other ones, do you know the status of them?

A.    I do not.

Q.    As far as the one you were rejected for, do you know if that has or had anything to do with your termination from Falls Township?

A.    I believe it does.

Q.    I'm asking you if you know.

When you say you believe it does, what is that based on?

A.    It was an interview -- I made it to an interview and then I was rejected after the interview.

Q.    The interview was with a police department?

A.    Yes.

Q.    Do you recall which police department?

Page 17

A.    Montgomery Township, I believe.

Q.    Is that here in Pennsylvania?

A.    Montgomery County.  Pennsylvania, yes.

Q.    And you said you were able so make it to an interview portion as part of that application?

A.    Yes.

Q.    You didn't have to do a PT test for that, did you?

A.    I did not.

Q.    So you were applying just as a lateral for that position?

A.    Excuse me?

Q.    Were you applying for a lateral position?  A lateral police officer?

A.    I believe I was applying for a police job.

Q.    So not a police officer?

A.    Yes, a police officer.

Q.    Do you know what a lateral police officer is?

A.    Explain it to me.

Q.    I'm just asking you.  If you don't know, you just don't know.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 18

A.    A lateral police officer?  I don't know that I've used that term or heard of that term.

Q.    You've never heard that term when one officer goes to work for a police department for some time and goes to another police department?

A.    You can get hired by other departments, yes.

Q.    What would you call that?

A.    Applying for another police department.  It's common.

Q.    The term -- I'm going to refer to that as a lateral position.  Okay?

A.    Okay.

Q.    So with that understanding, you were just applying for a lateral position for that police department?

A.    (No verbal response.)

Q.    What position were you applying for?

A.    Entry-level patrolman for --

Q.    Now -- I didn't mean to cut you off.  Were you done?

A.    -- for a police department.

Q.    And you said you made it to an

Page 19

interview process; correct?

A.    I believe it was Montgomery Township, yes.

Q.    And your testimony not long ago was that you believed you were not selected as a result of your termination from Falls Township.  You with me?  Is that correct?

A.    Yes.

Q.    Now, other than the fact that you had an interview and you were not selected after the interview, is there anything else that makes you think your termination from Falls Township was associated with your rejection?

A.    As far as documentation?

Q.    No, just anything.  You said your belief.  And correct me if I'm wrong, I believe your testimony was that your belief was that you were not hired because of your termination from Falls Township; is that right?  Did I get that right?

A.    Yes.

Q.    And I'm just asking you, what is your belief based on, other than the fact that you had the interview and you were rejected after the interview?

Page 20

A.    Well that's what it is based off of.

Q.    I don't understand your response.  When you say that's what, what is that based off of?

A.    You said other than that, what is my belief based.  That is what my belief is based on.

Q.    Did they ask you anything about your termination in the interview?

A.    Yes.

Q.    And what was your explanation in terms of your termination?

A.    Went into some brief detail about reporting the discrimination within Falls Township, being retaliated against by the Township and then subsequently terminated.

Q.    Let me ask you:  What is your belief of why you were terminated by Falls Township?

A.    I reported discrimination in the hiring process to the Township and then I cooperated with other officers who were subject to that discrimination and then I was terminated for it.

Q.    When you say "cooperated with other officers," what officers are you talking about?

A.    Officer Crozier.

Page 21

Q.    Just because we have a stenographer, is that C-R-O-Z-I-E-R?

A.    Yes.

Q.    Anyone else?

A.    Officers Langan and Rhodunda.

Q.    Okay.  Anyone else?

A.    Also previously Diviney, now Nicole White.

Q.    Is that it that you are referring to when you say you cooperated with other officers?

A.    Yes.

Q.    Now we've been talking about Falls Township for a little bit.  I just want to go back for a second.

You worked for Falls Township prior to your termination in 2024 for quite some time, yes?

A.    Yes.

Q.    Can you take me back -- and I don't want to go back way too far, but did you have any type of full-time employment prior to working for Falls Township?

A.    Yes.

Q.    Are we talking teenage years?

A.    I was hired at 23.  I began the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 22

testing process I believe at 21.

Q. Let me ask it this way: Prior to working for Falls Township, were you ever disciplined by any other job?

A. No.

Q. Were you ever terminated by any other job?

A. No.

Q. Now I'm going to ask you about Falls Township.

How did you first find out about Falls Township Police Department?

MS. BENFER: I'm going to object to the form of the question.

Are you asking about when he found out Falls Township exists or are you asking when he found out about the application process?

MR. HATCHETT: Do you understand my question?

THE WITNESS: It's incredibly broad, how did I find out about --

MR. HATCHETT: Now it's broad. I'm going to ask to the extent that you cannot have speaking objections, please don't do that. Because now where he was about -- I'll represent

Page 23

on the record where he was about to answer, now he doesn't understand.

BY MR. HATCHETT:

Q. So my question was how did you find out about the Falls Township Police Department. We've established at some point you got hired by Falls Township; correct?

A. Yes.

Q. Tell me how that happened. Do you understand that?

A. Well, I grew up in Falls Township.

Q. And then what?

A. (No verbal response.)

Q. You grew up in Falls Township and you just applied for the department?

A. (No verbal response.)

Q. What made you want to be a cop?

A. Okay. Probably when I was -- I'm trying to get an age range for you -- maybe 12 or 13, the neighbor next door moved and the new neighbor was a Falls Township police officer, John Yeager. He moved in. And he would drive his police van home for lunch, breaks, and have lunch at home. I had never really known any police officers or how you would even, like, entertain

Page 24

getting into the job. It seemed almost exotic as a 12-year-old, I guess. I think at some point I would have conversations with him in the driveway. He may have been the one who told me they were hiring, that there's an application process.

Q. Based on that, did you submit an application?

A. I did.

Q. Tell me about how that went.

A. I would it been back in 1997-ish. I remember there was a written portion; I believe it was at Pennsbury High School. Several hundred people applied. I don't remember if the physical agility was the same day or not. I mean, we're going back --

Q. Some time.

A. A very long time.

Q. Let me ask you this way: Whether there was physical agility aspect of it or a written aspect of it, whatever the case may be, you were eventually hired; correct?

A. Correct.

Q. Can you tell me once you were hired, can you just take me through your career up until about 2021?

Page 25

A. I was notified that I would be hired in 1999. I was sworn in in the end of 1999. I had to wait for an academy to occur, a police academy. They didn't put me on the payroll until that began. I believe it was January 13th of 2000. I was then officially hired as an employee, but I had to go attend the municipal academy at Pennsylvania State Police in Hershey. So I would commute from Sunday -- check in Sunday night and we would live there in dorms until Friday evenings. I believe initially we had to stay even weekends until they gave us permission to go home on the weekend. I completed the academy class there. I believe back then it was only maybe four months, so maybe April or May of 2000 I would have completed that. Started as a patrolman for Falls Township.

Q. Let me stop you there.

What would have been some of your duties as a patrol officer?

A. Falls Township, it's a medium-sized department, so generally everybody is working. The patrolmen would be assigned a sector or a chunk of the township at the beginning of their shift at roll call. You would be assigned a

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 26

vehicle to drive and then you would generally respond to calls for service that are dispatched to you by radio dispatch.

Q.    Mr. Elmore, when you say "a medium-sized department," how many officers generally -- how many officers, generally, does the township consist of, the police department?

A.    I know there's an exact number.  I don't want to guess at the exact number, but roughly 45 to high 40s, it should be.

Q.    So when you say "medium-sized," that's the number that you are referring to?

A.    Yes.  Comparable to what's around us, yes.

Q.    And, generally speaking, that size would have been -- the department would have been allocated for that size or at that capacity thought your entire tenure in the department?

A.    I don't know that I know the answer to that.  I don't know that I would know the owe official staffing manpower the entire time.

Q.    Well, would it be fair to say that throughout your tenure, the department never had a surplus of 50 or 100 officers?

A.    That's fair to say, yes.

Page 27

Q.    To the same extent, would it be fair to say the department was never as few as ten officers?

A.    That would also be fair to say.

Q.    So, generally, the department was around that 40-ish size; correct?

A.    Generally, I would expect from memory that it is roughly that size.

Q.    Unless you tell me that you worked for human resources at some point and you knew the exact number, I'm not going to hold you to the number as it relates to that.

So just going back, I was just trying to get an understanding of the size of the department.  And you were telling me about parole and just generally, I believe everyone's duty on parole at that -- I'm sorry --

MS. BENFER:  Patrol?

BY MR. HATCHETT:

Q.    -- patrol.  Would have been to basically be out on the street, so to speak; correct?

A.    Yes.

Q.    Anything else as it relates to your duties in patrol that you haven't spoke about at

Page 28

that point in time?

A.    I'm sorry.  I don't understand.

Q.    Sure.  Other than patrolling the streets, were you in any specialized units or anything like that?  And I'm talking about almost -- I'll call it right out of the gate -- once you get out of the academy?

A.    Out of the academy, no.

Q.    At some point in time -- so with that, would it be fair to classify and not minimizing it, just as a patrol officer?

A.    That would be accurate.

Q.    How long have you remained -- again, not minimizing it, but just a patrol officer?

A.    Just a patrol officer?  I know I was on SWAT for about 16 years.

Q.    Well, if you can tell me about that, because I'm going to assume, unless you tell me otherwise, that SWAT is not general patrol?

A.    Well, in Falls you don't stop being patrol when you pick up other duties.

Q.    How about that?  That's a good way to put it.

Did you pick up any additional duties outside of just being a patrol officer?

Page 29

A.    I did.

Q.    Can you just take me through that?  When did you start having additional duties placed on you as an officer?

A.    Again, for about 16 years I was assigned as a SWAT officer.  For the last ten years, I was assigned as a K9 officer.  Probably comparable to my time on SWAT, I was an instructor -- is that what we're looking into or?

Q.    I'm just asking about any additional duties.

A.    I was an instructor for several things.  I was assigned to that.  I was an explosives teacher.

Q.    How about this for SWAT?  Did you have to get any additional training?  Did you receive any additional compensation for SWAT?

A.    SWAT had a significant amount of additional training.  There was a specific SWAT -- they called it a SWAT school that you would have to attend just for basic SWAT.  There was also more advanced SWAT schools that we attended or I attended.  Hostage rescue aspects.  Then there wasn't an hourly wage increase, but there was a mandatory amount of overtime that came on with the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 30

SWAT duties.

Q.    And you remained on SWAT up until 2024 when you were terminated?

A.    Yes.

Q.    Other than SWAT, the other positions you mentioned, was that -- I know one position was a trainer.  Was there any additional compensation, mandatory overtime with your training responsibilities?

A.    Yes.

Q.    Tell me about that.

A.    I was assigned as an instructor for chemical munitions, including pepper spray, tear gas, as well as the flash-bang devices, the noise distraction devices, and impact munitions.  Having those within the department required periodic recertifications and retraining for the officers in the department that would use them and utilize them.  And as the instructor, it was my responsibility to conduct those trainings and recertifications.  So periodically -- I believe it was every three years -- I would have to go to a company-sponsored instructor course to be recertified as an instructor by the companies that manufacture them.  And then during the year, I

Page 31

would have the responsibility of recertifying and retraining the officers in Falls Township so that they could continue to carry and utilize the different chemical munitions and pepper sprays that we had available to us.

Q.    So you were one of those trainer people?

A.    I was classified as a instructor and then I would come in and train the rank and file.  And then also new hires would be required to go through initial training which was more extensive than the yearly updates.  So there was different versions of the training that I would have to basically make myself available to to train different officers at different times.  I don't know if that's...

Q.    No, that's fine.  I'm with you.

One of the other parts of the question that I asked about was additional compensation as a trainer.

Did you receive additional compensation?

A.    Most, if not all, of the training was outside of my schedule, so it all becomes overtime.

Page 32

Q.    Now, we talked about your other responsibilities as a trainer, other responsibilities as SWAT.

Did you have any other responsibilities other than those two?

A.    I was also a K9 officer for ten years.

Q.    Tell me how you first became a K9 officer.

A.    I can tell you about how I didn't first become a K9 officer.  I applied once before successfully applying and was not selected.  I applied a second time and I was selected as a K9 officer.  The position entailed an oral interview board.

Q.    Now you got to let me know which time you're talking about because you put out there two different times.

A.    Each time.  The first time I went through the process, I was not selected.  I believe it was Officer Lunquist was chosen.  And then another position became available and I applied for that and I was selected the second time.

Q.    Now let me ask you about the first

Page 33

time.  You brought up the first time as if there was something relevant as it relates to this current lawsuit.

Is there something --

MS. BENFER:  Objection to the form of the question.

BY MR. HATCHETT:

Q.    Is there something in connection with the first time you were not selected that connects to your current lawsuit?

A.    No.  I believed you asked about the process about becoming a K9 officer and to be thorough, the process began when I applied --

Q.    When you did not become one?

A.    Yeah, yeah.

Q.    Okay.  I'm sorry.  You were telling me the actual process when you were selected as a K9 officer.

It included -- what was the first step?

A.    There was an oral interview board.  I believe you had to respond that you were interested in it.  If you want to go back to the beginning there was --

Q.    That's fine.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 34

A.    It was being known that there was a position available and you would have to respond that you were interested.  And then you were scheduled for a time for the oral interview board where you would be questioned in an oral interview.

And then there was a practical application process, a day where you were assigned to go out and work with other officers, the K9s handled them, receive bites from the dogs, sort of a double-checking if it's really right for you.

Q.    I assume that that portion went well for you?

A.    The second time, yes.

Q.    We're talking about the time at this point -- let me be clear, we are talking about the time you were actually selected.

A.    Yes.

Q.    I don't want to know about your experience as a K9 officer when you weren't selected.

So moving forward from that point, you were actually formally selected, and started serving as a K9 officer.

Would that have been 2014?

Page 35

A.    '14, I believe March or April would have been the process it was occurring in.

Q.    Do you recall whether or not there was an actual policy with selecting K9 officers at that time?

A.    Policy with selecting K9 officers?  I don't recall.

Q.    Okay.  Nonetheless, you become a K9 officer.  How many officers were there when you officially became a K9 officer in 2014?

A.    That's a good question.  I don't want to guess at it.  I know -- I believe I was taking Sven Beauchmin's spot, who had been promoted to sergeant.  So I don't think he was active -- well, he still had a dog.

Q.    Well, let me ask this way:  When you first started back in 2014, were there ten or more K9 officers?

A.    No.

Q.    Would it be fair to say it was between five and ten K9 officers?

A.    I'd probably say somewhere -- yes, maybe five -- I -- I'm not sure what Sven's status was.  He was still bringing his dog to work, but I don't believe he was keeping up with the training

Page 36

or responding for K9 units.

Q.    That's fine.  I think you said, generally speaking, about five to ten?

A.    Not that many.  Generally, I know there was one for each squad for each rotation.  So there's four of us; two days, two nights.

Q.    Just four total?

A.    The four active ones on the patrol shifts doing the patrol duties, but I don't know what Sven's capacity was.

Q.    How about this:  Would it be fair to say there was at least four?

A.    Yes.  Easier to say that, yeah.

Q.    And I'm referring to back in 2014?

A.    (No verbal response.)

Q.    Let me ask this way:  In 2024, you were still a K9 officer prior to your termination; right?

A.    Yes.

Q.    In 2024, how many K9 officers were there for the department at that point in time?

A.    Again, I was removed from K9 about a month before I was fired.  At that point, I believe we were down to three.  Officer Langan had been promoted to lieutenant.  And then his K9 was

Page 37

in flux, it was with him and could do some work and couldn't do some work.  And I know there was a timeline where his was taken out of the equation.

Q.    But at least three officers in 2024 prior to your termination?

A.    Well, a month before my termination, I was removed from K9.  So at that point, it was two.

Q.    Now, just generally speaking, in terms of your duties as K9 officer, what were you responsible for?

A.    With the K9?

Q.    As a K9 officer.

A.    Again, you are still functioning as a patrol officer.  You are still being assigned to an area, you are responding to calls for service.  You just also are driving a vehicle to transport the K9.  You are also responsible for the maintenance and upkeep of the K9 -- the feeding, the grooming, the housing, his ongoing training.  But you are doing that, I guess, parallel with patrol work, if that makes sense.

Q.    I understand.  And then I imagine it would be parallel with SWAT work, as well?

A.    Yes.  SWAT wouldn't necessarily have

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 38

an overlap with your daily patrol. Some departments, like Philadelphia, has a full-time SWAT where there are SWAT guys that are doing SWAT all day. For us, we are considered part-time SWAT team where you are doing patrol the vast majority of the time and then when SWAT incidents occur, then SWAT officers would address them as SWAT.

Q. Let me ask you this: As a K9, officer, is there ever a scenario where you are not working with your K9?

Do you understand that?

A. Generally, we're every day, 24 hours a day.

Q. So you are partners, essentially; right?

A. Yeah. Responsible for him around the clock, yes.

Q. As a K9 officer, you receive additional compensation; right?

A. Yes.

Q. That would be in connection with the time it takes to care for the K9 and other things.

Is that fair?

A. Yes. There's a Fair Labor Standard Act portion that's compensated for, yes.

Page 39

Q. Would that have been part of your overall compensation up until 2024 when you were terminated?

A. I was, again, removed from K9 a month before I was terminated, so up until that point.

Q. Well, let me ask you this: You keep saying you were removed from K9 a month before you were terminated.

Were you placed on leave at that point? You weren't working anymore, were you?

A. No, I was.

Q. So you were out on the street without a K9?

A. Yes. I was ordered to not bring my K9 partner back to work and ordered to return the K9 car that I transported him with. And --

Q. And -- I'm sorry. Go ahead.

A. And then I was assigned to the regular patrol vehicle and I was assigned to go be fitted for regular patrol uniforms.

Q. When you are saying your K9 partner, you are referring to Monty?

A. Monty, yes.

Q. M-O-N-T-Y, Monty.

Page 40

Now, I'm just going back to figure out in terms of compensation, how it impacted your overall salary prior to you being terminated. And you keep making the distinction that you were on patrol a month -- I'm sorry, you were removed from K9 a month before you were terminated; right?

A. Well, for clarity because you keep making distinction up until termination, but I was not on K9 up until termination.

Q. I think we are saying the same thing.

A. We might be.

Q. I think we are.

There was a one-month period prior to you being terminated where you were not a K9 officer?

A. Yes, for clarity, yes.

Q. I'm clear on that.

Now, we mentioned briefly your K9 partner.

Did you have the same K9 partner throughout your entire tenure as a K9 officer?

A. I did.

Q. That would be Monty?

A. Monty.

Page 41

Q. Identified as Monty.

Tell me how you came about -- would it be receiving? Would that be the right word?

A. Assigned.

Q. Assigned.

How did you come to be assigned with Monty?

A. I was assigned to training at Badden K9, B-A-D-D-E-N. It's a -- I would loosely use the term "company" up in Canada, who raised and trained K9s or dogs. And then sold dogs. I was assigned to live there in Canada.

Q. I'm sorry to hear that. I'm kidding.

MS. BENFER: We didn't hear you. We missed it.

MR. HATCHETT: You heard that?

BY MR. HATCHETT:

Q. I didn't mean to interrupt you.

You said you had to live in Canada and I said I'm sorry to hear that.

A. Oh, oh, oh. Way over my head. I apologize.

I'm trying to think of the timeline.

Q. I'm sorry, I apologize.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 42

You were telling me about you had to go and live in Canada as being assigned as a K9 officer.

A.    Yes.

Q.    Please finish telling me about that.

A.    Generally speaking, the dog was already trained as a police dog.  I was told that he was trained with -- as specialized in bombs or explosives detection.  It was my understanding that I was going there to learn how to work with him and generally make sure that I didn't mess up the dog's training, that I was compatible with the dog.  I believe it was about six or eight weeks.  I brought him back to Falls Township and just began the regular course of being a K9 officer in Falls.

Q.    Consistent with the duties that you previously described as it relates to K9?

A.    Yes.

Q.    I want to ask you really quickly just going back to 2024, was the K9 unit something that the Falls Township department was recently implementing or it was already established?

A.    It was fairly established.  It was still growing, but it was established.

Page 43

Q.    And I want to fast-forward to that month where you were removed from K9.

What was your understanding in terms of the status of the K9 unit in terms of it's longevity, if you understand that?

A.    My understanding was a decision had been made to replace me as a K9 officer.

Q.    Did you have an understanding that the K9 unit was going to be shrunken?

A.    No.

Q.    It was never communicated to you that either the township or the chief wanted to retire dogs and not replace officers?

A.    No.

Q.    So going back just generally to you being assigned to Monty, would it be fair to say that you and Monty had the same duties throughout the entire -- I believe you said 10 years as a K9 officer?

A.    Yes.

Q.    What was your understanding, if you had an understanding, in terms of what happens -- well, let me ask it differently.

Did Monty retire?

A.    Monty was retired, yes.

Page 44

Q.    Tell me what it means when a K9 officer, such as Monty, is retired.

A.    Well, in Falls Township there is an expectation that you would continue to house, care for, and maintain the dog on your own.  I had later heard that some of the other dogs were still carried under the department's medical care.  I had never -- nobody ever expressed that to me when Monty retired, so I don't know if that was available to him.  And then the dog no longer comes to perform his duties with the township.

Q.    So if you are a K9 officer and your K9 partner is retired, what happens to -- is your status as a K9 officer impacted, based on your understanding?

A.    If your dog is retired?

Q.    Right.  You are essentially a K9 officer without a K9.  How long does that occur?

A.    Well, typically, your K9 would be replaced.

Q.    How often are K9 officers replaced, if you know -- in your experience, rather?

A.    I'm not sure how to -- like how often.

Q.    Well, let me ask it differently

Page 45

then.

Throughout your ten years in the K9 unit, have there been officers who had to retire their dogs?

A.    Yes.

Q.    About how many officers?

A.    Officer Langan had retired a dog and then his was replaced with, I believe, Max.  A decision was made to retire Officer Lunquist's first dog, and then he was replaced with Zico.  And then other officers pursued promotions where they were no longer eligible to work K9.

Q.    When you say "promotions," would that be corporal or detective?

A.    Sergeant or above.

Q.    Sergeant or above.

Again, based on your experience in the K9 unit, though, are you aware of any scenarios where a K9 was retired and not replaced, other than yourself?

A.    Without a promotion, no.  Hank was promoted.  Sven was promoted.  I believe I was the only person that as a K9 working patrol, my dog was retired and it was made clear that I wasn't going to receive one.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 46

(Reporter clarification.)

BY MR. HATCHETT:

Q.   And by the way, is Falls Township -- I know you said if a dog is retired, you are still responsible to pay for it.

Falls Township allowed you to keep Monty?

A.   Falls Township effectively abandoned Monty.

Q.   Where is Monty at now?

A.   Tennessee.

Q.   How did that happen?

A.   I was sent an email not to bring Monty back to work again.

Q.   So what did you do with Monty at that point?

A.   He continued to live with me and my family.

Q.   When you say he was abandoned, he still lives with you.

Is that incorrect?

A.   Abandoned by Falls, not by me.

Q.   Well, that wasn't my question.

My question was Falls Township let you keep Monty?

Page 47

A.   They directed me to not bring him back, yes.

Q.   They didn't tell you to return him; right?

A.   No.

Q.   In general, K9 officers that are retired are allowed to stay with their handlers; correct?

A.   In Falls Township, yes.

Q.   In Falls Township.  Thank you for that clarification.

I want to -- at some point in time, did you participate in a hiring process?  Do you understand what I mean when I say hiring process?

A.   For new applicants?

Q.   Yes.

A.   Yes.

Q.   In about 2021?

A.   Yes.

Q.   Can you tell me -- at that point in time in 2021, I just want to be orientated, you are a patrol officer and you are also a K9 officer; correct?

A.   Yes.

Q.   Are you also a SWAT officer at that

Page 48

point in time?

A.   Yes.

Q.   You are also designated as a trainer, as well?

A.   Yes.

Q.   So in 2021, you are approached to participate on a hiring panel for new officers?

A.   Yes.

Q.   Who approached you?

A.   Then sergeant, Chris Clark.

Q.   Now Lieutenant Chris Clark?

A.   Now Lieutenant Chris Clark, yes.

Q.   Now, did you and Chris Clark get along, just generally speaking?

A.   Yes.

Q.   Did there come a time when you and Chris Clark no longer got along?

A.   Yes.

Q.   So then -- well, let's talk about that, then.

So my question was there was a time when you two no longer got along.  What are you referring to?

A.   There was a point where I reported to the township a discrimination in the hiring

Page 49

process that Chris Clark was running and having been ordered to remanufacture records by Chris Clark related to that process.

Q.   Was there anything in particular that Chris Clark said or did that caused -- I'll refer to it as a falling out.

Is there anything that he did or said, other than what you just mentioned, that caused this falling out?

A.   Could you -- again?

Q.   Other than -- is there anything other than what you just mentioned that caused a falling out between you and Chris Clark?

A.   I don't believe so.

Q.   Now, going back to the actual hiring process that I think you said caused the falling out, tell me, Chris Clark came to you and essentially asked you to be on the hiring panel?

A.   Yes.

Q.   Prior to that -- and I'm going to refer to 2021 at this point, were you on a hiring panel in the past?

A.   No.

Q.   This was the first time you being on a hiring panel?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 50

A.    Yes.

Q.    Have you been on the hiring panel since?

A.    I'm sorry?

Q.    What part don't you understand?

A.    I was on a hiring panel with Chris Clark, yes.

Q.    That wasn't my question.

A.    Have I been on one since?

Q.    Correct.

A.    While I haven't been working?

Q.    Since 2021.

A.    No, there was in 2021, but there was cycles of hiring.  I don't know if that --

Q.    I'm just referring to -- because what we're talking about is the hiring process that you were involved in.

I'm really trying to understand, other than the hiring process in 2021, were you involved in any other hiring processes for Falls Township?

A.    No.

Q.    So the only time you have participated in a hiring process would have been 2021?

Page 51

A.    As an interviewer for panel, yes.

Q.    There's been -- in what other capacities have you served on a hiring process?

A.    Not served, but I was involved when I applied.

Q.    Mr. Elmore, you have to let me know -- I'm not trying to misdirect you or confuse you --

A.    I understand.

Q.    Yeah, you got to let me know if you don't understand.  I'm just asking about you being involved with a hiring process in terms of being a panelist, so to speak.

Is that fair to say?

A.    Yes.

Q.    So I just want to talk about that right now.

A.    Yes.

Q.    So, again, what was your understanding in terms of participating in the hiring process that Chris Clark asked you to do?  What did you understand your expectations to be or your responsibilities, rather?

A.    My expectations for me from him?

Q.    No.  I'm sorry, I meant your

Page 52

responsibilities.

What were going to be your responsibilities?

A.    To sit on the panel, to help ask questions.  And then specific to me, to be I guess you could say somewhat antagonistic, to try to lead scenarios on further and further.

Q.    For the applicants?

A.    For the applicants, yes.

Q.    Was this -- and I'm just trying to understand more about the hiring process in 2021 where you were part of a panel.

Was there a consortium type of testing process?

A.    We were receiving applicants from the consortium, yes.

Q.    And when you say "receiving applicants from consortium," I'm vaguely familiar with it.  I just want to make sure I understand it accurately.

What does it mean to be involved in the consortium process and to receive applicants?

A.    Well, perhaps for clarity, when I was hired where was no consortium.  Falls had a hiring process that they conducted beginning to

Page 53

end independently.  Subsequently more recently, I guess for efficiency's sake, a lot of the department or almost all of the departments with the county participated in a consortium where they have one testing day, one physical agility day that an applicant, somebody seeking a police job, can participate in, and then that's sort of the entryway for the process for multiple departments.

Q.    So, again, I understand consortium, but is it fair to say it's kind of like a pool of applicants?

A.    Yes.  Effectively they produce a list.

Q.    How does each department get applicants off of the list?

A.    It's my understanding that the applicants participating mark off the departments that they are interested in and then they get forwarded on, but I've never been part of that aspect of it.

Q.    As far as your involvement in 2021, do you recall which townships or departments participated in that consortium, that particular one?

A.    Other than Falls Township?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 54

Q.    Correct.

A.    I don't know if I've ever looked into it.

Q.    Do you recall, as you sit here today, any applicants that you would have interviewed, if they were from other departments that were going to lateral in -- remember I mentioned that term -- that were going to lateral in?

A.    I'm not sure that I'm following that.

Q.    I'm trying to figure out what you are -- my understanding, it's not just Falls Township that was in that 2021 consortium. There were other departments that received applicants. I'm just trying to understand which -- geographically which departments were involved?

A.    It was Bucks County. So it was a Bucks County consortium test.

Q.    It was more so geographically, it sounds like, for Bucks County?

A.    I believe it's the Bucks County Chief of Police Association that pools for efficiency's sake.

Q.    Thank you for that clarification.

Page 55

Now, with your experience in the 2021 hiring process, do you know the breakdown in terms of minority applicants that apply for that consortium?

A.    No.

Q.    Do you know how many minority applicants you actually interviewed or were considered for the 2021 hiring process for Falls Township, specifically?

A.    How many?

Q.    Do you have an independent recollection of how many minorities, meaning racially diverse or diverse by gender, sex?

A.    The number? No.

Q.    Do you recall if there were any?

A.    That interviewed and applied with us?

Q.    Yes.

A.    Yes.

Q.    Those that you can recall, can you let me know how they were diverse?

A.    We had female applicants that applied with us. We had minority male applicants that applied with us.

Q.    When you say "minority"?

Page 56

A.    African-American.

Q.    Okay. So at least those two groups?

A.    Yeah, I don't know any other categories that applied.

Q.    Well, that's why I asked about gender, but if you can't recall -- I mean sex -- but if you can't recall, that's fine.

Is it your testimony that you don't remember exactly how many applicants were considered?

A.    The exact number, no.

Q.    Would it be fair to say 10 to 20?

A.    I participated in I believe it was three cycles. And we got I'm guessing a dozen to 18-ish per cycle.

Q.    And when you say a cycle, I just want to make sure I understand what that means. When you say you participated in three cycles, does that mean you interviewed 12 to 18, did not consider them, and then moved on?

A.    There were multiple lists produced by the consortium for, I guess, different test dates. So that's periodically redone. That would generate a list and then the panel would interview from that list.

Page 57

Q.    Now, this 2021 hiring process, do you recall generally the month when it occurred? I'm not going to ask you about the date.

A.    Again, there was three separate cycles. So it was the beginning of '21, a few months later, and then a few months after that.

Q.    So a span of 2021 with three different cycles?

A.    The beginning portion of 2021, yes.

Q.    Part of what you testified was that there was -- well, you tell me.

Did you think that there was something wrong in the hiring process --

A.    Yes.

Q.    -- that you participated in?

A.    Yes.

Q.    Now, tell me all the things that you believe were wrong with the hiring process.

A.    When I was asked to be on the panel by Chris Clark, he specifically told me that it was his intent not to hire any female applicants in Falls Township in this process. He specifically told me he was going to begin at the beginning of that by going back to an older list. They had already exhausted the top scores on that

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 58

list and they were going to go down the list further than they would typically go down. And his hope was that he would find one or two guys to fill some seats and that he was afraid that the upcoming lists would have too many female applicants that performed too well and scored too high and he wouldn't be able to skip over them without making it very obvious that he was skipping over them.

So from the very get-go, I understood that Chris Clark intended not to hire any female applicants.

Q. Let me stop you there.
I imagine this is a verbal conversation?

A. It is.

Q. And prior to this -- would this have been the first, second, or third cycle where he mentioned this?

A. This was the initial conversation with him where he asked me to be on the panel where he was explaining what is was, how it works, how it was going to happen.

Q. Who else was on the panel?

A. Chris Clark ran and directed it,

Page 59

there was myself and Anthony Fanelli.

Q. So just you, Clark, and Fanelli?

A. On the panel, yes.

Q. Did Chris Clark say this to you or was it in the presence of Anthony Fanelli?

A. Chris Clark and me in the hallway in headquarters.

Q. So no one else was around. Is that fair to say?

A. No one else.

Q. So I imagine once Chris Clark said this to you, it was alarming, because you later on reported it; right?

MS. BENFER: Objection to form of the question.

THE WITNESS: I did report it, yes.
BY MR. HATCHETT:

Q. So I imagine at some point you did a memo regarding that?

A. (No verbal response.)

Q. You never wrote anything down right there and then when it happened, did you?

A. When it happened? No.

Q. Never went to the chief of police right then and there when it happened?

Page 60

A. No.

Q. So for all intents and purposes, you went along with this plan of Chris Clark's?

A. Well, he wasn't asking for my consent or participation; he was telling me what he intended to do.

Q. And I imagine you said something in response?

A. He also told me what my expectation was, to be an antagonist to further the scenarios along. I was replacing Yaegar who filled that role.

Q. My question was I imagine you said something in response?

A. To Chris?

Q. Yes. Basically when he said I want to discriminate throughout this hiring process, I imagine you said something in response?

A. No. Frankly, that wasn't surprising from Chris.

Q. When you said it wasn't surprising -- because I believe you testified that he never said anything else like that to you before; is that right?

A. About the hiring process?

Page 61

Q. No, about being discriminatory.

A. Well, I had known Chris Clark for 22 years.

Q. Because I previously asked you if you had any problems with Chris Clark prior to the process.
So now you are telling me Chris Clark was discriminatory and/or racist prior to 2021?

A. Chris Clark had issues with most of our female employees.

Q. And this is prior to 2021?

A. Yes.

Q. When you say he had issues with most female employees, what issues are you referring to?

A. He has previously been a sergeant in detectives. There was a female detective, Kathy Kaufman. She had brought a complaint against him, which was, from my understanding, what removed him from detectives and shifted him back as a patrol sergeant. I do not believe he was happy with that. When we would speak or refer to -- if another female officer's name came up, he would rename them or nickname them.

Q. Did you see this happen?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 62

A.    Oh, yeah.

Q.    So you knew about the situation with Nicole Diviney?

A.    Yeah, it was prolific.  It was -- yeah, everybody...

Q.    You never reported the gestures or anything like that, did you?

A.    No.

Q.    Anything else about Chris Clark and your testimony that he basically was discriminatory to women?  Because I cut you off and I'm sorry.

A.    (No verbal response.)

Q.    Let me ask you this for a moment.  Were you on the -- what is it called?  The FO -- it wouldn't have been a -- the police union at that time?  Were you a member of the police union?

A.    Well, everybody is a member of the police association.

Q.    Police association.

And my next question is:  Were you an elected official or an official for the police association at that point in time?

A.    I don't believe I was.

Q.    At some point in time, you become

Page 63

the president, though; correct?

A.    Correct.

Q.    I just want to understand if you were the president of the association when these allegedly discriminatory things were going on.

So other than we talked about the gestures and your testimony that he was moved to different positions, anything else?

A.    As far as being discriminatory towards --

Q.    Woman or just generally.

A.    Specifically Nicole.  She was on the shift with us.

Q.    What year are we talking?

A.    (No verbal response.)

Q.    Pre-2021?

A.    It was during that timeframe.  I don't know if it was '20 or '21.

Q.    Nonetheless, you were telling me about Nicole?

A.    Generally our roll calls we would have conversations.  We would be very social.  If Nicole was there at roll call, there was an expectation from Chris that you wouldn't have small talk.  You wouldn't have social talk.  You

Page 64

would sit there very quietly until she left, I believe effectively to ostracize her.  She would try to come in and engage in conversation and try to engage in the normal small talk that would normally occur at roll call.  I remember sometimes people would forget and start to have conversations with her and Chris would give them a look or a headshake, like stop what you are doing, stop treating her as a normal coworker.  And then it wasn't too long before she started truncating her roll call time and she would leave and we would go back to a regular -- you could have a regular conversation again.  You weren't being chastised for engaging in conversations.

Q.    Nevertheless, this was prior to you agreeing to serve on the panel?

A.    Yes.

Q.    Again, I just want to be sure that I understand.  Even though you testified you observed or heard these things, at this point in time prior to being on the panel, you made no complaints or anything like that?

A.    No.

Q.    Never memorialized anything to that effect?

Page 65

A.    Before that, no.

Q.    Now, going forward to the 2021 promotional process, what you just described, Chris Clark to be basically a bigot -- my words, not yours -- and just discriminatory in nature, but you still agreed to serve in the hiring process?

A.    I did.

Q.    And knowing that he said that, actively preclude woman from being hired, you still decided to go along with it?

MS. BENFER:  I'm going to object to form of the question.

THE WITNESS:  He was going to do that regardless of who was with him.

BY MR. HATCHETT:

Q.    You decided to be a part of that?

A.    On the hiring part, yes.

Q.    So what, if anything, did you do to stop that from happening?

MS. BENFER:  I'm going to object to the form of the question.

You can answer if you understand.

THE WITNESS:  To stop him?  I don't have any authority to stop him.

Exhibit 1

Page 66

BY MR. HATCHETT:

Q. You didn't have authority to go to the chief of police?

A. The chief assigned him to run the board.

Q. Did you have authority to go to the township manager?

A. At that point, I don't believe so, no.

Q. Did you have authority to go to a board of supervisors?

A. I believe that would have violated the chain of command, no.

Q. Well, let's be clear, there were other times where you didn't have a problem going around the chain of command.

Is that fair to say?

MS. BENFER: Object to the form of the question.

THE WITNESS: Referring to the time that I was serving as union president?

BY MR. HATCHETT:

Q. Well, tell me all the times you went around the chain of command.

A. Well, in my capacity as a union

Page 67

president, you are free to not follow that if you are looking to address working conditions, yes.

(Reporter clarification.)

BY MR. HATCHETT:

Q. Is it your testimony that you didn't consider what Chris Clark had laid out to you in terms of the hiring process to be something that would impact working conditions?

A. Well, when he laid it out to me, I was a patrolman. Again, he didn't ask for my participation or consent; he said this is what's happening.

Q. Is it true that you just didn't do anything about it because you just didn't care?

MS. BENFER: Objection to form of the question.

THE WITNESS: Care?

BY MR. HATCHETT:

Q. I'll ask it differently.

Is it true that you didn't do anything about it because you were just as discriminatory?

A. No --

MS. BENFER: Object to form of the question.

Page 68

THE WITNESS: I would say no.

BY MR. HATCHETT:

Q. So if there's testimony that you do not like Jewish individuals, which you heard that testimony; right?

A. I did hear that.

Q. That was Chief Whitney; correct?

A. That's correct.

Q. So you are saying when Chief Whitney gave that testimony, that was inaccurate?

A. Yes.

Q. And you also heard Chief Whitney's testimony that you don't like African Americans.

Do you recall that?

A. I don't recall that.

Q. But nonetheless, even if you don't recall that, if he testified to that, that would be incorrect?

A. That would be incorrect.

Q. Now, going into this hiring process where though you know all of this information about Chris Clark's history and his intent, you participated in three cycles?

A. I sat on the board for three cycles, yes.

Page 69

Q. Let me ask you as it related to the time period of 2021, because you mentioned a few officers -- woman officers that I believe your testimony was Chris Clark had issues with.

Does the name Victoria Crozier sound familiar to you?

A. Yes.

Q. Is Victoria Crozier an individual who you believe was discriminated against?

A. Yes.

Q. Can you tell me about that?

A. The way she was discriminated against?

Q. Any way you know as it related to allegations that she was discriminated against.

A. I know that Chris Clark had a degree of animosity towards her. I know that he and the other people on the squad would periodically pull up her Facebook postings, the pictures she had posted of herself and her family. They would sort of ridicule and mock her postings.

Q. Are you referring to just Chris Clark or other individuals, as well?

A. They were all on Chris Clark's squad, the day work squad.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 70

Q.   So you are not referring to just Chris Clark?

A.   No.  He had other people with him, yes.

Q.   So I'm just really referring to Chris Clark.

But I'm sorry, you said people would pull up her social media information?

A.   Yes.

Q.   Anything else that relates to Victoria Crozier and how you believe she was discriminated against?

A.   The department -- or rather a Hank Ward production.

Q.   Hank Ward?

A.   Yes, Hank Ward was Chris's uncle, Lieutenant Hank Ward.  Are you familiar with Hank Ward?

Q.   I thought you were going somewhere with that.

A.   Well, you said Hank Ward.

Q.   I was making sure the stenographer was clear.

A.   Oh, okay.  I'm sorry.

They had -- initially, I guess they

Page 71

were trying to fire her because she received a phone call of a crime in progress, which is basic police work.  People flag you down, people call you and say I see something going on.  But for her, it was nefarious.  She was contacted by somebody reporting potential criminal activity.  And I believe they were trying to fire her for that.  And that didn't have traction, that didn't go anywhere, so they came up with another scheme that they were going to rereview like a hundred different cases and dig through them and try to find anything wrong in them to put their finger on and use that as an excuse to fire her.

Q.   When you say "they," who are you referring to?

A.   This was between Whitney, Ward, and Clark.

Q.   Okay.

A.   And this was -- nobody had heard of such a thing.  And to the extent that the cases they were rereviewing already had been rereviewed by almost certainly Ward himself and having found nothing wrong with them, many had already gone to county court, been rereviewed by the DA's office, who found nothing wrong with them.  And many of

Page 72

them were prosecuted and adjudicated already, but they were going to find something wrong somewhere.  Effectively, show me the person, I'll find you the crime.  And this was not the norm and never applied to somebody else.  This was they wanted to get rid of Victoria Crozier.

BY MR. HATCHETT:

Q.   And when you say they, you are referring to Whitney, Ward, and Clark still?

A.   Yes.

Q.   And I'm still not clear on where the alleged discrimination -- you are saying they were doing all this because she was a woman?

A.   I believe Chris had always had an animus towards her.  She wasn't just female.  She was also when she was hired, she identified as lesbian.  That was the initial two decades that I had known her and worked with her.  And then more recently, she identified as transgender, which really became the focus of the ridicule.  She would post different pictures of herself online and they would critique -- she has facial hair now or she's not covering up her chest and they would pass around the pictures and laugh and mock.

Q.   You were present for this?

Page 73

A.   Yes.

Q.   And when this happened, did you report it?

A.   No.

Q.   Why not?

A.   Well, I would be either reporting it to Chris or his uncle, Hank Ward, or Nelson Whitney.

Q.   Or township manager?

A.   Yeah.  I never contemplated a township manager.

Q.   Or what about a board of supervisors?

A.   The board had actually just given Hank Ward a pass on beating an African-American prisoner in her jail cell.  Everybody thought Hank Ward was going to get fired for it, and then the board gives him a pass and clears him and not even a day's suspension.  So I can't say that that ever registered on my radar to go make a complaint to them.  This was fairly well-known.  This wasn't a secret of any sorts.

Q.   Well, the board gave you passes, as well, did they not?

MS. BENFER:  Objection to the form

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 74

of the question.

You can answer if you understand the question.

THE WITNESS:  Are you saying that was I accused of crimes or misconduct that didn't occur and I was cleared of?  Yes, I was cleared of things that I was accused of that didn't occur.

BY MR. HATCHETT:

Q.    So they gave you passes, as well?

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  If you are going to ask the same question, I will give the same answer --

BY MR. HATCHETT:

Q.    Your answer is yes?

A.    I was accused of things that didn't occur --

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  -- and I was cleared of is that, yes.

BY MR. HATCHETT:

Q.    But you are saying that the board gave other individuals a pass, but in all reality,

Page 75

they did the same thing for you?

MS. BENFER:  Objection to the form of the question.

BY MR. HATCHETT:

Q.    Right?

A.    No, I would --

MS. BENFER:  Objection to the form of the question.

BY MR. HATCHETT:

Q.    Right?

A.    I would dispute that.

Q.    Let's move forward.

How does the hiring cycle end?  You go through the three different groups of individuals.  Are any of those individuals hired?

A.    Are individuals hired from the hiring cycle?  I believe the first hiring cycle, we hired Edmund.  I think the second hiring cycle, we hired TJ.  I can't place his last name.

(Reporter clarification.)

BY MR. HATCHETT:

Q.    That's what I was going to ask you about.

You said Edmond; is that male or female?

Page 76

A.    Male.

Q.    Black, white, or other?

A.    White.

Q.    TJ; male or female?

A.    Male.

Q.    Black, white, or other?

A.    White.

Q.    Do you know the age of Edmond?

A.    Not offhand.

Q.    Would it be fair to say that based on your interpretation, would Edmond have been a younger officer?

A.    Compared to me, sure, yeah.

Q.    Well, I got to ask you now, what do you consider younger compared to you?

A.    Well, I'm 49, so...

Q.    I don't know.  I don't know what you consider younger.

A.    Younger than me, yes.

Q.    So 48, that's younger than you?

A.    Well, 48 is less than 49, yes.

Q.    I just want to understand because your complaint is that the township hired people younger than you.

So that's what I'm trying to

Page 77

understand what your concept of younger is.

A.    (No verbal response.)

Q.    So anyone that's at least one year younger than you.  That's what you just testified to?

MS. BENFER:  Objection to the form of the question.

BY MR. HATCHETT:

Q.    You consider that younger?

THE WITNESS:  If somebody is younger than me, they are younger than me.

MR. HATCHETT:  I understand.  That's fine.

BY MR. HATCHETT:

Q.    Were there any other applicants out of that cycle that were hired?

A.    I know Edmond was the first.  TJ was on the second.  Maybe Dean on the third.

Q.    Okay.  Dean, male or female?

A.    Male.

Q.    Black or white?

A.    White.

Q.    Younger?

A.    I don't know Dean's age.

Q.    Would you consider Dean younger?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 78

A.   Younger than me?

Q.   **Yes.**

A.   I don't know his age.

Q.   **Can't ballpark it?**

MS. BENFER:  Objection to form of the question.  Asked and answered.

MR. HATCHETT:  He just said he doesn't know his age.

I'll ask again.  Your response is your response.

BY MR. HATCHETT:

Q.   **Can you ballpark it?**

MS. BENFER:  I'm instructing the witness not to guess.

THE WITNESS:  Yeah, I don't want to guess.  His age is what it is.  I don't want to guess.

BY MR. HATCHETT:

Q.   **Jeff Rhodunda, does that name ring a bell?**

A.   Yes.

Q.   **And you mentioned Jeff earlier. Jeff was a police officer?**

A.   Yes.

Q.   **Jeff is no longer a police officer?**

Page 79

A.   I don't believe he is, no.

Q.   **Do you believe as part of -- well, let me wrap up the hiring process.**

**By the end of 2021, those three applicants are hired.  That's the result of that 2021 hiring process; correct?**

A.   Yeah, we had other hires.  I don't remember if they were from our interviews that I participated in.

Q.   **That's what I was going to ask you next, so perhaps that's the answer.  Were there any other individuals hired as a result of the hiring process that you were involved in?**

A.   That I was involved in?

Q.   **You were, correct.**

A.   Again, there were other people hired subsequent to them.  I don't recall if they were the ones that we interviewed or not.

Q.   **Whether or not you were involved with them, by 2021 the entire process is completed.**

**Is that a fair statement?**

A.   I participated in 2021 on three cycles on the board.

Q.   **Now, at some point -- I'm going to**

Page 80

go back to Rhodunda in a second, but at some point you complained about perceived discrimination in the hiring process; correct?

A.   Yeah.

Q.   **Assuming that all of the hiring is wrapped up by December 2021, do you complain in January of 2022?**

A.   In January of '22?  No.

Q.   **You do not complain in February of '22?**

MS. BENFER:  Objection to form of the question.

BY MR. HATCHETT:

Q.   **Do you?**

A.   In February, no.

Q.   **Is there a reason why you did not complain about all of the discrimination you described in the process in January of '22 other than what you testified to already?**

A.   I'm sorry.  Can you repeat that?

Q.   **Sure.  Other than what you've testified to already, is there a reason why you did not complain of the perceived discrimination in January of 2022?**

A.   Is there a reason I didn't complain?

Page 81

It seemed almost like common knowledge at that point.

Q.   **What was common knowledge?**

A.   That Chris Clark wasn't going to hire females.

Q.   **So that's why you didn't say anything up until that point?**

A.   Yeah.  There was -- it's like reporting grass is green.

Q.   **Let me ask you this:  Were other female officers employed by the department at that time?**

A.   In Falls Township?

Q.   **Correct.**

A.   They had fired --

Q.   **And I don't mean to cut you off, but let me streamline.**

**Because we know there was Crozier; correct?**

A.   Crozier was still working.  They were trying to fire her, yes.

Q.   **In 2021 we know there was Nicole Diviney/White; right?**

A.   She was working.  She was the one that Chris was harassing on day work, yes.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 82

Q.   I don't know that there were any other female officers that have been mentioned so far.

A.   We mentioned Kathy Kaufman.  She had been a detective, and I guess through the harassment from Chris Clark had gone out on, I believe it was an extended medical leave.  Hostile work environment.  She couldn't work there anymore.

And then Stephanie Metterle; Clark, Ward had been involved in her firing.  She had subsequently got her -- an arbitration award to bring her back and then the Township was still fighting the arbitration award not to comply with it.

Q.   Let me ask you this for a second.  When you say the township -- the township -- well, when you say "the Township," are you referring to Chris Clark, Chief Whitney, or are you referring to the board of supervisors, the manager, or just collectively?

A.   This was all, I believe, driven by Whitney, Ward, and Clark.

Q.   Now, you were saying that there was an arbitration decision?

Page 83

A.   For Metterle, yes.

Q.   Tell me what you recall.  What was the discrimination as it relates to Metterle?

A.   Again, this was a Chris -- or Hank Ward production where he would investigate, it wouldn't matter for what, make an accusation that you weren't truthful in the investigation and then fire you for that.  And his position was that those people would have to fight from the outside looking back in.  They may get their job back someday, but they will fight from the outside to do it.  I fell into that same realm.

Q.   Who are you attributing that statement to?

A.   That was Hank Ward speaking with Whitney and Clark.

Q.   Were you present for those conversations?

A.   For that one, yes.

Q.   Who specifically said it?

A.   It was Hank Ward speaking to Clark and Whitney, reference to a, I believe, Upper Makefield female officer that had been fired.

Q.   Fired from Upper Makefield?

A.   Yes.

Page 84

Q.   Not Falls Township?

A.   No.

Q.   How do you correlate that to Falls Township?

A.   Ward -- well, it was in Clark's office, I was in Clark's office.  Whitney had come in to see Clark, and Ward came in to try to find Whitney.  Ward told Whitney, "Do you remember such and such?"  I don't remember her name.  I don't know that I ever met her.  Said Makefield was investigating her.  Said the investigation found that she hadn't done anything and they seemed kind of disappointed.  And then Hank said, "But get this:  Turned around she lied on the investigation and so they fired her for that."  They seemed to cheer up a little bit.  Hank said, "That's how you do it.  That's what you do.  You make the investigations.  You accuse somebody of being untruthful and you fire them and they have to fight from the outside looking in."

Q.   But that conversation was predicated on an officer that wasn't employed by Falls Township; correct?

A.   They were discussing a female employee in a neighboring township and said,

Page 85

"That's how you do it."  And this is what Metterle went through, I believe.

Q.   So an officer not employed by Falls Township?

A.   Metterle was a Falls Township employee.

Q.   Right, but the conversation.  I thought you said that conversation --

A.   The conversation, yes.

Q.   Okay.  So I'm just trying to understand how you correlate that with Falls Township.  It seems like they were just having a conversation; is that right?

A.   They said, "That's how you do it."

Q.   Other than that, they were just having a conversation?

A.   Well, they were conversing, but the conversation entailed, here's the game plan on how to purge out your targets.

Q.   Now you are saying here's the game plan.  Who used the words "game plan"?

A.   Nobody.

Q.   Those are your words?

A.   They said, "That's how you do it."

Q.   Okay.  But "game plan," those are

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 86

your words?

A.    Those are my words.

Q.    And "purge," who used the word "purge"?

A.    I'm using the word purge.

Q.    That's, again, your word, "purge"; correct?

A.    That's how you do it.

Q.    Who used the words "that's how you do it"?

A.    Hank Ward.

Q.    Did anybody say that's how we're going to do it?

A.    That's how you do it.

Q.    Did anyone say that's how we're going to do it in Falls Township?

A.    No, that's how you do it.

Q.    Well, one of the things that you mentioned in that last portion of your testimony was having officers lie during the investigation. I'm somewhat paraphrasing it, but do you recall that portion of your testimony?

MS. BENFER:  I'm going to object to the form of the question.

BY MR. HATCHETT:

Page 87

Q.    In your prior testimony when referring to Upper Makefield, part of your testimony was that an officer lies, they get fired, they fight from the outside, and get brought back?

A.    They accused the officer of lying in the investigation.

Q.    Fair point.  An officer is accused of lying.

If an officer generally in a police department -- cardinal sin -- lying would be considered a cardinal sin -- those are my words -- as a police officer, would you agree with that?

A.    Yes.

Q.    And in Falls Township, since you spent 24 years there, lying during investigations, would that be something subject to discipline?

A.    Yes.

Q.    In fact, something that would be subject to discharge; correct?

A.    Yes.

Q.    Are you aware of any officers that were terminated for lying during an investigation in Falls Township during your experience?

A.    I know referencing back to Officer

Page 88

Metterle, their claim was that she was dishonest during the investigation, which is, I believe, the sticking point in deciding to terminate her.  And also became after an arbitrator ruled against that, they continued to maintain the position that they can't hire her back because they still contend that she lied in the investigation.  I believe for Vicki Crozier, it was their contention they were going to fire her because they were going to accuse her of lying in an investigation. I believe Officer Langan, they accused him of lying in an investigation and were going to terminate him for that.  He was also in a similar incident with Officer Bruce Rhodunda.  They wanted to accuse him of lying in an investigation and terminate him for that.  And then myself, they wanted to accuse me of lying in an investigation and terminate me for that.

Q.    Now, this Makefield conversation that you just testified about, did that happen prior to all of these things with these different officers?

A.    Yes.

Q.    Now, I was asking you about Jeff Rhodunda and any claims for discrimination as you

Page 89

are aware of as it relates to Rhodunda.

Can you tell me about that?

A.    Jeff Rhodunda was an older officer, approaching retirement age.  He was involved in a horrific car crash.  I believe he actually died in it and they brought him back.  His car impacted a tree, his body was crushed.  He worked for months to rehabilitate.  He was subsequently cleared.  He met all his doctor's requirements, met all the physical therapy requirements.  He was cleared to come back, and the Township tried to remove him from service by sending him to a medical evaluation to override his doctor's order saying you are healthy, come back to work.  He told me that he believed that that was to simply remove him from service, didn't want him back there again.  I spoke to Whitney about that.  Whitney said, "Why should guys work with him if they don't want to work with him anymore?"  And that's not the standard for rehabilitating from an injury, if people don't want you there anymore.

Q.    Did Whitney say that to you or were you present for that?

A.    Me and him.

Q.    So what else?  I'm hearing about car

Exhibit 1

Page 90

accident, he has to go through double clearance. Where's the discrimination that you perceived?

A.    Again, I believe he was also in the same promotional cycle that I was in and I believe they reduced his score, not as significantly as mine, but I believe they reduced it.

Q.    That you are referring to in 2023?

A.    Yes.

Q.    What about Steve Langan?

A.    Steve Langan, again, he's an older officer approaching retirement age. They had -- Whitney had initially accused him of a theft that never occurred, placed him on administrative leave without any due process or investigation, made statements that he was going to be incarcerated sometime soon. And then eventually all the accusations that he made didn't pan out. The DA's office said there's no crime to speak of, there was no wrongdoing that occurred. He came back and then very shortly after coming back, he was subject to one of the Hank Ward productions of we'll investigate you, we'll accuse you of lying in the investigation, and then fire you for lying. I believe it was a training, an MDT training and they accused somebody of shouting, yelling, or

Page 91

pushing and the people that we don't like, we are going to accuse them of lying.

Q.    What is the perceived discrimination?

A.    That he was, again, a senior officer approaching retirement age and they intended to remove him from service.

Q.    What's your understanding of the retirement age for Falls Township Police Department?

A.    There's what is considered a superannuation where you have to qualify for two parts; one is years of service and one is your age. Years of service is 25 years and age is at least 50 years of age.

Q.    Do you know how old Rhodunda was at this time in 2023?

A.    I believe Rhodunda was over 50. Are we talking Jeff or Bruce?

Q.    I'm sorry, Jeff.

A.    Jeff, I believe he's approaching retirement age. I don't know his exact age, no.

Q.    What about Steve Langan? Do you know his age in 2003?

A.    2003?

Page 92

Q.    2023, thank you.

A.    I'm terrible with age math. I believe he's slightly older than me, so...

Q.    What were their ranks?

A.    Whose?

Q.    Rhodunda and Langan.

A.    Bruce Rhodunda was a patrolman. Steve Langan had for a very long time been a corporal and then subsequently promoted to lieutenant.

Q.    At some point in time --

A.    And then he was demoted again.

Q.    At some point in time you become the -- would have been president, correct, of the police unit?

A.    Police association.

Q.    I apologize. Police association.
      You became president of the police association; correct?

A.    Yes.

Q.    Do you remember the date?

A.    It would have been in 2002. It would have been in February and I guess the third Wednesday of the month. I don't know the numerical.

Page 93

Q.    If February -- again, this is not that important -- February 16, 2022?

A.    If it was the third February [sic], then it could be.

Q.    Now you mentioned 2002? I'm not sure --

A.    '22.

Q.    February '22.
      It's fair to say that's when you became the president of the police association; correct?

A.    Yes.

Q.    Just generally a little bit of background, can you give me a little bit of background on that? Because when I asked you earlier, you said you were a member, but not an elected official; correct?

A.    Correct.

Q.    At any point in time prior to February of 2022, did you hold an elected seat?

A.    I may have been legal aid at some point. I don't know what the year or the term was or that I did anything active with that.

Q.    As legal aid, what would have been your responsibilities?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 94

A.    In theory on paper or in practice?

Q.    Both.

A.    In theory by the bylaws, legal aid would assist officers with if they had a grievance, if they had an issue, basically advocate and sell their case to the -- almost be their agent to promote their issue to the rest of the body.  In practice, legal aid did very little, if anything.  Occasionally sit in -- if you were subject to internal investigation, you would occasionally be asked to be the union representation to sit in with that person.  I can't recall --

Q.    That's fine.

A.    -- anything actively that I did, yeah.

Q.    Holding a position in legal aid, did you assist any officers in drafting grievances?

A.    I definitely assisted officers.  I don't know if it was in the capacity of legal aid.

Q.    I was just referring to legal aid at that point, so let's move on.  As you sit here today, as far as you can remember, you had the position of legal aid, and then outside of that, you became the elected president; correct?

Page 95

A.    For the one year, I was the association president, yes.

Q.    What were your duties and responsibilities as president?

A.    As the president of the union, I was the -- effectively the spokesperson for the department.  One person that would approach either the chief or the township manager, potentially the board, with union issues.  It was my responsibility to conduct and organize our monthly union meeting, and then advocate for union members, again, effectively the spokesperson for the association.  Again, I'm using union and association almost interchangeably.  Technically, it's not a union; it's an association.

Q.    Would that have been in the capacity where you would have assisted in drafting documents for other union members, association members?

A.    I know I would -- I had given copies of grievances to other union members as a template to follow.  Generally, if a member had a grievance, they would initiate the process by typing up a grievance and submitting it for step one review.  I recall -- I don't remember in which

Page 96

capacity, but people would say what does it need to have?  What does it need?  What is it supposed to look like?  They hadn't done one before.  So I had a couple of different ones that I provided to them.  This is the format.  If they had questions, I could help them figure out what it should look like at the end.

Q.    Let me just ask you this:  I know at one point your testimony was that you could go straight around the chain of command if you were the president; correct?

A.    Well, the president has a unique standing.  We are acting as president; you are not subordinate to the administration.  So you would approach them almost as an adversary to advocate for the issues that the union wanted to raise.

Q.    No, I understand that.  My next question was going to be, though, as either legal aid or the general member, you know you didn't have the ear of the prior president before you?

A.    The ear?

Q.    You weren't able to go to the prior president of the association with issues, such as discrimination?

A.    I'm sorry.  Your question?

Page 97

Q.    You told me that you couldn't bypass all of the chain of command because you weren't the president of the association.

You remember that?

MS. BENFER:  Objection to form of the question.

THE WITNESS:  Yes.

BY MR. HATCHETT:

Q.    My question now though is:  Were you in the position that you could go to the then president with these issues of discrimination to bypass the chain of command?

A.    Well, I think in that context as association members, there wouldn't really be a chain of command.

Q.    Let me ask it this way:  Did you ever go to the president prior to you with these issues of discrimination that you spoke of?

A.    Did I ever go to the president at the time that it occurred?  No.

Q.    Let me just narrow the timeframe as it related to the 2021 hiring process, the answer is no.  You wouldn't have gone to the president?

A.    That would have been Mike Callahan, no.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 98

Q.    January, the month before you take office, you don't go to the prior president, Mike Callahan is who it was?

A.    Yes.

Q.    You wouldn't go to him with issues of discrimination?

A.    He's very close with Chris Clark now.

Q.    What happened with Mike Callahan? Did he retire or just step down from the department and/or association?

A.    I believe he's still working.

Q.    How did you -- did he decide not to run again?

A.    He did, yes.

Q.    You ran against him? It was a contested election?

A.    No.

Q.    I'm not following.

He stepped down?

A.    Yes. He didn't want to do it anymore.

Q.    Your election, was it contested?

A.    Did I run against anybody?

Q.    Yes.

Page 99

A.    I think I did.

(Whereupon, a discussion was held off the record.)

(Whereupon, a recess was taken.)

BY MR. HATCHETT:

Q.    Mr. Elmore, we're back on the record. I want to ask you before we move on to a different topic, because I asked you about discrimination in the department and the different timeframes.

One thing I want to ask you about that we didn't cover, do you remember allegations of a 2019 claim of discrimination against an individual that you identified as SM?

A.    Stephanie Metterle.

Q.    I wasn't sure if that was referring to something different.

I'm referring to paragraph 34.

MR. HATCHETT: I'll mark this as Exhibit 1, the Amended Complaint.

(Elmore Exhibit 1, Amended Complaint, was marked for identification.)

(Whereupon, a discussion was held off the record.)

BY MR. HATCHETT:

Page 100

Q.    I'm referring to -- again, this is going to be Exhibit 1, the Amended Complaint. According to paragraph 34, it indicates: "On October 27, 2022 Elmore sent an email to the township manager, Matthew Takita, and the assistant township manager, Richard Dippolito, raising concerns about the unequal treatment of female officer, SM."

So I'm going to stop there for a moment.

Your testimony just now is that SM was referring to Stephanie Metterle?

A.    Yes.

Q.    Continuing to read, it says: "Officer SM was fired for allegedly providing false statements in her March 2019 discrimination complaint to the Pennsylvania Human Relations Commission." The paragraph goes on, but I'm going to stop there.

Do you see that portion of your amended complaint?

A.    Yes.

Q.    My question, though, prior to you identifying that individual as Stephanie Metterle, I wasn't sure if that was referring to someone

Page 101

else.

Is that referring to anything you previously testified to as it related to Stephanie Metterle? Is that the same thing or is that something different, what we just read?

A.    I'm sorry. Again, please.

Q.    I'm just asking, that paragraph that we just read, is that referring to what you already testified to regarding Officer Metterle or is that different?

A.    No, that's Officer Metterle.

Q.    I'm just trying to make sure because that timeframe indicated that that would have occurred in 2019.

Is that fair based on what we just read?

MS. BENFER: I'm going to object to the form of the question.

THE WITNESS: Are you asking when was Stephanie Metterle fired?

BY MR. HATCHETT:

Q.    I'm asking as it related to the alleged discrimination. My reading of that -- and that's why I'm asking you, you let me know -- my reading of that is whatever you were referring to

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 102

occurred in 2019?

MS. BENFER:  Wait.  Can we pull the exhibit back up so we can look at it at the same time?

BY MR. HATCHETT:

Q.    Again, my question, is my reading of this, I'm trying to figure out the timeline what you were testifying to as it relates to Officer Metterle.

A.    No.  That was the ongoing resistance to the arbitration award that she already won to maintain not bringing her back and to keep her from returning to work.  Like, nobody had ever fought against after an arbitration award.  I think they took it to the state Supreme Court and lost.  I think she is still fighting for back pay.

Q.    But whatever the alleged discrimination that occurred is, based on paragraph 34 of your amended complaint would have been in 2019.

Is that fair to say?

A.    An initial act of targeting her by going through the Hank Ward process of investigation, accuse of being dishonest, fire you for it, make you get your job back, but then

Page 103

continuing to the ends of the earth to resist the arbitrator's award, that was ongoing.

Q.    But she was never brought back to the department?

A.    She was.

Q.    And you are saying that the Department's challenging of the arbitration decision, that was continued discrimination in your words?

A.    Yes.  They never did anything like that to a male employee or...

Q.    Now, I want to go forward to there was an incident -- well, you are aware of an investigation into what was categorized as theft of time with you and other members of the K9 unit that occurred in 2022?

A.    I believe that was Whitney's characterization, yes.

Q.    It's a characterization, nonetheless?

A.    Yes.

Q.    You are familiar with that; right?

A.    Yes.

Q.    Can you tell me what occurred as it relates to the training?  And just take me through

Page 104

if you recall that training.

A.    The training date?

Q.    If you remember the date, but I'm just trying to generally understand what was the training?  How did you get permission to go to the training?  Did you go?  Kind of that narrative.

Do you understand?

A.    Perhaps we'll work our way through it, but, yeah.

Q.    Tell me about the training that day.

A.    The training that day was -- perhaps going back further.  As a K9 officer, per, I believe it's MPOETC standards now --

Q.    That's M-P-O-E-T-C?

A.    Municipal Police Officers Education and Training Committee.

Q.    MPOETC is the easier acronym.

A.    MPOETC, yeah.  I believe they are the ones that set the standard that now for an inactive in-service K9, you are required to train 16 hours per month.  Eight hours is related to patrol work, tracking, apprehensions.  And the other eight is related to the dog's specialty, either typically drugs or explosives.

MR. HATCHETT:  If you can just...

Page 105

(Pause in proceeding.)

BY MR. HATCHETT:

Q.    We had some sirens in the background and I asked you to pause your answer.  You were just telling us about MPOETC and mandates that they had?

A.    Yes.  In line with that, each month you are mandated to have an eight-hour training day for the dog's specialty, typically drugs or explosives.  There are some fringe ones like cadavers, where you look for dead bodies, but we don't have those dogs.  This training date was a set training date.  The training dates are established the year prior by Bristol Township.  They are in charge of that.  So our training unit worked with Bristol Township.  And then in the past, Bristol Borough, Lower Makefield, and Manheim Township.  More recently it's been Falls Township and Bristol.  Well, at that point back at that time, Bristol Township was responsible for picking the training dates for the upcoming year, so these dates were selected the prior year.  And we had also forwarded our training schedule to the county K9 Chip Keddi, who is the county detective, who is also a K9 officer, whose responsibility is

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 106

to ensure the dogs in the county are certified and meet the requirements for, I guess, court purposes. So we had -- well, "we" as in Bristol, Bristol had chosen the dates and those dates were forwarded on to the County so that if the County could schedule their mandatory certification dates at the same time as ours, then we wouldn't be asking our respective departments for a third training day. We had asked Chip to accommodate, these are the dates that we have if you can make them for work for you, then it will save us from a third training day and they are also good dates for anyone else in the county that's working 12-hour shifts, because it will be either after rotation or before rotation, but not between two 12-hour shifts. So that was the origin of the dates and then these were approved and scheduled for us to attend.

This date was a date that was a MPOETC 8-hour day that was Bristol Township's responsibility. Again, we had a training that was Falls officers and Bristol officers, but none of us were certified trainers or credentialed trainers, so sort of an in-house cadre. And when the schedule is made at the beginning of the year,

Page 107

dates were assigned to different officers. So generally you were assigned a month. And then it was your responsibility to put on the training for that month. You'd have a patrol day. You'd have a scent day. It would be your job to decide what you are going to work on. Maybe your job was to decide where to do it, the locations, and securing any training sites.

This was a Bristol day at the beginning of the year that they were conducting and hosting the scent day. And at our request they had -- the County had overlapped a mandatory certification day. The County has four times a year where the K9s have an opportunity to attend -- I believe you had to attend two, if not three. But they had an extra one, assuming you have vacations or injuries or whatnot. So this day was sort of a dual-purpose date, both a MPOETC eight-hour scent day for the K9s and also the County scheduled their mandatory scent certification day on top of it. For me that day, my day started at about 2:30 in the morning.

Q.   Was that in connection with an overtime shift?

A.   Yeah, the night shift was short.

Page 108

Q.   Let me ask you this because I never asked you in the beginning. Going back to -- we're talking about February-ish, February of 2022 at this point; correct?

A.   Yes.

Q.   If I represent that the date of the actual training was February 25, 2022, does that sound right?

A.   That sounds accurate.

Q.   So I just want to know around that time, what your schedule or shift was.

MS. BENFER: Objection to form to the question.

BY MR. HATCHETT:

Q.   Do you understand what I mean? What hours did you work?

MS. BENFER: Objection to form of the question.

THE WITNESS: I was scheduled for the day work shift for that period of time. And that was a regularly scheduled shift.

BY MR. HATCHETT:

Q.   I just want to make sure I understand. I've been corrected before as it relates to platoons, squads, and everything else

Page 109

like that.

When you say daytime shift, what hours would daytime shift end?

A.   So the daytime shift runs from 7 a.m. to 7 p.m. is the scheduled shift and is set aside and posted December of the year prior.

Q.   If you remember, it's not really important, but any RDOs? Regular days off? What were your regular days off at that time?

A.   For day work shift?

Q.   Yes.

A.   Day work shift ran a two-week rotation -- or all the 12-hour shifts ran a two-week rotation. So there would be a Friday, Saturday, Sunday that you worked. Off Monday, Tuesday. Then you would work Wednesday, Thursday. And then you'd be off Thursday, Friday, Saturday. So the two weeks would mirror roughly two days on, two days off. Friday, Saturday, Sunday being in the group. And then after two weeks, you would start to cycle again.

Q.   This is not that important, but I imagine they're similar schedules if you work night shift?

A.   There's day shifts, two night

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 110

shifts. Shift changes occur at 7 a.m. and 7 p.m.

Q.   Now, with your schedule now established, going back to the day in question, you were telling us about how you were working at 2 a.m.; right?

A.   2:30. I left my home to work an overtime shift from 3 in the morning until 7 in the morning.

Q.   Do you remember what capacity?

A.   Patrol for manpower shortage for night shift.

Q.   Did you have Monty with you?

A.   Yes.

Q.   Finish telling me what happened that day that you can recall.

A.   Again, I left my home about 2:30. I got to work to begin shift at 3. I don't recall what assignments I got or radio calls I got. At 7:00, I would have wrapped up the overtime portion of the patrol work that I had come in for, turned in whatever associated paperwork that was generated from those four hours, and then there was a transition into what was then a scheduled K9 training day. My responsibility as an explosive dog handler -- so Monty was trained for explosives

Page 111

detection. And then Falls Township was sort of the designated explosives provider. We had a thorough library of explosive scents. So I would have to get the explosive magazine from the steel locker and then collect different explosives for the day, put them in a travel case, load the case in the car with the dog, top it off with gas, and reported to Bristol Township. Bristol Township has their own K9 building. They have kennels. They don't take their dogs home, so they kennel and leave them there. Met up with the Bristol guys. The Bristol guys did not have training site for beginning of the day. They said the County has the cert coming up. We're just going to use their location, which was consistent with what we had been able to do in the past. So those of us prepped our dogs, walked them, emptied them. Especially for the cert days, it was critical that the dog did not urinate or defecate in the training site. That would effectively be a failure for the day. We individually prepped the dogs and tried to sharpen them up so they have a successful scent day. Bristol decided it was time to move over to the county site, which is a county facility where they house drug forfeiture items,

Page 112

cars, different things on the different county properties inside. There's an indoor warehouse and an outdoor yard. We've used that in the past for training sites. They usually have been very accommodating. And since everything keeps changing inside, it's always unique to the dogs. It's always a challenge to find a new site so the dog doesn't learn the site and you have a cleaner training environment. In this instance, on this day, I recall it was very cold. It was raining. The county training isn't usually as heavily attended. I don't know if it's because it's the first one of the year, but it seemed that every dog in the county came. I arrived there before the training was scheduled to start because I was bringing the explosives for them, the explosives or the drugs. When they're set up for these training days, they have to be placed out ahead of time. It's what's called aging. The C4, the det cord, whatever it is, would be hidden somewhere on-site for the dogs to locate, but then your would leave it for about a half an hour for the odor to spread and make it a more realistic scenario that there was a bomb placed somewhere previously and can the dog locate it in the

Page 113

different ways the scent travels through the air, it drifts. Your job is to wait for your turn to be certified. Again, it was a very heavily attended day, so the waiting portion was significant. I don't remember which order I fell in line, but when it was time for Monty to be certified, I got Monty, ran trough the certification explosives area. He found the stuff he was supposed to find. A good cert day for him. And then you wait for everybody else to finish. The other dogs were drug dogs, so I assume they were doing the same thing in the drug area. When the County was finished with the certifications, I was able to collect up all of the explosives, account for them, make sure there was nothing left behind. The County said thanks for coming, turned off the lights and sent everyone out the doors. We discovered at that moment we would not be able to use their building for the rest of the day that we had anticipated or expected that would be available to us. Bristol seemed as surprised as the Falls guys. Again, it's probably mid 30s, raining. Bristol said lets go grab lunch. We went to the lunch place that Bristol likes to go to and said we will figure out what we are doing

Exhibit 1

Page 114

from there. We went over to the -- it's a pizza shop. I think I ordered a cheese steak or something. I don't remember. And then through the course of it, we tried to locate new training facilities. The Bristol guys called their contacts. I know Tom and Fisher called their contacts. I didn't have anybody to call, but we needed an indoor location because of the weather that would allow us to host and run the dogs and do it on short notice. I know they exhausted their phone book of contacts. We previously used locations like the mall or office buildings that were being renovated that we've used in the past. I don't know if they couldn't reach the people or if they reached them and got denied that they weren't available for that day. This continued on until it was -- you reached a point in time where even if somebody called back at that moment, by the time you packed up, drove there, unpacked the explosives, let them age for the scent to dissipate, it would be time to pack them back up again. So it was almost a window of opportunity that as that time went on, closed on. I know that Tom and Fisher they were excited about a new training app that they had found.

Page 115

Q.      That's Lundquist?

A.      Lundquist and Fisher, yeah, yeah.

Q.      I know. It's a force of habit with police officers to commit to memory their last names.

I'm sorry. You were saying Tom and Fisher...

A.      Tom and Fisher, they were excited about a new training app they had found. It's geared more towards the tracking aspect.

Do you want to know more about the app or skip it?

Q.      Is it material to what you did that day?

A.      Me, no; them, yes.

Q.      Tell me about the app.

A.      I believe it was a paid app, like $5. You downloaded it to the person's phone. It was either man tracking or -- something like man tracking or person tracking -- but you would have the bad guy or decoy. You would activate their app.

Q.      Oh, in connection with the training app.

A.      They would go and run and hide and

Page 116

whichever street you would go down, it would keep a log of your progress, your speed, direction drawn on a map. You would have that and then the K9 officer tracking you, before they attempted to locate you, would activate their app and then let the dog do the work. That app would keep track of where the dog led him, which direction, how fast. And then at the end of the training, you could link the two and you could see how accurate your dog was following the pathway the decoy, bad guy, had left.

We didn't have anything like that. Like, a lot of our tracking training involved, well, which way did you go? Did you turn here? I went down the trail. Did you find me? And then going through woods, going through fields, going through random areas. And we would typical in training try to find out did the dog make a wrong turn? Was he on the track? How tight was he? So this was a very interesting opportunity to have a digital documentation of the person running and hiding versus the dog trying to locate them and then comparing, how accurate was your dog? Did he lose the scent and happened to find you again? We would never know that normally. So they went -- I

Page 117

don't know where they went to practice with it, if they did it on foot or they did it in cars, but that was their mission. They were going to go see if they could get that to work so we could use it in the next training, which I think we did use it the next training. So when Bristol wanted to go back to Bristol, either they went with them or they went with Bristol and then parted ways. I had the explosives still. I had to bring them back to headquarters and --

Q.      I don't mean to cut you off, but would it be fair to say you were alone the whole time -- you were alone when traveling by vehicle?

A.      In the car?

Q.      Right. I'm trying to find out if you guys were paired up.

A.      No. Everybody has their individual car with their dog.

Q.      Right, I assumed. Folks were splitting up?

A.      Not split up, but, again, we reached the point in time where even if a site called us back and said come down, we wouldn't be able to utilize it. The time it would take to get there, put the explosives and drugs out, give the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 118

explosives and drugs time to age and dissipate, gather the dogs again, it was a window of opportunity that, even though the day hadn't ended, the window of opportunity to have more scent training was effectively closing. So Bristol decided they wanted to go back to their headquarters. Again, I wasn't with Tom or Fisher. I don't know if they went to the headquarters or drive and track -- I don't know what they did. I had the explosives to deal with, so I went back to headquarters to secure them and lock everything up. And then at 3, I went to meet with Chief Whitney.

Q. Tell me about that.

A. The day or possibly the day prior, I had a meeting with Hank Ward where he had told me that Whitney had four or five people that he was getting rid of and anybody that got in this way was going to be collateral damage. And I was like, wait, you got Steve and Bruce and I guess the girls; and Hank's like, just don't get in his way.

Q. At this time, you are the union association president; right?

A. I had just taken over, yes.

Page 119

Q. What was the purpose of you going to meet with Chief Whitney?

A. I wanted to know from him, because I didn't trust Hank Ward, what exactly was going on with Victoria Crozier, like what were you doing to her? What is it this time? So I went in and spoke with him probably for 20-ish minutes.

Q. Who? Ward?

A. Whitney.

Q. On the 25th?

A. Yes.

Q. You were present for his testimony; right?

A. Yes.

Q. Did you hear his testimony that no meeting occurred?

A. Well, he says it didn't, yes.

Q. You are saying as it relates to that, he is inaccurate?

A. Yes.

Q. So according to your testimony, a meeting actually occurred on the 25th. Tell me about it.

A. I asked him what was going on with Vicki. He said they were going to send a bunch of

Page 120

her cases up to County to get reinvestigated. I said this is unheard of, nobody has ever done this before. We got into she's doing exactly what you say you want your people to do. She's being a hunter for you. Chris and his guys are doing the exact same thing and everybody is cheering for that, but then Vicki is doing the same thing and you say you want to fire her for it. It's like you can't say to the guys on Chris's squad great job and then telling Vicki you are being too aggressive and too many arrests and we're going to fire you for it.

Q. Mr. Elmore, let me just ask you this because the term "hunter" has come up in Chief Whitney's deposition as you know; correct?

A. Yes.

Q. Is there a particular meaning that you associate with the term "hunter"?

A. Yes.

Q. As it relates to coming from Whitney?

A. Chief Whitney did, I guess, a commercial promo for a company called Street Cop Training. It's still up on YouTube, I believe. I believe he was at the time the lieutenant for

Page 121

Falls Township. He was effectively running it. He said that Street Cop Training was the best training that he's ever attended and the best training that he's ever seen for patrol and that he wants his officers to be hunters and that he was going to send all of his hunters to Street Cop Training to receive more of their training. Again, I believe the video is still online. I don't know if you are familiar with Street Cop Training?

Q. You can spare me on the details as it relates to Street Cop Training. I'm just trying to stick to --

A. They were investigated by New Jersey Comptrollers Office and all of their training was found to be unconstitutional or explicitly racist and bigoted where they promoted discrimination against people based on race, gender, sexual orientation. I know one of the highlights was any time they would depict an African-American in like a traffic stop, it would be displayed by a picture of a monkey wearing a baseball hat. This was Street Cop Training.

Q. That would have been after Whitney made the video; right? I'm going to say

Exhibit 1

Page 122

decertification or whatever it was?

A.    They were investigated.  The comptroller's office investigated.  I know New Jersey prohibited anybody from attending the training.  I think Falls kept going.

Q.    I'm just asking in terms of Whitney and the video.  That would have been --

A.    When he made the promotion?

Q.    Correct.

A.    Yeah.  It was during their, I guess, peak.

Q.    Before all the investigations?

A.    Before the report.  The investigations were at the peak of the training.  Our guys were still going.

Q.    Understood.  Now you were just telling me in terms or I was asking more so about your understanding --

A.    Hunter?

Q.    Yes.

A.    Again, in reference to the Street Cop Training, it was promoting unconstitutional search and seizure, discriminatory targeting of individuals.  And Chris with his guys on his squad had, from what I saw, evidently embraced that.

Page 123

And there was never a problem with the arrests that they were making.  But Vicki make more arrests through clearing investigations for retail thefts.  And now he was targeting her and saying she is reckless with her arrests.  You made too many.  We have to investigate.  We're going to find something wrong with one of them and fire you for it after the fact.  It was the Hank Ward playbook of we'll investigate you, we will find something, and we'll probably accuse you of being dishonest in the end.  And I believe that's the path it went down.

Q.    Is that what Ward said to you the day before?

A.    Ward said that Whitney had a list of, I believe five or six people.  He was going to get rid of them.  Stay out of his way.  Anybody that gets in his way was going to be collateral damage.

Q.    But nothing in terms of, we're going to put him through the investigations, accuse them of lying --

A.    That's what I watched unfold, which mirrored the conversation I watched them have in the office.

Page 124

Q.    Right.  I'm trying to understand if someone verbally said that the day before.

A.    The day before?  No.

Q.    So you were again telling me about based on your testimony and meeting with the chief on the 25th.  And this was based on the conversation that you had with Ward; correct?

A.    That he had basically warned me that they were coming to get Vicki and stay out of the way, yes.

Q.    Going back to the 25th when you had that conversation.  Do you remember approximately what time it would have been?

A.    It would have been roughly 3 in the afternoon to 320-ish.

Q.    All right.  Now, let's take a break for a second because I want to figure out when would your shift had -- well, it would have been training, right, not a shift?

A.    The original scheduled shift, it would have been posted in December the year prior, would have been from 7 a.m. to 7 p.m. But on a training day, if you attend a training day, you are assigned for eight hours if your training goes for eight hours, and that satisfies your full

Page 125

12-hour shift.  And then typically there's nothing afterwards; you would leave.

Q.    So at 3:00 in the afternoon, you would still have been working?

A.    No.  I would have satisfied my day that day because it was a training day.

Q.    Because of the eight hours?

A.    7 a.m. until 3 would have satisfied the requirements for any training or school day.  I would not have been required to put a regular uniform back on and do regular patrol work, no.

Q.    I just wanted to get that clear.

Now, going back to the conversation with Whitney, I was just asking you about the timeline and I believe you were saying around 3 o'clock?

A.    Roughly 3 to 320-ish.

Q.    Anything else that you discussed with Whitney at that point?

A.    We actually discussed a different case with a different officer, Dan Matkowski.  Dan Matkowski had worked a case that initially didn't seem like it would go anywhere.  There was very little evidence.  We weren't sure where it was going to go to.  And like we discussed, you know,

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 126

Whitney, you are promoting volume arrests, but you also have guys spend time on one case and made a good case out of something that might not have been solved. Dan did -- I'm not particularly friendly with Dan, but Dan did a really good job following up and following through with the case. And I believe Whitney actually included Dan's arrest in a newsletter or something else. So he took something from that conversation about Dan pursuing this case that would have been difficult to solve and there's other ways to do quality work besides volume. You can dedicate time to one thing, not necessarily be a hunter, but still do the work. I thought it was actually heartening that he had taken something from that and acknowledged Dan had done a good job chasing this one case down.

Q. How does the conversation end?

A. The chief asked me to bring him some sort of case law. Which is -- that's like a throwback to an old time. Like, we had a previous chief that always claimed there's case law and stuff. That's just the way to end an argument or discussion or debate. What's the case law? It basically finished up with "Well, find me some

Page 127

case law." It was obvious that we didn't agree with those things, so my goal was to find him case law.

Q. You didn't prepare any kind of memos or anything like that as a result of the meeting, did you?

A. Memos? No.

Q. Would it have been your practice to prepare any memos or anything like that as a result of a meeting like that?

A. Memos? No.

Q. That date, which I believe we've established was February 25, 2022, was that the first time you formally raised any concerns of discrimination with Whitney?

A. It may have been the first conversation that I had with him in all contexts.

Q. Was that in your capacity as an officer or as a union representative?

A. What do you mean?

Q. When you went to speak with him, did -- you were testifying that you went on behalf of these other officers; correct?

A. Yes.

Q. And that conversation you had with

Page 128

Ward, was that in your capacity as officer or president?

MS. BENFER: I believe you misspoke on the name.

BY MR. HATCHETT:

Q. Who did you have the conversation with on the 24th?

MS. BENFER: Again, objection to the question. I think you have the wrong date. You said 24th.

BY MR. HATCHETT:

Q. You met with Whitney on the 25th; correct?

A. I believe that was the date, yes.

Q. And correct me if I'm wrong, but I thought your testimony was that you had a conversation with someone the day before?

A. It was a day or two before, yes, Ward.

Q. Regardless of when the day was, when you had the conversation with Ward, was it in your capacity as a police officer or as the president of the association?

A. I'd say both.

Q. That's fair because oftentimes when

Page 129

you become the president of the association, you never really turn your president off.

Is that fair to say?

A. When you become the president of the association, you never turn your hat off.

Q. Well, what I mean by that is can people contact you when you are not working as an officer with issues?

A. Union members or...

Q. I'm sorry. Union members, yes.

A. Well, anybody can reach out to anybody at any time, the coworkers.

Q. When you say anyone can reach out to you at any time, did association members do that once you became president?

A. Well, even before that. I mean...

Q. Well, I'm just trying to focus on now you are president. So I'm just trying to understand --

A. Well, you are saying as that, but it's still people that ask me questions. Again, I give people copies of different grievances if they are filing a grievance and weren't familiar to the process. I would like to think that I was somebody that was helpful to them in that

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 130

capacity, that if they had a question, that I was one of the people they would ask.

Q.    Well, what I'm trying to understand is when you spoke to Whitney on the 25th, what capacity that was in?

A.    I would say both.  Again, Hank had just told me this and it was concerning and I had the opportunity to go up and speak with -- I could walk into his office, yes.

Q.    And you said as you recall, that was the first conversation you had with Whitney?

A.    Probably in a long time.

Q.    Well, as it relates to discrimination.  How about that?

A.    Yes.

Q.    And when you say "in a long time," because we've established this is, as you sat there and testified as you can recall, on the 25th of 2022, February, that was the first time that you raised these concerns?

A.    With Whitney, yes.

Q.    With Whitney.

Well, did you raise them with anyone prior to Whitney?  Because we're in February of 2022 at this point.  And I previously asked you if

Page 131

you made complaints in January and in February.

A.    I think in the conversation with Hank, Hank was telling me that this is about what we're going to do.  That they would go to that length is shocking.  I think we discussed that for a while.  They told me to stay out of the way.  Don't get in his way.

Q.    I missed the first part, the day you went to where?

A.    No, the date that Hank initially came to say this is what we're about to do to Vicki, send her cases up and investigate her.  It was unheard of and I believe I complained to him, like you actually approved all of these cases yourself, you know, I have never heard of this.  Nobody's ever heard of this.  You've never done this to anybody else.  The chief told us stay out of the way.

Q.    Going back to February 25, 2022, Whitney tells you to bring him case law and that's how the meeting ends or conversation; right?

A.    I don't want to say for certain that that was the last word, but it was basically wrapped up.  We had also discussed the number of investigations that were happening.

Page 132

Q.    What kind of investigations?  Internal affairs?

A.    Internal investigations.  Yes.  What I would characterize as paralyzing.  People can't walk down the halls.  People were afraid to come to their shift because it seemed like no matter what they do, they will be investigated for something.  Somebody bumps somebody in the hallway, it becomes an investigation.  Benign things that typically -- you know, it's day-to-day stuff and now it's a full formal investigation.  Like it's ramped up to the point that people have anxiety about coming to work and people are calling out from work.  I believe it was that meeting where he told me to tell the guys they don't need to worry about all the internals.  He had a few officers who made EEOC complaints against him and he had to make it look like he was being fair to them.

Q.    That was coming from Whitney?

A.    That was from Whitney.  And I was shocked by that.  I think I said to him, "It's not looking like you are being fair.  It's you have to actually be fair."  I think at that moment maybe we realized we were talking past each other.  Like

Page 133

I had an expectation for him that wasn't going to happen and I think he had an expectation for me that I was going to help him with this stuff and that wasn't going to happen.

Q.    And that's the end of everything that day; correct?

A.    Yeah, I believe.

Q.    Do you report off after that?

A.    What's that?

Q.    Do you report off from work after that?

A.    No.  I actually went down the hall.  Chris Clark was a sergeant, but he wasn't the average sergeant.  He had a lieutenant's office.  Chris's sergeant's office was next to Whitney's so I went down and sat with him for, I think, an hour and a half.

Q.    How long did you sit with Whitney?

A.    Huh?

Q.    How long did you sit with Whitney?

A.    I think 20, 25 minutes in that meeting and went down and sat with Chris for another hour, hour and a half.

Q.    Are you still on the clock at this point?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 134

A.    Technically, my shift was satisfied at 3 that day because of training, so I could have gone home, but...

Q.    I guess my question is a little bit different.  I know it's been a little bit, but do you recall did you submit hours for the additional time that you stayed having these meetings?

A.    No.  There was overtime put in for the morning, 3 to 7, which was outside of my scheduled shift, which was the nighttime shortage that I filled.  But then from 7 a.m. until 3 was my training, and then after 3 was basically time that I could have left at any time.

Q.    As it relates to the conversation with Chris Clark, did you discuss anything as it relates to Whitney, with Whitney that day or discrimination?

A.    No.

Q.    That's for all intents and purposes that conversation has nothing to do with the claims with your lawsuit.

Is that fair?

A.    Excuse me?

Q.    I'm just trying to -- if it's not worthwhile, I don't want to get into the

Page 135

conversations with Clark that you had.

A.    The conversations with me and Clark?  No, just time.

Q.    Understood.

So at that point, you go home at some point; correct?

A.    Yes.  5:30 or 6 I think I get home.

Q.    Do you have another meeting with Whitney shortly thereafter or I'll say that you can recall?

A.    I do.

Q.    When is that?

A.    I believe it was early March.

Q.    March 9, 2022, does that sound about right?

A.    Sounds appropriate.

Q.    What was the point of the meeting, the March 9, 2022 meeting?

A.    To go back and reiterate the issues that I had raised with him.  I actually printed out -- when he said case law, I printed out sheets from the U.S. Constitution from the 5th and 14th Amendments.  Not case law, it's constitutional issues.  You are violating people's constitutional rights that you have -- there has to be a

Page 136

different way.  We really didn't make any progress on anything.

Q.    At some point in time you are made aware of an investigation into your activity on February 25, 2022; correct?

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  Yes.

BY MR. HATCHETT:

Q.    Tell me what you remember about being notified about an investigation into the time that you submitted for your training on February 25, 2022.

A.    I didn't submit time for training.  It was the regularly scheduled shift that was assigned that day.  At some period later in March, Hank Ward called on the phone and basically reiterated his threat that I told you you would be collateral damage.  They are saying you guys didn't attend training when you were supposed to be training that day.  I said we were at training.  We were with the training group.

Q.    What happened next?

A.    As it relates to that investigation?  I know I was interviewed about it.

Page 137

Q.    By who, Ward?

A.    Yeah.  And that interview had a different tone and tenor than the different ones I had said before.  And then I didn't hear anything about it.

Q.    Do you recall how soon after the notification from Ward about the investigation that you were interviewed?

A.    No.

Q.    Do you recall whether or not Hank Ward submitted findings regarding his investigation?

A.    I know now like almost a year later I got a copy of his accusation.

Q.    But not at the time?

A.    No.

Q.    As you sit here today now having received a copy of the investigation, are you aware that Lundquist and Fisher were also -- I'm going to call them "targets" -- targets of the investigation?

A.    Well, yes.

Q.    And what's your understanding of, as you sit here today now having received a copy, but also going through working there up until 2024,

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 138

what's your understanding of the investigation and the results and Hank Ward's recommendations?

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  I'm sorry?

BY MR. HATCHETT:

Q.    Just what's your understanding of what happened with the investigation?

A.    The Hank Ward accusations were found to be unfounded.

Q.    What were the accusations?

A.    That time had been stolen and people lied in the investigation.

Q.    Was it also part of the investigation and/or the accusation that you and the other officers submitted four additional overtime hours or four additional hours that should have not been submitted?

A.    I think you are conflating how the time is billed to the County.

Q.    So I understand.  What I'm -- I understand what you are saying in terms of -- is it fair to say that the County has to reimburse for any training hours?

A.    No.  The County only agrees to

Page 139

reimburse for four hours for training day.

Q.    Right.  I had it reversed.

And is it your understanding that that was part of the issue in Hank Ward's investigation?

A.    Well, Hank Ward had ordered us to have eight-hour training days.  So when Fisher and Lunquist submitted time slips for the training days, they were for the eight-hour training day that they had attended.  And then it's my understanding that the County forwarded -- or the Township forwarded the entire eight hours to the County for reimbursement, but the County only reimburses four hours for training.  So they wanted to know why they were getting the slip for eight.

Q.    Now, you previously mentioned not long ago that there was a -- was there a recommendation for discipline based on Hank Ward's investigation?

A.    Hank Ward recommended everyone get fired for everything.

Q.    I don't know if we touched on it too much, but maybe now is a good time.  What's the -- do you know what I mean when I says "progressive

Page 140

discipline"?

A.    With the discipline chart in our policy?

Q.    Just generally, progressive discipline?

A.    We have a chart in our policy manual.

Q.    Right.  My question is about progressive discipline.

Are you familiar with the term?  Yes or no?

A.    I'm familiar with the progressive discipline chart in our policy, yes.

Q.    Progressive discipline is in it?

MS. BENFER:  Objection to form. Asked and answered.

MR. HATCHETT:  He's never answered it.

THE WITNESS:  There's an aspect to it for second offense and third offense, so progressive discipline.

BY MR. HATCHETT:

Q.    Just asking --

A.    A very open question.  I mean, I'm trying --

Page 141

Q.    I don't need you to expound.  If you want to continue, you can.  I'm not trying to cut you off, but my next question, though, is just generally, I imagine you are familiar with the disciplinary policy for the department as it existed back in 2022 up through 2024?

A.    Yes.

Q.    As you sit here today, to the extent that you can recall, there were no changes in the policy between '22 and '24 prior to your termination?

A.    In the discipline policy?

Q.    Correct.

A.    I don't know.

Q.    You were the president of the association.  You weren't familiar with it?

MS. BENFER:  Well, I'm going to object to the form of the question.

You can answer it if you understand.

THE WITNESS:  They don't ask my opinion or get my approval for changes.

BY MR. HATCHETT:

Q.    I was just asking if you were familiar with it.

Let me ask this it this way:  As the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 142

president of the association, were you familiar with the disciplinary policy?

A.    Yes.

Q.    What was your understanding in terms of how discipline was implemented throughout the Falls Township Police Department in 2022 through 2024 as it relates to this investigation by Ward?

MS. BENFER:  Objection to form of the question.

THE WITNESS:  You lost me.  I'm sorry.

BY MR. HATCHETT:

Q.    Explain to me the disciplinary process.

You said Ward recommended discipline; correct?

A.    (No verbal response.)

Q.    Yes or no?  Ward recommended discipline?

MS. BENFER:  Object to form of the question.  He's answering your questions.  You don't need to be aggressive.  You can clarify your questions if he's not answering them the way you want them to be answered.

BY MR. HATCHETT:

Page 143

Q.    I don't want an answer -- to be clear for the record, I don't want an answer.  I just want to be sure you understand.

I'm trying to get you to tell me what you know about how discipline was implemented as it relates to -- you said Ward recommended discipline; correct?  Termination; right?

A.    How that process falls out?

Q.    Yes.

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  So if you are asking, you know, at the end of that year -- I think it was November or December -- like what the process or what the steps next steps or...

BY MR. HATCHETT:

Q.    Once Ward submits the memo, who does it go to?

A.    I don't know.

Q.    Generally with an officer, based on your experience as an officer and president of the association, once discipline is recommended, what happens next?

A.    So if the chief is going to make a recommendation, there will be a Loudermill

Page 144

process.

Q.    Loudermill process is when the officer has a chance to respond to the allegations.

Is that fair?

A.    Yes.

Q.    After the Loudermill process, what happens?  Is there a hearing?

A.    The Loudermill is basically your opportunity.

Q.    Okay.  Following the Loudermill, what would be the next step in the disciplinary process?

A.    It's my understanding that the chief would recommend something to the board of supervisors and they would make a decision.

Q.    As you sit here today, you don't have anything to indicate that a different process was followed as it relates to Ward's investigation, do you?

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  I don't know what happened with Ward's investigation.

BY MR. HATCHETT:

Page 145

Q.    You were never disciplined as a result of that investigation; correct?

A.    Correct.

Q.    Now, moving forward, did you have any other conversations with Chief Whitney regarding these claims or allegations of discrimination?  I believe there was one in March.

Was that the last one?

A.    I'm not recalling anything right now.

Q.    But, again, just wrapping up the subject matter as it relates to Ward's investigation, when did you receive a notification that you were not going to be disciplined, if you recall?

A.    That would have been sometime in early '23.

Q.    What do you recall about receiving a notification of no discipline?

A.    I know there was an email that it had been reviewed and there was a recommendation for not being disciplined for the K9 incident, that that was done.  That was over.

Q.    Throughout the remainder of 2022, do you recall any other conversations with Chief

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 146

Whitney complaining about any other discrimination?

A.    I'm drawing a blank.

Q.    That's fine.  If you don't recall, that's fine.

Do you recall taking issue with Chief Whitney contacting the district attorney's office about the -- I'm just going to refer to it as theft of time, I think that's how it's phrased -- the theft of time investigation?

A.    I'm sorry?

Q.    Throughout 2022, do you recall Chief Whitney referring the investigation regarding the K9 training schedule to the district attorney's office?

A.    I learned subsequently that he had.

Q.    When you say "subsequently," was that while you were still employed or --

A.    Yes.

Q.    Tell me what you learned and how.

A.    I don't remember where I first heard it from.

Q.    Well, regardless of who you heard it from, do you recall what you recall, generally?

A.    At some point I remember hearing --

Page 147

I was never told directly.  It was never officially told to me that Whitney had asked the DA's office to effectively review and prosecute or review and hope to prosecute for either crimes or Brady violations.

Q.    You mentioned Brady violation. What's your understanding of -- when you say "Brady," that's Brady/Giglio?

A.    Yes.

Q.    What's your understanding of Brady/Giglio?

A.    It's my understanding that it's the legal requirement that if a particularly -- it may have other broader-reaching aspects, but more particularly if a officer or somebody who is going to testify in a court hearing has been found to be untruthful or dishonest or that there's some type of exculpatory type of evidence, that that needs to be revealed to defendants in cases, either through the DA's office or -- actually the DA's office memo'd -- it actually falls upon individual officers as well in summary issues.

Q.    Is it your understanding that that is a requirement of the district attorney's office?

Page 148

A.    Well they sent a memo, yes.

Q.    Mr. Elmore, I'm going to make this bigger.  You just let me know when it's good for you.  Little bigger?

THE WITNESS:  That's good.

MR. HATCHETT:  For the record, I am showing Mr. Elmore a document identified as Defense 0743.  This will be Exhibit 2 and I'm referring to page 3 of the document, Bates-stamped Defense 745.

Let me know when to scroll down, Mr. Elmore.

THE WITNESS:  You can.

(Elmore Exhibit 2, Memo, was marked for identification.)

BY MR. HATCHETT:

Q.    You done reading it, Mr. Elmore?

A.    Yes.

Q.    For the record, is this the memo that you were referring to?

A.    It is.

Q.    And you can see it's dated February 15, 2022.

Would you agree?

A.    Yes.

Page 149

Q.    The subject line is Obligation to Advise of Brady/Giglio Material?

A.    Yes.

Q.    And this is from Chief Deputy District Attorney Matthew S. Lannetti.

This is the memo, again, that you recall reviewing?

A.    Yes.

Q.    And based on this notification of Brady/Giglio, Falls Township, as well as Chief Whitney would have been responsible for sending information over that would have triggered this Brady/Giglio?

Do you agree?

A.    I don't agree.

Q.    What don't you agree with?

A.    I would dispute that the accusations made by Ward were unfounded.  Didn't hold merit. And then they were subsequently investigated by the sheriff.  They agreed there was no merit to it.  There was no wrongdoing.

Q.    I'm referring to the document.

A.    No, you asked if they had an obligation to --

Q.    Right.  If Falls Township had an

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 150

obligation to share it; correct.  And you said you disagree; right?

A.    To share Hank Ward's false accusations, no.  They didn't have the obligation of sharing false accusations.

Q.    Well, you see it says the district attorney, right here, "When a department becomes aware of such information relating to an officer who is or was employed by that department" and it's referring to the upper paragraph where it says truthfulness and honesty, it says "Please contact Chief Deputy District Attorney Matthew S. Lannetti so the DAO can make a determination of whether such information must be disclosed to the defense."

That's at least what the memo says, would you agree?

A.    Well, the memo says what the memo says.

Q.    Right.  My question is -- and, again, if you disagree, you disagree.  You are saying that Falls Township didn't have an obligation to disclose the investigation into theft of time?

A.    The investigation by Hank Ward was

Page 151

itself dishonest.  There was no theft of time.  There was no dishonesty in the investigation.

Q.    Do you see in this document and even outside of the document, do you see it says, "The district attorney's office will make a determination"?

You understand that; correct?

A.    About a false accusation?

Q.    Just about any reporting to the district attorney's office under Brady/Giglio.  The DA's office makes their own determination?

A.    I understand that they did.  They found that there was no wrongdoing.

Q.    I'm not asking you about the wrongdoing at this point.  I'm just asking in terms of the obligations -- well, outside of what we just discussed, what else is your understanding of Brady/Giglio?  You don't have to report any violations that are not founded?  That's your understanding?

A.    Is there requirement to make false accusations to the DA's office?  No, there is not.

Q.    You lost me.

A.    Is there an obligation to make a false accusation to the DA's office?  No, there is

Page 152

not.

Q.    I'm not asking you about false allegations.  I'm asking about disclosures.

A.    Is there an obligation to disclose a false accusation?  I would say, no, there is not.

Q.    Well, would you agree that at the time the information was submitted to the district attorney's office there was no finding -- there was no finality to the investigation.

Would you agree with that?

MS. BENFER:  Object to the form of the question.

THE WITNESS:  At the time, it was a false accusation, yes.

BY MR. HATCHETT:

Q.    My question, though, is:  There was no finality.  Like it never went to the board of supervisors to say Mr. Elmore is not going to be disciplined?

A.    Well, from the generation, it was a false narrative.

Q.    That's not my question.  My question is really at the time that the information was submitted to the DA's office, was the investigation false or not?  Was it finalized as

Page 153

it relates to the disciplinary process?

A.    As it relates to the disciplinary process?  No.

Q.    Do you recall making any complaints with any township individuals in October of 2022?

A.    You are referring to Dippolito and Takita?

Q.    Or anyone else.

A.    What was the timeline?

Q.    October of 2022.

A.    I believe there would have been a meeting with Takita and Dippolito.

Q.    Just so I understand the timeline for a second, there is at least a February 23rd or 24th conversation with Ward; right?

A.    Yes.

Q.    Based on that conversation on February 25th, you bring up issues -- you meet with Whitney and bring up issues you described; right?

A.    Yes.

Q.    You subsequently met with Whitney in March to provide him case law and go over the issues again; correct?

A.    Yes.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 154

Q.      Any other subsequent meetings with anyone else for the Township between March and October?

A.      With township officials?

Q.      When I say "township officials," I mean anybody that works with Falls Township.

A.      Oh, I disclosed to Vicki Crozier all this information and she actually included it in her grievances in the Loudermill reports.

Q.      Crozier wasn't a supervisor; right?

A.      No, but she works for Falls Township.

Q.      Right.  And I know I asked you that, but my next question, because I want to make the distinction that Crozier was a police officer; correct?

A.      Corporal.

Q.      Corporal.
Outside of Crozier, anyone else?

A.      Like supervisor or?

Q.      Just to the extent that you can recall.

A.      I'm sorry.  Give me your question again.

Q.      The question is:  Between March 2022

Page 155

and October 2022 did you meet with any other township employees, other than Crozier, where you would have raised these issues of discrimination?

A.      Meet with them?  No.

Q.      Based on your recollection at this point, fair to say the next conversation would have been you mentioned October 6, 2022?

A.      If that's the date of the meeting with Takita and Dippolito.

Q.      Tell me what you recall about meeting with Takita and Dippolito in October of 2022.

A.      They called me to schedule a meeting.  I was expecting them to schedule a meeting around that time.  During the meeting, I explained to them in detail the hiring interview process that I had participated in and explained to them the initial premise when Chris asked me to sit on the board with him.  I explained the parameters Chris had set up for how the interview process was going to work, what his goal was, what his expectations were.  I explained to them that during this process that we did not individually grade applicants.  And then after a batch, again, there's several batches from the list, Chris would

Page 156

direct us to his office and Chris would direct us to fill out oral interview applicant and scoring sheets.  And we had to do this as a group effort with a consensus that Chris led for what the results should be.  And basically work backwards to make sure the scores got the results that already happened.  And then I explained to them that, I believe it was August 27th --

Q.      What year?

A.      '22.

Q.      Okay.

A.      -- that Chris had again directed myself and Sergeant Fanelli to meet with him in his office and said that all the interview forms that we had previously filled out as a group effort following the batches were no good.  He said they will never hold up in court.  We have to fix them.  The paperwork is wrong.  And then he had us sit down and remake a new form for each applicant we had interviewed one by one with new documents and new scoring sheets and scoring standards, but then they would ultimately have the same end result.  They would have the same pass/fail result for the applicants in line with what Chris had wanted in the interview process.

Page 157

And that I subsequently learned from conversations with Officer Crozier that I believe he had us manufacturer them because the Township had been sued for discrimination and these records were part of the discovery process, were being subpoenaed and he had to manufacturer new hiring records to defeat the discovery or subpoena process and that those would be subsequently submitted to the Court.  I believe I went through the whole thing with him twice.

Q.      When you went through the whole thing with the --

A.      Takita and Dippolito.  Went through the whole process.  And a few days later Dippolito called me again and asked me to go over it again for him.  I believe he said his head was spinning in the meeting and tell me what happened.  He asked if I minded if they spoke with Anthony Fanelli about.  You know, that's their job to do.  And that was the last I heard of it.

Q.      Mr. Elmore, up until this point in October of 2022, you are not put on leave or anything like that; correct?

A.      October of 2022, I believe I was out IOD at that time with a torn bicep.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 158

Q.     Other than IOD, no administrative leave once you filed the complaints or raised the issues as you are testifying to?

A.     I think shortly thereafter they denied me light duty --

Q.     My question was --

A.     -- which was effectively a suspension.

Q.     Were you formally suspended?

A.     Not formally, no.

Q.     When you say you were denied light duty, could you no longer work?

A.     I could perform light duty, but I was told by Hank Ward that the health insurance provider had determined that no light duty was available to me, but that's not how things work.

Q.     What light duty did you previously work?

A.     Phone calls, phone-in complaints, non-front-facing work at headquarters, taking calls, returning calls.

Q.     The timeframe when that occurred, when would that be?

A.     I believe I tore my tendon in September of that year.

Page 159

Q.     Of '22?

A.     Yeah.  It would have been after the injury, but before the surgery.  Things were okay and then things weren't okay.  I was taken off light duty and told not to come to work.

Q.     When you were taken off light duty, were you receiving compensation?  Workers' Comp or anything?

A.     Yeah, I was getting paid.

Q.     You were just not allowed to come to work?

A.     Right.

Q.     And light duty is essentially for any officers that are not able to perform their 100 percent function.

Is that fair to say?

A.     Sure.

Q.     And that could be for a variety of different reasons?

A.     (No verbal response.)

Q.     Light duty could be for a variety of different reasons?

A.     I don't know what --

Q.     You don't know what light duty is?

A.     I know what light duty is.  For a

Page 160

variety of reasons, explain.  It's a very open-ended question.

Q.     Are you familiar with other officers that have received light duty?

A.     Yes.  Typically a doctor would decide whether or not you can work in a light duty capacity or not.

Q.     For various different reasons; right?

A.     For a doctor's decision for medical issues.  I don't know about other reasons outside of that.

Q.     We're only talking about light duty as it relates to Falls Township department.

A.     With medical issues.

Q.     Are you aware of people that were placed on light duty for nonmedical issues?

A.     No.

Q.     Are you aware of other individuals that were denied light duty?

A.     Denied light duty?  No.

Q.     And as it relates to your testimony that you were denied light duty, would there have been a difference in your compensation?

A.     It would have prevented me from

Page 161

attending court or training that would have occurred during that time, so there is a loss of overtime opportunities.

Q.     As you sit here, I imagine you don't have an independent recollection whether you had court or other trainings at that time?

A.     No.

Q.     Now, outside of the light duty, I was just asking if there was any other kind of discipline or repercussions, other than that note; right?

A.     Up to what point?

Q.     We're talking about October of 2022.

A.     October?  No.

Q.     The conversations you were describing and testifying about in October of 2022 with Dippolito and Takita, were you in your capacity as the president of the association, police officer, or both?

A.     I would say police officer.  It was at Vicki's request that I let them know.

Q.     If it was in your capacity as a police officer, wouldn't that have been going beyond the chain of command?

A.     It was, but I believe the issue was

Exhibit 1

Page 162

the chain of command.  There was nobody before them that didn't have some involvement.

Q.    But to be accurate, Takita had previously been employed in Falls Township prior to that day; correct?

A.    Takita?

Q.    Yes.

A.    I don't understand what you're...

Q.    That wasn't the first day Takita showed up working; right?

A.    Yes.

Q.    Because your testimony was that was the first time there were new people involved; right?

A.    The first time that new people were involved?  I'm sorry.  I think I lost your original question.

Q.    I was just asking in terms of you being -- your capacity, whether you were there as a police officer or there as the president of the association.  I believe your testimony was that Vicki asked you to go, so you went in your capacity as a police officer?

A.    Vicki asked me specifically to tell the township manager what I know about what I told

Page 163

her.  I told her the whole thing.

Q.    Let me just ask about Dippolito. Dippolito was previously employed as the township manager during this 2021, '22 period; correct?

A.    No.  He was assistant township manager.

Q.    Did I say something different?  He was the assistant township manager?

A.    Yes.

Q.    But previously employed there; correct?

A.    Well, he worked there, yes.

Q.    Right.  I'm just trying -- it's not like October 6, 2022, Takita and Dippolito are on the first day on the job, and there's no people you can talk to.

That's not accurate; right?

A.    No.

Q.    What I'm trying to figure out is why didn't you go to them sooner?

A.    Because it was my conversation with Officer Crozier where she had discussed her complaints and her lawsuits and the involvement of the hiring process and the discrimination in the hiring process how they were related to her EEOC

Page 164

complaints and her lawsuits.  She had thanked me for being helpful with different issues throughout the year with giving her information about the meeting between Clark, Whitney, and Ward where they had laid out how they were going to take care of the people they wanted to get rid of.  She told me they subpoenaed or requested the hiring records and she knew I was a part of that and that they were going to be part of either the lawsuit that she was filing or the complaint that she had made. I told her you should.  There's a lot of problems in the hiring process.  I detailed to her, again, the whole story how everything had played out from being asked to participate to wrapping up with forging documents in Chris's office.  She asked me to speak with the attorneys involved and she asked me to speak to Takita.  And I agreed and said, "Yeah, I'll let them know what I know."

Q.    Would you agree just generally based on that timeline, that at this point at least ten months had gone by from when the 2022 hiring process had finalized before you had talked to anyone from the township side?

A.    That that was the calendar?  Yes, that was the calandar.

Page 165

Q.    That's the timeline, just assuming generally?

A.    Yes, timeline, calendar.

Q.    Throughout the remainder of 2022, well, separate and apart -- I just want to make sure.  Separate and apart from the IOD rejection, are you the subject of any kind of administrative leave in 2022?

A.    2022?  Yeah, I was placed on admin leave in December.

Q.    Tell me what you recall about that.

A.    I received an email saying that you are on administrative leave.

Q.    Why?  Do you recall why, the reason that was given?

A.    It's in the email.  It can speak for itself, but...

Q.    I'm asking you to speak, as well.

A.    Yeah.  I had advocated for my coworkers.  I made complaints to the Township.  I made complaints about discrimination and I was put on administrative leave.

Q.    By who?

A.    Whitney.

Q.    And at that point in time, did you

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 166

file a charge of discrimination?

A.    No.

Q.    Do you recall the specific reason why Whitney placed you on leave?

(Reporter clarification.)

MS. BENFER:  Object to the form of the question.  Asked and answered.

BY MR. HATCHETT:

Q.    Do you recall?

A.    Again, the email details that.  If I'm guessing as to the things --

MS. BENFER:  I'm going to instruct the witnesses not to guess.

THE WITNESS:  I'm going to refer back to the email.

BY MR. HATCHETT:

Q.    I know you mentioned an email.

Do you recall a memo being provided to you?

A.    The memo was emailed.

Q.    Two separate things.  You get an email and the email has the memo in it?

A.    Right.

Q.    I wasn't sure what you were saying.

A.    Yeah.

Page 167

MR. HATCHETT:  Mr. Elmore, I'm showing you a document marked as Exhibit 3, identified as Defense 704.

Let me know what you are done looking at that, Mr. Elmore.

(Elmore Exhibit 3, Memorandum, was marked for identification.)

BY MR. HATCHETT:

Q.    Were you able to see?  Just making sure.  I'm sorry.  Let me make it bigger.

You done, Mr. Elmore?

A.    Yes.

Q.    I'm just trying to understand what's going on at this point in time.  It's December in the memo, but I know you have this first conversation with the township individuals in October of 2022.

Are you and Whitney communicating at that point in time?

A.    I don't believe we talked.

Q.    How is -- I'm going to use the term "relationship" loosely.

How is the relationship between you and Whitney during that time?

A.    No.  We don't have a relationship.

Page 168

Q.    And it would have been the same at that time?

A.    At which time?

Q.    We're talking about October of 2022.

I'm not referring to the memo.  I'm just asking you because at this point of time in the timeline, your testimony is that you make a couple of complaints or a couple of allegations, and October is the first time you go to the managers.  I'm just trying to understand is there's any dialogue back and forth between you and Whitney?

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  I don't recall speaking to him.

BY MR. HATCHETT:

Q.    Now, looking at the memo that you've had a chance to review, this is, in fact, one of the memos you received in response to being placed on administrative leave?

MS. BENFER:  Object to the form of the question.

THE WITNESS:  It's a part two.  It's a follow-up to one that I didn't see that day.

Page 169

BY MR. HATCHETT:

Q.    Right.  But this is one memo that you received; correct?

A.    Yes.

Q.    I'll just go through this.  I know you read it.  You were ordered to immediately remove the items described in the December 2022 memorandum from the Google Drive so they can be no longer viewed by anyone.  You are ordered to return the copies of the CCTV video to my office by no later than 1200 hours on 7 December 2022.  You are ordered to cease displaying, advertising, or sharing my image or any images/video of any FTPD personnel.

That's the first paragraph.  I'm going to stop there.

What is that in connection with?

A.    Apparently the day before he had sent me a December 5th memo.

Q.    I'm just asking you about the --

A.    But I never saw that that day until the next day.  I think it got lumped into the email chain.

Q.    Do you know what he's referring to when he says take down any CCTV video?

Exhibit 1

Page 170

A.    Yes.  That was the video showing Hank Ward with a few other officers attacking a prisoner in a jail cell, an American-American.

Q.    What about images?  What images were being referred to, if any different ones?

A.    I think there was a still of Hank Ward striking that same individual and a still of Nelson Whitney posing next to Derek Chauvin.

Q.    Mr. Elmore, you should be able to see a document identified as DEFESI 753.

Do you recognize that document?

A.    That is the still of Nelson Whitney posing next to Derek Chauvin and a still of Hank Ward striking the prisoner in the jail cell.

MR. HATCHETT:  This is Exhibit 4 for the record.

(Elmore Exhibit 4, DEF_ESI_00753, was marked for identification.)

BY MR. HATCHETT:

Q.    Did you create this document?

A.    I did.

Q.    It says that "Falls Township deserves better.  The officers of the Falls Township Police Department and the residents of Falls Township have a right to a police department

Page 171

that is free of racism and sexism.  The Township has now effectively purged 75 percent of the female officers from its ranks and refuses to address deeply troubling racial incidents, including..."  and then you have "Chief Whitney posing with George Floyd's convicted murderer while on duty in uniform at the Black Lives Matter rally in Bristol.  Scan for full photos."

That's an accurate summary, so to speak; right?  Well --

A.    You read it.

Q.    -- verbatim.

Did you take that photograph?

A.    I did take that photograph.

Q.    Tell me, how does that happen?

A.    That's a great question.  So following George Floyd's death, there's a Black Lives Matter rally scheduled for Bristol Borough. This is very shortly after.  The rally was scheduled and organized to start at the train station in Bristol Borough where the rally goers would congregate and gather and there would be a peaceful March through Bristol Borough down to the waterfront.  I believe there was a statue of some significance down there that I don't recall at

Page 172

this point.  And they had organized speakers and different things throughout the timeline of the event.  It was scheduled in advance.  It was organized enough that Bristol Borough had enough time in advance to prepare for it, organize roadblocks and whatnot.  And some of that was a sort of mutual aid request from the surrounding townships that other departments, if they had the availability and manpower, to recruit some people to sign up and come down.  I know there was traffic issues.  And, again, this was very shortly after George Floyd's death.  Nobody kind of knew how that was going to end before it started. Falls Township had a sign-up, a contingency of officers that signed up to go down and lend assistance in whatever capacity was needed.  I know some of our other tactical officers were assigned to take sniper positions up on, like, elevated clock towers on higher buildings with the anticipation that there could be violence or some sort of issue that required snipers to be present.

I was with the Falls Township officers down the road from the train station, which was the initial starting, gathering point. I was there with my K9 partner, Monty.  I was

Page 173

asked to periodically check the train station. There was concern that if there was a counterprotest hide some sort of device in the parking lot or parking lot area that would injure the protesters as they were gathering.  I had done that, I think, two or three times.  I had taken Monty down and cleared the area.  We had been congregated back down the street probably maybe a 1,000 yards from the train station lot.  It was the rank-and-file officers assigned to the detail and Nelson Whitney arrived.  He was the acting chief at that point, not yet promoted to chief, but he was the head and leader of Falls Township Police Department.  He approached the group that congregated and made this statement:  "I hope the protesters don't think I'm Derek Chauvin and chase me down the street."  And nobody understood what that meant.  It didn't make sense to any of us. He continued to go on.  "I'm just like Derek Chauvin.  I look just like him.  They are going to look at me and chase me down the street."  And, again, we were -- the only image that anybody had seen of Derek Chauvin at that point was the video of him making the arrest behind the patrol car in uniform, and Nelson Whitney looks nothing like

Exhibit 1

Page 174

that person.  So, again, we were confused.  We rebutted his assertion that he's just like Derek Chauvin.  You look nothing like him.  And he said, "No, no, wait.  You haven't seen the booking photo yet.  He had a booking photo and the booking photo looks just like me."  So nobody had seen the booking photo yet.  Nobody had seen this photo yet.  Another officer at the scene, that's not me, went into his phone, went on line, found the booking photo that you are looking at, pulled it up on the phone.  And Nelson Whitney stood as he's standing and posed next to it for the group of us there.  And then he went to the other officers that weren't there and repeated it two or three more times to different officers that weren't with the same group.  When that ended, the officer with the phone there had put the phone back in his pocket.  And I asked Nelson, "You haven't seen it.  Do you want to see yourself posing next to him?"  And he said, "Yeah."  And he made the same smirk and he's trying to emulate the picture on the phone.  Brought the picture back up again, posed for it.  Again, this was probably the third or fourth time that it had actually ended and restarted so he could pose for me to take this

Page 175

picture for him so that he could see himself posing next to Derek Chauvin.  And I took that picture that you see there.

Q.    Are you the only officer that took a photograph?

A.    I believe so.

Q.    Do you remember the timeframe?  I know you said it was at a Black Lives Matter rally, but do you remember the timeframe?

A.    It would have been in the beginning portion while the rally-goers were congregating at the train station.

Q.    I mean month and year.

A.    I would be guessing, but I know there's news articles that document the exact date.

Q.    And I'm guessing you took the photograph with your paid department-issued cell phone?

A.    We do not have department-issued cell phones.

Q.    That was a personal cell phone?

A.    It was.

Q.    I'm just trying to figure out what was your intention because you didn't delete the

Page 176

photograph after; right?

A.    No.

Q.    What was the intention?

A.    He had asked me to take a picture of him so that he could see himself making the pose next to the picture.  So I did that and showed him the picture that he wanted to see.

Q.    What was your intention of putting this photograph in addition to the other still shot on a flier?

A.    It's how Nelson Whitney chose to depict himself.

Q.    What does that have to do with racism or sexism in the department?

A.    Well, I think Derek Chauvin is generally considered the modern-day Hitler of race relations.

Q.    I don't know if I would agree with that, but...

MS. BENFER:  I'm going to object.  You asked him.

BY MR. HATCHETT:

Q.    What about sexism?

A.    Again, our female officers were being purged out.  We were removing them.  We were

Page 177

fighting, bringing back the ones that overcame the accusations that had been made against them, and it was time to have that conversation.  It was time to have that conversation.  It was an uncomfortable conversation, but it was a cancer growing in the township.

Q.    My question was what does the photograph have to do with sexism?

A.    That photograph?  There's multiple issues, like...

Q.    Does that complete your answer?

A.    Are you satisfied with it?

Q.    I'm just asking you the question.  I'm just trying to figure out as it related to what you put in the flier, how there's any connection with the sexism?

A.    No.  That would relate more towards the racism.

Q.    You also indicated that the Township has effectively purged 75 percent of female officers.

How many officers would that have been at the time?

A.    We had lost, I believe, Lanning (ph) was gone at that point.  Metterle had been fired

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 178

and they were not bringing her back.  And Vicki was, I believe at that point either retired, but they drove her out.  So she had -- I believe at that point she was out already.  So we had Nicole White was effectively our only female officer left in Falls Township.

Q.      I'm just asking when you say 75 percent were purged, you named three.

A.      Three out of four.  Yeah, so I think that was the math that day.

Q.      That was going to be my next question.  The female numbers for the department had never exceeded ten.

Would you agree with that?

A.      Yeah, they were reluctant to hire females for a while.

Q.      And as it relates to the memo that we have seen in Exhibit 3 -- I could bring it back up.  But that's -- this document is what the chief was actually referring to in that memo; correct?

A.      Well, I believe the video, as well.

Q.      The document, that's what he was referring to; right?

A.      In the video, yes.

Q.      I get what you are saying.  You

Page 179

didn't, in fact, take it down as he requested; right?

A.      Again, the memo you showed me referenced a memo dated a date before that I did not see that date before.  So when I received the memo that you showed me, I did comply with everything I was ordered to do.

Q.      As we sit here today, are those QR codes active?

A.      No.

Q.      Are you sure?

A.      I don't believe so.  I'm not a computer expert, but...

Q.      Did you generate those codes?

A.      I did.  I believe that file was either erased or -- I remember checking to make sure they didn't work, and that date they didn't work.

MR. HATCHETT:  Now I'm going to show you Exhibit 5.

(Elmore Exhibit 5, Memorandum Defense 0699 -0700, was marked for identification.)

(Whereupon, a discussion was held off the record.)

(Whereupon, a recess was taken.)

Page 180

BY MR. HATCHETT:

Q.      Mr. Elmore, before we took a break, I was showing you a document, Exhibit 5, Bates stamp number Defense 699.

This, I'll represent, as you can see, it is a memo from Nelson Whitney to you dated December 5, 2022.  I'll read it as you read along: "Please be advised that your actions as detailed in the following two paragraphs may be found to constitute the following:  Conduct unbecoming of an officer under Sections 103.150 and 103.175 of the FTPD Discipline Code.  Insubordination under Section 103.305 of the FTPD Discipline Code.  Disobedience of orders under Section 103.560 of the FTPD Discipline Code.

When you appeared for the Loudermill hearings for Corporal Langan and Corporal Crozier, you were wearing and displaying a T-shirt with a photograph of my face next to a cell phone displaying Derek Chauvin's face printed on the front of this shirt.  You also wore and displayed this T-shirt when you returned to HQ later that day and while you were at the roll call for the night shift.  You had no business/work-related purpose to be at roll call since you are currently

Page 181

out IOD.  I have been informed that your intention is to misrepresent this photograph that you took in 2020 and falsely pass me as a racist to avoid your serious pending discipline?"

I'm going to stop for a second.

The serious pending discipline, was that in connection with the theft of time investigation?

A.      With Hank Ward's report, yes.

Q.      Continuing to read it says: "This past weekend after you were notified of your Loudermill hearing, a pdf was electronically circulated titled 'Falls Township Deserves Better.'  On the pdf is the aforementioned photograph, a still shot of video from the CCTV system at HQ showing the incident with a prisoner from 2017 and QR codes that brings anyone scanning them to a Google Drive containing several photographs, the full video of the cellblock incident and contact information for the Falls Township Board of Supervisors.  I have been informed that you have expressed your intention to use this video to attempt to discredit Lieutenant Ward to avoid your serious pending discipline.

If you wish to respond to these

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 182

charges in writing prior to your Loudermill on Friday, 9 December 2022 at 15:00 hours, you may do so; if not, you will be afforded an opportunity to respond to these charges at Friday's Loudermill hearing. After the hearing, recommendation for discipline will be forwarded to the Township for these charges as well as the outstanding recommendation for discipline that you were provided last week. You are ordered to immediately cease and desist this behavior. You are ordered to remove these items from the Google Drive so that they can no longer be viewed by anyone. You are ordered to return all copies of the CCTV video to my office. You are ordered to cease displaying, advertising, or sharing my image or any images/video of any FTPD personnel?"

Now, when you referenced the memo -- well, this memo, December 5, 2022. You had a chance to read it as I was reading it?

A.    Yes.

Q.    And the photograph that we looked at in Exhibit 4, the photograph that we looked at, the pdf document, that's essentially what this is referring to.

You agree?

Page 183

A.    Yes.

Q.    So now as a result of these two memos, you were then placed on administrative leave?

MS. BENFER:  Object to the form of the question.

If you know the answer to that, you may answer.

THE WITNESS:  I don't think the memo placing me on leave identified why. If you have it, I don't recall if it did.

BY MR. HATCHETT:

Q.    Well, we already established that you were placed on leave in December of 2022; correct?

A.    Yes.

Q.    How long were you on leave? And I'm sorry, let me ask you a different question first.

This leave. Was it paid or unpaid leave?

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  This was concurrent with my IOD status.

BY MR. HATCHETT:

Page 184

Q.    So it did not impact your compensation?

A.    (No verbal response.)

Q.    Outside of -- I'll rephrase the question.

It did not impact your compensation, other than what you already testified to, as it relates to IOD?

A.    I don't know that I can agree with that. There was a point where I had satisfied the surgeons, where I should have been released back to light-duty status, but I wasn't because I was in this nebulous admin leave without definition for a half a year.

Q.    When did you return?

A.    It was after six months.

Q.    While you were on leave, did a promotional process occur?

A.    A promotional process did occur.

Q.    Can you tell me about 2023, I'll call it a spring promotional process.

A.    You want everything?

Q.    As it relates to the allegations in your lawsuit.

A.    Okay. So I believe it was still in

Page 185

December that Chris Clark had announced that there was going to be a promotional process and that it would be upcoming and there would be further information. I believe there's a requirement to submit maybe a memo indicating that you wanted to participate. But I may be confusing that with the K9 application. Chris then subsequently submitted further information about the process, including testing dates, study material, the study guides were -- I think there was a separate email from Chris Clark detailing that if you had purchased some of the books that had been listed as study material, that they could be reimbursed through your clothing allowance.

Because I was on admin leave and I had been specifically directed not to have any contact with any of my coworkers, any Falls Township personnel, not to be on Falls Township property, I wanted to participate in the promotional process, but I felt that it was like an insubordination trap that if I did show up, I may be accused of insubordination for not following those orders. So at each step of the process I reached out to, I believe it was Takita, to see if my administrative leave included being

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 186

barred from participating in the promotional process. I was told that I could participate. I subsequently had extra time on my hands thanks to Nelson Whitney, so I purchased every book that was listed, every study guide, studied them thoroughly, used the extra days I had at my disposal.

The first portion was the written portion which was scheduled and held at an extra room at Pennsbury High School. I'm not sure what the room's normal usage was, but it was big enough to accommodate everybody -- those in the promotional testing. Our contract says that anybody involved in the promotional process can't be an employee of Falls Township or live within Falls Township. And that's to ensure -- it's an impartial process, that anyone participating has a fair shot in it.

When I arrived at the written portion, much to my surprise, Chris Clark was there on behalf of the township administration and Chris Clark was the proctor in charge of the written test. Chris Clark had the testing books. Chris Clark had the testing sheets. He gave directions. He was overseeing it and he was the

Page 187

proctor for the event. I just recently reported Chris Clark's discrimination and then been put out on leave immediately following it, so it caused, to say the least, a slight bit of anxiety in taking the test. I tried to make my best of it. I picked a position as far away from the front of the room as I could, as far away from where Chris appeared to be setting up to proctor and administer the test. I received my book. I received my answer sheet. Warnings were given that if anybody is caught looking at somebody else's sheet or if they are looking somewhere that they shouldn't be looking, it will be constituted as cheating and you will be disqualified and asked to leave the promotional process. So I sat throughout the entire thing with my head looking down, making certain that there was no way to be accused of looking in the wrong direction or glancing at someone else's sheet. Throughout the written test, Chris Clark did not stay in the front of the room where was initially his proctor position. He paced back and forth the back of the room past me, next to me. Would stand behind me, made huffs, and puffs, and grunts, yet somehow I managed to make it all the way through the written

Page 188

portion and actually did very, very well. I scored very high on the promotional test. Actually, for clarity's sake, there was one test being given, but it was two groups of people participating: one was patrolmen seeking corporal position and there was also anybody who was currently a corporal or detective could test for sergeant. Everybody was taking the same test at the same time at the same location. Of those of us who were patrolmen seeking the corporal position, I got the highest numerical score for that written test. I was very happy with that. The lead I had on the others based on the calculations I did, it would appear on that day that I got that score, that I would certainly be not only eligible, but like inevitable to be promoted. I believe there was five or six promotional spots open. There was a lot of promotion being made off of that test. I don't want to get hung up on the number, but there was a significant number of promotions that were going to occur. So it's a very good spot to be in. And I was still out on administrative leave and I was prohibited from being in the building or having contact with my co-workers.

Page 189

I then received at some point after that date a township email listing everybody's evaluation scores. By contract, our promotional process has a written portion which has the highest weighted amount, then there's also an evaluation and an interview portion. When I received my evaluation score, I saw it was I believe a 51, which was incredibly low, devastatingly low. I saw the other scores on the sheet and I knew that the lead I had from the written portion was destroyed. They had erased the opportunity that I had to obtain a promotion from this testing.

Q.    What does the evaluation consist of?

A.    The evaluation traditionally through all previous experience and previous testing cycles is your immediate supervisor will grade, basically scores. I believe it's usually 0 through 20 is the total range, but typically the scores range between 17 and 19. And your immediate supervisor will evaluate your performance and job functions as you have been doing them day in and day out on his squad. I found out that the evaluation that -- well, I was given the number and then I found out the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 190

evaluation form to support that number wasn't written until the day after.

Q.    Let me ask you this:  Fanelli was your evaluator; correct?

A.    Fanelli was my initial evaluator. He is not the one that gave me a 51.

Q.    Well, let me phrase it that way. Fanelli was your initial evaluator; correct?

A.    Yes.  And I found out after the fact that he had given me a significantly higher score.

Q.    Was Fanelli your immediate supervisor?

A.    I was on administrative leave, so I didn't have an immediate supervisor.

Q.    When you were working prior to you going out on administrative leave?

A.    Yes.

Q.    Are you aware of any -- disregard that.

You were saying that you didn't -- at some point in time you found out that Fanelli gave you a significantly higher score than 51; correct?

A.    Yes.  I requested my original evaluation and received the original evaluation with Fanelli's original score.

Page 191

Q.    Was Fanelli an easy evaluator in the sense that he would give out inflated or high evaluation scores, if you know?

MS. BENFER:  Objection to the form of the question.

THE WITNESS:  I don't believe so.

BY MR. HATCHETT:

Q.    When you say you don't believe so, have you had conversations or seen other evaluations for other individuals that Fanelli would have completed?

A.    No.

Q.    Nonetheless, as it relates to your evaluation, Fanelli completed the initial evaluation; however, someone else did a secondary evaluation; is that correct?

A.    Nelson Whitney and Chris Clark did a second evaluation and reduced my score from, I believe, 90 to 51.

Q.    What's your understanding of why Nelson Whitney and Chris Clark would have reduced your score and did a secondary evaluation?

MS. BENFER:  I'm going to object to the form of the question, and regarding the fact that he sat through Mr. Whitney's deposition, I

Page 192

don't think it would be appropriate for him to be testifying about what he heard in Mr. Whitney's deposition.  Does that make sense?

MR. HATCHETT:  I understand your objection.

BY MR. HATCHETT:

Q.    Subject to any deposition testimony, I'm just -- prior to that, if you had an understanding, what was your understanding?

A.    Why do I believe that they changed my score?

Q.    Yes.

A.    Is that the question?

Q.    Yes.  Excluding any deposition testimony.

A.    Retaliation.

Q.    When you say "retaliation," retaliation for what?

A.    Reporting their organized efforts to discriminate against current and potential future employees.

Q.    And this period of time now that we're talking about is spring of 2023; correct?

A.    Yes.

Q.    So you fully completed the testing

Page 193

process, which --

A.    No.  There was also an interview portion.

Q.    That's what I was going to ask you.

A.    No, you said fully completed.

Q.    Fully completed the testing process, which would have included the performance evaluation, the interview, and written portion; correct?

A.    The interview portion was the -- I believe the last portion in the cycle, which since you've asked about the process, I had actually researched and found out the company proctoring the test, SafeCity Solutions, had published a book for officers taking promotional interviews.  It had been out of print for a very long time and it cost a significant amount of money, but I purchased a copy of it and, again, used the extra time that I had at my availability to study that book.  When I took that interview, I knew each question they were about to ask, I knew the reasoning they put in the book for why they were asking these questions, I knew the answers that they wanted to satisfactorily satisfy those questions and the entire thought process of the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 194

interviewers conducting the interview.

Q.    Mr. Elmore, I was just asking --

A.    You asked earlier.

Q.    Right.  And at that point in time I was fast-forwarding the time -- the whole testing process was complete.  I was trying to go to that point.

A.    Well, the interview was part of the testing process.

Q.    And that's what I'm referring to.  I want to go to that point.

A.    Well, I just went through the interview process for you.

Q.    Tell me more.

A.    Again, when I attended the interview, it was -- I had their questions, I had their answers, I had the reasons for them asking the questions, and the reasons for them wanting the answers they wanted.  It was a very detailed book.  The questions they were asking were either word for word out of the book that they had published years prior or very slight variations.  At one point, I recall during the interview where they asked me to stop answering the one question because I was already moving to their next

Page 195

question that they didn't ask yet.  Then I found out I got a very poor score for the interview.  Then I found out that one of the interviewers was Nelson Whitney's son's coworker.

Q.    There's nothing prohibiting that, was there?

A.    Not explicitly.

Q.    So based on everything that you just said, is it your testimony that you feel like your score on the oral portion was unfairly impacted, as well?

A.    It's inconceivable to me that she would not have known some context of what was happening within Falls Township and that that did not bleed over into my scoring, especially -- I had the answer sheet literally.

Q.    So is that yes, you believe that the oral portion was unfairly impacted?

A.    I believe so.

Q.    For the oral portion, was it this one person that was doing the evaluation for the oral portion?

A.    There was, again, the three-board panel that was very similar to our hiring panel.  And I do not know what happened behind closed

Page 196

doors when I left, but the score that I received was not complimentary and not helpful.

Q.    I'm just asking about for the oral portion.  Was there this one person that you referred to?

A.    There was a three-board panel and this is one person that I know had a direct tie to -- well, worked with Nelson Whitney's son.

Q.    Who were the other individuals?

A.    I believe the other guy was one of the owners of SafeCity Solutions.  I forget which one was there and I don't recall the other guy.

Q.    At some point in time did you express any concerns with any of the township individuals regarding just generally the test?

A.    I did.

Q.    Okay.  Mr. Elmore, there is a document on the screen.  I will represent to you it appears to be an email from you -- is this your Gmail account?

A.    Yes.

Q.    -- to Matthew Takita and Richard Dippolito?

A.    (No verbal response.)

Q.    Is this the email that you sent to

Page 197

Matthew Takita and Richard Dippolito?

A.    Yes.

Q.    And Jeff Dence is copied on the email?

A.    Yes.

Q.    D-E-N-C-E, just for the record.

Just real quick, Jeff Dence is a board supervisor for Falls Township; correct?

A.    He's the chairman of the board of supervisors, yes.

Q.    Right.  He's been on -- he's been a board of supervisor for quite some time; correct?

A.    That's my understanding, correct.

Q.    Are you friendly with Mr. Dence?

A.    No.

Q.    Are you unfriendly with Mr. Dence?

A.    No.

Q.    What about any of the other board supervisors?  Did you have a personal relationship with any of them?

A.    No.

Q.    You hesitated?

A.    I'm probably one of the only people without personal relationships with the politicians in and around Falls Township.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 198

Q.   Now going back to the email, it appears to be dated May 3, 2023 at 2:46 p.m. It says:  "Dear sirs, I am writing to you directly with my concerns so that you may have an opportunity to address this issue if you choose.

Last year I came to you in good faith to bring to light the issue of discrimination in our hiring procedures, specifically having been directed by then Sergeant Clark that it was our goal to avoid having to hire any female applicants.  I detailed how I was recruited to be a part of the interview process by Sergeant Clark and how applicant evaluation forms were created to provide the desired results.  I also detailed how we were instructed at a later date to create new forms with rating scales as Sergeant Clark didn't think the original ones would hold up in court.  I later learned that this change was not to address a hypothetical future challenge, but to be used as rebuttal for current/active EEOC complaints filed by our female officers.  I informed you that I had spoken to those officers, as well as their legal counsel about these issues that I had firsthand participation at the direction of Sergeant Clark?"

That's the first paragraph.  I have

Page 199

read that first paragraph correct; right?

A.   Yes.

Q.   I'll give you the opportunity to review the remainder of the document.  Just let me know when you are done.

A.   Okay.

Q.   Would you agree as it relates to the first paragraph, is that the only thing you referenced speaking with the supervisors about in the prior meeting, is the 2021 hiring process that you were a part of?

A.   Well, the hiring process including sitting on the board, the preparation of the evaluations and then the remanufacture of new evaluations, but that would all be a part of that, yes.

Q.   Would it be a fair statement -- would you agree with the fact that you don't mention anything about Nicole Diviney or Nicole White in there?

A.   No.

Q.   You don't mention anything -- well, let me ask you this:  You don't mention anything about Metterle in this email; correct?

A.   In this email?  No.

Page 200

Q.   You don't mention anything about any of the other females that we spoke about generally in this email; correct?

A.   Not in this email, no.

Q.   Based on that, would it be fair to say that it was not discussed in a prior conversation that you referenced?

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  In this conversation -- I'm sorry, again, the question.

BY MR. HATCHETT:

Q.   The question was, based on your prior testimony, the answers to questions just now, would it fair to say that in the prior conversation that you referenced, that you did not bring up any other issues with Takita or Dippolito other than the 2021 hiring process?

MS. BENFER:  I'll reiterate my objection to the form of the question.

THE WITNESS:  That's very confusing.  If you are asking me if the meeting I had with Takita and Dippolito were specifically related to the hiring issues and the forging of documents after the fact, that's what I had been asked to

Page 201

discuss with them by Crozier.  So, yes, that would be accurate if that's the context of your question.

BY MR. HATCHETT:

Q.   Yes.  To that same point, you don't mention anything about the K9 investigation in this email, do you?

A.   The K9 investigation?

Q.   The theft of time that we've been talking about today.

A.   Well, there was no theft of time and that issue was resolved that there was no wrongdoing that occurred.

Q.   That issue would not have been resolved by October of 2022 where you referenced "Last year I came to you in good faith."

Is that accurate?

A.   October of '22?  Well, you are talking about the K9 investigation now?

Q.   Your email -- let's establish.  When it's says "last year I came to you," you are referring to the October of 2022 meeting that you had with Dippolito and Takita; correct?

A.   Correct.

Q.   Now, based on this email and the

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 202

absence of certain topics, would it be fair to say that in that October meeting you didn't discuss any topics that aren't referenced in the email?

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  I'm not sure I can sort that question out enough to give you an answer to it.

BY MR. HATCHETT:

Q.    You are not sure you can do what?

A.    Sort that question out enough to give you an answer to it.

Q.    Which part?

A.    It's a very confusing question.  It almost seems out of order what you are asking, so I'm not sure that I understand what you are asking.

Q.    Based on this email that references the October 2022 meeting, is it fair to say that you did not discuss anything other than what's referenced in that first paragraph with Takita and/or Dippolito?

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  This email is

Page 203

referencing a meeting.  Are you asking what the meeting was about?

BY MR. HATCHETT:

Q.    Yes.

A.    We covered the meeting.  The meeting was about I has been asked to go to them and explain to them the hiring process thoroughly, beginning to end.

Q.    Right.  And I think you said Crozier asked you to go to them?

A.    Yes.

Q.    In this email, you don't mention anything about Crozier; correct?

A.    This email?  No, I don't mention who asked me to go speak with them, that's correct.

Q.    Other than females, the only thing you are referencing in here is "to address a hypothetical future challenge, but to be used as rebuttal for current/active EEO complaints filed by our female officers."  That's the extent of what you referenced in the email, correct, as it relates to female officers?

A.    In this email.

Q.    As it relates to the hiring process, is it your -- are they your allegations that there

Page 204

were other officers who participated in that 2023 --

A.    I'm sorry?

Q.    As it relates to the 2023 hiring process, you know how we talked about earlier some of your claims are age discrimination; correct?

A.    Yes.

Q.    Are you aware --

MR. HATCHETT:  If you turn your head, you can clearly see Ms. Benfer shake her head.

THE WITNESS:  I apologize.  I'm trying to follow.

MS. BENFER:  Me too.  We really are.

THE WITNESS:  It almost seems like a map or a flowchart should be passed out at this point.

MR. HATCHETT:  Sometimes that's intentional.

MS. BENFER:  So that's why we are shaking our heads.

BY MR. HATCHETT:

Q.    I was asking about age discrimination as it relates to the 2023 promotional exam that you were a part of.

Page 205

A.    Promotional exam?

Q.    Testing process, promotional exam. 2023 --

A.    I don't want to conflate the hiring process with the testing with the promotional -- maybe that's --

Q.    I don't think I mentioned hiring, if I did, I'm referring to either the testing process, the testing for promotion.

A.    Testing for promotion, okay.

Q.    I just want to ask you, are you aware of any older officers who were passed over for promotion?

A.    Passed over?  I believe other officers had scores changed.  I believe they explicitly skipped over and passed over the female officer, Diviney, and they passed over and skipped the Jewish officer, Parnes.

Q.    As it relates to Diviney and Parnes, are you able to say that their age had anything to do with it?

A.    Their age?  No.  Diviney was female and Parnes was Jewish.  I believe that's why they were skipped over.

Q.    As you sit here today, are you able

Exhibit 1

Page 206

to testify regarding anyone that wasn't promoted had something to do with their age as it relates to the 2023 promotion process?

A.    I believe officer Jeff Rhodunda's score was reduced.

Q.    And I know we asked about it earlier --

A.    Jeff Rhodunda.  There's two.

Q.    Regardless of that, stay with me for a moment, do you know the age?

A.    He's about my age, roughly the same.

Q.    That wouldn't be 48, because that would be younger, so --

A.    I'm 49 now, so...

Q.    Other than Rhodunda, do you know anyone else's age?

A.    I know that everybody who was successful was all of the younger officers that were pushed up to the head of the line.

Q.    Do you know if those officers weren't qualified for the promotion?

A.    Well, I know the one in particular, which one was it?  I'm blanking out on his name, I'm sorry -- he had actually, if you would phrase it as you have been, stole time for sick time, he

Page 207

called out for his shift claiming to be sick and our policy requires you be at home during that. He was actually down the shore at South Carolina. And they did a house check on him and he wasn't there and found out that he had lied about where he had been.  That was overlooked and he got a promotion.

Q.    That was in 2023?

A.    In the cycle, yeah.

Q.    Anyone else?  Do you know his age?

A.    He was one of the younger guys, so he was A-okay.

Q.    Are you waiting on me or are you still thinking?

A.    I am.  I can't remember his name.  I can picture his name, but I don't have his name.

Q.    Would it be fair to say it was just another officer?

A.    One of the younger officers, yes. If we can leave it at that, then...

Q.    That's fine.
In 2023 after the hiring process, did you have any additional issues with Whitney?

A.    After 2023, the hiring process?  I was not part of the hiring process in 2023.

Page 208

Q.    2023, I'm referring to the promotional/testing process.

A.    Not hiring, promotional.

Q.    You've only ever participated in one promotional process; right?

A.    You said hiring --

MS. BENFER:  I'm going to object to the form of the question.

THE WITNESS:  It's very confusing.

MS. BENFER:  You did say -- you did jump back and forth there.  It's confusing.

THE WITNESS:  And I don't want to add to the confusion, but we're trying to be clear with this.

BY MR. HATCHETT:

Q.    No, I understand, but you know you only participated in only one promotional testing -- one process.

A.    I was involved in a hiring process. I was involved in a promotional process.  One was about hiring new candidates to come on the department and one was about seeking a promotion and we keep conflating the two of them, either accidentally or intentionally and it's getting confusing.  So I'm trying to sort them.

Page 209

Q.    I'm not intentionally conflating them, but I'm not conflating the year, 2023.  And you --

A.    2023, I was not involved in any hiring process.  I was involved in promotional process.  And what's the heart of the question?

Q.    The question was:  After the promotional process in 2023, did you have any issues with Nelson Whitney?

A.    Well, he accused me of bribery. That was a hell of a thing.

Q.    Tell me about that.

A.    How far do you want to go back?

Q.    He accused you of bribing someone?

A.    No, of receiving a bribe.

Q.    You can go back as far as it relates to the claims in your lawsuit.  Is this in connection with --

A.    The dog.

Q.    One dog or two?

A.    That's still in dispute.  I rescued two dogs.  One seems to be a phantom that nobody cares about.  The other one, everybody cares about.  These are technically two dogs, yes, but one seems to be a ghost.

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 210

Q.    Can you tell me how this comes about?

A.    The dogs?

Q.    The situation where you testify you believe you were accused of bribery?

A.    I was called by then Lieutenant Langan asking me if I would be willing to donate my personal dog then at that moment to Nelson Whitney so that he could then chose another police officer to work with that dog and take it to the police academy to be a police K9 at some point in the future. I said I'm not interested in that. Thank you. And the next day I found out that Nelson Whitney had accused or made the statement that my having the dog was a bribe that I took. So one day after I don't give him my property, he accuses me of criminal activity, which, to my understanding, is improper to say the least.

Q.    What timeframe was this?

A.    This was late November, early December.

Q.    Let me just ask: Between May and November, no issues with Whitney?

A.    May and November?

Q.    Of 2023?

Page 211

MS. BENFER: I'm going to object to the form of the question. Asked and answered already.

THE WITNESS: No. He had me out on admin leave for I have no idea why, for months.

BY MR. HATCHETT:

Q.    Now, going back to the -- because we're talking about a lot of dogs at this point. What were the dogs that were part of the bribery scenario, the names of them?

A.    Again, I think one was a ghost, nobody cared.

Q.    I'll write Ghost?

A.    Her name was Freya, F-R-E-Y-A.

Q.    And the other dog?

A.    Oakley. Oakley was the one that everybody wanted.

Q.    Now you say the day after you declined to give up a different dog, you were notified of accusations of bribery; correct?

A.    Yes. Steve Langan called me back and relayed that I wasn't going to give my personal dog to Nelson Whitney and said, well, it's bribery. And then after that, I learned that Clark and Reeves had gone down and accused a

Page 212

resident in engaging in bribery, bribing me.

Q.    Is that Mr. Kent?

A.    Yes.

Q.    Would it be okay -- can we agree on receive? Did you receive Freya and Oakley from Mr. Kent?

A.    I rescued two dogs from that man.

Q.    I'll say received; you say rescued.

A.    Fair enough.

Q.    But you rescued Freya and Oakley from Mr. Kent?

A.    Yes.

Q.    Did you have a previous relationship with Mr. Kent?

A.    A relationship? No.

Q.    Did you previously know Mr. Kent outside of that issue?

A.    I had -- yeah, I knew who he was. I had occasions to speak with him in the past over many, many years stretched out infrequently.

Q.    Was this a professional relationship or something different?

A.    You want to go through the whole timeline or?

Q.    My question is was this a

Page 213

professional relationship or something different?

A.    Professional relationship. He doesn't have any involvement with the police department. He --

Q.    Did you come across him in your capacity as a police officer?

A.    I met him initially after his equipment had been burglarized and that's maybe 20 years ago.

Q.    Outside of general pleasantries, did you have any interactions with Kent in your personal capacity?

A.    Personal --

Q.    Excluding receipt of Freya and Oakley?

A.    I don't know that I ever ran into him not working.

Q.    Okay. Going back to the point that you received Freya and Oakley, when is that?

A.    That would have been during my admin leave. I believe Oakley was May '23 and then Freya would have been further into the summer.

Q.    And is it your testimony that the first time anyone from the department mentions anything to you about Freya or Oakley would have

Exhibit 1

Page 214

been in November of '23?

A. Anybody in the department? No.

Q. Did you have conversations with anyone in the department with Freya and/or Oakley prior to November of 2023?

A. Yes.

Q. Can you tell me about those conversations?

A. I had conversations with, again, then Lieutenant Langan. He was the lieutenant in charge of our K9 program. I had discussed with him at some point that I had rescued a dog and then at some point rescued another dog. At some point --

Q. I just want to ask when you say you rescued a dog, in the conversation were you referring to Freya and/or Oakley?

A. Each one. And then I did it again. I got another one. Was that answered?

Q. I wasn't sure if you were done.
Outside of that conversation with Langan that you just described, no other conversations about Oakley or Freya up until November.
Is that fair?

Page 215

A. No. I think mid to late summer we had gone on an RV trip to the smoky mountains. And we had Oakley, but not Freya yet and Oakley was sort of recovering, so we didn't want to stick him in the kennel and set him back, so we took him with us. It was actually Margaritaville in Pigeon Forge. And I was watching him and he was tracking back and forth to where we had our RV parked in the corner to the dog run yards that's at the very far end of the complex. He was using his nose to find his way back to the trailer and he wanted to get back inside. I think I talked to Steve shortly thereafter and said the dog tracks on his own. He's a pretty good nose. It would be a cool Hallmark story if someday turned around and made a police dog out of him being a day away from being euthanized.

Q. Was it ever your intention to -- I'll use your terminology -- to make a police dog out of either Oakley or Freya?

A. It never made it past a thought.

Q. Did you discuss that with anyone?

A. Well, Steve and I talked about the dog has a good nose and tracks and it would be interesting at some point if he could become a

Page 216

police dog.

Q. When you say rescued Freya and Oakley, did you provide anything in exchange for the dogs to Kent? Did you provide anything to Kent in exchange for the dogs?

A. In exchange? No.

Q. Tell me what happened as a result. You mentioned that Langan came to you and said that there was going to be an investigation, right, or it was an issue that you had Freya and Oakley?

A. First, I was being accused of bribery and then they were going to investigate the dogs, yes.

Q. Tell me about the investigation.

MS. BENFER: I'm going to object to the form of the question.
To the extent you know about the investigation.

BY MR. HATCHETT:

Q. And were you investigated?

A. I was interviewed.

Q. Tell me about that.

A. There was an initial interview date that was set up. Mr. Rhoades contacted me by

Page 217

email. Mr. Rhoades seemed very cordial. Mr. Rhoades, through our email exchange, said we can meet at headquarters. I asked if we could meet off site because, frankly, it had nothing to do with work and I didn't want a bunch of ears eavesdropping on my personal life. He was fine with that and we were going to go down to I guess a coffee shop or something. He said it should take a short period of time, maybe like an hour to half an hour. Not a big deal. That day comes. I believe I worked the night shift. Come back to headquarters. I come to the downstairs lobby. I wait. He's not there. I emailed. I called. He doesn't answer. I was early. The time for the meeting came and went. Still no calls, no texts, no responses, no acknowledgement. And probably about five or six o'clock in the evening, several hours after the appointment time, I get a response, your command staff will reschedule the interview for you. That's Whitney and Clark. So my concept that an impartial investigation was going to happen ended because now it's not impartial because now it's Whitney and Clark had taken it over.

Q. At some point you had an interview

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 218

with Mr. Rhoades?

A.     No.  He was replaced with Mr. Atkins.

Q.     Let me rephrase that.

At some point you do have an interview with a representative from the law firm of Obermayer.

Does that sound about right?

A.     Yes.

Q.     You participated in an interview with some attorneys from Obermayer in connection with the bribery allegation; right?

A.     Atkins and Hearns.

Q.     As it relates to your involvement or connection with the interview, you don't participate with anything else or you are not asked for anything else, other than that interview; correct?

A.     There's a lot of negatives in there.

Q.     Let me phrase it differently.

Was that the extent of anything you did in connection with the bribery investigation?

A.     I was interviewed one time at one sitting by Atkins and Hearns, and that was it.

Q.     As you sit here today or some time

Page 219

prior, are you aware that the Obermayer law firm has issued or drafted a report in connection with the bribery allegations?

A.     And I've read it, yes.

Q.     Are you aware that they provided a recommendation regarding your employment as part of that investigation?

A.     Yes.

Q.     Are you aware that they provided that to the township officials?

A.     I believe Atkins herself adamantly provided her recommendations to township officials.

Q.     When you say "recommendations," that would have been in connection with your employment?

A.     Oh, she wanted me fired.  She actually testified that she was going to make sure I would never be a police officer again unless an arbitrator gave me my job back.

Q.     The testimony that you are referring to, where was that?

A.     That was at my arbitration hearing.

Q.     Do you know whether or not the board of -- well, as you sit here today, you know the

Page 220

board of supervisors, they voted on the recommendation; right?

A.     Correct.

Q.     And your understanding of the vote, did they approve the vote?

A.     Yeah, they fired me.

Q.     Do you recall the split in the vote?

MS. BENFER:  I'm going to object to the form of the question.

If you know the answer.

It's my understanding that he was not in the board meeting.

MR. HATCHETT:  If you want to testify, Ms. Benfer, be my guest.

MS. BENFER:  I am -- as you know, it was a closed meeting with their solicitor.  So he was not at the board meeting.  I'm going to object to the form of the question as he was not present during the vote.

R. HATCHETT:  Please don't do that, as I asked you earlier.

MS. BENFER:  No, I will do that.  That is a proper objection.  You are asking him to testify about a meeting that he didn't attend.

MR. HATCHETT:  I asked him about his

Page 221

knowledge.  I'm not doing this back-and-forth with you.  If you have an objection, please put it on the record in a succinct manner.  That was not succinct.  Otherwise, if the witness doesn't understand, he's been doing a great job of telling me that.

BY MR. HATCHETT:

Q.     My question is, do you know how the vote turned out as it relates to --

A.     I --

Q.     I didn't finish the question.  Sorry, I was just distracted.

The question is:  Do you know how the vote turned out as it relates to the board of supervisors and how they voted?

A.     Negatively; I was fired.

Q.     Do you know how individually the board of supervisors voted?

A.     I don't have personal firsthand knowledge, but it's my understanding that Dence voted not to fire me, and the other board members, maybe including Boraski, did.  I don't -- I'm unclear about Boraski.  I've heard conflicting.  Again, it's hearsay.  I wasn't there for it.

Q.     What did you hear about Boraski?

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 222

A.   That he voted for and against.  I'm not sure.

Q.   Are you currently treating with anyone for any mental health conditions?  I'm sorry, not mental health conditions.

Are you currently treating with anyone for any kind of emotional distress?

A.   Currently, no.

Q.   Have you previously treated with anyone for emotional distress as it relates to your termination?

A.   Treating, no.

Q.   Have you done anything to cope with -- I'll use the term "cope" -- you can take it however you want to.

Have you done anything to cope with your termination and everything you described in connection with your employment at Falls Township?

A.   Are we including self-medication?

Q.   If you've done something to cope with it.

A.   Drank way too much.

Q.   Other than that, anything?

A.   To cope with it?  I don't know that I have coped with it.

Page 223

Q.   As far as seeing any professionals -- I asked you about emotional distress, but as far as seeing any professionals, you haven't seen anyone?

A.   No, I couldn't.

Q.   Do you need a second, Mr. Elmore?

A.   I'm okay.

Q.   Do you have any out-of-pocket expenses associated with -- other than I don't really want to know about the self-medication, but any out-of-pocket expenses associated with any kind of treatment?  I know you said you haven't seen anyone, but I'm trying to figure out your out-of-pocket expenses.  I don't want to know about attorney's fees or anything like that.

A.   No.

Q.   How have you been able to support yourself since your termination?

A.   Well, I haven't had any income, if that's what you are asking.

Q.   How have you been able to support yourself?

A.   My wife continues to work.  She earns income.  We had to reduce cost of living.  We lost our house.  We had to sell it.

Page 224

MR. HATCHETT:  Mr. Elmore, I don't have any additional questions.

MS. BENFER:  I don't have any questions.

THE COURT REPORTER:  Do you need a copy, Ms. Benfer?

MS. BENFER:  Yes, please, just electronic.  Just regular, not mini.

THE COURT REPORTER:  Thank you.

(Witness excused.)

(Deposition concluded at 2:46 p.m.)

Page 225

C E R T I F I C A T E

I, ANGELA NOVAK, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania and the State of New Jersey, do hereby certify that prior to the commencement of the examination, EDWARD MICHAEL ELMORE, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date herein before set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____

Notary Public of the Commonwealth of Pennsylvania
My Commission expires August 11, 2028
Dated:  June 1, 2026

Exhibit 1

Edward Michael Elmore
May 19, 2026

Page 226

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 228

ACKNOWLEDGEMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached errata sheet.

DATE: _____

_____

Page 227

E R R A T A   S H E E T

WITNESS'S NAME   _____

DATE OF DEPOSITION _____

CASE NAME _____

PAGE   LINE CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Exhibit 1