Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

EDWARD ELMORE,          ) NO. 2:25-cv-02076-JHS
        Plaintiff,   )
                     )
-vs-                 )
                     )
FALLS TOWNSHIP,         )
        Defendant.   )

        Oral deposition of NELSON WHITNEY, duly sworn, was taken on Tuesday, April 28, 2026, between the times of 10:03 a.m. and 4:40 p.m., at Marshall Dennehey, P.C., 2000 Market Street, Suite 2300, Philadelphia, Pennsylvania 19103, before Noelle R. Nevius, Professional Stenographer, reported by machine shorthand, after which time the deposition was reduced to writing and set forth as follows:

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

Page 2

A P P E A R A N C E S:

FOR THE PLAINTIFF:
HARDWICK BENFER, LLC
BY:  TIFFANIE C. BENFER, ESQUIRE
2003 S. Easton Rd.
Doylestown, Pennsylvania 18901
215-230-1912
TBenfer@hardwickbenfer.com

MARK RISK, P.C.
BY:  MARK RISK, ESQUIRE
60 East 42nd Street, 47th Floor
New York, New York 10165
212-682-4100

FOR THE DEFENDANT:
MARSHALL DENNEHEY, P.C.
BY:  JAHLEE HATCHETT, ESQUIRE
2000 Market Street, Suite 2300
Philadelphia, Pennsylvania 19103
215-575-2584
JJHatchett@mdwcg.com

Also Present:  Edward Elmore

Page 3

I N D E X

EXAMINATION OF NELSON WHITNEY          PAGE
Mr. Risk                     7

Stenographer's Certification          246

Page 4

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Text Messages | 55 |
| Exhibit 5 | Memorandum | 115 |
| Exhibit 6 | Brady/Giglio Determinations | 122 |
| Exhibit 10 | November 4, 2022, E-mail | 136 |
| Exhibit 15 | November 30, 2022, E-mail | 69 |
| Exhibit 16 | December 2, 2022, E-mail | 141 |
| Exhibit 19 | December 5, 2022, Letter | 142 |
| Exhibit 34 | Harran 062 | 145 |
| Exhibit 35 | January 23, 2023, E-mail | 163 |
| Exhibit 37 | February 3, 2026, E-mail | 111 |
| Exhibit 43 | Performance Evaluation Form | 154 |

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit  2

Page 5

Exhibit 47    April 27, 2023, Letter    158

Exhibit 48    Performance Evaluation Form    161

Exhibit 55    June 9, 2023, E-mail    --

Exhibit 64    April 3, 2025, E-mail    173

Exhibit 65    EUO of Elmore    192

Exhibit 68    Handwritten Notes by Whitney    206

Exhibit 89    February 20, 2024, Memorandum    229

Exhibit 92  Obermayer Final Investigation Report --

Exhibit 125    BMR Interview Notes    58

Exhibit 132    January 27, 2023, Letter    146

Exhibit 133    Def_Esi 07028    188

Exhibit 140    June 12, 2023, Obermayer    --
              Memorandum

Exhibit 145    December 18, 2023, Letter    177

Page 6

- - -

NELSON WHITNEY was called as a witness, and after having been duly sworn to tell the truth, testified as follows:

(Witness sworn.)

- - -

MR. HATCHETT:  Before we proceed, I will just ask that there be the usual stipulations?

MR. RISK:  Well, I'm a New Yorker. What do you want to stipulate to?

MR. HATCHETT:  Just no speaking objections.  I want to waive reading and signing for the witness.

MR. RISK:  Okay.

MR. HATCHETT:  To the extent that anything comes up, I mean, I can address it on the fly.  But I was just asking for the usual stipulations based on EDPA practice.

Thank you.

MS. BENFER:  Okay.

- - -

(It is agreed by and between

Page 7

counsel that the reading, signing, sealing, filing, and certification are hereby waived and all objections, except as to the form of the questions, are reserved until the time of trial.)

- - -

DIRECT EXAMINATION

- - -

BY MR. RISK:

Q.  Mr. Whitney, good morning.  We met off the record, but I should do it again on the record.  My name is Mark Risk.  I'm here with Tiffanie Benfer.  We are lawyers for Mr. Elmore in this lawsuit against Falls Township.

I'm going to ask you some questions today that we think relate to the lawsuit.  If I ask you something and it's confusing to you, tell me that, and I will try to restate the question in a different way. Will you do that?

A.  Sure.

Q.  And if I ask you a question and you go ahead and answer it, I'm going to assume that you understood the question.  Is that fair?

A.  Sure.

Q.  Okay.  Now as I understand it, the transcript is

Page 8

going to be made here today.  And as I understand it, your lawyer has not requested that you have time to look at the completed transcript.  But throughout the day if something that you say that you think you want to add to or it's an error and you want to correct it, let me know, and we'll go back and fix that.  Things happen including -- I'll apologize in advance, I may call you the wrong -- for all I know, I'll call you Mr. Elmore or Mr. -- it's a lot of names in my mind for this case.  So I apologize for that.

Have you ever testified -- well, you testified at a deposition before?

A.  Yes.

Q.  You testified in court before?

A.  Yes.

Q.  How many times have you testified in a deposition?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

May I?  Chief, I'm going to provide you with some additional instructions.  Throughout this deposition if I object, I don't expect that I will tell you not to answer.  So you assume that you can answer unless I

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit  2

Page 9

tell you not to answer.

Do you understand that?

THE WITNESS: Yes.

MR. HATCHETT: Additionally, if at any point in time -- and I'm sorry, Mr. Risk.

MR. RISK: No. No. Thank you for that.

MR. HATCHETT: If at any point in time you don't fully understand the question, please ask counsel to repeat the question so that you can fully understand it. Otherwise, if you provide a response, we will assume that you understood the question and the answer that you provided was the true answer that you intended to give.

Do you understand that?

THE WITNESS: Yes.

MR. HATCHETT: Okay.

BY MR. RISK:

Q. Yes. Mr. Hatchett is going to object to a bunch of my questions. That's just to put it on the record in case we have to show that to the judge later. I'm still going to look to you to answer. Maybe from time

Page 10

to time, he will specifically direct you not to answer. But we expect that that'll be very rare and that's usually when there's some privilege involved, privilege communication. All right. Was there a question pending?

A. I recall your question. You asked me approximately how many times have I testified in depositions.

Q. Yes. Thank you.

A. I would say across my career, approximately a dozen of times.

Q. When most recently?

A. I definitely had a couple in the last year.

Q. Okay. Can you describe the -- well, can you describe those in either or?

A. I don't recall specifically which cases they were, but I have been deposed in the last year as the chief of police for Falls Township.

Q. Have you been deposed in the last year in any other -- any capacity other than as the police chief of Falls Township?

A. No.

Q. You gave a deposition in a case brought by a Mr. Langan; is that right?

A. That is correct.

Page 11

Q. I think that was the most recent deposition testimony you have given?

A. Possibly.

Q. Have you testified in proceedings brought by -- any kind of proceedings brought by Officer Crosier?

A. Yes.

Q. How recently?

A. Within the last year.

Q. What proceeding was that? Do you recall?

A. It was for a lawsuit that Officer Crosier filed.

Q. Okay. Have you testified in connection with Officer Rhodunda at any time?

A. Yes.

Q. When?

A. I would say within the last year or so.

Q. And do you know what kind of proceeding that was that you testified in?

A. For a lawsuit.

Q. And the three lawsuits that you said by Langan, Crosier, and Rhodunda, are any of those cases still pending as we sit here today?

A. No. I believe they are all completed.

Q. Completed by settlement? Or a verdict? Or a decision? Do you know?

MR. HATCHETT: Objection to the

Page 12

form of the question. You can respond if you know. However, don't disclose any information you've come across through attorney-client conversations.

THE WITNESS: I believe they were negotiated subsequently.

BY MR. RISK:

Q. And how about Officer Metterle? Have you testified in connection with any proceedings brought by Officer Metterle at any time?

A. Yes.

Q. What proceeding was that?

A. In a lawsuit filed by Officer Metterle.

Q. And how long ago was that testimony?

A. I think that was a little more than a year ago.

Q. And is that matter still pending, to your knowledge?

A. No.

Q. And how about a proceeding brought by Officer White or Officer Diviny? Is that the same person?

A. I know who are you referring to.

Q. Yeah. Nicole White. Have you testified for a proceeding brought by her?

A. I don't believe I have yet.

Q. Okay. To your knowledge, is there a current

Pages 9 to 12

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 13

proceeding pending by her? Brought by her?

**A. Pending. I don't believe it's been scheduled yet.**

Q. Is that a lawsuit?

**A. Yes.**

Q. Oh, that's a lot of testimony.

Okay. Could you describe your professional background, maybe beginning with -- since -- well, are you a high school graduate?

**A. Yes, I am.**

Q. All right. Maybe if you could describe your education and body of work beginning after you graduated high school?

**A. Well, I briefly attended college as a physics major at Rutgers. I decided to drop out and become a police officer in the 1980s. I was hired by Falls Township in 1988. I spent about my first 10 years as a patrol officer for Falls Township. I had a brief stint as a cold case homicide investigator. That was followed by -- somewhere in the neighborhood of years in our 15 detective division. I served both as a rank and file detective, a corporal, a sergeant, and then a lieutenant as the division commander.**

**In approximately 2016, I was placed as a division commander in charge of the patrol division.**

Page 14

**That led me to be in charge at the beginning of the pandemic. Beginning in January of 2021, I was promoted as the chief of police. I have a bachelor's degree in criminal justice administration from Franklin University and I'm in an MBA program at Eastern University now.**

Q. You do that remotely or at the -- on campus at Eastern?

**A. I do it remotely.**

Q. How long were you at Rutgers studying physics?

**A. About a semester. That was all I could pay for.**

Q. Well, that's a tough -- that's not the easiest way through Rutgers.

I'm not sure I got it in your answer; you began as chief in January 2021, but there was a period prior to that you were the chief at some interim capacity; is that right?

**A. I was acting chief from September until the end of the year in 2020.**

Q. And your title was acting chief?

**A. Yes.**

Q. Okay. Okay. What I -- what, if any, experience did you have with Mr. Elmore before you became the chief of police at Falls Township?

MR. HATCHETT: Objection to the

Page 15

form of the question. You can respond.

THE WITNESS: At one point Officer Elmore was the initial officer on a robbery complaint that I responded to as a detective. I remember us being co-affiants in that case and going to trial together.

Beyond that, I don't know that we had any cases that we worked together, but obviously I was aware of Officer Elmore's employment.

BY MR. RISK:

Q. Did you work on the same shift?

**A. No.**

Q. Had you ever -- before you become acting chief, had you ever had occasion to look at his personnel file?

**A. I don't know that I looked at his personnel file, but when I was division commander for patrol we talked a lot about officers' performance. I talked with each of the frontline supervisors. We looked at metrics for performance on their squads and we discussed how officers were doing.**

**I also think prior to that, I was on Officer Elmore's selection panel for his K-9. I was a sergeant**

Page 16

**back then. I could recall he was one of the candidates when I was on that selection panel.**

Q. And that means that you were on a panel of 3 people that selected Mr. Elmore to join the K-9 unit for the first time; is that right?

**A. We made a recommendation to the chief, but yes.**

Q. And do you know how long ago that was?

**A. Sometime between 2000 and 2013.**

Q. Do you recall whether the recommendation of Mr. Elmore for the K-9 unit was a recommendation that you joined in as a member on that committee?

**A. Yes.**

Q. Okay. Now you said you discussed Officer Elmore when you served as division commander for patrol. So I -- can I ask you again when that was?

**A. That was in 2016.**

Q. And how long did you serve in that capacity?

**A. Until I was selected to be acting chief of police.**

Q. And what are the duties of the division commander for patrol at Falls Township?

**A. In charge of training, in charge of the fleet of the patrol vehicles that the patrol was using. Essentially, defining the mission of the patrol division and working with frontline supervisor to make**

Pages 13 to 16

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 17

sure that officers are accomplishing that mission.

Q. And how do you go about? How did you go about that at that time?

A. We held weekly staff meetings -- excuse me, we held monthly staff meetings. We would review the staffing levels and performance metrics from the prior month, we would look at the goals and objectives defined for the patrol division and how close we were in meeting them.

Q. And when you say the command staff, who were the staff that attended those monthly meetings?

A. Any of the other lieutenants that were present in the department at that time as well as the sergeants and corporals.

Q. How many people would that be?

A. Well, in the patrol division there are 12 supervisors, 4 sergeants and 8 corporals. The detective sergeant would typically attend. And at one point, there were 4 lieutenants. So some of the other lieutenants would attend, some of them wouldn't. It's kind of optional. The chief would rarely attend.

Q. And at that time, that was Chief Wilcox (ph)?

A. Yes.

Q. And you mentioned in your discussion of these meetings, you mentioned performance metrics. Were the

Page 18

performance metrics that you looked at then as division -- with your command staff the same performance metrics that the department is using today?

A. Actually today, you know, we have been in a staffing crisis. We don't look at metrics or haven't been looking at metrics for quite some time in the way that we were then. Back then, it was more -- typically everything that an officer fills out on their daily activity report, how many calls for service they handled, how many backups, how many traffic crashes, how much time in different categories they spent. In other words, how much time in criminal investigations, traffic investigations, how much was unobligated time, you know, just patrol time, how many arrests they made in different categories, felony, misdemeanor, non-traffic, parking, how many traffic stops, how many traffic arrests, vehicles searched, warnings, mileage on the cars. Back then that's what we looked at.

Q. Are you really saying broadly you're just trying to figure out what the various officers were doing?

A. Sure.

Q. Yeah. Okay. You just mentioned a staffing crisis. I think you said -- and I don't want to ever put words in your mouth. I think you said we are in a staffing crisis. Can you tell me what you mean by

Page 19

that?

A. We are currently about nine positions down in the patrol division. So we are hiring to replace those officers.

Q. And those nine are police offers, not supervisory staff? They are police officers on the street that you are nine short?

A. Yes. I mean, the vacancies are for police officers. We don't hire people to come in in supervisory ranks. I do have a corporal vacancy at the moment.

Q. Is that in addition to the nine or aside from the nine? Or what part of the nine you described?

A. That would basically be filled from the cadre of officers we currently have. The nine vacancies are entry-level positions for patrol officers to be hired.

Q. And so, it's your testimony that you have nine fewer officers on the street than the department would like to have?

A. Yes.

Q. Or I'm guessing that one -- is -- am I -- let me start again.

Am I correct that one consequence of that is the existing officers would be called upon to work more overtime?

Page 20

A. Yes. I think it factors into the amount of overtime in the department and it factors into working more frequently at the minimum staffing level.

Q. And you are taught -- this nine, am I -- I've read that your total number of police officers is about 50; is that right?

MR. HATCHETT: Objection to the form of question.

MR. RISK: Let me ask it better.

BY MR. RISK:

Q. How many police officers do you have now and -- how many police officers do you have now?

A. I think right now around 45 or 46. Our authorized strength for sworn officers is 53.

Q. And that is what you as chief would like to have that, at 53?

A. Yes.

Q. Of the 46 that you have, how many of them are women?

A. Two.

Q. And how many of them are Hispanic?

A. Two or three.

Q. And how many of them are black?

A. I just had one African American officer retire, but I was happy to hire another one. So, one.

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 21

Q. And when you became the chief in January of 2021, how many women police officers were employed at Falls Township at that time?

A. I believe the number was two.

Q. And who were they?

A. Cathy Coffman and Nicole Diviny.

Q. And how about --

A. Oh. And Victoria Crosier. I'm sorry. I left her out.

Q. And how about Stephanie Metterle?

A. She was separated from service and then returned. I believe by 2021 she was not working for us, but she came back in '24 maybe.

Q. And staffing crisis was your word a minute ago. Is it your testimony that the -- being nine officers short in a department that's maximally 53 is a staffing crisis?

A. I think that's a fair term. Yes.

Q. Okay. Now, you know one of the issues that's been raised in this -- well, have you read Mr. Elmore's complaint in this lawsuit at some point?

A. Yes.

Q. Did you read it in preparation for today?

A. I looked over it yesterday, but I read it when it was first filed.

Page 22

Q. Did you meet with Mr. Hatchett in preparation for your deposition today?

A. Yes.

Q. Did you meet in person or over the phone or on Zoom?

MR. HATCHETT: I'm going to place a standing objection to the line of questioning regarding what the chief may have did or didn't do with me. At this point, Chief, I'm going to allow you to answer.

MR. RISK: Yeah.

BY MR. RISK:

Q. I'm not going to ask you --

A. A video call.

Q. A video call. And about how long did that last?

MR. HATCHETT: Objection. You can respond.

THE WITNESS: Approximately 45, 50 minutes.

BY MR. RISK:

Q. Okay. In preparation for your deposition today, you reviewed some documents?

A. I looked over the complaint.

Q. Anything else?

Page 23

A. I looked over a document that was provided to me from 2022 that was authored by Campbell Durrant.

Q. And that's the Campbell Durrant report authored in 2022 regarding certain allegations made by Mr. El -- regarding the vote of no confidence?

MR. HATCHETT: Objection to the form of the question. The report speaks for itself, but you can respond.

THE WITNESS: I would say yes to both.

BY MR. RISK:

Q. Okay. I meant to only ask you one question, but it was two.

A. Hmm-hmm.

Q. Okay. You are aware that Mr. Elmore has claimed in this case that when he was on a hiring committee in 2021 he was told that it was the intention not to hire women officers. Are you aware of that as an allegation of his?

A. I am.

Q. All right. Do you have an opinion about whether that's true as to the 2021 hiring committee?

A. I do.

Q. And what's your opinion?

A. My opinion based upon the outside investigation

Page 24

of his claim is that there is no basis to it whatsoever.

Q. Did you ever look into that issue yourself?

A. No. Outside counsel investigated it.

Q. You mean Campbell Durrant?

A. I mean I believe that was actually the attorneys from Obermayer.

Q. But you've conducted no inquiry into that on your own?

A. I have not.

Q. Is there an explanation of -- what is your -- how do you account for the fact that you're nine officers short and you have only two women officers?

MR. HATCHETT: Objection to the form of the question.

MR. RISK: Let me ask it more cleanly.

BY MR. RISK:

Q. Well, assuming that approximately half of the residents of Falls Township are women and half of the residents of Bucks County are women, why -- and that your are nine positions short, why are there only two female officers?

MR. HATCHETT: Objection to the form of the question. Do you understand

Pages 21 to 24

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 25

the question.

THE WITNESS: I do. What we have seen in both our experience in giving police officer entrance exams and repeatedly using the county consortium test as an entrance exam is that there are a very small percentage of applicants that are women. We continue to work at recruiting to try to attract more diverse candidates, but it's challenging.

BY MR. RISK:

Q. Well, is it your testimony that the list of applicants on, I think what you called the consortium list, would also have only 1 or 2 percent women?

A. I don't know what the percentage is, but I know it's nowhere near half.

Q. Do you think it might be a quarter?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I truly don't know. I know that when the attorneys from Obermayer investigated Officer Elmore's allegation, they looked at a great deal of candidate pool data and concluded

Page 26

that there was no evidence of any discriminatory practices on the part of Falls Township.

BY MR. RISK:

Q. And when you say you'd like -- I think -- and I don't want to put words in your mouth, Mr. Whitney. I think you said you would like to make the force more diverse. To what were you referring? More diverse in what fashion?

A. I think when we look for candidates, we are looking for, first and foremost, exceptional people who are drawn to service, but we also want to attract candidates that reflect the community. So those candidates would be not only candidates that are white, but candidates that represent different ethnicities and different genders. That's what I mean by diversity.

Q. You testified a minute ago that you recently hired a black officer?

A. Yes.

Q. Have any women officers been hired during your tenure as chief?

A. Not yet.

Q. Okay. How many women have commenced -- how many women officers have commenced proceedings against Falls Township? Let's say proceedings that were either

Page 27

initiated or already pending on New Year's Day 2021 when you took the helm?

MR. HATCHETT: Are you referring to lawsuits, Mr. Risk?

MR. RISK: Arbitrations, lawsuits, other administrative proceedings. Proceedings broadly.

THE WITNESS: I would say three or four.

BY MR. RISK:

Q. And those would be -- well, Crosier, White, Coffman, and Metterle?

A. Yes.

Q. Do you have any -- have you had any female officers during your tenure that have not commenced proceedings against the department?

MR. HATCHETT: Objection to the form of the question. You can respond.

THE WITNESS: You mean my tenure as police chief?

BY MR. RISK:

Q. Yes, sir.

A. No.

Q. Okay.

A. I would say I inherited some of them.

Page 28

Q. Some of --

A. Coffman and maybe to some extent Metterle. I would have to look back, but I did inherit some of these litigations. They weren't all initiated after I took over. I inherited a few.

Q. Without female officers, what happens when a female suspect is apprehended in Falls Township?

MR. HATCHETT: Objection to the form of the question. You can respond.

THE WITNESS: Are you referring to if that suspect needs to be searched?

BY MR. RISK:

Q. I think that -- well, that for sure, but there may be other -- are these other respects in which you need female police help in connection with female suspects? Other -- let's put search aside for a moment.

Are there limitations in what you can do with female suspects without female officers?

A. No, I wouldn't say broadly that there are. I think we treat everybody the same. But I think when it comes to searching somebody in custody, that's different. In those circumstance, we would call for a female from a different department for assistance.

Q. By a different department, you mean a neighboring

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 29

municipality?

A. Yes.

Q. And you said that's for searches when someone is in custody?

MR. HATCHETT: Objection to the form of the question. I don't believe that was his testimony, but --

MR. RISK: Well, I don't -- I certainly don't want to alter it, but I'm not a law enforcement person. When --

BY MR. RISK:

Q. When a stop is made -- if a stop is made of a vehicle that's driven by a female and officers wish to make an arrest, what happens then?

A. They would make the arrest consistent with policy and procedure.

Q. And when is -- but might not some type of search need to be made at the vehicle?

A. Well, the vehicle might need to be searched. The person might need to be searched incident to arrest. That's a limited search. That's not the kind of search we're talking about on a cell block.

Q. Well, would that be -- would that be something like a pat-down search to look for a weapon?

Page 30

A. That's something a little bit different. A pat-down search would be present if the officers had articulable reasons to believe that the person was armed.

Q. And so, if the -- if a stop was made of a car driven by a female and the officers making the stop were concerned that the person was armed, what -- your understanding of Falls Township procedure, what would the officers do at that point?

A. They would pat down the female to search for weapons.

Q. So male officers can do that?

A. Absolutely.

Q. No call needs to be made for a female officer at that point?

A. Correct.

Q. All right. And so, I think is it your testimony that a call to be -- a call for a female officer from another town would be necessary only if the suspect was brought into the -- brought into your department and held in custody?

A. Generally speaking, yes.

Q. When you say generally, what would the exceptions be?

A. Well, a police department can be pretty dynamic.

Page 31

I'm sure if we sat here long enough, we could come up with scenarios where we might want a female officer in the field. But most commonly, we run into the scenario where we are doing a search prior to placing someone in a cell, that search is more intrusive than anything that would be done in the field because you want to make sure they are not concealing anything and bringing it into the cell block with them. And that's typically when if we don't have the female working, we will call for one that's working in a neighboring jurisdiction for assistance.

Q. And when you say you are concerned about them concealing things, that would be some sort of dangerous weapon or instrument or drugs or anything else?

A. Yes.

Q. What else?

A. Well, I mean, I think you've hit it.

Q. I have. Okay. Okay.

A. Yes. You are searching for contraband or weapons.

Q. And at that point, you make a call for a female officer from elsewhere. Okay. Okay.

After you became the chief in January of 2021, were changes made in the procedures or protocols regarding discipline of officers?

Page 32

A. Yes.

Q. What were those changes?

A. We became an agency that practiced progressive discipline and that was more policy driven.

Q. What's progressive discipline?

A. Progressive discipline is essentially the idea that you take care of little things when they are small so that they don't become big things. The intent of progressive discipline is to correct behavior.

Q. And then you said something else in your early answer. I think you said that your discipline has become more policy driven, but I don't want to put words in your mouth. Is that what you said?

A. I believe what I was saying was that the department became more policy driven.

Q. And what does that mean?

A. Under my predecessor, policies weren't something that he considered very important. He didn't update the policy manual, for example. So it kind of languished in -- many of them were put out in 2002. There were some addition overtime, but you can tell the difference in an agency that's policy driven or not. If you are policy driven, you are on top of making corrections and updates, and you are also encouraging frontline supervisor to enforce policies so that

Pages 29 to 32

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 33

officers know, hey, if the policy is this, this is what we have to do. If we don't do that, there is some kind of consequence.

Q. In my preparation in reading all of these documents, I've read officers saying that your approach was to investigate everything. Is that a description of what you try to do as chief with regard to discipline issues?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I wouldn't word it in a way. I would word it this way; when I took over I had been dealing with 40 years of working with insurance counsel to deal with complaints filed by officers who felt that they were singled out. And in many of those discussions, the importance of treating everybody the same was stressed.

So one of the things I did as a lieutenant when I took patrol over was tell everybody, listen, we cannot continue to have a situation where discipline is so infrequently applied that when it is applied it feels

Page 34

personal. And when it feels personal, people feel like, hey, this is being done to me for reasons other than the policy violation and this feels personal.

So, I've been warning everybody about that for years. Change is hard. But when I took over, I said, well, here we are. We are just going to enforce the policy. If somebody dents a car, I want a recommendation for discipline from supervisor. If someone is late, fill in the blank. Like we are going to enforce the policies that we have and while that's managing change, that's hard.

BY MR. RISK:

Q. How many -- in your time as the chief, which is now 5 years plus, how many police officers have you recommended for termination?

A. Maybe five or six.

Q. All right. Of course we know Mr. Elmore. Mr. Langan would be one of them?

A. Yes.

Q. Officer Crosier would be one of them?

Page 35

A. Yes.

Q. Officer Rhodunda would be one of them?

A. Yes.

Q. Would Officer Coffman be one of them?

A. No.

Q. Officer Fischer (ph) would be one of them?

A. Yes.

Q. Officer Lundquist would be one of them?

A. Yes.

Q. Conduct of any others?

A. Officer Metterle.

Q. I know that from my reading that Officer Elmore at the time you had recommended his termination had been with the department for over 20 years. Do you know how long Officer Langan had been with the department at the time you recommended him for termination?

MR. HATCHETT: Objection to the form of the question. You can respond.

THE WITNESS: Probably a similar time period.

BY MR. RISK:

Q. What about Officer Crosier?

A. Same.

Page 36

Q. And how about Officer Rhodunda?

A. A little bit longer.

Q. Longer than --

A. Than 20 years.

Q. Okay. How about Officer Fischer?

A. Probably a little less.

Q. 15 years?

A. Could be.

Q. How about Officer Lundquist?

A. The same. I mean, I don't recall how long he had been on, but it -- my impression would be it was less than 20.

Q. More than 10, less than 20?

A. Probably so.

Q. And how about Officer Metterle?

A. I think she was closer to maybe the 10-year mark or maybe a little bit over.

Q. So all of these officers had served. The records aren't in front of us. But it is your best estimate that all of these officers had served with the department for 10 years or more?

A. Yes. I think that's fair.

Q. Okay. Prior to February of 2022 and this is not a test of dates. So, you know, let me know if a date is not significant to you and I'll try to fill it in.

Pages 33 to 36

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 37

But prior to November of 2022, were you aware of any discipline problem with Mr. Elmore?

A. Probably minor discipline. I could recall an incident involving him not wearing a mask during the pandemic and some medical staff complained. There might have been some other things that were minor along the way like that.

Q. What do you remember about the mask issue?

A. I remember he took a very strong stance with the supervisor that was recommending him for discipline that it was within his rights to not wear a mask. And the medical staff at the hospital was apoplectic about a police officer coming into their medical facility who wasn't wearing a mask.

Q. And how did that situation reach you?

A. Up through the chain of command.

Q. So you heard about it in the chain of command, not just talk?

A. You know, the nursing supervisor might have called me before it got that far. I'm not sure.

Q. Okay.

A. There was a nursing supervisor at the time who called me every time she was upset with one of my officers. I truly don't remember if Ed was one of them.

Page 38

Q. Okay.

A. But the rest of what I shared with you, yeah, it was told.

Q. You described that as a minor matter. Do you remember how that was handled?

A. Some kind of reprimand. It might have been counseling. It might have been an oral reprimand.

Q. Not by you?

A. No. I accepted the recommendation from whatever frontline supervisor handled it.

Q. Well, did you have to approve whether -- whether it was a reprimand or whatever that -- the remedy was, is that something that you had to approve or is that something that went on independent of you?

A. No. I needed to approve it.

Q. As the -- and this was when you were doing -- I have to get my -- this is when you're division commander for patrol; is that right?

A. Well, you mentioned February of 2022. In that time period, I was the chief of police.

Q. Okay. So you recall this mask situation as something that happened while you were the chief?

A. No. You asked if I recalled any discipline for Ed Elmore. Prior to that, honestly I don't remember if I was chief or lieutenant now that you are pointing

Page 39

that out.

Q. Okay.

A. I took over during the pandemic. But when I started, I wasn't chief. So I would have to look at the records to see if I was chief or not.

Q. Okay. Other than the situation involving a complaint that Mr. Elmore didn't want to wear a mask during the COVID period, prior to February of 2022, do you recall any discipline issues regarding Mr. Elmore of any kind at any time?

A. Not that I recall.

Q. Okay.

A. I would have to look back through records to make sure.

Q. And is there anything such as the personnel file for Mr. Elmore?

A. Sure.

Q. And what's in a personnel file? There's a folder somewhere, you can go look it at, and look at an individual officers's records?

A. Yes. It's typically their application to the police department, any other documents that are contemporaneous with the application, like, I don't know, getting their medical clearance or something like that.

Page 40

Q. Hmm-hmm.

A. They are typically full of letters from people who write in and say, hey, I really appreciated the officer doing a good job. There at times can be records of discipline in them. The records of discipline are placed in them during the reckoning period for the discipline, which is defined in the table of discipline. And then they are supposed to be removed when the reckoning period ends.

Q. So if you looked in a police officer's file today, you would expect it to contain application materials, perhaps some letters from residents, and disciplinary notices for which the reckoning period has not yet expired?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. RISK:

Q. Because at the end of the reckoning period, the notice is supposed to be removed from the personnel file?

A. Yes.

Q. Okay. Had you had occasion to look at Mr. Elmore's personnel file at any time?

A. I probably did at some point. I can't recall

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 41

specifically looking at it, probably when it was requested by counsel.

Q.   But as we sit here today, there is no -- you don't have a specific recollection of looking at Mr. Elmore's personnel file at any time?

A.   Correct.

Q.   Would there by something related to his selection on your board to be a K-9 officer in the personnel file?

A.   There could be.  I'm not sure what Chief Wilcox put in them.  You know, if he decided to put the recommendation in there, that could be in there.

Q.   And the K-9 selection, that's a competitive process?

A.   Yes.

Q.   And so, it's a credit to an officer who is so selected; is that right?

A.   Well, I certainly know they look at it that way.  Everybody wants to be a K-9 cop.

Q.   Well, how do you look at it?

A.   I think we should select the best people for the best job.  Sure.

Q.   Okay.  So it's an achievement for an officer to be selected to be a K-9 officer at Falls Township?

A.   Yes.

Page 42

Q.   And what about -- are you aware sitting here today that Mr. Elmore had SWAT training?

A.   Yes.

Q.   What is that?

A.   We are part of an collateral SWAT team which means that we work with other municipalities and we all contribute officers to the SWAT team.  So as an entity, the team consists of not just Falls officers, but officers from Bensalem Township, Bristol Township, and Bristol Borough.  Ed was one of our officers assigned to the SWAT team.

Q.   And is that an assignment made through a competition selection as well?

A.   I believe so.

Q.   And is that done by a panel or a group of selectors similar to the K-9 selection?

A.   I know that at times it is.  I also know that at one point the view from our department was that if you were selected to be K-9, you were automatically placed on the SWAT team.  I truly don't know whether those officers also competed to be on the SWAT team or they were just put on the SWAT team because they were K-9.  I don't know the answer to that.  But at that point in my career, I had nothing to do with that.

Q.   But it's a -- it would be a distinction for a

Page 43

Falls Township officer to be on the SWAT team?

MR. HATCHETT:  Objection to the form of the question.  Chief, you can answer again.

THE WITNESS:  Well, I certainly think it's a very important job.  I wouldn't want just anybody to be on the SWAT team, but I know that different chiefs look at it differently.  So the officers look at it as a distinction to be the SWAT team.

BY MR. RISK:

Q.   I'm sorry, you are saying yes, they do?  You're telling me the officers look at it as a distinction?

A.   I --

MR. HATCHETT:  Objection to the form of the question.  I don't know if this is the third or fourth time, but you can answer it.

THE WITNESS:  I think that would be fair to say.

BY MR. RISK:

Q.   You know, I have lots of questions but I didn't invite you at the beginning of the deposition, when you need a break, tell us and we'll -- you know, I'll get

Page 44

to a break and accommodate you.  So let us know.  Usually the witness wears me down and I'm the one that needs a break.  But we'll get to that.

You're aware that Mr. Elmore was placed on a hiring committee in -- or -- well, placed on a hiring committee in the summer of 2021?

A.   Sounds about right.

Q.   That was with sergeant -- and now Lieutenant Clark's committee?

A.   Yes.

Q.   Did you have a role in the selection of officers to be on that committee?

A.   Well, I think the final approval would be fair to say it would have been mine, but I told then Sergeant Clark it was his team.  I told him my expectations and I let him pick his team.

Q.   And your assumption that at some point in some fashion Sergeant Clark would have come to you and said, I'm picking this, this, this, and this officer, is that okay?  And it was subject to your ultimate approval?

A.   Yes.

Q.   And as you well know, Mr. Elmore was on that team in 2021?

A.   Yes.  That's sounds about right.

Q.   All right.  So as of the summer of 2021, you had

Pages 41 to 44

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 45

no issue with Mr. Elmore which would have made you consider not approving him to be on the SWAT -- on the hiring committee?

A.  Yes.  I supported Sergeant Clark's decision.

Q.  In some of these -- in the Obermayer report, which we will talk about later, it's indicated that you described Mr. Elmore as a low-performing officer.  Do you recall saying that to the Obermayer people?

MR. HATCHETT:  Objection to the form of the question.  I don't think at this point it's established that he is familiar with any Obermayer report.  I also don't know at this point it's established that he is familiar with the contents of it.

However, Chief, with that understanding to the extent you understand the question or have personal knowledge regarding it, you can respond.

I'm sorry, Mr. Risk, I didn't mean to put that long objection on the record.  I just wanted to make clear of my objection.

MR. RISK:  Well, we are here as colleagues.  You suggested in the

Page 46

instructions that there would be no speaking objections today.  I'll just leave it at --

MR. HATCHETT:  Well, that's why I apologized.

MR. RISK:  No speaking objections without apology.  Okay.

Can you read the question back?

THE STENOGRAPHER:  Yes.

(At this time, question was read back to the court reporter.)

THE WITNESS:  So I don't specifically recall saying that, but I do recall having performance discussions about Officer Elmore and it being regarded by people including myself that he was not a high performer.

BY MR. RISK:

Q.  Okay.  And so, was your judgment that Mr. Elmore was not a high performer related only to matters that occurred after the summer of 2021?

A.  No.  I think it was before or after.  I mean, we would talk about officers' performance at staff meetings and what are they doing?  You know?  And in particular, officers that are -- have been selected in

Page 47

key positions like being on the SWAT team or being a K-9 officer, are we getting a return for investment from these officers?  We spent a lot of time and money investing in them.  Are they out there being amazing?  Are they stopping cars?  Are they talking to people?  Are they walking a foot beat?  Are they doing anything?  And Ed was one of the officers that would come up frequently as somebody who just wasn't doing a lot.

Q.  Does it say that anywhere in writing?

A.  I'm sure the metrics support it if you were to pull his arrests, car stops, that kind of stuff, sure.  I mean, that was the impetus for the discussion at the staff meetings.

Q.  All right.  Well --

A.  And I'm pretty sure that the attorneys from Obermayer requested that information.  I remember telling staff to provide them with information from our records management system.

Q.  But you suggested a minute ago that you believed Elmore was regarded as a low-performing officer based on his -- I think you said his walking the foot beat, his being engaged, and doing various things.  And I think you mentioned arrest and car stops.  I'm asking does that account -- we will talk about arrests and car stops.  Is the account of him as a low performer

Page 48

written down anywhere prior to 2022?

A.  Well, we would have to look back to see if any performance appraisals were performed that he participated in.  My predecessor was not big on doing performance appraisals.  So he essentially ended the practice.  The only time performance appraisals were done were when there was a promotional exam and Ed didn't participate in many.  But I think the metrics tell the story.

Q.  And to the extent that there are performance appraisals, where would we look for those in the files?  In the personnel file you have described?

A.  No.  I don't think they would be in the personnel file.  They may be.  The personnel files are maintained by the human resources people on the township's side of the building.  So I don't know if they keep them in there or they keep them somewhere else.

Q.  Well, I'm about to ask Mr. Hatchett to look for them and produce them.  So help me to tell him where to look.

A.  Well, the important thing to consider is, you know, we used to do them twice a year and then we did that once a year.  And then when Chief Wilcox took over, he kind of cut down performance appraisals.  So there is a huge swath of time that the only time

Pages 45 to 48

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 49

anybody had a performance appraisal performed was when they were competing for a promotion because it's a part of the collected bargaining agreement. And, I mean, I don't know if Ed competed for promotions prior to the most recent one. But if he didn't, there is going to be no performance appraisals.

Q. Ahh. So there are no performance appraisals for Mr. Elmore?

MR. HATCHETT: Objection to the form of the question.

(Simultaneous talking.)

BY MR. RISK:

Q. I'm kind of asking if you are not sure or if there simply aren't any?

A. Well, I don't know. Officer Elmore is somebody I inherited. I didn't hire him; right? I wasn't chief when these policies were being done. So I can't tell you whether way back when Ed got hired, which my recollection was around the turn of the century, whether when Neil Harkins (ph) was running the agency, there might be performance appraisals from back then. If they exist, I don't know where they are. We would certainly look for them. And if they have been requested, we certainly have. But when Chief Wilcox took over, he pretty much shut that down.

Page 50

Q. All right. Well, I'll try to sort that out with Mr. Hatchett.

MR. RISK: But just to put it on the record, we will call for production of any performance appraisals of Mr. Elmore.

MR. HATCHETT: It's been produced. Anything regarding Mr. Elmore's personnel file has been produced. To the extent that there's a supplemental request as you mentioned --

(Simultaneous talking.)

MR. RISK: Well, the witness testified it's not in the personnel file. So I would -- we can talk about it on the break, but obviously we need them.

BY MR. RISK:

Q. What about the 2021 performance review? Did you not do them as your first year as chief?

A. When I first took over, no. I started to change the form -- the form that we have used, we've been told for years, was insufficient. So other than promotional processes, I hired a consultant to update the form, to update the policy and then implement that form later,

Page 51

but I don't think that was in '21. I think that was later.

Q. So there were no performance appraisals for police officers in Falls Township for the year 2021 other than in connection with promotional processes?

A. That's fair to say.

Q. And were there in 2022?

A. I honestly don't remember when I started. It took a long time to get the consultant on board and get the policy changed and 2022 was a punctilious year. So I'm not quite sure that I got that off the ground in 2022. It might have been 2023 before I got that rolling.

Q. Well, are there performance appraisals for Falls Township police officers for 2023 aside from those created in connection with promotional processes?

A. I believe we started at the end of '23. If not, it was 2024.

Q. And where are those kept?

A. Probably right now, probably in the filing system. We have a confidential file room. They are probably in there. If not, Lieutenant Clark has them.

Q. Okay. Would that performance appraisal -- I've seen the performance appraisals for Mr. Elmore and we will talk about them in connection with his applicant

Page 52

to be a corporal in the winter of -- the spring of 2023. But it is your testimony there should be an additional evaluation of Mr. Elmore for the 2023 year someplace?

A. No. I'm saying we would have to look to see when that was implemented. I'm not sure if it was late 2023 or if that started in 2024.

Q. When Sergeant Clark came to you in the summer of 2021 and told you he wanted to put Mr. Elmore on his hiring committee, you did not tell him that Mr. Elmore was a low-performing officer?

A. Sergeant Clark was well aware of that.

Q. All right. But you have to answer my question.

A. I didn't have to tell him because he was well aware of it. I mean, we have talked about the issues surrounding supervising Officer Elmore. Many times back during that time period, but my impression when he came to me he was thinking outside of the box. He thought this was something that Officer Elmore could handle. Sometimes when you have a low-performing officer, you give them something to try to help raise them up. And it was my impression that that's what Sergeant Clark was trying to do and I supported it.

Q. So, it's your testimony that -- well, it's your testimony that you regarded Mr. Elmore as a

Pages 49 to 52

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 53

low-performing officer at the time you approved him to be on Sergeant Clark's hiring committee to hire the next generation of police officers?

A.   That was his reputation at the time, yes.

Q.   Well --

MR. RISK:  Can read back my question?

THE STENOGRAPHER:  Yup.

(At this time, question was read back by the stenographer.)

BY MR. RISK:

Q.   Well, I'm asking what your belief was as the day that you approved him to be on the hiring committee.

A.   Well, I was aware of his reputation.  So, yes.

Q.   But -- well, all right, what do you mean by reputation?

A.   I mean through the experience of discussing with more than one sergeant, but certainly Sergeant Clark, and others Ed's performance over the years, I was aware that Ed in terms of the goals of the police department, and going out there and being active, and kind of working hard for the community, that was not his reputation.  So I would consider that low performing.

That didn't mean Ed was already a K-9 officer and already on the SWAT team and doing other things;

Page 54

right?  So you have to work with who you have.  I think Sergeant Clark was trying to bring Ed into a new experience and maybe breathe some life into an officer that wasn't really performing up to where we wanted them to be.

Q.   And so you believed as of the summer of 2021 that Mr. Elmore was not one of your officers who was out there working hard for the community?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  Yes.

BY MR. RISK:

Q.   Okay.  If I were looking for an indication that that was his reputation in writing, in any form, does it exist?

A.   Well, I think you'll find it in his evaluation when he competed to become corporal.

MR. RISK:  Well, can you give Mr. Whitney the exhibit binder and ask him to look at -- or does he have the exhibit binder and give a copy to Mr. Hatchett of Exhibit 1.

MS. BENFER:  Yes.

(Exhibit No. 1 was marked for identification.)

Page 55

MR. RISK:  You know, and take your time.

MR. HATCHETT:  I can share.

MS. BENFER:  There you go.

MR. RISK:  I will represent to you that these were text messages between Mr. Elmore and Mr. Clark produced by Mr. Elmore in this case.  Take your time.

MR. HATCHETT:  I have a standing objection to any questions to this witness based on this document.

MS. BENFER:  Okay.

BY MR. RISK:

Q.   You can -- there other pages you can look at.  I don't want to surprise you, but tell me when you are ready for a question, Mr. Whitney.

A.   Well, I looked at page 1.

Q.   All right.  You see where Sergeant Clark writes, I think very highly of you and you rose to the occasions and then some, as I knew you would.  I knew you would be a perfect fit and should be in additional leadership roles here.

Do you see that?

A.   I do.

Page 56

Q.   Does that change your testimony in any way that as of the summer of 2021, Sergeant Clark had an opinion of Mr. Elmore that he was a low-performing officer?

A.   It doesn't change my opinion.  You would have to ask Sergeant Clark what he meant by that and what his intentions were in conveying that.

Q.   It doesn't change your opinion that as of the day Mr. Clark wrote this text message, I think very highly of you.  And, in fact, Sergeant Clark had an unfavorable opinion of Mr. Elmore as an officer?

A.   Well, I think unfavorable and low performing are two different things.  But you would have to ask Sergeant Clark exactly what he meant when he conveyed that message.

Q.   Well, he is not here and I'm asking you today about what is your understanding of what Sergeant' Clark thought when he recommended Mr. Elmore for this role and alluded to additional leadership roles?

A.   Well, I think this is consistent with the idea that as a frontline supervisor you're trying to raise somebody up and sometimes when you are talking to an officer and you are trying to raise them up, you say encouraging things.  And I'm not speaking for Sergeant Clark, but I'm answering your question.  He's been to some of the same trainings that I have been to.  That's

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit  2

Page 57

how I interpret what I am looking at.

Q. The Obermayer report which I have here and I can show it to you if you want. And it says in there -- that in discussions with you, you said, Officer Elmore had a history of misconduct. Do you remember saying something to that affect to Obermayer?

MR. HATCHETT: Objection. And I want to ask to the extent of the capacity that you spoke to Obermayer was attorney-client, don't discuss any conversations you've had those attorneys.

With that limitation, you can respond.

THE WITNESS: Can you tell me when?

BY MR. RISK:

Q. Yeah. Let me show you.

A. Because it might help me frame my answer better.

Q. Yeah, for sure.

A. When we are talking --

Q. In this second -- find Exhibit 125. You have not seen -- yeah, Exhibit 125. Sorry. That's 124. Try this one here. I was trying to find notes from Mr. Rhodes of the discussion with you. Take your time, Mr. Whitney. It's a longer document. I want you to be

Page 58

familiar with it.

A. So I just want to clarify --

Q. Yes.

A. This looks like a document that was generated sometime late 2023 in the year.

(Exhibit No. 125 was marked for identification.)

BY MR. RISK:

Q. I'll represent to you that these were documents produced to us by Obermayer pursuant to subpoena and also reviewed by counsel for the township.

And I want to look at this note down at the bottom of the page where -- and I believe these are notes from your interview with Mr. Rhodes. Do you remember meeting with Mr. Rhodes?

A. I believe so. Yes.

Q. Mr. Rhodes writes, Chief, being you, stated that Elmore is a low-performing officer. Do you see that?

MR. HATCHETT: Chief, again, I have an objection. I'm renewing my standing objection. If this discussion or conversation was in connection with any attorney-client conversations, don't respond.

MR. RISK: Well, it's -- the report

Page 59

was produced and these notes are produced. So it is no longer a privilege that pertains to these notes.

MR. HATCHETT: I maintain a different position. I don't think that there's a foundation in what context this was produced or in what context the witness was interviewed, but that's not my job.

BY MR. RISK:

Q. Well, let me ask it differently to try to clear that up because --

A. Are we on the part of the exhibit labeled bottom right Obermayer 0030?

Q. 29.

A. 29. Okay. Thank you.

Q. Tell me when you are -- I don't want to rush you.

A. I have the correct page now.

Q. All right. Let me do it in a way that's trusted avia (ph) to Mr. Hatchett's objection.

Well, as of late 2023, did you believe that Mr. Elmore had a history of misconduct as a Falls Township police officer?

A. Yes. In the prior several years, he had amassed a series of alarming behaviors that I would

Page 60

characterize as misconduct.

Q. Well, I'm interested in the time frame. We will talk about the K-9 training incident of February 2022. Prior to that, did any of these alarming behaviors occur prior to February of 2022?

A. My recollection is that we discovered that the K-9 unit, including Officer Elmore, had been involved in attending trainings that were much shorter than they were reporting. And, therefore, they were either absent from their shift and making overtime and not actually working. And when that was discovered, we put out an order that said basically stop doing that. That was prior to the incident that you're talking about in February 2022.

Q. But after the --

A. -- we just became aware of it. My understanding is it went back years, we just become aware of it.

Q. Okay. Well, other than the suggestion that Mr. Elmore left K-9 training early, was there anything else in his history of misconduct that occurred prior to February of 2022?

A. Not that I was aware of at that time.

Q. Okay. So, if you believed in 2023 that Officer Elmore had a history of misconduct during his service as a Falls Township police officer, that relates only

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 61

to matters either after February 2022 or involving leaving the K-9 training early; is that right?

A.  **Well, I think that's part of it.  Yes.**

Q.  Well, what's the rest of it?

A.  **Well, there was an internal investigation after that during which he lied.  So, that's like the nuclear button.**

Q.  I'm asking about --

A.  **That all transpired prior to this.  And then this business about acquiring a K-9 dog came up and there were procedures that weren't followed.  So, yes, I mean, I think in a relatively short period of time he engaged into spiral of behavior that I would have characterized as misconduct.**

Q.  And we'll get to all of that.  I'm trying to see where we are on the calendar of his 24 years of service.

I asked you what prior misconduct he had engaged in prior to February of 2022.  You told me in -- well, you told me in another context that there was a complaint he didn't want to wear a mask during COVID in the hospital.  And you told me that you thought that the practice of leaving the K-9 training before the end of the shift had a history before February 2022.

I'm asking you, other than that, did Officer

Page 62

Elmore engage in any misconduct that you are aware of prior to February of 2022 when you became aware of the problem in the February 25th K-9 training incident?

A.  **Not that I recall.**

Q.  Okay.  Okay.  So if you told someone in 2023 that Elmore had a history of misconduct, you are referring to a history that started in February 2022 with the caveat that that might have been the repeat of some other leaving work early behavior; is that right?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  And the conduct since.  I mean, you have to understand I was working with labor counsel, the same labor counsel that had been involved in all of these other incidents.

So they were well aware of the fact that during this conversation in late 2023 that when I said a history, that's the history.  And, you know, they were in possession of whatever documents or correspondences or were present at meetings where all of that was discussed.

So I believe the attorney who

Page 63

was authoring this was well aware of what I was referring to.  We were talking about a recent history.

BY MR. RISK:

Q.  Ahh, that's what I am asking you.  A history that goes back to February of 2022?

A.  **Roughly speaking.**

Q.  Because in July of 2011, he was getting selected and approved by you to be the committee to hire new police officers; right?

A.  **Yes.**

Q.  Okay.  Very good.  Very good.  While we are here -- well, I suppose -- you mentioned metrics a couple of times and I'm not sure -- well, you tell me again, when you talk about the metrics used to evaluate a police officer, what are those metrics?  Or as used under your administration in Falls Township?

A.  **Well, there are many.  And I think to some extent they have grown over time with our ability to collect and visualize data.  But on a very basic level, we are talking about engaging with the community, doing traffic stops, traffic warnings, traffic arrests, drug stops, drug warnings, drugs arrests, searching vehicles.  The two things that were killing people in Falls Township in that time period, which was just the**

Page 64

**other side of the opoid epidemic were traffic crashes and drug overdoses.**

**So the mission of the patrol division was to be responsive to that as much as humanly possible to try to make an impact on both.**

Q.  So under your administration of Falls Township, it's valued for police officers to arrest more people?

A.  **No.  I wouldn't say arrest more people.  I would say that when arrests are called for, those arrests should be made.  But it's having contact and engagement with the community.  It depends on what kind of arrests we are talking about, whether those arrests are aligned with the goals of our organization.  You can't just arrest everybody.  But you could stop a lot of cars because there are a lot of traffic violations and people are killed in traffic crashes every year in Falls Township.**

**You could stop in areas where there's drug dealing and drug use going on and try to make an impact in that.  And those are the expectations of the patrol division rolling out of this time period into my taking over as chief of police and that continued.  We expect you to work hard.**

Q.  Well, I'm from New York.  So I've heard about -- well, it's not my fault --

Pages 61 to 64

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 65

MR. HATCHETT: Objection.

THE WITNESS: I've been tempted to ask Yankee or Mets.

MS. BENFER: Pittsburgh.

MR. RISK: Pittsburgh. I've heard about community engagement and community policing for a long time. I've never heard it described this way.

MR. HATCHETT: That's not a question. Don't respond.

BY MR. RISK:

Q. No. That's not a question. Just trying to get a question out of it.

More -- numbers of arrests and numbers of car stops are viewed by an officer are viewed as positive indicators under your administration; is that right?

A. It can be.

Q. Well --

A. I mean, it's more nuanced than that. Our model is a combination of community-oriented policing. So what does that mean? Well, it means you involve the community in problem solving, it means you're responsive to what's happening out in the community, including what's killing them.

Page 66

We also engage in problem-oriented policing, which is addressing specific strategies to areas where we have having problems. It means we practice intelligence policing, which is to use information we glean from people that we arrest or people that provide us information to make us more effective in being proactive. And we use evidence-based policing which is to try to use methods that are more validated and evidence-based to make an impact on the community.

So the days where you could say, well, we are just worried about how many arrests an officer makes are long gone, but an officer should be doing something. And if you are not stopping cars, you are not parking your car and talking to people, you're not going to schools and talking to little kids, if you not -- if you're not doing any of that stuff, then what you are doing? And that's the kind of stuff that we talked about and continue to talk about at staff meetings.

Yes, there are metrics, but the metrics are not the whole story. The whole story comes from talking to each supervisor and saying, hey, what's going on in your squad? You know, if there's no metrics on the spreadsheet of any note with this officer, what else is that officer doing? And if the answer the nothing, well, that's not a good answer.

Page 67

Q. And where would we look in your department's records to find out what the opinion was about what Mr. Elmore was doing in matters like community engagement, using judgments to solve problems, being a presence in the community, and face and foot time on the street?

A. Well, you would look at the metrics collected for those staff meetings.

Q. And what do they show? What metrics are collected other than numbers of arrests and number of tickets?

A. Calls for the service handled, time spent doing different time categories that are defined on the daily activity report of an officer, mileage. You know, there is a lot of things you can look at and see, all right, what's this officer doing while they are working for the last month?

Q. And what's the name of the piece of paper or the report that would indicate Mr. Elmore's performance in these and other categories that you have alluded to maintained by the department? What's it called?

A. It's a spreadsheet. It may be called squad performance. There may be another title to it.

Q. And where is that kept?

A. Electronically.

Page 68

Q. All right.

MR. RISK: Mr. Hatchett, I'm calling for the production of the squad performance spreadsheets for Mr. Elmore's work of -- I don't know, going back --

BY MR. RISK:

Q. Did the spreadsheet exist before you became the -- well, you did because you talked about when you were in --

MR. RISK: We'll say going back 10 years.

MR. HATCHETT: I have an objection to that. We will address that outside of the deposition.

BY MR. RISK:

Q. Mr. Whitney, that could be obtained -- it's on the computer; right? You can press a button? That's your understanding?

A. Well, you would have to make copies of the spreadsheets. Yes.

Q. Fair enough.

MR. RISK: Okay. So it's not burdensome and we call for its production and it seems to go on the

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 69

heart of the matter, but I'll talk to you on the break.

MR. HATCHETT: I will renew my objection. As well as other documents, we --

(Simultaneous talking.)

MR. RISK: Well, if we have it, then I will apologize.

MR. HATCHETT: Okay. Well, I'm sorry. I didn't mean to interrupt.

MR. RISK: Okay.

BY MR. RISK:

Q. Take a look at Exhibit 15. It's in the first binder.

THE STENOGRAPHER: You said, 15, 1-5?

MR. RISK: Yes. 15, 1-5.

(Exhibit No. 15 was marked for identification.)

BY MR. RISK:

Q. And take your time. I'm not going to quiz you on documents that you haven't read, Mr. Whitney. So tell me when you are ready.

A. Okay. I've examined the document.

Q. I just want to ask you -- and on the second page

Page 70

marked 0032 -- oh, this is written by you to Mr. Takita?

A. Yes.

Q. And Mr. Takita was relatively new in -- this was November 30th, 2022. Do you see that up there at the top?

A. Yes.

Q. And Mr. Takita was relatively new to the township at that time, wasn't he?

A. I would say this was probably two and a half to two and three quarter years in for him as township manager.

Q. And in the middle of the second page of Defense 0032, you tell Mr. Takita, as employee, Elmore has a history of attempting and succeeding of engaging in deceptive practices that benefit him or a cause that he attaches himself to.

To what were you referring when you wrote that on November 30, 2022?

A. I was referring to, I believe -- his theft of time in the K-9 training incident and his efforts at times to shield himself from scrutiny by claiming that he was engaging in First Amendment rights and rights as he knew and things of that nature.

Q. Well, anything prior to 2022 you were referring

Page 71

to with the exception of your suggestion that leaving K-9 training early might have taken place before 2022?

A. I mean, it's been a couple of years since I wrote this. That's my best recollection of what that particular paragraph was referring to. When I wrote this, I did it in concert with labor counsel. So we went back and forth a couple of times, but that was my recollection.

Q. And you mentioned labor counsel a couple of times. That at the time was the Obermayer firm?

A. Yes.

Q. And they are no longer your labor counsel?

A. Correct.

Q. Is there labor counsel now?

A. Yes.

Q. And who is that?

A. Campbell Durrant.

Q. And did there come a time when the township replaced Obermayer as labor counsel with Campbell Durrant?

A. Yes.

Q. When was that?

A. I think it was 2024.

Q. Okay. When you testified that you wrote this memorandum to Mr. Takita in consultation with

Page 72

Obermayer, is that true about -- was that your general practice with respect to your memoranda about employment matters to the township manager?

A. Yes.

Q. You did them with counsel?

A. Yes. And with the understanding from the township manager that normally these things weren't a surprise to the township manager. The process for discipline was collaborative. It was required to be by the township. So the manager and I would speak, the labor counsel would be looped in, and then we would take action.

Q. But -- well, are you suggesting that Mr. Takita told you to, okay, write me a memo in cooperation with labor counsel?

A. I don't know that it was necessarily he told me, but I'm sure we had conversations related to this with each other including labor counsel, and afterwards this memo was generated to Mr. Takita.

Q. But as to the facts in the memo, Elmore has a history of attempting and succeeding in engaging in deceptive practices, I'm assuming that you supplied that observation and not counsel?

A. I'm sure that we discussed it. I mean, counsel was aware of the history of recent misconduct on

Pages 69 to 72

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 73

Elmore's part. I can't tell you for sure who came with that specific wording, but I'm sure we discussed it while the memo was being written.

Q. Well, doesn't history suggest it goes back -- for a 24-year employee suggest it goes back a little further than the 10 months?

A. Not in this context.

Q. Oh, okay. So that's what you were referring to? The 10 months of issues you had with Mr. Elmore?

A. Well, I'm not sure it was 10 months, but it was a recent history of actions that, as I state in this memo, were of great concern, seemed to be escalating, were alarming.

Q. Okay.

MR. RISK: Why don't we take a five-minute break to stretch our legs and then we will come back?

MR. HATCHETT: Okay.

(At this time, off the record.)

(At this time, back on the record.)

MR. RISK: Yeah. I meant to say at 10:03 when we started that the sort of the plan for today, you know, we got the electronic production of thousands of documents last Friday, and I was busy

Page 74

preparing all of this, and Ms. Benfer looked at them, but we -- I had a conversation with Mr. Hatchett in which he said, we will go forward, but we might have to call Chief Whitney back if we see anything as we review these electronic documents that requires further inquiry.

I think Mr. Hatchett said, in substance, yeah, okay, but that doesn't mean you can have a million hours with the witness. There's got to be some limits.

So I'm going to try not to use 7 hours today. Normally conceding that I have to stop in 7 hours, but I'm going to try to leave us a little nub in case we have to have you back to talk about the ESI.

BY MR. RISK:

Q. If I say ESI, does that mean anything to you?

A. Yes. Sure. I understand.

Q. Yeah. Either on Zoom or in person, once we have the chance to get through this. But I have a tiny bit to show to you, if we get to it.

Page 75

A. Okay.

Q. Okay. We were talking about records and performance of officers. Do you keep personal records related to performance metrics of your officers?

A. Personal records?

Q. Where the files are. That's what I am interested in. Do you keep any files of your own about performance or discipline issues?

A. No.

Q. Okay. Mr. Elmore was involved in a fatal shooting in 2021 during your time as the chief. What do you know about that? When -- what do you recall about that?

A. I recall it was in August. It was a residence in the Morrisville area of Falls Township. The male subject in the house, the adult male, made a threatening move towards a fellow officer and Officer Elmore fired a fatal shot at the suspect.

Q. And what did the department do to support Mr. Elmore after this incident?

A. So standard procedure is you're placed on administrative leave, the district attorney's office does the criminal investigation and reviews the incident itself. It's essentially a homicide investigation.

Page 76

Q. And there have been no criticisms of Mr. Elmore, as I understanding it, in connection with that incident; is that right?

A. No. The shooting was justified by the district attorney's office. It was within policy for the police department.

Q. How common is an officer using a firearm in Falls Township?

A. It's relatively uncommon, although in the past five years I think we have had three or four. Prior to that, I think it was 19 years. So it does happen, but it doesn't happen as frequently as it does here in Philadelphia.

Q. In your evaluation of your officers, does the proper conduct of an extremely stressful and dangerous situation like that count as a plus performance-wise?

A. Well, we certainly want officers to perform well under those extreme, dire circumstances. So to the extent that you're asking me that, yes, we want our officers to perform very well. I'm not sure I would be comfortable saying it was a plus to get involved in a fatal shooting.

Q. It's horrible and I have nothing but respect for you all that there is even a remotest possibility that that's a situation any of you find yourselves in, but

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 77

we are talking about Mr. Elmore's record as a Falls Township police officer.

And I'm asking you if his handling of that horrible incident is -- his handling of it is a positive?

A.  I think he handled it very well.  I think the aftermath was devastating.

Q.  And when you say the aftermath was devastating, you are referring to what?

A.  I think he took it very hard.

Q.  And what's your basis for that belief?

A.  Things that Ed told me and the course of conduct that they placed afterwards.

Q.  So, you are connecting the difficulties you had with Mr. Elmore in 2022 to the personal dealing with his terrible incident in 2021?

A.  Well, I certainly think it's possible.  And I think that only Ed really knows.

Q.  Now, the complaint which you advised me you have read yesterday states that Mr. Elmore came to speak with you in late February 2022 about the -- to complain about the disciplining of various officers.  You saw that in the complaint?

A.  It does say that.

Q.  In early 2022, oh, in February of 2022, what do

Page 78

you remember about that conversation?

A.  I don't believe that conversation ever happened.  I think Ed has the date wrong.

Q.  Okay.  Well, did there come a time in early 2022 when you had one or more conversations with Ed about the treatment, the disciplining of other officers?

A.  Yes.

Q.  When do you think that was?

A.  It may have been earlier in the month.  It may have been, you know, past the end of the month of February into March.  There was a time Ed came to me and was concerned about whether or not administrative leave was the functional equivalent of discipline.  We had a conversation about that specific topic and I followed up to talk to labor counsel about it.

Q.  And --

A.  But that was pretty much the extent of the conversation.

Q.  And there were particular officers on administrative leave at that time?

A.  I believe so.

Q.  And who were they?

A.  I believe Langan and Rhodunda were still on administrative leave at that time.

Q.  And did you speak with Ed also about Officer

Page 79

Crosier?

A.  I do not believe that Ed had brought up Officer Crosier.

Q.  Did you speak with him about any other officers?

A.  Not that I recall.

Q.  Was Officer Crosier being investigated at the time in late February or early March 2022?

A.  Yes.

Q.  In connection with what?

A.  Well, there were two things that Crosier had going on at that particular time period.  One was a review that was being conducted by the trial attorneys at the district attorney's office of a large number of arrests that she made.  By large number, I mean somewhere in the neighborhood of maybe 60.  There were quality issues and grading issues with the arrests.

When it came to my attention, I asked the DA's office to look it over.  That took a little bit of time because they were busy.  And then while that was being done, she got involved in a traffic pursuit that ended in a crash in Morrisville Borough.  That was kind of the impetus for the decision to be made to place her on administrative duty while those two investigations played out.

Q.  How is administrative duty different from

Page 80

administrative leave?

A.  When you are reporting in for administrative duty, you are actually coming into work.  You're just not public front facing with the public.  When you are on administrative leave, you are being paid, but you are home.

Q.  And didn't Ed suggest to you that it was -- wasn't there a time when Ed, who of course by then was the president of the PAFT union, suggested to you that the reopening of dozens of Officer Crosier's cases was unfair?

A.  He never said that to me.

Q.  Did -- was there a time when he said to you it was unprecedented?

A.  He never said that to me.

Q.  Was there a time that he said to you that putting Officer Crosier on administrative leave or administrative duty was a form of unfair discipline?

A.  I don't remember him saying anything about her specifically.  I remember him being concerned about people being on administrative leave and whether that was the functional equivalent of discipline.

Q.  And what did he say to you about that?  What do you recall?

A.  He thought it was discipline.  I pointed out to

Pages 77 to 80

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 81

him that the collective bargaining agreement specifically exempts it from being considered discipline, but that I would talk to labor counsel about it.

Q.  Okay.

A.  I also encouraged him to talk to his union attorney about it and perhaps we could have a productive discussion.

Q.  And was there a subsequent discussion?

A.  I don't believe there was.

Q.  Was there a -- did you ever suggest to Mr. Elmore that he supply you case law authority on any subject?

A.  Yes.  I believe on that subject.

Q.  On that subject?

A.  Sure.

Q.  And did Mr. Elmore give you a copy of the U.S. Constitution?

A.  I do not believe that he gave me a copy of the U.S. Constitution.

Q.  Or the Bill of Rights?

A.  No.

Q.  Mr. Elmore suggested that show me the case law is a -- is a -- something that you would specifically say from time to time; is that right?

A.  Yes.  That's fair.

Page 82

Q.  Okay.

A.  It's normally to attorneys.

Q.  Was there ever a -- leaving aside for a minute the Bob Kent-Lawrence Bell (ph) situation that we are going to talk about later.

Was there ever a time in which the -- in which the Falls Township requested the district attorney's assistance in reopening closed cases to evaluate a police officer other than the Crosier situation?

A.  I'm not sure what you mean when you say reopening.  Do you mean have we ever asked the district attorney's office to review arrests or cases?

Q.  Well, cases that have come to a final disposition.  Am I correct that with respect to Crosier, they were reviewing the -- you would ask them to review dozens of cases that were completed and closed?

A.  Some of them were.  Some of them weren't.

Q.  Okay.

A.  Some of them were still pending.  A lot of them were cases where a warrant was obtained and the defendant wasn't in custody.

Q.  And what were you looking for in asking the district attorney to conduct this investigation of

Page 83

Crosier's arrest?

A.  I was looking to see if they had quality issues with the arrests, whether the arrests were supported by probable cause, whether the arrests were graded correctly, whether the arrests were filed correctly.  In some instances, then Corporal Crosier's had taken criminal conduct that had taken place on the same day and filed two separates criminal complaints weeks apart for the same criminal conduct, which created a joinder issue.

The grading issues had implications not only for the penalty for the defendant, but for extradition.  There were individuals that were taken into custody and incarcerated in other states and extradited back to Pennsylvania who weren't the defendant because they were misidentified.

There were substantial quality issues with those arrests and I wanted to make sure that not just my staff or township's labor counsel felt that way, but that the actual district attorney's office, who are the trial attorneys that are involved in this saw those issues for a number of reasons.  One, I thought having an outside review of it was appropriate to make sure that the conclusions that were being drawn were correct.  And, two, they had a role to play in this

Page 84

because these cases went to them and they didn't catch it either.  So there was a performance piece of this that I had to own, that my agency was having an officer make arrests that weren't good arrests.  But they needed to do their part of it too because the check and balance should have caught that.

So for all of those reasons, I think that was appropriate.  Now has that been done in other instances?  I -- probably.  I mean, you know...

Q.  Well, how many of Crosier's cases were -- did you instruct them to review?

A.  I think it was about 60.

Q.  Have you ever requested a review of that many cases for another officer?

A.  No.

Q.  Have you ever requested review of half of that many cases for another officer?

A.  No.  We did do our own internal review to make sure that the other top five producing officers who were making high arrests didn't have the same issues and we didn't find the same issues with them.

Q.  Was Crosier a high-arrest officer?

A.  Yes.

Q.  Okay.

A.  Statistically, significantly high.  We should

Pages 81 to 84

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 85

have caught it earlier.

Q.  Well, I won't comment.  And your own supervisors blessed those arrests as they went up the chain to the district attorney, didn't they?

A.  Many of the time it was her herself since she was a supervisor.  We have since changed that, that a supervisor cannot approve their own arrest report.

Q.  What was the district attorney's conclusion after review of the 60 Crosier cases?

A.  That there were substantial quality and grading issues with the arrests, that there were many that were vulnerable to having been misidentifications, that in many instances Corporal Crosier took the identification information from a civilian store detective without ever taking any steps to confirm that through her own investigation.

Q.  And what was the upshot of the district attorney's conclusions?

MR. HATCHETT:  Do you understand the question?

THE WITNESS:  I do not.

BY MR. RISK:

Q.  Well, I asked you what the district attorney concluded and you told me several bullet points or things about it.  I guess my question is:  What

Page 86

happened then as a result of that?

A.  Well, what happened then was I was out on administrative leave for 5 months because of a vote of no confidence.  And when I came back, Crosier was on a fast track to retire and get out of the police department.  So we never had an opportunity to address that with her either as a performance issue or a disciplinary issue.

Q.  Well, where is it said -- what -- with respect to the Bucks County DA's office, how was that aspect resolved?

A.  They assured me that they would review their internal procedures to make sure nothing like this happened again.

Q.  Was she sanctioned by the district attorney's office?

A.  Well, I don't know that they were in power to sanction her.  You know, the handling of the performance issues, whether we handled them as a performance issue or a disciplinary issue, is essentially up to us.

Q.  Yeah.  But even I know that you have a broad view of what constitutes proper request for a Brady-Giglio review for the district attorney.

MR. HATCHETT:  Objection to the

Page 87

form of the question.

BY MR. RISK:

Q.  So I'm asking you with respect to the Brady-Giglio aspect of the -- well, did the Bucks County -- sorry.

A.  It's becoming more clear.  Go ahead.  I think I know where you're headed.

Q.  Fair enough.  Did the Bucks County DA's office issue an opinion with respect to whether Crosier's arrests presented a Brady-Giglio issue?

A.  Thank you.  No.  They decided that they were not going to Brady-Giglio list Crosier.  Part of the review team was -- the assistant district attorney at the time was in charge of that.  So they did bear that in mind.

Q.  Isn't that a suggestion that the DA's office didn't view these Crosier's arrest problems as significantly as you just described them?

A.  No, not at all.  I was there for the meeting with the staff that reviewed it.  They expressed in strong terms their concerns about the seriousness of it.  We even talked -- the township to pattern and practice evidence, which would be very unfortunate, but it had not happened thus far.  But I could tell you that Brady-Giglio under the last two DAs in Bucks County has been a mirage, unless nobody is Brady-Giglio listed.

Page 88

It's countywide.

Q.  Which two DAs are you referring to?

A.  Matt Weintraub and Jenn --

Q.  Schorn?

A.  Yes.  Jenn Schorn.

Q.  Okay.

A.  Love them both, but they weren't losing the police union over Brady-Giglio people.

Q.  All right.  Did you have a follow-up conversation with Mr. Elmore regarding -- following your initial conversation with him about -- that you have described about the treatment of other officers?

A.  Mr. Elmore?

Q.  Mr. Elmore.  Did you have -- well, turning back, we've talked your meeting with Mr. Elmore in some date early in 2022 in which you discussed, among other things, the -- what's the proper use of administrative leave as a de facto disciplinary mechanism.  Did you speak to Mr. Elmore again about the treatment of the other officers?

A.  I don't recall if we had a further conversation about whether or not his position that administrative leave was the functional equivalent of discipline.  I don't recall if we followed up on that.  I did bounce it to labor counsel, but I don't remember whether we

Pages 85 to 88

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 89

had a follow-up conversation.

Q. Do you recall any conversation with Mr. Elmore in which he suggested to you that Crosier was being treated unfairly?

A. I did not.

Q. Did you ever have any conversation with Mr. Elmore in which he suggested that you that Langen and Rhodunda were treated unfairly?

A. He may have brought them up during that discussion about administrative leave, but I don't recall if we had any significant follow-up conversations.

Q. Did you have any conversation with Mr. Elmore in which he suggested that their age was a factor in what he thought was unfair treatment of them?

A. Absolutely not. He never said that to me.

Q. Okay. Getting to the incident involving the K-9 training in February of 2022. Mr. Elmore -- there were three officers. And as I understand it, of the three Mr. Elmore was not being paid overtime for the K-9 training day on that day; is that right?

A. Yes. That's my recollection that he was on day shift that day.

Q. Right. And the other officers were being paid overtime that day?

Page 90

A. That's my recollection as well.

Q. And that's because the training day for them was not a regularly scheduled shift?

A. Yes.

Q. Okay. If an officer leaves a shift early -- well, have you ever disciplined an officer for leaving a shift -- for punching out early?

A. Well, if an officer punches out early they use paid time off. So there's no violation of policy.

Q. Can you explain that?

A. Well, officers are permitted to use paid time off. So if you were working a 12-hour shift and you are working from 7:00 a.m. to 7:00 p.m., but you want to leave at 3:00, as long as it doesn't make the squad short and you get approval, you can go home early. You just use four hours of paid time off.

Q. All right. Have you ever had a situation in which an officer left the shift early without getting approval?

A. Not that I am aware of. I have issued discipline for officers who were AWOL and didn't show up for their shift.

Q. That would be an officer who didn't show up for a scheduled shift and did not call in to give notice about that?

Page 91

A. Yes.

Q. Meaning, if an officer calls in and says, I don't feel well today and I have a family problem, that's something else, isn't it?

A. Sure. Then they would be off sick.

Q. Okay. Taking a sick day. So the AWOL situation is when the officer has a scheduled shift, doesn't come in, and doesn't prenotify you?

A. Yes.

Q. So the department is left with an assignment, an important assignment on the streets somewhere and there is no officer to do the work?

A. That's one scenario. Yes.

Q. You have another scenario?

A. I have a scenario where an officer went for CPR training as a supervisor, lasted about two and a half hours, but he disappeared for an entire 12-hour shift. He got disciplined, too.

Q. What officer was that?

A. Sergeant Brian White (ph).

Q. And when was that?

A. I believe it was in 2021.

Q. And he was disciplined for that?

A. Yes.

Q. And that's during your tenure as chief?

Page 92

A. Yes.

Q. Was that a discipline that had to be approved by the supervisors?

A. It didn't because it wasn't a suspension day. I believe it was a -- I believe I gave him a written warning.

Q. And a written warning, that should go in the personnel file? Well, no -- what file would that written warning be placed in?

A. So the written warning would actually end up during the reckoning period in the officer's personnel file and then be removed when the reckoning period concluded.

Q. Is that the personnel file you described with the application, we hope the letter from thankful citizens, and any discipline matters until they are expired by the reckoning period? That file?

A. Yes.

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. RISK:

Q. And that's maintained where?

A. In the township human resources office.

Q. Oh, okay. So if we were looking for Mr. White's

Pages 89 to 92

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

reprimand, is that the word you used? That's where that would be housed in his personnel file in the township office?

A.  Well, it would have been. I'm sure the reckoning period has expired now. It's 2026.

Q.  Do you know offhand approximately what the reckoning period would be for an offense like that?

A.  I believe it's two years.

Q.  And do you recall whether that's a first offense?

A.  It was the first time I caught him. I can tell you that.

Q.  And, therefore, in the discipline world that is a first offense; right?

A.  Of course.

Q.  Okay. Okay. With respect to the -- the K-9 training day incident of February 2022, there came a time when you got a phone call from someone at the county?

A.  Yes.

Q.  And they said, your department has submitted a request for 8 hours of overtime reimbursement for each of three officers?

A.  I don't know that it was all 3, but our department submitted overtime reimbursement in the

amount of 8 hours for this training or even for the scent certification day where even the instructor wasn't there that long. So he was drawing it to my attention because it was inconsistent with every other department.

Q.  And why are your officers requesting -- why is your department requesting monies from the county for this in the first?

A.  For scent certification, it is reimbursable overtime from the district attorney's office because the dogs can be used anywhere throughout the county. If somebody requests a dog, we send our dog.

Q.  And the county doesn't pay your officers, it reimburses your department for the time; is that right?

A.  Yes.

Q.  All right. The county said to you, we normally pay for four hours -- we normally reimburse for four hours; is that right?

A.  I think the conversation was more like, everybody else put in for four hours, your department put it in for eight. So we are notifying you of that discrepancy.

Q.  Okay. Let's look together at -- oh, you made a recommendation to the -- after the internal investigation, you made a recommendation to the

supervisors that three officers be terminated based on this incident?

A.  At the end of the process, yes.

Q.  And then -- before acting, they hired a -- they sought advice from Sheriff Hearn? Let me say it differently. They sought advice on what to do from an outsider?

A.  Yes.

Q.  And that outsider happened to be the sheriff, but he was working in a private working capacity for Falls Township?

A.  That is my understanding.

Q.  And that's Fred Hearn?

A.  Yes.

Q.  And at that time, did you know Fred Hearn?

A.  Yes.

Q.  And in what way did you know him?

A.  Well, we've both been cops for a long time. I knew him when he worked for Bensalem.

Q.  Had you seen him within the last two years before he was retained by the county?

A.  Yes. He goes to the monthly Bucks County Chiefs of Police meetings. So we usually see each other there.

Q.  You are on a first-name basis with him?

A.  Yes.

Q.  In the documents I've seen that you suggested that beginning at the time you became the police chief, you were unpopular with two of the Falls Township supervisors because of your cooperation in an FBI investigation. Have I said that fairly or correctly?

        MR. HATCHETT: Objection to the form of the question. Do you understand?

        THE WITNESS: I believe that I do. Yes.

BY MR. RISK:

Q.  So, the answer is yes?

A.  Yes.

Q.  Okay. Okay. And I think you've expressed elsewhere the opinion that two of the township supervisors have sort of a bias against you perhaps related to that?

A.  Yes.

Q.  And you've suggested that because of that, you felt those supervisors were protecting certain of your officers from discipline?

A.  Yes.

Q.  And that would include Mr. Langan?

A.  It would.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 97

Q. Where I am getting to is: Did you view Mr. Hearn as anything other than an outside independent consultant?

A. Yes.

Q. All right. How did you view Mr. Hearn?

A. I feel like they hired Fred to get an outcome that would be determined by what they wanted it to be. My chairman is well aware that Fred and I don't get along.

Q. Well, did you and Fred not get along prior to his retention in connection with the K-9 training incident of February 2022?

A. Fred and I haven't seen eye to eye for decades.

Q. About what?

A. Just about our philosophies in policing, our philosophies in leadership.

Q. Is it your view that Mr. Hearn's philosophy of discipline is excessively lenient?

A. No. But I think that you can buy Fred to say what you want him to say and I think that's what happened here.

Q. You believe that Mr. Hearn was retained by the supervisors and that it was communicated to him that they wanted a report that suggested that these officers should be not disciplined or minimally disciplined. Is

Page 98

that your testimony?

A. Yes.

Q. Okay. Didn't the time to -- well, why was the -- didn't three officers have the right to have an up or down decision on discipline within 90 days after the start of the incident of February 2022?

A. Well, you know, that was a legal matter that was discussed a great deal by the township solicitor and labor counsel.

Q. Why did the -- why were these matters halted by your being placed on administrative leave?

A. That is a question for the township.

Q. Okay. Okay. So if I suggested to you that I can find no basis under the collective bargaining agreement that those -- that time wouldn't have expired under 90 days on those matters, you are simply saying you don't have an opinion for that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes. I think that's the history here. There is a lot of legal wrangling over that that I wasn't privy to and this is how it shook out.

BY MR. RISK:

Q. Well, as a practical matter, why didn't the issue

Page 99

of the disciplining of Officers Elmore, Fischer, and Lundquist continue on schedule under the leadership of the interim chief?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I don't know the answer to that.

BY MR. RISK:

Q. Because you were gone?

A. I was isolated from the decision-making apparatus of the township. So I have no idea.

Q. Did you ever say to anyone, has the time expired on these matters that were supposed to be resolved in 90 days?

A. At the time, I was more concerned with my return to active duty.

Q. I understand that, but you still have to answer my question.

Did you express to anyone that the time to pursue these matters may have expired?

A. I don't think I expressed a concern that they had expired. Early on, I expressed a concern that placing me on administrative leave wasn't the proper course of action and that I should be able to complete some of these tasks. So I don't think I worded it quite the

Page 100

way your question is asking, but I raised it prior to my departure.

Q. Okay. When you went on administrative leave, you did not know whether you would be coming back?

A. I did not.

Q. All right. And so, did you have an understanding that if you didn't come back, these matters would not be pursued?

A. Well, I think that's what a lot of people thought. So that's what I heard. So of course that caused me to concern the same thing.

Q. Yeah. And you have testified elsewhere, have you not, that you had a belief that at the -- that at least two of the supervisors wanted you not to return; is that right?

A. Yes.

Q. And that they were in cahoots in some way with some of the disciplined officers with the understanding that their discipline would be mild or nonexistent if they assisted in your ultimate departure?

A. Yes.

Q. Okay. You've testified about labor counsel. Did the police department have its own labor counsel?

A. No.

Q. Obermayer was township's labor counsel?

Pages 97 to 100

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 101

A. Yes.

Q. And so, when you consulted with counsel and they with you on these discipline matters, was there any concern that their actual client was the supervisors?

A. I'm not sure that -- I don't understand your question.

Q. Well, if you engaged -- well, let's do it this way. What approval did you have to get in the -- well, did you have to get any approval before reaching out to the Obermayer firm to work with you on a discipline matter?

A. Yes.

Q. What did you do?

A. I had to go through Matt Takita.

Q. And do you know what Mr. Takita had to do?

A. I do not.

Q. Do you know whether he -- well, if you called Mr. Takita and said, I want to call Obermayer to discuss a discipline matter involving Officer X, do you know if -- you would not do that without Mr. Takita's approval?

A. Yes, unless it was already approved in an ongoing matter. I mean, in that time period I was meeting with Mr. Takita and Mr. Dipoleto twice a week. Many times, labor counsel was in on the meetings and all of these

Page 102

issues were being discussed every week, at times twice a week. So, it was kind of a fluid situation, but rarely was there an out of the blue situation because we had these weekly meetings and then these twice-a-week meetings. So there was a lot of meetings and discussion going on.

Q. Could you pick up the phone and call someone at the Obermayer firm if a discipline question came out? Or did you have to go through Mr. Takita?

A. I think over time the relationship became that I could pick up the phone and call them because the matters were already being discussed. I can't recall an instance where something new came up that had never being discussed with Matt Takita that was discussed with labor counsel first. Matt was always in the loop.

Q. You've testified to us candidly about your belief that two of the supervisors had a clear opinion about you and this had an effect on the hiring of Mr. Hearn. But if there were five supervisors and two of them were a problem for you, why was the board of supervisors not controlled by the other three?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: That's a great question. If I could figure that out, I

Page 103

would be the governor of Pennsylvania right now.

BY MR. RISK:

Q. Oh. So you are saying to me that you don't know?

A. I don't know for sure how some of these decisions were made. I've talked to some of them since and tried to figure it out, but it's perplexing. My impression is they made decisions on incomplete and at times inaccurate information.

Q. Well, that may be true. That's different than suggesting that they had a fixed opinion and it was that you shouldn't be there?

A. Well --

MR. HATCHETT: Objection to the form of the question.

BY MR. RISK:

Q. Isn't it?

A. Well, I think I can give the other three the benefit of the doubt. But the two that you're referring to have very strong feelings about me. I don't think that's broadly shared.

Q. How did you come to be suspended on April 26?

A. I was called into the manager's office and given a memorandum.

Q. How did you become aware of the -- well, is it

Page 104

your belief that you were suspended because of the no confidence letter on -- well, by the no confidence vote of the officers, plus the no confidence letter?

A. That's what the memorandum that they gave me noted.

MR. RISK: All right. We may have to -- let's make a note. We may have to call for the production of that. I don't think we received that.

BY MR. RISK:

Q. Are you aware that there was a dissenters' letter by other officers who said we disagree with how the no confidence letter is written?

A. Yes.

Q. Who were the dissenters?

A. Well, I'm not sure I know who the dissenters are. I read the report last night. It didn't really identify them.

Q. You read what report last night?

A. The Campbell Durrant.

Q. Were you involved in the preparation of the dissenters' letter?

A. No.

Q. And as we sit here today, you don't know the names of any of the dissenters?

Pages 101 to 104

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 105

A. I mean, I could guess.

Q. Well, did anyone come to you and say, you know, I want you to know I signed that dissenters' letter?

A. No one used that term until last night. Were there people that came to me and said, I didn't join the mutiny? Yes, of course.

Q. Well, did people call and say to you, I was one of the people in the letter of protesting happened?

A. I truly don't remember people talking to me about a letter, but I do remember people saying, hey, listen, I think this is wrong and I support you. So I'm assuming they are the same people.

Q. Would Sergeant Clark be one of those people?

A. Yes.

Q. Would Lieutenant Ward be one of those people?

A. I don't think so. I mean, maybe, but he wasn't in the union. So my impression is that these were unions members.

MR. HATCHETT: Chief, I'll just remind you throughout your deposition I don't want you to guess or speculate.

THE WITNESS: Thank you.

BY MR. RISK:

Q. And how about Officer Steve Reeves (ph)?

A. I'm not sure on that.

Page 106

Q. How about Officer Makowski (ph)?

A. Okay.

Q. Well, how did you find out about the confidence note?

A. It was in the memo that the manager gave me.

Q. That's the first you heard of the no confident vote?

A. Yeah.

Q. You hadn't asked to speak to the men between the time that you -- that they took the no confidence vote and you were placed on leave?

A. I thought I asked for the meeting with everybody before it if anything was happening in terms of -- I had no idea there was no a confidence vote. But I knew from talking to the FBI that something was headed my way.

Q. The FBI spoke with you between the no confidence vote and your being told you'll be placed on leave?

A. The prior week, the FBI spoke to me.

Q. And what was -- who was that?

A. Special Agent AJ Hade (ph).

Q. And what did he say?

MR. HATCHETT: Objection to the form of the question. You can respond.

THE WITNESS: Well, I mean, I don't

Page 107

remember our exact conversation because it was a while ago. But I remember just saying to one another, something bad is heading my way. So they arranged to give me a grand jury subpoena and indicated to me that they didn't mind if I shared it with my employer. They were going to give it to me on Monday, April 25. I got it. I shared it with my employer. And the next day I got a letter saying there was a vote of no confidence and I was out.

So it was a valiant effort on the part of the FBI to help me, but it didn't work.

BY MR. RISK:

Q. What arrangements were made to run the department while you were gone?

A. All I know is that the only person left in the command staff was Lieutenant Clark. I'm sorry, Lieutenant Ward. It's been a while.

Q. Okay. Why did you -- I'm circling back just a tiny bit. Why did you task Lieutenant Ward with doing the investigation of the three officers in connection with the K-9 incident?

Page 108

A. He was the only lieutenant that I had.

Q. And, therefore, it would've been inappropriate to ask someone farther down the chain of command to do that?

A. Internal investigations are supposed to be conducted by lieutenants.

Q. Did you discuss with him before you sent him out to do the investigation your view of the K-9 training incident?

A. I'm not sure I understand that. I didn't know much at that point.

Q. Well, it seems that you viewed this conduct by the officers as a very substantial matter from the get-go, didn't you?

A. I think it would be more accurate to say I was hoping it wouldn't be. So I was at a conference when the deputy chief of the county detectives called me. And I called Lieutenant Ward. I said, listen, you are going to have to look into this, I'm hoping this isn't serious. I even said to him, I hope everybody tells the truth and that's how I left it. I was out of town. That's all I knew. I let the process play out.

Q. But you testified a little bit ago that when Officer White didn't show up for work and didn't tell you that was going to happen, he received a reprimand?

Pages 105 to 108

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 109

A.  Yes.

Q.  And now we have an incident in which there is a suggestion that Officer Elmore left a shift early and that resulted in a recommendation of termination?

A.  Yes.

Q.  Wasn't Officer White's conduct more egregious than Officer Elmore's?

A.  White didn't lie.  If these guys would've told the truth, they would've gotten almost nothing.  Lying is the nuclear button.  If you lie to your employer during an internal investigation, you sever the employer-employee relationship.  Like, what are we supposed to do with you?

Q.  So in your administration, however minor the officer's offense if they -- if on inquiry they speak about it in a matter that the investigator deems it not to be truthful, then the penalty for that is termination?

A.  No.  I wouldn't say it that way.  I would say that if you are truthful during an internal investigation, then the table of discipline guides us to what happens based on what the offense is.  If you lie during an internal investigation and complicate matters a great deal because now you not telling the truth.  We actually read you a form that tell you, you

Page 110

have to tell the truth.  If you don't tell the truth, you face termination.  They train us that in the police academy, you know?  You kind of force my hand when you don't tell the truth.

Q.  And so, these officers were deemed to have been not truthful about where they were after a short day of K-9 training and that for Lieutenant Ward and for you was the nuclear button?

A.  Well, it was more than just -- you know, not coming back to duty or going home after a scent certification.  It was initially Ed saying, we went to lunch and I was there for long enough to order and eat a cheese steak.  Then that turned into, well, lunch was, like, two and a half or three hours.  There is a big difference between those two statements.  And we had video from the facility that they were at, we have a county detective as a witness, there was a lot of evidence there that supported the fact that they just weren't telling the truth.

Q.  And so, you and Lieutenant Ward ultimately concluded that the fact that they had changed their story about the location and the duration of their lunch was a matter that now called for their termination?

A.  Yes, in consultation with labor counsel.

Page 111

Absolutely.

Q.  What other -- oh, never mind.  Take a look with me at -- take a look with me at Mr. Harran's report at Exhibit 37.

(Exhibit No. 37 was marked for identification.)

MR. HATCHETT:  We are now at Exhibit 37, which is Bates-stamped Harran 084, I don't believe that is a copy of the report.

MR. RISK:  Oh.  Fair enough.

BY MR. RISK:

Q.  I wanted to -- this is your e-mail -- you are absolutely right.  These are e-mails -- and never mind -- you know, we got this document from Mr. Hearn.

So the top e-mail is confusing.  That's when it was sent from Hearn to Benfer a month ago.  But these are e-mails between the Laura Gallagher, who I take it was outside counsel and Mr. Hearn on February 14th and 15th 2023, during his investigation.

I just want to look real quick with you at page 085.

MR. HATCHETT:  And before your question, I have a standing objection to this witness regarding anything in this

Page 112

document.

But subject to this objection, Chief, you can respond.

THE WITNESS:  Okay.

BY MR. RISK:

Q.  Take a look with me at the second page of Exhibit 85.  Sheriff Hearn writes to -- oh, he's writing about his progress.  He says, I spoke with Nelson the other day and his story has changed a little bit.  Do you recall a conversation with Mr. Hearn in which he said your story had changed?

A.  No.  No, not at all.

Q.  Do you recall changing your story in your discussions with Mr. Hearn?

A.  Not at all.  I can't tell what Fred is referring to here, if he's referring to me or whether he's referring to the prior sentence about Ed Elmore.  It's just not clear to me in reading the way he expressed that.

Q.  All right.  At what point did you become aware that Mr. Elmore had in fact gone back to work on -- after the K-9 training?

A.  Probably when I returned in September.

Q.  Well, if --

A.  Perhaps give me more context.

Pages 109 to 112

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit  2

Page 113

Q.  Well, if there was a discipline inquiry about Mr. Elmore's going home early and the video from your office suggested that he didn't go home and he came back to the station, I'm really asking -- wouldn't that be the end of the matter?

A.  Well, no.  If he hasn't been working all day and just pretending to and coming in at the end of the shift.  I mean, we don't pay officers to go to lunch for two or three hours during their tour.

Q.  So I'm really asking at what point you became aware that video evidence showed that Elmore came back to the building?

A.  At the end of Lieutenant Ward's investigation.

Q.  Lieutenant Ward reported to you that he had concluded that Mr. Elmore returned at some point from the K-9 training to the headquarters where he spent the rest of the day?

A.  Yeah.  I think my recollection was he had said he came back to turn stuff in.  He also said he saw me that day, which isn't true because I wasn't there.  But that's my recollection of it.  I don't know that Lieutenant Ward had the video, but Ed said he came back at the end of the day to get gas and put some stuff away.  That's my recollection of the fact pattern.

Q.  And so, it wasn't -- in your recollection, it

Page 114

wasn't disputed that Ed in fact came back before the end of his shift to your headquarters?

A.  Yes.  I mean, I don't remember that being a big issue.  I remember the issue being, you were done with scent certification before noon, you basically went and took a lunch the rest of the day, you lied about it. It doesn't really matter that you came to put gas in your car.  Where were you?  You were supposed to be at work.

Q.  Okay.

A.  Yes.  I mean, just to complete the loop on your question, I don't even remember seeing any -- I never saw any video evidence from headquarters, but I don't remember that being an issue.

Q.  Well, your testimony is that as you sit here today, the fact that there was video evidence of Ed being in the office by, I don't know, 3:00 o'clock or 3:30 doesn't change your view that this was terminable?

A.  No, because he lied.  I mean, any officer can come in at 7:00 in the morning, disappear all day long, and come in at 7:00 p.m. at night.  If you weren't doing your job as a patrol officer, then that's a problem.

Q.  Well, yes, but also Officer White's not showing up for work is also being a problem.  Well, sorry, that

Page 115

wasn't the question.

Let's look at the -- well, all right.  Let's take a look at the Campbell Durrant report, which I believe is at the Exhibit 5 in the book.

(Exhibit No. 5 was marked for identification.)

MR. HATCHETT:  I have a standing objection to this witness regarding anything contained in this document.

MR. RISK:  Well, I just want to -- you don't have to read the whole report.

BY MR. RISK:

Q.  Take a look at page 6, which is 021, Harran 021 in the lower right-hand corner.  The dissenters' letter, which I recognize, Mr. Whitney, you said you knew about it only from this report.  The dissenters' letter that you described a little and they say, in all matters of discipline recommendations are made by the township's labor counsel with the knowledge of the department command staff and township management.  Is that a correct statement?

A.  I'm sorry, where is that?

Q.  I'm sorry.  It's about six or eight lines up from the bottom on page Hearn 021.  It's a description of the so-called dissenters' letter.

Page 116

MR. HATCHETT:  Do you need help?

MR. RISK:  Take your time.  This is not an exam.

THE WITNESS:  I mean, I don't know exactly where they are getting that from.

BY MR. RISK:

Q.  Is it correct?

A.  Is that the case every time?  I don't know that I can really tell you that.  I mean, I'm sure the township manager must be involved in these things.  But is the command staff always involved?  I can tell you different times people have been disciplined and I have not been involved.

Q.  Your officers?

A.  Yeah.

Q.  Under what circumstances?

A.  The township has reached over my shoulder and decided to fire people like Billy Tanner (ph) without even asking me for input.

Q.  Well, I'm really interested in the -- and you've already testified somewhat about it.  You testified that you worked -- regarding disciplinary matters, you worked closely with the lawyers at Obermayer?

A.  I did.

Pages 113 to 116

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit  2

Page 117

Q. Which lawyers at Obermayer, by the way?

A. There were a group. Initially, there was a woman named Kelly Sullivan, Tom Hearn, Melissa Atkins, Brian Rhodes. At one point, there was an attorney named Dan. I forget his last name and there was another --

Q. How about Mr. Shoot?

A. Yeah, Brian Shoot. He was one of them. Like I said, there was a group.

Q. Okay. Was the one the main point of contact? I know later, for example, Ms. Atkins and Mr. Hearn were very involved.

A. Pretty much. Initially, it was more Mr. Hearn and Ms. Sullivan. But then it became Mr. Hearn and Ms. Atkins.

Q. Okay. I'm really asking here about the idea that the recommendations are made by counsel. I mean, are the recommendations for discipline made to the supervisors by you with -- in consultation with counsel? Or by counsel in consultation with you? Or some of each of those?

A. I would say some of each of those. It's worked in various different ways.

Q. So when you deal with discipline matters, that was always a very lawyered deliberation for you?

A. Yes.

Page 118

Q. And it was always with Obermayer at the time?

A. At the time.

Q. Yeah. Not now.

A. Yes.

Q. Okay. Could have there been a situation in which you made a recommendation for Mr. Takita to forward to the supervisors about a discipline and Obermayer said, we don't agree?

A. I mean, you are asking me could that be possible?

Q. No. No. Did you --

A. Do I recall it happening?

Q. Yeah.

A. I mean, anything is possible. It happened with respect to Bill Tanner.

Q. Okay. I better not get into Mr. Tanner. With respect to Mr. Elmore, all of the -- and you made a series of recommendations that Mr. Elmore be terminated. Each of those was made fully supported by Obermayer?

A. Yes.

Q. And ultimately when -- oh, and those you made a -- well, you made a recommendation, which we are going to get to in a minute, at the beginning of 2023 that Mr. Elmore be terminated related to the K-9 training time problem and his conduct in November. At that

Page 119

time, you made a formal recommendation to the supervisors that Elmore be terminated?

A. Yes.

Q. Right. Right. Go ahead.

A. At some point -- well, let me back up a moment. There was a lot going on back then with Elmore. So I want to make sure I get this right.

Q. Okay.

A. At some point, there was an outside internal investigation and recommendation came from Obermayer. I made a recommendation regarding the K-9 theft of time incident.

Q. You got -- well, I'm glad -- maybe that's what I needed to know.

You became aware of the K-9 -- let's call it the February '22 K-9 training incident, and you asked Lieutenant Ward to conduct an investigation, and he made a recommendation to you that Mr. Elmore be terminated?

A. Yes.

Q. And the others be terminated?

A. Yes.

Q. And then -- shortly thereafter, there was a vote of no confidence about you resulting on you going on administrative leave?

Page 120

A. Yes.

Q. Before you went on the administrative leave, did you make a recommendation to Mr. Takita or the supervisors that Mr. Elmore be terminated?

A. I don't recall. I don't recall if the process got that far or if we waited until I came back. I would have to look at the documents.

Q. Well, in your mind were you -- whether you actually got it to before you got your notice that you were going home, in your mind did you -- were you ready to support Lieutenant Ward's recommendation and request that the supervisors terminate Mr. Elmore at that point in April?

A. I believe so.

Q. Okay. Got it. The question is whether you actually did that prior to your termination?

A. Until my leave --

Q. I'm sorry about that.

A. Yeah. My leave.

Q. Yeah. Until you began your leave on April 26. I'm really sorry about that.

A. Yeah. I mean, I honestly don't recall whether Matt Takita and I had a conversation or a correspondence prior to that.

Q. You returned in September?

Pages 117 to 120

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 121

A. Of 2022.

Q. Yes. Of 2022. Thank you. Let me ask you this: While you have the Campbell Durrant opened, can you look at page 42? Hearn 42? No. It's Report 42. These are numbered in two ways. Take the last page, which is 42 of the report, Hearn 57.

A. Hmm-hmm.

Q. And this is a couple of recommendations by Campbell Durrant. I'm looking at the last paragraph.

MR. HATCHETT: I renew my prior objection.

BY MR. RISK:

Q. In the last 8 lines it says, further, the department should proceed with any pending disciplinary actions that have stalled due to this investigation while fully consulting with labor counsel regarding the appropriate process and disciplinary penalties.

You were already doing that, weren't you, Mr. Whitney?

A. Well, prior to being placed on leave.

Q. Yes. Yes. But that was already the procedure under your administration; right?

A. Yes.

Q. Then they say two sentences down, the last sentence of the document, labor counsel should review

Page 122

and approve all future discipline so as to hopefully mitigate any retaliation claims when future discipline is issued. That's not inconsistent with what you were doing; right?

A. Correct.

Q. Because you are telling us that in matters of discipline -- when you were a decision-maker the Obermayer firm is completely involved?

A. Yes.

Q. Okay. Can you look at Exhibit 6? Now, this was a letter from the district attorney's office to acting Chief Ward during your leave. You got to turn to the next tab with a --

(Exhibit No. 6 was marked for identification.)

MS. BENFER: Can we go off the record for a second?

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. I want you to look at the letter that's dated on August 17th.

A. I have it.

Q. All right. You were gone on August 17 and the district attorney's office wrote back to acting Chief

Page 123

Ward. The DA's office wrote -- as far as they were concerned, the issue was closed and there was no Brady-Giglio issue; is that right?

MR. HATCHETT: Objection. I have a standing objection for any questions to this witness regarding this document.

Subject to that, Chief, you can respond.

THE WITNESS: The letter states that they made a determination that the incidents described do not constitute a Brady-Giglio issue and we consider this particular issue closed.

BY MR. RISK:

Q. And I know you didn't receive this letter -- well, have you ever seen this letter before before right now?

A. I saw it when I returned.

Q. It says, we consider this particular issue closed. What's your understanding of what they were saying to you?

A. That they did not consider this a Brady-Giglio violation.

Q. And did you ask the district attorney to look into this matter in any other way other than with

Page 124

respect as to whether it's a Brady-Giglio violation?

A. Initially I asked him to screen it for any criminal misconduct.

Q. And did you get a reply on that before you went on leave?

A. No.

Q. So you were asking them to give you an opinion as to whether -- when these 3 officers may have either left or not completed a full shift on the training day, or turned in, or sought overtime for the training, whether that could be a criminal matter?

A. Yes.

Q. What would happen if they -- what would have happened to these three officers' careers had the district attorney determined that it raised a Brady-Giglio issue?

A. Well, it would depend on the level to which they were listed on the Brady-Giglio list. If the officers were no longer ever going to be called to testify by the district attorney's office, their employer with the township probably would have been severed. That would have been up to the board. If they were listed as being called for witnesses, but they have to disclose that, then their employment would continue.

Q. Well, if they had been terminated and they are on

Pages 121 to 124

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

the Brady-Giglio list, wouldn't they have to look for a career outside of law enforcement?

A.  I read about stuff like this happening all of the time where officers that are Brady listed somewhere else get a job at another jurisdiction.  It's a tough market.  I can't really answer the question.

Q.  Yeah.  What did you ask the district attorney to -- what aspect of this did you ask the district attorney in investigate in connection with possible criminal activity?

A.  The time theft.  I said, screen it for criminal conduct, screen it for Brady-Giglio and let me know.

Q.  And did you make a similar request of the district attorney's office in connection with Officer White's AWOL reprimand?

A.  No.  Because he told the truth.

Q.  When asked about it?

A.  Yes.

Q.  So, it's not the overtime theft that you felt the district attorney should be looking at, as you testified a minute ago.  It's that they didn't testify truthfully in the judgment of Lieutenant Ward.  That's what you thought was the -- should be investigated as a crime?

A.  Well, I think you have to take into account

the difference in time between those two incidents.  So when White came to light, I had no idea anybody was doing that.  That was a complete shock to me and I was well aware that I was managing change in an organization that was not policy driven here before and was also not practicing processive discipline.

So I said to White, we can't have this.  I said to the union leadership, this has to stop, you can't have people doing this.  It's time theft.  And then it continued.  So I put them on notice.  Notice is an important requirement and they did it anyway.  So then I had them screened.

Q.  Okay.

MR. RISK:  What time is it?

MR. HATCHETT:  1:01.

MR. RISK:  You have a call.  We will push on a little more.

MR. HATCHETT:  Okay.

MR. RISK:  Will you give me five minutes, Mr. Whitney?

THE WITNESS:  Sure.

THE STENOGRAPHER:  All right.  We are off the record.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q.  I'm going to ask you again, Mr. Whitney, from before the break.  You asked the -- you testified that you asked the district attorney's office to look into two aspects of the Elmore, Fischer, Lundquist K-9 training time whether there's a Brady-Giglio issue, which we discussed and whether a crime had been committed.

And so, I want to ask you again:  What aspect did you ask the district attorney to look at to determine whether a crime had been committed?

A.  The time theft.

Q.  The time theft.  Not the -- whatever they said in the internal investigation?

A.  Well, no.  It doesn't constitute to crime to lie to your employer unless you're talking to the FBI.

Q.  I understand.  So that's clear.  It was the time theft?

A.  Yes.

Q.  Okay.  Are you familiar in your work as a manager with the phrase captive audience meaning?

A.  Generally.

Q.  What's that?

A.  People who don't have a choice but to be there.  So they're captive audience.

Q.  You believe that in a labor management context?

A.  I'm not sure I'm following you.

Q.  Well, my question is:  Were -- had you spoken to the officers, were you in the process of speaking with them, or had you scheduled a meeting to speak with them as a group at the time you were notified that the supervisors had placed you on a leave of absence?

A.  No.  I had a -- those two things happened contemporaneously.  I had a meeting literally scheduled for -- it might have been 3:00 o'clock on Tuesday, the 26th of April in 2022.

Q.  With?

A.  With everybody.  Because when I heard, hey, people aren't happy, I don't know what's heading your way, but I got the federal government willing to give me a subpoena to try to stop it from happening.  So that's not a good sign.

So let me get everybody in the same room.  Let me just let everybody know what's going on.  There was a lot of stress in the organization over the external investigation, which turned into a union debacle with people deciding to cooperate within -- within union or not, there was a lot of stress because of the change that I had been implementing.  So I thought it's time for a meeting, but I never got there.

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 129

I got called into the office and told I was on leave.

Q. When you refer to the external investigation, you mean the FBI investigation?

A. Yes.

Q. What you were you going to say at that meeting?

MR. HATCHETT: Objection to the form of the question. You can respond, Chief.

THE WITNESS: I was just going to tell everybody, listen, just so everybody know this is how it's working. Here's our goals as an organization. Here's the box the township has put me in. Every time I have anything before me as a disciplinary matter, I'm in meetings with the township manager, with labor counsel. I'm not the final say on discipline like my predecessor was. That delegation from the board of supervisors to the police chief was revoked. They are the final decider on policy and discipline. I was just going to lay it out just so everybody knows where we are at as an organization. And I was going to let everybody vent and

Page 130

tell me what they were upset about, and then at least we know just where everybody stands.

BY MR. RISK:

Q. And did that meeting ever get convened?

A. No.

Q. And take a look with me -- see the tab for Exhibit 34?

A. I have 35.

Q. It's a long memo.

A. Yes. I have that.

Q. What is Exhibit 34, Mr. Whitney?

A. It is part of the recommendation for discipline that I prepared for the K-9 officers. This one appears to be directly related to Officer Elmore.

(Exhibit No. 34 was marked for identification.)

BY MR. RISK:

Q. Oh, okay. And this looks like a lot of lawyerly touch on this. You prepared this with the labor counsel?

A. I did, although I have to say I did the heavy lifting. It was reviewed, but I thought -- not to give you a long answer, but if you are going to the rational actor model of decision-making, if you think a group of

Page 131

people are making a bad decision, it's either the wrong person making the decision, they don't have enough information, or they don't have the right incentive. I can't control the first and the last, but I can give them enough information. And that was my intention here.

Q. And as a lawyer, it was very admiring of all of these footnotes. Who did that?

A. I did. Believe it or not, I was reading corena (ph) cover to cover back then.

Q. And so, you did a draft of this and it was reviewed by Obermayer?

A. Yes.

Q. Did they mark it up? I mean, did they make suggestions and corrections?

A. Yeah. They made some suggestions.

Q. And --

A. They changed the font.

MR. HATCHETT: Chief, I'm going to remind you -- and I didn't mean to cut you off. To the extent that it gets into questions related to or dealing with Obermayer or any counsel in your capacity as an employee for Falls Township, please don't discuss any

Page 132

conversations that you had.

THE WITNESS: Understood.

BY MR. RISK:

Q. Well, I'm going to try to ask the questions in a way that doesn't get to that, but I just want to establish that this was not Obermayer acting alone and this was not you acting alone. This was drafted by you and then worked on with Obermayer; is that fair?

A. Yes.

Q. Okay. Turning after the legal discussion -- turning to page -- to Hearn 069 in the lower right-hand corner. It's towards the back.

A. Hmm-hmm.

Q. Way down at -- about 10 lines up from the bottom, you say, upon my return, I assure the department that no retaliation of any kind would take place and the department would be looking forward, not back. Do you see that?

A. Yes.

Q. And is that something you did?

A. Absolutely.

Q. How did you do that?

A. I visited each roll call.

Q. I'm sorry?

A. I visited each roll call. And I spoke personally

Pages 129 to 132

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 133

with every officer.

Q.  You said, I even shook Elmore's hand and assured him of this personally.  Where did that occur and when?

A.  Well, it took three attempts for me to get Ed to shake my hand.  He didn't do it at roll call.  It may have been in the hallway or it may have been at a meeting.  I'm not sure.  But I wanted to shake everybody's hand including Ed and let them know that we are looking forward, not back, the department needs to heal, and that's what we are doing.

Q.  But didn't you shortly thereafter began to pursue the disciplining of Ed in connection with the K-9 incident of the February prior?

A.  Well, that was already in the process.  It had to be handled.  It had to go to a Loudermill.

Q.  Well, you didn't have to make a recommendation of termination.

A.  I can't tell you a chief in the United States that in my position wouldn't have made a recommendation of termination for officers who lied to enrich themselves.

Q.  Well, Fred Hearn would be one, off the top of my head?

A.  Well --

Page 134

MR. HATCHETT:  You don't have to respond.

MR. RISK:  He's the only other one I know, but okay.

THE WITNESS:  Not when he worked for Bensalem.

BY MR. RISK:

Q.  Okay.  So, you really were looking -- you were continuing to look back at that incident?

A.  Well, I had to handle what was in front of me that had already happened.  The concern --

Q.  Sorry.

A.  It's okay.  Listen, the concern that I think people had, the concern that was articulated to me by the manager when I returned was that you can't come back and be, like, looking to retaliate.  And I assured him, listen, this is not what I am going to do, but this stuff was just left hanging.  So it had to be handled.

Q.  Well, it's your testimony that this man who took three attempts to shake your hand knew it was likely he was facing a recommendation by you that his 24-year career be terminated; right?

A.  Sure.

Q.  So --

Page 135

A.  The other guy shook my hand.  It's not personal.  It's business.

Q.  You assured him of this personally.  You told Ed, we are looking forward, not back?

A.  I did.

Q.  Mr. Elmore was on medical leave when you returned?

A.  In September of '22?

Q.  Yeah.

A.  If you say so.  I don't recall.

Q.  Are you aware that -- well, you've read the complaint.  You read in the complaint yesterday that Elmore alleges that the township retaliated against him for complaints he made to Mr. Takita and Mr. Dipoleto in October regarding what had happened on the -- regarding bias against women and others on the hiring committee of the year before?

A.  I do remember hearing about that.  I couldn't tell you the time.

Q.  Take a look at Exhibit 10 -- yeah, you know what, let me -- I got to go faster.  No.  Let's take a look -- yeah, actually, it is Exhibit 10.  I'm sorry to be so confusing.  It's a series of e-mails from different dates.

You know, a good way to read Exhibit 10 is

Page 136

from the back, like lots of e-mails.  But take a minute and look it over and I'm going to ask you a question about Elmore's return.

A.  Okay.

(Exhibit No. 10 was marked for identification.)

BY MR. RISK:

Q.  Are you getting farther back in those?  Look in the back at Defense 712.

A.  Okay.

MS. BENFER:  Off of the record for a second.

THE STENOGRAPHER:  Sure.  We're off the record.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q.  Let's look at the one three pages into the exhibit.  It says it has a 2 at the bottom.

A.  Okay.  I'm on page 2.

Q.  Well, it seems that in early November, Mr. Elmore had returned from medical leave and was working light duty, which I think is the same or similar to what you have described as administrative duty.  And it seems that -- well, who is Sherry McGovern?

Pages 133 to 136

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 137

A. Sherry is the township's human resources coordinator.

Q. At that time?

A. Yes.

Q. And still?

A. Yes.

Q. And she writes -- and do you know who Mary Hicks is?

A. Mary Hicks is someone who works for the workers' comp carrier.

Q. So she writes on November 4th, also, is there any chance to revoke the recommendation of light duty? As I stated in the e-mail below, the chief is extremely concerned with allowing a police officer to work light duty without the use of his dominant right arm. Do you remember that?

A. I don't have an independent recollection of it, but it makes sense to have a concern about that.

Q. Yeah, it does. And but look at the e-mail below from a half an hour earlier. There are many concerns with this claim coming from the chief and the lieutenant. They feel he should not be on light duty because of the many restrictions he has with his right arm and having no contact with the public.

Officer Elmore's a K-9 officer who drives a

Page 138

marked car to and from work. Last night while driving into work, he claimed he banged his already injured arm on the arm rest in his vehicle which resulted in him calling out and not showing up for last night's shift. This is also a concern because of the personnel issues the command staff has been having with him.

As of November 4, 2022, what were the personnel issues the command staff was having with Elmore that you didn't want him on -- in the building on light duty?

A. I would have to speculate. I'm not sure what Sherry is referring to. I mean, other than everything that we have been talking about. That's the only thing I can imagine.

Q. That there was a problem about a K-9 training day 10 months before?

A. I mean, Sherry would have to clarify that, but that's the only thing I can imagine.

Q. Well, what about the no confidence letter?

A. I --

Q. Did you understand at that time Elmore to be someone who had a large role in the no confidence letter that had sent you home for 6 months?

A. I did, but I doubt very much that that's what that was referring to.

Page 139

Q. So you don't know?

A. But I would be shocked if that's what it's referring to.

Q. Well, you don't remember saying to Sherry -- well, do you remember ever saying to Sherry McGovern the fall of 2022, I'd rather Mr. Elmore not be here on light duty because of issues that we are having with him?

A. I don't remember specifically having conversations about him, but it makes perfect sense to me to be concerned about an officer working light duty who is driving a marked car back to work, who can't use his dominant arm.

Q. Yes. But those aren't personnel issues with the command staff and that's --

A. Like I said, we can ask her to clarify that. I'm not sure.

Q. All right. I think you have done what you could have on that. Okay.

What were the incidents that -- to your recollection, what were the incidents that happened in November involving -- well, let me say it this way.

What were the incidents that happened in November with Mr. Elmore that resulted in him being placed on administrative?

Page 140

A. You know, that may shed further light into what was going on what Sherry just said --

Q. Well, they were after that. That's why I'm asking. Anyway, I don't mean to --

A. It's okay. It was a long time ago.

So we had Loudermill hearings that had to be scheduled. They have been hanging in abeyance since I was on administrative leave. I had to get permission from the township to schedule them. So it took a while to schedule them. During some of the scheduled Loudermill hearings, Ed appeared and acted in erratic ways that caused us concern, specifically he dramatically unveiled a t-shirt that he had been concealing under a fleece that he had made with my picture on it next to a picture of Derek Chauvin. At the time, he said he didn't have a way to record the Loudermill except with a video. I can only assume he was expecting some dramatic response on my part, which he did not get.

But after all of that unfolded and he left, Sherry was concerned. I was concerned. He ended up wearing the shirt around headquarters for awhile. I think there was a second Loudermill in the afternoon where he wore it again. I consulted with manager and labor counsel about it.

Pages 137 to 140

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 141

Q.   Okay.  Take a look at Exhibit 16.

A.   I have it.

(Exhibit No. 16 was marked for identification.)

BY MR. RISK:

Q.   So a hearing was scheduled for Mr. Elmore on the K-9 issues for December 9?

A.   That is what this says.  Yes.

Q.   And do you know whether by that time the video that showed Elmore in the building on the date in question at 3:00 in the afternoon had been viewed by management?

A.   I did not.

Q.   Did you ever see it?

A.   I don't recall seeing it.

Q.   And you've already testified that that video did not change your views of the appropriate discipline in this situation for Mr. Elmore?

A.   No.  My recollection is that somebody said they saw him here.  I don't think it was factually in dispute that he came back at the end of his day.  The issue was where were you all day when you were supposed to be working?

Q.   And Mr. Elmore made a written submission on the Loudermill to exercise his Loudermill rights.  Do you

Page 142

recall that?

A.   Yes.

Q.   What happens to that written submission after he submits it to you?

A.   It goes forward to the manager and the board for consideration.

Q.   And what would have happened if he had made an oral presentation in the Loudermill hearing?

A.   Well, then Sherry McGovern and perhaps I would've taken notes.  We would've written something that would have gone to the manager and the board for their consideration.

Q.   But Mr. Elmore's written submission went intact with the materials to the supervisors?

A.   As far as I know, yes.

Q.   Take a look at Exhibit 19.  That's one of your -- or a series of e-mails by you and Mr. Ward and several people at that time.

MR. HATCHETT:  Exhibit 19?

MR. RISK:  Oh, I'm sorry.

(Exhibit No. 19 was marked for identification.)

BY MR. RISK:

Q.   It's your memorandum to Mr. Elmore in connection with this matter.  I'm sorry.  But I wanted you to look

Page 143

at -- do you got it?  Have I got you in the right place, Mr. Whitney?

A.   Yes.

Q.   December 5th, a memo by you.  I want to ask you in the bottom of the second paragraph you say, I've been informed that your intentions to misrepresent this photograph that you took in 2020 had falsely cast me as a racist to avoid your serious pending discipline.  Is that the way you felt at that time, that he was attempting to falsely cast you as a racist?

A.   Yes.

Q.   And tell us why that's a bad thing.

A.   It's unconscionable.  I mean, to be a racist in our field is an attribute that makes you unsuitable to be a police officer.  And for him to try to falsely accuse me of that and tarnish my reputation, which has been anything opposite of that my entire career, is horrible.

Q.   And if a -- and so, was the near claiming that you were racist something you note as significant in the recommendation you would make to terminate Mr. Elmore?

A.   Well, that recommendation was already on the table.  That had already been written.  This didn't help.  I think, you know, for me this was of great

Page 144

concern, but it was also concern for my part for the department.  I think he was taking a time when the country was falling apart over racially charged incidents and highjacking that narrative to try to save himself and attack me because I was doing my job as his chief.  I -- he was lying.  He was misrepresenting things.  These are all things that are of concern.  I never even heard of an officer doing this kind of conduct and I've been doing this for almost 40 years.  This is behind the panel.

Q.   Have you ever accused Mr. Elmore of being a racist?

A.   I've had discussions with counsel about things that I've been told about his view regarding other races.  I've never shared that.

Q.   Is that -- well, let me ask you again; have you ever described Mr. Elmore to anyone -- not at the dinner table, but in a formal or an important place, have you ever described Mr. Elmore to anyone as a racist?

A.   Only in conversations with labor counsel.

Q.   So that's a yes?

A.   I don't know if that's a yes to your question.  I've shared with labor counsel all of the information in my possession about Ed when they were in a position

Pages 141 to 144

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 145

to help evaluate the townships's position regarding it.

Q.  So, Mr. Elmore was placed on administrative leave.  At that point, you made it -- rather -- you submitted, I think among other things, Exhibit 34 a rather formal recommendation that he be terminated; is that right?  Do I have that right in the timing?  And, you know, the back pages of Exhibit 34 would give me the idea about the timing.

A.  In order to determine the timing of when I submitted this to the township, it ought to be fairly easy.  There was a cover page that was dated.  I'm not sure that I could determine the date from this part of the document, but there was a cover page, like a cover letter.

(Exhibit No. 34 was marked for identification.)

BY MR. RISK:

Q.  Yeah.  Well, I think I might have it but I didn't have it until --

And the question is:  Can I locate it?

MR. HATCHETT:  Mr. Risk, do you want to take a moment?

MS. BENFER:  Can we go off the record for a second?

THE STENOGRAPHER:  Sure.

Page 146

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q.  Exhibit 132.  We had the same question you did, Mr. Whitney, about the memo that we found in Exhibit 132 yesterday.

A.  I have it.

(Exhibit No. 132 was marked for identification.)

BY MR. RISK:

Q.  Is that the letter you're referring to?

A.  Yes.

Q.  Okay.  So that was the top page of what we've looked at as Exhibit 34?

A.  Generally speaking, yes.  It was part of a binder.  There may have been an index afterwards.  There may have been some other pages, but it was the first document in the binder that was related to Exhibit 34.

Q.  And as I read Exhibit 34, there were 31 exhibits.  I don't remember exactly, but it was a big submission with exhibits?

A.  Yes.

Q.  Yeah.  And this came with it.  Yeah.  This is your -- well, both Exhibit 34 and this letter are your

Page 147

requests that Mr. Elmore be terminated in January of 2023?

A.  To my recommendation to the board of supervisors, yes.

Q.  Okay.  Now when you say here towards the bottom, I urge you to consult with your labor counsel during your deliberations.  You knew at that time that the Obermayer firm agreed in your judgment that Mr. Elmore should be terminated?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

THE WITNESS:  Yes.

BY MR. RISK:

Q.  And you reached that judgment in constant collaboration with them, really, over a year, hadn't you?

A.  Over parts of the year.

Q.  Well, that was a collaboration that began with the February 25th incident?  Or 2022?

A.  Yes.  More or less.

Q.  And what do you know about what happened after you made this submission?

A.  Sometime later, I had heard that they hired Fred Hearn to review it.

Q.  And did you think to yourself immediately that

Page 148

was bad news for you?  Oh, wait, I'm sorry.  That that was likely to result in them not accepting your recommendation?

A.  I thought it was improper.

Q.  What do you mean improper?

A.  I thought it was improper for the board to hire a county sheriff to come in and take an internal investigation that he wasn't involved in and opine as to what the final discipline should be.

Q.  Do you have an understanding about how the supervisors came to retain Mr. Hearn?

A.  I do not.

Q.  And how did you find out Mr. Hearn had been retained?

A.  Mr. Takita told me.

Q.  Did Mr. Takita have a -- do you know whether Mr. Takita was aligned with you and Obermayer that Mr. Elmore should be terminated?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

THE WITNESS:  Well, he never voiced any opinion that was different during any of the meetings.

BY MR. RISK:

Q.  All right.  Take a look with me at -- well, did

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 149

you see at the time what Mr. Hearn's conclusions were? Or were they described to you orally or you didn't hear them at all? That's a terrible question.

How were you made aware of Mr. Hearn's conclusions?

A. To my recollection, I wasn't. I was just told what the board decided.

Q. You never corresponded with -- you were interviewed with Mr. Hearn in connection with this?

A. I was. And I provided him with whatever documents he requested and I answered whatever he asked. I was ordered to cooperate.

Q. Take a look at 55 with me.

MR. HATCHETT: I have a standing objection to any questions regarding this document for this witness.

BY MR. RISK:

Q. And you might want to read it from the bottom up so it's in chronological order.

A. Okay.

Q. You see Mr. Dence is saying, why is it -- we've made our decision. Why isn't Mr. Elmore back to work? And Mr. Takita is saying, I'll instruct Nelson, that being you, tonight that he is to return to work tonight. What happened? He wasn't returned to work.

Page 150

Do you know anything about that? Let me ask one question at a time.

I'm advising you that Mr. Elmore was not returned to work on June 9th. What do you remember about the events that kept him out of work after the psychiatrist that cleared him and after Mr. Hearn and the supervisors had cleared him to return?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I have no recollection of that. If Matt Takita told me to do X, I did X. So, I truly don't know.

BY MR. RISK:

Q. Can you look at 140?

MS. BENFER: Actually, all of it is 140.

BY MR. RISK:

Q. Well, this is on the fly because we just found these yesterday.

A. I have the document.

Q. All right. So you'll see that Obermayer, specifically Ms. Atkins and Mr. Hearn, wrote to the supervisors four days later on June 12th. And they say, in our absence during tonight's executive session

Page 151

due to prior commitments we want to provide the board with further guidance and historical perspective concerning Elmore.

Running attached executive summary, it has been our position that the totality of Elmore's conduct as reflected in the executive summary, which I think is the attachment, was unbecoming of a township police officer, and, therefore, warranted termination of employment.

Have you seen these documents before today?

MR. HATCHETT: Objection. I have a standing objection to this witness regarding this document.

Subject to that, Chief, you can respond.

THE WITNESS: No.

BY MR. RISK:

Q. Okay. Do you know why the -- why Obermayer might be speaking to the supervisors five days after the -- after Mr. Takita has directed to tell you to return Mr. Elmore to work?

A. No.

Q. And it's not a surprise to you, as I understand it, that Obermayer says, it's been our position that the totality of Elmore's conduct warranted termination

Page 152

of employment. You knew that's where they were on that issue; right?

MR. HATCHETT: Objection.

THE WITNESS: Yes.

BY MR. RISK:

Q. Okay. So, do you know anything about -- well, Elmore had to file a grievance in order to come back to work, which he did on the 19th. Do you remember any of that?

A. I really don't. But if you have it, it might refresh my recollection.

Q. All right. I will skip it. I do want to ask you about -- I want to ask you about the professional exam.

While Elmore was on administrative leave, he was invited to and did make application for a promotion to corporal. Do you recall that?

A. I do.

Q. All right. And as I understand it, the -- well, the procedure for evaluation of applications for promotion is set forth in the collective bargaining agreement?

A. Yes.

Q. And it is described there as an attempt to be an objective procedure. Are you aware of that?

A. Yes.

Pages 149 to 152

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Case 2:25-cv-02076-JHS    Document 49-5    Filed 07/20/26    Page 39 of 62

Page 153

Q.  And the major part of that, I gather, is the written test; is that correct?

A.  I think it's weighed at the highest.

Q.  And Elmore -- I can show you.  Elmore did quite well on the test.

A.  I remember he got an 80-something.  Yes.

Q.  Yeah.  His performance evaluation from his supervisor Mr. Fanelli (ph) was also quite strong.  Do you remember that?

A.  I do.

Q.  All right.  Now, that was changed.  What happened?

A.  So historically the chief has always been able to change the recommendation, the evaluation for an officer during the promotional process.

Q.  You mean as a matter of custom and practice?

A.  It's happened to me.

Q.  Okay.

A.  You know, I've gone through selection processes where the chief through my supervisor rated me a little too high and lowered me down.  At the time when I said, hey, Chief, what happened.  And he said, well, I lowered you and raised the lowest guy, I thought it was fair.

Q.  Okay.

Page 154

A.  In this particular instance, it's my understanding that Sergeant Fanelli didn't want to deal with the hard conversation it would be to tell Ed that he wasn't being rated high.  I think the words he used to Lieutenant Clark were he was afraid of Ed.  So he got an artificially inflated evaluation from his aligned supervisor and it got lowered.

Q.  How do you know that it was artificially inflated?

A.  That's the information that I got from Lieutenant Clark from his sergeant.

Q.  Who lowered it?

A.  Lieutenant Clark.

Q.  And the evaluation, which is in your book at the Exhibit 43, and the rescore evaluation is at Exhibit 47 -- I'm sorry.  It's Exhibit 49.

Take a minute let me know when you are ready for my question.

A.  I have them.  I'm ready.

(Exhibit No. 43 was marked for identification.)

BY MR. RISK:

Q.  I will tell you what, I opened my book so I can look at it side by side.  That's just a pro tip.

MR. HATCHETT: For us, 49 appears

Page 155

to be an e-mail correspondence.

MR. RISK:  Ut-oh.  48?  If you have it at 48, I'll take it at 48.  Sorry.

BY MR. RISK:

Q.  Do you have it, Chief, after all of my confusion?

A.  I have them both.  Yes.

Q.  Okay.  You signed 48, but is it your testimony today that you didn't -- weren't involved in the scoring changes?

A.  I adopted them.  I didn't make them myself.

Q.  Meaning, this was presented to you for signature, you looked at it, and you signed it?

A.  It, along with a whole bunch of other people whose scores were changed.  It was a pretty substantial issue in this promotional process.

Q.  Right.  Mr. Thomas (ph) complained about that, didn't he?

A.  He -- several people did.

Q.  Well, I mean in his capacity as the then president of the union, did you make any changes to what Mr. Clark had found on Exhibit 48?

A.  I do not believe so.

Q.  Now, Mr. Elmore was really rescored, wasn't he?  I mean, he was changed from a 90 to a 51?

A.  Yes.  That's correct.

Page 156

Q.  Did you know -- when Mr. Clark presented this to you for execution, did you know -- did you have the Fanelli original before you?

A.  I don't recall.  I may have.

Q.  And had you talked to Mr. Clark about your view of how Mr. Elmore's performance evaluation should be scored?

A.  No.

Q.  Did you talk to Mr. Fanelli at any point about this?

A.  No.  Other than training them in how to use the instrument.

Q.  So, Mr. Fanelli -- you relied on Mr. Clark's comment to you that Mr. Fanelli's afraid to give Mr. Clark an honest evaluation; is that right?

A.  Yes.

Q.  What time period of service is the Fanelli evaluation supposed to reflect?

A.  I --

Q.  And I don't mean this as a trick question.  I think it says, September 1st of 2022 to New Year's of 2023.

A.  Yeah.  I see there is a difference in the dates on the form Fanelli filled out as opposed to the final form.  The final form indicates it's supposed to be

Pages 153 to 156

212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 157

from January of '23 to October of '23, which makes more sense.

Q. Well, it wouldn't be October. It would be April 10th, wouldn't it?

A. I guess they filled that out wrong, too.

Q. So do you view these as related to the same time period or different time period?

A. Well, the time period for the evaluation for all of the candidates was the same, irrespective of a mistake that may have been made on the dates of this form. It was the same for everybody.

Q. And what's the time period?

A. I would have to look back at the other documents for the exam process. That was a while ago.

Q. Well, if the exam was April 26th, 2023, and the evaluation was contemporaneous with that or the same time as that, do you understand what period the evaluation would be for?

A. It would be from when we announced the tests. So I don't have that document in front of me, but it's probably January 1st to April 10th.

Q. The performance period measured would only be two or three months?

A. Well, the performance measurement for a promotional exam is only specific to that promotional

Page 158

exam. It's not an annual exam. This is required by the collective bargaining agreement. So it's more like a performance --

Q. During the period -- I'm sorry -- I'm interrupting you and I apologize.

It's a snapshot for the applicant's performance during the period from which the promotion process is announced to the date of the written -- the classroom exam?

A. More or less, yes.

Q. And so, it's your testimony that Mr. Clark in doing this, you know, extreme rescoring of the Elmore exam, and I can show you on that -- on exhibit -- back to Exhibit 47?

MR. HATCHETT: To the extent that there is a question, there is an objection to the form.

(Exhibit No. 47 was marked for identification.)

BY MR. RISK:

Q. I'm looking for your memo of April 27th regarding the scores on the written exam. I'm sorry. Regarding the revised performance evaluations.

MR. HATCHETT: Counsel, you referenced Exhibit 47. I just want to

Page 159

make sure.

THE WITNESS: I have the document.

MR. RISK: All right.

BY MR. RISK:

Q. All right. So, you noticed that as revised Mr. Elmore's score dropped from 90 to 51, which puts him last of all applicants by a wide margin. Do you see that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I see the scores.

BY MR. RISK:

Q. Would you say isn't the -- next highest score is a Mr. Rhodunda who we've already talked about who got a 64, and Mr. Elmore's score was dropped from 90 to 51. That's a rather dramatic change that Mr. Clark made, wasn't it?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I think it more accurately reflects Officer Elmore's performance. It should be noted almost all of these scores were changed.

(Simultaneous talking.)

THE WITNESS: The sergeants who

Page 160

performed these clearly weren't ready to use this instrument the way it was designed, in particular with the excessive use of exceeding expectations as one of the measurements on the form. That's reserved for extremely high performance.

MR. HATCHETT: Is that the end of your answer, Chief?

THE WITNESS: It is.

MR. RISK: Wow. Okay. Did you have something that --

MR. HATCHETT: I asked if that was the end of his answer.

I have to take a brief break.

MR. RISK: Oh.

MS. BENFER: We can go off the record.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. Well, I want to return with you, Mr. Whitney, to the promotion process. We were looking at the adjusted scores on Exhibit 47 and that would show you that Elmore's score was lowered. To say he is at the bottom

Pages 157 to 160

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 161

of the class is really an understatement here.  He is 13 points lower than every other single person on this sheet.

Why did you send out exhibit -- this was a distribution list.  You sent Exhibit 47 to all of these people, including Mr. Elmore; right?

MR. HATCHETT:  Objection to the form of the question.

BY MR. RISK:

Q.   How did it happen that you sent out the revised scores before you had actually revised Elmore's score?

A.   I'm not understanding this --

Q.   Well, Exhibit 47 you sent out for distribution on April 27th to a whole bunch of people.  The revised score in Exhibit 48 is dated the next day.

A.   The only thing I can think of is I either signed it the next day or there was an error in the date of the memo.

(Exhibit No. 48 was marked for identification.)

BY MR. RISK:

Q.   Well, the signing on the next day in theory, but Sergeant Clark signed it the next day -- Lieutenant Clark signed it the next day as well.

MR. HATCHETT:  Objection to the

Page 162

form of the question.  There's no question.

BY MR. RISK:

Q.   Did he?  Let me ask you this, Mr. Whitney:  Did you assign him a score of 51 before you changed the evaluation?

A.   No.

Q.   Are you sure?

A.   I'm positive.

Q.   Okay.  I did not know -- well, you see why it looks as though that's what happened; right?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  I don't.  I can tell you from experience and from a lot of processes like dealing with this and grievances and internals that that is frequently the case that a date is misdone on a document.  It's just one of the downsides to not having an administrative assistant when you're the chief trying to do too much.

BY MR. RISK:

Q.   I misdate documents, too.  It's not unique to law enforcement.

Page 163

But did Sergeant Clark or you do the reevaluation of Mr. Elmore with a particular final score in mind?

A.   No.

Q.   You testified before we broke to my surprise -- I had appreciated that you had said that it's your understanding that the collective bargaining agreement requires that when a performance evaluation is done in connection with a -- the service period for which it must be done is the period from which promotion, the promotional opportunity is announced, to the date of the written exam; is that right?

A.   I don't think it says that in the collective bargaining agreement.  I think loosely speaking, that's typically what people do.

Q.   So in other words, an officer could for a promotion really try to elevate their game during that period to hope to -- because they know that that's the period they could be evaluated for?

A.   They could.

Q.   And so, if a -- it's your understanding that if Mr. Elmore's evaluation was marked down dramatically from the Fanelli review to the Clark rescore, both of those were intended to evaluate and judge his performance during the period for which this corporal

Page 164

opportunity was announced to the written test of April 26th; is that right?

A.   In April of 2023.  That's what you mean; right?

Q.   Yes, sir.

A.   Yes.

Q.   Okay.  Take a look at Exhibit 35.  The promotional opportunity -- well, I'm rushing -- I'm sorry.

A.   I have it.

(Exhibit No. 35 was marked for identification.)

BY MR. RISK:

Q.   All right.  Is that the announcement of the promotional opportunity?

A.   It looks to be.  Yes.

Q.   And according to your testimony, January 30th strictly speaking is the date for which Elmore and all of the other applicants' performance should begin to be evaluated for three months really until the test of April 26th?

A.   That's when the metrics are collected.  Sure.  Yes.

Q.   So, if an officer did dramatically better during that period in terms of his activity and his metrics or everything or dramatically worse during that period

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit  2

than had been before, his evaluation should reflect that?

A.  Yeah.  There is no question that you could shoot up or shoot down the metrics portion of this during the period.  I've always thought we should just do evaluations every year and make it the average every time we have a promotion that's not what the CBA (ph) says.

Q.  All right.  But you told me before we broke that when I look at these, they are intended to judge the promotional opportunity period, in this case from January 30th to April 26th; right?

A.  Correct.

Q.  But Mr. Elmore was on administrative leave for the entirety of that period.  Is there any place on the evaluation or any of these documents that reflects that understanding?

A.  I don't think there was a spot for that.  Was he on administrative leave or administrative duty?  Just to refresh my --

Q.  Leave.

A.  Okay.

Q.  Remember, we showed you the events of the December prior when you wrote the distinguished memo with Obermayer and he was immediately placed on

administrative leave at your behest really.  Do you recall that?

MR. HATCHETT:  Objection to the form of the question.

MR. RISK:  But you recall that?

THE WITNESS:  Yes.

BY MR. RISK:

Q.  All right.  So, Mr. Clark's scores were evaluating and deployed during a period when he wasn't in the building; is that right?

A.  So was Sergeant Fanelli's.

Q.  That's right.  But what happened?

A.  They did the best they could under the circumstances.

Q.  Well, isn't it -- and -- wait --

A.  I mean, Fanelli says he was intimidated to give Elmore an evaluation that he thought was accurate because he didn't want to deal with the aftermath.

Q.  By whom did he say that?

A.  I believe he said it to Lieutenant Clark.

Q.  Is that written down anywhere?

A.  I don't know the answer to that.

Q.  Well, it's not -- I didn't see it among the many disciplinary charges leveled against Mr. Elmore; right?

A.  Well, I'm not certain that would result in a

discipline charge against Elmore.  It might be a ding for Fanelli.

Q.  And was it a ding for Fanelli being intimidated by officers to write a high evaluation?

A.  It's something that we have talked with him about.  Yes.  We've counseled him.

Q.  Well, you -- well, take a look at Exhibit 48 with me.  The first category is workplace qualities.  He was marked down from excellent to meets expectations in all four workplace qualities without being in the workplace.  Do you see that?

A.  Well, I certainly think meeting expectations is reasonable.

Q.  Well, it's reduced.

A.  I would say how do you exceed them when you aren't there?  I think meeting expectations is reasonable.

Q.  Doesn't the rescoring of the evaluation for a guy who is not in the building suggest that he's being treated unfairly because he's on leave?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  No.  I don't think that's the case at all.  I think that all of these evaluations the scores were

changed.  Some of the officers accepted that, okay, that's more fair, and some of them took exception to it and came to see me.  Nobody likes to have their score lowered.  I did the same thing when I was competing and my chief lowered mine.

BY MR. RISK:

Q.  But was there anyone whose was lowered by 40 points besides Mr. Elmore?

A.  I would have to look.

Q.  Do you think there could have been?

A.  I think it's possible that they were lowered substantially.  I can tell you that looking at the final distribution of scores, they seem reasonable to me.

Q.  Well, you know --

MR. RISK:  I don't know, maybe -- I don't know, Jahlee, I'd like to ask final distribution of scores, but you may say it's already in the 10,000 pages of the ESI.

MS. BENFER:  Can we go off the record for a second?

MR. HATCHETT:  Yes.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. Okay. Do you have a document at the rear of Exhibit 47? It looks sort of like that and numbered defendants ESI 7167?

A. I'm attempting to locate the document.

Q. You are doing great.

A. Okay.

Q. And all I can see is we got this from you all on Friday. So we assume it's a correct document out of your department's records.

And doesn't it show that the -- so nobody else other than -- while there are many rescoring and many non-rescoring, no one other than Elmore had a reduction of 39 points?

A. I see. I don't recall seeing this document before, but I'm looking at the document and the 18 names listed at the top beginning with Matt Clean (ph) and going down to Brian Fischer. So, it looks -- and just to make sure we are on the same page, it looks like the first column is the adjusted score and the second column is the original score? That's how you're interpreting?

Q. Yes.

A. Yeah. I'm not sure where this came from.

Q. Well, at least as to Mr. Elmore, it's showing that the numbers are correct; right? So 90 to 51, we saw that on the --

A. Yes.

Q. Okay. Well, assuming for the moment that this is a correct list of all of the adjusted scores, your department was really saying here in April of 2023 that of the 18 applicants for promotion, Mr. Elmore's performance was the worst by a wide margin; is that fair to say?

A. Well, he certainly came up the bottom of the list, but there's some other significant reductions. I mean, Clean went from a 93 to a 72. You know, Rhodunda went from an 88 to a 64.

Q. Yup.

A. Blithly (ph) went from a 92 to 72. Troxel (ph), from a 95 to 67.

Q. But, you know, Chief, all of these scores, even as adjusted, are at a minimum 13 points higher than Mr. Elmore's score.

So, I will ask you again: Does this Document 7167 in Exhibit 47 reflect the judgment by you and your sup -- by you that Officer Elmore is the worst of these 18 officers performance-wise by a wide margin?

A. Yes.

Q. Does the fact that you were in the process of attempting to terminate him bear on the assignment of the score of 51?

A. No. That is absolutely not a factor that we discussed during any part of this process.

Q. And so, what are the factors that would lead to -- that led to Mr. Elmore's revised score of 51?

A. Well, I think if you look at each factor, I think when Sergeant Fanelli did his evaluation, he had an extraordinary amount of exceeding expectations checked, which is not consistent with the training that he received. Exceeding expectations are somewhat rarely handed out and I think he didn't apply his training correctly.

I think when you look at the form and apply the training correctly, he ended up with a score of 51. And when I look at that group, that's not a surprise to me.

Q. Okay. Well, in -- later in June of 2023 the supervisors agreed that Mr. Elmore should return to work. Do you recall that?

A. I recall that happening. I don't recall when it was.

Q. And I showed you -- let's look again at 140.

There was a period in which he was to serve a five-day suspension which had been -- well, do you recall that happening?

A. I do.

Q. And that had been suggested as an option by Mr. Hearn. Do you recall that?

A. I never heard that from Fred, but I think I saw it in an e-mail from Matt Takita if I remember correctly.

Q. And do you remember whether Mr. Elmore ultimately served the suspension?

A. I don't believe that he did.

Q. And why is that?

A. I don't think Fred followed the procedure in the collective bargaining agreement to notify Ed that he was going to go beyond the 90 days called for in the agreement. I may be incorrect on that, but I remember people talking about it.

Q. But would Mr. Hearn have the right to do anything under the collective bargaining agreement?

A. Listen, they hired an outside guy. I have no idea.

Q. Well, well, any number of people could have looked at whatever rights there were to extend the period to discipline Mr. Elmore and did not; is that

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 173

right?

A. I'm not sure I follow.

Q. Yeah. That's fair. I'm not sure I followed it.

The suspension was ultimately dropped because Mr. Elmore filed a grievance, and the supervisors determined he was correct that it was too late to impose the discipline under the contract. Isn't that fair?

A. I really can't say I know exactly what happened because I made my recommendation and the process was kind of out of my hands. But if you have a grievance or a response that refresh my recollection, I would be happy to look at it.

Q. Well, take a look at Exhibit 64.

A. I have the document.

(Exhibit No. 64 was marked for identification.)

BY MR. RISK:

Q. Okay. This is a little bit confusing because, you know, on top it was forwarded to, I think to Ms. Benfer by Mr. Elmore. But this is Mr. Takita writing on August 8th with a copy to you that it was more than 90 days from the start of the investigation without a proper extension. And you see at the bottom, the personnel file of the grieving officer will make no

Page 174

reference to the disciplining post (ph). Do you see that?

A. I do.

Q. And by that time, Mr. Elmore was already back at work, wasn't he?

A. I believe so.

Q. Because the way the discipline process works once the supervisors impose the discipline, Mr. Elmore has rights to grieve it before the suspension is served; is that correct?

A. Yes.

Q. And that's what happened? And that's what happened. And Step 2 of that grievance, I guess, the supervisor says, oh, yes, you have a point.

And so, Mr. Elmore is back at work in the summer. And at that point, he has a clean bill of health, doesn't he? Well, at that point, there were no charges anywhere pending against him; is that right?

A. Yes.

Q. He is reemployed, in good standing, the personnel file will make no reference to the discipline imposed. And after all of that is going on, now he has a clean slate; doesn't he?

A. Well, I would say he is back to work.

Q. Okay.

Page 175

A. I'm not sure what the nuisance of saying somebody has a clean slate, but he's certainly back to work.

Q. You're right. Let me try to say it in a more lawyerly way.

He's back at work, there are no requests to discipline against him anywhere, there is no proceeding anywhere, there are no open charges and he is back at his job?

A. Yes.

Q. And now I want to spend some time talking about how it could be that, you know, half a year later he is gone.

A. Yes.

Q. How were you made aware that Mr. Elmore had filed a charge with the -- of employment discrimination with the U.S. Equal Employment Opportunity Commission and the PHRC?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I probably got an e-mail either from the manager or from an attorney. I don't recall.

BY MR. RISK:

Q. Okay. I'll represent to you -- well, I can show it to you, but I can also represent to you that the

Page 176

charge was filed --

MR. HATCHETT: Mr. Risk, if it's just a date, we can agree on the date.

MR. RISK: I thought you had another phone call.

MR. HATCHETT: No. Fingers crossed.

MR. RISK: It's -- I'll represent to you that the charge was filed on the 20th of September 2023, and presumably, sent to the township shortly thereafter.

BY MR. RISK:

Q. What, if any, role did you have -- well, you were still working with the Obermayer firm as employment law counsel at that time?

A. Yes.

Q. Okay. Did you discuss Mr. Elmore's charge where -- were you ever sent a copy of the charge by anyone?

A. Probably. That's normally done.

Q. Yeah. I'm assuming that it's -- well, you must have been involved in some way in the township's response to the charge?

A. Yes. The insurance company assigned an attorney and I would work with the attorney to craft the response. Of course.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 177

Q. And that's Marshall Dennehey?

A. Yes.

Q. And what role did Obermayer have in the crafting of the response, if you can recall, if any?

MR. HATCHETT: Objection. And, Chief, again I'm going to remind you about any attorney-client conversations.

MR. RISK: And what I -- I do want to know who the lawyer was and, you know, what their role was.

THE WITNESS: I don't recall anybody from labor being involved in this. I dealt with an attorney named Gary DaDamo (ph) before I met with Jahlee.

BY MR. RISK:

Q. Right. And if you take a look at Exhibit 145 before you, that's a full color exhibit with the handsome letterhead of Marshall Dennehey?

(Exhibit No. 145 was marked for identification.)

MR. HATCHETT: Mr. Risk, before you start asking questions, this document isn't Bates-stamped. I don't know that it was produced in discovery.

Page 178

MS. BENFER: It's in the -- can we go off of the record for a second?

THE STENOGRAPHER: Yup.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. Have you seen Exhibit 145 before?

MR. HATCHETT: Objection. This document has not been provided in discovery. The first time it's been produced is today by plaintiff's counsel. It is a document drafted by Marshall Dennehey dated December 18th, 2023, and addressed to Eric Marcanmello, M-A-R-C-A-N-M-E-L-L-O. Based on that, I'm going to instruct -- and also based on the fact that it was prepared by Gary DaDamo, D-A-D-A-M-O, who was a prior attorney at Marshall Dennehey, and apparently had some connection as counsel with this case.

I'm going to instruct the witness not to answer any questions concerning this document.

MR. RISK: Let's go off the record

Page 179

for one minute.

THE STENOGRAPHER: Okay.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. Sorry --

MR. RISK: Listen, it's to everyone's credit that we haven't been out in the hall five or six times. So that's a good thing.

Anyway -- -

MR. HATCHETT: May I before you proceed?

MR. RISK: Yeah.

MR. HATCHETT: Based on the off-the-record question, I maintain my position regarding the objection, my objection regarding this document. And in an effort to avoid the chief having to be deposed again, I'll provide very limited leeway regarding the questions of this witness, although my objection is the same because he has no personal knowledge regarding the document.

MR. RISK: We are unfamiliar with

Page 180

any rule that says that if a document is not called for by a document request, it has to be produced first in order to use it.

MR. HATCHETT: There is a rule that says that they have to have personal knowledge --

(Simultaneous talking.)

MR. RISK: Well, we are going to ask him about that.

BY MR. RISK:

Q. Mr. Whitney, have you seen Exhibit 18 before? I'm sorry, Exhibit 145, the Marshall Dennehey letter dated to the EEOC and publicly filed with the EEOC dated December 18, 2022? Have you seen it before?

A. I honestly don't recall. I would have to check my correspondences back and forth with Gary DaDamo to see if this was something that I was involved in.

Q. Well, you've testified -- yeah. Gary DaDamo was, through the carrier, was the township's lawyer at this point; right?

A. Yes.

Q. So I'm not going to ask you about your conversations about legal strategy with Mr. DaDamo. Then Mr. Hatchett would have a good objection.

Pages 177 to 180

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 181

But you worked with Mr. DaDamo as he prepared the EEOC submission, which is now Plaintiff's Exhibit 145?

A. We met and spoke and I provided him with whatever information he asked.

Q. And I think we have had some confusion. I think the record is clear that you don't know whether he never spoke to anyone at Obermayer at any point in connection with this, do you?

A. I have no idea.

Q. Do you know what kind of files you would have provided to Mr. DaDamo?

A. Whatever he requested.

Q. Well, do you know whether you sent him your long memo that we looked at on Exhibit 34, the covering letter that you had submitted to the supervisors back in June when you requested -- with the 31 exhibits when you requested the termination of Officer Elmore?

A. I truly am not sure. If he asked for it, I would have sent it to him.

Q. But you sent him documents?

A. Yes.

Q. By e-mail?

A. And in person.

Q. And in person?

Page 182

A. Yes.

Q. You met with him?

A. Yes.

Q. He came to Falls Township and met with you?

A. Yes.

Q. Okay. So, we'll assume -- we could look at the EEOC's record. We'll assume it was filed on or around December 18th, which would be almost three months after the EEOC charge that we looked at a minute ago; is that fair?

A. It looks to be. Yes.

Q. Who else besides you worked with Mr. DaDamo?

A. From Falls Township?

Q. Yes. From Falls Township. I'm sorry.

A. I don't have any firsthand knowledge of anybody else that he worked with, but it would have been normal to deal with the manager.

Q. That being you?

A. No. The township manager.

Q. Okay. Got it. Do you know if he met with any of your people?

A. I do not.

Q. Is it likely that he would have corresponded directly with anyone under your command?

MR. HATCHETT: Objection to the

Page 183

form of the question.

THE WITNESS: If he asked, we certainly would have made people accessible to him. I just don't recall if he ever did.

BY MR. RISK:

Q. Did he ask -- do you know how many times he came to your office?

A. My recollection is twice.

Q. And he sat with you and met and discussed the facts of the case?

MR. HATCHETT: Objection. Don't disclose what you discussed.

BY MR. RISK:

Q. I don't want to know what he said. Let me see if I can do it in a way that'll help let me satisfy Mr. Hatchett.

He came and met with you two times in your office in connection with the Elmore matter; is that right?

A. That sounds about right.

Q. And how long were these meetings?

A. My recollection is around an hour.

Q. Did you ever go to his office?

A. No.

Page 184

Q. Did you ever talk to him on the phone on other occasions?

A. I'm sure we talked on the phone. Sure.

Q. Any phone conversations of length? Of comparable length to the in-person meetings? About an hour?

A. I don't recall. We may have had a video meeting, but I may be confusing talking to Mr. DaDamo and talking to Mr. Hatchett.

Q. Okay.

MR. HATCHETT: For the record, I want to make a request for any and all documents that have in your possession that you haven't turned over as part of discovery at this point in time as part of my role in request for production documents.

MR. RISK: We will take that under advisement and we will discuss whether we should -- how we are going to respond to that, whether we should ask you respectfully for a document -- a Rule 26 document request.

MR. HATCHETT: It will be forthcoming. Thank you.

BY MR. RISK:

Pages 181 to 184

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 185

Q.  Did you discuss the Elmore EEOC charge with anyone other than Mr. DaDamo?

MR. HATCHETT:  Or any other attorneys.

BY MR. RISK:

Q.  Yeah.  Anyone other than -- well, no, anyone other than Marshall Dennehey?

MR. HATCHETT:  Or with labor counsel.

THE WITNESS:  I'm sure that if I -- along the way when I received document requests, I would have gotten assistance from my staff, document requests during this time period probably would have been limited to Lieutenant Clark.

BY MR. RISK:

Q.  And did you review a draft of the -- of Exhibit 145 that we just looked at?

A.  I don't recall.  I may have.  That's possible, but I truly don't recall.

Q.  Okay.  Let's take a look at 146 -- I'm sorry.  I think they might be the same.  Okay.

We are going to talk soon about the second K-9-related matter, but first let me ask you:  Is there anything else that happened involving Mr. Elmore

Page 186

between his return to work in late June and his termination in February of 2024 that you -- that arose to a disciplinary issue?

A.  You mean anything else except the acquisition of the dog and that whole thing?

Q.  The -- yes.  The acquisition of the dog and the related arrest from the year before.  That's right.

A.  Not that I recall.

Q.  Okay.  So, were there any additional performance issues that arose with respect to Mr. Elmore subsequent to his return to work in June of 2023 other than the -- as related to the adoption of the dog and the related arrest of Mr. Kent (ph) the year before?

A.  Not that came to my knowledge that I can recall.

Q.  If there were performance issues during that period that were documented, where would we find those documents?  In the personnel file with -- in the township?

A.  When you say performance issues, you mean issues communicated to the command staff by his frontline supervisors?

Q.  I wish I would have been able to say it that well.  Well, yes.

A.  They could be in the form of a memo or e-mail.  I don't recall any -- those are the ways they are

Page 187

typically transmitted.

Q.  And if you were to ask Mr. Hatchett to search and produce those --

(Simultaneous talking.)

BY MR. RISK:

Q.  Where would we direct him to look in your records?

MR. HATCHETT:  Objection to the form of the question.

MR. RISK:  Fair enough.

BY MR. RISK:

Q.  Where would we find such documents if they existed in your offices?

A.  So, I mean, if they were written to me, I may have a copy of them.  If they were e-mails, they would be in our e-mail system.

Q.  All right.  I want to talk about the adoption of the dog.

MR. RISK:  Can we take five minutes and then come back?  What time is it? 3:00 o'clock?

MR. HATCHETT:  3:09.

MR. RISK:  Okay.

THE STENOGRAPHER:  Sure.

MR. RISK:  Okay.  But I won't be

Page 188

long.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q.  Mr. Whitney, I'm about to show you Exhibit 133, which is Bates-numbered Defendants ESI-0702 A, 07029, 30, 31 through 35.

(Exhibit No. 133 was marked for identification.)

BY MR. RISK:

Q.  I apologize, but I only have one copy and I have my sloppy notes on it.  I apologize for that, but we just got it.  It came a little late, but we understand.

This was -- well, you know -- well, that's a draft that's a part of Exhibit 34 that I showed you; isn't it?

A.  Yes.

Q.  But the difference is -- Exhibit 34 was produced to us by Mr. Hearn and not by the township, and that has now been produced to us electronically by the township.

Do you know whose -- that's obviously some suggested revisions on Exhibit 34.  Do you know whose revisions they are?

MR. HATCHETT:  Objection to the

Pages 185 to 188

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

form of the question.

THE WITNESS: Yeah. My recollection is -- and I see the formatting changes that I referenced earlier with the font. My recollection is that that was Melissa Atkins.

BY MR. RISK:

Q. Excellent. Okay. Now, where -- do you today have a copy of the original Exhibit 34 that you sent to the -- to Mr. Takita to share with the supervisors? You said it was a whole binder full.

A. We have the binder. Sure.

Q. You do? All right. Where is that kept?

A. It's in a secured document storage room at headquarters.

Q. All right. That's your copy of the binder you sent on to Mr. Takita?

A. Yes.

Q. So you would have purchased at least two binders like these binders, at our deposition table?

A. That's about right.

Q. Do you know if there are additional copies of that binder?

A. Copies were given to the board. I don't know what they did with theirs. I never received them back.

Q. So that would be five more -- one binder for each supervisor?

A. Yes. And probably one for Mr. Takita, but I'm not 100 percent sure.

Q. And you are just getting back into the subject of where the documents are. This secure file in which your kept copy, your internal copy of the binder that you said with Exhibit 34 and the covering memo that we looked at, Exhibit 132, they are kept you said securely in your records room?

A. Securely in a separate storage room. We have a storage room that contains records of internal investigations and records of discipline.

Q. I see. So if -- so maybe the reason we haven't received this from your office is in your document search with the Marshall Dennehey, no one looked in there; is that right?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I mean, that would surprise me. You know, we had been moving physically our locations from building to building. But the records of discipline in this case, they are there.

BY MR. RISK:

Q. Well, in addition to your binder then, what else would be in that file in the secure records room that relates to disciplinary matters?

A. Regarding this case or other cases?

Q. Yes.

A. The binder would be in there and part of the binder are the audio recordings that were made of the interviews.

Q. Okay. Which interviews?

A. The interviews of Officer Elmore, Officer Lundquist, Officer Fischer, and the other witnesses in that case.

Q. Audio recordings made by Lieutenant Ward?

A. Yes.

Q. I see. Would these paper files be related to his evaluation and his report be there as well?

A. Yes. Whatever files and documents were part of his investigation would be there.

Q. And would your files related to the dog adoption and related matters be there as well?

A. I don't know that we have any records that were provided to us during the investigation about the acquisition of this dog, but anything we did acquire during the investigation would be there. Yes.

Q. Okay. All right. We will have to sort that out and maybe we will ask him to -- okay.

Take a look at Exhibit 65. I'll just represent to you that that's a stenographic transcript of, I guess, an investigative interview that Mr. Shoot at Obermayer conducted with Mr. Elmore. Can you read -- you don't have to read the transcript. Just get yourself familiar with it so that I can ask you questions without meaning to sandbag you.

MR. HATCHETT: I have a standing objection concerning any -- this document with any questions posed to this witness.

THE WITNESS: I have the document.

(Exhibit No. 65 was marked for identification.)

BY MR. RISK:

Q. All right. This interview appears to have been conducted on September 8th, 2023. And it appears to relate -- conducted by a gentleman we spoke about earlier, Mr. Shoot, Charles Shoot it turns out is his name at Obermayer. This interview, which I have read, appears to relate to Mr. Obermayer's allegation made on October 27th that the hiring committee in the summer of 2021 attempted to exclude females and minorities. Are

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 193

you satisfied with my description of that?

A. Broadly speaking, yes. I believe Attorney Shoot was assigned to investigate Ed's accusation that our hiring processes were discriminating.

Q. And that brings me to my question. If Mr. Elmore made that allegation to Mr. Dipoleto and Mr. Takita in October of 2022, do you know why this matter wasn't investigated until September of 2023?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I do not. You would have to ask him.

BY MR. RISK:

Q. Okay. Were you involved in this inquiry? This particular inquiry by Obermayer?

A. Yes. I believe they spoke to me about it and we certainly provided them with any records that they requested.

Q. Okay. Tell me how the -- I want to now turn with you to the K-9 adoption situation as you've described it. How did this matter first come to your attention?

A. Well, I wouldn't call it an adoption.

Q. Well, I got the word from you. You called it an adoption. Describe it however you would like it.

A. Well, if I did that, let me correct myself. How

Page 194

Ed acquired that dog has been the subject of a lot of debate and a lot of different points of view --

Q. I'm sorry. No. You called it a -- the transcript will speak --

(Simultaneous talking.)

THE WITNESS: So right around Thanksgiving of 2023, I received an e-mail from Matt Takita. It was a forwarded e-mail from the chairman of the board Jeff Dence asking questions about the status of our K-9 and how K-9s are selected.

BY MR. RISK:

Q. Can I stop you and ask you: As you sit here today, do you have an opinion as to why Mr. Dence was raising those questions at that particular time?

A. Yes.

Q. And what is that opinion?

A. Well, that something was coming my way in terms of what Dence wanted to happen with K-9. Normally when I get an e-mail like that from the township manager it means the chairman wants something done, he is going to ask a bunch of questions, and then just tell us what he wants. So something was coming my way from him about K-9.

Page 195

Q. And did you have an opinion then about what that was that he wanted done?

A. I didn't.

Q. Do you have an opinion now about what it was that he wanted done?

A. I do, in retrospect.

Q. And what was that?

A. I think he wanted Ed to have the next dog that he knew Ed had and I didn't.

Q. Sorry. Sorry to interrupt. You received the e-mail from Mr. Takita?

A. Yes.

Q. And can you proceed?

A. So, I think I talked to Takita and said, hey, what's coming my way? And, you know, by that point in our relationship, you know, he understood the same way that I did that something was coming my way. But it was Thanksgiving and he said, listen, I need a response to this, but you can do it after the holiday. No problem.

We rolled until after the holiday. If I remember right, I got some kind of reminder e-mail from Matt Takita like, hey, this is still hanging out there. So I decided to set up a meeting to see Langan. Langan at that time was the lieutenant in charge of the K-9

Page 196

unit. He is also extremely close with the chairman.

So, it made sense to me to both, A, find out what the answer to some of these questions were from Langan because he was closer to it than me. And, B, an attempt to get on the same page with the guy because no matter what I said, Chairman Dence was going to go to him anyway. So why deal with the aggravation of saying the same thing 14 times. Let's just try to get on the same page.

Q. You're saying you went to Langan because you felt Chairman Dence was going to go directly to then Lieutenant Langan?

A. Yes.

Q. That was your testimony?

A. Yeah. In part.

Q. Okay.

A. I mean, there was no doubt. They were going to have a follow-up conversation. So why not get on the same page so that we're not saying different things to each other.

Q. Yeah. Sure. Why do you think Mr. Dence, the chairman of the board of supervisors, had an interest in Mr. Elmore getting a new dog?

A. Because I was recommending the members of the K-9 units for discipline. I was also recommending Langen

Pages 193 to 196

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 197

for discipline for different reasons. The chairman is tight with Langan. The K-9 guys helped orchestrate, hey, let's try to get rid of Whitney to get rid of this discipline. They bonded over that experience. And it's a bond the continues to this day. I'm still dealing with K-9 things.

Q.   And Mr. Dence might have been worried that because of the history between you and Mr. Elmore and you and Mr. Langan, you might not want Mr. Elmore to stay in the K-9 unit? Is that what you are imagining here?

A.   I mean, I'm not sure what Mr. Dence felt about that, you know, about Ed Elmore's continued involvement. He probably knew that Ed had the dog already and he probably just wanted to exercise control over what happened because we were getting near the end of the year and the spot in the Philly academy for the dog was -- that class was going to start in January.

So we are getting near the end of the end. If he's going to exercise control over what happens, it has to start at some point. That's my theory as to why I got that e-mail.

Q.   All right. You went to see --
(Simultaneous talking.)
BY MR. RISK:

Page 198

Q.   So you went to see Mr. Langan?

A.   Yes. So I had -- my first question was, what are the ages and status of our different K-9 partners that we have, I took notes, he described to me the ages of the dogs. I'm not a dog guy. So I have to rely on other people to explain this stuff to me.

Much to my surprise the first time, he told me that Ed's dog was already too old to perform effectively as a K-9 partner which of course one of my responses to him was, why are we paying Ed overtime to go to a K-9 training and then the whole conversation started to talk about the K-9 unit again, the size of the unit. We had 4 dogs at one point. For an agency our size, I thought that was excessive. I've had ethical issues with the K-9 unit that we have gone over here today. The best way to deal with a small unit that has ethic issues is to shut the unit down and start over, back to management 101. So I wanted to through attrition shrink the size of the unit and eventually get it down to two dogs, to one dog, and then start over.

Q.   And the ethical issues that you are referring to, is the -- it's the K-9 training day payment problems that we have discussed?

A.   My understanding is that kind of time theft was

Page 199

going on for at least 10 years. So I just told everybody, I'm not doing an audit. I'm just dealing with the K-9 investigation. We have already talked about how that went. Not great. So here I'm going to try to handle this aspect of what happens with the K-9 unit and the township a little more carefully and get on the same page with Langan.

Q.   The -- Mr. Langan has testified elsewhere that he told you that Mr. Elmore's dog would be retiring on an upcoming birthday, not that he was currently unfit to serve. Do you disagree with that?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  I do. He told me both. After he told me the dog is no longer fit for duty right now, I said, well, what are we doing with the dog? And like I said, why am I paying this guy overtime to go train with the dog. He goes, we are going to retire the dog in January on its birthday.

BY MR. RISK:

Q.   So, you are testifying that -- Lieutenant Langan had told you that the department is putting a dog in service on the street to perform important work that's

Page 200

no longer fit to do the working? He told you that that day?

A.   Yes.

Q.   Okay. Please proceed with your conversation with -- about your conversation with Mr. Langan.

A.   So, then he told me for the first time that Ed had already a dog that he got in the summertime and that this dog was really starting to show promise and that he feels this dog could be a K-9 partner for Ed and that he is going to save the township $8,000 or so, you know, by this dog being gifted to Ed by their friend Kent who was a local businessman in town who has a tree removal service.

And we started talking about, well, you're my lieutenants in charge of K-9, is Ed Elmore your choice for the next K-9 officer? And he said, who do you want? And I said, it's not about who I want. I don't know a thing about K-9 except for what you tell me. Who do you want? And he pivoted to a different cop because --

Q.   Mr. Shannon?

A.   Mr. Shannon, because part of the question that the chairman wanted answered was, how are we going to select the next person; right? So I'm not happy that Ed has this K-9. That doesn't make sense to me.

Pages 197 to 200

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 201

We talk a little bit more about the K-9. Specifically, you know, Langan says, listen, if you don't want the K-9, we could get a different K-9. And I said, let me ask you this: Ed's been taking care of this dog and this dog you say now can make a great police K-9 and now you're saying you would recommend a different officer. Is Ed going to give that dog to the different officer? And he said, no, I don't think he would want to do that.

And I said, well, then you created a problem. There's multiple layers to this problem. First of all, you should have told me back in the summertime that a businessman in town was giving Ed a gift of a dog. And second of all, that's not how we pick K-9 partners. Nobody was authorized to do that. Third, I've been trying to reduce the size of the unit through attrition so it's not really working in the way that I am going. And, fourth, know you created a problem because Ed Elmore's head is going to explode when he finds out that you are not able to continue your relationship with him where you have apparently represented to him as a lieutenant that this is going to be his next K-9 partner. I said, when is the training? He said, well, the training is in January. I said, do you already have a spot? He said, reserved

Page 202

a spot.

Q.  And your testimony is that Mr. Langan told you as if it were a done deal that Mr. Elmore is going to bring in a new K-9 partner?

A.  Yes.

Q.  And -- but I've known you for most of the day now, Mr. Whitney. As you sit here -- and I listened to your testimony about this unit. As you sit here today -- that day with Langan, you wanted the K-9 unit smaller; is that correct?

A.  Yes.

Q.  And you wanted Mr. Elmore not in that unit; right?

A.  Well, I don't know about that. I didn't roll into that meeting saying, Ed Elmore's not going to be the K-9 unit. I rolled into that meeting thinking Ed Elmore's dog is fine. Part of my agenda for that meeting was not take Elmore out of the K-9 unit. I thought him and his K-9 were fine. This was new information to me.

Q.  But didn't you roll into that meeting thinking this unit is -- we have integrity issues in this unit related to a history of shortened training days, which you described as time theft and that the best way to reform that unit is to shrink it down and start again.

Page 203

Isn't that your testimony?

A.  Yes, but I've already been told I couldn't do that. So plan A wasn't within my authority to do. Plan B was, well, let's shrink this down through attrition, but I didn't know that plan B was going to work either because of the bottom line is we are a second-class township, and if the board of supervisors say they want something, they get it.

So I have to live in that universe and I do. But I didn't know that Ed's dog was already past its prime and not fit for duty. That was news to me. I didn't know that he already had a different dog that he was trying to replace it with. What I did know is that, A, my chairman wanted to know what the election process was going to look like. And, B, everybody out there in terms of patrol officers, all of their heads would pop off if there wasn't some kind of selection process because most cops want to be K-9 cops. They love the idea. It's extremely popular.

So, we talked a little bit more of why just giving Ed the dog was a problem because then there's no selection process. And we also didn't pick this dog. It's also a problem that the dog was a gift, and apparently an expensive gift, if you are saving me $8,000. And then Langan brings up this supposed

Page 204

two-dog rule, which there is no two-dog rule. It's entirely fabricated.

Q.  Well, people are gotten two dogs in the past for various --

A.  And including Langan, but I had to fight for him to get that second dog.

Q.  You know, there is so many money investigated in training these guys that there is a business reason to keep a K-9 officer in the K-9 unit, isn't there?

A.  If you are getting a return for investment. There's also a pretty good reason to cycle different people through just the same way you cycle different people through special teams all of the time.

So those were the kind of things that we talked about on day one. We had several subsequent conversations about this, but I was pretty surprised about the things I had been told.

Q.  Were Fischer and Lundquist still in the K-9 unit at that point?

A.  Yes.

Q.  And did you have an interest in them not being in it anymore related to the time problems? The theft of time problems?

A.  Well, I had an interest in disbanning it completely after that and I was told that I couldn't.

Pages 201 to 204

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 205

**Option A was off the table.**

Q.  And Mr. Langan has testified that you asked him to find out if Mr. Elmore would consider donating the gifted dog, his dog to the unit to be used by another K-9 officer; is that right?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  I said that, but I also made it clear in that same conversation that in no way, shape or form would that dog ever be a Falls Township police K-9 dog.  It wasn't acquired correctly and it came from explicitly the kind of background that you cannot have a police K-9 dog.

When I asked Steve Langan who was standing in front of me as a lieutenant, do you think Ed would donate the dog, I was trying to get Steve Langan to think through the error of his ways, and the fact that he hadn't really thought this situation though.  He's trying to sell me on, well, Ed, this is saving you money.  Okay, well, what if it's not?  How are you saving me money then?  Now

Page 206

you've got Ed mad, you've got the union mad, and you are creating problems.  And so, that's where I was headed when I said that.

BY MR. RISK:

Q.  I'm smiling at you getting Ed mad after all you have been through.

Could you look with me at Exhibit 68?

THE STENOGRAPHER:  I'm sorry, Mark, you said 68?

MR. RISK:  68.

THE STENOGRAPHER:  Thank you.

(Exhibit No. 68 was marked for identification.)

BY MR. RISK:

Q.  Okay.  These are your notes of the November 29 meeting?

**A.  Yes.**

Q.  And you are a -- I understand from some of the documents, you're a good notetaker?

**A.  Well, I find it helpful to take notes.**

Q.  Yeah.  But we have gotten these notes -- but we don't have notes from your second and third meetings with Mr. Langan, which came right away.  So I would make a request that you --

Page 207

MR. HATCHETT:  And there is no testimony that that exists.

THE WITNESS:  I would point out to you that the notes from the second day are on page 2, which is dated November 30.

The third day, it was a very brief conversation that I would describe as extremely exasperating and I did -- I did not take notes.  But you have the notes from the two meetings that I did take notes.

(Simultaneous notes.)

BY MR. RISK:

Q.  Okay.  That's even better.  Can you read us those notes?

**A.  So the first page of Exhibit 68 is -- my notes rather from my meeting on the November 29.  My habit when I take notes which I have always used since back I was a detective for the township is I'll write the date up the upper left-hand corner, I'll write the time the meeting started in the middle, I write the location in the upper right-hand corner.**

Q.  My office that says?  It's a New York office.  It says my office?

Page 208

**A.  My office.  I'm not that important.**

Q.  All right.

**A.  I write who is present besides myself in the left-hand margin.  So it says Langan.  That means it was only he and I.**

Q.  Great.

**A.  And then I take notes.  And then at the end of the meeting, I'll write the ending time and circle it. That's my way of knowing how long the meeting lasted.**

Q.  Okay.  It's handwritten.  So I just want to make sure -- well, it says, Monty 11, Leo 9, Zeko 8, Max 6, lifespan 10 to 12 years for a Malinois.  Am I saying that correctly?

**A.  I believe you are.**

Q.  Eddy and Fischer.  Help me with that sentence there.

**A.  It says, Eddy and Fischer up for second dog.**

Q.  Okay.  The next sentence.

**A.  And then we discussed the two dog rule and how it's --**

Q.  You got to read it to me because --

**A.  Can Monty perform appropriately as an active-duty K-9?  And then I quote Langan, no.  Eddy got a dog donated to him in the summer.  Dog is ready to go. Philly has a seat in the class of January.  Shannon**

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit  2

Page 209

would be Langan's recommendation and Fischer. Unit needs to look for work. That was me saying that him, listen, these dogs are a substantial investment of time and money and so is the training for the officer. I expect this to be a unit that goes out there and looks for work. Monty is retiring on his birthday in January. Steve has a slot in January. The school runs January to March for the first phase.

Q. Okay. Can we look at --

A. So the same gimmick. It started at 10:25 and ended at 11:28. Steve was getting a quote from Green Leaf which was a supplier for police K-9 partners so that we could purchase a dog. Also another vendor that Philly uses, so he was going to get me two quotes. Steve will check out the dogs once they arrive. Steve called Eddy but he didn't answer. And got the dog donated in the summertime. That's a further reference to when did Eddy get this dog. Kent Tree Service donated the dog to Eddy. I assumed he was going to roll it into it, so we had a conversation.

Actually, he grabbed two. And then I said, what do you mean he grabbed two? And he says, well, actually Eddy has two dogs from Kent. It's only the one that we want to use as a K-9 partner. I am taking notes of what I informed Steve. It's not reasonable

Page 210

for you to assume there was a two-dog rule. If you had to fight for yours, we talked about that a little bit and Langan agreed because it was very easy for me to take him down the memory trail of it was a fight to get you a second dog. There was no rule. If there was a rule, it would've been nice to tell me that then and you never mentioned it. There was no such thing. Our meeting ended at 11:28.

Q. And what about the third meeting?

A. The third meeting was, if I recall, a Wednesday, Thursday, and Friday. By Friday, I had already talked to the township manager. This -- the manager was talking to whoever, I don't know if it was the board, or the attorneys or both. But it was clear to me that this was taking on a life of its own.

And at that point, I was frustrated with Langan for all of the reasons that I have said already. When he came into my office that morning, I had someplace to go. So I was like, I'm not going to be here long, what's with this dog? And he was like, well, it was a gift. And I said, listen, we have a gift policy. You can't just take a gift. He goes, Nelson, people give me gifts all of the time. It was Christmas in June. He's making a joke out of it. I'm like, this is serious. This is not a joke.

Page 211

If somebody gave me a Ford Explorer as a gift and then I came to the township and said, hey, I have this brand new $32,000 Ford Explorer, how about we make it into my new police car? I would be in trouble. That doesn't make sense. We can't just do these kinds of things and he just wasn't getting it. He was like, why does it have to be such a big deal? I'm like, Steve, is it a donation or a gift? He goes, why does it have to have a name? And that's when I said to him, I feel like I'm talk to the mob. What are we doing here? This is not how the police department acquires K-9 partners and does business.

Q. This is until the December 1st meeting?

A. If that was the Friday, yeah.

Q. Third meeting? And the meeting you said it was short?

A. And that was it. It was a back-and-forth like that. I was a little more stepping outside my executive role because by that point I was exacerbated with his just not getting that there was an ethical issue here. And, yes, that was the last meeting. I didn't have a chance to sit down or take notes.

Q. Did you tell Mr. Langan at some point that in your review Elmore did not warrant another dog?

A. In our first meeting, I had him tell me whether

Page 212

he felt Ed warranted another dog. I said, you know what we are looking for out of a K-9 officer and partner. That's when I said, is he your recommendation? And he pushed back a little, who do you want? I don't know. There's nobody -- me wanting isn't part of the equation here. You're the K-9 guy. Who do you want?

Q. Well --

A. Now if he would've just stuck to Ed, we would've talked more about Ed. My next words would have been, explain to me -- like, make me a believer, talk me into it. But it didn't take him long to pivot to somebody else.

Q. One of the notable things of your account of this is that Langan told you that this dog was going to save the township $8,000 and you described that as Mr. Elmore being -- given a gift that's worth $8,000. Is that in your notes anywhere?

A. I don't think I wrote down the price, but it's very memorable and then he gave me a quote that was more. I think the quote he gave me was either 10- or $12,000.

Q. But the quote he gave you was for the cost of a new dog through a normal channel, wasn't it?

A. Yes.

Pages 209 to 212

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 213

Q.  Do you have your own opinion about what this dog was actually worth?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  I don't.  I don't know how to independently evaluate the --

BY MR. RISK:

Q.  Have you ever seen the dog?

A.  I've never seen the dog.

Q.  Did you ever ask anyone to look at the dog?

A.  No.  The investigation was conducted by outside counsel.  I was out of it.

Q.  Do you know whether they ever saw the dog?

A.  I don't.

Q.  Do you know whether they ever saw -- ever met Mr. Kent?

A.  I don't know that for sure, but I don't think so though.

Q.  Do you know whether they have a -- consulted with Mr. Bell (ph)?

A.  I don't believe they did.

Q.  Did you talk to Mr. Elmore about this matter?

A.  I did not.

Q.  Never?

Page 214

A.  Never.

Q.  So as we sit here today, you've not had a conversation with Mr. Elmore about the gifted dog?

A.  No.  That was the purpose of the investigation conducted by outside counsel.

Q.  Okay.  We are going to talk to them about it.

Another thing about this -- you testified about all three of these meetings, but you haven't said anything or written anything about -- am I right, about the Bell Kent incident?

A.  That was part of the investigation that outside counsel conducted.

Q.  Yeah.  But wasn't that a part of your -- have you testified elsewhere that that was part of your discussion with those three meetings with Mr. Langan?

A.  If you could refresh my recollection, I don't remember talking to him directly about that, but it has been a couple of years.  Actually, now that you say that I can't remember if I talked to him or the attorneys did.  But somebody asked him if knowing what he knows now that Ed had made this arrest, which was kind of unusual for Ed, would he have thought it was a good idea for Ed to have the dog and he said no.  But I think that was at a hearing.  You would have to show me something to refresh my recollection.

Page 215

Q.  Well, take a look with me at Exhibit 125, which we looked at earlier.

MR. HATCHETT:  Do you need a break or are you good?

THE WITNESS:  No.  I'm good.

BY MR. RISK:

Q.  Yeah.  We looked at this earlier.  This is your interview with Mr. Rhodes.

A.  Okay.  I have the document.

Q.  This was Mr. Rhodes' notes of his interview with you.  Mr. Rhodes claims that you told him that Elmore was a low-performing officer with a history of misconduct.  Do you remember that?

MR. HATCHETT:  Objection.  I maintain my earlier objection about questions related to this document.  Subject to that, Chief, you can respond.

THE WITNESS:  Yes.  I remember our discussion about that.

BY MR. RISK:

Q.  Okay.  You told him Elmore had not stopped a car for a whole year?

A.  Yes.  At one point, that's true.

Q.  What do you mean at one point that's true?

A.  I mean, I don't remember when that was, but I

Page 216

remember looking at list of officers who hadn't made traffic stops in an entire 12-month period and Ed was one of them.

Q.  And how many were there?

A.  A handful.

Q.  Well, except as of the date of this interview which is in early 2024, Mr. Elmore had been on leave for most of the last year?

A.  Well, I don't think we were talking about that time period.

Q.  Well, Chief stated that Elmore has not stopped a car for a whole year.  Presumably if he is on leave, you wouldn't want him stopping cars; right?

A.  That's --

(Simultaneous talking.)

MR. HATCHETT:  -- objection to the form of the questions.

THE STENOGRAPHER:  Hold on.  Hold on.  The transcript is getting sloppy.  Can we do your objection first and then, Mr. Whitney, please repeat your answer.

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  My answer is the context of that is we were talking about

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

Exhibit  2

Page 217

the kind of officer that we are talking about here when it comes to Elmore and his performance. And, you know, the sharp point on that is I think it's shocking you can go an entire year in a patrol division and not stop a car.

BY MR. RISK:

Q. Yeah. I know --

**A. That's not when he was on leave.**

Q. But this is the attorney's notes. Do you think that Mr. Rhodes' notes are inaccurate about what you told him? Or do you think you told him that Elmore had not stopped a car for the whole year as of the date that you --

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Well, I wouldn't suggest that his notes are inaccurate. But when you take notes, they are to refresh your recollection and maybe when Mr. Rhodes looks at this, it'll refresh his recollection within the context that I just gave you.

BY MR. RISK:

Q. How about two paragraphs above it where it says,

Page 218

Chief stated he told Langan that Elmore did not warrant having another dog. Did you tell that to Langan?

**A. I'm sorry, what page are you on?**

Q. Same page. It's two paragraphs up on 0029.

**A. I don't know. Maybe I did say that during our conversation. And I didn't write it down. When I looked at my notes, it didn't refresh my recollection.**

Q. Okay.

**A. I mean, we talked for however long that was. It was more than an hour. It's possible that I said that and then I remembered that more clearly when this had happened.**

Q. All right. Mr. Rhodes also writes, Langan is suing the township. So he had a proceeding against the township at the time you were having these meetings with him about the K-9 group?

**A. Yes.**

Q. What you say about that, briefly?

**A. It was about him being placed on administrative leave back in 2021.**

Q. Okay. Can you turn to the next page? I'm not sure what Mr. Rhodes meant when you -- well, he had these paragraphs marked backstory, which is -- I'm going to ask you about another one. This is where you

Page 219

said according -- in the middle of the paragraph, it says, backstory indented this is where it says, according to the chief, however, Kent and Elmore may share the same extreme conservative beliefs and may both be racist. You testified this morning that you may have said something about your perception of Mr. Elmore's racial views in an interview with an attorney. Is that what you were thinking of?

**A. Yeah. I think that's fair to say.**

Q. You'll agree with me that a meeting with an attorney conducting an investigation is a pretty serious place to make a statement about someone; right?

**A. Well, it's important to be honest.**

Q. Okay. What was your basis for that assertion? Mr. Rhodes seemed to not inquire further, but what was your basis for that?

MR. HATCHETT: Objection to the form of the question.

MR. RISK: Yeah. Let me ask it again.

BY MR. RISK:

Q. What was your basis for telling Mr. Rhodes that Mr. Elmore and Mr. Kent, a Falls resident, may share the same extreme conservative beliefs and they both may be racist?

Page 220

**A. So, I've been told that Kent doesn't like African Americans. I've been told the same thing about Elmore. I've been told Elmore is a Holocaust denier, I've been told Elmore has openly been critical who a former officer who was of the Jewish faith. And I didn't find that out until after I exit interviewed the guy.**

Q. Who was that? Was that Mr. Parnes?

**A. It is.**

Q. You've been told by whom?

**A. Well, for one Lieutenant Clark who supervised him for years.**

Q. When did Lieutenant Clark tell you that?

**A. After this situation with Elmore acquiring the dog and learning of Kent's involvement that he told me about and about some of these other things. And I shared that with the manager and also with labor counsel.**

Q. Well, other than Mr. Clark telling you his views about Mr. Elmore's beliefs and racial attitudes, do you have any other basis to believe that -- from any other basis in which you asserted to Mr. Rhodes that Elmore might have extremely conservative beliefs and might be racist? Is it just from your conversation with Mr. Clark?

**A. I have heard that from other officers, but at**

Pages 217 to 220

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 221

this moment I can't recall. Some of the details surprised me about Ed. But generally speaking, that was his reputation.

Q. Oh. You said generally speaking, it was his reputation in the Falls Township Police Department?

A. Yes.

Q. Well -- well, this conversation you had about Ed's views, is that the same conversation -- with Mr. Clark, is that the same conversation in which he told you about the arrest of Mr. Bell on the Kent property in 2022?

A. I believe so.

Q. So, you met with Mr. Langan for the first time about the dog on November 29th. And at some point after that, you talked to Mr. Clark?

A. Yes.

Q. And how did that happen?

A. He is my operations lieutenant. I informed him, listen, I got a problem with this K-9 question coming from the chairman. It's taken on a life of its own and this is what's going on. And he said, oh, let me tell you about this aspect of this -- where this Bell arrest took place. And I thought, okay, well, now I got to tell the manager and labor counsel about that.

Q. Okay. When was that in the sequence of the

Page 222

meeting on November 29th and December 1st?

A. Probably either the first or second day.

Q. And what did he say to you?

A. What I just said.

Q. Well, I want to know the best you can -- there was an incident on Mr. Kent's property a year and a half ago and what --

A. And it was the kind of arrest that normally Ed wouldn't make. And he arrested this African American guy who Kent complained was trespassing and trying to union organize on his property.

Apparently Kent had blocked the guy in so that Ed could come there and take the call for service. And it kind of seemed to Chris (ph) like it up-charged him, like he charged more charges than were warranted. My understanding at the preliminary hearing that the charges were lowered in grading and that the guy pled guilty.

Q. Well, who attended the -- Mr. Elmore was on leave at the time?

A. Yes.

Q. Who attended on behalf of the department?

A. Lieutenant Clark.

Q. Wouldn't it have been his responsibility if he thought there was something wrong with the arrest to

Page 223

speak up?

A. Well, yes. I think if he had put it together then, he would have spoke up and brought it to me. I think the issue with the arrest becomes concerning when you place in a context with Ed later getting this dog as a gift. You know, on the one hand by itself, it's Ed Elmore who we've already talked about not being the biggest producer in the department making an arrest that got downgraded. Okay. That happens.

But when you place it in context with, this is the same Ed Elmore and the same businessman who later gives him this dog that is going to become his K-9 partner and save the township $8,000, well, this creates a new concern. That is the quid pro quo. Did Ed make this arrest out of some friendship or allegiance to this guy and is this a payback? That's a concern. But you wouldn't know that a year and a half ago because Ed hadn't gotten the dog.

Q. But the arrestee, Mr. Bell, made a guilty plea, did he not?

A. That's my understanding.

Q. Yeah. Mr. Clark was there?

A. Hmm-hmm.

Q. Look with me back at Mr. Rhodes' notes in 125. It says, the chief was very concerned over the

Page 224

legitimacy of the arrest including the write-up and citation.

Other than the conversation you had with Mr. Clark, what was the basis for your concern?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: The basis for my concern was Lieutenant Clark's description of how the preliminary hearing went and then taking a look at the report and the affidavit and feeling like this does not look like a legitimate arrest. We have a concern here.

BY MR. RISK:

Q. Well, other than discipline -- attempt to discipline Mr. Elmore, did you do anything else to address this situation that you were concerned about?

A. Well, I talked to labor counsel and the township manager about presenting that to the district attorney's office for review. I, at that time, needed authorization to do such things.

Q. From the supervisors?

A. Ultimately.

Q. Hmm-hmm.

Pages 221 to 224

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

A. The authorization never came.

Q. All right. So it was never brought to the attention of the district attorney that you and your land -- that you and Lieutenant Clark were concerned about, in hindsight, about this arrest which resulted in a guilty plea?

A. Not that I can recall.

Q. And what was done with respect to Mr. Kent on this same set of facts? Well, he wasn't arrested; right?

A. No.

Q. He wasn't charged with, you know, an attempt to unduly influence an officer or offer a bribe?

A. No.

Q. So, did anything happen to Mr. Kent other than you saying that Mr. Clark and Mr. Rhodes after the meeting one time?

A. That was, to my understanding, the sole involvement directly that we had with Kent. I know we wrote a letter to the board.

Q. And was any steps taken to determine what, if anything, value the dog had?

A. Not to my knowledge.

Q. And no one from the department spoke in a serious way with Elmore, an officer of 24 years, over this

charge?

A. This was the responsibility for labor counsel to speak with Elmore about it.

Q. What would have had to happen for the dog to be approved -- the adopted dog to be approved as a K-9 dog for the township?

A. So the township would have had to been aware that we were trying to acquire a dog. The township would have had to approve the person that we were acquiring dog from and the dog would have to have an appropriate background. And by that, I mean the policy specifically states that the dog can't have been a guard dog or a junkyard dog with aspects of anger issues or violence associated with it. And that's how the dog has been described. So the dog -- even if all of this was done above board, this dog wouldn't have been able to be a police K-9.

Q. Never would have happened?

A. Correct.

Q. Well, several stops and checks along the way?

A. They should have done it --
        (Simultaneous talking.)

BY MR. RISK:

Q. Well, were they trying to -- are you saying that Mr. Langan and Mr. Elmore were trying to get around the

guardrails and the checkpoints that are in place for the adoption of the dog?

A. Well, I think that's obvious.

Q. What were they doing?

A. They had already leveraged their relationship with the chairman to be the most serious recommendations for discipline that you can see in the police department. So they thought they were going to be able to pull this off. That's what I think.

Q. Oh. You are referring to the events of the prior year where you and Obermayer made a serious recommendation for termination and the supervisors denied it?

A. Yes.

Q. And so, you are saying because of that, that suggested to you then and now that Langan and Elmore had an ability to break the rules with impunity?

A. Yeah. That and the fact that Langan also beat discipline and within a month got promoted. I mean, there was ample evidence to say these guys have a strong relationship with the chairman of the board and they have got power to make things happen. So I think that's what they thought here. I wish they wouldn't have done it that way, but they did.

Q. But did they do anything -- are you suggesting

that they were in the process that was going to result in Mr. Elmore showing up with a new dog for work who would somehow be certified?

A. I think he would have ended up going to the academy with that dog and it would've been a police K-9 partner.

Q. That never could have happened, could it?

A. It wouldn't be the first time the township side broke our policies without looking back.

Q. All right. But had that happened, it would have been a clear breach of your policies regarding K-9 acquisition?

A. Sure.

Q. And if a K-9 was taken on in the K-9 unit in an inappropriate way and there was ever an incident where someone was hurt, that would be a serious matter for the township, wouldn't it?

A. It would be. And that was a major factor in why Langan got demoted and why Ed got himself in trouble. Among the people in the police department that should have known that this was a terrible idea, they are at the top.

Q. Yeah. You described it in Exhibit 89 in the Loudermill notice. On page 181, the Loudermill notice. As the surreptitiously intending to use a non-certified

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

K-9 from an unverified source. That's what you were accusing Mr. Elmore of doing?

A. I have the document and the page. Can you orient me --

(Exhibit No. 89 was marked for identification.)

BY MR. RISK:

Q. Sorry. The various charges are up at the top of the page. The last one is -- they are numbered strangely 3, 4, 5, 6, 7, 1, 2 and I'm looking at Number 2.

A. Yes. That's what it says.

Q. Yeah. And so, you thought that Langan and Elmore were in a scheme with the -- somehow with the assistance of the head of the board of supervisors to bring in a new dog, keep Elmore in the unit, and get around the township's K-9 policies?

A. That's essentially what Langan told me he wanted to do.

Q. Well, the part about the chairman and the board of supervisors being involved?

A. Well, we never got that far. But it's pretty well established that Steve Langan has a very close relationship with Jeff Dence.

Q. Did you take any notes when Mr. Clark first told

you about the July 22 arrest of Bell?

A. I did not.

Q. Did Mr. Clark, to your knowledge, express any concerns about the quality of the arrest when he was in court?

A. I don't know the answer to that.

Q. Why didn't Mr. Clark come forward sooner if he was concerned about the arrest?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: That's a question for Lieutenant Clark.

BY MR. RISK:

Q. Well -- or his supervisor. Are you concerned that he didn't?

A. I think I have already answered that. I don't think at the time that it was unusual to see Ed Elmore's arrests not be of the highest quality. I think that the additional concerns became obvious later once we found out that the same person that Elmore had made an arrest on behalf of gave him a dog.

Q. Well, I've heard you say earlier today that -- and in the documents that Mr. Elmore didn't make a lot of arrests. But this is the first that I heard you say that the arrests that he did make were "not of the

highest quality." By that, do you mean his arrests generally were of lower quality?

A. Well, I would have to look at his conviction rate as compared to his arrest rate to get a good answer to that question. But I've been told many times by his supervisors, including Chris Clark, that Ed is the kind of guy for a -- not on view (ph) arrest like this. So he didn't show up and somebody is attacking somebody else. That's an easy arrest. But if you show up and somebody says, hey, this guy did this, that Elmore would be the kind of cop that would do his best to talk the victim out of it. Are you sure you want to come to court? You sure you want me to make this arrest? I make this arrest, you're going to come to court no matter how many times it's continued; right? Because that happens all of the time. And then the civilian will be like, okay, forget it.

That's the kind of officer that Ed is described as to me. I never supervised him directly because I was in detectives when he got hired. But I lean on my staff to tell me about the people under their supervision and that's what I've been told.

Q. You know, you are in the evidence business. There is a lot of say-so in this part of the case.

A. Well, it would have --

(Simultaneous talking.)

MR. HATCHETT: No. That's not a question.

BY MR. RISK:

Q. So, you said to -- you told Mr. Rhodes you thought the arrest was suspicious and that Elmore and Kent were in cahoots against Bell? Do you still think that today?

A. Against Bell? Did I use the word cahoots?

Q. Well --

A. It doesn't sound like something that I would've said. But do I think that that was the case? Sure.

Q. Okay. Good enough. Take a look at -- let me just --

MR. RISK: You know what, give me five minutes and then I could consolidate this a little bit. We will step out, but we won't be long.

MR. HATCHETT: Okay.

THE STENOGRAPHER: We are off the record.

(At this time, off the record.)

(At this time, back on the record.)

BY MR. RISK:

Q. You suggested that Officer Parnes had told the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 233

department that -- I don't think you used the word anti-Semitic, but I think that was the substance of what he said -- that Mr. Elmore was -- didn't like Jewish people?

MR. HATCHETT: No. Objection. I'm sorry.

MR. RISK: Well, what was your testimony, Mr. Whitney? I want to get it right.

MR. HATCHETT: Well, I'll let the witness speak for himself. I apologize. I thought that his testimony was in part --

MS. BENFER: Well, why don't we just --

(Simultaneous talking.)

MR. HATCHETT: Well, first of all, there is one attorney asking questions.

MR. RISK: All right. I want to get the testimony from the witness.

BY MR. RISK:

Q. Please clear up this record about -- what do you know about what Mr. Parnes suggested was inappropriate with any attitudes of Mr. Elmore?

A. So, its been a minute since he left and we did

Page 234

his exit interview. But one of the things he said during his exit interview was that he felt like he was not treated well because of his Jewish faith, and that was the first time that I had heard of that.

So when the exit interview was over, I called Lieutenant Clark into my office because he had supervised Parnes and Ed. And I said, is there any truth to what he is saying? And that's when I was told, yes. And I got told some anecdotal stories and things that Ed Elmore had said both in front of the then Lieutenant Clark as a prior lieutenant. He was a sergeant back then. And I said, listen we can't have this. I put out immediately an e-mail reminding everybody of our harassment policy. And at the next staff meeting, I've talked and talked since about it that we cannot permit this kind of conversation to happen in the workplace.

Q. So, everything you know anything about Mr. Parnes said that was critical of Mr. Elmore's racial and religious views you got from Mr. Clark?

A. Yes. I didn't question anybody else about it.

Q. Okay.

A. By the way, if Parnes had come to me as a lieutenant or as a chief, there would have been a full-blown internal investigation and all kinds of

Page 235

things would have happened.

Q. Who did Mr. Parnes' exit interview?

A. Myself, Lieutenant Clark, and I believe Sherry McGovern, which is what we always do.

Q. Okay.

A. Actually, I'm not sure we always add Sherry in. But at that point in time, we added Sherry in.

Q. And you heard Mr. Parnes say anything critical of Mr. Elmore or anyone about treating him differently because of his religious orientation?

A. No. He didn't name names and that was the first time I heard of it.

Q. There is no question in the department, is there, that Clark is very supportive of you?

A. I think that's fair to say.

Q. I mean, I could show it to you. All right.

A. I mean, he was also always very supportive of Officer Elmore when he wanted him on -- to be part of the interview team.

Q. Well, yes, but he was not -- well, we have talked about the many ways in which Officer Clark was not supportive of Mr. Elmore. So something changed. Did you read Mr. Kent's letter?

MR. HATCHETT: Objection to the form of the question.

Page 236

BY MR. RISK:

Q. Did you read Mr. Kent's letter about the dog situation?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I believe I did at some point. I haven't seen it recently.

BY MR. RISK:

Q. Do you know why this matter was not referred to Mr. Hearn by the supervisors?

A. I'm sorry, Mr. who?

Q. Well, this is the third time you've charged Mr. Elmore. In the first two times, the supervisors sent it for an opinion to Mr. Hearn. Do you know why they didn't do that this time?

A. No.

Q. Do you have a belief?

A. I truly have no idea what their relationship with Fred Hearn is.

Q. Well, they charged Obermayer with this investigation; right?

A. Yes. They were hired to conduct it.

Q. And you indicated when I asked you if you did certain things like -- you've indicated the investigation was really given over to Obermayer.

Pages 233 to 236

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 237

Wasn't Obermayer's view about whether Mr. Elmore should be terminated already clear from their recommendation of him in the five or six months previously?

MR. HATCHETT: Objection to the form of the question. Chief, I will remind you regarding attorney-client conversations or instructions.

MR. RISK: Well, this is no doubt --

BY MR. RISK:

Q. Do you want to answer that or should I ask it a different way?

A. Well, I think we all rely on people to give us recommendations of what's in front of them; right? So, yeah, there was a recommendation for termination. In one instance, everybody moved on. It didn't happen. It is what it is. What can you do? That's local government. Then you have a new sets of facts and circumstances that arise and you make a recommendation.

Q. But you read the Obermayer report. Did you read the Obermayer report in preparation for today or am I confusing that with the Campbell?

A. No. I mean, I read it back then. I haven't read it in quite a while.

Page 238

Q. Well, I ask you because according to Obermayer in their report, which is essentially -- it was being used in other proceedings. It was used in discovery.

The Obermayer report is 92, Mr. Whitney?

A. I have the document.

MR. HATCHETT: I have a standing objection regarding any line of questions regarding this document to this witness. You don't have to throw it.

MS. BENFER: Oh, I wasn't. It was just -- because of the book, it was kind of --

MR. HATCHETT: Excuse me, Chief.

BY MR. RISK:

Q. Obermayer contains right at the beginning of their report that -- on page 3 of 26 in the middle of the page, initially in an e-mail on December 15th, Obermayer was asked to investigate the circumstances surrounding the donation of the dog to Elmore and whether it violated policies or ethical concern. On January 5th, 2024, Obermayer was instructed to investigate further whether the circumstances surrounding the "donation of the dog" including the intent to allow Officer Elmore to use it as a

Page 239

replacement for Monty was an isolated incident or another example of the consistent force of conduct for both Lieutenant Langan and Officer Elmore.

Do you know how their initial assignment was modified?

A. No.

Q. Did you suggest that it be modified?

A. No.

Q. Obermayer's views about Elmore's prior conduct were quite clear from Mr. Hearn's memo in June to the township recommending of his recommendation, weren't they?

A. For the prior incident?

Q. For the K-9 time incident, the November 2022 Loudermill hearing, the t-shirt incident, the flyer incident, as set forth in your binder at the end of 2023, and the memo by Mr. Hearn in June of 2023.

A. Yeah. I had never seen that Hearn memo until today. My reading of this paragraph here is that it reflects some kind of communication between the board and their representative and their manager or the solicitor's office. It's not a reference to communication from me.

Q. Yeah. We will have to ask them. How shortly after the -- after Mr. Elmore's termination was

Page 240

Obermayer disengaged, should we say, as labor counsel for the township? If you know.

A. I don't recall.

Q. Okay. Do you have an understanding of why they were terminated?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I never talked to the board directly about that. I know the board made a decision to change labor counsel.

BY MR. RISK:

Q. So, it was initiated by the board?

A. That's my understanding.

Q. The Obermayer report that you are looking at, exhibit -- I can't remember now that you are looking at it -- 92, it was sent to you directly by Mr. Hearn, wasn't it?

A. That's possible.

Q. Well --

A. I know it was sent to me via e-mail. I don't know if it came from Matt Takita or Tom Hearn, but it's possible.

Q. And was that appropriate in your review?

MR. HATCHETT: Objection to the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 2

Page 241

form of the question.

THE WITNESS: Yeah. I don't see why it's not appropriate. I mean, normally police chiefs are kept in the loop about these things.

BY MR. RISK:

Q. Tell me what work you did on the -- on the report with that.

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I was interviewed as part of the investigation. I don't recall seeing a draft of this, but it's been awhile.

BY MR. RISK:

Q. Okay. Take a look at 89 with me.

A. I have the document.

Q. All right. Does 89 indicate to you that you utilized the Obermayer -- well, your notice to Mr. Elmore -- this is a Loudermill notice? 89?

A. Yes.

Q. Does this refresh your memory that you used the -- I'm not asking it well.

Did you use the Obermayer report in preparing the Loudermill notice?

Page 242

A. I would imagine that I would have and I remember this being done with counsel's assistance.

Q. Okay. Is it -- not to make any judgments of what you are doing with your current employment counsel today. Would it be the case that any Loudermill notice or memorandum of any significant length on a disciplinary issue would have been vetted by you before it sent it to the officer with Obermayer?

A. Yes.

Q. Why -- what's the -- what was the issue with respect to the article in the newspaper about Mr. Elmore's dog, Monty?

A. I was not aware of the article until it was published and people aren't allowed to talk to the media without my approval.

Q. If the person Mr. Elmore talked to was, you know, a township public relations person and he was instructed to do that by a supervisor, would that change your view of that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Well, ultimately it appeared that Jeff Dence told Steve Langan that he think this was a good idea. So, you now, that's a good

Page 243

example of what it's like to work some time in local government where people do things around you.

So it appeared to me from talking to staff that some of the things that were represented in the article were exaggerated.

BY MR. RISK:

Q. Do you remember anything in particular? We can look at the article if you want, but do you remember anything that was what you think discipline worthy in your mind?

A. I mean, I think it's just another example of -- well, stretching the truth when it benefits you to do so.

Q. In what respect?

A. My recollection is that Ed made a claim in the article that if it weren't for his dog, they never would have found this particular guy on a residential street. And when I talked to Lieutenant Clark, who was the sergeant who was working that day, it was, like, listen, I was there, the guy ran into a drainage ditch. We all saw him in the drainage ditch before Ed released his dog. That's just like a fishermen's tall tale.

Q. Anything else?

Page 244

A. So it's not unusual sometimes to get tall tales from K-9 officers.

Q. Okay.

MR. RISK: Give me two minutes with Ms. Benfer. Let me see if -- I don't have much more.

THE STENOGRAPHER: We're off the record.

(At this time, off the record.)

(At this time, back on the record.)

MR. RISK: I'm going to stop here. We made a statement on the record about all of this additional -- I think we haven't quite used up our seven hours, if it's seven hours. But I will stop now and nothing further.

Thank you, Mr. Whitney.

THE WITNESS: Okay.

MR. HATCHETT: I don't have any questions, Chief. I'm just going to ask you not to discuss your deposition testimony with anyone.

THE WITNESS: Understood.

THE STENOGRAPHER: All right. Counsel, regular delivery of the

Pages 241 to 244

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 2

Page 245

transcript?

MR. RISK: Yes.

MR. HATCHETT: Yes.

- - -

(Whereupon, deposition of NELSON WHITNEY concluded at approximately 4:40 p.m.)

Page 246

STENOGRAPHER'S CERTIFICATION

I, NOELLE R. NEVIUS, hereby certify to the following:

That the transcript is a true record of the proceedings;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in this action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____, 2026


_____

NOELLE R. NEVIUS
Professional Stenographer

Pages 245 to 246

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit  2