## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
No. 2:25-cv-02076-JHS
--------------------------------x
EDWARD ELMORE,

     Plaintiff,

     vs.

FALLS TOWNSHIP

     Defendants.
--------------------------------x

DEPOSITION OF:  ERIN MULLEN
DATE:  WEDNESDAY, MAY 27, 2026

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

## Page 2

T R A N S C R I P T of the deposition in the above-entitled matter by and before GERALDINE E. LOMBARDY, a Stenographic, Certified Court Reporter of the State of New Jersey, License Number 30XI00228000.  Held VIA VIDEOCONFERENCE, on May 27, 2026, commencing at 10:03 in the morning.

A P P E A R A N C E S:
HARDWICK BENFER, LLC
BY: TIFFANIE C. BENFER, ESQ
2003 S. Easton Rd.
Doylestown, PA 18901
Phone: (215) 230-1912
E-mail: TBenfer@hardwickbenfer.com
Attorney for Plaintiff
MARK RISK, PC
BY:  MARK RISK, ESQ.
60 E. 42nd Street
New York, New York 10165
(212) 682-4100
Attorney for the Plaintiff

MARSHALL DENNEHEY, P.C.
BY: JAHLEE HATCHETT, ESQ.
2000 Market Street, Suite 2300
Philadelphia, PA 19103
P: (215) 575-2584/F: (215) 575-0856
E-mail: JJHatchett@mdwcg.com
Attorney for Defendants

Also present:  Edward Elmore

## Page 3

I N D E X

WITNESS       DIRECT   CROSS   REDIRECT   RECROSS

ERIN MULLEN
BY: MS. BENFER   4


E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| P-15 | Memo | 43 |
| P-42 | Letter | 55 |
| P-49 | E-mail | 57 |
| P-55 | E-mail | 64 |
| P-90 | (not used.) | 81 |
| P-92 | Investigation report | 99 |
| P-129 | EEOC complaint | 70 |
| P-131 | EEOC Complaint | 69 |
| P-132 | Memo | 52 |
| P-140 | E-mail | 66 |
| P-166 | E-mail | 82 |

## Page 4

(Whereupon the witness was sworn in remotely by the stenographic certified court reporter.  All parties appearing remotely agree to the remote conduct of the deposition and waive any objection to the remote administration of the oath.)

ERIN MULLEN,  appearing via videoconference, having first been duly sworn testified as follows:

DIRECT EXAMINATION BY MS. BENFER:

Q.     Good morning.  Ms. Mullen, my name is Tiffanie Benfer, along with my cocounsel, Mark Risk, we represent Mr. Elmore in the case of Ed Elmore versus the Falls Township.  Before we get started could you just state your full name for the record.

A.     Erin Mullen.

Q.     And Ms. Mullen, have you ever had your deposition taken before?

A.     Yes.

Q.     Okay.  So you probably are familiar with, I call them the rules of the road for a deposition, but just -- I'm going to go through them just to refresh your recollection so that we are all on the same page.  And our goal is to make the court

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Page 5

reporter's job as easy as possible, and her job is, obviously, to take down a complete and accurate record of my questions and your answers, okay?

A.    Yes.

Q.    Okay.  So first of all, the first cardinal rule in a deposition is that all responses need to be a verbal response.

Can we agree to that?

A.    Yes.

Q.    Okay.  And if any questions I ask you, you don't understand, please let me know.  I will rephrase it, I will do whatever I need to do to make sure you understand it, I'm not here to trick you.

Can we agree to that?

A.    Yes.

Q.    Okay.  If you answer the question, I am going to assume that you understood the question that I'm -- that's being asked.

Can we agree to that?

A.    Yes.

Q.    At any point if you need a break, please let us know, we will take a break.  The only thing I ask is that if a question is pending, you answer the question before we take the break.  Okay?

Page 6

A.    Sure.

Q.    Okay.  Is there anything preventing you from testifying truthfully here today?

A.    No.

Q.    Is there anything preventing you from understanding my questions that I'm asking you here today?

A.    No.

Q.    Okay.  And you understand that you are under oath here today?

A.    I do.

Q.    Okay.  One last thing.  Throughout the deposition your counsel will most likely object to a question I have asked.  Despite the objection, you are still going to answer the question unless specifically instructed not to answer.  Okay?

A.    Understood.

Q.    Great.  All right.

With that said, I would like to just get start with your background, specifically your position with Falls Township?

A.    Sure.

Q.    So what is your current position with Falls Township?

A.    I'm a vice chair of the board of

Page 7

supervisors.

Q.    And that means you are one of the board of supervisors?

A.    Correct.

Q.    And how long have you held that position?

A.    I've -- was appointed to the board in 2021, I think, around November.  I filled a vacancy and then I think I ran for election the next year in '22.

Q.    And are you serving a five, six, or seven year term?

A.    Six year term.

Q.    As part of your role as board of supervisors, it's my understanding, does the township assign you an e-mail address?

A.    Correct, yes.

Q.    And do you use that e-mail address to communicate with your fellow board members?

A.    Yes.

Q.    Okay.  What about, do you use that e-mail address to communicate with the township manager?

A.    Yes.

Q.    And what about communicating with the

Page 8

chief of police?

A.    Sometimes.

Q.    Okay.  Do you communicate directly with the chief of police?

A.    Not in a while.

Q.    At any point did you directly communicate with the chief of police by telephone or e-mail?

A.    Yes, telephone and occasionally e-mail I think.

Q.    And you say not in a while, did something change that you stopped communicating directly with him?

A.    Yes, we got a new manager and -- who prefers that things kind of run through his office.

Q.    A new township manager?

A.    Yes, mm-hmm.

Q.    So when Mr. Takita was the township manager, is that the timeframe in which you are referring to that you e-mailed directly with chief of police?

A.    Yes.

Q.    And you also had telephone conversations directly with the chief of police?

A.    Yes.

Pages 5 to 8

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 3

Page 25

because of five police officers that the company was unwilling to insure?

A.    No, I don't remember anything about five specific police officers.

Q.    Okay.  Do you recall at any point the township having trouble getting liability insurance?

A.    To the extent I answered, yes.

Q.    Do you have any recollection of when that was?

A.    No.

Q.    Okay.  I would like to go back to the audit itself.  Mr. McGowan with Mr. Malloy conducted an audit.  Did you have any interaction with either of those two men during the audit process?

A.    Yes, I had at least one Zoom.  I can't remember if there was more than that.

Q.    And what did you talk about during that Zoom?

A.    General opinions about what was going on between the board and the chief, and I think that was mostly it for our interview purposes.

Q.    Okay.  And what did you discuss more specifically, what was going on between the board and the chief at the time?

A.    I don't think I discussed

Page 26

specifically, I shared my view that I thought the board's relationship was -- the board and the chief both shared responsibilities for the state of their relationship and that at times it was frustrating for me that neither seemed to want to take any accountability for that.

Q.    Anything else you just discussed?

A.    I'm sorry, say it again.

Q.    Did you discuss anything else during that Zoom meeting with them?

A.    I don't think so.  I don't remember any other specifics.  I remember kind of the overarching theme being that.

Q.    So at that time during the audit, was the relationship between the board and the chief not a good relationship?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  It's -- it just didn't exist.  I think at that point is when I had offered to the board that I kind of be, sort of like a liaison in the chief and to -- I think that was maybe the extent of the board's relationship, I'm not sure.

Page 27

BY MS. BENFER:

Q.    And how did that work, how did your -- how were you the liaison to the chief?

A.    It's -- liaison is my word, by the way, I wasn't like, appointed.  But I just thought that it could improve relations if we kind of knew the kind of -- what the chief's goals for the department and things like that were.

Because at that point we kind of didn't have any much contact with him.  And so we would have -- we had like a couple meetings where we saw, you know, he showed me some like PowerPoint presentations and things like that, and had a couple phone calls about things that could, you know, help the police department or, you know, maybe reasons he felt the board wasn't, you know, he didn't feel supported by the board, or things like that.

Q.    So I just want to make -- so are you saying these are conversations that you had just between you and the chief of police?

A.    Yeah, we had conversations.

Q.    At the -- I'm sorry, go ahead.  I'm sorry to interrupt you.

A.    Yeah, we had the conversations and the board knew that I was having conversations.

Page 28

Q.    Okay.  So you and the chief were having conversations and he showed you, it sounds like you said -- correct me if I'm wrong -- you said PowerPoint's during those conversations he showed you, at least one PowerPoint?

A.    Yes.

Q.    What kind of PowerPoint did he show you?

A.    One of the PowerPoint's specifically, he has in the past sort of asked the township to approve in his budget like these sort of tazing gloves, and they were expensive and I think the board of supervisors didn't have an appetite for that.  So I remember one of the PowerPoints was about -- he showed me a video of how the tazing gloves could be effective, and kind of making a case for why we should purchase them.  So that was one PowerPoint.

Q.    Any others?

A.    Yeah, there was another PowerPoint that involved, I think it was priorities.  And like one was manpower, being low on manpower, the importance of kind of hiring the, I can't really remember.  Oh, policies.  He thought that some of his policy recommendation, or something like that,

Pages 25 to 28

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Page 29

were kind of being held up in like, you know, somewhere; either with the manager, or the solicitor, or HR, or something.  So that was like one of his priorities.  So they were just very much like, kind of outlining priorities.

Q.    Any policy recommendations you can remember specifically that he felt were being held up?

A.    There were specific ones, I just don't know what they were.  Like we hired a third-party company to sort of revamp the policies, and they were, I guess, being approved in kind of like installments.  Like, okay, these ten are okay, these ten are okay, these ten are okay.  So I don't remember if it, you know, what specific ones at that time were being held up.

Q.    Okay.  And after you had these conversation with the chief would you go back and report that to the board?

A.    Yes.

Q.    Okay.  And what was -- how did they receive that information?  Were they positive, negative, frustrated?

A.    Positive, negative, frustrated.  I mean, it kind of depended on the subject, I guess --

Page 30

I don't, I mean, I don't really remember exact responses.  I don't -- I wouldn't say -- I wouldn't say it's fair to characterize them as either positive or negative.

Q.    And so at some point -- so these conversations are happening between you and the chief, and at some point though it sounds like those conversations stopped; is that correct?

A.    Yes.

Q.    And what happened, why did those conversations stop?

A.    So the manager -- the manager, the new township manager made a point that I just very much agreed with that he thought that it was inappropriate for department heads to be reaching out to the board of supervisors and vice versa.  And I agreed.

Q.    Okay.  I would like to fast forward to March of 2022 and talk about -- are you familiar with the K-9 officers being accused of theft of time?

A.    Yes.

Q.    What information or what knowledge do you have about that?

A.    I just recall that one or more --

Page 31

well, definitely more than one officer, was accused of just being somewhere that they were allowed, like maybe a training or something, and that they kind of put in for more time than they like, were at the training, or something like that.

Q.    Did you ever see any report regarding this incident?

A.    I don't recall ever seeing a report.

Q.    I'm going to represent to you that Lieutenant Ward wrote a report.

Does that refresh your recollection, do you remember seeing a report written by Lieutenant Ward?

A.    It doesn't.

Q.    Do you have any knowledge of those individuals -- well, this incident occurred in March of 2022, did you have any knowledge of any Loudermill notice being issued to these officers in the spring of 2022?

A.    I don't.

Q.    Okay.  Would that be something at that point in time that the township would have to approve, the Loudermill notice being issued, or is that something that they wouldn't have had to approve at that point?

Page 32

A.    I do not know.

Q.    Do you remember, did the board ever get together and actually discuss this incident among themselves?

A.    Did the board ever get together, like in -- like in executive session or something?

Q.    Well, just, it can be executive session, but the facts, did the board ever get together and discuss the facts of this particular incident, the allegations of the accused theft of time?

A.    I'm not sure if I can disclose.

Q.    Right, you can't disclose attorney -- let me clarify.  Any conversations you had with counsel, absolutely can't disclose, but the board members having discussions among themselves about facts, particularly facts of this case are not privileged.  So I'm just trying to understand about facts, I am -- we are sticking to facts, were there discussions of facts in that incident?

MR. HATCHETT:  Let me instruct you.

THE WITNESS:  Yes, please.

MR. HATCHETT:  So I'm representing you for the purposes of the deposition, I'll be the one that's instructing you.  For the purpose of

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078