Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                              )
EDWARD ELMORE,                )
                              )
     Plaintiff,               )
                              )
     vs.                      ) Case No.
                              ) 2:25-CV-02076-JHS
                              )
FALLS TOWNSHIP,               )
                              )
     Defendant.               )
_____)


     REMOTE DEPOSITION UPON ORAL EXAMINATION
OF JEFFRY DENCE, taken by and before Douglas J.
Zweizig, RDR, CRR, CA CSR, TX CSR, WA CCR, PA Notary
Public, NY Notary Public, on Thursday, May 7, 2026,
commencing at 4:00 p.m. EST.
                    ---oOo---


HUDSON COURT REPORTING & VIDEO   (800) 310-1769

Page 2

APPEARANCES:
     For Plaintiff:
          By TIFFANIE C. BENFER, ESQ.
             TBenfer@hardwickbenfer.com
          Hardwick Benfer, LLC
          2003 S. Easton Rd.
          Doylestown, PA 18901

     For Defendant:
          By JAHLEE HATCHETT, ESQ.
             JJHatchett@mdwcg.com
          Marshall Dennehey
          2000 Market Street
          Suite 2300
          Philadelphia, PA 19103

               ---oOo---
PRESENT:
Edward Elmore

               ---oOo---

Page 3

                    INDEX
Witness:                              Page
JEFFRY DENCE
     BY:  Attorney Benfer              5


          EXHIBITS (Previously Marked)

Exhibits         Description           Page

Exhibit 9    Email from Mr. Elmore to Mr.     32
             Takita and Mr. Dippolito, dated
             October 27, 2022

Exhibit 31   Memo from Nelson Whitney to Ed     44
             Elmore and Others Regarding
             Administrative Leave, dated
             December 13th, 2022

Exhibit 42   Email from Mr. Takita to Mr.     49
             Elmore, and Mr. Nelson, Dated
             April 7, 2023

Exhibit 49   Email String Regarding          50
             Promotional Testing Performance
             Ratings, Dated May 4, 2023

Exhibit 55   Email String Regarding Ed       53
             Elmore, Dated June 8 and 9,
             2023

Exhibit 58   Draft Email and Email Regarding    61
             Return to Work , Dated June 14
             and 15, 2023

Page 4

          EXHIBITS (Previously Marked)
               (Continued)
Exhibits         Description          Page
Exhibit 66   Email String Regarding K9 Dogs,    69
             Dated November 28, 2023

Exhibit 92   Email and Report Regarding       86
             Investigation into Falls
             Township Police Department K9
             Unit and Donated K9s

Exhibit 132  Nelson Whitney Memo to Board of    46
             Supervisors, Dated January 27,
             2023

Exhibit 140  Memorandum from Tom Hearn and     56
             Melissa Atkins to Falls
             Township Board of Supervisors,
             Dated June 12, 2023

Exhibit 166  Email Dated February 26, 2024,    82
             from Matthew Takita to Falls
             Township Board of Supervisors
             Regarding Elmore Loudermill
             Response

Exhibit 167  Email String Regarding Elmore,    39
             dated November and December,
             2022

Exhibit 168  Email String Regarding          85
             Loudermill Response, Dated
             February 23, 2024

Pages 1 to 4

Page 5

---oOo---

JEFFRY DENCE, having first been duly sworn, was examined and testified as follows:

---oOo---

EXAMINATION

---oOo---

BY ATTORNEY BENFER:

Q. Good afternoon, Mr. Dence. My name is Tiffanie Benfer. I represent Edward Elmore in his complaint against the Township.

I'm going to be asking you questions today, hopefully only for a few hours.

I'd like to start with, first of all, giving you some instructions just to make the court reporter's life easier and making sure the record is clear and understandable by all in the future.

Can we agree to that?

ATTORNEY HATCHETT: She's asking you.

THE WITNESS: Oh, yes.

BY ATTORNEY BENFER:

Q. Okay. All right.

First of all, let me start with, where are you located today?

A. **Falls Township municipal building.**

Page 6

Q. Okay.

ATTORNEY HATCHETT: Ms. Benfer, before we continue, can we agree to the usual stipulations?

And I would just ask the court reporter, if possible, can you have timestamps on the transcript?

And I will waive reading and signing.

THE COURT REPORTER: No problem, Counsel.

BY ATTORNEY BENFER:

Q. Okay. So it appears that you are, obviously, in the same room with your counsel.

I'm going to ask the following: Even though your counsel's there, and I'm sure there's a computer on -- is it your computer or is it counsel's computer you're using right now?

A. **It's his.**

Q. Okay. All right. Then I'll skip the instructions on asking you to close any other documents or anything like that on your computer. I'm going to assume that there are no other documents, anything like that, that are open right now except for the Zoom.

Page 7

ATTORNEY HATCHETT: There are documents that are open. But what I will do is I'll close out email just to avoid any beeps or dings throughout the process.

ATTORNEY BENFER: Thank you.

BY ATTORNEY BENFER:

Q. All right. Mr. Dence, I'll start with letting you know, if you need a break at any point, please just say so. Sounds like I think you've worked a full day, so please let me know and we'll take a break.

Please understand, though, all the answers need to be verbal responses so the court reporter can take down your response. So the shaking of the head or the "uh-huh" isn't going to work. I need a verbal response.

Can we agree to that?

A. **Yes.**

Q. Okay. If you answer the question, I will assume you have understood the question being asked.

Can we agree to that?

A. **Yes.**

Q. Okay. If you don't understand a question, please tell me. I'm not here to

Page 8

trick you. I want the question to be clear, and I want you to understand it so that you can answer it clearly.

Can we agree to that?

A. **Yes.**

Q. All right. In preparation for your deposition today, did you speak with anyone other than your attorney?

A. **No.**

Q. Okay. Did you review any documents in preparation for your deposition today?

A. **No.**

Q. Okay. Have you ever reviewed the amended complaint that Mr. Elmore filed?

A. **No.**

Q. Okay. Is there anything preventing you from understanding my questions here today?

A. **No.**

Q. Is there anything that would prevent you from answering truthfully here today?

A. **No.**

Q. Okay. And you understand you're under oath today?

A. **Yes.**

Q. Okay. Throughout this deposition,

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 9

opposing counsel -- your counsel may object to questions I'm asking. Even though he objects, in most situations, you're going to still be answering my questions, just so you know ahead of time how the rhythm of this is going to go; okay?

A.    Yes.

Q.    Okay. Also, if there's any point where you don't understand a question, please tell me so I can rephrase it; okay?

A.    Yes.

Q.    All right. I'd like to start with your background, particularly at Falls Township, what your role is at Falls Township currently.

A.    I'm a Township supervisor, elected Township supervisor.

Q.    And how long have you held that position?

A.    17 years.

Q.    Okay. Are you in the middle of a term now? Is it coming to an end? Or where do you --

A.    I'm at the fifth year of a six-year term.

Page 10

Q.    Are you going to be running again?

A.    I don't know. I'm not sure.

Q.    And, currently, are you -- do you hold any position within the board of supervisors?

A.    I'm the chairman of the board of supervisors.

Q.    How long have you held the position of chairman?

A.    I think eight years, seven or -- yeah, seven or eight years.

Q.    Okay. So just for clarification, you held that position of chairman of the board in '21, 2022, 2023, and 2024?

A.    Yes.

Q.    Does the Township manager report directly to the board of supervisors?

A.    Yes.

Q.    Okay. And does the chief of police answer directly to the Township board of supervisors or to the Township manager?

A.    Township manager.

Q.    Despite that, did the Township board of supervisors have interactions with the chief of police --

Page 11

A.    Yes.

Q.    -- directly?

And how do they communicate with the chief of police directly?

A.    Me personally?

Q.    Yeah, let's start with you personally.

A.    In the past, by telephone or text message or face to face.

Q.    Do you still exchange text messages with him?

A.    No.

Q.    Why not?

A.    We had a falling out several years ago.

Q.    What was your falling out over?

A.    That's a long story. There's a lot to it. He's basically accused us of being criminals.

Q.    The chief of police has accused who of being criminals?

A.    Me.

Q.    You.

Anybody else?

A.    Ex-supervisor, Jeff Boraski. Our

Page 12

solicitor, Mike Clarke.

Q.    Any other board of supervisors he's accused of being criminals?

A.    No.

Q.    Okay. Has he ever filed any criminal charges against any of you?

A.    Not that I'm aware of.

Q.    Is the keyword not that you're aware of?

ATTORNEY HATCHETT: Objection to the question.

BY ATTORNEY BENFER:

Q.    Let me ask you this: Could it have happened and you not know?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond, sir.

THE WITNESS: Yes.

BY ATTORNEY BENFER:

Q.    In 2021, I believe Nelson Whitney became the chief of police. Prior to that, he had been the interim; correct?

A.    I don't remember the exact dates, but that sounds about right.

Q.    Okay. Let me ask you this: When he

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 13

became chief of police, did Nelson Whitney have the authority to discipline officers on his own, or did he have to get permission from anybody?

A.    He should have gotten permission from the manager, labor counsel, et cetera. The board of supervisors have the final say.

Q.    Does the board of supervisors have the final say in all discipline regarding police officers?

A.    No.

Q.    Okay.  In what circumstances does the Township have the final -- the supervisors have the final say with regard to discipline of officers?

A.    I'm not sure -- I'm not remembering the exact policy, but I know he likes to hand out discipline.  I don't think some small discipline, you know, "This guy was late for work; he's going to be disciplined" is something that would be chipped up to the board of supervisors.

More extreme stuff where, you know, he wants to suspend somebody or put someone on administrative leave or more extreme than that,

Page 14

fire them, then that's definitely something that will come to the board of supervisors.

Q.    Okay.  So suspension, administrative leave, and termination -- Whitney -- Chief Whitney does not have the unilateral authority to do any of those when it comes to police officers?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  I don't believe he does.

BY ATTORNEY BENFER:

Q.    Okay.  Do you know who Dan Doyle is?

A.    Yes.

Q.    Who is he?

A.    Dan Doyle was briefly our -- human resources director was the title he was given.

Q.    Who hired him?

A.    The board of supervisors.

Q.    Why did they hire him?

A.    Our labor attorneys at the time --

ATTORNEY HATCHETT:  Objection to the form.

Mr. Dence, I'm just going to instruct you, there may be times throughout this deposition where you get into conversations

Page 15

where you were asked questions about the labor attorneys.  We're going to take those on an as-they-come basis.

For the purpose of your response, if you're about to discuss what labor attorneys advised you, I'm going to tell you, "Don't disclose any attorney-client conversations."

Do you understand that?

THE WITNESS:  Yes.

ATTORNEY HATCHETT:  Okay.  You can continue your answer with that understanding.

THE WITNESS:  Okay.

We were told that we don't have a capable human resources department and that we needed to hire someone that had a background dealing with police issues, that could handle police matters.

BY ATTORNEY BENFER:

Q.    And so Dan Doyle was hired?

A.    Yes.  He checked all the boxes at the time.

Q.    Okay.  And then how long was he employed by Falls Township?

A.    I believe less than a year.

Q.    What happened?  Why did his

Page 16

employment end?

A.    He was the Township manager, assistant manager at the time.  He was basically shut out.  He was never really permitted to do his job properly.  And I think out of frustration, he left.

Q.    Oh, so did Mr. Doyle leave -- did he resign, or was he terminated by the Township?

A.    He resigned.

Q.    Do you have any idea why he was frozen out by the Township manager?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  No.

BY ATTORNEY BENFER:

Q.    Did you ever ask the Township manager about his relationship with Mr. Doyle?

A.    I don't recall having a conversation specifically about his relationship.  We may have had conversations where you need to let him do his job and include him, stuff along those lines, yes.

Q.    Did you have any discussions with the -- when we're talking about the supervisor, are we referring to Mr. Takita?  We'll start

Pages 13 to 16

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 4

Page 17

there.

A.    The manager, yes.

Q.    Yes. Okay. Did you have any conversations with Mr. Takita about working with Mr. Doyle --

A.    Yes.

Q.    -- and cooperating with Mr. Doyle?

A.    Yes.

Q.    And what did Mr. Takita say when you asked him about or instructed him to cooperate with Mr. Doyle?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: He would say, you know, "We're working with Dan. We're going to include Dan in this and that." But it never really -- he was still shut out, seemed like.

BY ATTORNEY BENFER:

Q.    What gave you the impression that Mr. Doyle was shut out by --

A.    Mr. Doyle --

Q.    -- Mr. Takita?

A.    I'm sorry. Mr. Doyle told me.

ATTORNEY HATCHETT: Mr. Dence, I'll

Page 18

just reiterate, for the purpose of the stenographer and especially --

THE WITNESS: Yeah, I got it.

ATTORNEY HATCHETT: See, you just did it. Just please allow counsel to ask her question, and she'll do her best to allow you to fully answer her question.

THE WITNESS: I apologize.

BY ATTORNEY BENFER:

Q.    Mr. Dence, do you know Chris Clark?

A.    I know who he is, yes.

Q.    Did you have any interaction with him ever?

A.    No.

Q.    Have you ever spoken to him?

A.    No.

Q.    Do you know a gentleman by the name of James McGowan -- I'm sorry, McGovern? McGovern.

A.    James McGovern?

Q.    Yes.

A.    I don't believe so.

Q.    What about James McGowan?

A.    The McGowan name sounds familiar, but I don't recall.

Page 19

Q.    Do you have any knowledge of the Township hiring an outside consultant in the last couple of years?

A.    We hired someone to do a review of the police department, yeah.

Q.    And why did you hire someone to do a review of the police department?

A.    Because we had major problems with our police department administration.

Q.    Could you tell me about those, please.

A.    Yeah. We have major leadership issues. We have major division in our police department. We have an unprecedented number of officers leaving -- or had an unprecedented number of officers leaving Falls Township, stuff along those lines.

Q.    Are you aware of the fact that I believe there's currently nine vacant positions in the police department?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: I don't.

/ / /

Page 20

BY ATTORNEY BENFER:

Q.    What is the cause of the major -- if you know, what's the cause of the major leadership issues?

A.    Starts at the top, Nelson Whitney.

Q.    Have you ever heard officers complain that they were walking on eggshells because of Nelson Whitney?

A.    No. I --

ATTORNEY HATCHETT: Just answer the question as asked, if you have --

THE WITNESS: Can you please repeat the question.

BY ATTORNEY BENFER:

Q.    Yeah.

Have you ever been told that the officers are walking on eggshells because of Nelson Whitney?

A.    Not directly by officers themselves.

Q.    Have other people told you that?

A.    Yes.

Q.    Who?

A.    Other officers may have said it in a general way, that they are walking on eggshells. No one's ever come to me, "I'm

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 21

walking on eggshells because of this."

Q.    Has the Township -- had the board of supervisors considered the fact that -- strike that.

Have the board of supervisors ever considered terminating Mr. Nelson Whitney?

A.    If we could terminate him, we would have terminated him already.

Q.    And why can't you terminate him?

A.    He's protected by the Police Tenure Act.

Q.    And that's prohibiting him from being terminated?

A.    Yes.

Q.    Why would you want to terminate him if you could?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  Because he's terrible at his job.

BY ATTORNEY BENFER:

Q.    Why is he terrible at his job?

A.    I can only give you my personal opinion.  I don't know what's wrong with him.

Q.    Okay.  Can you give me your personal

Page 22

opinion, as a board of supervisors, why you think he's terrible at his job as the chief of police?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  I think he's a lunatic.

BY ATTORNEY BENFER:

Q.    What makes you think he's a lunatic?

A.    Well, he -- anything that doesn't go his way, he's going to manipulate people and situations to get his way.

Q.    Do you know anything about the K9 officers being accused of theft of time on January 25th of 2022?

A.    I do.

Q.    Okay.  Can you tell me what you know.

A.    He came to us and told us, the board of supervisors --

Q.    And when you say "he" --

A.    He didn't come to us directly.  He may have gone through our Township manager.  I don't remember exactly.

But the issue was they went to a training in Doylestown, I believe.  And then

Page 23

the training ended early, and they came back to the Township building.  And then they went home for the day, but they put in for being at training all day.

It was alleged that the County called him about it, and "him" being Nelson Whitney.  But that was never confirmed.

And then we ended up hiring someone to do a third-party investigation into the whole thing.

Q.    And that would have been Fred Harran?

A.    Yes.

Q.    Okay.  And we're going to talk about that investigation in a few minutes.

I just want to ask you a few more questions about this time on the day in question.

Was it ever communicated to you the day started at 8:00 a.m. at the Bristol Township Police Department to get the dogs ready?

A.    I don't recall.

Q.    Okay.  Were you ever informed that the actual -- the training that day would take

Page 24

part in -- take place in two parts, the first part being the County and the second part being run by the Bristol Police Department?

A.    No.

Q.    That was never communicated to you?

A.    No.  This is the first I've ever heard of Bristol Township.

Q.    Okay.  So you have no knowledge prior to me telling you anything about this that the second half of that day, the officers were supposed to be doing training with the Bristol Township K9 officers?

A.    No.

ATTORNEY HATCHETT:  Objection to the form of the question.

Can you repeat your answer.

THE WITNESS:  "No" was my answer.

BY ATTORNEY BENFER:

Q.    Okay.  Was it ever communicated to you that the Bristol Township police officers were supposed to secure a location for the second half of the training that day and failed to do so, and that's what caused the officers to not have anything to do in the afternoon on February 25th of 2022?

Pages 21 to 24

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 25

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: I don't recall any of that.

BY ATTORNEY BENFER:

Q. Are you aware that Lieutenant Ward recommended that Mr. Elmore be terminated as a result of the incident on February 25th, 2022, with regard to the theft of time?

A. Yes.

Q. Okay. And did you agree with his recommendation?

A. No.

Q. Did you have concerns about the report -- let me ask you this: Are you aware that Mr. -- Lieutenant Ward wrote a report about his investigation?

A. Yes.

Q. Have you reviewed his report?

A. Probably at the time, but I don't recall.

Q. Did you ever have any concerns about the report he wrote?

A. Yes.

Q. What were your concerns?

Page 26

A. I know that our assistant Township manager at the time had video specifically showing Ed Elmore in the building, going into -- I thought it was Nelson Whitney's or Chris Clark's office, when they said that he was not there. But they have it on video they were doing it.

Q. Correct.

So you're aware of the fact that Mr. Ward's -- his report, based on his investigation, doesn't indicate that, in fact, Mr. Elmore was in the police station, based on the videos?

A. I don't recall.

ATTORNEY HATCHETT: And I have an objection to the form. The witness answered before I placed my objection on the record. That's fine.

BY ATTORNEY BENFER:

Q. Do you know who Officer Bryan White is?

A. Yes.

Q. Okay. Were you ever informed that Officer White went to a training session one day, and it ended within a few hours; and then

Page 27

he went home instead of coming back into the police station?

A. No.

Q. Okay. And you weren't informed that Mr. White received a warning for that incident?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: I don't recall.

BY ATTORNEY BENFER:

Q. Did you have any knowledge that Lieutenant Ward contacted the County detectives and asked for criminal charge -- to screen Mr. Lundquist, Mr. Elmore, and Mr. Fisher for potential criminal charges as a result of the theft of time with the K9?

ATTORNEY HATCHETT: Objection.

THE WITNESS: No.

BY ATTORNEY BENFER:

Q. No, you had no knowledge of that?

A. I don't recall hearing that before.

Q. On April 26, Chief Whitney was placed on administrative leave; correct?

A. Yes.

Q. Okay. And that was because the board of supervisors received a vote of no

Page 28

confidence from PAFT; correct?

A. Yes.

Q. All right. And it wasn't simply that it was Mr. Elmore asking the board of supervisors or telling the board of supervisors that he had no confidence. It was 22 other officers who voted for no confidence of Mr. Whitney; is that correct?

A. That is correct.

Q. And the Township did an investigation?

A. We had someone do an investigation, yes.

Q. And what happened with that investigation?

A. It found there were all kinds of problems in our police department, but it also found that they said that Nelson Whitney didn't specifically do anything overly terrible, I guess. I don't know what to say. I don't know how to word it.

Q. Okay.

A. It didn't say that he did nothing wrong. He has his own issues. There was supposed to be training done for him and other

Pages 25 to 28

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 29

officers that never took place.

Q.    That was my next question.

As a result of that investigation, did they -- was there a recommendation that the chief receive some type of training?

A.    Yes, there was.

Q.    And what was the training he was supposed to receive?

A.    I believe he kept referring to people as hunters. I think, if I'm not mistaken, the term was "hunters" that he would refer to his officers as. And they said that was a problem and that he needed training on some issues he had.

Q.    But that training, you said, never happened?

A.    Not that I'm aware of.

Q.    Was it on Mr. -- was it on -- was it the responsibility of Nelson Whitney to get the training taken care of?

A.    I would think it was the responsibility of the Township to make sure he did get the training.

Q.    Would that have been Mr. Takita that would have been responsible for that training

Page 30

happening?

A.    Yes.

Q.    I believe that Campbell Durrant was hired to conduct the investigation?

A.    I believe you're correct.

Q.    Okay. What -- in April of 2022, what was the Township's relationship with Campbell Durrant?

A.    The only relationship we had was we hired them for that specific reason -- to do that investigation. I'm sorry.

Q.    They were hired to do the investigation?

A.    Yes.

Q.    So they weren't, at the time, your labor counsel?

A.    No. One of our other supervisors had just been in Hershey for a conference and listened to them do some type of seminar, and she was impressed by them and suggested that we hire them.

Q.    Okay. Do you know anything about a meeting in early October of 2022 that included Mr. Takita, Mr. Dippolito, and Mr. Elmore?

A.    I don't recall.

Page 31

Q.    Okay. Do you recall anyone, either Mr. Takita or Mr. Dippolito, communicating to you that Mr. Elmore had reported to them discriminatory hiring practices within the police department?

A.    I don't recall the details, but I remember hearing about something along those lines. But I don't remember details of that.

Q.    Was there any investigation in October of '22 --

A.    There was not.

Q.    -- that -- let me --

A.    I'm sorry.

Q.    -- done by the Township regarding discriminatory practices in the police department?

A.    Not that I recall. I remember the subject coming up, but that's all I remember.

Q.    Do you have any recollection who brought it up to you?

A.    No. I remember them telling us that officers on the training team were told to change their reports or claims of who they should and shouldn't hire, stuff like that.

ATTORNEY BENFER:  I'm going to show --

Page 32

I'd like to show Exhibit 9, please.

(Exhibit No. 9 was previously marked for identification.)

THE WITNESS:  Are you asking me?

BY ATTORNEY BENFER:

Q.    No. I'm going to show it to you. I'm telling the court reporter so the court reporter knows.

Okay. Mr. Dence, this is an email from Ed Elmore to Mr. Takita and Mr. Dippolito. The email was not sent to you.

My question to you is:  Was this email ever forwarded to you?

A.    I don't recall.

ATTORNEY HATCHETT:  Can you see that okay?

THE WITNESS:  No.

BY ATTORNEY BENFER:

Q.    Do you need me to blow it up for you?

A.    You would have to, yeah. I can't see it.

Q.    Okay. Give me one second.

How's that? Is that better?

A.    A little more.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 33

**That's better.**

Q. There we go. How's that?

**A. Good.**

Q. Okay. I'm going to scroll down and give you an opportunity to review it, and then I'm going to ask again.

Let me know when you want me to scroll further.

**A. Hold that.**

**Can you go down a little bit?**

Q. Of course.

**A. Hold that.**

**Can you go down a little further?**

Q. Of course. A little bit further. There you go.

**A. That's good.**

Q. Let me know when you're done, and I'll ask you some questions.

**A. Okay. I'm done.**

Q. Okay. Was this email ever forwarded to you?

**A. I don't recall ever seeing that email.**

Q. Okay. What about -- let me ask you about the substance, though, of it.

Page 34

Do you know anything about the arbitrator's decision in regard to the Metterle matter?

ATTORNEY HATCHETT: Objection. I'll have a standing objection to any questions regarding this document to this witness.

You can respond, sir.

ATTORNEY BENFER: I can take the document down. I'm not asking about the document.

THE WITNESS: There was a lot.

BY ATTORNEY BENFER:

Q. I'm asking, do you have any knowledge of a Metterle incident -- or arbitration? I'm sorry. Arbitration.

**A. I do, yes. There was a lot to the whole Metterle situation that went on for quite some time.**

Q. And at some point was she brought back to work?

**A. Yes.**

Q. Okay. Was there ever any investigation regarding the time frame in which it took to get her back to work?

**A. No, not that I'm aware of.**

Page 35

Q. Whose job is it to make sure the chief of police doesn't retaliate against officers for reporting discrimination?

**A. I would assume it's the Township manager.**

ATTORNEY HATCHETT: Mr. Dence, we don't ever want you to guess, respectfully. Okay? If you don't know, just let us know you don't know.

Likewise, if you do know, please tell us.

THE WITNESS: It should be the Township manager.

BY ATTORNEY BENFER:

Q. Did you know in October of 2022 Ed Elmore was on light duty, working in the station, because of an IOD?

**A. No.**

Q. You have no knowledge of that?

**A. I don't think I do.**

Q. Okay. Did you have any knowledge of Mr. Elmore working a light duty and then the Township then telling him he could no longer work light duty?

Do you have any knowledge of that?

Page 36

**A. I don't recall.**

Q. Okay. Are you aware of any personal issues the command staff was having with Mr. Elmore in October of 2022?

ATTORNEY HATCHETT: Objection to the form of the question.

Do you know what she means when she said "command staff"?

THE WITNESS: Yes.

ATTORNEY HATCHETT: Okay. You can respond.

THE WITNESS: I don't remember the dates, but I know they had a problem with them at one point, yes.

BY ATTORNEY BENFER:

Q. Do you have any recollection what that problem was?

**A. Yeah.**

Q. What was it?

**A. He became president of PAFT. And he found out they were full of shit, to be blunt.**

Q. What do you mean that "he found out that they were full of shit"?

**A. There was other investigations going on. The prior -- not the prior to him, but the**

Pages 33 to 36

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 37

PAFT president and treasurer before him were put out on administrative leave, a whole investigation by the County, with all this evidence that they were stealing and stuff like that.

And my understanding is Ed Elmore became president, saw all of the evidence that they provided, and realized that they were -- "they" being the rest of the PAFT membership -- were being lied to by their president, who was manipulated by the command staff. That's my understanding.

Q.    And who makes up the command staff?

A.    Nelson Whitney, Chris Clark. They're the top of the chain up there.

Q.    Lieutenant Ward, was he part of that command staff, too, for a little while?

A.    Up until he retired, he was.

Q.    Let me ask you about Lieutenant Ward.

Was there ever an incident involving him and a civilian --

A.    Yes --

Q.    -- in a cell block that got recorded?

Page 38

A.    I'm sorry.

Yes, there was.  I apologize for that.

Q.    And it was actually -- there's a video of it; correct?

A.    Yes.

Q.    Have you ever seen the video?

A.    Yes.

Q.    Okay.  And did that civilian bring a civil suit against the Township for what happened on that video?

A.    I don't recall.

Q.    You don't recall?

A.    I don't.

Q.    Was Lieutenant Ward ever disciplined for what happened that day in the cell block?

A.    He was put on administrative leave. We hired a third-party person to do an investigation, who found no wrongdoing -- not no wrongdoing, but he didn't -- found discipline wasn't appropriate.

Q.    So is it fair to say that third-party investigator recommended he not be disciplined?

A.    Correct.

Page 39

Q.    But it wasn't -- the third party did not find that he did nothing wrong; is that correct, too?

A.    I don't recall.  That was a while ago.

(Exhibit No. 167 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.    I'm going to show you Exhibit 167.

Do you need me to blow it up for you a little bit more?

A.    Oh, yeah.

Q.    Okay.  Just tell me; I'll do it. Okay.

It appears that a memo, "Elmore, Subject.  Please see attached," it says here.

Do you see that?  To Takita from Nelson, and then that's eventually forwarded on to you.

Do you see that?  And that's a November 30th and December -- actually, December 1st of 2022.

Do you recall getting a memo from Mr. Nelson Whitney regarding Elmore?

THE COURT REPORTER:  Counsel, I

Page 40

believe we might have lost them.

ATTORNEY BENFER:  I see what you're saying, too.

(Brief pause in proceedings.)

BY ATTORNEY BENFER:

Q.    I'm not sure where we're at.  Were you able to see this -- can you see this email now?

A.    I only see the first thing about "Please see attached memo from Chief Whitney regarding Officer Elmore."

Q.    Like that?

A.    Yeah, I see it.

Q.    Okay.  Do you recall getting a memo from Chief Whitney Nelson?

A.    I don't.

Q.    No.  Okay.

Let me ask you this:  At some point the Township hires Fred Harran; correct?

A.    Yes.  Yes.

Q.    What happened?  Why was Fred Harran hired?

A.    We didn't trust Henry Ward doing these investigations.

Q.    Okay.  Why not?

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 41

A.   We felt he had a personal vendetta against certain officers.

Q.   Including Mr. Elmore?

A.   Yes.

Q.   Okay.  So you didn't trust his investigation?

A.   Correct.

Q.   And so you felt a new investigation had to be done?

A.   Yes.

Q.   Okay.  Why was Mr. Harran -- what was his -- what was the scope of his investigation?

A.   The four K9 officers that we discussed earlier.

Q.   I think there were three.

A.   Three officers.

Q.   Fisher, Lundquist, and Elmore.

A.   Okay.

Q.   Yeah, okay.  Making sure we're on the same page.

A.   That's what he investigated, them and the training day.

Q.   The time?

A.   Yes.

Page 42

Q.   Okay.  And then was he also asked to investigate Mr. Elmore regarding anything else, like harassment or anything like that?

A.   No, not that I recall.

Q.   Not that you recall?

A.   No.

Q.   Okay.  Let me ask you this:  Who decided to hire Fred Harran?  Was it the whole board?  Were there certain members of the board?

Could you tell me if you remember?

A.   It was a unanimous decision.

Q.   Okay.  And was -- did the entire board agree that they couldn't trust the investigation that was done by Lieutenant Ward?

A.   I can't speak for everyone.

Q.   Okay.  But it was a unanimous decision to hire Fred Harran to conduct a new investigation?

A.   Correct.

Q.   Okay.  And Mr. Harran did that investigation; correct?

A.   Yes.

Q.   Okay.  And he came back to the board with a recommendation with regard to the theft

Page 43

of time; correct?

A.   Yes.

Q.   Okay.  And his recommendation was, for Mr. Elmore in particular, no disciplinary action; right?

A.   Correct.

Q.   And the board followed his recommendation?

A.   As far as I remember, yes.

Q.   Okay.  So once the board decided not to take any disciplinary action for the K9 theft -- the alleged theft of time, did that close that subject with regard to any discipline being taken towards Mr. Elmore?

A.   For that specific issue, yes.

Q.   Yeah.  I mean, it was close, right?  He was found -- no discipline -- he did -- nothing he did that day warranted him to be disciplined for; correct?

A.   As far as I remember, yes.

Q.   Okay.  Prior to Mr. Elmore -- I'm sorry.

Prior to Harran being hired, or it may have been around the same time, in December of 2022, Mr. Elmore was placed on

Page 44

administrative leave.

Was the board of supervisors informed of that before it happened?

A.   Why was he placed on administrative leave?  You have to refresh my memory.

Q.   I don't know.  There are no documents I've seen as to why he was placed on administrative leave.  He was placed on administrative leave, according to the records, on December 12th of 2022.

A.   I don't recall.

Q.   Let me show you -- maybe this will help, but I don't know if it will.  Let me show you Exhibit 28.

(Exhibit No. 31 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.   I'm going to show you Exhibit 31.

Okay.

A.   You're going to have to zoom in on this.

Q.   Yep, I will.

This is a memo from Nelson to -- Nelson Whitney to Ed Elmore on December 13th, 2022.  It says, "Assignment of administrative

Pages 41 to 44

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 45

leave."

Do you see that?

A.    Yes.

Q.    It says, "Please be advised that effective immediately you are assigned to administrative leave with pay."

Do you see that?

A.    Yes.

Q.    Was the board of supervisors informed that Mr. Elmore was being put on administrative leave in December of 2022?

A.    I don't recall.

Q.    Would that be something that Mr. Whitney Nelson needed to get permission from the board of supervisors to do before he did it?

A.    He should, yes.

Q.    Did he always do it, or did he sometimes --

A.    No.

Q.    -- do it without asking you?

A.    Sorry.  I did it again.

No, he didn't always do it.

Q.    So were there times when Whitney would place officers on administrative leave

Page 46

without informing the board of supervisors and getting permission?

A.    I don't remember how many times, but I'm sure it's happened, yes.

Q.    Okay.  Did you have any knowledge that Mr. Elmore was on administrative leave from December of 2022 until June of 2023?

A.    I don't recall.  I don't see how I could not know, but I don't recall.

Q.    Okay.  I'm going to show you Exhibit 132, please.  One second.

(Exhibit No. 132 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.    Is that big enough for you?

A.    A little more.

Q.    Little more?  How's that?

A.    Yeah.

Q.    If I do that, you'll lose it a little.  Yeah.

A.    Yeah, that's good right there.

Q.    How about that?

A.    That's good.

Q.    Okay.  This is a memo dated January 27, 2023, to you, the other board

Page 47

members.

A.    Yes.

Q.    And you scroll down, it's from Nelson Whitney.

Do you see that?

A.    Yes.

Q.    Do you recall receiving this memo?

A.    I don't.

Can I read it real quick?

Q.    Of course.  Take your time.

A.    Can you go down a little further?

Q.    Yep.  You just tell me when.  I'll move it.

A.    Keep going.  That's good.

Okay.  I don't have my glasses, but I read most of it.  I can see it.  I don't recall ever seeing that before.

Q.    Okay.  It says here from him, "It's imperative that you carefully examine all of these materials individually before you begin your deliberations as to what level of discipline you decide to impose in this case."

A.    Correct.

Q.    He testified he gave you other documents in addition to this memo.

Page 48

Do you have any recollection of receiving any other documents from him?

ATTORNEY HATCHETT:  Objection to the form of the question.

You can respond.

THE WITNESS:  I do not, and I don't recall ever seeing anything with audio and video that we were supposed to listen to.

BY ATTORNEY BENFER:

Q.    Okay.  And --

A.    Nothing stands out.  That never happened to me.  I don't recall.

Q.    Okay.  So you don't recall listening to all the audio recordings and watching the video provided?

A.    I've never watched any audio or video recordings related to Ed Elmore for anything.

Q.    It says here at the very top "My recommendation for the dismissal of Ed Elmore."

So he's recommending Mr. Elmore be terminated --

A.    Yes.

Q.    -- on January 27, 2023; correct?

A.    Yes.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 49

Q.    And the board didn't follow this recommendation.

A.    **I don't recall.**

Q.    You don't recall them following it or you don't ...

A.    **He was terminated at some point. I don't remember the date.**

Q.    He was terminated -- I'll represent to you he was terminated in February of 2024.

A.    **Okay.**

Q.    A full year later.

A.    **I'm sorry.**

**Then, no, we did not follow this recommendation.**

Q.    Okay. So I'm going to show you what is Exhibit 42.

(Exhibit No. 42 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.    I'm just going to show you, this is an email from Mr. Takita to Mr. Elmore informing him -- as you can see, it says, "After reviewing the recommendation for discipline, the board of directors determined no disciplinary action is warranted for the

Page 50

incident on February 25th of 2023, involving misuse of time."

Just for clarification, I asked Mr. Takita in his deposition. And he clarified that the 2023 was a typo; it should have been 2022.

Does this refresh your recollection that they -- I think we already talked about it -- the board did not discipline Ed Elmore for the misuse of time on February 25th of 2022.

ATTORNEY HATCHETT: Objection to the form of the question.

I don't even know -- do you follow the question at this point?

THE WITNESS: Yes.

ATTORNEY HATCHETT: Okay. You can respond.

THE WITNESS: That is correct.

BY ATTORNEY BENFER:

Q.    Thank you.

I'll show you Exhibit 49.

(Exhibit No. 49 was previously marked for identification.)

/ / /

Page 51

BY ATTORNEY BENFER:

Q.    Let me know, Mr. Dence, did I blow it up big enough for you?

A.    **Yes.**

Q.    There we go. Okay.

So this is an email from Mr. Elmore to Takita, Dippolito, and you. And you were cc'd on this email.

Do you see that?

A.    **I do.**

Q.    Okay. Do you remember receiving this email?

A.    **Can I read it real quick?**

Q.    Oh, yes, of course. Take your time.

A.    **I do recall.**

Q.    Okay. You recall receiving this.

What did you do when you received this memo?

A.    **I'm sure we discussed it as a board.**

Q.    Was there any investigation initiated as a result of this email into Mr. --

A.    **I don't recall.**

Q.    Let me finish.

A.    **Sorry.**

Q.    -- into Mr. Elmore's allegations of

Page 52

retaliation in the third paragraph?

A.    **I don't recall any investigation.**

Q.    No investigation?

A.    **No.**

Q.    Was there any discussion about doing an investigation?

A.    **I don't recall.**

Q.    Whose responsibility would it be to initiate an investigation into Mr. Elmore's allegations of retaliation in this email?

A.    **That would have been decided by the manager, the board of supervisors, and our solicitor.**

Q.    And sitting here, you have no recollection -- let me just make sure I'm clear.

No investigation was done into Mr. Elmore's allegations of retaliation in this email; is that correct?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: I don't recall any investigation.

/ / /

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 4

Page 53

(Exhibit No. 55 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.      Let's look at Exhibit 55.

Okay.  Mr. Dence, I'm going to blow this up for you.  Again, I'm going to go over to the second page because it's an email string starting on the second page from you; okay?

A.      Yeah.

Q.      I'm going to do my best to make it as big as possible so you can see it.  There we go.

Okay.  There we go.  Do you see that?

A.      Yep.

Q.      Okay.  It's an email from you on June 8, 2023, to Mr. Takita, Michael Clarke, Erin Mullen, Brian Galloway, Jeff Boraski, John Palmer.

Are those the other board of supervisors?

A.      Correct.

Q.      Okay.  And in this email -- if you can just take a minute to review it, and then I have some questions for you.

Page 54

Okay?

A.      I recall that, yes.

Q.      You remember that?

Well, let me ask you this:  What prompted you to send this email?

A.      I don't recall that.

Q.      What do you remember?

A.      I remember sending the email because it was a while after the investigation results, obviously, and he still hadn't been returned to work.

Q.      And you thought he should be returned to work?

A.      Yes.

Q.      Had the board discussed returning him to work?

A.      I don't recall that.

Q.      Okay.  How was this resolved?  And I'll scroll up so you can see his response to you.

It says, "It is my understanding that the board has decided Officer Elmore is to be returned to work without any discipline.  I will direct Nelson tonight to advise Officer Elmore that he is to return to work

Page 55

tomorrow."

Do you see that?

A.      I do.

Q.      But he didn't go back to work the next day, did he?

A.      I don't recall.

Q.      Okay.

A.      I don't recall what he was even out on administrative leave for.

Q.      I have no record of understanding either.

Okay.  So just --

ATTORNEY HATCHETT:  I'm sorry, Ms. Benfer.  Mr. Dence asked me if he could ask a question.

My instruction to you, Mr. Dence, is you can ask if you need clarifying on any questions or anything like that.

But generally in a deposition, counsel is going to be asking you questions; okay?

THE WITNESS:  That's fine.  Go ahead.

BY ATTORNEY BENFER:

Q.      Okay.  All right.

Just keep in mind, this was June 9th this email exchange took place; okay?

Page 56

A.      Uh-huh.

Q.      And now I'm going to show you Exhibit 140.

(Exhibit No. 140 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.      And I'm going to show this to you because I -- it's to the board of supervisors.

A.      Okay.

Q.      And it says -- at the top here, it's dated June 12.  It's from Tom Hearn and Melissa Atkins.

Were they the labor attorneys for the Township at the time?

A.      At the time?

Q.      Yes.  Were they?

A.      Yes.

Q.      Okay.  And they're no longer labor attorneys for the Township; correct?

A.      Correct.

Q.      Why not?

ATTORNEY HATCHETT:  Objection to the form of the question.

You can respond.

THE WITNESS:  We fired them.

Pages 53 to 56

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 57

BY ATTORNEY BENFER:

Q. Why did you fire them?

ATTORNEY HATCHETT: Well, objection -- I'll take that back.

You can respond.

THE WITNESS: They're terrible at their job.

BY ATTORNEY BENFER:

Q. Why are they terrible at their job?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: It would be just my opinion. Want that?

BY ATTORNEY BENFER:

Q. Yeah, I want your opinion.

ATTORNEY HATCHETT: I'm going to object.

But you can respond.

THE WITNESS: Nelson Whitney weaponized Melissa Atkins against anyone that didn't toe the line with him. He manipulated her, and she was doing everything that he wanted her to do to try to discipline everybody that he didn't like, anything that he wanted,

Page 58

it seemed like.

BY ATTORNEY BENFER:

Q. Well, let's look at this because this is a memo from Tom Hearn and Melissa Atkins.

Well, let me ask you one more question about the term -- you're no longer using Obermayer as your labor counsel.

Do you recall when you fired them? Was it shortly after Mr. Elmore's termination?

A. I don't recall the exact timeline.

Q. Okay. In this memo, it says here that Obermayer is recommending that Mr. Elmore be terminated.

Do you see that on the first paragraph?

ATTORNEY HATCHETT: I don't think he can see anything.

BY ATTORNEY BENFER:

Q. Okay. Let me blow it up for you. Give me one second. It's just a little delay there.

Do you see that now?

A. No.

Q. How about now?

Page 59

A. Can you go one more?

Q. I'll do my best. How about that?

A. That's a little bit better.

Q. There we go. Okay.

A. What was this in reference to?

Q. Well, it's reference to Mr. Elmore.

And remember --

A. Okay.

Q. -- we just looked at an email that you sent on the 8th of June saying, "Why isn't he back to work?"

Right? Because --

A. Correct.

Q. And we also talked about that on April 7th, I believe it was, of 2023, the board had decided not to discipline Mr. Elmore for the theft of -- the misuse of time; correct?

A. Correct.

Q. Okay. So then you get this memo, though, from Obermayer recommending that Mr. Elmore be terminated.

Do you see that?

A. Yes, I do.

Q. And this is four days after you had said, "Why isn't he back to work? You know,

Page 60

we -- Harran's done his investigation. Why isn't he back to work?"

Do you see that?

A. Yes.

Q. So any idea why they were recommending he be terminated on June 12?

A. No.

Q. And the Township did not follow this recommendation, did they?

A. I don't recall.

Q. Well, I can represent to you he wasn't terminated in 2023.

A. Correct. We did not follow this.

Q. Right. Okay. All right.

So in 2023, they recommended -- Obermayer recommended Mr. Elmore be terminated, and the Township did not follow that recommendation.

Can we agree to that?

A. Yes.

Q. Do you have any idea why they wanted -- they thought that he was -- that he should be terminated?

A. I don't recall.

Q. Was this ever discussed with the

Pages 57 to 60

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 61

board?

A.    I'm sure it was, but I don't recall the details.

Q.    Okay.

A.    The hardest thing for me to recall is the timeline.

ATTORNEY HATCHETT:  Mr. Dence, there's no question.

THE WITNESS:  I'm sorry.

ATTORNEY HATCHETT:  No.  That's fine.

If you had anything to add, you certainly can.  But, otherwise, there's no question.

BY ATTORNEY BENFER:

Q.    Okay.  This was my understanding this document was attached to that memo.

Do you remember seeing this memo?

A.    Is this the same one we looked at earlier.

Q.    It's unclear to me.

A.    I don't recall.

Q.    Okay.

(Exhibit No. 58 was previously marked for identification.)

/ / /

Page 62

BY ATTORNEY BENFER:

Q.    I'm going to show you Exhibit 58.  There we go.  I'm going to make it bigger for you.  Give me one second.

You can see this is an email from Mr. Takita to Mr. Elmore.

A.    Yes.

Q.    Do you see this?

And it was his -- it's "Return to Work."  It says June 15th, 2023.

So a few days later, he's brought back to work.

Do you see that?

A.    Yes.

Q.    Okay.  In here it says -- and I'm going to blow it up so you can see it better.  Give me one sec.

ATTORNEY HATCHETT:  Objection to the form of the question.  I have a standing objection.

ATTORNEY BENFER:  I don't -- let me ask my question before you -- because this is important.

BY ATTORNEY BENFER:

Q.    "In addition, the investigation into

Page 63

harassment complaints filed against you have concluded."

ATTORNEY HATCHETT:  Don't respond.

BY ATTORNEY BENFER:

Q.    "Based on the findings of the investigation, the recommendations of the investigator, the board of supervisors sustained your violation of Section 103.5 of the Falls Township Police Policy 2.8.1, Conduct Unbecoming an Officer."

Do you recall doing that and the board of supervisors doing that?

ATTORNEY HATCHETT:  All right.  I would really appreciate if you not cut me off or interrupt me.  I have done the same for you and given you that courtesy.

ATTORNEY BENFER:  You don't.  You cut me off before I finish the questions all the time.

ATTORNEY HATCHETT:  As I was saying, I have an objection to place on the record prior to you cutting me off.

I have a standing objection for any questions to this witness based on this document.

Page 64

Sir, with that objection, you can respond at this point.

BY ATTORNEY BENFER:

Q.    Yeah, Mr. Dence, you can respond.  This is a question you can answer.  You're allowed to answer.

A.    What was the question again?

Q.    Sure.

I'm going to read it to you, because this is -- Mr. Takita is citing -- he's citing a decision by the board.

And I'm asking if the board actually made a decision that Mr. Takita cited in this email to Mr. --

ATTORNEY HATCHETT:  I would also ask that you stop testifying.  If you have a question, that's fine.

But I will ask you to refrain from testifying.

ATTORNEY BENFER:  I'm not.  I'm citing what's in the document here.

BY ATTORNEY BENFER:

Q.    So it says in the document, "In addition, the investigation into the harassment complaints filed against you have concluded.

Pages 61 to 64

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 65

Based on the findings of the investigation and the recommendations of the investigator, the board of supervisors sustained your violation of Section 103.5 of the Falls Township Police Policy 2.8.1, Conduct Unbecoming an Officer."

So Mr. Takita -- I'm asking: Is Mr. Takita accurately representing to Mr. Elmore in this email what the board decided?

ATTORNEY HATCHETT: Objection. You can respond.

THE WITNESS: I don't remember.

BY ATTORNEY BENFER:

Q. Okay. Would there be any records in the board's notes or any documentation that would reflect what the board actually decided and was then communicated to Mr. Takita to communicate to Mr. Elmore?

A. **I don't think so. We don't keep notes at our executive sessions unless our solicitor does.**

Q. So how would this decision be communicated to Mr. Takita?

A. **From the board to the solicitor.**

Q. And then the solicitor to

Page 66

Mr. Takita?

A. **Typically, that's how it took place, yes.**

Q. Are you aware of the fact that Fred Harran did not actually recommend that Mr. Elmore receive a five-day suspension?

A. **Yes.**

Q. So why was Mr. Elmore, if you have any recollection, given a five-day suspension?

A. **I don't recall.**

Q. But you do recall Mr. Harran not recommending a five-day suspension?

A. **Yes.**

Q. Do you have any recollection who recommended that Mr. Elmore receive a five-day suspension?

A. **I don't.**

Q. Do you recall -- okay. So there was a Step 2 grievance that Mr. Elmore had in August of 2023.

Are you familiar with that?

A. **This is -- I'm not. This is related to the dog-training incident.**

Q. No, it wasn't. And I'll be happy to show you a document, but your attorney is going

Page 67

to object to me showing it to you. So I'm just trying to get the information from you before I show it to you.

Do you have any recollection of Mr. Elmore receiving a Step 2 grievance for what we were just looking at? Remember, Mr. Takita conveyed to him he had a five-day suspension.

ATTORNEY HATCHETT: You may respond.

I'm going to object to any characterization made regarding myself or what I may or may not do throughout this deposition.

Please refrain from making any characterizations or references to what I may or may not do.

Subject to that, Mr. Dence, you can respond.

THE WITNESS: Can you repeat it.

BY ATTORNEY BENFER:

Q. Sure.

We were previously looking at a memo, if you recall --

A. **Yes.**

Q. -- Mr. Takita sent to Mr. Elmore telling him he was -- a five-day suspension.

Page 68

He got a five-day suspension.

And then I'm asking you, subsequent to that, there's a Step 2 grievance regarding that five-day suspension. And that suspension is then sustained, and he's not given the five-day suspension.

Do you have any knowledge of that, in fact, happening?

A. **I don't remember.**

Q. Okay. Did you have any knowledge of -- do you have any knowledge of the step -- him not receiving any discipline for the alleged harassment complaints that were brought against him?

A. **I don't remember that either.**

Q. In September 2022, Mr. Elmore files an EEOC charge of discrimination.

Are you aware of that?

A. **Yes.**

Q. Okay. Was that charge of discrimination shared with you?

A. **I'm sure it was.**

Q. Okay. Do you remember reviewing it with the board?

A. **No.**

Pages 65 to 68

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 69

Q. Do you remember just individually reviewing it yourself?

A. I don't.

Q. Do you recall the board discussing the fact that he had filed a charge of discrimination?

A. It was probably summarized by our solicitor, if I was to guess. That's usually how it works.

Q. Okay. Did the Township initiate any investigations into the allegations in Mr. Elmore's EEOC charge?

A. No.

Q. No investigation?

A. Not that I recall.

Q. Okay. Then we go forward to November of 2023.

(Exhibit No. 66 was previously marked for identification.)

BY ATTORNEY BENFER:

Q. Let me show you Exhibit 66.

Okay. This is an email from you down here at the bottom, and I'm going to blow it up for you.

It says, "Update on this."

Page 70

Do you see that?

A. Yes.

Q. And then the response is -- let's -- there's discussions about that between them.

Let me ask you, do you recall why you sent this email?

ATTORNEY HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: I don't.

BY ATTORNEY BENFER:

Q. You don't recall why you sent this email?

A. No. What was the subject?

Q. The subject is "Regarding K9 Dogs." I can blow it up a little bit more.

A. Oh, I see it.

Q. Do you see it now?

A. Yeah.

Q. Yep. Does that -- now that you can see that better, is that --

A. No.

Q. No recollection?

A. No.

Q. Do you remember anything going on

Page 71

with the K9 dogs in the November time frame of 2023?

A. What was the timeline of the discipline when he wanted to fire the three K9 cops? This wasn't the same time?

Q. No. No.

Do you recall there being another K9 issue with Mr. Elmore and him -- well, separate and apart -- strike that.

No. This is a separate issue, and I don't know what it's about. I was asking you about it.

A. I do recall a second issue that came along later, yeah.

Q. Let me ask you this: Has there been discussions about the status of the K9 unit as a whole at Falls Township?

ATTORNEY HATCHETT: At what time?

ATTORNEY BENFER: At all.

BY ATTORNEY BENFER:

Q. Have you had any discussions about the status --

A. Yes.

Q. -- of the K9 -- yes. Okay.

And what have those discussions been

Page 72

about?

A. It became clear that Nelson Whitney wanted to dismantle and do away with the entire K9 unit. He at the end of last year directed -- let me go back a little bit.

Officer Lundquist's dog had died. And then he told Officer Fisher that at the end of the year, the K9 unit was over.

The board of supervisors went to the Township manager and said, "No, that's not happening. We're not doing away with the K9 unit. Officer Fisher's dog is not retiring."

Even though it's an older dog, if he can't do the police work, he can still do community policing until he can't function anymore, and that we wanted them to start working on another K9 officer for 2026.

We budgeted for it and directed Chief Whitney to start working on another K9 dog.

Q. And did he comply with your request?

A. No, not yet.

Q. What happened?

A. Not clear.

Q. So is Mr. -- is Nelson Whitney

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 73

trying to get rid of the K9 unit altogether? Is that your understanding?

A.    Absolutely, he is.

Q.    And does the board of supervisors support that decision?

A.    No.

Q.    Do you have any idea why he wants -- why Nelson Whitney wants to get rid of the K9 unit?

ATTORNEY HATCHETT:  Objection to the form of the question.

You can respond, Mr. Dence.

BY ATTORNEY BENFER:

Q.    You can answer.

A.    Yes.  He wanted to get rid of those three cops that he couldn't get rid of, and their dogs.

Q.    Why does he want to get -- do you have any idea why he wants to get rid of those three cops?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  He's a monster.  He couldn't fire them, so he's going to do whatever he can to make them -- hard for them.

Page 74

BY ATTORNEY BENFER:

Q.    Make them pay?

A.    Yeah, exactly.

Q.    Okay.  At some point in December of 2023 -- okay, this is a few months before Mr. Elmore's terminated -- did you find out that Mr. Elmore has two dogs that he got from a resident named Bob Kent?

A.    Yes.

Q.    Okay.  Tell me what you know about that.  What happened there?

A.    Our understanding is Bob Kent is a local tree service company in Falls Township.  He was a tow truck operator at one point, but I don't think he still does that.  And he also breeds these K9s.

My understanding was that he had a couple dogs that he didn't think were good enough, that he couldn't keep or was going to get rid of.

And Ed Elmore agreed to take the dogs that, you know, rather than just take them to a shelter, he'll take them.

He kept them, I guess, as pets.  He came to another officer that was still working

Page 75

in Falls on the K9s at the time, relayed to the lieutenant at the time, Steve Langan, and said, you know, "I think this dog might make a decent police dog," along those lines.

Our understanding is that Lieutenant -- I guess he's a lieutenant at the time.  I could be wrong on the timeline.  He may have been a corporal -- went to Whitney and said, "Eddie's got this one dog that he thinks may be a good enough cop dog, save the Township some money not to buy a dog."

Lieutenant Whitney, it is my understanding -- he didn't say this to me -- "Oh, that would be great.  Maybe that will work," something along those lines.

And then the next thing you know, that turned into the crime of the century because they were criminals and they were stealing and they were all -- it was a giant conspiracy, another one.  That's my understanding.

Q.    Do you think that Ed Elmore did anything wrong when he took those two dogs?

A.    No.

ATTORNEY HATCHETT:  Objection to the

Page 76

form of the question.

You can answer.

THE WITNESS:  "No" is my answer.

BY ATTORNEY BENFER:

Q.    Then why was he terminated?

A.    He was terminated -- I don't remember the exact details.  There was a few different things on the list.

If I'm not mistaken, that was still Obermayer at the time.

Q.    It was.

A.    Yes.

Q.    They provided you with a report.

A.    Correct.

Q.    Did you take issue with the report that Obermayer provided you with, with regard to this investigation of Mr. Elmore and these dogs that he got from Mr. Kent?

A.    I took -- I had issue with Elmore -- not Elmore.  I'm sorry.  I misspoke -- with Obermayer's -- with one of their reports, yes, where they called me out in a memo.

I took great -- I had a major problem with that with them.  Without warning, they called me out in a memo.  They could have

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 77

given me the heads-up, if they were professional.

But they're not professional, so they didn't.

BY ATTORNEY BENFER:

Q. I'm going to show you -- okay.

So let me ask you this: Who decided -- was Obermayer hired to or -- yeah, was Obermayer hired to investigate Mr. Elmore obtaining these two dogs and how it came to be?

A. I don't recall that.

Q. Okay. Do you have any recollection of Obermayer investigating Mr. Elmore regarding the dogs he got from Bob Kent at all?

A. I don't recall that either.

Q. Okay. I'm going to show you something.

I'm showing you a text message that Mr. Takita received from a supervisor. It says here "From the Supervisor" -- do you see right here?

You may need me to blow this up for you.

It says "From the Supervisor."

Do you see that right here?

Page 78

A. Yeah. Can I see the beginning of it?

Q. Yeah. I'm going to scroll up and then let you read it just so you have a context of what I'm -- there you go. There is the text message from the supervisor.

ATTORNEY HATCHETT: Objection based on the lack of foundation at this point.

However, Mr. Dence, you can answer whatever questions.

THE WITNESS: I read it.

BY ATTORNEY BENFER:

Q. My question is -- I'm trying to find out who the supervisor is. Was the supervisor you?

A. No.

Q. Do you have any idea which supervisor it was?

A. I would be guessing.

ATTORNEY HATCHETT: Don't guess or speculate.

BY ATTORNEY BENFER:

Q. Do you recall having any discussions with your fellow board of supervisors and discussing expanding the investigation into

Page 79

Mr. Elmore?

A. Yes.

Q. And who did you have those discussions with?

A. Jeff Boraski.

Q. Anybody else?

A. Not that I remember.

Q. Was Jeff Boraski, was he encouraging the expansion of the investigation?

A. I don't recall an expansion of the investigation, if that's the correct way of explaining it.

But he was involved, yes.

Q. How was he involved?

A. He was troubled by the fact that they went down to Bob Kent, Chris Clark, and another officer -- I don't remember who -- and accused him of trying to bribe an officer.

We got a formal complaint from Bob Kent or on behalf of Bob Kent about the whole incident, how they came down there in front of his grandkids and accused him of bribing officers and stuff along those lines, which really troubled him.

Q. Troubled Mr. Kent or troubled --

Page 80

A. Mr. Boraski. I'm sorry. I'm sorry. I should have let you finish.

Q. I was just asking: Is it Mr. Boraski or Mr. Kent? I'm sorry.

A. Mr. Boraski was bothered by Mr. Kent's complaint.

Q. Okay. So Mr. Kent made a complaint to the Township about Chris Clark coming down to his place of business and accusing him of what? I'm sorry.

A. Trying to bribe an officer, yes.

Q. Was Chris Clark disciplined for doing that?

A. No.

Q. Why not?

A. I don't know.

Q. Should he have been?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: Probably.

BY ATTORNEY BENFER:

Q. Should Chris Clark have been disciplined for doing that?

ATTORNEY HATCHETT: Same objection. Restate your answer.

Pages 77 to 80

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 81

THE WITNESS: Probably.

BY ATTORNEY BENFER:

Q. Just for clarification, do you know, was there ever any bribery charges brought against Mr. Kent?

A. **Not that I'm aware of.**

Q. Tom Hearn, he's one of the Obermayer attorneys that was investigating Mr. Elmore. Are you aware of that?

A. **Yes.**

Q. Okay. And along with Melissa Atkins; correct?

A. **Yes.**

Q. Okay. And Mr. Hearn, he also has served as a Township-appointed arbitrator in the matter of Police Associate of Falls Township and the Falls Township -- and Falls Township; is that correct?

A. **No, I have no idea.**

Q. You have no idea that he served as an arbitrator on behalf of the Township?

A. **No.**

Q. Mr. Elmore received a Loudermill notice in February of 2024 regarding a few things.

Page 82

Let me ask you, first of all, were you shown that Loudermill notice before it was sent to Mr. Elmore?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: I don't recall.

BY ATTORNEY BENFER:

Q. Okay. Would you typically, as a board member, be shown a copy of a Loudermill notice before it was sent to an officer?

A. **We'd be made aware, not necessarily shown.**

THE WITNESS: Can we take a short break?

ATTORNEY BENFER: Absolutely. Yep.

(Recess taken from 5:26 p.m. to 5:32 p.m.)

(Exhibit No. 166 was previously marked for identification.)

BY ATTORNEY BENFER:

Q. All right. Let's look at Exhibit 166.

Okay. I'm showing you Exhibit 166. And this is from Matthew Takita, and it's to the board, to the rest of the board. Do you see that?

Page 83

A. **No. I can see the document, but I can't read it.**

Q. All right. Let me blow it up for you. Sorry. So sorry. There you go. Can you see that now?

A. **"Attached please find Officer Elmore's response" -- that's all I can read.**

Q. Yep. That's all there is.

A. **Yeah.**

Q. So it says also "Attached please find Officer Elmore's response." And the attachment says "Elmore Loudermill Response.pdf." Okay?

A. **Yes.**

Q. This email was sent on Monday, February 26, at 12:33 p.m. That's a Monday. Does the board typically meet on a Monday?

A. **I don't remember that year if we met on Mondays, but usually on Monday or Tuesday are meeting nights.**

Q. Yeah.

A. **What year was that?**

Q. And this was '24. I'll represent to

Page 84

you I've looked at the board meeting notes, and it appears that there was a board meeting that evening.

A. **Okay. Then, yes.**

Q. Okay. And what time does the executive session usually start prior to the board meeting?

A. **If it was a 7:00 meeting, it probably would have started at 6:00.**

Q. Okay. Just for clarity, so about five and a half hours before the board meeting, the board received Mr. Elmore's written response. Do you see that?

A. **Yes.**

Q. Okay. Do you remember ever discussing with the board Mr. Elmore's Loudermill response?

A. **No.**

Q. Do you remember discussing Mr. Elmore's Loudermill response with anyone?

A. **No.**

Q. What about -- okay. Let me take this down.

/ / /

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 85

(Exhibit No. 168 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.      Showing you Exhibit 168, and I'm going to blow it up for you.  Give me one second.

Okay.  It's an email, and I'm going to show you.  This is Exhibit 168.  It says -- the first email is Ed Elmore to Nelson Whitney, Daniel -- and Daniel Doyle, says, "Subject: Loudermill Response."

Do you see that?

A.      Yes.

Q.      It's Friday, February 23, 2024.  So that's three days before the board meets on Monday.

And it says, "See attached."

And then about five minutes later, Daniel Doyle forwarded that to you.

Do you see that?

A.      I do.

ATTORNEY HATCHETT:  Objection to the form of the question.

Repeat your response.

THE WITNESS:  I do.

Page 86

BY ATTORNEY BENFER:

Q.      Do you recall having a conversation with Daniel Doyle about Mr. Elmore's Loudermill response?

A.      I don't remember the details.

Q.      But you remember having a conversation with him about it?

A.      Not specifically, but I'm sure we did.

ATTORNEY BENFER:  Okay.  All right.  Let me stop sharing that.

(Exhibit No. 92 was previously marked for identification.)

BY ATTORNEY BENFER:

Q.      I'm going to show you Exhibit 92.

Okay.  I'm going to blow it up for you.

Let me know.  I'm going to scroll.

Does this refresh your recollection about the investigation that Obermayer did regarding Mr. Elmore?

A.      Somewhat, I guess.  I don't remember the details, but let's go through a little bit.

Q.      Let's go through it, yeah.  Please let -- okay.

Page 87

So this is to you and the rest of the board and Mr. Takita from Melissa Atkins, Tom Hearn.

Michael Clarke and Lauren Gallagher are cc'd on it.

Were Michael Clarke and Lauren Gallagher your solicitors at the time?

A.      Yes, they are.

Q.      Yeah, okay.  It says, "Investigation into Falls Township Police Department K9 Unit and Donated K9s.  Summary of interviews and investigation."

Do you see that?

A.      Yes.

Q.      The very first sentence says, "Falls Township retained Obermayer Rebmann Maxwell & Hippel to investigate the donation of K9s to the Falls Township Police Department."

Do you have any recollection of any K9s being donated to the Falls Township Police Department?

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  I do not.

/ / /

Page 88

BY ATTORNEY BENFER:

Q.      Okay.  Do you have any idea why they were investigating donations of K9s to the Falls Township Police Department?

A.      I would think this goes back to the previous discussion we had about the dog that Ed Elmore rescued from Bob Kent.

Q.      Right.  And --

A.      It might have been more than one.

Q.      Right.  And Ed Elmore is the one who got the dogs, correct?  They were his dogs.

A.      Correct.

Q.      They weren't donated to the Falls Township Police Department.

A.      No.

Q.      Then it goes on, "On December 15, 2023, Matthew Takita, the Falls Township manager, requested an investigation by this firm to determine if there were any conflicts of interest, policy violations, or ethical issues related to the donation of a dog to the K9 unit by a private citizen directly to the K9 officer without prior Township knowledge."

Do you have any knowledge that this actually happened?

Pages 85 to 88

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

Page 89

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: No.

BY ATTORNEY BENFER:

Q. No. In fact, it never did happen; correct?

A. **Correct.**

Q. So this is the report that they put together, and I'd like to scroll down to Mr. Elmore in particular.

Oh, first of all, Bob Kent was not interviewed by Obermayer.

Did you know that?

A. **No.**

ATTORNEY HATCHETT: Objection to the form.

BY ATTORNEY BENFER:

Q. Do you know that Bob Kent -- that Melissa Atkins previously testified that the board of supervisors instructed Obermayer not to interview Bob Kent?

ATTORNEY HATCHETT: Before you respond, I had an objection following the last question. I asked you to repeat your response. Can you repeat your response,

Page 90

Mr. Dence.

THE WITNESS: My response was "no" to the last question.

ATTORNEY HATCHETT: Thank you.

THE WITNESS: Can you repeat this question.

BY ATTORNEY BENFER:

Q. Yeah. Do you have any knowledge of the fact that Melissa Atkins previously testified that the board of supervisors instructed her not to interview Bob Kent?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: No. I was unaware of that.

BY ATTORNEY BENFER:

Q. Do you recall ever giving Obermayer the instruction not to interview Mr. Kent?

A. **No, I never did that.**

Q. So if we go down to the section -- Officer Elmore, he was interviewed on January 2nd, 2024; okay?

A. **Yes.**

Q. Okay. And then here it says, "Prior incidents involving Ed Elmore."

Page 91

Right? Do you see that?

A. **Yes.**

Q. Then first thing it says is "Theft of Overtime by K9-training."

Do you see that?

A. **Yes.**

Q. He was cleared of that, wasn't he?

A. **He was.**

Q. So why is this in the memo; do you know?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: I do not.

BY ATTORNEY BENFER:

Q. Did you take issue with the fact that this was in the memo?

A. **I'm starting to remember that, yes. I'm getting aggravated just reading it.**

Q. I'm sorry to aggravate you.

A. **That's okay.**

Q. Okay. Yeah. So my understanding is effective overtime for K9 training had been resolved, and he had been found not to have done anything wrong in the spring of 2023, which was a month -- a whole year before this;

Page 92

correct?

ATTORNEY HATCHETT: Objection to the form of the question.

THE WITNESS: That is correct.

BY ATTORNEY BENFER:

Q. And it even talks about Lieutenant Ward's investigation in here.

Do you see that?

A. **I do.**

Q. Okay. And you found issue with Lieutenant Ward's investigation; correct?

A. **Yes.**

Q. The board of supervisors did as a whole; correct?

A. **The board of supervisors at the time, back when that happened, decided to have a third-party investigation. I don't remember if it was unanimous at the time.**

**But it was under the advisory of the solicitor's office, I'm sure, told us that, you know, you should do this. I can't speak for all of the supervisors, so that's why I said that.**

Q. Okay. And then the next thing that they list is "Vote of No Confidence Against

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 4

Page 93

Chief Whitney Led by Officer Elmore."

Q. Do you have any knowledge of Officer Elmore leading the vote of no confidence against Chief Whitney?

A. I believe he was the PAFT president. Other than that, I -- that's all I know.

Q. Right. And as we talked about before, other officers voted in support of the vote of no confidence; correct?

A. I'm sorry. You do that thing where you pause, and then I answer before you finish. I apologize for that.

Yes, all but I think 11 didn't sign it.

Q. All but 11 officers signed on to and voted no confidence against Chief Whitney; is that correct?

A. I believe so.

Q. And then it goes on to Elmore's "insubordination and inappropriate conduct."

A. Yeah.

Q. Do you see this?

A. Yes.

Q. This is back on November 15 about -- talking about "Whitney emailed Corporal Langan

Page 94

to schedule his Loudermill hearing."

And this has to do with, I believe, Mr. Elmore's -- the harassment complaints that were brought against Mr. Elmore.

A. This is from the T-shirt that he wore and stuff like that?

Q. Correct. Yes.

A. Yes, I remember that.

Q. Right? Yes?

A. Yes.

Q. And, again, at the end of the day, that discipline, in the end, was cleared from his record; correct?

A. Yes.

Q. Okay. So those are the prior incidents that they looked at.

And then we have the dog, him getting this dog -- two dogs, I should say.

So then I want to go down to the end of this final memo, "Findings and Recommendations."

Do you see this?

A. I do.

Q. Let's go to the very one for Mr. Elmore. Let's see what they say.

Page 95

Officer Elmore, here it is:

"Considering the comprehensive investigations of instances of Mr. Elmore's misconduct, outlined herein, and other investigation reports, which encompass time theft, dishonesty during multiple inquiries, and evasion of policies under the guise of unawareness, we have discovered alarming findings. Among these is the omission of exculpatory evidence pertinent to the arrest of Lawrence Bell, a matter of grave concern. Officer Elmore's behavior, persistently displayed over the past few years, indicates a lack of potential for reform. Considering the seriousness of these offenses, and in the interest of upholding integrity within the FTPD, they recommend termination."

Do you see that?

A. Yes.

Q. What was Mr. Elmore being terminated for?

A. I don't know.

Q. Who does know?

A. Melissa Atkins, who was weaponized by Nelson Whitney to fire him.

Page 96

Q. So who made the decision to terminate him?

A. The board voted on this in a public meeting.

Q. And why did the board terminate him?

A. They -- it wasn't unanimous. They -- we -- we generally follow the recommendations of our solicitors.

Q. Well, you hadn't followed the -- well, right.

But Melissa Atkins wasn't a solicitor. She was outside labor counsel.

A. Well, she was our labor counsel. I voted no. I didn't vote to fire Ed Elmore, just to be clear. I voted no.

Q. I know. Yeah. Thank you. I know.

Who else? Did anyone else vote no, not to terminate him?

A. I don't believe so.

Q. Okay. And sitting here today, do you have any idea, though -- and I'm not trying to harp on this.

I'm just trying to understand -- what actions did Mr. Elmore -- of Mr. Elmore's resulted in his termination?

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4

A.    At the time, Nelson Whitney had the ear of multiple supervisors, at least three other supervisors, who would talk to him, you know, by way of phone calls or text messages or what-have-you.

So I'm sure that had something to do with it.

And, you know, Melissa Atkins' recommendation. A lot of them, I will tell you, were offended by the T-shirt incident. I wasn't because I'm a union man, and I know that's a standard union tactic, you know.

If I got fired tomorrow from my job, my business manager would have my picture on T-shirts printed up, and everybody on the job would be wearing them.

So, you know, that's just something that -- how they do things.

Q.    Let me ask --

A.    The shirt wasn't offensive --

ATTORNEY HATCHETT:  Go ahead.

BY ATTORNEY BENFER:

Q.    Go ahead. I'm sorry. I didn't -- go ahead.

ATTORNEY HATCHETT:  I wasn't sure if

you --

THE WITNESS:  Yes. The shirt didn't bother me because, you know, from prior, I guess, arbitrations, depositions -- we read so much stuff. I know Ed Elmore took the picture.

So Melissa Atkins' story about how somebody just held the picture up and snapped it or held the phone up with Derek Chauvin's picture and snapped the picture of Nelson Whitney was not true.

BY ATTORNEY BENFER:

Q.    Right. In fact, is it your understanding that Mr. Nelson -- Whitney Nelson actually posed with the photo, to have the photo taken in 2020?

A.    Everybody in that room except for Melissa Atkins knew that's what happened. Yes. It wasn't so much that that bothered them. It was the fact that he wore the shirt to the arbitration, I think, is what bothered some of the board members.

Q.    But wasn't the shirt part of Fred Harran's investigation?

A.    I don't recall that.

Q.    Because if we can go back and look

at Fred Harran's investigation, if that would help you, his report, but Fred Harran investigates that and talks to Ed about that. And there's a harassment complaint. There's no discipline -- that -- and he wore the T-shirt back in December of 2022.

Was there any -- and there was no discipline for that, wearing the T-shirt, in 2022; correct?

A.    Correct.

ATTORNEY HATCHETT:  Objection to the form of the question.

THE WITNESS:  Correct.

BY ATTORNEY BENFER:

Q.    And there was no discipline for him wearing that T-shirt in 2023; correct?

A.    Correct.

Q.    So an entire year had gone by, and then there's terminating him for wearing the T-shirt in 2024?

A.    That's what happened.

Q.    But that's a violation of the collective bargaining agreement.

A.    I'm not saying that's the only reason. I mean, they've outlined all kinds of

stuff in there. You know, I'm not -- I can't speak for the rest of the board. I can only say that I voted no. It didn't bother me.

Yeah, they never got Ed any help -- I mean, listen, I know Ed's on this call. And I don't want to say things that I shouldn't say. I mean, I'm sure it's a sensitive issue.

I know Officer Elmore was involved in a shooting that someone died, and he was on administrative leave for that for a while. And the recommendation was that the Township get him help. I don't think they ever did. They never followed up with anything. They never got him any help to talk to anybody about it. He killed someone.

And I apologize, Ed, because I know you're here, but ...

Q.    Yeah. That was in 2021.

A.    '21, yeah. The timeline is very sketchy to me. Yeah, and, you know, they don't -- there's a lot of stuff they didn't follow up with.

Q.    Who's "they" didn't -- when you say "they," who are you referring to?

A.    Falls Township, us. I mean, I'm

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 101

responsible as much as anybody. I'm only one vote, and I'm only one person.

And I personally have a major hang-up with Nelson Whitney. Nelson Whitney attacked me personally and my family. So he'll never be okay with me.

So maybe I'm harsher than other ones towards him. But I know he has zero support from the board of supervisors or the Falls Township administration at this time.

The ones that may have had his ear or he may have had their ear back then, that's not the case anymore.

As we said earlier in this deposition, if Falls Township could fire him tomorrow, Falls Township would fire him. It would have been done probably a year ago. He's a monster.

Q.    I have one question for you.

A.    Go ahead.

Q.    Do you take issue with the statements that are in this report that were by Obermayer?

A.    Yes.

Q.    Do you agree with any -- do you

Page 102

disagree with some of the statements that are in this report written by Obermayer?

A.    A lot of it, yes.

The same night we demoted Steve Langan, who's mentioned in this report, if I recall correctly, who I also voted no for and -- to demote because it was all a bunch of stuff that they just turned into the crime of the century.

Q.    Do you think that Ed Elmore taking those two dogs from Mr. Kent justified him being terminated for doing that?

A.    Absolutely not.

Q.    Do you think that Mr. Elmore should have been terminated for taking those two dogs from Mr. Kent?

A.    No.

Q.    Can you tell me which supervisors were supportive of terminating Mr. Elmore?

A.    You used the word "supportive." I'm not sure supportive of terminating him. They may have agreed to terminate him. I believe -- I was the only one that voted "no." I don't recall if all five of us were there that night or only four.

Page 103

Q.    Okay. Since the termination, have the board of supervisors discussed this report?

A.    No, not with me.

Q.    As the board of supervisors, have you ever discussed Mr. Elmore's termination since you voted on his termination?

A.    No.

Q.    Okay. Did you know that Mr. Elmore filed a grievance trying to come back to work?

A.    Yes.

Q.    Okay. And was that grievance ever taken up with the board of supervisors?

A.    It was discussed.

Q.    Was there ever any thought about reconsidering and bringing Ed Elmore back to work?

A.    That was never recommended to us.

Q.    Okay. And that recommendation would come from your solicitor or labor counsel?

A.    Correct.

The board was under the assumption that he was going to win that arbitration and get his job back.

But I think there was a mistake on filing the paperwork or something like that

Page 104

which caused him to -- so he didn't lose the arbitration. There was a fatal error made, and that's why it never moved forward.

The board was under the assumption, and our solicitors, if I'm not mistaken, that he was going to get his job back. Everybody thought Ed was going to get his job back.

Q.    Would you bring Ed Elmore back now?

ATTORNEY HATCHETT: Objection to the form of the question.

You may answer.

THE WITNESS: I would.

BY ATTORNEY BENFER:

Q.    Okay.

A.    I never would have fired -- I didn't fire him in the first place.

ATTORNEY BENFER: Okay. Mr. Dence, I may be done.

Can you just give me five minutes to talk and review my notes and then we'll come back?

THE WITNESS: Sure.

ATTORNEY BENFER: Okay. Thank you.

(Recess taken from 5:53 p.m. to 5:56 p.m.)

/ / /

Pages 101 to 104

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 4

Page 105

BY ATTORNEY BENFER:

Q.      Mr. Dence, I just have one question for you.

A.      Yes.

Q.      Do you fear retaliation by Chief Whitney, personally?

A.      I did for a while.  I was honestly afraid to get pulled over in my own Township for a while.

But I think the rest of the police force, even some of the ones that he had, you know, believing in his crap, I believe were on the other side of the curve now.

And they all realized that, you know, it was a mistake.  I don't -- not anymore, no.  I'm not afraid of him.  I did fear retaliation at one point, but --

Q.      But there was a point --

A.      Oh, yeah.

Q.      -- over the last couple years that you feared retaliation by Mr. Whitney --

A.      Oh, yeah.  I was afraid to get pulled over in my own town.  I told my wife and son to be careful driving in Falls Township, because -- yes, absolutely.  Personally, what

Page 106

he does to the people that don't toe the line or cross him -- like I said before, he's a monster.

ATTORNEY BENFER:  That's all I have. Thank you.

THE WITNESS:  Okay.  Thank you.

ATTORNEY HATCHETT:  Can I have a digital copy of the transcript, full and mini, with any exhibits.

Thank you.  Have a great day.

(Deposition concluded at 5:57 p.m.)

Page 107

C E R T I F I C A T E

I, Douglas J. Zweizig, a Registered Diplomate Reporter, Certified Realtime Reporter, and PA Notary Public, do hereby certify that prior to the commencement of the examination, JEFFRY DENCE was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER certify that I am neither a relative of nor employee nor attorney nor counsel for any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

DATED: May 19, 2026
Hudson Court Reporting

_____

Douglas J. Zweizig, RDR, CRR, FCRR, CA-CSR

Pages 105 to 107

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 4