Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD ELMORE,      :
        Plaintiff,  :
                    :
    vs.      : No. 2:25-cv-02076-JHS
                    :
FALLS TOWNSHIP      :
        Defendant.  :

- - -

Tuesday, May 5, 2026

- - -

Deposition of MATTHEW TAKITA, taken pursuant to notice, at the law offices of Marshall Dennehey P.C., 2000 Market Street, Philadelphia, Pennsylvania, before Michele L. Murphy, a Registered Professional Reporter and Notary Public, on the above date, beginning at approximately 9:59 a.m.

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

---

Page 2

A P P E A R A N C E S:

HARDWICK BENFER, LLC
By:  TIFFANIE C. BENFER, ESQUIRE
    2003 S. Easton Rd.
    Doylestown, PA  18901
    215-230-1912
    TBenfer@hardwickbenfer.com
    Representing the Plaintiff

MARSHALL DENNEHEY, P.C.
By:  JAHLEE HATCHETT, ESQUIRE
    2000 Market Street, Suite 2300
    Philadelphia, PA  19103
    215-575-2600
    JJHatchett@mdwcg.com
    Representing the Defendant

ALSO PRESENT:

Edward Elmore

- - -

---

Page 3

I N D E X

WITNESS                 PAGE
Matthew Takita
    By Ms. Benfer           7


E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 100 | August 19, 2021 e-mail string to McGowan from Clark | 26 |
| 2 | March 29, 2022 memo to Whitney from Ward | 36 |
| 176 | April 10, 2022 memo to Chief Martin McDonough from Ward | 40 |
| 150 | October 4, 2022 e-mail to Takita from Dippolito | 49 |
| 7 | Text message between Dippolito and Elmore | 49 |
| 119 | Plaintiff's Requests for Admissions | 55 |
| 120 | Defendant's Responses to Plaintiff's Requests for Admissions | 55 |
| 112 | Falls Township Police Department Policy No. 2.8.2 | 59 |
| 9 | October 27, 2022 e-mail to Takita and Dippolito from Elmore | 60 |
| 10 | November 4, 2022 e-mail string | 62 |

---

Page 4

INDEX (Continued):

E X H I B I T S

| No. | Description | Page |
|-----|-------------|------|
| 11 | November 7, 2022 e-mail to Elmore from Ward | 71 |
| 122 | November 9, 2022 memo to Takita from Whitney | 73 |
| 13 | November 21, 2022 memo to Takita from Ward | 77 |
| 14 | November 22, 2022 memo to Atkins from Ward | 86 |
| 22 | December 7, 2022 memo to Takita, Dippolito, and Dence from Elmore | 91 |
| 16 | December 2, 2022 memo to Elmore from Whitney | 94 |
| 32 | December 16, 2022 e-mail to Harran from Gallagher | 101 |
| 42 | April 7, 2023 e-mail to Elmore from Takita | 106 |
| 45 | April 26, 2023 memo to Takita from Harran | 108 |
| 49 | May 3, 2023 e-mail to Takita, Dippolito and Dence from Elmore | 109 |
| 47 | April 27, 2023 memo to corporals, detectives and officers from Whitney | 117 |
| 51 | May 15, 2023 letter to Elmore from Takita | 123 |
| 53 | May 23, 2023 e-mail to Takita from Harran | 124 |

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 5

Page 5

INDEX (Continued):

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 54 | May 24, 2023 memo to Atkins from Harran | 125 |
| 55 | June 8, 2023 e-mail to Takita from Dence | 126 |
| 57 | June 14, 2023 memo to Whitney from Elmore | 128 |
| 58 | June 15, 2023 to Elmore from Takita | 129 |
| 140 | June 12, 2023 memo to Board of Supervisors form Hearn and Atkins | 131 |
| 64 | August 8, 2023 e-mail to Elmore from Takita | 141 |
| 76 | Falls Township post about Officer Matkowski | 163 |
| 155 | December 5, 2023 e-mail string | 164 |
| 75 | 12/8/2023 letter from Bob Kent | 167 |
| 82 | Text message from Takita | 171 |
| 93 | February 28, 2024 letter to Elmore from Takita | 180 |
| 92 | Obermayer Final Investigative Report | 182 |
| 89 | February 20, 2024 memo to Elmore from Whitney | 193 |
| 148 | Answer and New Matter of Falls Township | 196 |

Page 6

INDEX (Continued):

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 152 | January 18, 2024 memo to Takita from Shute | 198 |
| 115 | Defense 983 | 204 |

- - -

Page 7

(It is hereby stipulated and agreed by and between counsel that reading, signing, sealing, filing and certification are waived; and that all objections, except as to the form of questions, be reserved until the time of trial.)

- - -

...MATTHEW TAKITA, after having been duly sworn, was examined and testified as follows:

- - -

BY MS. BENFER:

Q.   Good morning.  Good morning, Mr. Takita.  I previously introduced myself, Tiffanie Benfer, and I represent the plaintiff in this matter, Mr. Edward Elmore.

Before we get started, I want to just give you some instructions on the ground rules.  Our goal here is to make the court reporter's job as easy as possible.  So the very first instruction I'm going to ask is, I'm going to be asking you questions and you're going to be answering those questions, and throughout the day there's going to be

Page 8

times where you probably are going to anticipate what I'm asking, but if you could just hold off until I finish my question before answering so the court reporter can accurately reflect the record.

Can we agree to that?

A.   Yes.

Q.   And we'll both do it, and we're going to both have to stop ourselves.  Okay?

A.   Yes.

Q.   Okay.  Great.

If at any time throughout the day there probably will be objections and in most cases despite the objections, you will be answering the questions.  Okay?

A.   Okay.

Q.   At any point if you need a break, this is not a marathon, let me know.  We'll take a break.  Okay?  The only thing I ask is if the question is pending, you answer the question before we take that break.

A.   Okay.

Q.   I also would ask -- I'm going to ask you questions, and if you don't understand the question I'm asking, say so.  I'm not

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 9

here to trick you. I want the record clear. So I will rephrase the question, make the question so that you understand it and the record is accurately reflected.

Can we agree to that?

A. Yes.

Q. I will also ask, though, that can we agree that if you answer the question, I'm going to assume that you understood the question that I asked?

A. Yes.

Q. Can we agree to that?

A. Yes.

Q. Is there anything that's preventing you from testifying truthfully here today?

A. No.

Q. Okay. Have you ever had your deposition taken before?

A. Yes.

Q. Okay. How many times?

A. Three or four maybe.

Q. Okay. And were they in civil litigation matters?

A. Arbitrations and things like that, yes.

Page 10

Q. All right. And when was the most recent time you took a deposition?

A. Within the last six months.

Q. And was it in the capacity as an employee of Falls Township?

A. Yes.

MR. HATCHETT: Mr. Takita, I'm going to ask if you can keep your voice up just for the stenographer.

THE WITNESS: Okay. Sorry.

BY MS. BENFER:

Q. Okay. In preparation for your deposition today, did you review any records?

A. No.

Q. Have you ever reviewed the Complaint or the Amended Complaint that Mr. Elmore filed against the Township?

A. I got a copy of it. I mean, I saw it. I mean, I didn't review it at length or anything.

Q. Okay. I'd like to start with a little bit of information about your background. What is your education post-high school?

A. I have a Bachelor of Science in

Page 11

Architecture.

Q. And could you give me your work history since you got your Bachelor's of Science in Architecture?

A. I worked for Bensalem Township as their director of code enforcement for about 27 years. I opened up my own private architectural practice, and then Falls reached out to me, and I've been working at Falls for roughly the past five years. I initially started as their director of code enforcement and then I stepped in as the township manager.

Q. When did you become the township manager?

A. I'd say about four years ago. It was roughly like almost a year after I had gotten there. The township manager at the time left and then I took the position.

Q. Were you the township manager in 2022?

A. Yes.

Q. And were you the township manager in 2023?

A. Yes.

Page 12

Q. And what about were you the township manager in 2024?

A. Yes.

Q. Okay. And are you currently the township manager?

A. No.

Q. And when did you no longer become the township manager?

A. It was just a few months. It was Labor Day of 2025.

Q. And what is your current position?

A. Director of code enforcement and zoning administrator.

Q. And why did you go from township manager to the current position you hold?

A. They found a real township manager basically.

Q. Were you the interim township manager?

A. Yes. I mean, my title -- excuse me. But my title was township manager, but I was not, in my mind, there permanently.

Q. So when you were hired as the township manager, was the objective for you to be the interim and eventually they would

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 13

find a full-time --

A. Yes.

Q. -- township manager?

A. Yes.

Q. Have you ever seen the organizational chart at Falls Township?

A. We don't, like, have one.

Q. Who does the township manager report to?

A. I report to -- well, at the time, I reported to the Board of Supervisors.

Q. And who reported to -- while you were the township manager, who reported to you?

A. All the department heads.

Q. Did that include the chief of police?

A. Yes.

Q. Did you have a regular standing meeting with the Board of Supervisors?

A. Yes.

Q. When was that?

A. They would have -- well, we had a regular Board meeting the fourth Monday of every month and there was typically an

Page 14

executive session before that.

Q. And other than the executive session of the Board meeting, did you have a regular meeting with the Board?

A. Not with the whole Board. Just with chairman and the attorneys. It was a staff meeting.

Q. And how often did you meet with the chairman and the attorneys?

A. They were scheduled for every Monday, but oftentimes just due to lack of anything to talk about, we cancelled them.

Q. And when you say "attorneys," was that the solicitor or was that labor counsel?

A. Just the Township general counsel, and then we would have sometimes the Township engineer. We would -- those staff meetings were to discuss day-to-day stuff.

Q. So I just want to clarify. The attorney that met with you in these meetings, was it the solicitor?

A. Correct. Yes.

Q. Before you became township manager, did you ever receive any training in HR work?

A. No.

Page 15

Q. Have you ever received any training on how to conduct an investigation?

A. No.

Q. Have you ever received any training prior to becoming the township manager, any training on discrimination in the workplace?

MR. HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: When we would have the -- I mean, Bensalem, I think one time we had like a harassment seminar kind of thing, but otherwise no formal training, I would say.

BY MS. BENFER:

Q. During your tenure as the township manager, did you ever conduct any investigations of discrimination at the Township?

A. Me personally? No. It was -- stuff like that would be forwarded to labor counsel.

Q. Does Falls Township have an HR department?

A. We have an HR administrator, yes.

Page 16

Q. And who was -- let me start with during your tenure as the township manager, who was that person?

A. Sherry McGovern.

Q. And who did Sherry McGovern answer to?

A. She would answer to the township manager.

Q. During your tenure as township manager, was there an individual by the name of Dan Doyle working in the HR department?

A. Yes.

Q. And what was his position?

A. He was sort of HR, sort of general administrative oversight, but I believe his primary role was to work with Sherry.

Q. Did Sherry answer to Dan Doyle, that you know of?

A. Yeah. That was, I guess, a bone of contention, who did she answer to. So for the most part, she would answer to the township manager.

Q. And who did Dan Doyle answer to?

A. Township manager.

Q. Why was Dan Doyle hired?

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 17

A. They wanted somebody to help out with HR issues.

Q. Was the Township having HR issues?

A. Yeah. There was a lot of grievances in the Police Department, so they were trying to get somebody to help Sherry out.

Q. Was there an increase in the number of grievances in the Police Department?

A. Yeah, there was an increase. Yes, there was.

Q. Did you do any investigation as to why there was an increase in the grievances in the Police Department?

A. Well, there was an investigation done, not by me but by a separate group, looking into the overall administration of the Police Department.

Q. And who conducted that investigation?

A. It was a separate third-party group. I don't recall the name offhand.

Q. McGowan by chance, does that sound familiar?

A. McGowan does sound familiar, yeah. There were two separate ones. So, yeah, one

Page 18

of them was McGowan. I mean, if you got a document, I can confirm whether or not...

Q. Okay. So let me just get this clear. There were two investigations conducted into the increase in grievances; is that correct?

A. Yes. That was probably by -- well, let me qualify. Sorry. It wasn't just because of grievances, but it was prompted by the insurance company because we were -- so they were saying we should have somebody take a look at how we're doing things from a personnel issue or standpoint and see where we could either improve or change or things like that. So as a result of that, we hired a third party -- two third-party groups to take a look at how we were functioning as a whole.

Q. Okay. And were those two organizations that were hired, were they hired by the Board of Supervisors?

A. Yes.

Q. And was Dan Doyle part of one of those two organizations that was hired to investigate?

Page 19

A. No. And this was in time-wise, this is like down the road. It wasn't like while things were really in the throes -- you know, like when there are all of those complaints. There wasn't -- they weren't brought in at that point in time.

Q. That was my next question.

A. Sorry.

Q. No. It's okay.

So when were these investigations conducted?

A. I mean, we're going back a few years, but we had like, you know, a large batch of grievances. We were getting through those, and as those were winding down -- let me try to think. I would say they were coming in as I was being -- they were there looking for somebody else. So within the past two years.

Q. Okay. Past two years?

A. Yeah. About two years ago, I'd say.

Q. So let me -- maybe this will help with the benchmark. Mr. Elmore was terminated in February of 2024. Did those investigations take place after Mr. Elmore

Page 20

was terminated or before?

A. It was after. After.

Q. Sherry McGovern, correct? Is that the correct last name?

A. Yes.

Q. And does Sherry McGovern have any authority to do any discipline?

A. No.

Q. As the township manager, what was your job role, if any, in disciplining police officers?

A. Basically I was more or less a conduit. I would receive whatever -- so you'd have your grievance process. So after Step I, if it was denied, it would come to me. I would hear that out and then either agree or deny the claim. After that, then it would either go to arbitration -- because if discipline were to move forward from that, that was a decision by the Board of Supervisors. Most, if any of that, would go to labor counsel, and then labor counsel would advise the Supervisors.

Q. Let's take a step back, literally in Step I. So if a police officer is bringing a

Pages 17 to 20

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 21

grievance, they've been disciplined and they've been disciplined by the chief of police and they want to file a grievance, they file a Step I grievance; is that correct?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer.

A. Yes.

Q. Okay. And what if the individual that disciplined the officer was the chief of police himself; how is that Step I grievance then handled?

A. I don't know.

Q. Are you aware that in the Collective Bargaining Agreement the township manager or the chief of police is responsible for determining discipline and resolving a disciplinary issue within 90 days?

A. Yes. I'm familiar with the timeframe, yes.

Q. Are you familiar with Loudermill notices?

A. Yes.

Page 22

Q. As the township manager, what was your role with regard to Loudermill notices?

A. I'd receive a Loudermill notice and then we'd have to schedule a hearing, and during the hearing, my understanding was that basically it was one last opportunity for them to, you know, state their case and convince us that the discipline wasn't warranted. And then after that hearing, we would render a decision.

Q. After the Loudermill hearing is held, who issues the decision?

A. It would be -- the Board ultimately makes the determination. We would confer with labor counsel, and then the Board would decide what the outcome would be.

Q. And who presents -- let me back up. First there's a Loudermill hearing, then there's a decision after the Loudermill hearing, correct?

A. Yes.

Q. And that decision is then taken to the Board of Supervisors, correct?

A. Yes.

Q. And who takes the decision as the

Page 23

decision of the Loudermill to the Board?

A. Like physically takes it to them? I mean, it could be either labor counsel or depending on what it would be -- I'm just speaking globally right now. If it was something minor, it could be presented by me but, again, you know, under the advice of labor counsel.

Q. So were there times where you would present to the Board of Supervisors recommendations on how an officer should be disciplined?

A. An officer? No. Anything with the Police Department I always referred to labor, and we'd get whatever they had. So, you know, as far as me, it would be something, say, for like an AFSCME employee, clerical staff, where I would present something myself, but anything with the Police Department, I really relied on the labor counsel's advice.

Q. So any recommendations regarding discipline of a police officer that was presented to the Board of Supervisors was done by labor counsel?

Page 24

A. Yeah, either in the form of a report or if it was personally.

Q. At any point during your tenure as township manager, did the chief of police have to get permission from you in order to issue a Loudermill notice?

A. I don't recall him asking permission to issue a Loudermill notice, because at that point, we would have been in the throes of whatever discipline there was and we would be getting direction from labor counsel. So, I mean, no. I don't recall him ever asking me to issue a Loudermill.

Q. At any point was the chief of police restricted in his ability to issue Loudermill notices during your tenure?

A. There was a memo that went out to him early on about how discipline should proceed and it should proceed through the manager's office as opposed to him doing it directly. I don't recall the exact substance of the memo, but basically it was, you know, he needed to follow some chain of command instead of just directly disciplining.

Q. So just for clarification, did the

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 25

chief of police have to provide you with a copy of the Loudermill notice to review before the Loudermill notice was issued to a police officer?

A. The Loudermill notices were -- I would maybe receive a copy of it, but it was vetted by the labor counsel.

Q. So even Loudermill notices were vetted by labor counsel?

A. Yes. I mean, I was not in a position to review those.

Q. Nelson Whitney was placed on administrative leave in April of 2022. Do you recall that?

A. Yes.

Q. And while he was out on administrative leave, Lieutenant Ward was the acting chief; is that correct?

A. Yes.

Q. And as acting chief, Lieutenant Ward had the full authority as the chief of police; is that correct?

A. Correct.

Q. As the township manager, did you have the authority to request an

Page 26

investigation be conducted of any complaint made by a police officer regarding discrimination?

A. Yes.

Q. And did you ever do that?

A. Yeah. I mean, if we received a complaint about discrimination, I would always send it up to labor counsel and ask, you know, what, if anything, needed to be done with that.

Q. I'm going to look at Exhibit-100, which I believe is in this binder right here (indicating).

MR. HATCHETT: Objection. Standing objection for any questions to this witness regarding this document.

MS. BENFER: Okay.

BY MS. BENFER:

Q. My very first question is, have you ever seen this e-mail string? And it has some additional documents attached to the e-mails that were also included.

A. I have not seen this.

MR. HATCHETT: Mr. Takita, I'm sorry. For a moment I just want to

Page 27

identify it. I mean, this is a series of documents marked by the plaintiffs Plaintiff Exhibit-100. The first page appears to be an e-mail correspondence dated August 19, 2021. The documents are not Bates stamped.

MS. BENFER: For the record, they were Bates stamped when we saved them, but we were unable to print them given the way they were produced. We were having trouble with the Bates stamps on them.

BY MS. BENFER:

Q. Okay. So my question, though, actually is more specifically, you'll see that it was a James McGowan at the top of the very first page. Does that name ring a bell to you?

A. It sounds familiar, yes.

Q. And do you have any idea why Christopher Clark, who I believe is -- says at the bottom of this page here, he was a sergeant at the time -- would be interacting with Mr. McGowan with regard to anything regarding Falls Township?

Page 28

A. No. No.

Q. Okay. Did Mr. Clark ever inform you that he reached out to have some -- receive some consultation regarding rating instruments?

A. No.

Q. All right. You can put that aside. Thank you.

Do you have any knowledge about the hiring process of police officers at Falls Township?

A. A basic understanding, yes.

Q. And what's your basic understanding?

A. They put out an advertisement. You get the candidates. Now, it could either be through the Consortium, the County Consortium test. They pull candidates and -- well, I guess now they have their own test.

Based on the scores, they bring in a certain number of people, and then there is an oral -- I believe there's an oral interview, and then after that, once that part is done, we had set up a process where me, the assistant township manager at the time, one of -- the solicitor, just the

Pages 25 to 28

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 29

general solicitor, and then Sherry would sit, and we would -- I don't want to say interview, but we would at least talk to the candidates who were potential candidates, just to kind of get a feel for them. And then we would write a recommendation as to whether or not we thought they were good or not. And then that would go to the chief, and the chief would have like a final interview with the candidates, and then they'd go before the Board to be hired.

Q. And the process you just described, was that the process that was followed throughout your tenure as the manager?

A. The initial -- for the most part, because that last -- that one step before the chief where we sat and talked with the candidate, that kind of happened as -- you know, while I was there. It wasn't something that was in place when I got the job. It was something that was created while I was there, so...

Q. And you said the process went from the County Consortium to now we have our own test. Can you explain to me, A, why -- well,

Page 30

let's start with why did the process change?

A. So it changed to the extent that we have another -- there was another opportunity to pull candidates, because the County Consortium test only runs at certain times, and a lot of other -- my understanding is other municipalities are running their own test and they can grab possible candidates at any time of the year.

So with Falls Township, the number of police officers is low, so they wanted to try to have an opportunity to get more candidates in. So there was -- that's basically the reason.

Q. When you say the numbers are low, does Falls Township need to hire more police officers?

A. Yeah. There's some -- there is some, you know, minimum staffing requirement and we're right there. So if somebody calls out sick or something like that, it could be problematic.

Q. Has Falls Township had trouble hiring police officers?

A. Yeah. I'd say yes.

Page 31

Q. Do you know why?

A. No. I mean -- no. I can't -- I could guess, but I don't know why, no.

Q. Do they pay a competitive salary to other communities around them?

A. Yes.

Q. Who runs the process, the test, the interviews, and the scoring?

A. So with the county test, my understanding it's just -- the County Consortium test is all done by the county. So Falls has nothing to do with that part of it. But then when it gets to the oral review, I believe that's Township police officers. They're picked to sit on that board, and then they conduct their interviews and their score, you know. And those scores are done by, my understanding -- I believe it is Falls Township that does that scoring, yeah. And then when it was our -- you know, when it was just me and -- this is the township manager and solicitor, that group, that was just us.

Q. Does Chris Clark have any role in that process?

Page 32

A. I believe he does.

Q. During your tenure, did he?

A. I believe so, yes.

Q. On August 29th, 2021, Officer Tanner was involved in a DUI. Are you aware of that?

A. Yes.

Q. And as a result, he caused an accident. Are you aware of that?

A. Yes. Yeah.

Q. And was he disciplined for this?

MR. HATCHETT: Objection to the form of the question. I have a standing --

MS. BENFER: I'll rephrase it. How about that?

BY MS. BENFER:

Q. Was Officer Tanner disciplined for receiving a DUI?

MR. HATCHETT: Objection to the form of the question. I have a standing objection for this line of questioning. However, you can answer.

THE WITNESS: Yeah. I mean, yes, he was.

Pages 29 to 32

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 33

BY MS. BENFER:

Q. And what was the discipline that he received?

A. He was put on -- I mean, I think we tried to terminate him. In fact, yeah, because we had gone through an arbitration. We had to go through an arbitration and everything like that. We had hearings. And then I believe he was reinstated, so I think he was terminated.

Q. Was the decision to terminate him the Board's decision?

A. Yes.

Q. In February 2022, did you have any discussions with Chief Whitney about any conversations he had with Officer Elmore?

A. I'm sorry. Say that again.

Q. In February 2022, did you have any discussions with Whitney about any conversations he had with Mr. Elmore?

A. I know there was an issue with some kind of a grievance hearing, and Officer Elmore showed up, and he was upset with, you know, the shirt that Officer Elmore was wearing. There was a discussion about that.

Page 34

I'm not sure if that was that timeframe that you're referring to.

Q. I'll represent to you that it's my understanding that happened in December.

A. Okay.

Q. November, December timeframe. So I'm looking at the early spring of 2022.

A. I may have. I'm not going to just count that I did.

Q. Let me ask you this: Do you recall having any conversations with Whitney about the K-9 Unit --

A. Yes.

Q. -- and --

A. Sorry.

Q. -- and their scheduled training session on February 25th of 2022?

A. Yes, I believe I did. That was -- there was some concerns with the scheduled training and how long they were there and then what was the time they put in on their time sheets or whatever.

Q. The time sheets, my understanding -- and correct me if I'm wrong -- is this correct that the time sheets -- the officers

Page 35

fill out the time sheets and then Falls Township then turned those Township time sheets over to the county to get reimbursed?

A. Yes, that's my understanding.

Q. So the officers themselves didn't turn the actual time sheets into the county, that was something that went through Falls Township?

A. I believe so, yes.

Q. Well, do you recall now -- let's go back. Do you recall having any conversations with Chief Whitney about the events on February 25th, 2022 in that timeframe?

A. Yes.

Q. And what do you recall discussing with him?

A. Basically that the -- he went over the concern he had with the time that they put in based on what they actually had done and he wanted to look into what actually had occurred, because he felt like there was some, you know, theft of service or -- theft of time for that.

Q. Did he inform you that he was going to ask Lieutenant Ward to conduct an

Page 36

investigation?

A. He may have. I -- yeah. He may have.

Q. Is Lieutenant Ward someone who would typically conduct investigations of police officers?

A. I mean, in the time that I was there, he did do investigations.

Q. What type of investigations during your time did he conduct?

A. Like when it was Tanner, for example, when that incident happened with him, he had a meeting with him. They have like an interview. They go through and they ask them questions. I believe it's recorded and everything like that too.

Q. Do you remember was Lieutenant Ward asked to investigate Officer Crosier?

A. I believe he did, yes.

Q. I'm going to ask you to look at Exhibit-2, please. It might be this one right here (indicating).

MR. HATCHETT: For the record, this document is Bates stamped Elmore 5.

THE WITNESS: (Witness

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 37

complies.)

BY MS. BENFER:

Q. Mr. Takita, have you ever seen this document before?

MR. HATCHETT: Are you done looking at the document?

THE WITNESS: Yes, I am.

Yes, I have.

BY MS. BENFER:

Q. You have, okay. When was the first time you saw this document?

A. It actually may have been during an arbitration. I don't recall getting this like formally as a submission to me as the township manager.

Q. So you have no recollection of this report being submitted to you when you served as the township manager?

A. Correct. Yeah. Not directly to me, but, again, I may have saw it probably like paperwork for depositions or something like that.

Q. Okay. Do you recall either in March of 2022 or April of 2022 receiving any Loudermill notice for Mr. Elmore?

Page 38

A. Of '22?

Q. 2022, spring of 2022. And let me -- I'll clarify it. Regarding the K-9 -- use of time on the K-9 day of February 25th of 2022.

A. I don't recall. I do recall getting a Loudermill. I don't recall if it was for that or for something different. But, I mean, if you have --

Q. I'll represent to you I do not have any Loudermill notice that was dated in the spring of 2022 for Mr. Elmore, and I was just asking if you recall if you ever saw one.

A. I don't recall. I mean, I recall getting Loudermill notices, but I don't recall that one specifically.

Q. Okay. Do you recall any conversations about the memo you're looking at that's marked Exhibit-2 with anyone in the Township?

A. Yes.

Q. And who did you discuss that memo with?

A. With Rich. He's the assistant township manager at the time.

Q. So you and Rich had a conversation

Page 39

about this memo?

A. Yes.

Q. At the time it was written or subsequently?

A. It would have been sometime after it was written.

Q. And what did you and Rich discuss about the memo?

MR. HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: Just about whether or not, you know, that this had any -- what they did, you know, if there was any real merit to it.

BY MS. BENFER:

Q. Any real merit to what?

A. To the issues that had taken place.

Q. And what was the decision between you and Rich?

A. We didn't -- we basically said let's see how it plays out, because we are not the decision-makers on this.

Q. Did you find any problems with this investigation?

Page 40

A. No. I mean, to the extent that I understand that kind of stuff, no.

Q. According to this memo, Lieutenant Ward is recommending that Mr. Elmore be terminated. Were you aware of that at the time in March of 2022?

A. I recall that, yeah. My recall, I think he wanted all of them terminated.

Q. And what became of that?

A. The discipline, it was dismissed.

Q. Can you turn to Exhibit-176, please.

A. (Witness complies.)

Q. Take a moment and then I'll ask you a question about it.

MR. HATCHETT: For the record, the document is identified with Bates stamp Defense ESI 1333.

(Brief pause.)

THE WITNESS: Okay.

BY MS. BENFER:

Q. Have you ever seen this memo before?

A. No.

Q. So did you ever have any knowledge that Lieutenant Ward reached out to Chris Martin at the Bucks County Detectives --

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 41

**A.  I don't recall that happening.**

MR. HATCHETT:  I have an objection.  I'm sorry.  You answered before I could place the objection.

MS. BENFER:  And I didn't finish my question.

THE WITNESS:  Oh, sorry.

MR. HATCHETT:  I'll just retract the objection for now.  The question wasn't finished.

I don't know if you were given the instruction initially.  I know you've been deposed in the past, but in order to have an accurate record, we just have to allow one another to talk and fully -- counsel has to fully ask her question before you can provide your answer, and we'll allow you to fully provide your answer.  Okay?

THE WITNESS:  Okay.

MR. HATCHETT:  Thank you, Mr. Takita.

BY MS. BENFER:

Q.  We discussed that at the beginning, didn't we?  I told you it would get

Page 42

difficult, but we'll work through it.

Okay.  Did you have any knowledge that Lieutenant Ward reached out to Chief Martin McDonough, I believe, at Bucks County Detectives regarding Mr. Elmore?

MR. HATCHETT:  Objection to the form of the question.

You can respond.

THE WITNESS:  No, I don't recall that.

BY MS. BENFER:

Q.  So you have no knowledge that Lieutenant Ward was seeking criminal charges against Mr. Elmore for the overtime/time submission on February 25th of 2022?

MR. HATCHETT:  Objection to the form of the question.

You may respond.

THE WITNESS:  No, I don't recall that.

BY MS. BENFER:

Q.  On April 26th Chief Whitney was placed on administrative leave.  Are you aware of that?

**A.  Yes.**

Page 43

Q.  And why was he placed on administrative leave?

**A.  There was a vote of no confidence that was issued by the Department.**

Q.  And was an investigation done?

**A.  Yes.**

Q.  And that investigation, was that done by the law firm of Campbell Durrant?

**A.  Yes.**

Q.  What was Campbell Durrant's role, if any, with the Township at the time?  Were they their labor counsel?  Were they an outside third-party counsel?

**A.  They were outside third party.**

Q.  In April of 2022, who was the Township's labor counsel?

**A.  Obermayer.**

Q.  And Obermayer is no longer their labor counsel?

**A.  Correct.**

Q.  Why is that?

MR. HATCHETT:  Objection to the form of the question.

You can respond.

THE WITNESS:  They shifted over

Page 44

to Campbell Durrant.

BY MS. BENFER:

Q.  And so Campbell Durrant is now the labor counsel for the Township?

**A.  Yes.**

Q.  Do you recall when that occurred?

**A.  Not specifically, no.  It would have been -- sorry.  So at least some timeframe, it was before they got the new manager.  So I'd say maybe within a year before I left that position.**

Q.  As a result of the Campbell Durrant investigation, were there any steps taken in the Police Department to address anything with regard to the complaints that were in the original vote of no confidence?

**A.  I don't recall anything -- any changes being made to the Department.**

Q.  The investigation records officers reporting low morale at the Township at the time, in summer of 2022.  Do you recall that?

**A.  Yes.**

Q.  Was there anything done to address the low morale in the Police Department as a result of the investigation?

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 45

MR. HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: No. I mean, that I can -- no.

BY MS. BENFER:

Q. The report cites that Mr. Elmore reported that officers were afraid of being on an alleged list that the chief had.

Do you have any knowledge of that?

MR. HATCHETT: Objection to the form of the question.

You may respond.

THE WITNESS: On a what list?

BY MS. BENFER:

Q. On a list.

A. On a list?

Q. Yeah.

A. I don't know anything specifically about a list, but no -- I mean, there was a general -- just my understanding of it was that there was a general sort of concern that they would become -- looked at a little more closely for discipline.

Q. Let me just go back. So are you

Page 46

saying that there were officers that had concern that they would be looked at more closely regarding discipline?

A. There was a fear of discipline. I think that's a better statement.

Q. And who feared the discipline?

A. I couldn't say specifically who. It was just the general in talking -- this is, you know, somebody talking to me from hearing from somebody else. So it's, you know, third, fourth hand, but just generally there was concern that -- the term I heard was "walking on egg shells" because of fear of discipline.

Q. As the township manager, did you take any steps to address any of these fears?

A. I mean, no, because there was no -- nothing was happening. I mean, there wasn't any active discipline, just concern.

Q. Who were they concerned that the discipline would come from?

MR. HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: I mean, it would

Page 47

be from the chief.

BY MS. BENFER:

Q. So were there officers concerned or expressing concern that they were walking on egg shells because they feared being disciplined by the chief?

A. Sorry. Ask -- say that again.

Q. Yeah. Is it your understanding that there were officers that felt like they were walking on egg shells because they feared being disciplined by the chief?

A. Yes.

Q. You previously talked about that memo with regard to Lieutenant Ward. He investigated Lundquist, Fisher, and Elmore for allegedly stealing time on February 25th, 2022. Do you remember that memo?

A. Yes.

Q. Did you ever ask Lieutenant Ward if any other officers have been accused of stealing time?

A. No.

Q. Did you ever ask Chief Whitney if any other officers have ever been accused of stealing time?

Page 48

A. No. I don't recall.

Q. So sitting here today, you have no knowledge of any other officers being disciplined for stealing time?

MR. HATCHETT: Objection to the form of the question.

You may respond.

THE WITNESS: No.

BY MS. BENFER:

Q. I'm going to skip ahead to the fall of 2022. Okay?

Are you aware that Mr. Elmore was injured on duty and suffered a torn bicep tendon in September of 2022?

A. I mean, I know he was out on IOD.

Q. Okay. And when you're out on IOD, was he -- you said he was out on IOD. Was he working light duty?

A. I don't remember. I'm sorry.

Q. Can you be on IOD and work light duty?

A. Yeah, I believe you can. I mean, if we get a doctor's note that says you're capable of doing certain -- you know, how much work you can do, yes.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 49

MR. HATCHETT: Mr. Takita, I'll just remind you, please don't guess or speculate. If you know something, please tell us, but otherwise don't guess or speculate.

BY MS. BENFER:

Q. I'm going to have you look at Exhibit-150. Just one page.

A. (Witness complies.)

MR. HATCHETT: For the record, this document is Bates stamped Defense ESI 6714.

BY MS. BENFER:

Q. Mr. Takita, this was a Teams meeting notice. It was sent to you. It appears it was sent by Mr. Dippolito, and the subject was Elmore. Do you see that?

A. Yes.

Q. Okay. Keep that in mind. Okay? And I'm going to have you then switch and look at Exhibit-7 for me, please. And I'm going to ask you questions before we get to the exhibit, so hang tight for a second.

First of all, I'm going to ask about the document you were just looking at, the

Page 50

Teams meeting invitation. Do you recall receiving that invitation from Mr. Dippolito?

A. I don't recall, but, I mean, I did receive it obviously.

Q. And it was flagged as subject matter is Elmore. Do you remember having a conversation with Mr. Dippolito about Mr. Elmore?

A. Not a formal meeting, like not a formal meeting just about Mr. Elmore, me and him, no.

Q. Do you recall meeting with Mr. Dippolito and Mr. Elmore at the same time --

A. I believe we did.

Q. -- in October of 2022?

A. We did have meetings, so yes.

Q. You had more than one meeting?

A. Yeah. I think we had at least, yeah, one.

Q. So now I'm going to ask you to look at Exhibit-7, which now you have open, and I'm going to have you review the first page and then I have some questions for you.

MR. HATCHETT: Based on the

Page 51

current testimony, I have a standing objection to this witness for any questions regarding this document identified as Plaintiff's Exhibit-7.

BY MS. BENFER:

Q. Okay. This is a text message Mr. Dippolito is sending, it appears, to Ed, and it says, "Ed, it's Rich Dippolito. Hey next time you're in the building can you stop and see Matt and I, just wanna go over a couple things with you, nothing bad. Thanks."

Does this refresh your recollection of meeting with Mr. Dippolito and Mr. Elmore?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes, it does.

BY MS. BENFER:

Q. And do you recall when you met with Mr. Dippolito and Mr. Elmore what you discussed?

A. Unfortunately not -- no. I don't recall.

Q. You have no recollection whatsoever?

A. I know -- I remember we did meet,

Page 52

but the specifics of the conversation I don't recall. Sorry.

Q. Do you recall having any conversations with Mr. Elmore and Mr. Dippolito at the same time in the fall of 2022 regarding the hiring practices at the Township?

A. Yes.

Q. And during those conversations, did Mr. Elmore report that he believed that the hiring practices were discriminatory?

MR. HATCHETT: Objection to the form of the question.

You can respond.

THE WITNESS: Yes, he did have concerns regarding the hiring practices.

BY MS. BENFER:

Q. And he expressed those to you?

A. Yes.

Q. Was there any investigation into the hiring practices at that time?

A. Not by myself or Rich. It would have been -- that would have been something we would have forwarded to labor counsel.

Q. Well, that's my next question.

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 53

A.  I'm sorry.

Q.  Don't be sorry.

After you met with Mr. Elmore and Mr. Dippolito and Mr. Elmore shared with you that he believed that there's discriminatory practices in the hiring practices at Falls Township, did you share that information with anyone?

MR. HATCHETT:  Objection to the form of the question.

Mr. Takita, unless I tell you not to respond, you can respond.

THE WITNESS:  Okay.

If I did, I would have said something to labor counsel.

BY MS. BENFER:

Q.  Did you have any conversations with Mr. Dence about the conversation you had with Mr. Elmore and Mr. Dippolito that we were just discussing?

A.  I don't recall specifically.  I may have.

Q.  How did you usually -- did you communicate with Mr. Dence on a regular basis?

Page 54

A.  We had the Monday staff meetings. So when we had them, that's when we would typically talk.

Q.  Is there an outline for that Monday staff meeting?

A.  No.

Q.  Did you take notes during that Monday staff meeting?

A.  On occasion, yes.

Q.  Where did you keep those notes?

A.  On a notepad.

Q.  And then what did you do with them after the meeting?

A.  If I had -- you know, if I kept the notepad, then I would still have them. Otherwise they would have just been thrown away.

Q.  Have you been asked for any notes of those meetings for this litigation?

A.  No.

Q.  Do you think you still have any of those notepads from 2022 and 2023?

A.  I could look, yes.

Q.  Did you communicate with Mr. Dence through e-mail as well?

Page 55

A.  Yes, we would.  Yeah.

Q.  Was that on a daily, weekly?  How often?  As-needed basis?

A.  Yes.  As needed, yeah.

Q.  How would you describe your relationship with Mr. Dence?  Do you have a fairly professional working relationship?

A.  Yes.

Q.  Do you two get along?

A.  Yes.

Q.  In this litigation, we provided what are called admissions, Request for Admissions to the Township.  Okay?  There are questions, and we ask the Township to either admit or deny those admissions.

Were you shown those admissions?

A.  Yes.

Q.  Were you shown all of them or were you only shown a certain few?

A.  I don't know.  I don't know if it was all of them.

Q.  Okay.  I'm going to ask you to turn to exhibit -- unfortunately you got to do it 119 and 120 at the same time, Exhibit-119 and 120 at the same time.  119 are the actual

Page 56

Request for Admissions, and 120 are the answers that were provided by the Township.

(Brief pause.)

I'm going to have you stop right there.  There's a verification, and I believe you signed the verification; is that correct? Did you sign this verification?

A.  Yes.

Q.  I'm going to have you turn to the answer that was marked in Exhibit-120, and it's Admission No. 19.

A.  (Witness complies.)

Q.  I'm going to read to you the admission request sent by plaintiffs to No. 19.  "Admit that on October 6, 2022, the Plaintiff met with Matthew Takita, the Township Manager, and Rich Dippolito, the Assistant Township Manager."

Is that an accurate statement?

A.  Can you repeat it, please?

Q.  Yeah.  "Admit that on October 6, 2022, the Plaintiff met with Matthew Takita, the Township Manager, and Rich Dippolito, the Assistant Township Manager."

Is that an accurate statement?

Pages 53 to 56

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 57

A. I couldn't say the exact date.

Q. Okay. And even based on the documents we've looked at, the invite that you looked at, you still can't verify the exact date?

A. Based on the conversation we just had, I could say yes, that that would be correct.

Q. What efforts did you do to verify the responses in the admissions from the Township to verify the accuracy of the responses?

A. I went through e-mails and any notes that I would have had in my notebooks.

Q. So you reviewed your notebooks?

A. Yes, I did.

Q. So those notebooks still exist, it sounds like, then if you reviewed --

A. Yes.

Q. -- them to help with the admissions? And the notebooks, are they handwritten notes?

A. Yes.

Q. How many pages are we talking?

A. They were small, you know, a few

Page 58

hundred pages, because there was not just -- it was all the stuff I was doing for code enforcement and any other meetings that we had, so...

Q. Let's go back to clarify something. So you said you keep your notes in a handwritten note. Do you keep any notes on like an iPad or anything like that or your computer?

A. Yeah. Recently I had -- you know, I went to reMarkables. So it's like an electronic thing, but up until then, it was all pencil and paper.

Q. I'm sorry. And you said you have a what?

A. It's called reMarkable. It's an electronic note-taking notebook.

Q. Did you have that in 2022?

A. I don't think I did. I mean, I just have to take a look to see what the dates are. That's all.

Q. So sitting here today, you don't know which dates you had -- when you started using the reMarkable?

A. Correct.

Page 59

Q. And did you do any search of the reMarkable for this litigation?

A. I probably did.

Q. You think you did?

A. Yes.

Q. Okay. I'd like to look at Exhibit-112. Exhibit-112 is the Falls Township Police Department Policy No. 2.8.2.

A. (Witness complies.)

Q. Have you had a chance to look at it?

A. Yes.

Q. Okay. My question for you is, based on this policy, who is responsible for ensuring retaliation by the chief of police does not occur?

A. Based on this policy?

Q. This policy or any other policy that you're aware of.

A. It would be the -- retaliation by anybody would be -- the township manager would be, I guess, ultimately responsible for that.

Q. Township manager?

A. I would say yes.

Q. Okay. I'm going to have you turn to

Page 60

Exhibit-9, please.

A. (Witness complies.)

MR. HATCHETT: For the record, this is Bates stamped Elmore 24.

BY MS. BENFER:

Q. Have you had a chance to review it?

A. Yes.

Q. Mr. Takita, this appears to be an e-mail that was sent to you from Mr. Elmore on October 27, 2022. Do you see that?

A. Yes.

Q. And do you recall receiving this e-mail?

A. Yes.

Q. Okay. At the very bottom of the e-mail, last paragraph, it reads, starting with "the optics of how." Do you see that sentence?

A. Where at?

Q. You're in the right paragraph, very last paragraph, second-to-last sentence.

A. Okay.

Q. Okay. "The optics of how hard the township is fighting to resist the arbitrator's decision is not great and lends

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 61

to asking if she would have been treated differently if she was a hunter in the chief's inner circle, if she was the lieutenant's nephew or if she was simply not she. Someday if you have some time, I could fill you in on MIRT. It would likely bring you clarity on this particular issue."

Do you see that --

A. Yes.

Q. -- sentence?

Did you ever follow up with Mr. Elmore about that sentence I just read to you?

A. I don't recall having followed up with him on that.

Q. You have no recollection of following up with him on this?

A. Correct.

Q. Was there any investigation initiated as a result of this e-mail that Mr. Elmore sent to you?

A. As far as Officer Metterle?

Q. Officer Metterle, yes.

A. I don't recall.

Q. Okay. Do you have any recollection

Page 62

of what Mr. Elmore is referring to when he says "resist the arbitrator's decision"? Do you have any understanding of what that meant?

A. No.

Q. Do you know if the arbitrator found in Officer Metterle's favor?

A. Regarding what?

Q. I don't know. Was there an arbitration decision in Officer Metterle's favor found?

A. I mean, she's working. You know, she is back here working again. So, yeah, I mean, I guess it was. I don't know. I don't recall.

Q. Do you recall if there was a delay in bringing Officer Metterle back to work after the arbitrator decided in her favor?

A. I believe there was a delay, yes.

Q. Do you know why there was a delay?

A. I don't recall specifically.

Q. Okay. I'm going to make it easy and have you look at Exhibit-10.

A. (Witness complies.)

Q. Okay. We're going to actually start

Page 63

from the back of this string of e-mails. It makes it easier. It gets stacked in reverse, and the very first one is on the bottom. And Mary Hicks, she's a -- signature is a nurse care manager, Delaware Valley Trust. Delaware Valley Trust is -- what association does that have, if any, with Falls Township?

A. They work with our insurance carrier for personnel issues.

Q. All types of personnel issues or specific personnel issues?

A. It's just for like people who are injured on duty.

Q. Right. So just with regard to IOD scenarios; is that correct?

A. Correct.

Q. Okay. And Mary Hicks we've talked about -- I'm sorry. Sherry McGovern we talked about earlier. She was the HR administrator at Falls Township, correct?

A. Yes.

Q. Okay. And October 27, she's reaching out to Mary Hicks at the Del Val Trust about Mr. Elmore.

Do you recall Sherry McGovern

Page 64

reaching out to Del Val Trust regarding Mr. Elmore?

A. I recall her telling me that she was reaching out to them or having conversations with them about Officer Elmore.

Q. And at whose direction was she having those conversation with, if anyone?

A. I believe actually the chief. I had not directed her.

Q. That was my next question. Did you direct Sherry McGovern to reach out to the Delaware Valley Trust regarding Mr. Elmore and his IOD status?

A. I did not.

Q. Turn a few pages. It's Page 3 at the bottom -- I'm sorry. No. I apologize. It's Page 2 at the bottom. Do you see Page 2? It's Defense 710 on the right corner.

A. Yes.

Q. Sherry McGovern reaches out on November 4th -- I'm sorry. Mary Hicks reaches out to Sherry McGovern on November 4th and is asking her about Mr. Elmore again, regarding Elmore. It's the paragraph right where your hand is, right

Pages 61 to 64

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 65

there, exactly. She says, "Good morning, there are many concerns with this claim coming from the Chief and Lieutenant. They feel he should not be on light duty because of the many restrictions he has with his right arm and having no contact with the public. Officer Elmore is a K-9 officer that drives a marked car to and from work. Last night while driving into work he claimed he banged his already injured arm on the arm rest in his vehicle, which resulted in him calling out and not showing up for last night's shift. This is also a concern because of the personnel issues that command staff is having with him."

Do you have any knowledge of the issues that command staff was having with Mr. Elmore as of November 4th of 2022?

A. This would have been after the vote of no confidence?

Q. The vote of no confidence was in April of 2022. This is in November. But let me strike all of that. Let's start again.

The vote of no confidence was in April of 2022. The chief was out on

Page 66

administrative leave from April until September of 2022. The chief returned to work in September of 2022. This e-mail is sent in November of 2022.

A. I don't recall any issues at that time.

Q. And I'll just clarify. Did the chief bring to you any concerns he was having with Mr. Elmore in or around November 4th of 2022?

A. Not that I can recall. The only thing that I recall that him coming to me was about when they were having some kind of a union hearing or meeting and officer only showed up with a T-shirt. I don't know if that was --

Q. And we'll talk about that in a second.

I'd like to back up back to that meeting that you had with Mr. Elmore, Mr. Dippolito, and yourself in early October 2022.

A. Yes.

Q. We previously talked about that, right?

Page 67

And I believe you stated that Mr. Elmore did report to the two of you that he believed that there was discriminatory hiring processes in the Police Department; is that correct?

A. Yes.

Q. Did you share that information with Chief Whitney at the time?

A. I don't recall. I don't remember.

Q. Is that something you would share with Chief Whitney?

A. I mean, is it something I would share? I see no reason why I wouldn't.

MR. HATCHETT: Again, Mr. Takita, I'll just remind you, don't guess or speculate.

THE WITNESS: Sorry.

BY MS. BENFER:

Q. And just one final follow-up regarding Exhibit-10.

Look at the very first page of Exhibit-10.

A. (Witness complies.)

Q. A lot of things are redacted, so I don't have any content, but I do have who the

Page 68

e-mail was sent to, to and from, and there's part of the e-mail string that we were just looking at with Sherry McGovern and the Del Val Trust people. And in here it's from Whitney and it's to Thomas Hearn, Aimee Schnecker, Daniel Unterburger, and you're cc'd on this e-mail. Do you see that?

A. Yes.

Q. Does this refresh your recollection that you were made aware of Ms. McGovern's correspondence or interactions with Del Val regarding Mr. Elmore?

A. If that's what the subject matter was, then, yes, because I would have been copied on that. And, again, that's -- whatever we would have, we would refer to labor counsel for their opinion or direction.

Q. Do you recall being part of any conversations that the decision was to take Mr. Elmore off light duty and remove him from light duty and prevent him from working while he was IOD status?

A. I don't recall.

Q. So sitting here today, you have no knowledge of the fact that Mr. Elmore was

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 69

initially working light duty after his injury in September of 2022 and at some point in November, early November of 2022, he was no longer allowed to do light duty?

A. I don't recall. If he did, he did, but I just don't recall.

Q. You have no recollection of any conversations about why he went from being allowed to do light duty to not being allowed to do light duty?

A. No. I apologize, but during this period of time, there was -- I was doing --

Q. Two jobs?

A. -- three jobs, because I was doing zoning as well, and then we had -- so it was -- I apologize. So I'm not trying to be evasive or anything like that.

Q. Just for the record, let's clarify. You were doing three jobs. What three jobs were you doing and for what timeframe?

A. I was director of code enforcement, I was zoning officer, and then I was also the township manager.

Q. For how long?

A. For, I guess, roughly five years.

Page 70

Q. Three full-time jobs?

A. Yes.

Q. Did they pay you for all three full-time jobs?

A. Yes. So I was -- there was a lot going on. So I apologize if my recollection is not that sharp.

MR. HATCHETT: Before the next question, can I just take a quick break. Mr. Takita.

THE WITNESS: Sure.

- - -

(Short recess.)

- - -

BY MS. BENFER:

Q. Mr. Takita, I just want to clarify. Delaware Valley Trust, were they the administrators of individuals that were out of IOD with regard to their medical, like getting health insurance coverage and making sure their paperwork is done?

A. Yes.

Q. Okay. Did Delaware Valley Trust have any authority on whether or not an employee could work light duty while they

Page 71

were considered IOD?

A. I don't know.

Q. Well, who could decide if the Township could accommodate an officer who needed light duty? Is that up to the Township or was that up to Delaware Valley Trust?

A. To accommodate the employee, it would be the Township.

Q. Delaware Valley Trust couldn't require the Township to accommodate an officer, correct?

A. Correct.

Q. I'm going to take a look at Exhibit-11. This is an e-mail from Lieutenant Ward to Mr. Elmore, and Whitney Nelson is cc'd on it and Ms. McGovern is cc'd on it. It was sent on Monday, November 7th. It's Elmore 25. And it says, "Ed, Delaware Valley Trust has advised the Township that a light duty assignment is not available for you at this time."

Did Delaware Valley Trust have the authority to advise the Township that a light-duty assignment is not available to

Page 72

Mr. Elmore?

MR. HATCHETT: Objection to the form of the question, standing objection to this document for this witness.

THE WITNESS: I don't know.

BY MS. BENFER:

Q. You don't know if Delaware Valley had the authority to advise the Township that Mr. Elmore -- there was no light duty for him?

A. I don't know the context, I guess, of that statement, having them say it's not available.

Q. Okay. But let's take it away from this e-mail. If there was light duty, if the Township had light duty for an officer, it's up to the Township whether or not to offer that light duty to the officer, correct, not Delaware Valley Trust?

A. If their injury would allow them to do that light duty and we could accommodate them. But, you know, we can't create light duty that would make the injury worse.

Q. Correct. But if there is an accommodation possible, that's up to the

Pages 69 to 72

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 73

Township, correct?

A. Provided the doctor says that he's capable of doing it.

Q. Exactly. Right?

A. Correct.

Q. Let's jump ahead to November of 2022, and I'm going to look at Exhibit-122.

(Brief pause.)

That's it. It's two pages.

A. Okay.

Q. Okay. This is a memo to you from Nelson Whitney and it's regarding Sergeant Clark, and it's dated November 9th of 2022. Do you see that?

A. Yes.

Q. He says, "I acknowledge receipt of your memorandum regarding Sergeant Clark's testimony at the suppression hearing in the Loretta Hall prosecution."

Do you see that, the very first sentence of the memo?

A. Yes.

Q. What memo is he referring to?

A. I don't recall. I don't know.

Q. Did you write a memo regarding

Page 74

Sergeant Clark's testimony at the suppression hearing in the Loretta Hall prosecution?

A. No. I don't remember that, no.

Q. Do you have any recollection of this Loretta Hall prosecution?

A. No.

Q. Do you recall doing any investigation into Sergeant Clark in the fall of 2022?

A. I don't recall any formal investigation into Sergeant Clark.

Q. Bottom paragraph, it says, "Additionally, Sergeant Clark advised that he recently became aware that Officer Ed Elmore was in possession of Judge Finley's ruling in the Hall suppression hearing."

Do you see that?

A. Yes.

Q. Did you ever read Judge Finley's order that he's referring to in this memo?

A. I don't recall.

Q. Any recollection of reviewing any orders by a judge in the fall of 2022?

A. I recall -- yeah. I do recall one regarding Sergeant Clark, and the judge had

Page 75

made some favorable comments about him.

Q. Unfavorable?

A. Favorable.

Q. Oh, favorable comments?

A. Strike that. I don't recall if it was favorable or unfavorable, but I just recall there was a decision by a judge specifically related to Sergeant Clark.

Q. Specifically? I'm sorry.

A. Related to Sergeant Clark.

Q. And Judge Finley's order, it's a public document, correct?

A. Yes.

Q. So anybody can go onto Bucks County courts and get a copy of that order, correct?

A. Yes.

Q. Back to the same exhibit, 122, bottom paragraph. Nelson Whitney goes on to say, "Sergeant Clark stated that Officer Elmore was heard reading from the document to a large group of FTPD officers and criticizing Sergeant Clark for testifying for the Township at a grievance arbitration hearing. Sergeant Clark expressed concern that this matter has been brought to the

Page 76

attention of the Township as a form of retaliation against him and to deliberately negatively impact his chances at promotion to Lieutenant."

Do you see that?

A. Yes.

Q. Well, first of all, Lieutenant Clark -- I'm sorry. Sergeant Clark was promoted to Lieutenant Clark, right, in November -- in 2022?

A. He was promoted, correct.

Q. Correct. And as we discussed, the decision by Judge Finley is a public document?

A. Correct.

Q. So Mr. Elmore having a public document and sharing that public document with his fellow officers, there's nothing illegal about that, correct?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. There's nothing wrong with that?

A. Not to my knowledge.

Q. And at the time, Mr. Elmore was also

Pages 73 to 76

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 77

the president of PAFT, do you recall that, fall of 2022?

A. Yes.

Q. So him taking issue with Mr. Clark testifying at a grievance hearing, wouldn't that be as the president of PAFT something that he would do in his course as president?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I didn't see anything unusual about it.

BY MS. BENFER:

Q. Do you recall meeting with Mr. Elmore, Sergeant Fanelli, and Mr. Dippolito on November 15th, 2022 to discuss labor issues and grievances?

A. I don't recall.

Q. If you could turn to Exhibit-13, please.

A. (Witness complies.)

Q. This is a memo dated November 21st, 2022. It's to you from Lieutenant Henry Ward at the top. Do you see that at the top?

A. Yes.

Q. Okay. Just take a moment to review

Page 78

it and then I have some questions for you.

(Brief pause.)

A. (Witness complies.)

Q. So does this refresh your recollection of having a meeting with Mr. Elmore, Mr. Fanelli, and Mr. Dippolito on November 15th?

A. Yes.

Q. Okay. And do you recall what was discussed in that meeting?

A. **They brought up the issues of Lieutenant Ward having had the issues in cellblock and some of the outstanding grievances that were going on at the time, but I don't recall the specifics of that.**

Q. You discussed the grievances that were pending at that time?

A. **Right, but I don't recall the specifics.**

Q. And you said Lieutenant Ward. They brought up Lieutenant Ward in that meeting?

A. **I believe they did.**

Q. And what did they discuss with you about Lieutenant Ward?

A. **The issues that had occurred in the**

Page 79

**cellblock back in 2017.**

Q. Did you know about those incidents in the cellblock in 2017?

A. **No.**

Q. You had no knowledge of that?

A. **Correct.**

Q. Were you even at the Township in 2017?

A. **No.**

Q. Okay. And during that meeting, were you given a flash drive?

A. **I don't recall, but in this memo it says I did.**

Q. Do you recall having a flash drive given to you by either Mr. Elmore or Mr. Fanelli?

A. **I don't recall.**

Q. Do you recall ever having a flash drive that then you passed on to anybody?

A. **No, I don't recall.**

Q. So you have no recollection of even having the flash drive?

A. **Correct.**

Q. So asking you where that flash drive is today, you wouldn't know?

Page 80

A. **Oh, no.**

Q. Do you recall ever seeing a video with Mr. -- sorry. Do you recall ever seeing a video with Lieutenant Ward and other officers involving an individual that has been arrested in the cellblock?

A. **Yes.**

Q. You've seen that video?

A. **Yes.**

Q. When did you watch the video?

A. **It would have been around the time of this memo.**

Q. Do you recall who showed you the video?

A. **Not specifically, no.**

Q. Do you know that individual that was the civilian that was in that video, did they bring a claim against the Township for what happened in that cellblock?

A. **I don't have any, like, direct knowledge of it. I don't know.**

Q. Do you know who would?

A. **The Township solicitor.**

Q. Board of Supervisors?

A. **Yes.**

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 81

Q.   According to this memo from Ward, he's saying that you told him about the meeting you had with Elmore and Dippolito. Do you recall telling Mr. Ward about that meeting?

A.   I had a meeting with Lieutenant Ward after I had gotten this -- I had a meeting with Lieutenant Ward.  Now, it was after this.  It would have been after this memo to discuss his concerns.

Q.   To discuss Mr. Ward's concerns?

A.   Correct.

Q.   Did Mr. Ward ask for the meeting?

A.   I don't recall.

Q.   And what were his concerns?

A.   Basically what was outlined in the memo, concerns of additional -- concerns for his family.

MR. HATCHETT:  I'm sorry, Mr. Takita.  I was just going to ask for you to wait for the sirens to stop.

(Brief pause.)

I'm sorry.  Mr. Takita, you could continue your answer.

BY MS. BENFER:

Page 82

Q.   Do you need the question read back to you?

A.   Yeah.

MS. BENFER:  Can we read the question back.

(Court Reporter read back as follows:  "And what were his concerns?"

Answer:  "Basically what was outlined in the memo, concerns of additional -- concerns for his family.")

THE WITNESS:  Yeah.  That's it.

BY MS. BENFER:

Q.   And I think my question was what concerns did he have for his family?

A.   Well, as he stated in the memo, fear of personal attacks, and he mentions, you know, workplace violence as well.

Q.   And what did you do in response to those concerns he expressed?

A.   I did forward this.  I remember forwarding this to labor to discuss how we should approach something like this.

Q.   Okay.  And was there a response to this memo eventually?

A.   I don't recall.

Page 83

Q.   Did you feel that you needed to take any emergency action in response to this memo?

A.   Yeah.  I recall because of the things he was mentioning about the escalation of behavior, workplace violence, I had concerns regarding something bad happening.

Q.   What acts of violence were you concerned about that had happened?

A.   There was no acts of violence.  It was the tone.  It was what he had mentioned in his memo.

Q.   So your concern was based on what Lieutenant Ward wrote in his memo?

A.   Correct.

Q.   Did you have any personal firsthand concerns about what was happening at the police station with regard to Mr. Elmore?

A.   I had no -- I mean, I had no personal issues or concerns with my interactions with Officer Elmore.

Q.   Was there any investigation initiated as a result of this memo?

A.   I don't recall.  I don't recall.

Q.   If there was an investigation

Page 84

initiated, who would have done that investigation?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  It would have been labor counsel.

BY MS. BENFER:

Q.   And sitting here today, do you know if labor counsel did any investigation in response to this memo by Mr. Ward?

A.   I don't recall.

Q.   You briefly mentioned earlier the picture on a T-shirt.  Do you remember saying something about that?

A.   Yes.

Q.   Okay.  Tell me what you know about the picture on the T-shirt.

A.   It was a picture of Lieutenant Whitney -- or Chief Whitney and Derek Chauvin.  I think they were side by side.

Q.   Do you know when that picture was taken?

A.   Not specifically, no.

Q.   What if I represented to you that it was taken at a Black Lives Matter rally in

Pages 81 to 84

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 85

2020. Do you have any knowledge of that?

A. Yes.

Q. Does that refresh your recollection?

A. Yes, it does.

Q. And did Chief Whitney ever complain about that picture being taken between 2020 when it was taken and December of 2022?

A. No.

Q. Was there any investigation about how that picture came to be?

A. Not to my knowledge.

Q. Did you ask for an investigation into the picture and how it came to be?

A. No.

Q. Did you have any concerns with the fact that Chief Whitney was in a picture next to Derek Chauvin's picture and had his picture taken?

A. No.

Q. Just for clarification, the memo starts off with, "Based on information I recently received from Falls Township Police Officers, Sherry McGovern, Chief Whitney and yourself, I am aware of the following information, in summary."

Page 86

That suggests to me that everything in this memo is something that he learned from others that he listed at the very opening paragraph. Is that how you interpreted this memo?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes, that is.

BY MS. BENFER:

Q. So based on the way he framed this -- or is it your understanding that Lieutenant Ward has no firsthand knowledge of any of the information in this memo?

A. Say that question again.

Q. Is it your understanding that Lieutenant Ward had no firsthand information about anything in his memo, in this memo?

A. Based on the way it's phrased, correct.

Q. I'm going to look at Exhibit-14, please. This is an e-mail from Lieutenant Ward the next day, and this e-mail is being sent to Melissa Atkins at Obermayer, Thomas Hearn at Obermayer, David Unterburger at Obermayer, it looks like Aimee Schnecker at

Page 87

Obermayer, and then you're cc'd on it as well as Mr. Dippolito, Sherry McGovern, and Nelson Whitney. Do you see that?

A. Yes.

Q. Do you recall receiving this e-mail?

A. Yes.

Q. Okay. And as a result of this e-mail, what happened? Anything? Any actions taken?

A. My recollection is fuzzy on it, but yeah. There was concern regarding this e-mail. I do recall that.

Q. Just to clarify, Mr. Henry Ward, right, he's sending this e-mail. First of all, he sends it to labor counsel. Did Mr. Ward have access to directly -- is that common for him to communicate directly with labor counsel on his own?

A. No, it's not common.

Q. Did he have to get permission to do so?

A. Typically, yes.

Q. Do you recall, did you give him permission to send this to counsel?

A. I don't recall.

Page 88

Q. Well, the last sentence, it says here, "Officer Elmore has access to our explosives magazine. With the current events, I'm going to have the locks changed and have an inventory of the locker done."

Did you think that was a proportional response to what was taking place?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I mean, I couldn't -- I can't -- I couldn't comment on that. I don't know.

BY MS. BENFER:

Q. Well, based on your knowledge of what was taking place in this timeframe, did you think it was necessary to change the locks on the explosives locker?

A. Based on the concerns, I mean, that Lieutenant Ward was having -- I mean, I was not part of any of those interactions, so just relying on his concerns.

Q. What about your concerns? Did you have concerns based on everything that you would have been experiencing and your

Pages 85 to 88

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 89

knowledge of what was happening at the time? Did you think it was necessary to change the locks on the lockers where the explosives were kept?

A. **Based on the way -- yeah. Based on the way it was represented, yes. I didn't think it would be -- it was like a disproportional response.**

Q. And what was said specifically that was represented to you that made you feel it wasn't a disproportional response?

A. **Just the level of concern that Lieutenant Ward was having. That's outside of my world.**

Q. So it was lieutenant's concerns that you felt were proportional. My question to you was based on your own personal knowledge and information that was shared with you, because we looked at the memo previously, I believe it was Exhibit-13, he's telling you in his memo that this memo, this information is coming from Sherry McGovern, Chief Whitney, and you and here's a summary of what you've told them, and I guess what I'm saying is, based on what you told him, did you feel

Page 90

it was necessary, did you think it was proportionally necessary to change the locks on the explosives?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I don't recall what I told him in discussion with him regarding that, but, no, I don't think that there was anything wrong with him changing the locks on the explosive magazine.

BY MS. BENFER:

Q. This e-mail -- we're still talking about exhibit now 14 that went to the labor counsel, you and others -- was this ever forwarded on to the Board of Supervisors?

A. **Which?**

Q. Exhibit-14, the one right in front of you.

A. **I do not know.**

Q. All right. Let's talk about -- at some point Frederick Harran gets hired by the Township, correct?

A. **Correct.**

Q. How did that come to be?

Page 91

A. **The Board was looking for somebody who could -- like an impartial person to look at the Department or any of the issues that we had to see if there was any, you know, any merit to them and try and resolve some of the issues that were going on with the grievances.**

Q. Okay. Was Fred Harran specifically hired to investigate Mr. Elmore?

A. **He was hired to do specific investigations. I don't recall if the issues with Elmore were one of them.**

Q. Okay. Well, let's turn to Exhibit-22.

A. **(Witness complies.)**

Q. This is an e-mail. It was December 7th. It was from Mr. Elmore to you and Mr. Dippolito and Mr. Dence, and it says harassment and retaliation. Do you see that?

A. **Yes.**

Q. I'll give you a second to review it and then I have some questions for you.

(Brief pause.)

A. **Okay.**

Q. Okay. Halfway through it says,

Page 92

"Specifically, he has threatened to terminate me for meeting with union members, advocating for union members subject to discipline, challenging the credibility of administration involved in discipline and addressing deeply troubling issues with racism and sexism within our department and how that has affected our members and our working conditions."

Do you see that?

A. **Yes.**

Q. Did the Township conduct an investigation into the allegations that Mr. Elmore submitted in this e-mail to you?

A. **I don't recall.**

Q. If they did, would it be documented anywhere?

A. **Yes.**

Q. And where would it be documented?

A. **Probably through labor counsel, yeah, through e-mails over some kind of report.**

Q. Sitting here today, is it your understanding that there was an investigation or there was not an investigation?

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 93

A.  I don't remember.

Q.  You don't have any recollection of an investigation being done?

A.  I don't remember, no.

Q.  Surely if there was, it would be documented.  Would you agree that?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  Yes.  Yeah.

BY MS. BENFER:

Q.  It would be documented somewhere, you would agree?

A.  Yes.

Q.  I'd like to go back in time a little bit to December 2nd.  We were previously talking about Mr. Elmore's Loudermill notice that he received.  I represented to you that I've seen no Loudermill notice that was issued from April of 2022 until December of 2022.  Do you recall me saying that?

A.  Yes.

Q.  You said I believe you recall reviewing at least one Loudermill notice; is that correct?

A.  Yes.

Page 94

Q.  Okay.  Can you turn to Exhibit-16, please?

A.  (Witness complies.)

Q.  Exhibit-16 is an e-mail from Nelson Whitney to Mr. Elmore.  You are not on this, but my question to you is -- and it says attachments, it says K-9 Unit recommendations PDF, and it says, "Please be advised your Loudermill hearing for the above attached discipline recommendation is 9 December 2022 at 1500 hours."

Do you see that?

A.  Yes.

MR. HATCHETT:  Objection.  I have a standing objection for any questions to this witness regarding this document.

MS. BENFER:  Why do you have that?

MR. HATCHETT:  Because as you -- would you like me to explain it? Although I don't have to.

MS. BENFER:  Sure.

MR. HATCHETT:  As you previously mentioned as part of your line

Page 95

of questioning, this witness is not copied on this information or on this e-mail correspondence.  At this point, there's no foundation that this witness has any personal knowledge regarding the contents of the e-mail, and the witness must have personal knowledge to provide competent testimony.  That's my objection.

MS. BENFER:  Doesn't your objection, though, have to be about the fact if I ask him specifically about this document, information that's in the document?

MR. HATCHETT:  Well, I'm going to leave my objection at that.

MS. BENFER:  Okay.  We'll leave it at that.

BY MS. BENFER:

Q.  Okay.  My question to you, though, is, you previously, I believe -- well, let me ask you this:  Any Loudermill hearing notice that's issued, do you have to review?  Did you have to review it as the township manager?

Page 96

A.  I would get a copy of it.

Q.  Before it was issued or after it was issued?

A.  It would be after it was issued.

Q.  So a Loudermill notice would be issued and then you would be cc'd on it?

A.  Yes.

Q.  Okay.  So prior to issuing a Loudermill notice, Chief Nelson did not have to have your review and approval; is that what your testimony is?

A.  Say that again.

Q.  Sure.  Prior to issuing a Loudermill notice, did the chief have to get your approval before he issued the Loudermill notice?

A.  The Loudermills were drafted by labor counsel.

Q.  Well, I guess what I'm trying to understand, because this says a Loudermill hearing for the above attached discipline recommendation is 9 December 2022, and the K-9 Unit recommendation appears to be -- the only K-9 recommendation I found is the one that was issued by Lieutenant Ward back in

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

April of 2022.

MR. HATCHETT: I don't think that's -- I don't know if that's a question.

BY MS. BENFER:

Q. So I'm just trying to understand. Did you review this e-mail before it was sent or did you review any Loudermill notice in addition to this for Mr. Elmore that I haven't shown you that you may know that exists?

MR. HATCHETT: With that, I have an objection to the form of the question.

You can respond if you understand.

THE WITNESS: I'm not following. I'm sorry.

BY MS. BENFER:

Q. Okay. Let me ask it another way. This is a Loudermill notice that Chief Whitney issued. Before he issued it, did he discuss it with you?

MR. HATCHETT: I'm going to object as the document that's in front of

the witness is not a Loudermill notice.

BY MS. BENFER:

Q. Well, it says here, "Please be advised your Loudermill hearing for the above attached discipline recommendation is 9 December 2022."

Were you advised prior to the scheduling of this Loudermill hearing that it was going to be scheduled?

A. I don't recall being advised of that.

Q. At any point did you ever review the Loudermill notice that was actually issued to Mr. Elmore?

A. At some point, yes.

Q. So you recall there was an actual Loudermill notice issued to Mr. Elmore at some point?

A. I recall seeing a Loudermill notice, yes.

Q. Okay. And when you say you recall seeing a Loudermill notice, would it have been a separate document that said "Loudermill notice" on it?

A. I don't know. I know other ones

had -- other Loudermill notices would have -- they'd say "Loudermill notice" on it.

Q. But sitting here today, do you have any recollection, do you have any knowledge whether or not a document that said "Loudermill notice" was issued to Mr. Elmore regarding this hearing that's being scheduled on December 9th of 2022?

A. I don't know.

Q. And it says the attachment is K-9 recommendations. Do you see that at the very top --

A. Yes.

Q. -- under the subject, attachments? Do you know what the K-9 Unit recommendations were at the time?

A. No. I don't recall.

Q. If there was a Loudermill hearing notice issued to Mr. Elmore for this hearing that was scheduled on December 9th of 2022, would that document be kept somewhere in the possession of Falls Township?

A. Yes.

Q. And where would that be?

A. Either police records or the

solicitor's office.

Q. So either the solicitor would have a copy of it or, I'm sorry, the?

A. In the Police Department.

Q. Where in the Police Department?

A. Wherever they keep their personnel records.

Q. So would it be in his personnel file?

A. I don't know.

Q. Okay. On December 12th Mr. Elmore was placed on administrative leave by you. Do you recall doing that?

A. Yes.

Q. And why did you place him on administrative leave?

A. I don't recall.

Q. You have no recollection of why you put him on administrative leave?

A. I know there's probably something in writing on it. I just need my memory refreshed.

Q. Did you have a conversation with Mr. Nelson Whitney about putting him on administrative leave?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 101

A. I would have had a conversation with labor counsel.

Q. And it's your recollection that labor counsel would recommend that you put him on administrative leave?

A. Yes.

Q. Okay. At some point -- going back to Fred Harran, Fred Harran was hired by the Township; is that correct? He was hired by the Township?

A. Correct.

Q. And was he hired to conduct investigations?

A. Yes.

Q. And you do not recall what he was hired to investigate; is that correct?

A. Not specifically.

Q. Okay. Let me have you turn to then Exhibit-32.

A. (Witness complies.)

Q. At the bottom of Exhibit-32 is an e-mail from Lauren Gallagher to Mr. Harran, and you are cc'd on that e-mail. Do you see that?

A. Yes.

Page 102

Q. Okay. And it says documents. I'm going to have you review it and then I'm going to ask you a few questions.

(Brief pause.)

A. Okay.

Q. Does this e-mail refresh your recollection as to what Mr. Harran was hired to do with regard to any investigation pertaining to Mr. Elmore?

A. Yes.

Q. And what does it refresh your recollection? What do you recall now?

A. He was looking into the canine grievance that was filed against Officer Elmore and the different harassment statements that were filed as well.

Q. Let me just clarify that. When you say "grievances," was it actually the Loudermill -- isn't a grievance something that an officer files?

A. Yes. The officer files the grievance.

Q. So was Mr. Takita Harran investigating a grievance filed by Mr. Elmore or was he investigating the Loudermill

Page 103

hearing that was -- the Loudermill notice that Mr. -- I'm sorry; Chief Whitney issued to Mr. Elmore in December of 2022?

A. It would have been the grievance.

Q. The grievance?

A. Correct.

Q. Okay. So he was investigating Mr. Elmore's grievance?

A. I remember he was looking at the issue with the time, the theft of time for the K-9s. He was looking at that. I don't recall him looking into any Loudermills.

Q. Okay. Well, let's go back, because it's my understanding that we talked about this Loudermill hearing that was scheduled -- there's a notice of a Loudermill hearing that was given to Mr. Elmore for December 9th of 2022. Okay?

On December 9th of 2022, was there an actual decision as a result of that Loudermill hearing on December 9th regarding Mr. Elmore?

A. I don't recall.

Q. And I'll represent to you it's my understanding that he was put on

Page 104

administrative leave a few days later. Do you know if that had anything to do with the Loudermill hearing on December 9th or was that something separate and apart from the Loudermill hearing on December 9th?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. If you know the answer.

A. I don't know.

Q. You have no idea? Okay.

So sitting here today, do you have any understanding of what Mr. Harran was investigating when it came to Mr. Elmore?

A. What I recall is him investigating that theft of time.

Q. Okay. And what was the outcome of his investigation?

A. That there was no -- my recollection is there was no issue.

Q. No theft of time?

A. Correct.

Q. So Mr. Harran did an investigation. He was given documents that in fact we just looked at listed in Exhibit-32, correct?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 105

A. Yes.

Q. And was he given any additional documents beyond these documents here?

A. Not to my knowledge.

Q. Okay. But he conducted an investigation. Do you know if he looked at videos of what transpired in the police station on February 25th, 2022?

A. I do not know.

Q. Okay. Well, I'll represent to you in his memos he says he reviewed videos. And at the end of his investigation with regard to the theft of time on February 25th, 2022, would you agree he found that there was no theft of time with regard to Mr. Elmore?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes.

BY MS. BENFER:

Q. You agree?

A. I agree.

Q. Okay. Now, I believe that Mr. Harran was also investigating -- and I believe you mentioned it -- harassment complaints that were brought against

Page 106

Mr. Elmore, correct? Is that correct?

A. Yes. I mean, based on this e-mail from Lauren.

Q. So do you have a vague recollection of that, that he was investigating harassment complaints that were brought against Mr. Elmore?

A. I don't recall seeing anything coming from him regarding that.

Q. Okay. Let's look at Exhibit-42.

A. (Witness complies.)

Q. This is an e-mail from you -- I'm sorry. Yes, from you to Mr. Elmore, and Mr. Whitney is cc'd on it. Do you see that?

A. Yes.

Q. And the top it says, "K-9 discipline recommendation for incident on February 25th, 2023."

Would you agree that that date is incorrect, it should have been 2022?

A. Based on -- yes, based on everything else.

Q. And I'll represent to you that we were just looking at documents. Mr. Elmore was put on administrative leave in December

Page 107

of 2022. Do you recall that?

A. Yes.

Q. So, in fact, he was still on administrative leave in February of 2023, correct?

A. Correct.

Q. Right. So with that information, would you acknowledge that the title is incorrect, it should have been February 25th, 2022?

A. Yes.

Q. Okay. And you're telling him, "After reviewing the recommendations for discipline, the Board of Supervisors has determined no disciplinary action is warranted for the incident on February 25th," again 2023 but it should be 2022. You agree, right?

A. Yes.

Q. "Involving the misuse of time," correct?

A. Correct.

Q. So the issue of the misuse of time as of April 7th, 2023 is closed. Would you agree with that?

Page 108

A. Yes.

Q. Done?

A. Yes.

Q. No record, nothing, should be clean, clean slate on that issue, correct?

A. Correct.

Q. Okay. Can you look at Exhibit-45.

A. (Witness complies.)

Q. This is a memo from Fred Harran to you April 26th, 2023, and it says regarding K-9 investigation of 2/25/2022 summarization. Do you see that?

A. Yes.

Q. Now, this is April 26th. We had just discussed that on April 7th the Board had said subject closed, no discipline, correct?

A. Correct.

Q. So why is there a follow-up from Fred Harran on April 26th regarding the K-9 investigation?

A. What was the previous one, the previous one we were looking at?

Q. Exhibit-42.

A. So I sent that on April 7th.

Pages 105 to 108

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 109

Q. Correct.

A. And in his memo he mentions that there was a memo sent on April 5th regarding the K-9 investigation.

Q. Correct.

A. So I don't know why this came out later, but it appears that there was a memo sent before my e-mail to Officer Elmore regarding K-9 investigation.

Q. So you don't know why another memo was written?

A. I don't want to guess at it.

Q. You have no recollection if anyone asked you to continue to investigate the K-9 issue or anything like that?

A. After that e-mail I sent to Officer Elmore, it was over.

Q. As far as you were concerned, the subject was closed, correct?

A. Correct.

Q. Okay. I'm going to ask you to look back to Exhibit-49. Forward. I'm sorry. Exhibit-49.

A. (Witness complies.)

Q. This is an e-mail from Mr. Elmore to

Page 110

you, Mr. Dence, and Mr. Dippolito. It's on May 3rd, 2023. Take a moment to review it and I have some questions for you.

(Brief pause.)

A. Okay.

Q. All right. If you flip to the next page, I believe you're going to see another document, DEF ESI 5929. It's the same e-mail, but at the very top, it's from you to Ed Elmore, Rich Dippolito, and Jeff Dence, and it's saying, "Officer Elmore, thank you for this e-mail. We'll look into this matter."

Do you see that?

A. Yes.

Q. Did you look into the matter?

A. This would have been forwarded to labor counsel.

Q. I'm going to read it to you, beginning the very first sentence of the second paragraph. It says "last year." Do you see that?

A. Yes.

Q. "Last year I came to you in good faith to bring to light the issue of

Page 111

discrimination in our hiring procedures."

Do you see that?

A. Yes.

Q. And you previously testified you recall him doing that, correct?

A. Yes.

Q. "Specifically having been directed by then Sergeant Clark that it was our goal to avoid having to hire any female applicants. I detailed how I was recruited to be part of the interview process by Sergeant Clark and how applicant evaluation forms were created to provide the desired results. I also detailed how we were instructed at a later date to create new forms with rating scales as Sergeant Clark did not think the original ones would hold up in court."

Do you remember him telling you about that?

A. That, I don't recall.

Q. "I later learned that this change was not to address the hypothetical future challenge but to be used as rebuttal for current active EEOC complaints filed by our

Page 112

female officers."

Do you recall anything about that?

A. No.

Q. "I informed you that I had spoken to the officers as well as their legal counsel about these issues and that I had firsthand participation in at the direction of Sergeant Clark."

Okay. I'm going to go to the third paragraph down. "I don't believe any neutral party observing this could come to any conclusion other than this was retaliation for having made a good faith report for EEOC violations and cooperating with current EEOC investigations."

Do you see that paragraph?

A. Yes.

Q. Was there any investigation into this allegation of retaliation that Mr. Elmore made to you on May 3rd of 2023?

A. This is -- they had performance evaluations, I think, that were done. I think in the previous paragraph he mentions he had performance evaluations. And there was discussion, I remember, about the timing

Pages 109 to 112

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 113

of the evaluations, like why did he decide to change the scoring of them.  The chief had changed the scoring of the evaluations or the structure of the evaluations.  And discussion about whether or not they should be disregarded at this point in time or kept and I guess what implication that would have on any future testing and things like that.

Q.   Who was part of those conversations?

A.   Myself, labor counsel, solicitor, and I recall Dence being in on the conversation as well.

Q.   And what was the outcome?  What was the decision of how to proceed?

A.   I think in looking at the -- I recall that everything was basically -- the new scores would remain because it didn't affect anybody based on the testing -- the scores they got on the test that they took.

Q.   Was there any question about the scoring of the individual evaluations that were done?

A.   As far as?

Q.   Any issues with the evaluations, scores being changed?

Page 114

A.   Some of the scores were significantly different, so that, yeah, that caused, you know, some concern, why.

Q.   And what was the outcome of that? What did they do with the significant change in evaluation scores?

A.   I don't recall anything -- any action being taken specifically about those scores or changing the evaluations that were being conducted.

Q.   Was there discussions about throwing those evaluation scores out the window and starting again?

A.   There was discussion about -- there was a discussion, yeah, about getting rid of those scores.  But, again, then I remember it circling back to does it have -- in this particular instance, does it have any effect on the people who just recently took their promotional exam.

But outside of that, there was no action taken on like saying to like Chief Whitney, you cannot use this evaluation form anymore.  I don't recall that happening.

Q.   Was there any investigation into

Page 115

Mr. Elmore's allegations of retaliation after you received this e-mail?

A.   I don't recall.

Q.   If there was, would it be documented?

A.   It would be.

Q.   And where would it be documented?

A.   Either, again, with the solicitor's office and with the Police Department.

Q.   Okay.  But you have no personal recollection of any investigation being done?

A.   No.

Q.   Okay.  If an investigation was started, would you be part of that conversation to determine whether or not an investigation should be done?

A.   Yes.

Q.   At some point, there was a Fitness for Duty Examination that the Township wanted Mr. Elmore to take part in in the spring of '23.  Do you recall that?

A.   Yes.

Q.   Okay.  And Melissa Atkins from Obermayer reached out to the therapist and scheduled that appointment.  Do you recall

Page 116

that?

A.   I don't recall.  I don't recall who scheduled it.

Q.   So in the end, he meets, has the evaluation with the independent evaluation, Mr. Elmore, correct?

A.   Yes.

Q.   And the independent psychiatrist clears him to return to work, correct?

A.   Yes.

Q.   Okay.  Just for clarification, do you have any knowledge of the fact that Chris Clark was taking the lead on running the promotional process in the spring/summer of 2023?

A.   I know he was involved.  Whether he was taking the lead, I don't know.

Q.   I mean, there's e-mails that he's sending out to the officers saying time and place, so the written exam, and he's the one who is -- and then there's postings of the scores.  Do you have knowledge of that?

A.   Yes.

Q.   And do you have any knowledge that in fact Mr. Elmore, his initial evaluation

Pages 113 to 116

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 117

was done by his direct supervisor and then a few weeks later Mr. Clark then revised his evaluation? Are you aware of that?

A. Are you talking about the evaluation scores we were talking about previously where the scores shifted?

Q. Yes. Not the written exam, the actual evaluations of the officers.

A. After the exam as part of the promotional process?

Q. Let me show you.

Look at Exhibit-47 for me, please, and it has quite a few documents in it, so we'll work our way through them.

A. (Witness complies.)

Q. So the very first one is Elmore 60 and it's April 27th. Do you see that? The very first page. Oh, Elmore 60 is the Bates number at the bottom right-hand corner. I'm sorry.

A. Bear with me.

I'm sorry. Yes.

Q. Right. So we're on the same page. You agree?

A. Yes.

Page 118

Q. And this is a -- they're called performance ratings, right? And this memo was issued on April 27th. Do you see that?

A. Yes.

Q. And Mr. Elmore's rating is a 51?

A. Yes.

Q. And this memo is from Chief Whitney. Do you see that?

A. Yes.

Q. Okay. And then what I'm asking, if you turn then to the very last page of this, it's DEF ESI -- keep going. It's the very last page. It's DEF ESI 7167. Do you see that?

A. Yes.

Q. Okay. This has got a bunch of scores too, and if you look at the Officer Rank Original Scores halfway down, and then it says Officer Rank Updated Scores. Do you see that?

A. Yes.

Q. Okay. And if you look above, there's a column with one score and then another score. Okay?

A. Yes.

Page 119

Q. And if you look at this, Officer Elmore -- remember we looked at the very first page of this exhibit, remember, and that said his score was 51? Do you see that?

A. Yes.

Q. But on this page, it has 51 and 90. Do you see that? There's two columns, the 51 and the 90?

A. Correct.

Q. Do you understand that the 90 was the original score that he was given by his supervisor and that the 51 is the one that Officer Clark gave him later on?

A. Yes.

Q. Okay. And did you as a group, did you review these scores with anybody?

A. At the time of -- no. I was not part of the review process for these scores.

Q. Okay. Were you part of a discussion about the fact that these scores changed at some point?

A. Yes, like I had said before.

Q. And are these the scores you were talking about when you were previously referencing changes in scores?

Page 120

A. Correct.

Q. Okay. And so Mr. Elmore's score went from 51 to 90. Do you see that?

A. Yes.

Q. And with the original score, Mr. Elmore is rated No. 5. Let's go to the very last page again. Do you see that?

A. Yes.

Q. And with the new score, right, go to the updated score, he goes all the way to No. 18. Do you see that?

A. Yes.

Q. And the score that was done, this new change, this 50, was done by Chris Clark. Are you aware of that?

A. I was not aware that the new scores were being done by Sergeant Clark.

Q. You did not know that?

A. No.

Q. Okay. Would that have impacted your decision in the process had you known that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No. No.

BY MS. BENFER:

Pages 117 to 120

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 121

Q. Well, we were talking about earlier Mr. Elmore files the memo to you complaining about retaliation a few days later --

A. Yes.

Q. -- right?

Knowing this information now, understanding seeing that his score dropped significantly and that Chris Clark was the one who filled out his evaluation that caused him to drop significantly, do you think that Mr. Elmore had a legitimate concern of retaliation?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I would question it.

BY MS. BENFER:

Q. You would question what, the retaliation or question the situation?

A. **The reason for the drop.**

Q. Yeah. You would, wouldn't you?

MR. HATCHETT: Objection. That's not a question you --

BY MS. BENFER:

Q. You don't have to answer that. Let

Page 122

me ask it this way: Now with this information in front of you, do you question the drop in Mr. Elmore's score?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yeah. Even initially thinking that it was done by his immediate supervisor, I would question. I mean, I question the drop.

BY MS. BENFER:

Q. But it wasn't done. You understand that?

A. **Yes, I understand that. And so even -- so in both instances, I'd question a drop.**

Q. But do you recall that Mr. Elmore had come to you -- and we talked about this -- in the fall of 2022 and complained about the hiring process, reporting that it was discriminatory?

A. **I do recall that, yes.**

Q. And do you recall that it was Mr. Chris Clark that was running the hiring process that he was complaining about that Mr. Elmore reported was discriminatory?

Page 123

A. **Yes.**

Q. Okay. We've been going a while. Tell me if you need -- I can keep going, but please speak up. Okay?

A. **I'm good.**

Q. All right. Can you turn to Exhibit-51, please?

A. **(Witness complies.)**

Q. Just one page.

Okay. This is a May 15th memo from you to Mr. Elmore. It's telling him that, "Please be advised that for you to return to full duty as a Falls Township officer, you will need to complete a Fitness for Duty Exam."

Do you see that?

A. **Yes.**

Q. And it's been scheduled and it tells him when and where to go.

So what was your understanding at the time you wrote this memo if he was cleared by the independent psychologist or psychiatrist to return to work, would he have been returned to work or should he be returned to work?

Page 124

A. **That was -- that would be my understanding.**

Q. Okay. And that would have been as of May 15th?

A. **Yes.**

Q. Okay.

A. **When you say "as of May 15th," not return to work on May 15th.**

Q. No. Correct. I can clarify for you so the record is clear. My question is, as of May 15th when you sent this memo, it's your understanding that if he cleared -- went through the Fitness for Duty Exam and the independent reviewer cleared him, he could come back to work?

A. **Correct.**

Q. Okay. Can you turn to Exhibit-53, please?

A. **(Witness complies.)**

Q. The bottom is an e-mail May 23rd from you to Fred, and I believe it's Fred Harran, but do you recall if I'm correct about that? It says, "The psych evaluation cleared Elmore to return to work. Can you finish your report on this?"

Pages 121 to 124

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 125

Do you see that?

A. Yes.

Q. And he responds to you that same day, "I certainly aired another" -- "I could certainly aired another paragraph, but I think my report ended recommending he be seen by a professional if the professional clearing him for duty I think that he should be fine, but if you want me to add some more I will certainly do that. It would help if I saw the report from the psychologist."

Do you see that?

A. Yes.

Q. Okay. So what report needed to be finished? What were you looking for at that point?

A. It would have been -- I don't recall specifically what report it would have been.

Q. Okay. Well, let's turn to Exhibit-54. Take a look at that and then I will ask you some questions.

(Brief pause.)

MR. HATCHETT: I have a standing objection to any questions to this witness regarding this document.

Page 126

THE WITNESS: Okay.

BY MS. BENFER:

Q. My question is, the very first sentence says, "As per Township Manager, Matthew Takita, I've been asked to provide you with an opinion and a conclusion regarding the complaint lodged again" -- it says again -- "Officer Elmore regarding harassment."

Do you see that?

A. Yes.

Q. Does that refresh your recollection?

A. As far as? I'm sorry.

Q. That's okay. Why you needed a report from Mr. Harran finished that we previously were talking about in the previous exhibit.

A. I mean, anything that would be going -- like anything regarding harassment or I guess anything like that, it's being vetted through labor. So if -- you know, if I requested Fred to finish up his report, it would have been so that we could get an opinion from labor counsel on how to proceed.

Q. Okay. Let's look at Exhibit-55.

Page 127

A. (Witness complies.)

Q. And it starts on the first page, which was 67, and it goes to 66. It's in reverse. Do you see that, Elmore 66 and 67? So you're going to start on the back page and go forward.

(Brief pause.)

A. Okay.

Q. So on June 8th, Mr. Dence is e-mailing you and a bunch of others, but you're sent this e-mail regarding Ed Elmore and he's asking what is the status of Elmore and why he has not been returned to work, correct?

A. Yes.

Q. So that's on June 8th. Mr. Elmore is not back to work. And he's asking you what is the holdup for returning him to work. Do you see that?

A. Yes.

Q. And you respond by saying, "It's my understanding the Board has decided Officer Elmore is to be returned to work without any discipline. I will direct Nelson tonight to advise Officer Elmore that he is to return to

Page 128

work tomorrow."

Do you see that?

A. Yes.

Q. Did you do that?

A. Return him to work?

Q. Did you advise Nelson Whitney to bring Mr. Elmore back to work the next day?

A. I mean, if I made that statement, then I did.

Q. Okay. Just trying to understand, what was the holdup? Why wasn't he brought back to work --

A. I don't recall.

Q. -- as of June 8th?

A. I don't recall the holdup.

Q. You don't have any recollection what the holdup was?

A. No.

Q. Okay. So let's fast forward to Exhibit-57.

A. (Witness complies.)

Q. It's Mr. Elmore's June 14th grievance, and he's saying he's not back to work. Do you see that, Exhibit-57?

A. Yeah.

Pages 125 to 128

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 129

Q. Okay.

(Brief pause.)

A. Okay.

Q. So was this grievance shared with you?

A. I remember seeing this.

Q. Okay. You remember seeing it?

A. Yes.

Q. If you turn to the next page, Exhibit-58, the very next day, it's an e-mail from you to Mr. Elmore, Nelson Whitney, George Thomas, Sherry McGovern, and Rich Dippolito, and it says return to work. Do you see that?

A. Yes.

Q. Okay. Halfway down, the middle paragraph says, "In addition, the investigation into the harassment complaints filed against you have concluded."

Do you see that?

A. Yes.

Q. So as of June 15th, the investigation of harassment complaints against him were concluded, correct, based on your statement here?

Page 130

A. Yes.

Q. "Based on the findings of the investigation and recommendation of the investigator, the Board of Supervisors sustained your violation of Section 103.5" -- I believe it should be something other than 0.5, because 0.5 does not exist in your --

A. Okay.

Q. I think it's 1.5, but I do not know.

-- (continued) "of the Falls Township Policy 2.8.1, Conduct Unbecoming an Officer. The Board will not tolerate Falls Township employees conducting themselves as you did and therefore, is imposing the maximum of five day suspension."

Do you see that?

A. Yes.

Q. Okay. And then Mr. Elmore -- somehow the original grievance he filed on the 14th seemed to have incorporated this harassment discipline and there's a disciplinary -- a Grievance II hearing held a few weeks later, do you recall that, in which you conducted that?

A. I recall a grievance, yeah.

Page 131

Q. And at the conclusion of that grievance, what happened?

A. The Step II?

Q. The Step II grievance.

A. I don't recall.

Q. Well --

A. The -- I'm sorry. The grievance was for -- Step II was for -- what was the grievance?

Q. It was a Step II grievance for the five-day suspension --

A. Okay.

Q. -- that you indicate in your letter here, as far as I understand.

A. Yeah. I don't recall the outcome of that.

Q. Okay. We'll get to that in a second, but looking at that e-mail, you issued him a five-day suspension, correct?

A. Yes.

Q. Okay. I'd like you to look at Exhibit-134 for me, please.

Actually, I apologize. That may not be the right document. One second.

I take that back. Exhibit-140,

Page 132

please. I'm sorry.

A. (Witness complies.)

Q. Exhibit-140 is a memo to the Township Board of Supervisors from Tom Hearn and Melissa Atkins, and you are cc'd on this, and it was sent on June 12th of 2023.

And just so I can refresh your recollection, we were just looking at your letter that was dated June -- I believe it was June 15th. You issued a memo giving him a five-day suspension on June 15th. Okay? We were just looking at that. Now I'm going back in time, because on June 12th there's this memo, and in this memo, this is a memo from the Township supervisors -- I'm sorry; to the Township supervisors from Tom Hearn and Melissa Atkins, correct?

A. Yes.

Q. And they're your labor counsel at that point, correct?

A. Correct.

Q. They provide legal advice to the Township. Their objective is to do what's in the best interest of the Township, correct?

A. Correct.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 133

Q. But in this paragraph, very first paragraph, it says here, "In our absence during tonight's Executive Session, due to prior commitments we wanted to provide the Board with further guidance and historical perspective concerning Mr. Elmore. Accordingly, we are providing the attached Executive Summary, which was previously distributed to the Board. It has been our position that the totality of Elmore's conduct, as reflected in the Executive Summary, was unbecoming of a Township officer and therefore warranted termination of employment."

Do you see that?

A. Yes.

Q. So they're saying we recommend he be terminated, right?

A. Correct.

Q. Okay. Let's turn to the next page. The next page is this Executive Summary. It's to you. I don't know who it's from. Do you recognize it? But it says Executive Summary at the top.

MR. HATCHETT: Well, there are

Page 134

a couple of difference questions. Do you want him to answer whether or not he recognizes it?

BY MS. BENFER:

Q. I'm sorry. First of all, do you recognize it?

A. Yes.

Q. You do recognize it? And who was it from?

A. It's not -- it's from Obermayer.

Q. It's from Obermayer?

A. Yes.

Q. Okay. So they're referencing a memo -- they're saying based on the memo attached here, we think he should be -- we warrant termination of employment, correct? Am I understanding that correctly in the opening paragraph?

A. Yes.

Q. Okay. All right. And this memo is from Obermayer?

A. Correct.

Q. And just so I'm clear, as of April 7th of 2023, the Board of Supervisors had decided that Mr. Elmore would not be

Page 135

disciplined for the K-9 theft of time on February 25th of 2022, correct?

A. Correct.

Q. Okay. This memo was sent on June 12th of 2023. So this is like three months later, approximately?

A. Correct.

Q. Two months later.

Okay. And at the bottom of this memo, this Executive Summary, it says Evidence Against Mr. Elmore, right? Do you see that?

A. Yes.

Q. And the evidence is time theft, but this issue has been resolved, right? This issue was decided already. Am I right about that?

A. Correct.

Q. And then it goes on to say the internal investigation about the time theft, if you stay on the back page, right? A is time theft, then B is the internal investigation about the time theft.

A. Yes.

Q. And then the conduct unbecoming is

Page 136

about the time theft, because this is in April of 2022. Potential discipline, this is all about him and what was going on in April of 2022, right, right around the time theft, correct?

MR. HATCHETT: Objection to the form of the question.

Are you following?

THE WITNESS: Yes, I am.

BY MS. BENFER:

Q. Thank you.

Right? So I guess I'm just trying to understand, Obermayer is recommending him for termination on June 12th of 2023 based on the time theft that had already been resolved by the Board of Supervisors two months before, correct?

A. It wasn't just on a time theft. That's not how I see this. It was regarding -- they did include the time theft, but they also discussed the conduct unbecoming, insubordination, and --

Q. Where? What page are you looking at?

A. I'm sorry. Page 2, conduct

Pages 133 to 136

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 137

unbecoming, insubordination.

Q. April of 2022, though.

A. Correct. Then they talk about him orchestrating a vote of no confidence of PAFT members. They mention him perjuring himself.

Q. How did he perjure himself?

A. That, I don't know. I'm just stating what's in here.

So, I mean, based on what they wrote in their summary, it wasn't just the time theft that they're mentioning here, but they do mention the time theft.

Q. This memo is sent to you. Did you look into what he was talking about when they accused Mr. Elmore of perjury on the very last bullet point on Page 2?

A. He was talking about the -- yeah. There's concerns about a quota system that was brought up --

Q. Yeah.

A. -- that Chief Whitney had created.

Q. Right. And that was outlined in the letter, right, the no confidence letter, correct?

A. I don't recall that, but --

Page 138

Q. That's when it was brought up, the no confidence letter. Then Mr. Elmore was interviewed, and during that interview, he gives his information that he feels -- he's giving information about that, right?

A. Mm-hmm.

Q. Is that correct?

A. Yes.

Q. Okay. So any other time that he committed perjury that you know of that they're referring to here?

A. I don't know.

Q. Was Mr. Elmore ever issued a Loudermill notice for committing perjury?

A. Not that I recall, no.

Q. No. Okay. And if he did, it would be documented somewhere?

A. Correct.

Q. So I'll represent to you I haven't seen a Loudermill notice for perjury. I'm just making sure, have you ever seen a Loudermill notice issued to Mr. Elmore for perjury?

A. No.

MR. HATCHETT: Objection to the

Page 139

form of the question.

Can you state your response again?

THE WITNESS: No, I have not.

BY MS. BENFER:

Q. Officer Elmore has then orchestrated a vote of no confidence. Do you see that above there? We're still working on that same document, Page 2.

A. Yes.

Q. Again, at the time that the no confidence vote was taken, he was the president of PAFT, correct?

A. Yes.

Q. And he didn't single-handedly vote for the no confidence, 22 other officers voted along with him for a vote of no confidence, correct?

A. Correct.

Q. So it wasn't Mr. Elmore solely saying I have no confidence in Chief Whitney and that is the result of why Chief Whitney was put out on administrative leave?

A. Correct.

Q. It took multiple officers; in fact,

Page 140

22 officers, to vote no confidence?

A. Yes.

Q. And as the president of PAFT, if the officers want to do a vote of no confidence, would it make sense that that letter of no confidence going to the Board of Supervisors would have to come from the president of PAFT at the time?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer.

A. It would make sense.

Q. It would make sense, correct?

A. Correct.

Q. At the end of the day, the Board of Supervisors did not follow the recommendation of Mr. Hearn and Ms. Atkins, did they?

A. Correct.

Q. They end up giving him a five-day suspension?

A. Yes.

Q. Now, was that something you recommended or was that something the Board came up with on their own?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 141

**A. It's something the Board came up with.**

Q. Could you turn to Exhibit-64, please?

**A. Okay.**

Q. Okay. This is an e-mail from you to Mr. Elmore on August 8th and it says subject, Step II response. "Following up on his Step II grievance hearing, which was held on Monday, July 31st," correct?

**A. Yes.**

Q. And at the end of the day, at the bottom it says, "More specifically, sustaining this grievance acknowledges only that, in accordance with Article 12 of the Collective Bargaining Agreement, discipline must be resolved within 90 days from the start of the investigation, unless a written notice of the Township Manager or Chief is explaining the delay," correct?

**A. Correct.**

Q. And so as a result of this, the five-day suspension is not implemented, correct?

**A. Correct.**

Page 142

Q. And then it says, "Accordingly" -- the last sentence, "Accordingly, the personnel file of the grieving officer will make no reference to the discipline imposed"; is that correct?

**A. Yes.**

Q. So what is left in the personnel file, if anything, regarding the incident that he received a five-day suspension for?

**A. I don't know.**

Q. Should anything be in there?

**A. Regarding the five-day suspension?**

Q. The allegations that resulted in the five-day suspension.

**A. It should make no reference to the discipline imposed.**

Q. So his record, again, as of -- well, not again. As of August 8th, there's no discipline -- there should be no discipline in his record. His record is clear with regard to the theft of K-9 time, right?

**A. Correct.**

Q. And the harassment complaint that was brought against him, correct?

**A. Correct.**

Page 143

Q. Okay. So right now as of August 8th, Mr. Elmore has got a clean record; is that correct?

**A. Yes.**

Q. Nothing in his records -- there should be nothing in his record?

**A. No, there should not.**

Q. Okay.

MS. BENFER: All right. This will be a good time, can we take like a ten-minute break.

- - -

(Short recess.)

- - -

BY MS. BENFER:

Q. In September of 2023, I believe Mr. -- let me back that up.

Do you know a person named Charles Shute at Obermayer?

**A. He was one of their attorneys.**

Q. Yeah. Okay. In 2023, he conducted some type of investigation, are you aware of that, for the Township?

**A. Yes.**

Q. And his investigation was -- he

Page 144

investigated discriminatory hiring practices, correct?

You don't know?

**A. That, I don't know.**

Q. Okay. Do you know who hired him to do the investigation?

**A. It would have been the Board.**

Q. Okay. Oh, I'm sorry. Let's go back to Fred Harran. You may have testified to this, and I apologize if I'm asking the same question again.

Who hired Fred Harran to conduct investigations?

**A. The Board.**

Q. And did anybody recommend him to the Board or did the Board on their own make that decision?

**A. The Township solicitor recommended him.**

Q. Okay. And so I'm just trying to understand. There's an e-mail that is telling Mr. Elmore there's a Loudermill hearing he's going to have to attend on the 9th of December. Remember we looked at that --

Pages 141 to 144

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 145

A. Yes.

Q. -- that e-mail?

What was the outcome of that Loudermill hearing?

A. I don't recall. I don't recall the Loudermill -- of 2023?

Q. 2022, December 2022. I'll represent to you that Mr. Elmore was put on administrative leave in 2022 shortly thereafter.

A. I don't recall. I don't recall.

Q. Do you recall ever seeing a written decision on the Loudermill that he received in December of 2022?

A. I don't know.

Q. In September of 2023, Mr. Elmore filed a charge of -- actually, September 20th, 2023, he filed a charge of discrimination with the EEOC. Were you given a copy of that document?

A. I don't recall. Typically that is what would happen, I'd receive copies of that stuff.

Q. And what would you do with it when you got it?

Page 146

A. I would forward it to labor counsel and to our solicitor.

Q. Do you recall having any conversations with Nelson Whitney about it?

A. No.

Q. Do you remember, did you give it to him?

A. No. I don't recall doing that.

Q. Do you remember having any conversations with the Board about the EEOC charge that Mr. Elmore filed in September 2023?

A. It would have been brought up at an executive session, but I don't recall any exhaustive conversation about anything.

Q. Do you recall what the Township's decision -- what the Township did with it once it got it?

A. I don't recall. Again, it would have been forwarded to labor counsel for direction on how to proceed.

Q. And do you recall how you were instructed to proceed?

A. No, I don't recall.

Q. Would that be documented anywhere?

Page 147

A. Yes, it would be.

Q. How?

A. Either through an e-mail -- typically through an e-mail.

Q. And would the e-mail have come from counsel giving you specific instructions on what you should do in response to the EEOC charge?

A. Yes. An EEOC complaint would also have gone to our insurance carrier, and at that point then, basically let the insurance carrier do what they need to do.

Q. Was there any investigation initiated in response to any of the allegations in the EEOC charge that Mr. Elmore made?

A. Not to my knowledge.

Q. So there was no investigation of the complaints he made in the EEOC charge?

A. Not to my recollection, no.

Q. Why not?

A. It was sent to insurance counsel for their review and action.

Q. I understand that it was sent to them, that they're to respond to it or do

Page 148

what they're going to do with it, but did the Township conduct any investigation into the allegations that were in the EEOC charge separate and apart from what the insurance company did?

A. I don't recall any.

Q. You don't recall any investigation?

A. Correct.

Q. Were you asked to assist with gathering information to respond to the EEOC charge that was filed by Mr. Elmore?

A. If I was given any requests to gather them, I would have.

Q. Do you recall providing any documents?

A. No. I don't recall specifically, no.

Q. Okay. November 2023, late November, Mr. Dence sends an e-mail -- so Mr. Dence sends an e-mail November of 2022 asking for an update regarding the K-9 Unit. Do you have any recollection about that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: What the status

Pages 145 to 148

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 149

of the K-9 Unit was?

BY MS. BENFER:

Q. Well, let me strike that. Mr. Elmore -- I'm sorry. Mr. Dence sent you an e-mail regarding a request about the canines. Do you have any recollection what that request was about?

A. Yes. It was about the general status of the K-9 Unit, the number of canines and -- yeah. It was just sort of a general question as far as, you know, what that --

Q. Any idea why?

A. There was concern that they were not going to be -- taking in any more canines.

Q. There was concern they weren't going to take any more canines?

A. Yeah. The chief was not going to hire any more K-9 units.

Q. Who was concerned about that?

A. The Board was.

Q. Why were they concerned?

A. They wanted to know the status before anything -- you know, before any decisions were made as far as eliminating personnel or anything like that.

Page 150

Q. Had the chief conveyed that he wanted to eliminate the K-9 Unit at that point?

A. He had made comment to me about, you know, wanting to phase them out.

Q. When did he make that comment to you?

A. I mean, it was a while ago. I don't know exactly when, though.

Q. Prior to November of 2023?

A. I don't know. I mean, I couldn't pinpoint a date.

Q. And did the Board of Supervisors, did they support that decision to phase out the K-9 Unit?

A. No. They weren't a hundred percent supportive of that idea. There was questions that were being brought up about, you know, how much does it cost us, you know, to have a K-9 and, you know, what value do they have, you know, what support do they really play and those kind of questions came up.

So it was not -- there was no unanimous decision to go one way or the other.

Page 151

Q. Did the chief express to you why he wanted to phase out the K-9 Unit?

A. Primarily cost.

Q. Any other reason?

A. That was the only thing he brought up to me.

Q. At some point did you become aware of the fact that Mr. Elmore had gotten a dog from Mr. Kent?

A. Yes.

Q. Tell me about that.

A. Chief Whitney had made a comment to me about talking to Lieutenant Langan about the canines and getting additional canines, and then in that conversation he mentioned that Officer Elmore and Langan had worked to get a dog from Kent.

Q. Anything else?

A. Oh, he was concerned -- well, so he was concerned about how that occurred and that there was -- it was supposedly gifted to them, and then the value of the gift violated some police policy.

Q. Did you ever talk to Mr. Elmore about how he got the dog?

Page 152

A. Not me specifically, no.

Q. Did anyone ever share with you that he represented that he rescued the dogs?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I had heard that, that was -- that he had rescued them.

BY MS. BENFER:

Q. Did you ever know the value of the dogs when he obtained those dogs?

A. The value when he obtained them, no, but there was a value that was discussed as to what the value of the dog would be. I don't recall the specific number, though, but my understanding is that it exceeded the threshold for a gift.

Q. My question is --

MR. HATCHETT: Objection. Were you finished answering the question?

MS. BENFER: Sorry.

THE WITNESS: Yes.

BY MS. BENFER:

Q. I'm sorry. I apologize. My question, though, was at the time that Mr. Dence -- I'm sorry. At the time that

Pages 149 to 152

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 153

Mr. Elmore got the dog, the first dog -- let's start with that one, the first dog. First he got one dog. Do you have any knowledge of the value of that dog when he got it?

A. No.

Q. Do you have any knowledge of the health condition of that dog when he got it?

A. No.

Q. Did you ever make any inquiries about the health condition of the dog when he got it?

A. No.

Q. Okay. Sitting here today, do you have any knowledge of how much it cost Mr. Elmore in vet bills once he acquired that dog?

A. No.

Q. Then there was a second dog. Sitting here today, do you have any knowledge at the time when he got the second dog the health condition of that dog?

A. No.

Q. Did you ever know the health condition of that dog --

Page 154

A. No.

Q. -- when he got it?

A. No, I did not.

Q. Do you have any idea how much it cost Mr. Elmore out of pocket to care for that dog when he got it?

A. No.

Q. But yet the dog was valued at something -- let me ask you this: You previously testified there was a value to that dog. Who put that value on the dog?

A. What I heard was it came from chief.

Q. So the chief told you the dog had a certain value?

A. Correct.

Q. And do you know whether or not the chief ever spoke with Mr. Elmore personally about the dogs?

A. I don't know.

Q. I'll represent to you he testified he never did.

MR. HATCHETT: You don't have to respond.

BY MS. BENFER:

Q. You don't have to respond.

Page 155

So everything you know about the dogs came from the chief, correct?

A. Correct.

Q. And everything the chief knows about the dogs came from someone other than Mr. Elmore?

A. Based on this, yes.

Q. Do you know if -- so then there's an investigation done. Do you have any knowledge whether the people who -- it was actually Obermayer who conducted this investigation. Do you know if they ever acquired any information about the value of these dogs?

A. I don't know.

Q. Do you know if they ever evaluated the health condition of these dogs?

A. No, I don't know.

Q. Did you ever see any documentation that provided the health condition of these dogs?

A. I did not.

Q. These dogs could be very, very sick and you wouldn't know that, correct?

A. Correct.

Page 156

Q. And Mr. Elmore never reported to you that he got these dogs as a gift, correct?

A. I don't recall, no.

Q. Because you never spoke to him about them?

A. Correct.

Q. And he never said to you that they were donated to him, correct?

A. Correct.

Q. So at some point in December of 2022, there's an investigation started. Was that at your request or somebody else's request? And the investigation into how Mr. Elmore, I guess, got these dogs. It's unclear what the investigation was about.

A. There was an investigation. I don't recall who initiated it. I mean, ultimately the Board does make those decisions.

Q. Did you ever see the letter from Robert Kent regarding the dog that Mr. Elmore got from him?

A. I don't recall.

Q. Do you have any knowledge of the fact that Chris Clark and Officer Reeves went out on December 1st of 2023 and spoke to

Pages 153 to 156

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 157

Mr. Kent?

A. That, I do know, yes.

Q. Okay. And did you instruct them to go out and speak to Mr. Kent?

A. Yeah. They were at -- I was -- part of the investigation was that they should get some kind of a statement from Mr. Kent. So I had contacted Lieutenant Clark to go out there and see if he could get ahold of him to talk to him and to get whatever information they would need.

Q. So you sent Lieutenant Clark out?

A. It would have come from me, yes.

Q. Do you think that was a smart idea given the fact that Mr. Elmore had filed an EEOC complaint in --

MR. HATCHETT: Objection.

MS. BENFER: Can I finish my question?

MR. HATCHETT: I thought you were finished.

MS. BENFER: I haven't finished.

MR. HATCHETT: You paused.

MS. BENFER: Let me start

Page 158

again.

Can you read back what I started, please?

(Court Reporter read back as follows: "Do you think that was a smart idea given the fact that Mr. Elmore had filed an EEOC complaint in --")

MS. BENFER: Thank you.

BY MS. BENFER:

Q. Do you think it was a smart idea to send Mr. Clark out to interview Mr. Kent given the allegations against Mr. Elmore that he took a bribe from Mr. Kent, given the fact that Mr. Elmore had filed an EEOC charge in September of 2023 alleging discriminatory actions by Mr. Clark?

MR. HATCHETT: Objection to the form of the question.

Do you follow?

THE WITNESS: Yes, I do.

MR. HATCHETT: Okay.

THE WITNESS: So Officer Reeves went out with him as well, so I didn't have concern that -- I mean, there was somebody else there to witness the

Page 159

discussion.

BY MS. BENFER:

Q. But just to make sure when it came to rank, it was Lieutenant Clark who ranked over Officer Reeves, correct?

A. Correct.

Q. So Officer Reeves answered to Lieutenant Clark?

A. Correct.

Q. Okay.

A. As far as sending somebody out, I'm not in a position to direct the Police Department how they should conduct an investigation. So in me reaching out to Lieutenant Clark, it would be up to him as to who would go out. I did not say specifically, I want you and Sergeant Reeves to go out. That did not happen.

Q. But you directed them to send somebody out?

A. Somebody needs to go out and speak to Mr. Kent.

Q. Okay. And why?

A. As part of the investigation, they needed to get some statement -- labor counsel

Page 160

that was doing the investigation wanted some kind of a statement from Mr. Kent as to his side of the story, what had happened.

Q. Okay. But they didn't get a statement, did they, a written statement?

A. I don't recall what the outcome -- you know, what they received.

Q. In fact, they came back and just wrote up a report of what he told them, correct?

A. I don't recall. Again, I don't recall the final form of it.

Q. Would you agree that if they came back and sat down and wrote a report, that that would be hearsay?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I don't know if that qualifies as hearsay.

BY MS. BENFER:

Q. Let me ask you this: Have you ever seen any written statement from Mr. Kent?

A. I don't recall. I have a vague recollection of seeing something. I don't recall if it's from Mr. Kent or not, though.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 161

Q. Okay. In the investigation -- eventually Obermayer conducts an investigation into the report that they issue in February of 2024, and we'll talk about that in a second. But in that report, they state that they were instructed not to speak to Mr. Kent directly. Do you have any knowledge of that?

A. No.

Q. And do you have any idea why they would be instructed not to speak to Mr. Kent directly?

A. No.

Q. Would you think it would be helpful if they had gotten a written statement from Mr. Kent?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer.

A. I mean, it wouldn't have hurt, and that's why they were -- we had a police officer go out.

Q. Did you give any instructions on what they should ask Mr. Kent when they went

Page 162

out to speak to him?

A. No.

Q. Do you know that they accused him of bribery when they went out and spoke to him?

A. No.

Q. Does an officer have to get permission to adopt a dog in Falls Township?

A. On its own personally?

Q. Yeah. If they want to adopt a dog, do they have to get permission from the Township before they adopt a dog?

A. I don't know of any policy that says you can't.

Q. There's no policy that requires an officer to report that they're going to adopt a dog, correct?

A. Correct.

Q. In fact, in December timeframe Daniel Matkowski -- do you know Daniel Matkowski, he's an officer?

A. He's an officer, yeah.

Q. He adopted a dog that he found, correct? Do you have any knowledge of that?

A. I don't know.

Q. Okay. He didn't have to get

Page 163

permission to adopt that dog, did he?

A. No.

Q. Let's look at -- let's turn to Exhibit-76.

A. (Witness complies.)

Q. Did you ever see this before?

A. No.

MR. HATCHETT: I'm sorry. Did you say no?

THE WITNESS: No.

MR. HATCHETT: There's an objection to any questions to this witness concerning this document based on his testimony.

MS. BENFER: But I'm allowed to ask him if he's seen it before, correct?

MR. HATCHETT: I didn't tell him not to answer. I'm placing an objection on the record.

MS. BENFER: But I just want to clarify. Are you objecting to me asking if he's ever seen it or are you objecting to follow-up questions?

MR. HATCHETT: No. You asked him if he's seen it. He answered that.

Page 164

I didn't object to that. I objected to any follow-up questions.

MS. BENFER: That's what I was just clarifying. It was unclear, so I just wanted to clarify.

BY MS. BENFER:

Q. Does the Falls Township Police Department have like a website that they post things on?

A. Yes.

Q. Okay. And looking at this exhibit that we're looking at, does it appear that this was posted on their website? Can you tell based on your knowledge of what their website looks like?

A. Just based on the format of the page, it does look like it, yes.

Q. It looks like it would have been posted on their website?

A. Correct.

Q. Thank you. Let's look at Exhibit-155.

A. (Witness complies.)

Q. I'm going to have you look at Exhibit-155. It's an e-mail from you to

Pages 161 to 164

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 165

Thomas Hearn and Melissa Atkins on December 15th of 2023. And I'm going to direct your attention to the second paragraph. Oh, at the very top, it says subject K-9.

(Brief pause.)

A. Okay.

Q. And you say in that sentence, you say, "I would like to have this matter reviewed by a third party."

What are you referring to?

A. Somebody outside of Township personnel or the Township solicitor.

Q. And what did you want them to investigate?

A. Basically what I outlined here, whether or not there was any conflicts of interest or policy violations with the donation of dogs. And he does mention -- I mention here, you know, Kent's letter.

Q. Right. What makes you use the word "donation"? Who said it was donated?

A. Somewhere in one of the correspondence would have been -- I don't know why I used the word "donation" at this

Page 166

point now.

Q. Mr. Elmore never told you that the dog was a donation, correct?

A. Correct. We never spoke.

Q. You never spoke. So I go back to where did you come up with the word "donation"?

A. I could surmise where, I mean, but that's the word I used.

Q. It's the word you used, but it's not firsthand information from the person who actually got the dogs, correct?

A. Correct.

Q. So you don't know in fact whether the dogs were donated when you sent this e-mail?

A. Correct.

Q. And you don't even know how he obtained the dogs when you sent this e-mail, correct?

A. Correct.

Q. Let me clarify. You don't know the circumstances surrounding how Mr. Elmore obtained those dogs, correct, when you sent this e-mail?

Page 167

A. The only circumstances I knew were from what Chief Whitney would have relayed to me.

Q. It appears that you had reviewed Kent's letter, though, when you sent this e-mail; is that correct?

A. That is correct.

Q. Okay. So I'd like to show you Kent's letter. Look at Exhibit-75.

(Brief pause.)

A. Okay.

Q. So this is the letter that you were referring to in your e-mail that we were just looking at in Exhibit-155?

A. Yes, it is.

Q. Okay. And the word "donation" does not appear in this letter, correct?

A. Well, it does come up in the letter. He's donated to the Falls K-9 program. He's donated to other -- so in that context, correct.

Q. Thank you.

Nothing in this letter -- I appreciate that clarification.

Nothing in this letter says he

Page 168

donated dogs to Mr. Elmore, though, does it?

A. No.

Q. And nothing in this letter says that the two dogs in Mr. Elmore's possession that he got from Mr. Kent were actually donated to the Township via Mr. Elmore, correct?

A. No.

Q. I want to go back to we were talking about the e-mail you sent where you said I'd like to have the matter reviewed by a third party. Remember that statement you made?

A. Yes.

Q. Did you consider Obermayer a third party?

A. Yes, I did.

Q. You did?

A. Yes.

Q. Even though that they were on retainer and were paid by Falls Township to do --

MR. HATCHETT: Object.

THE WITNESS: Yes. I still did.

BY MS. BENFER:

Q. You did, okay.

Pages 165 to 168

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 169

Do you think they were a third party given the fact that in June of 2023 they recommended that Mr. Elmore be terminated?

A.  Yes, I did.

Q.  And did you think they were a third party given the fact that they had also recommended Mr. Elmore be terminated in January of 2023?

A.  I didn't factor that in.

Q.  So you didn't factor in the fact that on at least two, maybe three occasions the law firm of Obermayer had recommended Mr. Elmore be terminated prior to them investigating Mr. Elmore in the end of December of 2023 going into '24?

A.  Correct.

Q.  Okay.  Who wrote the -- well, in response to the plaintiff's EEOC charge, a position statement was filed with the EEOC on behalf of Falls Township.  Are you aware of that?

A.  Yes.

Q.  Who wrote that position statement?

A.  I don't know.

Q.  Do you know what law firm wrote the

Page 170

response, if a law firm wrote a response?

A.  It would either have been our labor attorney or the insurance company's attorney.

Q.  So it would have either have been -- okay.

So I have a question for you.  Obermayer starts the investigation, and according to the Obermayer report, Mr. Nelson Whitney was interviewed on December 29th of 2023.  Lieutenant Clark was interviewed on December 29th of 2023.  Okay?

A.  Mm-hmm.

Q.  And then Mr. Reeves was also interviewed on the 29th regarding his meeting with Bob Kent.  Mr. Langan was interviewed on January 2nd of 2024 and Mr. Elmore was also interviewed on January 2nd, 2024.  Okay?

A.  Yes.

Q.  Okay.  So as of January 24th of 2024, Mr. Elmore had been deposed.

MR. HATCHETT:  Objection.

BY MS. BENFER:

Q.  I'm sorry.  Not deposed.  Strike that.  Mr. Elmore had been interviewed by Obermayer?

Page 171

MR. HATCHETT:  Objection to the form of the question.

BY MS. BENFER:

Q.  I'd like you to look at exhibit for me 82.

A.  (Witness complies.)

Q.  Okay.  This is a text message that appears that you sent, and it appears you sent it to a person named TH.  Is that Thomas Hearn --

A.  Yes.

Q.  -- at Obermayer?

A.  Correct.

Q.  You say -- this is Friday, January 5th.  So this is three days after Mr. Elmore has been interviewed by Obermayer.  Okay?  Three days later you sent him this text message.  "Matt, I know I said we want the report completed quickly but make this clear to Obermayer.  It can't be rushed.  We need a thorough laying out of the facts of those two officers' actions.  Were there any policies or laws broken?  Is this an isolated incident or is this another example of their course of conduct?"

Page 172

What are you referring to?

MR. HATCHETT:  Objection.  I have a standing objection.  Based on the current testimony, I believe that this is attorney/client privilege.

However, for purpose of the deposition, Mr. Takita, you can respond.

THE WITNESS:  Okay.  Let me just read it.  So this is a forward of a message.

BY MS. BENFER:

Q.  Yes.  And if you look at the bottom, it says from a supervisor.  So what supervisor communicated to you that you needed to send this to the attorneys?

A.  I don't recall which one specifically, and I don't want to guess at the names, you know, of which one it might have been, but it did come from a supervisor and basically outlining these concerns to make sure that we get it done correctly.

Q.  Let me ask you this:  Was the text message that you sent to this person -- well, the Matt in here is you, right?

A.  Correct.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 173

Q. So this actually is a text message not to -- I know you forwarded it to counsel. That's attorney/client privilege, but the text message between the supervisor to you is not attorney/client privilege, and that's why I'm asking, who sent this text message to you originally?

A. A supervisor sent this to me.

Q. Exactly.

A. That's why it's saying -- because I just copy and pasted it and sending it to Tom. It starts out with "Matt." So I want to be clear that that was from --

Q. No. I appreciate your clarity on that, and that's what my understanding was too.

So a supervisor sends you a text and then you get that and then you send it on to somebody else. My question is, do you know who the supervisor was that sent that text to you originally?

A. I don't recall specifically. I mean, I could guess at a couple different names.

Q. Would it be in your phone still?

Page 174

A. Probably, yes.

Q. Okay. I'd like to see if we could go back and find out who originally sent this text message to you.

A. Okay.

Q. Because that takes it out of the attorney/client privilege world and makes it just between you and the supervisor giving you instruction.

A. Say that again. I don't understand.

Q. I'd like to know who the supervisor was that gave you those instructions.

A. Okay.

Q. And I guess the question is, do you have any idea what this meant by "is this an isolated incident or is this another example of their course of conduct"? What is that referring to or what was your understanding of what that was referring to when you got this text message?

A. Is it an isolated incident is -- there were concerns over just the overall because of the environment in the Police Department with all the grievances and things like that and was this part of -- like just

Page 175

another example of them doing something that's inappropriate or is it just an isolated incident where really it doesn't amount to anything. That's how I perceived it.

Q. Right. But we talked about this earlier, right? I mean, there was -- Mr. Elmore was disciplined for two things. He was submitted with a Loudermill hearing for the K-9 stealing of time, right, on February 22nd of -- 25th of 2022 and then there was a harassment Loudermill hearing, a Loudermill notice, correct?

A. Yes.

Q. There was two, right? And those two things you and I discussed earlier, right, they're no longer in his record. His record was clear at the end of August of 2023, right?

A. Correct.

Q. His file should have been clear?

A. Yep.

Q. So why are we looking at something -- if his record is clear, what are we looking at?

Page 176

A. At the -- this specific issue with the canines and the, I'll use the word, donation of the dog.

Q. Anything else?

A. That was all that I recall this being about.

Q. Right. So this investigation should only be about the canines, it shouldn't have been about any previous issues or any previous write-ups that Mr. Elmore had had, because those were all clear, correct?

A. Correct. Yes.

Q. Right. So they shouldn't be expanding their investigation beyond how they got the dogs, correct?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. Well, was it your understanding that they shouldn't be expanding the investigation beyond how these dogs were obtained by Mr. Elmore?

A. My understanding is the investigation was supposed to be on the canine incident, the donations incident.

Pages 173 to 176

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 177

Q.  That's it?

A.  **Correct.**

Q.  But somehow it got expanded, didn't it?

A.  **I'd have to see his report, because I recall -- there was a report that went beyond, like it involved more stuff.**

Q.  And should it have?

A.  **I'm not an attorney, but...**

Q.  Well, you hired them --

A.  **The report we requested was for this specific thing with the donation of the canine.**

Q.  And that's it, right?

A.  **Correct.**

Q.  There's a little heart up in the right-hand corner.  What does that heart mean to you in a text message?

A.  **Somebody liked it.**

Q.  Yeah.  So the person who received this liked your text.  Would you agree with that?  It's a heart emoji.

A.  **Yes.**

Q.  Okay.  So Mr. Elmore, as we talked about, was interviewed by Obermayer on

Page 178

January 2nd, and then we fast forward over a month.  What happens in that month between January 2nd and eventually he's then issued a Loudermill notice in February?  What happened in that month in January with regard to this investigation?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  There was the investigation and then Obermayer wrote up a report, and then that report was reviewed by the supervisors and our solicitor.

BY MS. BENFER:

Q.  My question is, between when you got that -- when you sent that text message saying lock this down, right --

A.  **Right.**

Q.  -- was there any additional investigation done in January by Obermayer?

A.  **I don't recall there being anything else.**

Q.  I have not seen any additional interviews of Mr. Elmore after January 2nd.  Are you aware of him being interviewed a

Page 179

second time?

A.  **No.**

Q.  It was one interview --

A.  **Correct.**

Q.  -- as far as you know?

A.  **Yes.**

Q.  Well, let me ask you this:  Why was Mr. Elmore terminated?

A.  **It was for -- and I might be getting my reports mixed up, but there was an accumulation of issues with prior conduct with the K-9.**

Q.  But I just thought we talked about prior conduct was off the table.  So was he terminated for prior conduct?

A.  **I'd have to see Obermayer's report to see what they had laid out --**

Q.  Well, let's look at your termination letter.

MR. HATCHETT:  Objection.  I'm just going to ask that the witness be allowed to finish his response.

MS. BENFER:  I'm sorry.

MR. HATCHETT:  I don't know if you were finished or not.

Page 180

THE WITNESS:  Either, the report or the termination letter.

BY MS. BENFER:

Q.  Let's look at 93.  Oh, wait a second.  Yes, 93.  I apologize.

(Brief pause.)

A.  **Okay.**

Q.  Okay.  This is dated February 28th to Mr. Elmore and it's written -- well, it's signed by you.  Did you write this letter yourself?

A.  **No.**

Q.  Obermayer wrote this letter --

A.  **Correct.**

Q.  -- for you?  Okay.

Did you discuss it with them before you gave it to Mr. Elmore or did you just sign it?

A.  **I reviewed it and I signed it.**

Q.  So do you have a basic understanding of what you were signing before you sent it?

A.  **Yes.**

Q.  All right.  "After carefully reviewing your Loudermill Response and considering the recommendation and charges

Pages 177 to 180

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 181

outlined in the Loudermill Notice" -- before I go any further, was Mr. Elmore's Loudermill responses actually shown to the Board of Supervisors?

A. I don't recall.

Q. Whose job would it have been to give it to them?

A. It would have been either mine or labor counsel.

Q. I'm going to continue then. "Your employment with Falls Township Department is terminated, effective February 28th, 2024. The totality of your misconduct violates the following sections of Falls Township Code and Policies, Disobedience of Orders, Neglect of Duty, Conduct Unbecoming an Officer, and severely undermines the trust and integrity necessary for your role as a police officer."

That's it. Why was Mr. Elmore terminated? What did he do? What conduct was he being terminated for?

A. It was based on the report that was done prepared by Obermayer on the totality of his conduct over the course of a period of time.

Page 182

Q. And what period of time would that have been?

A. I'd have to look at the report again.

Q. Okay. Well, let's look at the report. Turn to Exhibit-92 for me, please.

A. (Witness complies.)

Q. If anything, I'm going to start with the beginning and then I'll have you review it, but I have one specific question. At the very beginning it says Executive Summary at the very beginning of it?

A. Yes.

Q. Do you see that?

And this was sent to you. So there's no question you got this report, correct?

A. I did.

Q. Okay. And the Executive Summary says, "Falls Township retained Obermayer Rebmann Maxwell and Hippel to investigate the donation of canines to the Falls Township Police Department."

That's what they were hired to do, right?

Page 183

A. Correct.

Q. "On December 15th, 2023, Matthew Takita, the Falls Township Manager, requested an investigation by this Firm to determine if there was any conflicts of interest, policy violations, or ethical issues related to the donation of the K-9 Unit by a private citizen directly to a K-9 officer without Township knowledge."

First of all, opening sentence, let's go back. Falls Township retained them to investigate the donation of canines to the Falls Township Police Department. Where did that come from? What dogs are they referring to?

A. It would be the dogs that were from Kent.

Q. But they weren't donated to the Township, were they?

A. That -- I never had, you know, spoken to Elmore.

Q. I know. I know. But were you under the impression that these dogs were donated to the Falls Township Police Department and that's what you conveyed to Obermayer to

Page 184

investigate?

A. That was my understanding of the situation, yes.

Q. The dogs were never in the possession of the Township, correct?

A. That, I don't know. I don't know how that works.

Q. The dogs always remained in Mr. Elmore's possession. They were his dogs. They were his family dogs. Do you know that?

A. No.

Q. What gave you the impression that the dogs were donated, donation of canines to the Falls Township Police Department?

A. That's how it was reported.

Q. By who?

A. Chief.

Q. The chief told you that?

A. Correct.

Q. And you never looked beyond what the chief told you?

A. Well, we had the investigation into circumstances surrounding --

Q. Well, and we'll talk about the investigation --

Pages 181 to 184

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 185

MR. HATCHETT: Objection.

BY MS. BENFER:

Q. -- but what they were charged with doing was investigating canines that were donated to the Falls Township Police Department. I have seen no evidence that any dogs were donated to the Falls Township Police Department. I'm asking you, have you seen any evidence that the dogs were donated to the Falls -- actually donated to the Falls Township Police Department?

MR. HATCHETT: Mr. Takita, before you respond, Counsel, I think that may have been the third time where you interrupted Mr. Takita while he was speaking. I'm going to renew my request that you allow Mr. Takita to finish his responses before cutting him off.

MS. BENFER: Sure.

THE WITNESS: If you could repeat the question. I'm sorry.

BY MS. BENFER:

Q. Sure. I'm just trying to understand, have you seen any evidence or any documents that show that the dogs from

Page 186

Mr. Kent were donated to Falls Township Police Department?

A. I have not.

Q. Okay. When you reached out and obtained Obermayer to do this investigation, did you give them instructions on what to investigate?

A. Yes. An e-mail would have -- there would have been some form of written request to go out to them.

Q. And do you recall what specifically you asked them to investigate?

A. Well, yes. It was in that e-mail that I had sent to Melissa about if there was any policy violations, any conflicts of interest or anything like that. That was that previous e-mail where I referred to Kent's letter.

Q. Well, other than that e-mail that you sent to Melissa, did you have any other communications about what the investigation should entail?

A. That and that text message.

Q. And the text message, okay.

A. That I can recall.

Page 187

Q. Okay. I'm going to take a look at this memo and then I'd like to ask you -- my question is still standing. Why was Mr. Elmore -- what was Mr. Elmore terminated for.

If you want me to, I'll make life easier. Turn to the last page of 26. I'm not trying to make it challenging. I just realized it myself that's where it is.

A. Okay.

Q. Page 26. Do you see that, Officer Elmore?

A. Yes.

Q. "Considering the comprehensive investigation of instances of Mr. Elmore's misconduct, outlined herein, and other investigation reports, which encompasses time theft, dishonesty during multiple inquiries, and evasion of policies under the guise of unawareness, we have discovered alarming findings. Among these is the omission of exculpatory evidence pertinent to the arrest of Lawrence Bell, a matter of grave concern. Officer Elmore's behavior, persistently displayed over the past few years, indicates

Page 188

a lack of potential for reform. Considering the seriousness of these offenses, and in the interest of upholding integrity within the FTPD, the recommended course of action is termination."

So was he terminated for all of those reasons, all those things put together, and if so, which ones? I'm just trying to understand.

A. The Board made the determination based on this report to terminate, and it was not -- there was concerns regarding the scope of the investigation going outside of the canines. So there was discussion of that, and from what I recall, I don't believe that the Board unanimously approved termination. I think it was a split Board. So there was concerns regarding that.

Q. There was concerns by the Board that the investigation went beyond the scope of Mr. Elmore acquiring these two dogs from Mr. Kent?

A. Correct.

Q. And that the recommendation to terminate him by Obermayer was based not only

Pages 185 to 188

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 189

on him acquiring these two dogs but other things as well?

A. Correct.

Q. Okay. So he wasn't terminated just for the fact that he acquired those two dogs; is that correct?

A. Based on this report, no.

Q. No. He was terminated for a wide range of things?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. Yeah. That was a bad question.

He was terminated for things other than just the canine -- obtaining those two canines?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Correct.

BY MS. BENFER:

Q. Correct?

And, in fact, it looks like it was encompassing theft of time, which he had already been cleared from, right?

MR. HATCHETT: Objection to the

Page 190

form of the question.

BY MS. BENFER:

Q. Well, he was cleared of theft of time, correct?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer. He was cleared of the theft of time from February 25th of 2022; isn't that correct?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer.

A. Yes, he was.

Q. That happened over a year before this memo was issued, correct?

A. Yes.

Q. And it says dishonesty during multiple inquiries. Well, was he ever issued any Loudermill notices or was he disciplined for any dishonesty on multiple -- during these multiple inquiries?

A. Not to my knowledge.

Q. So, in fact, he did something -- if

Page 191

he was dishonest, surely he would have been written up for it. Would you agree with that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Typically, yes.

BY MS. BENFER:

Q. Yes, right? Typically if you're dishonest, that is the nuclear button for the chief, right, being dishonest, correct?

A. Correct.

Q. Right. And so if he had been dishonest and they discovered it, they would have at least taken some type of disciplinary action. Would you agree with that?

A. Yes.

Q. But he hadn't, correct?

A. Not to my knowledge.

Q. Evasion of policies under the same guise of unawareness. Any idea what that means?

A. I believe -- I don't know.

Q. Okay. So at the end of the day, was there any disciplinary action taken previous to this memo with regard to evasion of

Page 192

policies under the guise of unawareness?

A. I'm sorry. Repeat the question.

Q. That was a bad question.

Are you aware of Mr. Elmore being disciplined for any evasion of policies under the guise of unawareness prior to this memo being written?

A. No.

Q. You said that there was a split. The Board didn't agree to terminate him?

A. Correct.

Q. What was the split; do you recall?

A. I recall three to two.

Q. And who were the two people that didn't want to terminate him?

A. Supervisor Dence and Boraski.

Q. Did they express why they didn't want him terminated?

A. No. I don't recall if they did.

Q. Did they express concerns about this investigation?

A. There was concerns about, again, the scope of the investigation.

Q. I just want to clarify one thing. Could you look at Exhibit --

Pages 189 to 192

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

MR. HATCHETT: Are you doing okay?

MS. BENFER: I actually may be done soon.

BY MS. BENFER:

Q. Can you take a look at Exhibit-89?

A. (Witness complies.)

Q. This is the Loudermill notice that Mr. Elmore was given by Chief Whitney. Do you see this?

A. Yes.

Q. We were previously talking about the Loudermill notice or I was looking for information about the Loudermill notice that Mr. Elmore was issued in December of 2022. Would this typically be what a Loudermill notice looks like, as far as you know?

A. Normally the few I've seen, it says "Loudermill notice." It states what it is at the top.

Q. Yeah. Okay. And if you look in this, it says here, "The purpose of this letter is to provide you with timely notice of the potential for disciplinary action against you, to describe the evidence

obtained during the Township's investigation, and to provide you with an opportunity to offer any information which could cause me to reconsider recommending discipline in this case."

Do you see that?

A. Yes.

Q. Okay. So the investigation that he's referring to, is that the investigation done by Obermayer?

A. Yes.

Q. So Chief Whitney would have reviewed the Obermayer investigation and then used that to write this Loudermill notice?

A. Typically these are prepared by --

Q. That was my next question.

MR. HATCHETT: Wait.

MS. BENFER: I'm sorry.

COURT REPORTER: I didn't hear the last word.

THE WITNESS: They're prepared by labor counsel.

BY MS. BENFER:

Q. So typically Loudermill notices are written by labor counsel. Do you know in

this case was this Loudermill notice written by labor counsel?

A. I do not. I don't know.

Q. You don't know?

A. Correct. I don't know.

MS. BENFER: Okay. Take a not even five-minute break, come back. I may have a few, and then I think I'm done.

- - -

(Short recess.)

- - -

BY MS. BENFER:

Q. Can you go back and look at exhibit -- we were looking at Exhibit-89, which was the Loudermill notice.

A. (Witness complies.)

Q. And then on Page 2, it has Relevant Disciplinary and Policy Violations. Do you see that?

A. Yes.

Q. And then there's like a list, 1 through 7, and then there's like a 1 and 2 on their own. Do you see that?

A. Yes.

Q. Do you have any knowledge of what

specific conduct they're referring to in each of these?

A. No.

Q. You have no idea?

A. No.

Q. Do you recall hearing anything about Mr. Elmore -- them taking disciplinary action for him talking to the press? Does that ring a bell to you?

A. No, I don't recall.

Q. So you don't recall there being an issue with Mr. Elmore having any interaction with the press?

A. No, I don't recall.

Q. Bear with me. I'm looking for one document that we just got in the last week or so. I know it's here. Well, two documents. Can you look at Exhibit-148?

A. 148?

Q. Yeah, 148, please.

A. (Witness complies.)

Q. Do you recognize this document? Do you know what it is? It's not a trick question. I'm just trying to understand it.

A. It's responses to -- it's responses

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 197

to a Complaint.

Q. Okay. Do you know who brought this Complaint? Do you have any knowledge of this document at all? Because if you go to the last page, it says, "Elmore's charge is barred, in whole or in part, by the applicable statute."

A. Sorry. Which?

Q. Under New Matter on the third page, it says -- it's about Mr. Elmore. I'm just trying to understand what it's about.

A. I don't understand what the term means "charge is barred."

Q. Okay.

A. I don't know.

Q. Were you asked to assist with this? It was written on April -- signed off by Melissa Atkins on April 27th of 2023.

A. It's regarding unfair labor practice.

Q. Was there an unfair labor practice brought by Mr. Elmore?

A. That, I am not too sure. I mean, looking at this, PAFT had filed something against Falls Township.

Page 198

Q. Did it have something to do with maybe wearing the T-shirt?

A. I don't know.

Q. Okay. I don't want you to guess. I honestly was just...

At the same time that Obermayer was conducting an investigation into the canines in January of 2024, right, the canine -- Mr. Elmore acquiring those two canines, correct?

A. Yes.

Q. If you turn and look at Exhibit-152. January 18th the law firm also issues by Charles Shute a decision regarding the investigation of the police hiring practices, correct?

A. Correct.

Q. And in there they talk about the interview -- or the allegations that Mr. Elmore made about Mr. Clark, correct? Turn to Page 12, if that helps you.

A. Paragraph 2?

Q. Page 12.

A. Page 12.

Q. Yeah.

Page 199

A. I don't know what OEB is.

Q. I don't either. Were you aware of the fact that they issued this memo, though, in January 2024?

A. It looks familiar, yes, and actually I received it, so I did get it.

Q. So at the time in January of 2022, Obermayer had multiple investigations going on with regard to Mr. Elmore, didn't they?

A. Yes.

Q. Okay. All right. Can you turn back to Exhibit-89 for me. That was Mr. Elmore's Loudermill notice.

A. (Witness complies.)

Q. And I'm going to have you turn to the second page, Paragraph 3. And Paragraph 3, "On January 8th," do you see that halfway down?

A. Yes.

Q. "Levittown Now published an article where the statements you made to the media contradict the facts as stated in your Incident Report concerning an apprehension and arrest and your inclusion in the last round of promotional exams on or about

Page 200

June 2023."

Do you know anything about that?

A. No.

Q. Did that ever become part of the reason that Mr. Elmore was terminated, as far as you know?

A. What do you mean?

Q. I mean, this is one of the things that they're alleging he did that is going to be part of his Loudermill hearing. Was this part of something he was disciplined for?

A. I don't recall any -- I don't know about any of this. I don't recall it being part of it.

Q. Do you have any knowledge that in fact after Mr. Elmore was terminated, this very same article that was published in the Levittown on January 8th was then subsequently published by the Township after he was terminated?

A. I'm not aware of that.

Q. Okay. So as far as you know sitting here today, this No. 3 was -- the events that are outlined in No. 3 had nothing to do with Mr. Elmore's termination?

Pages 197 to 200

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 5

Page 201

A. As far as I know.

Q. What about the events in Paragraph 2? Take a moment to read those and I just have a question for you on those.

(Brief pause.)

A. Okay.

Q. Were any of the events set forth in Paragraph 2 used as reasons for why Mr. Elmore was terminated?

A. They weren't specifically. This was not specifically listed in Obermayer's report verbatim.

Q. It wasn't included in the Obermayer's report verbatim?

A. Correct. I mean, I don't recall that, this being in there.

Q. It was or was not --

A. I don't recall this specific language being in there, yeah.

Q. Was Mr. Elmore terminated for the way in which he handled Lawrence Bell's arrest?

A. I don't know. I'm trying to remember -- just look at the Obermayer report if they had referenced Lawrence Bell in the

Page 202

report. I mean, if they had, then I would say yes, that played into their --

Q. And was Chris Clark ever investigated about how he handled his testimony at the Lawrence Bell hearing?

A. Not to my knowledge.

Q. Okay. Was Chris Clark ever investigated for any acts of discrimination?

A. In my tenure, the only thing would have been the investigation by Charles Shute, the one we just looked at for -- that was the only one I know of.

Q. The hiring practices?

A. Correct.

Q. Are you aware, were any complaints brought about Christopher Clark by any other officers?

A. I mean, Officer Elmore.

Q. Other than Officer Elmore, did anybody else bring complaints about Christopher Clark that you're aware of?

A. No, not that I can recall.

Q. Did any female officers ever complain that he harassed them?

A. I don't recall getting any

Page 203

complaints specifically that he was harassing them, but that there was concern about his -- you know, some of the complaints that we received involved him. To what extent, I don't recall specifically.

Q. There was complaints from outside the Police Department or inside the Police Department?

A. Inside the Police Department.

Q. So you recall receiving complaints about Christopher Clark from inside the Police Department?

A. Correct. Not like an active complaint, like he was actively doing something there at that time, but more like historically.

Q. Historically?

A. Correct.

Q. There had been complaints about Christopher Clark?

A. No, that he -- something had been done in the past before my being there as the township manager.

Q. Were those complaints ever investigated?

Page 204

A. Any complaints like that would get forwarded to labor counsel.

Q. I'm going to have you look at Exhibit-156. And I'm going to try, but it's so small. I'm sorry. I'm doing the best I can with this.

This is too small. We can't use this one. I apologize. Let me find another one that's bigger.

I'm not going to use that document. Let's look at Exhibit-115. And I apologize, but I have to turn my phone on so I can see it. It's so small. Give me one second.

And I want you to turn to the second page. I'll represent to you this document was provided by Falls Township. Okay? And if you look at the second line down -- if you need my flashlight, I'll be happy to share it with you. It's the second page.

A. Yes.

Q. Are you looking at the second page? And the second line down is "Ed Elmore, conduct unbecoming an officer."

You see that?

A. Yes.

Pages 201 to 204

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 5

Page 205

Q. And then it says "termination" and it says "2/20/24" and it says "unauthorized canine acquisition and false statements."

Do you see that?

A. Yes.

Q. It appears to me that's the reason for his termination. So I'm just going to ask again, do you have any idea what the false statements are that they're referring to on this document?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No, I don't.

BY MS. BENFER:

Q. You don't know? Okay.

Do you have any idea who would fill this form out?

A. No, I don't know.

Q. Okay. And "unauthorized canine acquisition," you see that?

A. Yes.

Q. What was unauthorized about the way he got that dog -- or the dogs, I should say?

A. Based on the report, it violated the donation policy.

Page 206

Q. What about it violated the donation policy?

A. I'd have to review the report. I don't know.

Q. The dogs would have to be donated first, right? I mean, to violate the donation policy, the dogs have to be donated in the first place. Would you agree with that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Correct. Yes.

BY MS. BENFER:

Q. Yes. Right. And Mr. Elmore when he met with the investigators, he did not use the -- in their report it reflects he did not use the word "donate" when he was interviewed by them. He used the word -- he referred to them as being rescued. Did you know that?

A. No, I did not.

Q. Did you know that the dogs were not in good health; in fact, they were malnutritioned and on the brink of being put down when they were acquired by Mr. Elmore?

A. No.

Page 207

Q. Would you consider a dog who is about to be put down a donation or a rescue?

MR. HATCHETT: Objection to the form of the question.

BY MS. BENFER:

Q. You can answer.

A. It would be a rescue in my --

Q. In your opinion, would it be a rescue?

A. Correct.

MS. BENFER: I have no further questions.

MR. HATCHETT: Can I have an electronic copy of the transcript, full and mini, with any exhibits via e-mail. Thank you.

COURT REPORTER: Yes.

- - -

(Witness excused.)

(Deposition concluded at 2:32 p.m.)

- - -

Page 208

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence and objections are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter, and that this is a true and correct transcript of same.

--------------------
MICHELE L. MURPHY
RPR-Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 5