Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTER DISTRICT OF PENNSYLVANIA
No. 2:25-cv-02076-JHS

EDWARD ELMORE,                :
                              :
        Plaintiff,            :
                              :
        v.                    :
                              :
FALLS TOWNSHIP,               :
                              :
        Defendants.           :
_____:

REMOTE DEPOSITION VIA ZOOM OF JEFFRY BORASKI

T R A N S C R I P T of Deposition
Proceedings in the above-entitled matter, as taken by and before MARIA F. PIOTROWSKI, Certified Court Reporter and Notary Public of the State of New Jersey, on TUESDAY, JUNE 2, 2026 commencing at 5:00 P.M.

HUDSON COURT REPORTING & VIDEO   (800) 310-1769

---

Page 2

A P P E A R A N C E S

HARDWICK BENFER, LLC
BY: TIFFANIE C. BENFER, ESQ.
179 N. BROAD STREET
DOYLESTOWN, PENNSYLVANIA 18901
T:  215.230.1912
Attorney for the Plaintiff
Tbenfer@hardwickbenfer.com


MARK RISK, P.C.
BY: MARK RISK, ESQ.
60 EAST 42ND STREET
47TH FLOOR
NEW YORK, NEW YORK 10165
T:  212.682.4100
Attorney for the Plaintiff
MDR@mrisklaw.com


MARSHALL DENNEHEY, P.C.
BY: JAHLEE J. HATCHETT, ESQ.
2000 MARKET STREET
SUITE 2300
PHILADELPHIA, PENNSYLVANIA 19103
T:  215.575.2585
Attorney for the Defendant
JJHatchett@mdwcg.com

---

Page 3

INDEX TO WITNESSES

WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
JEFFRY BORASKI
By MS. BENFER        4


INDEX TO EXHIBITS
NUMBER          DESCRIPTION          IDENT
(No exhibits marked.)

(phn) indicates a phonetic spelling.
[sic] indicates the text is as stated.
Quoted text is as stated by speaker.

---

Page 4

COURT REPORTER:  All Counsel participating in this deposition acknowledge that we are physically not present in the same locations and that I will be reporting this deposition remotely.

You further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter under penalty of perjury.

If all Counsel consent to this arrangement and waive any objections to this manner of reporting, please indicate your agreement by stating your name and your agreement on the record.

MS. BENFER:  Tiffanie Benfer, I agree.

MR. RISK:  Mark Risk, I agree.

MR. HATCHETT:  Jahlee Hatchett, I agree.

JEFFRY BORASKI, was duly sworn to tell the truth and testified as follows:

DIRECT EXAMINATION BY MS. BENFER:

Q   Good afternoon, Mr. Boraski.  My name is the Tiffanie Benfer.  I represent Edward Elmore in the matter of Elmore versus Falls Township, and my co-counsel Mark Risk is here today as well, so we have all four of us here.

Could you state your full name for the record?

A   **Jeffrey Boraski.**

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 6

Page 5

Q    Mr. Boraski, have you ever had your deposition taken before?

A    No.

Q    Okay.  I'm sure that Mr. Hatchet walked you through this, but I'm just going to give you what I call the ground -- rules of the road for a deposition so we make the court reporter's job a lot easier because her job is to take down everything I ask you and all of your answers accurately.  Okay?

So the first rule I am going to ask you that we can agree to is that all of your responses are verbal responses, not an uh-huh or the shaking of the head because the court reporter can take that down.

Can we agree to that?

A    Yes.

Q    If you answer a question that I ask I'm going to assume that you understood the question that was asked.

Can we agree to that?

A    Yes.

Q    If you don't understand a question I'm asking please let me know and I'll rephrase it so that you understand it.  My global here is to make sure the record clear and the question is clear and the answer is clear.

Can we agree to that?

Page 6

A    Yes.

Q    At any point during this deposition if I've asked you a question and, let's say, 20 minutes later you remember the answer, for whatever reason, please let me know, we can go back and we can correct the record so it reflects your accurate answer.

Can we agree to that?

A    Yes.

Q    Okay.  Is there anything preventing you from understanding and answering my questions here today?

A    No.

Q    Is there anything that's preventing you from testifying truthfully here today?

A    No.

Q    And you understand that you're under oath today?

A    Yes.

Q    Before this deposition did you review any documents?

A    No.

Q    Okay.  Have you ever reviewed the Complaint that Mr. Elmore filed against Falls Township?

A    I don't remember.

Q    Have you ever reviewed the EEOC charge that Mr. Elmore filed against Falls Township?

Page 7

A    I don't recall.

Q    If you were to be shown those documents would that help refresh your recollection?

A    I'm not sure.

Q    Okay.  All right.  I'd like to start with your background with Falls Township.  Could you please explain to us your position with Falls Township currently and in the past five years?

A    I have no position in Falls Township right now.  My term expired December 31st of 2024.  So I have no -- this is actually my first time in the Township building since I came off the Board.  I was on the Board for 12 years, Supervisors, and prior to that I was on the Planning Commission quite a number years, I don't remember if it was six or seven maybe years on the Planning Commission before that.

Q    While you were on the Board did you hold any specific positions?

A    Because I came from the Planning Commission I was -- we have -- we did liaisons for a little while and I was the liaison for the Planning Commission, basically if there was an issue or they had a question for the Board or maybe the Manager or they had, you know, maybe a meeting issue or a Board Member, they would just deal with one Board member, I did that.  I don't know if I

Page 8

ever stopped doing that.

Q    Mr. Boraski, what do you do for a living?

A    Union electrician.

Q    While you were -- while you held a position on the Board of Supervisors did you receive an email address from Falls Township?

A    Can you repeat that?

Q    Sure.  Let me rephrase it.

As a Board Member did you have an email that was assigned to you by Falls Township?

A    Yes.

Q    And did you use that email address to communicate with your fellow Board Members?

A    I used that email to communicate with Township business.

Q    That's my next question.  Did you do all your Township business through your Falls Township email address?

A    Yes.

Q    And when you left the Board in, I believe you said, 12/31 of 2024, was that correct?

A    Yes, I'm pretty sure that was the end of my term.  Yeah, I didn't come, like, after that at all.

Q    At the conclusion of your term did your email address -- did you still have that email address or did

Pages 5 to 8

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 6

Page 9

it cease to exist?

A    From what I remember I actually think I got some sort of notification somehow that was that the Township itself had shut off the domain and I know longer had access.

Q    I'm focusing on your time as a Board Member.

A    Okay.

Q    Did you at any time communicate with the -- with your Board -- fellow Board Members through text messaging?

A    I don't recall.  I'm sure I've texted them.  I don't know any certain situation, like, whether it was, you know, probably personal stuff, you know, one-on-one. they're people I know a long time.

Q    Did anyone from Falls Township ask you to review your text messages to see if there was any responsive messages to the discovery requests in this case from Plaintiff?

A    No.

Q    Did you ever communicate directly with the Chief of Police via text message while you were on the Board of Supervisors?

A    I have.

Q    You did?

A    Yes.

Page 10

Q    Okay.  And did you use your home -- I'm sorry, your personal phone number to do those text messages?

A    Yes.

Q    Did any of those text messages have to do with Mr. Elmore?

A    They did not.

Q    While you were on the Board -- I just want to clarify, is it your understanding that during that time period that the Police Chief answered to the Township Manager and the Township Manager answered to the Board of Supervisors.

A    Do I believe that that's how -- yes, but that was the way it should have been.

Q    But is there something else, did something else occur?

A    Oh, I just think that there wasn't always -- we weren't following proper protocol with the Chief of Police.

Q    Can you explain to me what you mean by that?

A    So I haven't spoken to the Chief since probably 2021, from what I remember, maybe 2022, but I just lost a little bit of faith in him as a leader.

Q    Why did you lose faith in him as a leader?  And when we say "him" you're referring to Nelson Whitney; is that correct?

Page 11

A    Yes.  There was a lot of, like, a lot of distractions.  I don't know if he was always being the most truthful person.  And from what I remember it was 2021 it was just when, if my time's correct, you know, it's been a couple years but, you know, the FBI probe happened in the Falls Township and I learned very early that he had turned his backs on specifically Mr. Dence and myself.

So up until that point we were all working together and then I learned that, you know, probably in the fall of that year that he, you know, he was actually working to try to destroy us for some unknown reason. Still to this day I don't know why.  And, I mean, spacing myself from him was -- the distance between me and him was for the best.

Q    You said the fall.  Are you referring to the fall of 2021?

A    That's what I remember or it was 2020.  I don't remember the year exactly.  Whenever that FBI probe started.

Q    You said there was a lot of distractions.  What distractions were there?

A    I just think that we -- you know, it was nonstop personnel matters and it was a lot for someone who works full-time trying to raise my family and I think

Page 12

that a lot of it was, I don't know if -- I think he was the driving force -- when I look back at that, I think he was the driving force behind all that, in fact, I think he was causing a lot of the problems himself.

Q    Causing a lot of problems for what, could you clarify that?

A    For the taxpayers.

Q    And you mentioned there was a nonstop personnel and I didn't catch the last piece of that.

A    Personnel matters, I just -- from when I started on the Board and I think until he became Chief we didn't have that many grievances.  I don't remember I -- mean everybody's gonna have them, but I just remember it being personnel matter, after personnel matter, after personnel matter, from what I remember.  What they were specifically I couldn't tell you at this point, you know, but I remember that, you know, still to this day just -- that's what I remember about my last few years being a Supervisor.

Q    What do Supervisors do with regard to these personnel matters you were referring to?

A    I mean, these are handled by, you know, Labor Counsel, but ultimately, you know, presented to the Board of Supervisors and, you know, that was always one of my things where as a Supervisor I was never involved in the

Pages 9 to 12

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 13

hiring process, not involved in the promotional process, but when it came time to discipline people he'd drop them on the Supervisor's lap to make the decisions and that was always, still to this day, one thing that bothered me about being here.

Q   Was there an increase in personnel matters when Chief Whitney took over as the Chief of Police?

A   Yes, from what I recall, yes.

Q   And did the Board Members discuss the increase in personnel issues that took place when Mr. Whitney took over as Chief of Police?

A   I don't remember us having conversations regarding that.

Q   Was there -- did the Board Members express among themselves concerning about an increase in the grievances under Mr. Whitney's administration?

A   I don't recall.

Q   Do you recall were any investigations initiated by the Board into Chief Whitney and the number of the grievances that -- the increase in the grievances?

A   I don't know.

Q   Were you a Board Member when the Chief -- when Chief Whitney was appointed the full-time Chief of Police?

A   I was.

Page 14

Q   And did you vote to put him in that position?

A   I did.

Q   You also mentioned earlier the lack of truthfulness.  What were you referring to?

A   After seeing the way he treated me I just felt -- I just felt like there was that I questioned everything he did because I know the way he treated me from '18 or '19 up until getting his promotion and then I seen him just try to destroy someone's life and I thought if he was willing to do that to his, quote/unquote, boss then who else -- what's he capable of.  And I just felt at that point, like I said, I distanced myself and no longer spoke to him and I had no reason to speak to him. Everything would go through our Township Attorney if I had a question.

Q   Did you -- was it your opinion that Chief Whitney lacked truthfulness?

MR. HATCHETT:  Objection to the form of the question.  You could respond.

A   It is.

Q   And you just gave me an explanation of why you felt there was lack of truthfulness.  Is there anything else that you'd like to add that you didn't share with me about the fact that he lacked truthfulness?

A   We're going back four years, almost four years,

Page 15

I just -- you know, I can't pinpoint anything at this time other than, like, I keep repeating what I saw he was capable of doing and he was willing to destroy my life and everything I built in this Township and, you know, my voluntary hours and make me out to be somebody I wasn't. And I just, again, I distanced myself from him and...

Q   Did you ever fear retaliation by Chief Whitney?

A   I did not.

Q   Did you ever discuss your concerns of lack of truthfulness by Chief Whitney with your other Board Members?

A   I had -- outside of Executive Sessions, I didn't speak about Nelson Whitney.

Q   Inside executive sessions, and I'm not asking for legal -- what you told your attorneys or what they've told you or any legal advice they gave you, but when you're sitting there in your Board meeting, even Executive Sessions, and you're talking among the Board Members, just the Board Members themselves, did you ever share with them that you felt there was a lack of truthfulness with Chief Whitney?

A   We never would speak about anything, like, it would always be with our Labor Counsel, you know what I mean, like, I would express my feelings on a situation with if I was being explained something by our Labor

Page 16

Counsel and maybe I didn't agree or, you know, needed more information.

Q   Let me rephrase that.

I understand you were speaking to them.  Did you ever express to your fellow Board Members that you were of the opinion that Chief Whitney lacked truthfulness?

A   Yes, I'm sure I have.

Q   Do you remember any specific instances in which you expressed that lack of truthfulness with them?

MR. HATCHETT:  Outside of any conversations with any attorney.  And you can answer with that understanding.  Okay?

THE WITNESS:  I'm not sure I understand.

MR. HATCHETT:  To Miss Benfer's question, she asked you about any conversations that you would have had about Chief Whitney's truthfulness, I'm instructing you that you can provide -- that you can answer as long as your answer doesn't disclose any conversations you had with any attorneys.

A   It would be an executive session with the attorneys.

Q   I understand with the attorneys.  My question is, sitting around, I'm assuming executive session that you all sit around like a conference table?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 17

MR. HATCHETT: Again, I'm going to instruct you with an answer even if there -- if there were Counsel present, even if they weren't actively talking, I'm going to ask you not to respond, but to the extent that there was no Counsel present, you can respond.

A   Yeah, no, not without Counsel in the room.  I was never --

Q   I'm going to go -- I just want to -- I'm sorry, go ahead.

A   I was just saying, I wasn't in executive sessions when there was no Counsel present and we wouldn't have been speaking about just to have a conversation, it might have been at the moment there was something being discussed regarding a labor issue or something with the Chief and, you know, maybe I didn't agree, which I tend to do, when I was tending to do with him towards the end of my career as a Supervisor.  So I might have had them conversations, but they would have been with our attorneys at the time.

Q   I understand -- yeah.  And I guess I'm not asking for you to share what you shared with your attorneys, I'm asking what you shared -- let me ask a different way.

Do you recall any specific opinions about, that

Page 18

you recall, with regard to the Chief and his lack of truthfulness, in your own knowledge?

MR. HATCHETT:  Outside of anything that was discussed with any attorneys.

A   I do not have in those specifics.

Q   Okay.  And I'm not -- you could have had these discussions, like your own -- I'm not asking discussions or even your thoughts eventually sharing with Labor Counsel, what I'm asking you is, sitting here today can you share with me, I guess, your opinion or your thoughts about any specific acts by the Chief that represented lack of truthfulness in your opinion?

MR. HATCHETT:  Objection to the form of the question.  Do you understand the question?

A   I think I'm trying to answer it by honestly and truthfully tell you that in 2021, like, I second guessed everything he said and I just -- so I always had a question, I always wanted more information, I always wanted to know, you know, if someone else had any input on a situation.

Q   Thank you.  Did any of your fellow Board Members ever share with you that they agreed with you, that second guessing -- that they also second guessed Chief Whitney?

A   I don't recall.

Page 19

Q   Are you aware of at any point in your last couple of years on the Board that Chief Nelson Whitney was given instruction that he was prohibited from disciplining police officers without first getting approval from either the Township Manager or the Board of Supervisors?

A   I remember being -- I do recall something like that, yes.

Q   Do you know was that something the Board decided upon to implement?

A   I don't know if that was a Board directive or it was, like, a decision that was made as a whole Executive Team, you know, when I talk about Manager and Solicitor and the Board of Supervisors, I don't remember how we got to that point, but I do definitely do remember something of that nature, yes.

Q   So let me just clarify.  So you're not sure how you got to that point but you do remember getting to that point --

A   Yes.

Q   What about at any point did Chief Whitney was he required to get permission to issue a Loudermill Notice to a Police Officer without -- strike that.  Let me rephrase that.

At any point in the last couple of years while

Page 20

you were on the Board was Chief Whitney required to get permission from the Board or the Township Manager before issuing Loudermill Notice to a Police Officer?

A   I don't recall that.

Q   Do you recall the Board having any involvement in Loudermill hearings?

A   No.

Q   Do your recall the Township hiring Labor Counsel?

A   Which one?

Q   Well, let me ask you.  Was there Labor Counsel employed by the Township during your tenure on the Board?

A   Yeah, so I remember, you know, Randy Flager was here, I don't know what his law firm was, I just don't remember.  And then I'm pretty sure it was Obermayer, right, was after -- I don't know if there was someone in between.  I think it went from Mr. Flager to Obermayer.  I don't know if there was anyone in between that, I don't remember that.  That would have been in '18 or '19 and then it was or I believe it might still be Amber Durelnell [phn].

Q   At any point during your tenure did the Board give a directive to Labor Counsel that the Labor Counsel was to review and approve all Loudermill Notices that the Chief sent out?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 21

A   No, I don't remember that.

Q   You mentioned earlier there's the hiring practice, which the Board was not involved in, I believe, and then you said, but we were involved in the discipline process.  Did I understand that correctly?

A   It wouldn't have been discipline process, from what I remember it was more that when it came to -- it wasn't just Police it was anybody, when it came to -- and maybe it was, like, I just don't remember the extent of the discipline, but it was if we had to terminate to -- when it came time to terminate an employee that's the part that still bothers me today.

Q   Why does that bother you still to this day?

A   Because where I work we see employees on their first day, we work with them, we bring them up, it's just a different mentality, it's a different way of -- you know, as a Foreman where I work the first day an employee's hired he comes work for me.  If I have an issue I deal with him from the day he was yes or no he was a good employee to the day we may have to lay him off or fire him.  So I was present for the whole process.

As a Supervisor, you know, we don't make a decision on who we get to hire here, you know, we're never a part of that.  As a matter of fact, I don't even know -- they don't even swear in the Police Officer in

Page 22

front of the Board.  I don't know if they do now, but I could probably count on one hand how many times they did the swearing in in front of the Board of Supervisors in my whole 12 years here.

Q   So is it your testimony that the Board of Supervisors had no role in deciding what Police Officers to hire?

A   Right, yes.

Q   Who made the decision on which Police Officers to hire?

A   Whoever's in that -- but like I remember being of course Nelson, I think Chris Clark was involved in that, Lauren Gallagher, Township Manager's Office, Sherry McGovern.  Sometimes at night -- you know, we had to push for years to at least give us a heads up a couple nights before the meeting so we could at least read the notes and see who the people were.  I remember, I can't think of the guy's name, but I remember coming to a meeting one night and getting to podium, I was sitting in my seat and were hiring somebody that I had never -- I didn't hear we were hiring a cop until I got there that night.

Q   Do you know does Falls Township have any rules or regulations or policies that requires the Board of Township to be the ones who make the final approval of what Police Officers --

Page 23

A   I believe, yes, that's the policy that the Board of Supervisors have to have an official act to hire the police officer.

Q   And were they actually following that policy during your tenure?

A   From what I recall, yes.

Q   You mentioned Sherry McGovern, what was her position during your tenure?

A   HR Coordinator, I believe, is her official title.

Q   Do you know did she have any certificates or anything like that for HR work?

A   Not that I'm aware of.

Q   Did she have any background in HR before she came to Falls Township?

A   Not that I'm aware of.

Q   Do you know where she worked at before she came to Falls Township?

A   I do not.

Q   Was she working for Falls Township when you became a Board Member?

A   Yes.

Q   Is she in charge of running HR for the Township?

A   I believe so, yes.

Page 24

Q   Was she ever in charge ever running or doing investigations on behalf of the Township for any complaints of, like, discrimination or retaliation or anything like that?

A   Not that I'm aware of.

Q   Did she have any authority to make any decisions with regard to hiring or firing?

A   Not that I'm aware of.

Q   There's a gentleman by the name Dan Doyle.  Are you familiar with him?

A   Can you say that again?

Q   Yeah.  Are you familiar with the name Dan Doyle?

A   Yes.

Q   Okay.  It's my understanding that Dan Doyle was employed by the Township; is that correct?

A   Yes.

Q   Do you know who hired him?

A   The Board of Supervisors.

Q   Why did the Board of Supervisors hire him?

A   Board of Supervisors hired Dan for some of the exact reasons I have already talked about were, I think, there was a lot of -- seemed to be a lot of personnel matters, especially specifically coming from the Police Department after Nelson became Chief and Dan having the

Pages 21 to 24

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 25

background in the Police Department at Tullytown, being the Chief of Police, the Board of Supervisors felt that Dan could be useful to the Board of Supervisors and the Manager's Office to help us understand some of these grievances or some of these complaints or some of the -- I just lost my train of thought. I'm sorry.

Q   You were explaining to me --

A   I just lost the word I'm looking for. You know, we have the grievance, the grievance process -- I'm sorry, it will come to me and I will say it, I promise you.

Q   Let me ask you this. Did Dan Doyle actually help with the grievances once he was hired?

A   From my recall of Dan working here, Dan's life was not easy, it was met with resistence, not only from the Police Department, but from the Manager's Office itself. And I think that's what ultimately led Dan to resign.

Q   When you say Dan's life was not easy, are you referring to Dan's life was not easy while working -- in the working environment at Falls Township or his personal life? I just want to make sure.

A   I'm sorry, just to clarify, it was his life working here, but I am sure that was crossing over to his home life.

Page 26

Q   Did Mr. Takita have any issues with the Township hiring Dan Doyle?

A   I don't recall anything exactly. So I don't recall having that conversation with Mr. Takita at all.

Q   Do you remember having a conversation with anyone in the Township that was unhappy with the hiring of Dan Doyle?

A   I think outside of Dan, you know, Dan would tell me Matt's not helping with this or Matt's not making this easy, I think that Mr. Dippolito, I don't think he was happy with that hiring and I think he -- from what I remember he told me that personally, he told me that himself.

Q   Did he tell you why he wasn't happy with the hiring of Mr. Doyle?

A   I just -- from what he said he didn't think he was the right person for the job.

Q   Did Mr. Doyle make any changes when he became -- and I believe his title was Director of Operations and Chief Human Relations Officer; does that sound correct to you?

A   It does, yes.

Q   When he took on that position did he make any changes that maybe had upset people?

A   Not -- I don't think he ever had the

Page 27

opportunity to make any changes or anything, but I -- you would have to refresh my memory, but I don't think Dan Doyle was here very long.

Q   That was my next question. Do you recall Dan Doyle how long he was actually employed by the Township?

A   I would say would be months, if I was remembering correctly.

Q   Do you know why he left only months later?

A   I think because the new job role was met with resistence from the employees and that was from him -- that was Dan having conversations with me and he just -- I don't think anything he even tried to talk about he was -- I remember him not being able to have access to certain things, I don't know what they call it, you can access some employee files or their records -- policies, I don't think he had access to even see the policies, things like that, I remember that.

Q   Do you have any idea who was denying him access to this information?

MR. HATCHETT: Objection to the form of the question. You can respond, sir.

A   I do not.

Q   After Mr. Doyle left did the Supervisors consider hiring another person to replace him?

A   We did not.

Page 28

Q   After Mr. Doyle left did the Township hire -- my understanding they may have hired, I believe, maybe James McGowen and Patrick Malloy to conduct some internal audits. Does that found familiar to you?

A   What was the second name again?

Q   Sure. Patrick Malloy.

A   I do remember him, I just don't remember, like, what that was about, but I do remember that name.

Q   Separate and apart from the names, do you remember the Township hiring anyone or any organization to conduct internal audits of the Police Department.

A   Yes, yes.

Q   Okay. And what were they hired -- first of all, do you recall who was hired?

A   Can you repeat that?

Q   Do you recall who was hired by the Township to conduct --

A   I don't really know if there was a company name, I just remember -- I remember that Malloy last name, I do remember that last name, but I don't know if there was a company,m that I recall.

Q   I have a name called Sir 369, does that sound familiar to you?

A   I don't think so.

Q   Okay. What was Mr. Malloy hired by the Board

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 29

of Supervisors to do?

A    I don't recall.

Q    Did he ever provide a report to the Board?

A    Not that I'm aware of.

Q    Let me ask you this. Whose job -- during your tenure whose job was it to make sure the Chief of Police did not retaliate against a Police Officer for reporting discrimination?

A    It should have been the Township Manager.

Q    Anyone else?

A    I mean, I would hope that it was anybody it was reported to.

Q    How would you describe Mr. Takita and Mr. Whitney's relationship?

MR. HATCHETT: Objection to the form of the question. You can respond, if you know.

A    I think it was attempting to be professional.

Q    Did they get along?

A    Like, they just worked together, like, they were both just trying to do their jobs.

Q    Do you know at any time did they not get along?

A    I do not.

Q    Whose job -- during your tenure whose job was it to make sure the Township Manager did not retaliate against a Police Officer for reporting discrimination?

Page 30

A    He would respond to the full supervisor so I would say it was the Board of Supervisors.

Q    Did the Board of Supervisors during your tenure ever receive any complaints about Mr. Takita?

A    Not that I recall.

Q    Do you know if the Board of Supervisors ever conducted any investigations into Mr. Takita during your tenure?

A    Not that I recall.

Q    What about Chief Whitney during your tenure, did the Board of Supervisors conduct any investigations into Chief Whitney?

A    I don't remember us doing anything.

Q    We talked about Obermayer earlier. I'll represent to you I believe Obermayer was Labor Counsel some time between 2021 to 2024, give or take on those years. What is your understanding of the role of Labor Counsel for the Township?

MR. HATCHETT: Objection to the form of the question. You can respond.

A    My feelings on the Labor Counsels, they're working for the Board of Supervisors, they're working for the -- ultimately for the taxpayers, there were here to guide the Supervisors and present them with labor issues and ultimately, you know, help us come to that final

Page 31

decision.

Q    So they were -- their job was to provide you with legal advice?

A    Yes.

Q    The Board with legal advice?

A    Yes.

Q    Would you consider labor counsel a third party, neutral third party?

A    I'm not sure I understand that.

Q    Would you -- well, let me ask you this. Obermayer and other labor Counsels that you've hired over the years, the Township would pay them money to provide them with legal advice; would you agree with that?

A    Yes.

Q    Does that sound, right?

A    Yes.

Q    And their goal, right, was to -- the Labor Counsel's goal is to give the Township advice on potential liabilities or legal issues?

MR. HATCHETT: Objection to the form of the question. You can respond.

THE WITNESS: I can respond?

MR. HATCHETT: You can respond.

A    Yes.

Q    Okay. At some point the Township stopped using

Page 32

Obermayer as their Labor Counsel; are you aware of that?

A    Yes.

Q    And were you still on the Board when that happened?

A    Yes.

Q    Why did that happen?

A    I think that the Board of Supervisors I know -- I can respond -- let me respond for myself. For myself I lost all faith in Obermayer's ability to represent the Township as our Labor Counsel.

Q    Why did you lose faith in Obermayer?

A    So I wasn't present for a whole lot of Executive Sessions, but the last time I was in an executive session was probably in 2024, early 2024, and I seen firsthand Melissa Atkins disrespect Supervisors to their face, one being myself and one being Mr. Dence. And I don't know who was before that or after that, but there was -- it was either before or after, I just don't remember the timeframes, but I even went to the Board of Supervisors and I asked them in Executive Session if we could -- I asked the attorneys if we could separate out their bill list because I no longer felt that they were representing the tax payers -- the Board of Supervisors the way they should have and we started separating out the bill list and I from that time forward the meetings I

Pages 29 to 32

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 6

Page 33

voted no for everyone of their bills.

Q    You said Melissa Atkins disrespected you?

A    Yeah.

Q    How did she disrespect you?

A    It was an executive session, I had questions regarding disciplinary stuff -- discipline, that was the other word I was trying to get out.  I'm sorry out.

Q    That's okay.

A    So we were discussing some personnel matters and, again, I questioned everything, had tons of questions, things that I didn't think that they would represent were truthful, and she went on attack about Nelson and his integrity and my ability to, you know, want to always second guess that and ask questions.

Q    Was this --

A    And, again, to add, I want to add to that, that I believe that that was the last night I was ever in Executive Session ever and I don't think I ever went back.  I don't believe I ever went back to Executive Session.

Q    Why didn't you ever go back?

A    Because of the way that that was allowed to happen in that executive session and the fact that I didn't -- it was not just her, but there was other things in the Township where I felt like that was an executive

Page 34

session, that was confidential, things were being discussed and then I would hear about it on the street and I just felt like I can't be a part of that ever again.  And it was my last year.  I mean, I think I only came to six meetings in 2024 anyway, you know, but I never went back in Executive Session after that.  So whether that was late '23 or early '24, I don't remember.

Q    Do you recall was the discipline that was attaboy that at that particular meeting Mr. Elmore's discipline?

A    I believe it was, yes.  I believe it was Mr. Elmore and Mr. Langdon that night.

Q    Did you question the truthfulness of the report that Melissa Atkins wrote for the Board regarding Mr. Langdon and Mr. Elmore?

A    Can you repeat that.  I didn't hear who you said was questioned on that.

Q    Yes, of course.

Did you question the truthfulness of the report that Melissa Atkins wrote and presented to the Board regarding Mr. Elmore and Mr. Langdon in 2024?

A    I do remember that being the main issue that night, yes.

Q    And the main issue, did you question the truthfulness of the actual report that was written and

Page 35

provided to the Board?

A    I questioned the truthfulness of her representing Nelson Whitney.  I felt that she was working for Nelson Whitney and the Police Department at that time and not for the Board of Supervisors and the taxpayers.

Q    Any specific examples you can provide me?

A    I don't recall at this point, I just know that was a bad night.

Q    I'm sorry.

A    Yeah.

Q    I'm going to ask that question a little differently because I'm just trying to understand what you just said.

A    Sure.

Q    Well, let me strike that.  Could you read back his answer to me, please, Maria.

(Court Reporter read the pertinent part of the record.)

Q    What specifically, if you recall, made you feel that way?

A    I don't remember that night of, you know, being -- of why, you know, what were the discussions going back and forth, I don't remember at all.  But some things they were telling us, like, I just felt, like, I just felt like it was all one-sided.  I just remember

Page 36

everything and I believe Nelson was in the room with us at the time and he was in Executive Session and so I was already worked up about that and I remember her, you know, it was basically this was Nelson's word, I felt like it was Nelson, it was all about Nelson was the truthful one, Nelson was telling the truth and no one else could tell the truth in the room except for him.  I remember that specifically why she was carrying on and screaming and I said to her why are you yelling at us, no one's raised their voice at you, I'm not yelling at you, you don't even know who I am, you know.  And I remember asking her and she was -- Jeff was sitting right to my left and she was yelling at Jeff and then I think, you know, Mr. Clark got it in under control and it was kind of over from there.  And that was the last night I had stepped into Executive Session.

Q    Was she yelling at you?

A    Yes.

Q    Was she screaming at you?

A    It was raising her voice at two Supervisors, myself and Mr. Dence, for questioning a report that she put together.

Q    Did you have questions about the report she put together?

A    Yeah, I just don't remember what the nature --

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 37

what the questions were at that moment, I'm sorry. I -- just her -- I remember her being like she was aggravated at us, almost like she had this idea of we were -- I felt like it was coming from Nelson because of the way Nelson felt about Jeff and I and it was, like, she was letting that show in a situation where she shouldn't have been letting that show and just, like, felt, like, you know, I don't -- it was ugly.

Q   It was ugly?

A   Yeah.

Q   Let me ask you, did she attack Mr. Elmore during that meeting as well?

A   I don't think so, like, I don't remember that specifically. My recollection is that that was all the same night, I feel like it was early of 2024 and I believe this was all the same night that that -- that the Board voted in the majority to fire Mr. Elmore and Mr. Langdon and I don't remember her attacking anyone personally in there I just remember it was more about, like, us having questions about the report she put together.

Q   How did you vote, did you vote to terminate Mr. Elmore?

A   I did.

Q   Do you recall why?

Page 38

A   I recall that at the moment I felt like I was doing the right thing. I can tell you from the next day until this day forward I don't believe I made the right decision.

Q   Why?

A   Because the more the Board went on the more things I was hearing, the more things were happening, the more I just think that, you know, I think that that firm Obermayer I believe was just doing the will of Nelson and I felt that until the day I left the board here.

MS. BENFER:  Okay. This would be a good time to take a break. Can we take a five-minute break.

MR. HATCHETT:  Yeah. Thank you.

(Whereupon, a recess was taken.)

MS. BENFER:  Back on the record.

Q   Mr. Boraski, I wanted to circle back. I'm still thinking about that meeting, sorry. I believe you said something about -- you used the Melissa Atkins was all about Nelson, I think you said something along. What did you mean by that?

A   I believe that her -- what we hired Obermayer to do was to work on behalf of the taxpayers and the Board of Supervisors and I believe what transpired over the years was her working for Nelson. I believe that he had direct contact with her. I believe that Nelson could

Page 39

go right to -- I'm not even gonna say Obermayer because the only person's name I remember is Melissa Atkins and I will remember that name forever because of the way she acted in that Executive Session and -- but I believe he had full access to her and I think that that was leading to a path of decisions that were being made or things that were being presented to the Supervisors that I look back at now and were -- that was not right or maybe not truthful or probably definitely not truthful. And this is coming from me, maybe the other Board Supervisors don't feel the same way or maybe they believe the things she was saying, but I -- after that night I didn't, I didn't believe the things she was saying.

Q   What things do you think she said in the meeting that were truthful?

MR. HATCHETT:  Objection to the for of the question. You can respond.

A   I'm struggling to pinpoint things. It was over two years ago. I had no communication with them and I stopped voting for their bills. I can't pinpoint anything other than that night and it was a result of that, what we're referring to as a, I'm sorry, I lost the word -- the report, the report she put together, and having questions and asking for more information and it was -- and I remember her saying, like -- Nelson was

Page 40

there and it was, like, she would look at him like if he said it was truthful and everybody else was a liar. So if there's anything I can pinpoint, I remember her saying that, everybody was a liar.

Q   She said that to the all of you that she --

A   Right.

Q   -- that everybody's a liar?

A   Somebody made a -- I think Mr. Dence specifically asked a question, I don't know whether it was about Steve or Mr. Elmore, but I remember her response being, like, they're liars, they are lying. And then I said something in regard to that, he said something and she just went off. And, again, it lasted not a long time. I kind of asked her why is she acting like that and then Mr. Clark kind of said that's enough.

Q   So did Miss Atkins call Mr. Elmore a liar at that meeting?

A   If I remember correctly she referred to anybody that was testifying to that report, if anybody was saying anything that wasn't result of her outcome was a liar, they were lying. And I don't remember whether it was Mr. Langdon or Mr. Elmore at that point, but she used the word liar, they're lying or he's lying or somebody is lying, that's what just set the whole thing in motion at that point.

Pages 37 to 40

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 41

Q    And I'm not trying -- I'm just trying to make sure --

A    I understand.  It's been a long time.

Q    Is there anything specifically you remember that she said, did she identify a specific lie that was told?

A    I don't remember at this point, I do not.

Q    Do you remember her referring to the report at all and saying, you know, this report -- anything about the report specifically?

A    No, I'm sorry.

Q    You earlier testified you regret your decision to terminate, I believe, Mr. Elmore; is that correct?

A    That is correct.

Q    Can you tell me all the reasons why you regret it at this point?

A    I can tell you the main reason was leading that and believing that feeling in my heart that she was not representing the Township, she was not -- she didn't care -- her outcome was going to be whatever Nelson wanted her outcome to be and I believe that for -- I will tell you I believe that for the entire Obermayer firm at this point and that's why I voted -- you know, I was the first one to support Campbell Durant and I never supported paying a bill for Obermayer ever again and

Page 42

while they were here.  And I don't know if they're done or not.  When I left I believe we still had little things that were trickling from them but, again, I wouldn't know.

Q    So I'm just trying to understand.  So you regret voting to terminate Mr. Elmore.  Can you identify specifically why you regret that?

A    I've always questioned whether or not the report was accurate after and it was immediately the next day after I left I just felt I always had this regret that I made the wrong decision and I was making my decision based off of what we were discussing in Executive Session with our attorneys and I voted that way for Mr. Elmore and then immediately had regret that, you know, it was not -- I should just -- I should have maybe followed my heart a little more and I was trying to follow the Solicitor's advice.

Q    Did you question the legitimacy of that report?

A    I definitely had questions of what they were.  I'm sorry, I don't remember what specifically I questioned in that report.

Q    What about the next day did you question the legitimacy of the report the next day?

A    Okay.  I don't remember any specific questions, but I remember questioning the legitimacy of the report,

Page 43

yes, but I don't remember what in particular.  I think it was more about the situation I saw happening between her and specifically Nelson Whitney.

Q    And that was my next question.  I understand you're not sure why.  What specific -- but my question was why did you question the legitimacy of that report?

A    I questioned it because of the relationship I believe they had or what I thought I was seeing happening.  That was him having direct access to her and her putting on paper anything he wanted her to put down.

Q    Anything else that we haven't covered that you can think of?

A    No.

Q    Well, we kind of jumped to the end.

A    Sorry.

Q    No, no, no, it's fine.  I'd like to jump backwards, if that's okay, just in time, shifting in time.  I'd like to go back to 2021 and talk about -- well, actually before we do that, let me ask you one more question about the report that was issued.

I want to back up a little before that.  How did it come to be that this report was even written in the first place?  The report I'm talking about is the Obermayer report that was issued.

A    I don't remember whether it was a directive

Page 44

from the Board of Supervisors and the Solicitor's Office or it came from Nelson, I don't know what initiated that.

Q    Do you know why it was initiated?

A    At the time, and even from what I remember, it was that -- it was just everything to do with Officer Langdon and everything to do with Officer Elmore.  I don't remember specifically what it was or what the report was one thing or I remember it being -- I felt like it was multiple things but, again, I don't remember.

Q    Do you recall did the Board make a decision and they issued like a directive to Obermayer to investigate, you know, specific items?

A    I do not.

Q    If that were to have occurred how would that have occurred?

A    It would have been an Executive Session from what I remember them being it would have been from our Township Solicitor, Mr. Clark or Miss Gallagher to the Board of Supervisors, we would have discussed that.  I don't believe Labor Counsel would have even have been present and then we would have made that decision to do an investigation, and -- but I don't remember that being the case in this.  And it may have been, I just don't remember being there or being a part of it.

Q    Do you have any recollection why Obermayer was

Pages 41 to 44

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 45

the one that was asked to do the investigation?

A    Only because they were our Labor Counsel.  If there was an investigation, I don't remember there being -- I mean, the report -- I don't know if the report -- I mean, unless you're telling me, like, I don't remember if the report was a whole investigation, I just don't remember what the result or what the -- what drove the report to even come in front of the Board that night in early 2024.

Q    Prior to getting that did you review any documents from Mr. Elmore prior to that decision to terminate him?

A    I don't think so.  Not that I recall.

Q    So I'll represent to you Mr. Elmore got a Loudermill Notice in February of 2024 and he provided a written response to that Loudermill Notice.

Do you recall him providing a response to the Loudermill Notice?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A    I do not, no.

Q    Okay.

A    You know what, I want to -- I want to -- I think -- if I remember, I think I might have read an email.  I don't remember if it was regarding that but I

Page 46

want to -- I don't know if it came from Mr. Elmore or it came from the -- if he wrote it -- if he wrote it in a email, like, for some reason something -- I remember reading something from Mr. Elmore, I just don't remember what.  It might have been in the form of an email and I definitely read that.  I remember it being something from Mr. Elmore.

Q    Okay.  I'm going to show you an exhibit.  I'm going to show you Exhibit-89.  Bear with me, it's not working.  Let me see.  I apologize, Mr. Boraski, I'll get this faster for you.  Okay, here we go.

MS. BENFER:  And Mr. Hatchet is my speed okay?

MR. HATCHETT:  Yes.

BY MS. BENFER:

Q    Okay.  I'm sharing with you an exhibit which has been previously marked Plaintiffs Exhibit-89, Mr. Boraski, and I'm go to show you that this is from Officer Elmore from -- I'm sorry.  I apologize.  This is from Chief Whitney Nelson to Officer Elmore and it's dated January 20th and it's saying, "Notice of potential discipline Loudermill rights."  Do you see that?

A    Yes.

Q    Do you recall was this document ever shared with you?

A    I don't remember ever reading this.

Page 47

Q    Okay.  I'm going to share with you, this is an email.  I am having a little -- it's not cooperating.  Here we go.

This is Exhibit-166 and this is an email from Mr. Takita and it appears to have been sent to all the Board members -- Board of Supervisors.  Do you see that?

A    Yes.

Q    And then it says, "Attachments Elmore Laudemill Response," and this is on February 26 of 2024.  Do you see that?

A    Yes.

Q    Do you recall -- does this refresh your recollection, do you recall getting Mr. Elmore's response to the Loudermill Notice?

A    I do.

Q    This was sent at 12:33 on February 26, that was a Monday.  Did the executive meetings usually occur on a Monday?

A    They would be for the meeting, I don't remember exactly the dates we have and, you know, we were moving -- we had some meetings in one building, some meetings in another building so I don't remember if that was a meeting day or not.

Q    Okay.  Do you recall actually reading Mr. Elmore's response before the meeting --

Page 48

A    I did.

Q    -- to discuss his termination?

A    I did.

Q    Okay.  Did the Board Members discuss Mr. Elmore's written response to the Laudemill Notice before they terminated him?

A    I don't recall.

Q    Do you recall any other document being discussed other than the Obermayer report in the meeting --

A    No.

Q    Let me finish.

Do you recall any other document being discussed other than the Obermayer report in the meeting in which the Board considered terminating Mr. Elmore?

A    No.

Q    So was the Obermayer report the only document the Board Members considered in their discussion?

A    Yes, that I can remember.

Q    Okay.  Now I'd like to go back to July of 2021.  Do you recall the Township receiving a Subpoena for hiring records in 2021?

A    I do not.

Q    Do you recall the Board ever -- the Township ever receiving any Subpoena for hiring records?

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 49

A No.

Q If the Township did receive a Subpoena, what's your understanding of what the process would be once that Subpoena was received by the Township?

A I would imagine they would adhere to whatever they were told to do in the Subpoena.

Q Were those Subpoenas ever -- strike that.

Were Subpoenas ever shared with the Board during your tenure?

A The only Subpoena I remember receiving, and I believe it came from Nelson Whitney, was that he was Subpoenaed to testify about something and it just happened to be on a certain night, and I don't remember what the night was. It may come back to me, but I remember thinking how convenient that was that he received the Subpoena and I don't remember when it was, but that was the only Subpoena I remember them actually sharing with us and it was shared from him.

Q Okay. Has the Township ever received any complaints about Chris Clark during your tenure?

A I have not specifically, I didn't receive any.

Q Did the Board ever receive any complaints about Chris Clark?

A I don't remember any written complaints against Chris Clark that I read.

Page 50

Q Okay. Did you ever hear any -- did you ever get any -- strike that.

Was it ever brought to your attention that Chris Clark was harassing any female officers?

A No.

Q Was it ever brought to your attention that Chris Clark was discriminating against female officers?

A No.

Q Did the Board ever discuss the fact that there's only four female officers at one point during your tenure?

A We did not.

Q Was there ever any discussions among the Board Members about the demographics of the Police Officers in Falls Township?

A Not that I recall.

Q Was it ever brought to the Board's attention that four female officers over time had brought discrimination complaints against the Township?

MR. HATCHETT: Objection to the form of the question. You can respond.

A Yeah, I don't remember having discussions regarding that.

Q Do you recall having any discussions about any complaints brought by female officers?

Page 51

A No.

Q Did you ever receive any complaints regarding the hiring practices by the Township.

A I did not receive any complaint regarding the hiring process.

Q What about the Board, did the Board ever receive any complaints about the hiring practices by the Township?

A As a Board of Supervisor I don't remember the Board receiving complaints about our hiring process.

Q Okay. March 2022, do you recall anything about Canine Officer Mr. Elmore, Canine Officer, being accused of the misuse of time?

A I remember that incident, yes.

Q Okay. Can you tell me what you remember about that?

A I remember there being a training, some of our canine, if not all of our canine, were at a training. I believe the training got done. I remember specifically Mr. Elmore, I remember us being told that he did come back to the building. I think they actually say on camera he was here, he didn't steal any time at all. I don't remember clearly, but if it was -- I think it was past practice maybe if the training got done early you were kind of done for the day, but regardless of that I

Page 52

remember specifically Mr. Elmore being at the building and accounted for for his hours.

Q How was this incident brought to your attention?

A Excuse me?

Q How was this incident with the canine and Mr. Elmore being alleged?

A In Executive Session.

Q And was Chief Whitney the one who presented that to the Board?

A I don't remember.

Q At some point the Board then hires a Mr. Harran. Do you recall that?

A I remember, yeah, yes.

Q Why was Mr. Harran hired, if you recall?

A I think Mr. Harran was hired specifically for this incident, to investigate this incident.

Q So is it your understanding that Mr. Harran was hired to investigate the Canine Officer's misuse of time in 2022?

A Yes.

Q Okay. And at the conclusion of the investigation do you remember what Mr. Harran's conclusion was?

A I do not.

Pages 49 to 52

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 53

Q   Do you remember the Board ever receiving a written report about Mr. Harran's decisions on this investigation?

A   I can't be sure of that.

Q   Okay.  So in April of 2022 the Board received a vote of no confidence from the Police Officers; do you recall that?

A   Yes.

Q   What did the Board of Supervisors do when they received that vote of no confidence?

A   I don't remember specifically what our next action was that night.

Q   Okay.  Do you recall that the Chief was put on administrative leave?

A   I do remember that, yeah.

Q   Do you recall why he was put an administrative leave?

A   I believe he was put on administrative leave so that the Board could investigate the vote of no confidence.

Q   And the Board did initiate an investigation; is that correct?

A   Excuse me?

Q   The Board did initiate an investigation?

A   Yes, from what I remember we did.

Page 54

Q   And they hired an outside firm to do that?

A   I don't remember.

Q   So you have no recollection as to who conducted the investigation?

A   No.

Q   Do you recall the outcome of the investigation?

A   I remember Chief Whitney being cleared of all wrongdoing.

Q   He was cleared of all wrongdoing?

A   That was my -- that's the way I remember it.

Q   Do you recall was there any complaints by any of the Officers that were included in the report about Chief Whitney?

A   I don't recall that.

Q   So the Board received the report from Campbell Durant and then did they then conduct -- I'm sorry.  Strike that.

After the Board received the Campbell Durant report they brought Chief Whitney back to work, correct?

A   Yes.

Q   Okay.  Was there any concern about Chief Whitney retaliating against anyone for his administrative -- being put on administrative leave?

A   I don't remember specifically us having a discussion about him retaliating against anyone or I

Page 55

don't remember that being discussed.

Q   Was there ever any discussion that there was concern he might retaliate against somebody?

A   I don't recall us discussing that.

Q   Okay.  Subsequently have there be any discussions about Mr. Whitney retaliating against anyone as a result of his administrative leave?

A   I didn't receive any complaints regarding that.

Q   Okay.  Are you aware that on April 10 of 2022 Lieutenant Ward sent a memo to the Bucks County Chief McDonough referring Canine Officers Elmore, Lundquist [phn] and Fischer to the County Detective for potential -- committing potential criminal charges?

A   I don't remember that.

Q   So just to clarify, that information was never shared with you?

A   Can you read the names again?

Q   Sure.  Elmore, Lundquist and Fischer, they were all Canine Officers that were accused of misuse of time on February 25th of 2022?

A   Yeah, I don't remember Officer Ward being involved in that.  I don't even know if he was employed here at the time.

Q   I'll represent to you that Mr. Ward was one of the first people to conduct an investigation and there's

Page 56

a report.  Have you --

A   I don't remember that.

Q   I'm going to ask, you never saw Lieutenant Ward's investigation of the alleged misuse time?

A   I can't remember reading a report from Mr. Ward.

Q   Okay.  October 2022, do you know anything about Mr. Takita and Mr. Dippolito meeting with Officer Elmore in October 2022?

A   I don't remember that.

Q   Do you know -- strike that.

Did either Mr. Takita or Mr. Dippolito ever inform the Board that Elmore had reported discrimination in the 2022 hiring practices to them?

A   I don't recall that.

Q   You have no recollection?

A   No recollection.

Q   Did the Township ever investigate any discrimination complaints that Mr. Elmore reported?

A   Not to my knowledge.

Q   If, in fact, the Township did investigate, that would be something -- would that be something that the Board of Supervisors would have been responsible for initiating?

A   Can you repeat the question?

Pages 53 to 56

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 57

Q   Sure.  If the Township did investigate discrimination complaints made -- discrimination that Mr. Elmore reported, would that have been something that the Board of Supervisors would have initiated?

A   If we knew about -- if we knew we were getting a report I would think that the Board would initiate an investigation on it.

Q   But it's your recollection that no investigations were initiated?

A   Not that I recall.

Q   Is there anyplace that the Board keeps track of any investigations that are being conducted within the Police Department?

A   Not that I'm aware of.

Q   I'm going to share with you another exhibit.

Okay.  Mr. Boraski, I know you're not on this email.  I'm going to give you a chance -- I'd like to give you a chance to read it before.  I'm going to give you two questions I'm going to ask you, but just so you have this in mind when you're reading it.  Was this email ever forwarded to you or was this information in this email ever shared with you?  And I can scroll down and I can make this bigger.  Please let me know.

MR. HATCHETT:  I was going to ask, can you see it okay?

Page 58

THE WITNESS:  Yeah, I can see it.

A   You want me to read it?

Q   You can read it to yourself.

A   Okay.

Q   And let me know and I'll scroll down so you can see it.

MR. HATCHETT:  Does that say Exhibit-9?

MS. BENFER:  Exhibit-9.

A   Can you scroll down, please.

Q   Of course.  That's what I'm here for.

A   I don't remember ever seeing or reading this letter.

Q   Okay.  Do you recall any of this information of this letter ever being shared with you?

A   I do not.

Q   No?  Okay.  Have you ever heard the term hunter referred to at the Police Department in Falls Township?

A   I have.

Q   And, one second, I'm just going to bring this down.

You have heard that term?

A   I have, yes.

Q   In what context?

A   I believe it was a training that our officer were being sent to.

Page 59

Q   And who was referring -- who was using the term hunter?

A   I just remember that at an Executive Session them discussing it and I believe they shared a video of this training that Nelson was sending our Officers to and I think he was even -- I think they even interviewed him and he said something about being hunted or being a hunter, I remember watching him saying those words.

Q   Did that interview -- how did you feel about that interview?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A   It was slightly appalling.

Q   It was appalling?

A   Yes.

Q   Did the Board discuss that interview or that video that they watched?

A   We did.  I don't remember what the outcome, if there was any of, I don't know.  We -- I couldn't even tell you if we stopped using them as a training device, I don't remember.

Q   Was there any discussion about, hey, we gotta top this, this can't be used this anymore?

A   Yes, I believe that was the consensus of the Board that that was not the way we wanted our Police

Page 60

Officers to be viewed by the residents.

Q   As hunters?

A   Yes.

Q   Who was using the term hunter, did the Chief ever use that word hunter?

A   From what I remember there was, like, you could go to that company's website, and I think they did that during Executive Session, went to a website and clicked on the interview with him and it shows him using the word hunter, hunters, maybe it may be plural, hunters.

Q   And was he referring -- was Chief Whitney referring to the Police Officers as hunters?

A   Yes, I believe so he was.

Q   Whose job, if anybody, on the Board was it to tell the Chief that we're not gonna do this anymore?

A   It would come from the Township Manager.

Q   And at the time would that have been Mr. Takita?

A   Yes.

Q   Any other time that you heard the word hunters used, the term hunters used?

A   No.

Q   Did you ever hear Chief Whitney use the word hunters other than on that video?

A   I didn't not, and didn't speak to Chief Whitney

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 61

at that time either, never had any one-on-one conversations with him.

Q   Did any other Police Officers or anyone else in the Township ever inform you that the Chief was referring to the Police Officers as hunters?

A   No.

Q   I can pull it back up.  That email was referring to an Officer Metterles and getting her back to work.  Do you have any recollection of Officer Metterles in an Arbitration being told that she can come back to work?

A   I believe Officer Metterles came back to work. I don't remember what the date or when it was and whether it was towards the end of my tenure or not, but I believe Officer Metterles was back to work.

Q   Do you recall was a delay in bringing her back to work?

A   I do not recall that.

Q   You have no recollection of that?

A   No.

Q   Let me -- going back to Exhibit-9.  At the very bottom is says, "The optics of how hard the Township is fighting to resist the Arbitrator's decision is not great and lends to asking if she would have been treated differently if she was a hunter in the Chief's inner

Page 62

circle."

Do you see that?

A   I do.

Q   Do you have any recollection of discussing that with the Board?

A   No.

Q   Okay.  And did you have any knowledge of the term inner circle being referenced -- used in reference to Chief Whitney?

A   I do not.

Q   Okay.  Are you familiar with the term IOD, Injured on Duty?

A   Yes.

Q   Okay.  Did you have any knowledge that Mr. Elmore was on IOD status in the fall of 2022?

A   Not that I remember.

Q   Okay.  And was there ever any discussions with the Board about accommodating Mr. Elmore for getting injured on the job?

A   Not that I remember.

Q   Any accommodations like light duty that can be given to a Police Officer is that something that ever rises to the level of the Board or is that decision made within the Police Department itself?

A   I don't remember ever authorizing light duty.

Page 63

I don't think that if rises to the Board of Supervisors.

Q   Okay.  That's something that would be handled at a lower level?

A   Yes.

Q   In the fall of 2022 were any personnel issues with regard to Mr. Elmore brought to your attention, do you recall?

A   I don't remember the specific date, no.

Q   I'm sorry, you don't remember any specific --

A   I don't remember that date.  Like, if you're asking me on that day or that month or that year, I don't remember there being -- when it would have been.

Q   We talked about a little bit -- we've already talked about the misuse of time, that incident.  Set aside dates, is there any other incidents or issues with Mr. Elmore, are there any other issues that you have any recollection of with regard to Mr. Elmore?

A   I remember the incident with a shirt that Mr. Elmore wore.  I don't know whether it was to work or to role call or where it was worn, if it was even here, but I remember it being a comparison to the Derek Chauvin. And then the other incident would be -- the only other thing I remember is, you know, getting a dog from Mr. Kent.

Q   Okay.  Let's talk about the shirt incident.

Page 64

What do you recall about the shirt incident?

A   Other than hearing about it, and that's all I remember, being told that this had happened in an Executive Session.

Q   And did the Board take any disciplinary action against Mr. Elmore for the shirt incident?

A   I don't recall.  I don't recall that.

Q   Let me ask you this.  Did the shirt incident come up in February of 2024 when the Board decided to terminate Mr. Elmore?

A   I don't remember if it did.

Q   You don't recall whether if did or didn't?

A   I do not.  I'm sorry.

Q   That's okay.  Do you recall -- backing up to that incident, that February 2024 meeting when the Board decided to terminate Mr. Elmore, do you recall any specific examples of conduct by Mr. Elmore that were discussed at that Board meeting?

A   Nothing specifically that I remember.

Q   Nothing specific?

A   No.

Q   Do you recall the dogs -- getting the dogs from Mr. Kent discussed that night?

A   I do not.  I just know at that timeframe that was the big discussion.  I don't remember if it was

Pages 61 to 64

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 65

talked about that night to fire Mr. Elmore.

Q   Did Melissa Atkins recommend that the Board terminate Mr. Elmore?

A   Yes.

Q   What actions did she cite for why Mr. Elmore should be terminated?

A   I think it was in the report and I'm sure I had read the report going in, but I just don't remember what the language was or what the incidents were at the time.

Q   Let me show you Exhibit-115.  I take that back.

According to Mr. Elmore's termination letter he was terminated for unauthorized canine acquisition and false statements.  Do you recall what false statements he made that resulted in his termination?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A   I do not.

Q   Do you recall that -- while you may not recall what those statements were, do you recall Melissa Atkins actually identifying specific statements for the Board that were false or she represented to you that they were false?

A   I do not recall.

Q   Okay.  All right.

I'm going to show you an Exhibit-22.  And this

Page 66

is -- I'm looking at the email here from Ed Elmore, on Wednesday, December 7, to Mr. Takita and Mr. Dippolito and Mr. Dence.  Do you see that?

A   Yes.

Q   And it's, "Subject:  Harassment and Retaliation."  I'm going to have you review it.  I have the same questions about whether or not it was forwarded to you or was information shared with you.  So I'll give you a second to review it.

A   (Witness complies.)

Q   Was this email forwarded to you?

A   It was not, not that I remember.

Q   Okay.  And was any of the information in this email ever shared with you?

A   I do recall discussing portions of this in Executive Session.  I do remember there being something posted.  I don't know if it was a bar code or a QR code, I remember something about a QR code.

Q   Did the Board take any steps in disciplining Mr. Elmore for any of this information, that you recall?

A   Not that I remember.

Q   If the Board decides not to take any disciplinary action is that the end, subject closed?

A   I would think it would be.

Q   The Chief didn't have the ability to override

Page 67

the Board's decision, correct?

A   Correct.

Q   Did the Chief ever override the Board's decision and the Board found out after the fact?

A   I don't recall that.

Q   And in that complaint Mr. Elmore's complaining about harassment and retaliation.  Was Chief Whitney ever investigated for retaliating against Mr. Elmore as a result of protected activity listed in that letter?

A   I don't recall.

MR. HATCHETT:  Objection to the form of the question.  Can you repeat your answer?

A   I do not recall.

Q   I'm going to show you Exhibit-180.  Mr. Boraski, I'm going to ask you, this is a memo to Mr. Takita from Obermayer and it says, "Regarding charges unfair labor practices filed against Falls Township Police Officer Ed Elmore."  Were you aware that the Obermayer law firm was recommending that Mr. Elmore be -- ULP be filed against Mr. Elmore?

A   I don't recall.

Q   Do you recall the Board ever discussing Obermayer recommending Mr. Elmore being charged with Unfair Labor Practices?

A   No, I do not.

Page 68

Q   Okay.  December 2022 Mr. Elmore is put on administrative leave.  Was the Board informed of that administrative leave that he was being placed on?

A   I don't remember the specifics on that.

Q   Do you remember anything about Mr. Elmore being placed on administrative leave in December of 2022?

A   I do not.

Q   You have no recollection -- I shouldn't say -- no knowledge of him being put on administrative leave in 2022?

A   I don't think I have a recollection of that happening.

Q   Before an Officer is placed on administrative leave would the Police Department have to get the Township Board of Supervisors to do that or could they do that unilaterally without permission of the Board?

A   I don't recall whether or not that would come from the Board of Supervisors.  I don't remember voting to put Mr. Elmore on administrative leave.

Q   Well, let me ask it a different way.  Let me take this down.  I'm sorry.

If an Officer is being put out on administrative leave is that something the Board has to vote on in order for that to happen?

A   I don't remember.

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 69

Q   Do you know if there was a policy or regulation, or anything like that, that would set forth how that has to happen, the administrative leave has to happen?

A   I don't recall there being something. I just don't remember it.

Q   Okay. I'm going to show you what's been marked Exhibit-132. This is Exhibit-132 and it was dated January 27th of 2023 and it was sent to the Board of -- each of the Board Supervisors.

Do you see that at the top?

A   Yes.

Q   Okay. And I will represent to you if we go to the bottom. I apologize, this document, for whatever reason has a mind of its own, we've had this problem before. But it's from Chief Whitney Nelson. Do you see that at the bottom?

A   Yes.

Q   Okay. Do you recall receiving this memo?

A   Do I get to read through it?

Q   Of course. And I can blow it up. Let me know --

A   That's okay. I can see it.

Q   And let me know and I'll scroll down.

A   Can you scroll down, please.

Page 70

I don't remember receiving this or reading this.

Q   You don't remember receiving it or reading it?

A   I do not.

Q   Do you recall any of the information in here?

A   I do not.

Q   In here Mr. Whitney is recommending that Mr. Elmore be terminated, and that was in January of 2023. Do you have any recollection of Mr. Whitney recommending Mr. Elmore be terminated in January of 2023?

A   I do not recall that.

Q   Okay. Do you recall whether or not the Board ever considered terminating Mr. Elmore in January of 2023?

A   I do not.

Q   We talked about the meeting in 2024 in which the Board discussed and did vote to terminate Mr. Elmore. Okay? My question is, on any other occasion did the Board ever discuss terminating Mr. Elmore?

A   Not that I recall.

Q   So is it your recollection the only time the Board discussed and then actually did vote to terminate Mr. Elmore was in February of 2024?

A   Yes.

Q   Did you have any knowledge that at the time in

Page 71

February of 2024 that Mr. Whitney had made previous recommendations to terminate Mr. Elmore on more than one occasion?

A   He did not to me and I don't remember that.

Q   You don't remember that?

A   No.

Q   Did Melissa Atkins ever share with you that there had been multiple recommendations to terminate Mr. Elmore before February of 2024?

A   I don't recall that.

Q   And did Mr. Whitney ever come to any Board meetings and personally ask the Board to terminate Mr. Elmore on any other occasion besides the February 2024 meeting?

A   Not that I'm aware of.

Q   Back to that meeting in February 2024, I believe you testified that Mr. Nelson Whitney was at that meeting; is that correct?

A   Yes, from what I recall he came in the Executive Session.

Q   Do you recall what he said, if anything, to the Board during that meeting?

A   I do not, no.

Q   Do you remember if he said anything at all?

A   I think she might have asked him questions and

Page 72

he responded. I don't remember what it was about and I don't know if he was offering any information other than the stuff she may have been asking him. I don't remember that.

Q   So Melissa Atkins was asking Mr. Whitney questions at the Execute -- during the Executive Session?

A   From what I recall, yes.

Q   Is that normal protocol for the Police Chief to be asked questions during an Executive Session?

A   He honestly didn't come in a lot after that -- from 2021, and if he did there were a couple of times I would walk in and he was there and I would wait in the hallway for the meeting to start. I did not want to be in his presence. That night specifically they asked me to stay in Executive Session. So if he was in there, I usually was not in there.

Q   Oh, so if the Chief -- if Chief Whitney Nelson was attending an Executive Session you would not attend the Executive Session?

A   Yes.

Q   Okay. And you said on that -- on the February 2024 night you did attend?

A   Correct.

Q   Who asked you to attend?

A   Mr. Clark asked me to stay and be there.

Pages 69 to 72

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 6

Page 73

Q   Was there any explanation as to why you needed to stay in that meeting?

A   We had disciplinary actions we were facing that night.

Q   If you hadn't stayed and voted what would have happened?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

Q   Let me rephrase that.  That's fair.

If you hadn't submitted a vote that night would the Board still have terminated Mr. Elmore?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A   I don't remember how many members -- if everyone was present that night or not, if we would have been -- if all five of us were there I don't think it would have mattered.

Q   Can four Members vote and -- four Board Members vote and that be the deciding factor?

Let me strike that, that was confusing.

Does the Board need all five Members of the Board to be present to make disciplinary decisions?

A   I believe that the quorum is a result of members of the Board, not the amount of members present, that would be a quorum.  I don't know how the vote would

Page 74

relate to that.  I don't remember.

Q   Let me ask you this.  In the spring of 2023 there was -- the Police Department was conducting a promotional process.  Are you familiar with that term?

A   Yes.

Q   Okay.  Was the Board informed of that promotional process taking place in the spring of 2023?

A   I believe so.

Q   Okay.  And did anything get reported out to the Board regarding that process?

A   If that's the same process I'm recalling there was issues with test scores.  I remember that specifically.

Q   That is.  And can you tell me what you recall with regard to the issues with the test scores?

A   I think scores were changed or curved, or something like that, that's what I remember.  I don't know a whole lot about the situation.

Q   Do you recall who brought that to the Board's attention?

A   I do not.

Q   Do you recall did the Board discuss the fact that scores were changed?

A   Yeah, we were in Executive Session regarding that and I don't -- I don't remember correctly, but I

Page 75

believe we had like the originals and then the new ones and I think the Board wanted to use the old test scores or retest, or something, from what I remember.

Q   Yeah.  So what happened in the end of that discussion?

A   I don't recall how that ended.

Q   Do you know -- so do you know if the old test scores were used and the new ones were tossed out?

A   I can't remember.

Q   Do you know where the new test scores came from, was that shared with the Board?

A   I don't remember that.

Q   Okay.  Was it ever reported to you that Clark and Whitney went and changed evaluation scores of some of the Officers?

A   I don't recall that being the reason.

Q   Was it ever brought to your attention that Mr. Elmore's evaluation score was reduced by almost 40 percent -- 40 points?

A   I don't recall what Officers were involved in the promotional process.

Q   Okay.  Do you recall at the conclusion what was the resolution to these changing scores?

A   I honestly do not remember what the final decision was.

Page 76

Q   Did the Board actually make a final decision on how to proceed?

A   I would hope the Board of Supervisors did.  I don't remember being a part of it.

Q   Were you not part of that because Chief Whitney may have been in attendance at that meeting?

A   I don't know.  I just don't remember what the outcome -- even with the outcome, even if I wasn't in the Executive Session I don't remember how this all ended.

Q   Do you recall -- is there anything else that you recall about that incident at all regarding the test scores or anything else?

A   No, I'm sorry.

Q   Do you recall an Officer Nicole White bringing a discrimination complaint against the Township for not being promoted during that spring of 2023 promotional process?

A   I may, I may.  I remember there being something like that, yes.

Q   So do you recall she was the only female that applied for a promotion in that process?

A   I don't remember that, no.

Q   Okay.  What do you recall about her bringing a complaint?

A   I just remember hearing about it, I don't even

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 77

know what the details were. I just remember it being around that time, I don't know why or if it had to do with the test score or the rescoring of the test.

Q   Okay. Was there any -- as a result of this process was there any decision by the Board to change the promotional process going forward and how it was handled?

A   To what I don't know and if we did I don't remember the Board being happy that there was multiple test scores for people out there. I don't know if we changed -- you know, tried to get policy written to change it or not. I don't know if the Board is involved in that process, I don't remember then.

Q   You just said the Board was not happy. Do you remember which Board Members were not happy?

A   I do not.

Q   Do you recall how this even came to the Board's attention that these test scores were changed?

A   I would say that this was done in Executive Session, from what I remember.

Q   No, I understand. I'm trying to understand how did it get reported -- let me strike that. Let me rephrase.

How was it reported to the Board that test scores had been changed?

A   I don't know. I would have found out from Mike

Page 78

Clark and Lauren.

Q   So was there any Officer, anyone else that came to an Executive Session and reported the changing of the test scores?

A   Not that I recall.

Q   I'm going to show you what's been marked Exhibit-49. And then I -- this is an email from Mr. Elmore to Mr. Mr. Takita and Mr. Dippolito and Mr. Dence.

I'm going to give you an opportunity to review it and then I'll have the same questions I had before about whether it was shared with you. Give me one second, I'm going to blow it up for you.

A   Okay. I read it.

Q   Was this email forwarded to you?

A   I don't think so. I don't remember reading this.

Q   Was any of this information ever shared with you?

A   I remember hearing about test scores. Again, I don't know what Officers were involved and I don't remember hearing about that, but I remember there being -- it was a large change that -- to these scores and whether it was 90 to 51 that I remember, I just don't know what the names of who that were involved. But I do remember there being a substantial change in test scores

Page 79

when Clark was involved.

Q   Was there any investigation done by the Police Department into this changing of the test scores?

A   I do not recall.

Q   Okay. Did Melissa Atkins at the February 2024 meeting regarding discussing Mr. Elmore's termination did this complaint of retaliation ever come up during that discussion?

A   I don't recall.

Q   And I believe you testified before, but just clarifying now that you've seen this most recent complaint of retaliation by Mr. Elmore. Did the Township investigate this retaliation complaint in May 3rd, 2023 letter that Mr. Elmore provided to the Township Manager and Mr. Dence?

MR. HATCHETT:  Objection to the form of the question, you can respond.

A   I don't remember that.

Q   I show you Exhibit-140.

Okay. Mr. Boraski, this is a memo to the Board of Supervisors from Tom Harran and Melissa Atkins. It's date June 12, 2023, and it's regarding Mr. Elmore.

Do you see that at the top?

A   I do.

Q   It's a memo and in the very -- I'm going to

Page 80

highlight it. Do you see the highlight I just did?

A   Yes.

Q   And this is -- remember this is from Mr. Harran and Miss Atkins. "It has been our position that the totality of Elmore's conduct as reflected on the Executive Summary was unbecoming of Township Police Officer and, therefore, warranted determination of employment."

Do you see that?

A   I do.

Q   Do you have any recollection of that being discussed that Melissa Atkins and Mr. Harran were recommending Mr. Elmore be terminated in June of 2023?

A   I do not. I'm sorry.

Q   Okay. Do you recall did the Board take a vote on terminating Mr. Elmore in June of 2023?

A   I do not.

Q   You don't recall voting to terminate Mr. Elmore in June of 2023?

A   I do not recall that.

Q   Okay. Do you recall any conversations about receiving recommendations from Melissa Atkins and Mr. Harran about Mr. Elmore and the Board not following those recommendations?

A   I do not.

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 81

Q   You don't remember?

A   I do not.

Q   Do you recall in general receiving recommendations from Melissa Atkins and the Board deciding not to follow those recommendations during your tenure?

A   I don't remember any specific situations.

Q   Do you remember any -- other than them being specific, do you remember there being instances of that happening?

A   I mean, I can't really respond either way to that, because I don't remember a situation where I know that we got -- that we were advised to do something and we weren't going to do it.

   Let me go back.  Do you want to ask the question again?

Q   I'll have the court reporter read it back.

   (The court reporter read the pertinent part of the record.)

A   So going book to the last time I was in Executive Session and that night, I believe it was February of '24, Obermayer recommended terminating both Mr. Langdon and Mr. Elmore and I didn't vote to support firing -- terminating of Mr. Langdon.  So me myself that's the only time that, I can only speak for me, that

Page 82

I didn't adhere to -- I didn't go off their recommendation.

Q   Do you recall receiving any recommendations from the Obermayer law firm prior to that and just in general recommendations?

A   Nothing specific, no, I can't recall.

Q   When Obermayer was recommending something about Police Officers and discipline, were those -- how is that typically communicated to the Board, if at all?

A   We would -- I remember having Zoom calls with them, there was a lot of Zoom calls with them, specifically Tom Harran, I don't know if he ever came to anything, but a lot of things would be presented from our Solicitor, from Mr. Clark, or Miss Gallagher.

Q   So Labor Counsel would they share their opinions or their suggestions with Labor Counsel and they -- I'm sorry.  Strike that.

   Would the Obermayer law firm share their opinions or recommendations with the Solicitor and the Solicitor would share them with you all?

A   I remember -- yes, I recall that there was situations where we would get the information from them.

Q   Them being Obermayer via the Solicitor?

A   Yes.

Q   When the Board takes -- when the Board votes on

Page 83

issues in Executive Session are the issues that are voted upon are they documented anywhere?

A   I would imagine if we're in Executive Session our Solicitor is keeping notes, but there could have been decisions made and things voted on without the majority of the Board of Supervisors in that Executive Session as well and may not even have been in there.

Q   And is every vote on discipline, and it may not be so I'm just trying to understand.  In Executive Session if the Board votes not to take disciplinary action do they then go into the public meeting and represent that that's how they voted or does it never get that far?

A   I don't -- it usually comes out of the Executive Session as personnel matters.

Q   But it doesn't indicate what the personnel matter is; is that correct?

A   Right, yes.  And I believe even the night that we voted to terminate employees they were determined that an Employee ID Number was used, there wasn't the even a name on the agenda items, from what I remember.

Q   Prior to going to that meeting in February of 2024 did you go into that meeting with any information that Melissa Atkins was going to recommend that Mr. Elmore be terminated?

Page 84

A   I don't recall if -- yeah, I don't recall.

Q   And you might have answered this and I apologize.  Did you read the Obermayer report before you went to the meeting?

A   I believe I did, I just don't remember.  I don't remember how far in advance we received it, so I don't know if I read it -- like, if I read it that day when I'm at work or I read it before the meeting and I'm trying to eat dinner, or I read it as I was walking in there.  I don't remember when we received it.

Q   All right.  September 2023 Obermayer -- a lawyer from the Obermayer law firm, Mr. Charles Shoot conducted an investigation into the hiring practices that Elmore reported.  Do you have any knowledge of that investigation?

A   I do not.

Q   Were you informed that he was going to conduct that investigation?

A   Not that I recall.

Q   Do you recall the Board voting to have him conduct that investigation?

A   I do not.

Q   If Obermayer -- would the Board have to approve that investigation before it could be initiated?

A   I would say, yes, the Board should have voted

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 85

to go forward with that.

Q   Does the Board have to vote on all actions taken by Obermayer or any investigations conducted by Obermayer before they do actually conduct any investigation?

A   I don't know what the exact -- you know, what the exact policy behind it was.  I don't remember.  I don't recall.

Q   Let me ask you this.  Could Obermayer -- could an investigation be initiated by Obermayer without the Board's approval?

A   I would hope not.

Q   Did Mr. Takita have the authority to initiate an investigation via Obermayer without the Board's approval?

A   That's possible.

Q   And who would have given Mr. Takita the authority to do that?

A   I would say that if we were giving Mr. Takita authority then we would have voted on it and I don't recall voting on, like, every situation we voted on and I don't recall this, but if Mr. Takita did it he would have acted as the Township Manager.  If we were giving him permission then we would have voted on it as the Board of Supervisors.

Page 86

Q   Do you recall the Board of Supervisors ever giving -- voting to give Mr. Takita the authority to unilaterally doing investigations --

A   No.

Q   -- of Police Officers?

A   No.

Q   Okay.  On September 20, 2023 Mr. Elmore filed what's called a charge of discrimination with the Equal Employment Opportunity Commission, and in that he asserted retaliation by Chief Whitney, among other things.  Was that charge of discrimination brought to your attention?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A   Not that I recall.

Q   Do you recall ever reviewing the charges of discrimination that Mr. Elmore filed against the Township?

A   I do not.

Q   Do you recall have any discussions with your fellow Board Members about Mr. Elmore filing an EEOC charge again the Township?

A   I do not.

Q   Prior to me telling you about that, that Mr. Elmore filed a charge of discrimination today, did you

Page 87

have any knowledge of Mr. Elmore filing a charge of discrimination?

A   I don't recall.

Q   You don't recall?

A   I do not.

Q   What is the typical process if an employee who does file a charge of discrimination against the Township, how does that process -- or how is that handled by the Township?

A   I have no idea.

Q   During your tenure on the Board were you ever shown any charges of discrimination that were brought by any of the Police Officers?

A   I don't recall any charges of discrimination.

Q   You don't recall receiving any charges of discrimination during your tenure?

A   I do not recall.

Q   Do you recall ever receiving a complaint of discrimination at all brought during your tenure?

A   I do not.

Q   Okay.  Let me show you this.  I'm going to show you what's been marked Exhibit-75.  Mr. Boraski, this is a letter from Kent Lawn Landscaping, Inc.  Do you see that at the top?

A   Yes.

Page 88

Q   And I can make this bigger.  I'm going to give you the opportunity to review it and then I have some questions for you.  And I'll scroll down, let me know.

A   Yeah, I remember reading this letter.

Q   Okay.  When did you read this letter?

A   I don't remember when.

Q   Do you recall did you review it before Mr. Elmore was terminated?

A   I believe so, yes.

Q   And did you have any issues with this letter?

A   And I remember, and I believe this might have been a question I had brought up that night, and the night that we terminated Mr. Elmore was I think that we found out after there was something about the timing with him sending Chris Clark and Steve Reeves there that didn't sit well with me and I don't know what that timing is.  I also -- my other issue is that I also know Bob Kent, he's a really great guy and was supportive of my Little League.

Q   Did you take this letter into consideration -- or strike that.

Was this letter discussed in February of 2024 at that meeting regarding Mr. Elmore's termination?

A   I don't recall.  Well, my timing is horrible, right, so we're trying to go back so many years and know

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 89

whether it's that night, but I know for a fact that when I received this letter, I think this might have been emailed to the Board of Supervisors directly, and if there wasn't something from Mr. Kent I think maybe his wife might have emailed something. But I remember specifically having an issue that without the Supervisors knowing this and the Township being aware of it I believe that, from what I remember, there was a timing issue and Chris Clark and Sergeant Reeves went down there -- were directed to go down there from Nelson Whitney. I remember having that question and not getting -- don't remember whether I got a straight answer or not.

Q   Okay. In this letter I don't see -- nowhere in this letter do you see that Mr. Kent says I donated a dog to the Township, does it say that, do you see that in this letter?

A   No.

Q   All right. And in this letter nowhere does it say that he donated the dog to Mr. Elmore either, right?

A   I don't even see Mr. Elmore's name in here.

Q   He says Ed here.

A   What's that?

Q   He refers to him as Ed.

A   Oh.

Q   Ed was the perfect candidate.

Page 90

A   Oh, didn't even catch that.

Q   Yeah. And nowhere in here does he say that he gifted this dog to Mr. Elmore, does it?

A   No, not that I recall, no.

Q   Yeah. So based on reviewing this do you have any recollection about your understanding of how Mr. Elmore got this dog, what was represented to you -- let me strike that.

What was represented to you in the meeting in February 2024 about how Mr. Elmore got this dog?

A   I don't recall that. I don't recall what was discussed in that meeting that night.

Q   Were you told that Mr. Elmore took -- well, let me ask you this. Did Melissa Atkins tell the Board that her investigation determined that Mr. Elmore did not take a bribe?

A   I think their investigation led, from what I remember, that Mr. Elmore did take a dog from Mr. Kent to use it for Township purposes, I believe them representing it to us, yes.

Q   That's what was represented to you?

A   That's what I recall, yes.

Q   Did Melissa Atkins share with you the fact that this dog was given to Mr. Elmore while he as in on -- did he acquire this dog by Mr. Kent while he was on

Page 91

administrative leave?

A   I don't remember that part.

Q   Did she represent to you that the dog -- the state of -- the health of the dog during the meeting?

A   Not that I recall.

Q   Did she represent, in fact, the dog -- because of the dog's physical health the dog could not be a Canine doing?

A   Not that I recall.

Q   Did she represent to the Board that this dog was his family dog and it was living with his family for six months prior to this conversation happening about him supposedly --

A   She was not representing that.

Q   She did not represent any of that information to you at all?

A   Not that I recall, no.

Q   If you had that information would that have impacted your decision on voting -- on how you voted to terminating Mr. Elmore?

MR. HATCHETT: Objection to the form of the question. You can respond.

A   Yes.

Q   It would have?

A   Sure, yes.

Page 92

Q   If you had known that information would you still have terminated Mr. Elmore?

MR. HATCHETT: Objection to the form of the question. You can respond.

A   No.

Q   You would not have?

A   No.

MR. HATCHETT: Objection.

THE WITNESS: Sorry.

MR. HATCHETT: You're fine.

Q   We talked about how Obermayer, let me take this down, was hired to investigate this dog that Mr. Elmore got from Mr. Kent. Was there ever any discussions about hiring Fred Moran to conduct the investigation instead of Obermayer?

MR. HATCHETT: Objection to the form of the question. You can respond.

A   I don't recall that.

Q   Was there ever any discussion about hiring anyone else other than Obermayer to investigate how Mr. Elmore got this dog?

A   Not that I recall.

Q   In fact, we keep saying one dog. Did you know there was actually two dogs that Mr. Elmer got from Mr. Kent?

Pages 89 to 92

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 93

A    I do not.

Q    So, in fact, he actually got two dogs from Mr. Kent.  Oh, and did you know that those two dogs that Mr. Elmore got were not purebreds?

A    I do not.

Q    And did you know that Mr. Elmore didn't -- Mr. Kent did not provide Mr. Elmore with any AKC validation or anything like that?

A    I do not.

Q    Would that information have impacted your decision as well on whether or not to terminate Mr. Elmore?

A    Yes, ma'am, very possible.

Q    Would that information have impacted your decision would you -- would that also support your decision not terminate Mr. Elmore having known that information?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A    Yes.

Q    I may have covered this, but I just want to make sure I get it clear.

On January 5th Mr. Takita instructed Obermayer to expand its investigation into Mr. Elmore.  Did you have any knowledge of that request?

Page 94

A    No.

Q    Did he ask the Board's permission before he made that request?

A    Not that I recall.

Q    Did the Board vote -- ever vote on expanding the scope of Obermayer's investigation into Mr. Elmore in January of 2024?

A    No.

Q    In order to expand the investigation conducted by Obermayer would the Board have to have voted ahead of time before that expansion of the investigation occurred?

A    If the Board -- yes.

Q    Okay.  I think we can take a break.  I may be done.  If you just give me a few minutes to review my notes and then we can -- may be done.

(Whereupon, a recess was taken.)

Q    Mr. Boraski, can you hear me?

A    Yes.

Q    Mr. Hatchett's going to make fun of me, but I'm going to say I have one more question.

We talked about a Mr. Clark.  It was actually Mr. Clark and Mr. Reeves that went out and spoke with Mr. Kent as his property.  Were you told that?

A    I found out in that letter Mr. Kent sent.

Q    Yeah.  Were you concerned about the fact that

Page 95

Clark and Reeves went and saw Mr. Kent?

A    Yes.

Q    And why.

A    I was because it was -- if I recall I believe that it was because they went down there, he sent them there.  I believe that in my heart that they worked for Nelson, that they will do whatever Nelson wants them to do.  And I remember at the time that I think that if there was an incident it should have been brought to the Township Supervisors, the Managers Office, the Township Solicitor and then we should have proceeded from there. It shouldn't have been Nelson sending those two guys to Mr. Kent's place of business.

Q    So you thought it was inappropriate for Mr. Nelson -- Mr. Whitney to send them to Mr. Kent's place of business?

A    Yes, ma'am.

Q    Okay.  Let me ask you this.  Mr. Elmore filed on September, we talked about that, remember, September 20th, 2023 he filed an EEOC charge against Mr. Whitney and in that he identified Mr. Clark as hiring practices, committing discriminatory hiring practices. With that knowledge and then a few months later, two months later Mr. Whitney sends Mr. Clark out to ask Mr. Kent about his interactions with Mr. Elmore.  Given that

Page 96

knowledge of that EEOC charge now, do you find that the fact that any issue with Mr. Clark being sent out to interview Mr. Kent as well?

A    Yes, ma'am.

Q    And do you think it was inappropriate for someone who had recently been accused of discriminatory hiring practices by one individual to be investigating that same individual?

MR. HATCHETT:  Objection to the form of the question.  You can respond.

A    If Mr. Clark was aware of that then, yes, absolutely I do.

Q    Okay.  I have no further questions.

CROSS-EXAMINATION

MR. HATCHETT:  I don't have any questions.

Maria, can I just have the digital copy of the transcript, full and mini, with any exhibits if they are included.

COURT REPORTER:  Okay. Sure.  No problem.

MR. HATCHETT:  Thank you.

(Witness excused.)

(Deposition concluded at approximately 7:25 p.m.)

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6

Page 97

CERTIFICATE

I, MARIA F. PIOTROWSKI, a Certified Court Reporter and Notary Public of the State of New Jersey, certify that the foregoing is a true and accurate transcript of the testimony of JEFFRY BORASKI, the aforesaid first duly sworn to by and before me.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____

Maria F. Piotrowski
Certified Court Reporter
License No.: 30XI00128900

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 6