Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
No. 2:25-CV-02076-JHS
-------------------------------x
EDWARD ELMORE,

        Plaintiff,

        vs.

FALLS TOWNSHIP,

        Defendants.
-------------------------------x

VIDEOTAPED DEPOSITION OF: MELISSA ATKINS
DATE:  WEDNESDAY, JUNE 3, 2026

HUDSON COURT REPORTING & VIDEO   (732) 906-2078

---

Page 2

T R A N S C R I P T of the deposition in the above-entitled matter by and before GERALDINE E. LOMBARDY, a Stenographic, Certified Court Reporter of the State of New Jersey, License Number 30XI00228000.  Held VIA VIDEOCONFERENCE, on June 3, 2026, commencing at 11:00 in the morning.

A P P E A R A N C E S :

HARDWICK BENFER, LLC
BY: TIFFANIE C. BENFER, ESQ
2003 South Easton Rd, Suite 308
Doylestown, PA 18901
Phone: (215) 230-1912
E-mail: TBenfer@hardwickbenfer.com
Attorney for Plaintiff

MARK RISK, PC
BY: MARK RISK, ESQ.
60 E. 42nd Street
New York, New York 10165
Phone: (212) 682-4100
E-mail: MDR@mrisklaw.com
Attorney for Plaintiff

MARSHALL DENNEHEY, P.C.
BY: JAHLEE HATCHETT, ESQ.
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Phone: (215) 575-2584
Fax: (215) 575-0856
E-mail: JJHatchett@mdwcg.com
Attorneys for Defendants

STAMPONE O'BRIEN DILSHEIMER HOLLOWAY
BY:  BROCK J. ATKINS, ESQ.
500 Cottman Avenue
Cheltenham, PA 19012
E-mail: BAtkins@stamponelaw.com
Attorneys for Deponent

Also present:  Pasha Korneychuk, videographer;
        Edward Elmore

---

Page 3

I N D E X
WITNESS      DIRECT   CROSS   REDIRECT   RECROSS
Melissa Atkins
BY: MR. RISK     5

E X H I B I T S
EXHIBIT              DESCRIPTION

*exhibits premarked.

---

Page 4

(Whereupon, the witness was sworn in remotely by the stenographic certified court reporter.  All parties appearing remotely agree to the remote conduct of the deposition and waive any objection to the remote administration of the oath.)

THE VIDEOGRAPHER:  Good morning.  We are on the record at 11:00 o'clock a.m. Eastern time on Wednesday, June 3, 2026 for the stenographically recorded and videotaped deposition of Melissa Atkins in the action Elmore versus Falls Township.

My name is Pasha Korneychuk.  I'm the videographer, and Dina Lombardy is our court reporter.  We're with Hudson Court Reporting and Video Nationwide.

This deposition is being taken remotely with all parties attending via videoconference, and all counsel present will be noted on the stenographic record.

Before swearing in the witness, all counsel present, please introduce yourselves for the record.

MR. ATKINS:  Brock Atkins on behalf of Melissa Atkins.

MR. RISK:  Mark Risk, co-counsel for

---

Pages 1 to 4

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9

Page 5

the plaintiff, Mr. Elmore, on behalf of the plaintiff.

MS. BENFER:  Tiffanie Benfer, plaintiff's counsel, on behalf of the plaintiff, Edward Elmore.

MR. HATCHETT:  And Jahlee Hatchett on behalf of Defendants in this matter.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please swear in the witness.

MELISSA ATKINS, appearing via videoconference, having first been duly sworn, testified as follows:

DIRECT EXAMINATION BY MR. RISK:

Q.    Good morning, Ms. Atkins.  We met briefly off the record, but I will introduce myself again on the record.

I am Mark Risk.  I'm co-counsel in this case with Tiffanie Benfer for Mr. Elmore in this lawsuit against Falls Township.  I'm going to ask you a series of questions today.

It's rare that I take the deposition of a lawyer, and it feels funny to talk about the

Page 6

instructions because you are familiar with them, but I have to put them on the record.

I'm going to ask you a series of questions about the case.  If you don't understand my question, and that surely will happen, please let me know, and I will rephrase it.

Will you do that?

A.    Yes.

Q.    And if you answer the question, I'm going to assume you understood the question; is that fair?

A.    Yes.

Q.    Remember, too, that though we are on video today, we also have a court reporter doing a written transcript, and she, Ms. Lombardy, can only take down oral answers.

So remember to answer my questions verbally rather than with a nod or a gesture.  Can you try to remember that?

A.    Yes.

Q.    All right.  There are a lot of lawyers here today.  Mr. Hatchett is representing Falls Township, and he may have an objection to one of my questions once in awhile, but -- and he will make the objection succinctly, and then I'm going to

Page 7

look to you to answer the question.

Do you understand that?

A.    Yes.

Q.    You're also here with your own counsel, Mr. Brock Atkins, and he may have an objection to one of my questions, but I'm then going to still look to you to answer the question, okay?

A.    Yes.

Q.    Is that -- now, we can't hear you.

A.    Yes.

Q.    There we go.

MR. HATCHETT:  Mr. Risk, I'm sorry, don't mean to interrupt you.  Does it make sense to go off the record for a moment to sort out --

MR. RISK:  For what?

MR. HATCHETT:  I just want to make sure the audio issues are sorted out.

MR. RISK:  That's okay with me.  That's okay with me, Jahlee.

THE VIDEOGRAPHER:  Off the record at 11:05.

(Whereupon, a discussion was held off the record to address technical issues.)

THE VIDEOGRAPHER:  Back on the record at 11:06.

Page 8

BY MR. RISK:

Q.    I was going to ask -- we were talking about Mr. Hatchett, counsel for Falls Township, and your personal counsel Mr. Atkins, and I was just going to add to that it's possible that while they are going to object to questions just for the record, and you will proceed to answer, it's possible that occasionally or rarely someone will affirmatively direct you not to answer.

And in that case, I'm assuming you will follow the direction, but in every other case, we will let the lawyer complete their objection, and then I'm going to look to you to give the answer, okay?

A.    Yes.

Q.    I asked you off the record, but I will ask you again.  From Ms. Benfer's office, we e-mailed a box of documents to you that should have arrived yesterday by Federal Express, and you've indicated that you have them.

A.    I do.

Q.    Are they in front of you?

A.    Yes.

Q.    Have you looked at them?

A.    I glanced at them.  I didn't have

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 9

enough time to read them.

Q.   You are not -- I can't require you to study them.  Don't worry about it.

A.   I didn't.

Q.   But as we -- there was no restriction on them, but you may need time to -- especially the longer ones, to look at them more carefully during the deposition, and let me know, and we will arrange for that even if we have to go off the record for you to do that.  This is not a pop quiz.

MR. RISK:  Mr. Atkins, do you have a box of the documents, as well?

MR. ATKINS:  I do.

MR. RISK:  And, Mr. Hatchett, you have a box of documents.

MR. HATCHETT:  That's correct, yes.

MR. RISK:  There are a lot of exhibits, and I apologize for that.  That is just the way it is.  They were sent to you in chronological order.

So you know, if I ask her to look, ask Ms. Atkins to look at Exhibit 92, you can find your way to that chronologically.

BY MR. RISK:

Q.   Where are you, Ms. Atkins?

Page 10

A.   In Philadelphia.

Q.   You are cutting in and out again.

MR. RISK:  Did you notice that, Mr. Hatchett?

MR. HATCHETT:  Yes.

THE WITNESS:  I'm in Philadelphia.

BY MR. RISK:

Q.   Are you in your home?

A.   Yes.

Q.   And you now -- I've looked at your website.  You now work -- you practice law from your home; is that right?

A.   Correct.

Q.   You're in some sort of home office?

A.   Yes.

Q.   Is there anyone in the room with you?

A.   My dog.

Q.   Okay.

A.   No person.

Q.   All right.  Well, if someone else enters the room, let us know, and we will deal with that.

Are you unplugged from any computers other than the one that you are on the Zoom call with?

Page 11

A.   What do you mean, unplugged?

Q.   Well, I want you to not have access to e-mail or other documents while I'm asking you these questions.

A.   Okay.

Q.   If you want to check your e-mail, I understand that, and you know, we can do that.  You can ask for a break.

And speaking of breaks, we'll have one from time to time.  Let me know if you would like one, and I will try to get to the next convenient stopping point.

As I get older, it's turning out that it's usually me that is begging for a break and not the witness, but let me know if you need a break for any reason, including if there's something you have to tend to.  I want you to have your full attention here.

Can you -- I know a little bit about you because I have looked at your very handsome website, but can you describe your professional background, maybe beginning with high school.

A.   With high school, okay.  I graduated 2001 from Penn Charter.  I went to the University of Miami.

Page 12

Q.   Miami in Florida?

A.   Yes, the University of Miami.

MR. RISK:  You are cutting in and out, Melissa.  I'm not sure what to do.

Is the court reporter having difficulty?

THE WITNESS:  I think there are too many of us on the video.

THE VIDEOGRAPHER:  Off the record at 11:10.

(Whereupon, a discussion was held off the record to address technical issues.)

MR. RISK:  You are still in your home, but you've moved.  Where are you now, Ms. Atkins?

THE WITNESS:  In my dining room.

MR. RISK:  It's just you there and possible the dog; it's quiet there?

THE WITNESS:  There is no one in my house, sir.

MR. RISK:  Okay.  We were --

THE VIDEOGRAPHER:  I'm sorry, let me get us back on the record.  Please, stand by.

MR. RISK:  Sorry.

THE VIDEOGRAPHER:  Back on the record

Pages 9 to 12

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 13

at 11:20.

BY MR. RISK:

Q.   All right.  Ms. Atkins has relocated within her house.  It sounds -- we are hoping she comes in clearly, and we are optimistic so far.

Before the break to work on the sound, we were beginning to talk about your education, and you had said you went to the University of Miami, and I asked you which one.

I think you said Florida; is that right?

A.   Correct.

Q.   And to digress for only a second, you were an athlete of great distinction there, weren't you?

A.   I played basketball at the University of Miami, correct.

Q.   That's division one, isn't it?

A.   Yes.

Q.   That's a yes?

A.   Yes, that's division one basketball.

Q.   And what did you do after graduating the University of Miami?

A.   Well, I graduated with a major in business and -- a double major in business and

Page 14

marketing, and then I went on to Faulkner University for law school, which is in Alabama.

I passed -- took the Alabama bar, passed the Alabama bar, moved back home to Pennsylvania, took the Pennsylvania bar, passed the Pennsylvania bar, and then worked at Stradley Ronon & Young in their business department for ten months.

And then I took a position at the prosecutor's office in Philadelphia, in the health and adult services unit first, which processes 302 hearings, which are involuntary commitments, and then does voluntary commitments, also did adult guardianship type cases.

I then moved on to employment where I left in 2018 and went to Chubb, in-house at Chubb doing discrimination defense and then that picture -- and then after that went to Obermayer, where I started off as counsel and then was a partner, was named partner.

Q.   Thank you.

A.   Then that ended, and I went and started my own firm.

Q.   Thank you for that answer.  I'm very sorry to say you're still cutting off.

Page 15

THE VIDEOGRAPHER:  Counsel, can we go off the record, please.

Hearing no objections, off the record at 11:23.

(Whereupon, a discussion was held off the record to address technical issues.)

THE VIDEOGRAPHER:  Back on the record.  Please, stand by.

Back on the record at 11:26.

MR. RISK:  Why don't I ask the court reporter to read back your long last answer, Ms. Atkins, and let's see if she was able to get it all.

(Whereupon, the record was read back by the reporter.)

THE WITNESS:  Not the prosecutor's office, the city solicitor's office.

MR. RISK:  Otherwise, Dina, very good.

BY MR. RISK:

Q.   Okay, and when -- do you remember when you joined the Obermayer firm for the first time?

A.   2021, April of 2021.

Q.   And when you left the Obermayer firm?

Page 16

A.   September 2025.

Q.   And now you practice employment law on your own?

A.   Correct, labor and employment.

Q.   Do you have any professional relationship now with Falls Township?

A.   What does that mean?

Q.   I'm sorry, do you perform legal services for Falls Township?

A.   No.

Q.   Do you perform legal services for any employees of Falls Township?

A.   No.

Q.   Do you work at all with the Obermayer firm on anything now?

A.   No.

Q.   Is part of your -- oh, there came a time when Falls Township ended its relationship with Obermayer as its labor counsel.

Was that before you left the firm or after you left the firm?

A.   That was before.

Q.   Do you know when that was?

Well, I think you said you left the firm in September 2025; is that right?

Pages 13 to 16

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 17

A.    Correct.

Q.    And the termination of Mr. Elmore that we are here to talk about was in February of 2024.

Do you know when Falls Township ended its employment -- ended its relationship with Obermayer as its labor counsel?

A.    I don't, because after this investigation, I actually transitioned off of Falls Township because my caseload was getting too heavy, and so I asked to be -- just really to work on my own client stuff.  So I kind of out grew working on other people's stuff at that point.

Q.    So Falls Township -- you're saying as a business matter, Falls Township was someone else's client relationship?

A.    Correct.

Q.    Was that Mr. Hearn?

A.    No.

Q.    Whose client -- whose relationship was it?

A.    Dave Nasatir.

Q.    Okay, and I have seen some of the names of the Obermayer people that worked on various parts of the Elmore matter.

Page 18

Is Mr. Hearn still at Obermayer as far as you know?

A.    As far as I know, he is, yes.

Q.    And what about Mr. Charlie Shute?

A.    As far as I know, he is.

Q.    What about Brian Rhodes?

A.    No.

Q.    He left.  Did he leave the firm before you or after you?

A.    Before me.

Q.    Okay.  Does your work now involve the conduct of investigations?

A.    Yes.

Q.    And what can you -- do you have any professional certifications in employment law investigations?

A.    Just a law degree.

Q.    Okay, and where in your career have you done investigations?

A.    At what employer?

Q.    Yeah.

A.    Oh, the City of Philadelphia, Chubb and Obermayer and now on my own.

Q.    Did you do investigations at Obermayer other than for Falls Township?

Page 19

A.    Yes.

Q.    About how many?

A.    I mean, throughout my whole career. I mean --

Q.    At Obermayer, other than for Falls Township.

A.    Ten, like maybe, yeah, about ten.

Q.    Okay.  We took Chief Whitney's deposition about a month ago, and he testified that all the disciplinary matters he was involved in he acted in consultation with Obermayer.

Is that correct as to what you can recall?

MR. HATCHETT:  Object to the form of the question.

Ms. Atkins, I just want to put out there, as you know, I'm not your attorney.  So I can't instruct you whether or not you can or can't answer.  I'm just placing my objection on the record.

THE WITNESS:  I know.  Thank you. Can you repeat the question actually.

MR. RISK:  Can you read it back, Dina.

(Whereupon, the previous question was

Page 20

read back by the reporter.)

BY MR. RISK:

Q.    Let me try to simplify it, Ms. Atkins.

Did Chief Whitney consult with Obermayer concerning all officer discipline matters?

A.    I don't know.

Q.    Did he --

A.    I don't know every officer that was disciplined.

Q.    Did he consult with Obermayer concerning all possible officer terminations?

A.    Probably.  Well, I can't say.  I can't say yes or no to that.  I don't know.

Q.    That would be a question for Chief Whitney?

A.    Yeah.  I don't know that.

Q.    Obermayer advised Chief Whitney and Falls Township with respect to a series of disciplinary matters involving Elmore over a two-year period.

Were all the actions taken by Chief Whitney with Obermayer's support?

MR. HATCHETT:  Objection to the form of the question.

Pages 17 to 20

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 21

THE WITNESS: I don't -- I don't know.

BY MR. RISK:

Q. Do you recall any instance in which Chief Whitney wanted to take some disciplinary action with respect to Mr. Elmore, and someone from Obermayer said to him, no, we think you should not do that?

MR. ATKINS: Objection. You are asking for information that would be attorney-client privileged, aren't you?

MR. RISK: Well, I hope not. I don't want to ask her what legal advice she gave them. I just want to know if with respect to HR decisions, Ms. Atkins --

MR. ATKINS: That would be legal advice, and that would infringe on attorney-client privilege. So she can't answer that question.

MR. HATCHETT: I will just put on the record -- this is Jahlee Hatchett on behalf of Falls Township. I have had a separate conversation with the current solicitor for Falls Township, as well as the township managers, and the defendant has agreed to waive any privilege as it relates to the then investigations that were conducted as it

Page 22

relates to Obermayer. So I'll just place that on the record.

MR. ATKINS: Well, can you explain what that means. What do you mean, investigations?

This is not asking about investigations. It's asking about advice and counsel.

MR. HATCHETT: I understand that.

THE WITNESS: It's information. So that is not part of the investigation. I'm not answering. That is attorney-client privilege, how I advised them.

MR. HATCHETT: All I'm doing is putting on the record what my client has represented to me.

MR. RISK: Yeah, I think the privilege runs to Falls Township, and counsel for Falls Township is saying you can answer these questions so far.

MR. ATKINS: That is not how I heard what he said. He said it relates to investigations. This is asking for advice and counsel --

MR. RISK: I don't -- Ms. Atkins, I don't want to know --

MR. ATKINS: -- specifically.

Page 23

MR. RISK: -- any legal advice you gave to Falls Township concerning whether anything would be lawful or unlawful.

But in the record, Obermayer seems to often be advising Falls Township with respect to management decisions, which employees to terminate and why, and that is really what I want to ask you about, but I don't want to know any legal counseling you gave to Falls Township today.

THE WITNESS: I think it -- well, I think you are confusing, because I was labor counsel, and so those are potentially labor issues which are either legal or not under the National Labor Relations Act.

So you are thinking about Title 7, EEOC land, but there are other risks involved in employment decisions when you are dealing with unions, and I was labor counsel, and so we were advising on labor issues as it dealt with the police department.

BY MR. RISK:

Q. Okay. All I want to know is with respect to the business decisions to discipline or terminate people, not the legal, not whether they are legal or illegal.

Page 24

A. Okay.

Q. That was -- that is the way I'm asking the question. I think that is the -- we have a lot of documents from Obermayer and Falls Township already, and we've been asking witnesses about it.

So we may have to tread that carefully, but that is what I mean to do, and I notice that often Falls Township is endorsing a decision to discipline an employee, in particular Mr. Elmore.

MR. HATCHETT: Objection to the form of the question.

I'm sorry, I didn't mean to cut you off. I thought you were done.

BY MR. RISK:

Q. I'm really asking you whether there was any instance in which Chief Whitney wanted to impose a discipline on Mr. Elmore, and Obermayer did not agree with that decision from a management point of view.

MR. HATCHETT: Objection to the form.

MR. ATKINS: Objection. You are asking for attorney-client privileged information. You are asking what their advice and counsel was.

MR. RISK: I have -- we have a box

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 25

full of documents in which Obermayer is saying to Falls Township, we support this. We support the chief recommending the termination.

I want to ask the Obermayer -- the former Obermayer lawyer about those documents which have been produced by Obermayer and by Falls Township.

MR. ATKINS: Well, what about those documents? Irrespective of Ms. Atkins's relationship to this case, she no longer works at Obermayer.

So she can't speak to who or when those documents were produced or why they were produced, but she can speak to the advice and counsel that she gave to her client. You are asking about that. She can't answer those questions.

MR. RISK: Yeah, but it's the client's privilege. It's not Ms. Atkins.

MR. ATKINS: And the client said the privilege --

MR. RISK: The Falls Township lawyer is right here.

MR. ATKINS: He said it goes to the investigation. You are asking about advice and counsel, which is different than investigation.

Page 26

MR. RISK: Let me see if I can ask it in a way that solves that, but if not, maybe we'll have to get Judge Slomsky involved.

BY MR. RISK:

Q. Was there any management decision made by Judge Whitney with respect to Mr. Elmore that Obermayer did not agree with?

MR. HATCHETT: Objection to the form of the question.

MR. ATKINS: Objection.

MR. RISK: I can't hear you, Melissa.

THE WITNESS: I don't know.

BY MR. RISK:

Q. Okay. Can you think of any?

A. No.

Q. I will withdraw that.

Is there any situation in which you said to Chief Whitney, regardless of whether something is legal or illegal, as a policy matter I don't agree?

MR. ATKINS: Objection. You are asking for her advice and counsel.

MR. RISK: I don't mean to be.

MR. ATKINS: Well, that is what the question is.

Page 27

THE WITNESS: You are. You're asking how I advised them as to a disciplinary decision. That is called advise and counsel, I mean in my professional capacity as an attorney.

BY MR. RISK:

Q. It's Falls Township's privilege. I mean, it's been --

A. **And they waived the privilege.**

Q. The attorney is saying -- we've shown you the documents. We will ask about them.

A. **You are asking me about every decision that Obermayer is involved in as it relates to discipline. That is not what Mr. Hatchett just said they waive their privilege on.**

**They waive their privilege as to the investigation that I was involved in. I want to make it clear I wasn't involved in every investigation that these documents relate to.**

**So I was involved in one investigation, period. So if you want to ask me questions about that, I'm happy to answer it, but I don't -- I'm not going to talk about how I advised them outside of the investigation. That's attorney-client privilege, and I don't know why you have those documents.**

Page 28

MR. RISK: Mr. Hatchett, as the attorney for the client to whom the privilege runs, do you have an objection to these questions so far?

MR. HATCHETT: To some, just based on different grounds, but as you know, Mr. Risk, there have been extensive questions concerning the investigation.

There have been documents that have been provided by the township from Obermayer that you all secured through a subpoena and then which the defendant redacted and provided the information as is. So again, I have some objections, but they are based on various grounds.

MR. ATKINS: So what we need to do here then, I think, is we need something written from the client or a conversation with the client, not Mr. Hatchett but the client itself, that will give us a contour of what Ms. Atkins can testify to.

Because you're asking about attorney-client privileged information that she cannot testify to, and with no disrespect to Mr. Hatchett, we need to hear from the client his or herself to explain to Ms. Atkins what she can testify to as it relates to advice and counsel she gave them.

Pages 25 to 28

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9

Page 29

THE WITNESS: On various occasions, not just as it relates to this investigation.

MR. ATKINS: So if we want to just put this deposition on hold to a later date until a conversation can be had with the client, then that is what needs to happen.

MR. RISK: Well, we've --

THE WITNESS: Or, get an e-mail. Get an e-mail from the township manager or Michael Clark that says what I can testify to. I haven't seen anything.

MR. RISK: Well, it's --

THE WITNESS: Were the other witnesses attorneys?

MR. RISK: It's the client's privilege. We have a small problem, which is that our discovery cutoff has come and gone, and we advised -- to accommodate Ms. Atkins, we scheduled this for the 27th, and then when she took on Mr. Atkins as counsel, we had to push it off further, but we are already past the deadline. Let me try to --

THE WITNESS: Discovery is a long time, and you didn't notice me or subpoena me until a month ago.

Page 30

MR. RISK: Let me try -- I'm not blaming anyone. I'm just telling you the problem we have about adjourning the deposition.

I'm not sure Judge Slomsky would be very happy, but maybe, Mr. Hatchett, at the break you can get something that will assist us, but I will try to soldier on, and at Mr. Atkins's suggestion, it sounds like we'll do what we can do today, and we will agree to keep the deposition open until this matter is clarified.

And I appreciate that suggestion, Mr. Atkins.

MR. ATKINS: That is not what I said. I said if we need to cancel this deposition today and take it to another day, let's do that, but if you're going to continue the deposition, per the Federal rules you have seven hours. So let's use those hours wisely.

MR. RISK: That is not helpful, and I will try to soldier on, but the client has -- well, let me see what I can do.

BY MR. RISK:

Q. A recommendation was made by Chief Whitney to terminate -- well, what do you recall about the controversy in 2022 regarding a

Page 31

K-9 group training day, Ms. Atkins?

A. Not much.

Q. Well, what do you recall?

A. That there was K-9 training, and the township was notified that the reimbursement that they submitted was inaccurate because the training lasted a shorter amount of time than they had submitted in for overtime or something to that effect. I don't --

Q. Well, do you -- were you involved in the review of that matter at Obermayer?

A. Possibly.

Q. You don't recall?

A. Not really.

Q. Okay. According to the -- you don't have to look at it, but according to Exhibit 92, the Obermayer report you prepared related to Mr. Elmore's termination -- and you are welcome to take your time and look at it.

On page 22 of that report --

A. What page?

What document is this?

Q. Exhibit 92, the Obermayer report that your office prepared, signed by -- well, with your name on it, dated February 14, 2024.

Page 32

A. Mm-hmm, okay.

Q. That report says that with respect to the K-9 investigation labor counsel supported the recommendation that several officers be terminated.

Do you recall -- do you know that to be correct?

MR. ATKINS: What page?

Can you give the Bates number on the page.

MR. RISK: Page 22. It has no Bates number that I'm aware of.

MR. ATKINS: Elmore underscore 00 and a series of numbers.

MR. RISK: All I see here is Exhibit 92, page 22 of 26.

THE WITNESS: I'm on 000171, is the Bates number.

MR. ATKINS: Which paragraph are you looking at, Mr. Risk?

MR. RISK: I was looking at near the middle of the page, specifically speaking about Corporeal Langan.

BY MR. RISK:

Q. It says, labor counsel supported the recommendation, referring to the recommendation to

Pages 29 to 32

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 33

terminate then Corporal Langan.

Do you see that?

A.   Yes.

Q.   And do you remember whether -- do you know whether that is -- well, did you write Exhibit 92?

Were you part of a group that wrote Exhibit 92?

A.   Yes.

Q.   Okay.  Do you know whether -- well, were you the draft person or the editor, or how was that labor divided?

A.   I can't recall.

Q.   Okay, and do you know whether it's correct?  Well --

A.   Yes, I support that the investigation that I did and the findings of my investigation and all the information in there I believe is accurate based on what we knew at the time.

Q.   Okay.  So as far as you are concerned, the account of the 2022 investigation as set forth in your report in 2024 is correct?

A.   Yes.

Q.   All right, and did Mr. Hearn and Mr. Rhodes work on Exhibit 92 with you?

Page 34

A.   I don't know.  I mean, I'm sure they reviewed it, or I don't know if Mr. Rhodes did.  He had to do something.

I mean, he was involved in the investigation.  So we had his notes or had his -- yeah, I mean, everybody was involved that was in -- that signed it.

Q.   Well, I know Mr. Rhodes conducted at least some if not all of the interviews.

Did you remember that?

A.   He didn't conduct all of them.

Q.   Pardon me?

A.   He didn't conduct all of them.

Q.   Who else conducted interviews?

A.   Tom and I conducted one.

Q.   Which one?

A.   I believe I did Langan.

Q.   Okay.

A.   I know I did Langan.  Part of the reason was my father was in the hospital, and so I couldn't conduct --

Q.   I read that.

A.   -- all of the investigations.

Q.   Okay.  Chief Whitney recommended to the board of supervisors -- turning back to 2022,

Page 35

Chief Whitney recommended to the board of supervisors that Mr. Elmore be terminated in connection with the K-9 training leaving early incident.

Do you remember that?

A.   Stealing time?

Q.   That some police called stealing time.  As I understand what happened, they left the training session early.

A.   And they submitted for reimbursement for the full day.  That is called stealing time, and I believe he -- I believe maybe he was recommended termination.  Whatever it says in the report, then that is what I stand by, so if that's what it says.

Q.   And were you involved in that recommendation?

A.   I can't say.

Q.   Okay.

A.   It wasn't just like -- how the labor department at Obermayer works, it's not one person making a decision.  We make group decisions.

We talk about it, and then, you know, we come to whatever the consensus is based on, you know, a whole bunch of different factors that we go through, and then we advise our client.

Page 36

I mean, it's not one person.  It's not me making a decision saying, hey, Chief, I agree.  That's not how it works.  It's a collaborative effort.

Q.   Well, do you remember the report prepared by Campbell Durrant?

A.   I don't believe I ever saw that report, honestly.

Q.   Well, it's in your materials now as Exhibit 4, and I just want to look at it for a second.

I'm sorry, it's exhibit -- not Exhibit 4.

A.   I haven't looked at it.

Q.   It's Exhibit 5.

A.   Exhibit 5?

Q.   Yeah, do you have 5?

A.   I have it.

Q.   If you turn all the way to the last page of that, and that is Bates numbered Harran 057, tell me when you are ready.

A.   I'm ready.

Q.   The last paragraph of the report says -- begins with the words, in summary.

A.   Hm-mmm.

Pages 33 to 36

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 37

Q.    In the middle of that paragraph, Campbell Durrant says, the department should proceed with any pending disciplinary actions that have stalled due to this investigation while fully consulting with labor counsel regarding the appropriate process and disciplinary penalties.

Was the Falls Township police department already doing that with Obermayer?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  Doing what, advising our client?

MR. RISK:  Fully consulting with labor counsel regarding the appropriate process and disciplinary penalties.

THE WITNESS:  I can't say that they did that all the time.  We advised them when they requested it.

BY MR. RISK:

Q.    Do you remember whether Obermayer did anything differently or more after the Campbell Durrant report?

A.    No, I can't -- I don't remember that.

Q.    Okay.  Can you look at Exhibit 2, please.  It should be right on top of the pile.

Page 38

And that should be on letterhead of the Falls Township police department, a memo dated March 29, 2022.

A.    Okay.

Q.    Do you know if you've ever -- take a look at it if you would like, but tell me if you've ever seen it before.

A.    I'm sure I have.

Q.    Okay.  That is -- I'll represent to you that is Lieutenant Ward's report of his investigation of the K-9 training incident, which is described two years later in your report, Exhibit 92.

Did you or anyone from Obermayer work with Lieutenant Ward in preparation of his memo, Exhibit 2?

A.    I mean, possibly we did sometimes, but we didn't all the time.  So I mean, I don't know.

Q.    You only remember what you remember.

A.    Yeah, I mean --

Q.    I know, but I have to ask you.  I want to find out what you remember and what you don't.

A.    I mean, Falls Township was a client

Page 39

that needed a lot of advice, a lot, like all the time, and there was multiple people, you know, involved in decisions throughout the weeks and years and months of me advising Falls Township.  So it's possible that I was involved.  I don't know, though.

Q.    When you say Falls Township, are you referring to the Falls Township police department or other agencies of Falls Township?

A.    Anyone who had a union.  Any -- there were other unions within Falls Township.

Q.    And would it have been -- would Obermayer from time to time assist a supervisor like Lieutenant Ward in preparing a memorandum like Exhibit 2?

A.    He was a lieutenant, not a supervisor.

Q.    Okay.

A.    Yeah, it could be possible.

Q.    Okay.

A.    Yes.

Q.    Do you know whether you ever assisted Lieutenant Ward in preparation of a memorandum?

A.    Like I said, it's possible.  I can't specifically remember, but it is possible.

Q.    Okay.  Did you ever assist

Page 40

Chief Whitney in preparing a memorandum?

A.    Yes, possibly.

Q.    Okay.  Take a look at Exhibit 10, please, and Exhibit 10, I'll represent to you, is a series of e-mails produced to us by the defendant.

A.    I'm not on these e-mails.

Q.    Pardon me?

A.    I'm not on this e-mail.

Q.    Okay.  Let me ask you a question first.

At the time --

A.    No, I was on maternity leave.  I was on maternity leave during this.  I don't have any -- that's why this --

Q.    All right.

A.    Now, I remember.  So there was -- I had a baby in August of 2022, and I went out on maternity leave until November 20th.  Like, maybe I came back after Thanksgiving of 2022.  So I wasn't -- that's why I'm not copied on this.

Q.    And who is Aimee Schnecker?

A.    She was an associate.

Q.    Was she taking your place while you were gone?

A.    Yeah.  No.

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 41

Q. No, okay. I really just wanted to show you on the third page, Defense 710, this is a conversation with -- between the HR coordinator, Ms. McGovern, and the insurer, Delaware Valley Trust, and they asked for Mr. Elmore to be put on -- to be having his light-duty assignment taken away because of personnel issues -- in part because of personnel issues the command staff has been having with him. That is near the bottom of page 710.

Do you know anything about that?

A. No.

Q. Okay. Can you look at Exhibit 15.

That is a memo from Chief Whitney to Acting Township Manager Takita, and you know both of those men, right?

A. Correct.

Q. Okay. Do you know if you were back from maternity leave as of November 30, 2022?

A. I believe I was back, but I was not involved in a lot of this because I was coming back from maternity leave. I had to get caught up on stuff.

So whoever was involved in this while I was out, they were handling all this. I was getting caught up after being out for three months.

Page 42

Q. Well, let me ask you this, it's a lengthy memo recommending discipline of Mr. Elmore.

Is that the kind of memorandum that Chief Whitney would run by Obermayer before sending it to Mr. Takita in your experience?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. RISK:

Q. Okay, but this one, this one as far as you know you've never seen it before, and it's unlikely you were involved?

A. I can't say I haven't seen it, but I don't believe I was involved in this. It's possible, but you know, I was back from maternity leave.

It's possible, but like I said, in a situation like that, I may have done edits because probably most of my colleagues would have probably -- would have agreed I was one of the stronger writers in our department.

So there is a lot of times I would edit things or, you know, make sure just that it read -- it was clear and provided clarity for what was trying to be said.

Page 43

Q. So the chief would have shown you a draft of -- he would have done the first draft and shown it to Obermayer, and someone at Obermayer, one or more people at Obermayer would have counseled him about it?

A. Correct.

Q. And then he would have submitted it as revised to Mr. Takita?

A. I mean, it could go back and forth a couple times. I mean, you know, it could have gone back, you know, three or four times. It depends on what was trying to be conveyed and how it was written the first time.

Q. Do you know whether Chief Whitney had to get approval from Mr. Takita before he could ask Obermayer to review a memorandum like this?

A. No, he didn't have to.

Q. So if Chief Whitney thought he needed help preparing a disciplinary document to submit to Mr. Takita, he was able to pick up the phone or send an e-mail and get Obermayer's help?

A. Yes.

MR. HATCHETT: Objection to the form of the question.

BY MR. RISK:

Page 44

Q. Okay, and that's all the way through the Falls Township Obermayer relationship as you know it before you left the firm?

A. I can't speak to that. I don't know the type of relationship he had with the attorneys after, you know. I stepped off beforehand. So you know, Chief had known me for four years. He felt comfortable asking me to review things.

He felt comfortable asking Tom. Tom had kind of stepped off to the side, too, and it was Charlie and I think a woman named Terry and Aimee that were handling Falls Township, and then shortly thereafter, they decided to go with Campbell Durrant.

Q. Have you spoken with Mr. Takita since you left Obermayer?

A. Maybe like Happy Thanksgiving. Like, that's about it. I don't -- not professionally.

Q. Would that be on the phone or by e-mail?

A. He probably texted me to say Happy Thanksgiving.

Q. And are you in touch with Chief Whitney?

A. Hm-mmm.

Pages 41 to 44

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 45

Q.     Have you communicated with Chief Whitney in any way since you left Obermayer?

A.     **I think he sent me a Happy Thanksgiving text or Merry Christmas or something like that shortly after, but no, not in 2026. I haven't spoken to him.**

Q.     As far as you know, he doesn't know you are here today?

A.     **No, no, no one does. I haven't spoken to anybody.**

Q.     Okay.

A.     **Oh, that's not true. I did speak to their labor counsel because he is a friend of mine. That's it.**

Q.     That is someone at Campbell Durrant?

A.     **Correct.**

Q.     Who is that?

A.     **Ben Patchten.**

Q.     Can you look at Exhibit 17.

A.     **What is the Bates? These don't appear to be --**

Q.     I'm so sorry. It's Elmore 00105, but I don't know that is going to help you find it. It's the flyer.

Do you remember the flyer,

Page 46

Ms. Atkins?

A.     **The flyer?**

MR. ATKINS: It's right after 15.

MR. RISK: I'm sorry, did someone say something I couldn't hear?

MR. ATKINS: Yeah, I said it's right after 15. There is no 16. It goes to 17.

MR. RISK: All right. 17, I'm sorry. You are absolutely right, Mr. Atkins.

17, the flyer.

THE WITNESS: Oh, okay.

BY MR. RISK:

Q.     Have you seen that Exhibit 17 before?

A.     **Well, I don't know if I saw it.**

**Yeah, yes, I think so. I think I did. I feel like this was also coming off of my maternity leave, and I was like confused about what was going on, like what is going on.**

Q.     I think you are right. I think the timing is as you've described it, as you were on your way back from maternity leave. I think that's right.

I really just wanted to ask you about, you know, I think it's not in controversy, just part of the trouble Mr. Elmore got in with the

Page 47

chief is that he made this flyer, and I want to ask you about the claim in the second sentence.

The township has now effectively purged 75 percent of the female officers from its ranks.

Were you aware at all of any issues at the Falls Township police department related to the hiring and maintenance of female officers?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No.

BY MR. RISK:

Q.     No. Did you know -- did anyone at Obermayer -- strike that.

Are you aware that there are no female officers at Falls Township now?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No, but that's not unusual for a small police department.

BY MR. RISK:

Q.     Are you aware that there were four at the time Chief Whitney became chief?

A.     **No.**

Q.     Are you aware that all four commenced

Page 48

proceedings against Falls Township?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I feel like every officer does there. I mean, that's not unusual for Falls Township. It's an unusual place.

BY MR. RISK:

Q.     Okay, but I apologize, can you answer my question.

Are you aware that all four of the female officers commenced proceedings against Falls Township?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No.

BY MR. RISK:

Q.     Are you aware that no new women officers have been hired during the -- since Chief Whitney became the chief?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No. I'm also not aware of how many applied.

BY MR. RISK:

Q.     Okay. Well, I'll represent to you

Pages 45 to 48

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 49

that according to Mr. Shute's report of Obermayer, 17 percent of the applicants were women. I can show you that, but that is in Mr. Shute's report.

A. What report?

Q. It's Exhibit 175.

Do you see it, Ms. Atkins?

A. I don't know what I'm looking at.

Q. It's Obermayer letterhead. It's a double spaced memo marked attorney-client privilege and work product.

That's a good example of Falls Township's waiver of the privilege.

MR. HATCHETT: Well, I would object to that.

THE WITNESS: Who submitted it?

MR. RISK: The defendant, but anyway, if you look -- do you have it now?

THE WITNESS: I see it, 101.

101, are these the interviews?

MR. RISK: No, no, Exhibit 175.

THE WITNESS: Okay.

BY MR. RISK:

Q. See, it's Mr. Shute's memo. You had just asked me when he made this report, and I'm showing you the memo says January 3, 2024.

Page 50

A. Okay.

Q. What I'm going to do is show you that on page -- oh, do you recall that Mr. Elmore alleged that when he was a member of the department's hiring committee, it was deliberately not hiring women?

Are you familiar with that allegation?

A. I believe -- wasn't -- I believe that is the investigation that they did.

Q. Well, that is what Mr. Shute was investigating. I'm asking if you are familiar with it.

A. Correct. I mean, I wasn't involved in that investigation.

Q. But this is where he says, on page 5 of that, which is Defendant ESI09266, about -- near the bottom of the page he says, thus, females represent slightly less than 17 percent of the applicant pool.

A. Okay.

Q. So now I'm just asking you again if you are aware that Falls Township did not hire a single female officer.

A. I wasn't involved in their hiring.

Q. But I have got to finish the

Page 51

question. I understand, but are you aware they didn't hire a single female officer from the day Chief Whitney became chief until today?

A. No.

Q. Okay. Can you look at Exhibit 19.

A. Yeah, I have it in front of me.

Q. Okay. This is a memorandum from Chief Whitney to Mr. Elmore dated December 5, 2022.

Do you know whether you reviewed that memorandum before it went to Mr. Elmore?

And take your time. I don't mean to rush you.

A. I mean, it looks like I'm copied on that e-mail.

Q. Are you in the right place?

A. Well, I'm just looking at the e-mail afterwards.

Q. Okay. Where is that?

A. Exhibit 21, isn't that the same?

Q. I was asking you to look at Exhibit -- well, start by looking at 19, and then we will talk about 20 and 21.

A. I guess I saw it. I mean --

Q. It's the sort of memo you would have reviewed before it went from Chief Whitney to

Page 52

Mr. Elmore?

A. Correct.

Q. And you or someone at Obermayer might have proposed edits to Chief Whitney?

A. Correct.

Q. Okay, and what about Exhibit 20?

That is a memo from -- of the same date from Lieutenant Ward to Sherry McGovern.

Were you speaking about that before?

MR. ATKINS: Exhibit 20?

MR. RISK: I see.

THE WITNESS: I don't have a 20.

MR. ATKINS: There is no 20. It goes from 19 to 21.

MR. RISK: I see what you're saying. It's my bad.

BY MR. RISK:

Q. This Exhibit 21 indicates to you that Obermayer, including you, reviewed the memo that Chief Whitney sent to Mr. Elmore dated December 5, 2022.

A. I'm copied on it, which is the next day.

Q. Right.

A. Because it looks like the memo goes

Pages 49 to 52

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 53

out on the 5th, and then we are sent it on the 6th.

I'm assuming somebody reviewed it. I can't say that I did, but I mean, somebody did.

Q. It would have been the practice for someone at Obermayer to review something like Exhibit 19 before it went out to Mr. Elmore?

A. I mean, unless I have an e-mail, I can't say for sure because --

Q. Right.

A. It looks like the e-mail goes out afterwards.

Q. Well, take a look at Exhibit 21 behind the e-mails.

A. So it goes out the 6th.

Q. Yeah, that -- maybe that is -- do you think that is the memo to Mr. Elmore that the e-mail before it was referring to?

A. I don't know.

Q. Okay. Is it -- was it the practice that a disciplinary memo like the December 6 memo from the chief to Mr. Elmore would have been first vetted by someone at Obermayer?

A. If he requested it.

Q. Okay, and to your understanding, he had the authority to pick up the phone and say to

Page 54

Obermayer, I would like you to look at a draft of the memo, and then Obermayer would do so?

A. Yeah. There was a point that they told him he couldn't do that, though. I don't remember when that is, but there was a point that I believe the board instructed him not to contact us so freely.

Q. Do you have any idea when that was?

A. I have -- no.

Q. Turning back to the December 6 memo in Exhibit 21, is that a Loudermill notice?

Do you know what a Loudermill notice is?

A. Yes.

Q. What is it?

A. It's advising somebody, a public employee of their -- the charges against them pretty much.

Q. Okay, and do you consider Exhibit -- the memo in Exhibit 21 to be a Loudermill notice?

A. Yeah, it says it at the bottom.

Q. Okay, and do you know if it would have been the practice for Obermayer to review any Loudermill notice before it got sent to the employee?

Page 55

A. Same answer, if it was requested, then we would review it and provide our comments or advice.

Q. Well, is it possible that Obermayer drafted Exhibit 21, the Loudermill notice in Exhibit 21?

A. I don't know. I can't speak to that.

Q. Okay. Can you look at Exhibit 180, please.

A. 180?

Q. Yes, way in the back.

A. Okay, the ULP.

Q. Do you want to take a minute?

What is Exhibit 180?

A. A ULP, is that what it is, a memo?

Q. It looks like a memo from Obermayer to Mr. Takita advising that Obermayer believes that the township could file an unfair labor practice charge against Mr. Elmore.

Have I described that correctly?

A. Filed it against him?

Q. Yeah.

A. I don't know.

Q. You don't know what?

A. I don't remember this.

Page 56

Q. Okay. You don't remember that as something you either wrote or reviewed?

A. I wasn't involved probably in that.

Q. You have no recollection of being involved as you sit here today?

A. I don't remember any ULPs with Falls Township. I remember other townships having ULPs, but I don't remember Falls Township.

Q. Let me ask you this; right in the first sentence of Exhibit 180 it says, President Edward -- Police Association of Falls Township President Edward Elmore has recently engaged in a course of erratic, disruptive, unlawful and deleterious conduct.

Do you have any recollection of who wrote that?

A. No.

Q. Does it sound like anyone on the Obermayer team's writing?

A. Possibly.

Q. Do you know whether you wrote that?

A. No, I didn't write that.

Q. Okay. Can you look at Exhibit 26 with me, please.

A. 26?

Pages 53 to 56

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 57

Q.    26.

A.    Okay.

Q.    That is memorandum a dated December 9 from Chief Whitney to the file under -- I guess you would call it the letterhead of the Falls Township police.

Do you see that?

A.    Yes.

Q.    Take a look at it, and I'm going to ask you if you know if you were involved at all in the preparation of Exhibit 26.

A.    In the preparation?

Q.    Yeah or the review of this draft. You have testified that --

A.    Yeah, probably.

Q.    Well, probably you reviewed a draft of it?

A.    I mean, I can't speak specifically. I'm going to say somebody at Obermayer probably reviewed a draft of this.

Q.    And you say that because it was the practice of Chief Whitney to have someone at Obermayer look at his disciplinary memoranda before they went out?

A.    Well, I would say that based on

Page 58

everything that is going on, and I'm looking at all these different issues, we would probably be reviewing most of the information that is related to one person over a course of, you know, it looks like three days or four days.

Q.    And if I understand you correctly, you would -- your testimony is Obermayer would review that, review these memoranda before they went out rather than after they were sent?

A.    I would say that, yeah. If we are going to advise on it, we can't advise on it after it's already gone out.

Q.    Okay, and how about Exhibit 27?

A.    What's this?

Q.    That's a memo on Falls Township police department letterhead by Lieutenant Ward.

A.    I would say no.

Q.    Let me ask you first. Let me ask you first; do you know whether you reviewed Exhibit 27 before it went out?

A.    I can't say for sure, but Lieutenant Ward didn't really come to us with, like, things to review. It would be coming from Chief Whitney.

Like, we wouldn't just communicate

Page 59

with Lieutenant Ward. He is not going to circumvent the chain of command. He would talk to Chief Whitney and see if it would be okay for him to reach out to us on a specific issue, but we weren't, like, just reviewing things of Lieutenant Ward.

Q.    So Lieutenant Ward would not have picked up the phone to call Obermayer?

A.    No.

Q.    Chief Whitney might have?

A.    Correct.

Q.    And would Chief Whitney have been able to call Obermayer and say, I have a -- my lieutenant, Ward, has a draft of a memo that we're sending on our letterhead that we would like Obermayer to review?

A.    Yeah, but it would typically just come from Chief Whitney. It wouldn't come from Lieutenant Ward.

Q.    In other words, if Obermayer got Exhibit 27 to review in draft, that would have been sent to Obermayer by the chief?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  In most cases, yes.

BY MR. RISK:

Page 60

Q.    Okay.  Were there cases in which Lieutenant Ward could have reached out to you directly?

A.    He would not without Chief Whitney knowing.

Q.    Got it.  So in a way, is it fair to say with regard to police matters Chief Whitney was the gatekeeper between the department and Obermayer?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  No.

BY MR. RISK:

Q.    You didn't like that?

A.    Well, I mean, you need to clarify gatekeeper.

Q.    Okay.

A.    No, he's not a gatekeeper.

Q.    Fair enough.

Well, he was -- well, okay.

For something to get from the police department to Obermayer, it would have had to get there through Chief Whitney?

A.    For something to review, but if an officer had an issue that they wanted to address with labor counsel, they could certainly reach out

Pages 57 to 60

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 61

to us, but if somebody wanted us to review something, and it wasn't like a complaint, or you know, they wanted us to advise on something and review a draft, then yes, it would come from management and not a lieutenant. It would come from the chief.

Q. Okay. Can you turn to Exhibit 28.

A. Okay.

Q. That appears to be an e-mail from Mr. Takita to Chief Whitney and Sherry McGovern, copied to several folks at Obermayer, including you.

Do you see that?

A. Yes.

Q. And it's dated December 12, 2022, and it appears it instructs Obermayer to prepare a notice for Chief Whitney that Officer Elmore is to be placed on administrative leave effective immediately.

Have I described that fairly?

A. That's what it says.

Q. Do you have any recollection of your involvement in Mr. Elmore being placed on administrative leave on or about December 12, 2022?

A. What do you mean, my involvement?

Q. Well, did you prepare the notice for

Page 62

the chief to send to Mr. Elmore?

A. That was not the practice. Even if this is what it says, we would ask the chief to do the draft typically, say can you give us a first draft, and then we would make edits based on that because we don't have all the background information.

But I can't say one way or the other if I was involved in this. I don't have any specific recollection.

Q. Okay. Take a look at Exhibit 23.

That is a one page memo dated December 7, 2022 from Steven Reeves to Sherry McGovern.

A. Steven Reeves, okay.

Q. Do you know if you've ever seen Exhibit 23 before?

A. It looks like a lot was going on in 2022. I'm sure I saw this, yeah.

Q. Is that -- do you know whether Exhibit 23 is a memorandum that Obermayer reviewed before it was sent out to Ms. McGovern?

A. No. This came from PO Reeves. No, we wouldn't review that.

Q. Okay. Do you know PO Reeves?

Page 63

A. I mean, I know of him.

Q. You don't know if you've ever met him or spoken with him?

A. I feel like he maybe -- he may have been on the negotiation team for PAFT 111, but I don't know.

Q. Take a look at Exhibit 34, and with it, I think Exhibit 34 goes with Exhibit 132, which we -- it's got -- they are so far apart because 132 was produced much later.

A. Who drafted this?

Q. What are you asking me, Ms. Atkins?

Well, let's take a look at 132, and I think that will help you.

A. Okay.

Q. Do you now know what Exhibits 132 and 34 are?

A. 132.

Q. Well, 132 is a letter.

A. It's a memo. This is like some memo that the chief wrote, right?

Q. Which document are you referring to, 34?

A. 132.

Q. Take a look at 132, which is -- I

Page 64

believe you're going to say it's the cover letter to 34, but that's up to you.

A. Correct.

Q. All right. What was your involvement in the preparation of Exhibit 132?

A. I guess I reviewed it.

Q. And by that, you mean you reviewed a draft prepared by the chief?

A. I don't know. I feel like Tom looked at this.

Q. That's Mr. Hearn?

A. Correct.

Q. And why do you say that?

A. Because I would have more edits.

Q. Your testimony is that you were a more aggressive editor of the chief's work than Mr. Hearn?

A. Of anybody's. It's not really my writing style either.

Q. And why do you say that?

A. Because it's not.

Q. What do you see there that makes you say, I never -- this couldn't have been edited by me?

A. I'm not going to say it couldn't have

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 65

been at one point, but yeah, I don't have any recollection of this really.

Q. Okay. Take a look now with me at Exhibit 34.

A. Okay.

Q. Would you agree with me that Exhibit 132 and Exhibit 34 went together?

A. Yeah, they look like the same thing, yeah.

Q. One is the cover letter for another, right?

A. Right.

Q. Okay, and I'll represent to you that Chief Whitney recalled that he was the primary drafter of Exhibit 34.

A. That he was?

Q. Yeah. Do you know what -- is that your recollection?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Like I said, I would have had more edits. So I don't think -- yeah, right.

All I can say is based on the timing of when this letter went out, I would have been back

Page 66

from maternity leave, and I would have been fully immersed back into Falls Township.

If he wanted us to review this, this would probably be something that I would have reviewed, and these do not look like -- this just doesn't look like my style of writing, like I said. So it seems accurate that the chief wrote this.

BY MR. RISK:

Q. Well, we were surprised when the chief told me that, because it looks like a lawyer's work, but he claimed he was the -- he put the footnotes in, and he was the drafter.

A. Yeah, I wouldn't have put all those footnotes in.

Q. Okay. Take a look now at Exhibit 133.

A. Okay.

Q. And I'll represent to you it appears to be, and there has been testimony that it is, an edited version of Exhibit 34.

A. Mm-hmm.

Q. All right. Do you have any idea whether those are -- well, the testimony has been that someone in Obermayer edited it.

Do you have any idea who that was?

Page 67

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: No.

BY MR. RISK:

Q. Could it have been you?

A. I mean, anything is possible. It could have been more than one of us looked at it but --

Q. You don't have any recollection of editing any version of Exhibit 34?

A. No, and a lot of the edits look like they are just format changes.

Q. Take a look at Exhibit 137.

A. Okay.

Q. Have you ever seen -- well, that appears to be all or part of Exhibit 34 with an e-mail on top from Mr. Clark.

A. Okay.

Q. Do you know whether Mr. Clark was involved at all in the preparation of Exhibit 34?

A. No, I have no clue.

Q. Okay, and if Chief Whitney testified that Obermayer reviewed his draft before Exhibit 34 went out to the supervisors, do you assume that is correct?

Page 68

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: Yes.

BY MR. RISK:

Q. Okay. There came a time when you became involved with Fred Harran.

Who is Fred Harran?

A. I have no clue.

Q. Okay. Well, do you recall that the Falls Township supervisors retained an outsider to look at -- well, I will do it this way.

Exhibit 34 and Exhibit 132 together are the chief's recommendation to the board of supervisors that Mr. Elmore be terminated; is that fair?

A. Yeah, that is what he says, yes.

Q. And that was submitted, we know from 130 -- now, I'm confused.

That was submitted in January 2023. Do you recall that the -- Obermayer was in support of Chief Whitney's recommendation, wasn't it?

A. I don't know. I guess. I really don't know.

Q. You don't remember?

A. I don't remember.

Pages 65 to 68

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 69

Q.   Okay.  Well, in Exhibit 132, the letter, the chief says, these materials constitute my recommendation for the dismissal of Officer Edward Elmore, and below in the middle of the document, if you fail to dismiss him, that would be tantamount to saying that this misconduct is acceptable as a Falls Township employee.

Did Obermayer agree with that conclusion?

A.   I agree with it.

Q.   Okay.  Do you know whether your colleagues at Obermayer agreed with it?

A.   I don't know what they agreed with, but I agree with that.

Q.   Well -- and as of January 27, 2023, tell me why you agreed with that conclusion as of that date.

A.   Because you can't have police officers that are stealing time from a municipality.  There are a lot of issues with that.

So they are held to a higher standard.  They are supposed to follow the law.  They are enforcing the law, and so therefore, if you have an officer that not only is stealing time but also lied about it, then you would terminate them

Page 70

and have an arbitrator put them back to work.  For public perception, I mean that is stealing public funds.

Q.   And what was your opinion as to the appropriate remedy at that time for that offense?

Well, let me ask you this; your opinion was that the appropriate remedy was termination?

A.   Yeah.  I mean, like based on -- you have to look at other factors, but you know, if -- stealing time is a big issue, a big issue, and there were other police officers that were also terminated for similar actions.

And so you know, an arbitrator ended up putting one officer back to work, and you know, that is on the arbitrator, but the township has to make the decision to either keep somebody on that has stolen time or let them go.

Q.   And if someone -- if these officers left early from the training session, you think that the description for that is stealing time?

A.   And submit a time sheet as if you worked all day, I don't know how else you would describe that.

When you go to work, you put in the

Page 71

time that you work.  That's what it says in the handbook, and when you end your work day, you put that in, and you are paid for the time you work.  You are not paid for the hours you don't work.

Q.   And is it your testimony that is what Mr. Elmore did here?

A.   Yes.

Q.   Okay.

A.   And I believe there were other officers involved.

Q.   Officer Fisher and Officer Lundquist?

A.   Yeah.

Q.   Do you recall that -- well, let's not get ahead of ourselves, and so the -- do you recall that after this memorandum, Exhibit -- well, Exhibit 34 was submitted with the cover letter, Exhibit 132, to the board of supervisors, the board of supervisors hired an outside consultant to look at the matter?

Do you remember that?

A.   Yeah, I believe that was Fred Harran.

Q.   Okay, and had you -- in what way did you interact with Mr. Harran in connection with that matter?

A.   I don't really remember interacting

Page 72

with him much, maybe sent him any information he needed, but we weren't really involved.  He was doing the investigation.

Q.   And do you remember what Mr. Harran concluded?

A.   No.

Q.   Well, take a look at Exhibit 39.

A.   Yeah, that's his opinion based on no qualifications.

Q.   What do you mean, based on no qualifications?

A.   I mean, what were his qualifications to do an investigation.

Q.   Oh, okay, and take a look at Exhibit 41.

A.   Okay.

Q.   And does that refresh your recollection about any other interaction you had with Mr. Harran in connection with this matter?

A.   Where are you referring to?

Q.   Either of them.  I've shown you 39 and 41 so far.

A.   I don't understand the question.  Does that refresh my recollection of having interactions with him, the memo?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 73

Q.    I think you testified that what you recall so far is that you may have sent Mr. Harran some information?

A.    Yeah.  I'm saying we didn't have much interaction with him.  We were labor counsel.  We don't work for the township.

We were labor counsel for the township.  So how they wanted us involved was on them.

Q.    Right.  Take a look at Exhibit 54.

A.    Okay.

Q.    Take a minute.  That's Mr. Harran's e-mail to you.

A.    Yeah.

Q.    And do you recall how it came to be that on May 24 you were exchanging e-mail with Mr. Harran?

A.    Because they were putting Elmore back to work, and he had been out for long.  I think he was on administrative leave for -- I don't remember, from maybe January, and so he was out of the force too long.

He needed to be cleared for fitness for duty to return.  So we were involved in coordinating the exam for him to return for duty, to

Page 74

full duty.

Q.    Did you ever tell Mr. Harran that you did not agree with his conclusion as to Mr. Elmore's discipline?

A.    No, I don't, probably not.

Q.    Do you know whether anyone at Obermayer did?

A.    No.  That's not -- we don't -- we advise.  We don't make decisions.  That's on them.

Q.    And at the bottom of Exhibit 54, Mr. Harran says to you, I suggest that we meet and discuss either by phone, Zoom or in person regarding this matter so that a conclusion can be had.

Did you speak to Mr. Harran?

A.    Possibly.

Q.    Well, sitting here today, do you recall speaking to Mr. Harran?

A.    I mean, I recall speaking to him at some point.  I don't know if it was this conversation or another conversation, but I had a conversation with Mr. Harran in the past.

Q.    Well, tell me everything you recall about that conversation.

A.    That it was had.

Q.    That's all?

Page 75

A.    Yeah, I don't remember specifics about this stuff.  This is like not a --

Q.    I understand.

A.    I mean, it's just not relevant in my life anymore.  So it's pretty much out of my mind.

Q.    Well, it's relevant in my life now, so I have to ask you these things.

A.    I understand.

Q.    Take a look at Exhibit 50.

Do you recall -- and I don't want to rush you.  It's a chain of e-mails, and you may want to read them up and down and down and up.

A.    Okay.

Q.    Were you involved in the referral of Mr. Elmore for a mental health exam?

A.    Yeah.  I mean, this is part of what we -- this doctor is -- she is used in many fitness for duty across multiple townships.  So that is why we coordinated it.

Q.    But you are getting ahead of me.

What did you do in connection with the referral of Mr. Elmore for a mental health exam?

A.    I actually think my colleague, Dan, coordinated this.  He is not on the e-mail, but I believe it was my colleague, Dan, that coordinated

Page 76

the fitness for duty with Dr. Fenchel.

Q.    Did you speak with Dr. Fenchel about Mr. Elmore?

A.    I don't think so.  I saw a report.

Q.    Mr. Elmore is going to testify from his conversations with Dr. Fenchel that you had told her that the concern was that Mr. Elmore was a threat of violence in the department.

Do have any recollection of that conversation with Dr. Fenchel?

A.    No.

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  No.

BY MR. RISK:

Q.    Okay.  Can you look at Exhibit 61 with me, please.

That's a multiple page report on Dr. Fenchel's letterhead addressed to you.

A.    Mm-hmm.

Q.    Why was Dr. Fenchel's report of her exam with Mr. Elmore addressed to you?

A.    Because I coordinated the exam, I'm assuming.

Q.    Does that -- do you want to change

**New York**
**212-273-9911**

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
**732-906-2078**

Exhibit 9

Page 77

your testimony that your other colleague was more involved?

A. No, because I believe he was handling like all -- any information that she needed, I believe that my colleague, Dan, was handling that, but because I was a partner, I was the partner listed as the one to receive the report and get it to the client.

Q. Okay. Did there come a time in about the same time, in June of 2023, when Obermayer made a recommendation to the board of supervisors that Elmore be terminated?

A. I don't know. I don't know.

Q. Well, take a look at -- let me see if I can find it.

Take at look at Exhibit 140, and you may want to take a minute. It's a multiple page document.

Take a minute and tell me when you are ready for a question.

A. Okay.

Q. What is Exhibit 140?

A. It looks like a memo from Tom and me.

Q. Do you have any recollection of it sitting here today?

Page 78

A. No.

Q. Do you --

A. I mean, like, we recommended termination before. I mean, on more than one occasion. So it's -- I mean, I'm not saying that I haven't recommended termination, but I can't speak to the specifics of this.

Q. I'm sorry, Ms. Atkins, I'm sorry.

A. I just can't.

Q. When you say you recommended termination before, do you mean with respect to Mr. Elmore or generally?

A. Generally, just generally, a lot of stuff flows together.

Q. Okay. So sitting here today, you don't recall this memo you sent on June 12, 2023?

A. No. I mean, my name is at the top. I am sure Tom and I discussed the contents of what is in there and made a recommendation to the board.

Q. Do you know -- do you have a view about whether Exhibit 140 is written in a way that you might have been the drafter, or do you think Mr. Hearn was?

A. No. Well, I definitely edited it.

Q. Why do you think that?

Page 79

A. I can't say if I was the drafter or not, but I definitely would have done edits because Tom was our writer.

Q. Ah, okay. So you're saying that because you were -- you had skills as a writer, you either were the draft person or the editor because that is the way you would have worked with Mr. Hearn?

A. Yeah. Most of the time partners don't draft stuff. So most of the time, it would be the associates drafting it based on, you know, what the partner has conveyed to them, and then the partners will work together on edits in conjunction to get a final draft.

I don't -- so I can't say if I'm the one who actually drafted this. We, as Obermayer, drafted this report -- I mean, this memo.

Q. And you're saying it might have been the case that some associate whose name is not on here drafted Exhibit 140, and then you and -- you and/or Mr. Hearn reviewed it and edited it?

A. I'm trying to remember why we weren't there. I think that -- because usually, I mean, most -- I won't say most of the time, but we did go to some executive session.

Page 80

It says, in our absence during tonight's executive session. So I'm assuming that it was a late notice that we got for the session, and we couldn't attend because we had prior commitments, and so we drafted this instead of, you know, saying what we had to say in person.

Q. There is no dispute that Exhibit 140 says that we at Obermayer, we, Tom Hearn and Melissa Atkins of Obermayer, believe that termination of Elmore is warranted right now.

A. Correct.

MR. RISK: Okay. It's -- we have been at it about two hours. Would you like to have a short break?

THE WITNESS: Yeah.

MR. RISK: All right. When shall we -- do you want to resume in 15 minutes?

THE WITNESS: That's fine.

MR. RISK: That would be 10 minutes after 1:00.

THE WITNESS: I only have until 3:00 o'clock. I have to pick up my kids.

MR. RISK: Until what time?

THE WITNESS: 3:00 o'clock. I have to pick up my kids from school.

Pages 77 to 80

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 81

MR. RISK:  I can't promise -- I respect that.  I can't promise we will be done.

THE WITNESS:  Well, I have to be done.  That is what I'm telling you.  I have to pick up my kids at 3:00 o'clock.

MR. RISK:  I want you to pick up your kids.  I can't promise we will be finished.

THE WITNESS:  Well, I am going to be finished.

MR. RISK:  As Mr. Atkins suggested, I have seven hours.

THE WITNESS:  And we would have to split it up.  We can get the judge on the phone if we have to do that, but I have to pick up my children at 3:00 o'clock, and you were advised of that.

MR. RISK:  I want you to.

THE WITNESS:  I have a prior commitment.  Thank you.

MR. RISK:  I want you to pick them up, but we'll have to finish another day soon.

THE WITNESS:  That's fine.

MR. RISK:  We will see you at 10 after 1:00.

THE VIDEOGRAPHER:  Off the record at

Page 82

12:56.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 1:11.

MR. RISK:  We're back on the record.

Ms. Atkins advised us just before the break that she has to pick up her children from school.  We know from the record at least one of those children is very young because she testified about the maternity leave.

We agreed we would stop at 2:45 so Ms. Atkins has time to comfortably pick up her children and absolutely won't be late.  I ask counsel only that we work together to find a date very soon when we can just complete whatever is left of this, which I hope to be not too much, on Zoom.

Mr. Hatchett suggested we discussed that 2:45, and that's okay with me.

Are all counsel agreed that we will proceed in that way?

MR. ATKINS:  Sure.

MR. HATCHETT:  I have no objection.  However, with the caveat that I did advise that I have scheduling conflicts, but I'm committed to trying to resolve any bifurcated deposition.

Page 83

MR. RISK:  Okay.  We are -- as it comes to scheduling, Jahlee, we are on your side also.

All right.  Can we go back -- well, we are on the record.

BY MR. RISK:

Q.    Returning to Exhibit 140, Ms. Atkins --

A.    Yes.

Q.    Do you know what happened at the board of supervisors when they met after you submitted your office's recommendation in Exhibit 140?

Take your time and read it all you like.  This is not a quiz.

A.    I will have to guess that they didn't agree with the recommendation.

Q.    And you guess.  That is your guess because why?

A.    Well, because he remained employed.

MR. HATCHETT:  I just have a retroactive objection.  The witness responded before I could get my objection out.

Again, Ms. Atkins, I'm not your attorney, but to the extent that you can, please

Page 84

refrain from guessing or speculating.

MR. RISK:  Well, she was making a judgment based on what she knew.

THE WITNESS:  Yeah, it wasn't really a guess.  It was surmised based on the documents in front of me and what I know, that they did not agree with the recommendation and gave a different -- gave a different discipline, I guess.

BY MR. RISK:

Q.    Well, Ms. Atkins, let's address Mr. Hatchett's objection, because he is a smart guy.

You know that Mr. Elmore continued to be employed for another six months, right?

A.    Yes.

Q.    And so from that, you conclude that he wasn't terminated on or about June 12?

A.    Correct.

Q.    Okay.  Let me show you -- can we take a look at Exhibit 162.

This purports to be an e-mail from Mr. Takita to the supervisors and a bunch of counsel, including you and Mr. Hearn, dated June the 1st.

Which just to keep things clear, that is about two weeks before you wrote Exhibit 140; are

Pages 81 to 84

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9

Page 85

you with me, Ms. Atkins?

A. Yes.

Q. All right. Mr. Hearn -- Mr. Takita, excuse me, appears to be recommending that Mr. Elmore receive a five-day suspension.

Do you see that?

A. Yes.

Q. Do you remember that?

A. No.

Q. When Mr. Takita says he will need to be given a book, do you know where the idea of a five-day suspension came from?

A. No, but do you have the memo?

Q. I believe I do.

How about Exhibit 54. We looked at this already.

A. Okay.

Q. All right. Does Exhibit 162 help you recall Exhibit 54 and your role in Exhibit 54?

A. Wait, what, 54 or 154?

Q. 54.

A. I thought you said 154.

Q. Sorry, sorry about that.

A. Do you know the Bates on them?

Q. I'm sorry?

Page 86

A. Do you know the Bates stamp?

Q. Yeah, we looked at 54 just a little bit ago. It's Harran 003. We looked at it about 15 minutes ago.

A. I got it.

Q. I know, the more I ask you to pull them the more the pile gets confusing, and I apologize for that.

A. Okay. Can you repeat the question now.

Q. Well, I will ask you a new question. We talked about Exhibit 54 before the break, and you did not have much recollection about it, and I'm asking you really now -- well, I am asking now whether Exhibit 162 helps you remember the context of Exhibit 54.

Or, let me ask the whole thing more simply, Melissa, I'm sorry. Is it your understanding that Exhibit 54 is the PDF that was attached to Exhibit 162 that you were just asking me about?

A. No. Maybe, yeah. I guess honestly I don't know, maybe.

MR. ATKINS: Just to be clear, she asked you for the memo.

Page 87

MR. RISK: I'm sorry?

MR. ATKINS: She asked you for the memo.

MR. RISK: Yeah, I think that's it. Well, memo to Ms. Atkins, 5/24.

THE WITNESS: Can you tell me the two documents I'm supposed to be looking at.

MR. RISK: Okay, 162, an e-mail from Takita to a bunch of people dated June 1.

THE WITNESS: Okay, got it.

You are asking me if this helps me recall a conversation with Mr. Harran?

BY MR. RISK:

Q. Let me ask you a much cleaner question, I'm sorry.

Is it your belief that Exhibit 54 is the memo to Ms. Atkins referred to by Mr. Takita in Exhibit 162?

A. Was it the -- it appears to be, but I can't say for sure. It appears to be just based on the dates.

Q. And in fact, Exhibit 54 is a memo to you from Mr. Harran, right?

A. Correct, but Harran is not copied on this e-mail. That's why it's throwing me off.

Page 88

MR. RISK: I'm sorry, we lost -- I don't know if others did, but you cut out for just a second.

Did you get the answer, Ms. Lombardy?

(Whereupon, the previous answer was read back by the reporter.)

BY MR. RISK:

Q. Okay. Well, let me read to you from Exhibit 162. Mr. Takita says, all -- and I guess that is the many people copied on the letter, after a review of Mr. Harran's investigation conclusion attached, it is my recommendation that PO Elmore serve the maximum suspension of five days.

Because I'm recommending discipline for PO Elmore's inappropriate conduct, he would need to be given a Loudermill notice. I am further recommending that Mr. Harran provide PO Elmore his Loudermill notice. It is likely that PAFT will challenge the discipline.

PAFT will challenge the discipline since the investigation was not completed within 90 days. Nonetheless, this will serve as notice to PO Elmore and other officers that this kind of conduct will not be tolerated in Falls Township.

Have I read that correctly?

Pages 85 to 88

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 89

A.    Yes.

Q.    All right.  So now in view of that, do you believe that the memo to Atkins, 5/24/23, to which Mr. Takita referred is this document that's Exhibit 54?

A.    My answer hasn't changed.  It appears to be.

Q.    Okay, and is Exhibit 54 Mr. Harran's recommendation that Mr. Elmore be disciplined not more than a five-day suspension?

A.    That is Mr. Takita's.

Q.    Well, take a look with me at the second paragraph of Exhibit 54.  Pending --

A.    I'm looking at 162 where it says, it is my recommendation that PO Elmore serve the maximum suspension of five days.

Q.    Yes, after a review of Mr. Harran's investigation conclusion attached.

A.    Okay.

Q.    So I'm asking if you look at Exhibit 54, the second -- I will just read you the second paragraph.  Read along with me.

Pending no further information, Officer Elmore may have violated the following policy under the Falls Township police department:

Page 90

Policy 2.A.1, disciplines, subsection conduct unbecoming an officer, section 103.150, releasing police information or policy without authorization, acting in the capacity or speaking for the department or the chief.

The first offense for the violation is reprimand to five-day suspension; do you see that?

Did I read that correctly?

A.    Yes.

Q.    So I'm really asking you if Mr. Takita is making his recommendation in Exhibit 162 based on Mr. Harran's memo to you on May 24 now marked Exhibit 54.

A.    Yes.  This independent consultant made this recommendation to labor counsel, and labor counsel had a different recommendation.  I don't understand what is so hard about that.  That is our advice.

Q.    Labor counsel being Obermayer?

A.    Yeah.  That is our advice.  They don't have to take our recommendation.  They can deviate, which is actually in the memo drafted from Obermayer to the board where it says, this is only our recommendation.  You have the right to deviate.

Page 91

But ultimately, it's -- if you deviate from what has been done in the past, then you have to answer why you did it in a deposition.  I don't know why they did it, but that wasn't our recommendation based on how other officers had been disciplined in the past.

For the similar -- for similar conduct, they were terminated, and it was our opinion as counsel that they should proceed with the same discipline and then go to arbitration and have an arbitrator put him back to work.

And we were entitled to our opinion, and they were entitled to deviate from that, which they did.

Q.    But isn't the -- isn't Mr. Harran saying that the written policy provides for a maximum penalty of a five-day suspension and that more than that would be a deviation from the policy?

A.    I don't have the policy in front of me.

MR. ATKINS:  Are you asking her to give an opinion on a piece of paper written by another person?

THE WITNESS:  Yeah, but I also don't have the policy in front of me, or I don't know how

Page 92

they -- this was his opinion based on his interpretation.  I don't know.  He is not a lawyer or labor counsel.

BY MR. RISK:

Q.    Well, what I'm really interested in is do you remember why, if Mr. Takita made this recommendation on June the 1st, Obermayer is writing its very formal Exhibit 140 thirteen days later recommending termination?

Do you remember what happened?

A.    I mean, we couldn't be at the board of supervisors meeting.  I think that was said in there.

So the board makes the ultimate conclusion, right.  Do you know how this works?  So they make -- the township manager makes a recommendation to the board, and then the board is the ultimate decision-maker on what happens.

In most municipalities, in most municipalities that I have represented in the past, the board of supervisors or council, city council will go with the advice of the chief.  Falls Township was different.

Q.    But when you wrote your memo on June 12, Exhibit 140, hadn't the board already

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9

Page 93

decided on the -- that Mr. Elmore would be returning to work?

A.    They hadn't officially made, you know, the official action, I believe, because the board of supervisors meeting, you know, was after that.

That is the date it was, June 12, and in the memo, it says -- I mean, this is privileged, but it is advising them why we believe that the decision should be termination.

So I mean, until it's final, it's not final, and the last sentence of this memo explains that as the ultimate decision-maker for discipline, discipline issued to employees, members of the board will be required to explain final disciplinary decisions that deviate from departmental recommendations in deposition and/or other court proceedings, not labor counsel, because they make the ultimate decision.  I can't speak to why they made the decision they made.

Q.    All right.  Well, I want to show you some other documents about that, but I can't put my finger on it.  So maybe we'll pick that up when we come back, because I know our time is short today.

Were you involved in the dispute

Page 94

regarding Elmore's application for a promotion to corporal while he was on a leave of absence in the first half of 2023?

A.    No.  I don't even remember him being offered a promotion.

Q.    Well --

A.    I mean, it's kind of odd that if you're out on administrative leave for disciplinary issues that you're eligible for a promotion based on my --

MR. RISK:  We lost you, Ms. Atkins.

Ms. Atkins, you are frozen.

THE WITNESS:  I've represented lot of municipalities.

MR. RISK:  We lost you for about twenty seconds there.  You were frozen for awhile.

THE WITNESS:  I am frozen even though I can hear you?

MR. RISK:  You're back now, and we are glad to see you are fine, but at least on my screen, and I assume others, you were frozen for a good chunk of time.

THE WITNESS:  Could you hear me, though?

MR. RISK:  I couldn't hear your

Page 95

answer.  So maybe we will get back -- I'm sorry, we'll have to do a do-over.

Can you read back the question, Ms. Lombardy.

(Whereupon, the previous question was read back by the reporter.)

THE WITNESS:  Just based on my experience in representing municipalities and counties in Pennsylvania, typically when an officer is out pending discipline they are not eligible for promotion.  So I -- yeah.

BY MR. RISK:

Q.    Well, if need be when we come back another day, I will show you the documents, but I think you will see the record will show that Elmore was among those invited to apply for a promotion, and he did, and his performance evaluation was changed.

MR. RISK:  You are frozen again.

You were frozen again.

MR. HATCHETT:  She just came back.

THE WITNESS:  You were frozen, too. I don't --

MR. RISK:  I might just look that way, Melissa, but you were definitely frozen.

Page 96

Do you want to read the question again, Dina.

I'm sorry, Melissa.  Maybe your computer is getting tired of all my questions.

(Whereupon, the previous question was read back by the reporter.)

MR. RISK:  Mr. Hatchett, I can't believe you didn't object to that.

MR. HATCHETT:  You weren't done.  She was frozen.

THE WITNESS:  You are very kind.

BY MR. RISK:

Q.    Are you aware that there was -- that the performance evaluations of Mr. Elmore and possibly others were changed by the Falls Township police department in the spring of 2023?

A.    Yes.  I don't remember what the discrepancy was, but I remember something.

Q.    Well, do you have -- I didn't think I would have -- do you have Exhibit 48?

A.    Yes.

Q.    I'll represent to you that Exhibit 48 is the second version of his evaluation.  This one is signed by Mr. Clark, in which his overall score is -- if you look at the top of the second page,

Pages 93 to 96

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 97

Elmore 00062, the overall score is 51.

Do you see that?

A.   Mm-hmm.

Q.   All right, and I will represent to you, and I can show you when we come back another day, that the department replaced an evaluation done by his supervisor, Sergeant Fanelli, where his evaluation was 91, you know, and I'll represent to you -- and I could show you all the documents, that effectively cost him a promotion that he had earned based on the scores.

So I'm asking you what you know of that dispute in 2023, if anything.

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  What I remember is Fanelli wasn't his supervisor at the time.  There was a period where -- I mean, obviously he had been out for -- you know, out on administrative leave.

So you know, I just remember -- I feel like I remember that whoever did the first evaluation wasn't really the supervisor that was supposed to be evaluating him.  That is kind of how I remember it, but I don't know how accurate that is.

Page 98

BY MR. RISK:

Q.   Do you see on Exhibit 48 in the second line -- I'm reminding you this is the amended evaluation.  Do you see it says it covers the period from January 1 to April 10, 2023?

Do you see that?

A.   Mm-hmm.

Q.   I'll represent to you that Mr. Elmore was out on administrative leave for that entire period.

A.   Okay.

Q.   Take a look with me at -- do you have Exhibit 49?

A.   Yeah.

Q.   Take a minute and read that, and tell me when you are ready for a question.

A.   Okay.

Q.   I thought she was frozen, but she is studying.

A.   I was reading.

Q.   Are you aware -- were you aware at any time that Mr. Elmore had reported to the department that he had been on a hiring committee in 2021 that he believed was discriminating against women applicants?

Page 99

A.   When did I become aware, is that what you were asking?

Q.   Were you ever aware?

A.   Yeah, there was an investigation about it.

Q.   All right.  Were you -- and were you -- but you were not involved at all in that investigation; is that right?

A.   Right, but I knew there was an investigation.

Q.   Okay.

A.   We weren't involved in it because we believed there was -- we believed somebody else -- it shouldn't have been Tom and I.  It should have been somebody else, because you know, you were -- we knew we were just recently involved in some other discipline.

So we were like let's get somebody else.  This doesn't really involve a disciplinary issue.  It was more of discrimination.  So let's take this out of the labor and put this into a discrimination investigation.

Q.   And that's how Mr. Shute got involved?

A.   Yes.

Page 100

Q.   What kind of lawyer is Mr. Shute?

A.   He is an employment lawyer.  He doesn't do really traditional labor.  He does more of the employment, so discrimination defense and claims of discrimination.

Q.   And was his involvement for Falls Township just with respect to this one investigation?

A.   Yes, until I kind of stepped off, and then he came on.

Q.   And that was -- when you say you stepped off, that was the period beginning just after the Elmore termination and for the duration of your employment at Obermayer until sometime in 2025?

A.   Yes.  I had taken on two new clients that were taking all my time, and to be fair, I really didn't have time to do that investigation, but because it had to be done very quickly, I was -- I had done investigations.

I was a partner, and you know, everybody was like all hands on deck at that point.

Q.   Well, we'll talk about that later, but since you brought it up, why -- what was your understanding of why that investigation had to be done quickly?

Pages 97 to 100

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

A.    Your guess is as good as mine.

Q.    Okay.  Well, returning to Exhibit 49 --

A.    Yes.

Q.    Are you aware that Mr. Elmore alleged that his -- he had been denied a promotion he earned by the dramatic rewriting of his performance evaluation score in retaliation for his bringing to light the issues about gender discrimination on the hiring committee in 2021?

MR. HATCHETT:  Objection to the form of the question.

BY MR. RISK:

Q.    Take your time, Ms. Atkins.  It's not so easy to read.

A.    You are asking me did I know?

Q.    Did you know he had made the charge that his opportunity for promotion was taken away from him because of his complaint about discrimination and hiring procedures?

A.    I probably became aware of it at some point.  I mean, I don't agree with that but --

Q.    You don't agree with what?

A.    That he was denied a promotion because he made a complaint.

Q.    Why?

A.    He wasn't the only one making complaints.  I mean, Langan was promoted, and he is a complainer.  So I mean, there have been lots of officers that were disciplined, that had made prior complaints, and they were still promoted.

So I don't think -- you know, that's my opinion.  I just don't believe that was the case.  I mean, even the timing, I mean, I find it interesting that he didn't believe that him being out on discipline, you know, had anything to do with it.

You know, and all the things that had gone on when I was out on leave, it was just -- it was just a lot.  I mean, creating that flyer, in any other department -- I worked at the city.  I worked for the City of Philadelphia police department.  That would have been commissioner's direct action, immediately terminated.

That is about the commissioner or about the chief, your highest ranking command officer.  That doesn't happen in other police departments.  It's very unusual that happened, and he wasn't terminated for that.

So do I believe that it was based on

a complaint, no, I do not.

Q.    Well, you just -- during that long answer, you referred to Mr. Elmore as being out on discipline in the first half of 2023.

A.    Yeah.

Q.    That is not accurate, is it?

A.    Wasn't he out on administrative leave?

Q.    Yes, yes, but is that -- is it your opinion that administrative leave is discipline?

A.    Well, it's pending investigation, you know, and like I said, typically in other police departments you are not even eligible for promotion during that time, and so you know.

Q.    Yeah, but now I want to -- I want to hone in on that.

A.    Okay.

Q.    Is it your testimony that administrative leave is a form of discipline?

A.    No, no, but it was pending discipline.  I misspoke, pending discipline.

Q.    Okay, and in the end -- in the end, there was no discipline, was there?

A.    I thought he got the five-day suspension.  Did I miss something?

That was the recommendation, and the board decided not to, right?  Correct.

Q.    Not exactly.  Let's return to Exhibit 162, which was your -- I'm sorry, I'm sorry, Melissa, Exhibit 162.

I'm sorry again, which we looked at, which was Mr. Takita's memo about the five-day discipline.

A.    Because it was challenged because of the timing of the investigation.

Q.    I want to ask you about that.

A.    I don't understand that rule.

Q.    What rule?

A.    I really don't.

Q.    What rule?

A.    I don't understand.  I don't understand it, and I don't think the township does.  It was written -- I don't know where it's written, maybe in the contract.  I don't know if it was in the CBA.

Q.    Can I stop you, Ms. Atkins, respectfully because the Judge or others are going a to see this transcript who don't know the inside story.

So you testified that there is a rule

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

you don't understand.  Can you tell the Judge clearly which rule you don't understand.

A.    Falls Township has -- and I can't remember where it is.  It may be in the handbook or police policies, but they have to conclude an investigation within 90 days.  Otherwise, they need written consent to extend by both parties, I think, to extend the investigation period.

My understanding of that as labor counsel, and we expressed this multiple times, was that was internal investigations done by internal affairs, like similar to internal affairs, but it was typically, I think, just Lieutenant Ward did most of the investigations because it was such a small department, and so he had 90 days.

When you have an outside consultant or you have labor counsel or you have a DA's office do an investigation, you can't hold them to the policies of your township.

Like, how is an outside consultant going to say, I can conclude this investigation in 90 days, and you hold me to that.

I mean, that's unreasonable, and so I believe that was drafted for internal investigations, and you would have, as a township

while doing those internal investigations, an agreement with PAFT, which is the labor union representing them, to extend the investigation beyond the 90 days.

I can't make an agreement with PAFT.  I don't have a CBA that is between us.  It would be between the township and PAFT.

BY MR. RISK:

Q.    All right, but the rule, the 90-day rule that you're criticizing, it's in the collective bargaining agreement, right?

A.    I don't know.  Is it in the CBA?  I don't know.

Q.    Okay.  Well --

A.    Do you have the CBA?

Q.    No, but we'll return to that next time, and I will do so.

A.    So I mean, that's even -- that's even a stronger argument, because how can they hold an outside investigator to a contract that doesn't apply to them.

Q.    All right, but was Mr. Takita saying to all these supervisors and lawyers that it was his view that Mr. Elmore should be -- should receive the five-day suspension even though the 90-day rule was

violated?

A.    Yeah.  Yes.

Q.    Okay.

A.    And I think that is just because of the ambiguity in it.

Q.    Can you take a look at Exhibit 64, and that is confusing because there is an e-mail on top forwarding this from Mr. Elmore, but I want you to look at the bottom half.  That's Bates number Elmore 00086.

A.    64.

Q.    It's an e-mail from Mr. Takita to Mr. Elmore --

A.    Okay.

Q.    -- copying the union and the chief.

A.    Mm-hmm.

Q.    And Ms. McGovern and Mr. Dippolito on August 8.  Take a minute and read that, and I want to ask you about that.

A.    Okay.

Q.    So I guess Exhibit 64 answers your earlier question, that the rule is in Article 12 of the collective bargain agreement.

A.    There you go.

Q.    Do you see that?

A.    Yes.

Q.    Do you recall that Mr. Elmore grieved his five-day suspension?

A.    No.

Q.    And do you understand the bottom half?

A.    Oh, yes.  He grieved it, yes, correct.

Q.    And do you understand Mr. Takita's e-mail to you and others on -- not to you.  I misspoke.

His e-mail to Mr. Elmore, the chief and others on August 8 is sustaining the grievance?

A.    Yes.

Q.    That is the township agreed that Mr. Elmore's grievance about the 90-day rule and his five-day suspension was meritorious?

A.    Yes.

Q.    What is a step two grievance hearing?

A.    What is it?

Q.    Yeah.  What is step two of the grievance process at Falls Township, if you know?

A.    A hearing with the township manager.

Q.    Okay.  So the last sentence of Exhibit 64 is, accordingly, the personnel file of

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 109

the grieving officer, that is Elmore, will make no reference to the discipline imposed.

Do you see that?

A.   Yes.

Q.   So wasn't that -- wasn't Mr. Elmore being told that the attempt to discipline him for these ancient matters, at least 2022 matters, is now over?

A.   No, he is not getting disciplined, right.

Q.   Well, the matters are closed?

A.   Correct.

Q.   That he is not receiving discipline in connection with the K-9 training incident in which he returned to the headquarters or the November 22 incident involving the flyer and the T-shirt and the other things you spoke about, that he will receive no discipline in connection with those matters?

A.   Correct.

Q.   And in fairness, Mr. Takita included a sentence in here making it clear that he didn't like that, that this did not mean the township was condoning some of the things he had done.

Do you see that?

Page 110

A.   Yes.  I also didn't agree with this.

Q.   I'm sorry?

A.   I also didn't agree with this, but this was their decision to make.  This was not my -- I didn't agree with this, because like I said, I didn't believe the 90 days was applicable to outside investigations.

Because I mean, Mr. Harran took how long to do the investigation, and Campbell Durrant took how long to do that investigation, and so it's a little hard to hold outside people to this, but you know, honestly, I think the township made a business decision.

You know, the cost of litigating this through arbitration just wasn't worth their time and effort anymore.

Q.   Well, were you involved in discussions with anyone that led to -- that preceded the e-mail to Elmore from Mr. Takita that is Exhibit 64?

A.   What do you mean, was I?

Q.   Were you in the discussion when this grievance was --

A.   Yeah, they absolutely knew I didn't agree with this.  Tom would testify to the same

Page 111

thing.  This was not on the advice of counsel.

Q.   Tell me what you remember about your office's involvement in the decision about whether Mr. Takita would grant Mr. Elmore's step two grievance.

A.   Oh, they -- I mean, it was, you know, they -- it wouldn't have -- it wouldn't have likely been worth their time because it was a toss-up once you get to arbitration.

But in my opinion and in, you know, Obermayer, we didn't agree that he should not be disciplined.  We wanted them to move forward in the grievance process, but they didn't want to spend the money.

We can't force our client to spend money.  So they chose to sustain the grievance and not discipline him.  I thought the conduct was egregious enough that it warranted discipline.

Q.   All right.  So is it your testimony that your office was consulted before Mr. Takita wrote the August 8 e-mail, Exhibit 64, and you and Mr. Hearn made clear you didn't agree?

You felt that the step two grievance should not be sustained?

A.   We wrote the memo, 140, saying what

Page 112

our advice was.

Q.   Well, 140 you wrote in June.

A.   Do you understand how the grievance process works?  You have to implement the discipline first, and then they challenge the discipline.

So he was suspended five days.  Then, he grieved it through the grievance process, which is after you've implemented the discipline, and he challenged that and said he should not have been disciplined because the investigation took longer than 90 days.

The township said, okay, we don't feel like spending any more money on five days or not.  So guess what, we'll sustain the grievance.

That is how it works.  So all of that happened after we advised on our recommendation, which was June 12.

Q.   All right.  I apologize, let me try to ask my question again.

You wrote a very -- you and Mr. Hearn wrote a very lengthy professional memo on June 12 recommending that Mr. Elmore be terminated, and we've looked at that with you, Exhibit 140.

A.   (Witness indicates.)

Q.   And then we looked at -- we looked at

Pages 109 to 112

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 113

Exhibit 162 in which Mr. Takita was suggesting that Mr. Harran's report be followed and a five-day suspension of Mr. Elmore be the penalty.

And we -- I think we concluded that the township decided to impose the five-day suspension and not terminate Mr. Elmore at that time.

And then, as you testified a second ago, Mr. Elmore grieved that, and then his grievance was sustained by Mr. Takita at step two, and that is Exhibit 64, right?

I have summarized our conversation correctly so far?

A.    Yes, it was upheld at step one and sustained at step two.

Q.    So I'm asking you whether -- I know Obermayer spoke very formally and in detail in Exhibit 140 in June.

Now, I'm asking you whether Obermayer was consulted prior, again prior to the e-mail of August 8, Exhibit 64, sustaining the step two grievance.

A.    I would assume so.  This has to do with labor, and we are labor counsel.

Q.    Do you --

Page 114

A.    We advise on labor issues.

Q.    Do you recall saying to Mr. Takita or the supervisors or the chief or Mr. Dippolito or anyone, no, we think the step two grievance should be not sustained, and it should go to step three?

A.    Yes.

Q.    All right, and to whom did you say that?

A.    Everyone, solicitor, the board, Takita, the chief was in agreement.  I mean, everybody knew how Obermayer felt when it was based on this, and we felt very strongly that he should have been terminated based on his conduct.

A five-day suspension wasn't enough for us, what we believed.  We believed, like I said, that he should have been terminated.  So of course, we wanted them to uphold the step one grievance and move forward to step two.

Instead, they sustained it, and we were done litigating then, but we would have went to arbitration.  We said that he should have been terminated and have an arbitrator put him back to work.

So of course, we would have defended our position that he should have been disciplined

Page 115

for five days considering that we saw it should have been termination.  We didn't change our position at any point.

Q.    Was step three arbitration before a neutral arbitrator?

A.    Yes.

Well, does step three go to the board?  I think step three.  I don't remember what step three is.  You have to look at the contract.

Q.    Okay, okay.

Did Mr. Harran's analysis and his recommendations on the appropriate discipline or lack of it for Mr. Elmore affect Obermayer's thinking in any way going forward?

A.    What do you mean?

Q.    Did Obermayer or anyone at Obermayer say, Mr. Harran -- we have to take Mr. Harran's analysis seriously and rethink our position?

A.    No.

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  We are counsel.  We were counsel, not him.

BY MR. RISK:

Q.    Did anyone at Obermayer think that

Page 116

the step two grievance decision set forth in Exhibit 4 -- 64 meant that the conduct pertained to Exhibit 64 should not be considered in future disciplinary investigations involving Mr. Elmore?

A.    Did I think that?

Q.    Did anyone at Obermayer think that?

A.    I can't speak to what they thought, but no, we included it in the last investigation, because you can't undo what you know.

So although he wasn't disciplined, that was never our recommendation.  I don't know how many times I have to say that.  This behavior is not normal in other police departments.

So that's -- no, that's not -- we included it in our last investigation.  Obviously, we thought it was relevant.  So he may not have been disciplined, but that doesn't mean the conduct didn't happen.

Q.    There came a time -- well, as of August 8, the date Exhibit 64 was issued, Mr. Elmore had returned to work, and there would be no discipline imposed against him; is that correct?

A.    Correct, I believe.  Is this when he had the -- had to return and have the fitness for duty?

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

I don't remember, but yeah, he returned at some point.

Q. He returned before the step two.

A. Yeah, I don't remember.

Q. Just to help us through at this late hour, I think he had returned, and I could probably show you that, and the suspension had been imposed but not levied until he exhausted the grievance.

A. Right, right.

Q. In other words, he was -- he had returned to work in June.

A. Right.

Q. And they grieved the five days, and that would waive the playing out of the grievance.

Is that your recollection?

A. Yeah, that is typically how it happened. They could use vacation days, I believe as well, or sick days or something.

Q. What do you mean, they could use vacation days?

A. They could use that for discipline.

Q. Oh, to pay the suspension with accrued time?

A. Correct.

Q. But that didn't happen here?

A. I don't know.

Well, it could have, and then he would have been returned the time back after the grievance was finished.

Q. Okay, but he didn't -- but I think we are saying the same thing but still talking past each other.

Because he had the grievance, he wouldn't be -- he wouldn't serve the suspension until the grievance had reached whatever the conclusion was?

A. I don't remember.

Q. Well, let's say -- let's do it again. I wish I had the document at my fingertips.

Mr. Elmore was returned to work in or around -- in or around --

A. Can I explain? Because if you were terminated, for instance, you would be terminated, and then they grieve the termination.

Like, you have to have the action happen. Otherwise, there is nothing to grieve, and so he has to actually be suspended before he can grieve the suspension.

And so what I'm saying is I don't know if he actually served a suspension, because

they could use time, and so he would just give five days out of his bank, and then he would go back to work like normal and not actually serve suspension.

Q. Well, when I see you next time, I will try -- somewhere in this file is a document that says, you are suspended in substance for five days, but it won't be levied on you until there is an arbitration ruling or the end of the grievance.

A. But there is some other wacky thing in the contract that said you can't impose discipline after the decision is final, and again, we -- there was an arbitration decision that basically was like that doesn't even make sense.

So the arbitrator is like how -- you have to have an action happen before you can grieve it. So how do you grieve something if it never happens.

Q. Where I'm headed here is that as of August he was returned to work at no discipline.

A. Yeah.

MR. RISK: You know, let's just clear this up. Ms. Benfer, do you have the exhibit which I have not sent on to the witness which precedes that, that brings him back to work?

Do we have that at our fingertips?

Then, we will see what exhibit it is.

Can you put it in the share, Ms. Benfer, Tiffanie.

MS. BENFER: (Indicating.)

MR. RISK: Are you attempting to do that?

I'm sorry, here it comes.

Can you make that bigger so Ms. Atkins and I can see it.

BY MR. RISK:

Q. This is Exhibit 58, which is not in your materials. I didn't expect that we would go this way.

Can you read that, Ms. Atkins, or is that straining you?

A. I can read it.

Q. Take a look at. Here it comes. We are going to be smothered by it in a minute.

Take a look at it, and tell me when you are ready for a question.

A. I'm ready.

Q. All right. Does this Exhibit 58 from Mr. Takita to Mr. Elmore and Chief Whitney and others indicate that Mr. Elmore in fact returned to work on June the 19, 2023 at 7:00 p.m.?

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 121

A.    Yes.  It looks like he was ordered to do that.

Q.    All right.  Now --

A.    From --

Q.    But at the same time, Exhibit 58 imposes the five-day suspension, doesn't it?

A.    You said this is Exhibit 58?

Q.    Yeah.  Can you see it, the top right-hand --

A.    Now I can, yes.

MR. RISK:  Now, let's see the bottom again, Ms. Benfer.

THE WITNESS:  Yeah, that is what I'm talking about, Article 12 of the CBA.  The suspension shall be served after the determination of an arbitrator.

BY MR. RISK:

Q.    In this case, the fact the grievance was resolved before the arbitrator means that it never came into play; is that right?

A.    Correct.

Q.    All right.  So it seems that on June the 19, about one week after your office wrote Exhibit 140 recommending that Mr. Elmore be terminated, he was returned to work by Mr. Takita;

Page 122

is that right?

A.    Yeah, it looks like three days.

Q.    And that according to Exhibit 64, almost two months later, on August 8, his grievance was sustained, and the suspension was withdrawn.

Is that the right way to describe it?

A.    Yeah, there was no discipline imposed.

Q.    So as of that date, Mr. Elmore had returned to work to his job with no discipline, as of August 8, 2023?

A.    Correct.

Q.    No discipline for the entire period back to the K-9 incident of February 2022?

A.    Correct.

Q.    All right.  Are you aware that Mr. Elmore filed a charge of discrimination with the US EEOC in September of 2023?

A.    I wasn't until now.

Q.    What do you mean, you wasn't -- you weren't until now?

A.    Until I got the subpoena, I didn't know.

Q.    What do you mean by -- what do you mean by until you got the subpoena?

Page 123

A.    I mean, I had it figured he was suing for something.  I mean, I see Marshall Dennehey is one of the attorneys.  I mean, like I'm -- I have been in this practice for a long time.

Q.    So it is your testimony that you were not aware until you received our subpoena in this lawsuit that Mr. Elmore had filed an EEOC charge?

A.    Correct.

Q.    Did Obermayer not cooperate with Marshall Dennehey in connection with the preparation of Falls Township's response to the EEOC charge?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  I don't know what they did.  I don't know what they did.  I wasn't at Obermayer anymore.

I wasn't involved in any of this.  I didn't prepare any of these responses.  I didn't look through any e-mails.  I didn't even know that they turned over e-mails that had my name on it.

I didn't know that they turned over memos that appear to be protected by the attorney-client privilege, because they are giving advice.  They are not redacted.  I didn't know any of this.

Page 124

MR. RISK:  All right.

THE WITNESS:  Until I got the subpoena, and I still didn't know what documents until you sent me the documents -- to Mr. Atkins.  I didn't see any of these, so I was not aware.

BY MR. RISK:

Q.    All right.  I'm asking a smaller question, which is -- well, you testified -- if I have it correct, I think you testified this morning that you left Obermayer in September of 2025; is that right?

A.    Correct.

Q.    All right, and Mr. Elmore filed his first EEOC charge in September of 2023.  I'll just represent that to you, but you're -- it's your testimony that you were unaware that Mr. Elmore had filed an EEOC charge in the remaining time you were at Obermayer?

A.    I did not know.

Q.    Okay.  Take a look with me at Exhibit 129, and that's a long document.  So don't let me rush you.  Get familiar with it.

A.    I have to find it.  What is the document?

Q.    It's Mr. Elmore's EEOC charge.

Pages 121 to 124

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 125

A.    I will say this, too, also as labor counsel we didn't handle any of their employment related stuff.  It was separate from --

Q.    When you use the term labor counsel, I have learned from you today, you really mean issues related to the union's collective -- the unionized work force, let's say.

A.    That's all we dealt with, their unionized work force.  We didn't -- they have a -- they used their insurance counsel for employment stuff.

Q.    But when Mr. Elmore alleged that, related to this, women were being discriminated against in hiring, that matter was still referred to Obermayer.

A.    It was, yeah, but not -- I didn't -- it was our employment side that did it.

Q.    I understand.

A.    I mean, we still have an employment wing.

Q.    I assume -- but I assume the matter was sent either by you or Mr. Hearn over to Mr. Shute to do that investigation.

A.    They asked us if anybody in our office could do it, and we said that they could, but

Page 126

that's also why we wouldn't have represented them in an EEOC complaint, if you are doing an investigation.

Go ahead.  I have the charge.

Q.    Do you want to read through it and see what it's about?

A.    No, I'm okay.

Q.    Okay.  Well, take a look at page 4, or Elmore 0097 and 98, which relates to what we were talking about before, the performance evaluation.

See, he says here at the bottom of the page, 0097, my immediate supervisor, Sergeant Fanelli, filled out my performance evaluation on April 19, 2023.  He gave me a score of 90.

I think you testified earlier that you recalled that the problem with the original evaluation may have been that it was not prepared by a supervisor?

A.    Yeah, I know it had a supervisor.  There was a supervisor issue.

Q.    All right, but if -- and I can show you the original one.  This just seemed faster.

Do you see that Mr. Elmore is alleging that the original one with the score of 90

Page 127

was prepared by his direct supervisor, Sergeant Fanelli?

A.    Yes.

Q.    If you turn to page 0098, you see that a memo was published that gave him a score of 51, and that -- oh, and look again at -- we were looking earlier at --

A.    But he wasn't the only officer that was affected.

Q.    Well, we should be having questions and answers.  Is there more you want to say about that?

A.    Well, I'm just saying that, like, he was -- there were other officers that also had scores that I believe changed so -- for the worst.

Q.    I'll represent to you, because we're not supposed to be having a chat, but I can tell you that yes, that is true.  None of them changed remotely like the reduction in Mr. Elmore's score, which is almost 50 percent, put him at the bottom of the class like a lead balloon, but we're not here to do this, and I apologize for that.

MR. HATCHETT:  I want to object.

THE WITNESS:  But also nobody had the disciplinary history he had either.  I won't say

Page 128

disciplinary, but the conduct, the misconduct.

MR. HATCHETT:  I'm just making sure the court stenographer caught my objection.

MR. RISK:  Yes, it's noted retroactively.

BY MR. RISK:

Q.    Well, looking again with me at Exhibit 48 --

A.    That's on the screen?

Q.    No, no, that is in your book.

A.    I thought we were on 129.

Q.    Well, we are in a lot of places.  Let me do it more slowly, Melissa, and thank you for your patience with me on this.

129 says that he got his performance review of 90 on April 19, and then on April 27, the chief published a memo that gave him a lower score, a score of 51 percent.

Do you see that?  That is on Exhibit 129; do you see that?

A.    No.  Yes, sorry, yes.

Q.    All right.  What I'm trying -- why I did the inconvenient thing of springing you back to Exhibit 48 was only to show you that the revised evaluation didn't exist until the following day,

Pages 125 to 128

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 129

April 28, 2023, after the reduced score had already been published.

A.    Mm-hmm.

Q.    That is what Mr. Elmore is trying to say in that part of the EEOC charge.  So I'm going to ask you again, now having gone through all of this, do you have any recollection of your office being involved with Mr. Elmore's claim that the tampering with -- the damaging his promotion materials by lowering his performance evaluation drastically was retaliatory for his civil rights complaints?

MR. HATCHETT:  Objection to the form of the question.

THE WITNESS:  Were we involved?

MR. RISK:  Yes.

THE WITNESS:  I don't believe so.

BY MR. RISK:

Q.    All right.  Am I telling you -- as far as you can recall, am I telling you things about the promotion situation that you think you are hearing for the first time?

A.    I don't know if I necessarily -- I don't know if I knew that he thought it was discriminatory, yeah.

Page 130

Q.    Okay, and now, I have shown you Exhibit 129, and you don't think you've seen it before right now or before yesterday when you got a Fed-Ex from us?

A.    No.  Actually, when I got the subpoena, I had called the attorney from -- the labor counsel for Falls Township and asked what is this even about.  I thought he -- I thought the arbitration was done.

And he was like, well, I think he is suing, and that's -- I didn't see the complaint, I mean, the charge.  I haven't seen anything, but I mean, I'm not shocked.

Q.    What do you mean?

A.    I mean, everybody who is terminated and they exhaust their administrative -- their grievance process, they go on and sue for some reason or another.

Q.    Take a look at Exhibit 145.

A.    145.

Q.    Take your time.  It's also lengthy. Take your time.

A.    These things are all confused. 145?

Q.    Yeah.

Page 131

A.    What is it; can you tell me what it is?

Q.    It's on Marshall Dennehey letterhead.

MR. HATCHETT:  Before you get started, I'm going to place a standing objection on the record for any questions regarding this document to this witness.

MR. RISK:  What would the basis of that be, Mr. Hatchett?

MR. HATCHETT:  One is the basis is going to be speculation, as I imagine that Ms. Atkins has probably never seen this document prior to today.

MR. RISK:  That depends on what I ask her.  That depends what I ask her.  This is a public document.

But I'm sorry to interrupt.

THE WITNESS:  It's not public.

MR. RISK:  I asked you for your basis, and I interrupted you.  Go ahead, Jahlee.

MR. HATCHETT:  It would be to the extent that your line of questioning seeks to solicit any kind of impressions, thought process and to Marshall Dennehey, as the document references the current representation in this current matter.

Page 132

MR. RISK:  Well --

MR. HATCHETT:  Just for the record, I will note that this document was not produced as part of discovery from my office.  That is the extent of my objection.

MR. RISK:  Well, I will let you object.  I don't really understand it, but I'll let it sit there.  It's true it was in a box of documents you received yesterday, right?

MR. HATCHETT:  I'm just saying I don't want to belabor the point.  I have a standing objection.  The document was not produced by my office.  It is in connection with the current representation of Falls Township in this litigation. I'm just going to leave it at that.

MR. RISK:  All right.

BY MR. RISK:

Q.    Ms. Atkins, apart from this EEOC charge, didn't Mr. Elmore also file a grievance in connection with the same matters?

In other words, didn't he file -- have an additional grievance subsequent to his returning to work and being -- and getting the August 8 decision in the step two grievance?

A.    I mean, honestly, I don't remember.

Pages 129 to 132

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9

Page 133

Q.    Well, I am asking because that -- if he had, that would have come to Obermayer, right?

In other words, a grievance under the collective bargaining agreement goes to labor counsel?

A.    Correct.

Q.    All right, so I will try to track that down to show you the next time.

A.    What was the outcome of that grievance?

Q.    Well, I don't know if it -- I don't know if, you know, he was -- he was terminated, and it went to arbitration, and I don't know if you have testified in that, but let me leave it at that. I wasn't involved in that.

A.    No, I'm saying for the grievance for the hiring.

Q.    My understanding is that arbitration was resolved for the township but on procedural grounds related to timeliness, but honestly, I'm not labor counsel. I know nothing more about it than that.

Who at Obermayer would have assisted Marshall Dennehey in -- well, as far as you know, did Marshall Dennehey have any relationship with

Page 134

anything about Elmore during the time you were with Obermayer?

A.    No, I don't -- I don't -- I have no clue. I don't know what claim that is.

Q.    Right, right. Well, let me ask it this way; other than in connection with Elmore, did your representation of Falls Township as labor counsel involve any interaction with the Marshall Dennehey firm?

A.    I don't believe so, but I did have contact with the prior insurance defense counsel.

Q.    Who were they?

A.    State Farm maybe, I don't --

Q.    Who?

A.    State Farm maybe.

Q.    State Farm was the company. You mean in-house counsel?

A.    Yeah, their counsel.

Q.    Why would you -- what do you remember about that contact?

A.    Oh, I mean, she would reach out sometimes to see if we -- Falls Township was getting sued by Langan and another attorney -- I'm sorry, another police officer, and we were handling maybe discipline with Langan, and they had put that case

Page 135

in stay, and so it was contact on whether we had resolved our grievance process while this case was in stay. That's really it.

Q.    If Marshall Dennehey needed information and documents related to all these allegations by Mr. Elmore in Exhibit 129, who would they have dealt with at Obermayer?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I don't know. I honestly don't know.

BY MR. RISK:

Q.    And I mean, it wasn't you?

A.    No, I wasn't there.

Q.    Well, this was December of 2023.

A.    No, it wasn't me.

Q.    But you were there another two years, right, almost?

A.    Correct, but I don't -- I didn't get a --

Q.    Okay, but you were there?

A.    Yeah, I was. Yes, I was there in 2023.

Q.    Yeah, okay. Did you talk to Chief Whitney about any of -- let's say from the

Page 136

time Mr. Elmore was returned to work in this -- in June, on June 19 of 2023, did you have any conversations with Chief Whitney about Mr. Elmore?

A.    Probably.

Q.    Tell me anything about any of those conversations, what you remember.

A.    That he was my client, and I'm labor counsel. So I probably had some communication with him.

We were -- were we in Act 111 -- we may have been in Act 111 at that point, so we talked often, more about labor negotiations, and that is the other thing you need to consider, because I was -- I negotiated the contract, and so I was the lead negotiator in that contract.

So my attention was really focused on labor negotiations and less about the overarching issues that circulated Falls Township, as far as discipline.

I was -- truly, I was focused on negotiating the contract, and you know, I probably was involved in --

MR. RISK: We lost you, Ms. Atkins. This time we really lost you. You froze on us again. I'm terribly sorry.

**New York**
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 137

Do you want to read what you have, Ms. Lombardy.

We don't have much longer today. So soldier on, Melissa, and I will try to get to a breaking point soon.

(Whereupon, the record was read back by the reporter.)

THE WITNESS: Yeah, I was involved in a collaborative effort, as Falls Township was our client, but I don't have any specific memories on what I was advising them on or what the chief and I talked about. It was business related. I mean, we weren't like hanging out.

BY MR. RISK:

Q. Was your client, Chief Elmore --

A. **Chief Whitney.**

Q. Yes, was your client, Chief Whitney, angry when the joint recommendation of his, of his and Obermayer's to terminate Elmore was not adopted by the supervisors?

A. **No. We knew it was going to happen.**

Q. What do you mean by that?

A. **I can't speak to why they do things, but I mean, we had some signal probably that is how they were leaning, so but that is not going to**

Page 138

**change how we advise.**

Q. Well, the chief testified that he felt that it was his belief -- testified in these depositions that it was his belief that Mr. Harran was issuing his report because he thought that is what the people who hired him wanted from him. Have I -- let me try to say that better.

A. **I know what you are trying to say.**

Q. Well, he said it. It's not -- do you have an opinion as to that, as to Mr. Harran's intentions in recommending no discipline?

MR. HATCHETT: Objection to the form of the question.

MR. RISK: Fair enough.

THE WITNESS: No.

BY MR. RISK:

Q. Okay. Your client, the chief, testified in these cases that he had -- he was not on speaking terms during this period and currently with at least one of the township supervisors. Do you know anything about that?

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: That's accurate.

Page 139

BY MR. RISK:

Q. Who is that?

A. **What's his name?**

Q. Well, I can help you a little bit.

A. **Dence.**

Q. Chairman Dence. And what do you know about the problem between Mr. Dence and Chief Whitney?

A. **I don't know.**

MR. HATCHETT: Objection to the form of the question.

THE WITNESS: I don't know. I literally do not know, but they don't see eye to eye.

BY MR. RISK:

Q. So that part you were aware of, that they didn't see eye to eye while you represented the chief?

A. **I don't think it's secret to anybody.**

Q. Okay. How about Mr. Boraski?

A. **Who?**

Q. Jeff Boraski.

A. **The supervisor?**

Q. Yeah.

A. **I mean, I feel like he just -- him**

Page 140

**and Dence kind of just hung together. Like, those were the two that kind of voted together, you know. That's not -- that's not atypical. I mean, you see that in, you know, leadership, where you have people who vote together, and I don't think Falls Township was any different, but I will absolutely say that the chief and Dence did not see eye to eye. I don't know what -- I don't know what the issue was. I thought it was like some high school thing. Maybe they went to the same high school. That is what it seemed like. So I don't know.**

Q. All right. Let's just try to do a little -- if you will hang with me for another few minutes, we will try to do a little more, and then you will be on time for where you have to go.

A. **Yeah, I don't even know what time it is.**

Q. 2:36; it's okay? We can do a touch, just a touch more, and then it will be a pretty good breaking point for me.

MR. RISK: And I say to all the lawyers, I have more, but I am optimistic that this will conclude as a less than seven-hour deposition.

Pages 137 to 140

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 141

We are moving along okay. I am sort of getting up to the last chunk of it, which we can do next time.

BY MR. RISK:

Q. What do you recall about the engagement by Falls Township to do a new investigation in November 20 -- in or about December 2023 of Mr. Elmore about how the matter came to Obermayer?

A. **Oh, is that the K-9 investigation?**

Q. Well, there is a K-9 in a lot of these investigations, so the --

A. **Well, he was a K-9 officer.**

Q. The final investigation for which you prepared Exhibit 92.

A. **Right.**

Q. Is that a good way to say it?

A. **That came to us, I think, by Matt Takita maybe. Either the -- either the township manager or the chief had e-mailed the township manager, and then he e-mailed us.**

Q. Okay. Well, let me -- take a look with me at Exhibit 77, and I will remind you that, you know, these documents have been -- by agreement, they have been reviewed by township counsel for

Page 142

anything that township felt was privileged.

MR. RISK: Is that a privileged mark? Is that your mark on Exhibit 77, Mr. Hatchett?

MR. HATCHETT: I want --

MR. RISK: Why are you smiling?

MR. HATCHETT: Because I'm not being deposed here today, but I will --

MR. RISK: Oh.

MR. HATCHETT: I will let you know that yes, I believe that is a privileged mark provided in the course of my office producing these documents.

MR. RISK: I was just trying to be courteous.

MR. HATCHETT: That's it.

MR. RISK: It's got a big ugly mark on it. I was just trying to put the witness at ease.

BY MR. RISK:

Q. Do you recall sending the e-mail at the bottom half of Exhibit 77, Ms. Atkins?

A. **Yes.**

Q. All right. What were the circumstances that resulted in you sending that?

Page 143

A. **My mom was in the hospital.**

Q. Well, I'm terribly sorry, and I have --

A. **That's -- I wasn't going to be really available. So I was letting them know that my colleague, Brian, would be handling this, who wasn't typically who would handle it.**

**He was an associate. He wasn't a partner, and so I was just e-mailing the solicitor to let them know that it was going to be handled by Brian and not necessarily me, but then because of timing, I needed to jump in.**

Q. And by timing, you mean the sense from the client, Falls Township -- strike that.

By timing, you mean the instruction from Falls Township that this matter needed to be done quickly?

A. **Correct.**

Q. And I asked you before why, and you said you really didn't know why, but it did, but that is what the client wanted?

A. **Yes, and I honestly believe -- I will say that it was likely because of how long investigations had taken in the past, and so it was let's get it done.**

Page 144

Q. Are you saying to me that having seen what had happened with prior investigations and the looming 90-day collective bargaining rule in Article 12, this time they said we have to focus?

A. **Correct. Like, let's not -- let's not have any question on whether this clause, 90 days, is even applicable to outside investigations. Let's just get it done within the timeframe so there's no question at the end.**

Q. And am I correct that all of the Obermayer lawyers we have talked about so far, yourself, Mr. Hearn, Mr. Shute and now Mr. Rhodes, all worked in Obermayer's Philadelphia office?

A. **Correct.**

Q. All right, and had Mr. Rhodes been involved in Falls Township work prior to this new investigation?

A. **Yes.**

Q. He was; when?

A. **He was hired to -- I mean, he was hired really to take the load off of Tom and to step in more doing the municipal work for our team.**

**So he was hired with the intention that he would be the go-to for Falls Township, the go-to for Falls Township and other municipalities**

Pages 141 to 144

New York
212-273-9911

Hudson Court Reporting & Video
1-800-310-1769

New Jersey
732-906-2078

Exhibit 9

Page 145

while I kind of transitioned off, and Tom transitioned off, as well.

Q.    And you testified this morning that after the meeting with the board of supervisors in late February about the Exhibit 92 report, you did much less with Falls Township because you had other clients of your own?

A.    Correct, and they just took up too much of my time.

Q.    Was Mr. Rhodes stepping into your role?

A.    As far as municipal work, yes.

Q.    Well, how about as far as Falls Township?

A.    Yeah, they were one of the municipalities.

Q.    So when I see Rhodes in these papers going forward, that is -- he was sort of in the place in the batting order that you would have been in previously?

A.    Correct.

Q.    As sort of lieutenant to Mr. Hearn?

A.    No, I was the lead negotiator. I wasn't a lieutenant. I was the chief.

Q.    With --

Page 146

A.    Tom wasn't -- Tom wasn't the lead on anything for Falls. So you shouldn't assume.

Q.    All right. Well, let's talk about that.

What was the division of responsibilities between you?

When you were actively working on Falls, what was the division of responsibility between you and Mr. Hearn?

A.    That is not how it worked at our firm.

Q.    How does it work?

A.    Who -- the matters would come into Tom and myself, copied. Both of us would be on the e-mails.

If you see, most of the memos are from both of us, but I was just becoming partner and building up my own clientele. So as I started to get my own clients and big clients, then I could no longer be the lead, and so that's why Brian was hired.

So he could lead, and Tom and I could fall back a little bit but still be in the picture, because we were the labor attorneys. Like, we knew labor and municipal labor.

Page 147

I worked at the city. I dealt with police departments, and we represented more municipalities than just Falls Township. They just took up a lot of our time, and Tom and I didn't have the capacity to serve the client as Obermayer wanted.

So we had to hire somebody else to come in and handle that. So I mean, like, the division of work is not -- it's just really depended on what we were doing. I did most of the arbitrations. I was the lead in -- the lead negotiating the Act 111.

But Tom was always involved. I was always on the phone with Tom, and we talked a lot, and we would talk through issues and come to a conclusion.

No issue was determined in silo or, you know, without speaking to my colleagues, but they wanted to hear from me. They liked me.

MR. RISK: It's 2:45. I promised you I would stop now. I want you to pick up your children. I thank you for your time.

You are able to come back and do the last piece of this on a date soon I hope, subject to these other lawyers' schedules.

Page 148

Will you do that?

THE WITNESS: Yes.

MR. RISK: Okay, then go pick up your child.

THE WITNESS: Four of my kids.

MR. RISK: Get going, and you can turn off. If you want, I will talk to the lawyers for a minute.

THE WITNESS: Yes.

MR. RISK: Thank you for your patience.

THE VIDEOGRAPHER: This concludes volume one of the video recorded deposition of Melissa Atkins. Off the record at 2:45 p.m.

(Whereupon, a discussion was held off the record.)

-----

THE COURT REPORTER: Mr. Atkins, will you be ordering a transcript?

MR. ATKINS: No.

THE COURT REPORTER: Mr. Hatchett --

MR. HATCHETT: Yes, full and mini electronic only with any exhibits if they are attached or included.

(Whereupon, the deposition adjourned.

**New York**
212-273-9911

**Hudson Court Reporting & Video**
1-800-310-1769

**New Jersey**
732-906-2078

Exhibit 9

Page 149

Time noted:  2:45 p.m.)

-----

Page 150

CERTIFICATE

I, GERALDINE E. LOMBARDY, a Certified Court Reporter of the State of New Jersey, do hereby certify that the witness was duly sworn by me.

I FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties in this action and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____

Certified Court Reporter
License No. 30XI00228000

Pages 149 to 150

**New York**
**212-273-9911**

**Hudson Court Reporting & Video**
**1-800-310-1769**

**New Jersey**
**732-906-2078**

Exhibit 9