PRIVILEGED & CONFIDENTIAL



# FINAL INVESTIGATIVE REPORT

## FALLS TOWNSHIP POLICE DEPARTMENT K-9 UNIT

Obermayer Rebmann
Maxwell & Hippel LLP

Date: February 14, 2024

By:  Melissa K. Atkins, Esquire
Thomas T. Hearn, Esquire
Brian M. Rhodes, Esquire

Page **1** of **26**

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000150

## FINAL INVESTIGATIVE REPORT

**To:**    Jeffry E. Dence, **Chairman**
Erin M. Mullen, **Vice Chairwoman**
Brian M. Galloway, **Secretary**
John W. Palmer, **Supervisor**
Jeffrey M. Boraski, **Supervisor**


Matthew K. Takita, **Township Manager**


**From:**    Melissa K. Atkins, Esquire
Thomas T. Hearn, Esquire
Brian M. Rhodes, Esquire
**Obermayer Rebmann Maxwell, and Hippel**
**Investigators**

**CC:**    Michael P. Clarke, Esquire
Lauren A. Gallagher, Esquire
**Solicitors for Falls Township**

**Date:**    February 14, 2024

**Re:**    Investigation into Falls Township Police Department K-9 Unit and
Donated Canines: Summary of Interviews and Investigation

---

## I.    Executive Summary

Falls Township retained Obermayer Rebmann Maxwell and Hippel to investigate the donation of canines to the Falls Township Police Department ("FTPD"). On December 15, 2023, Matthew Takita, the Falls Township Manager, requested an investigation by this Firm to determine if there are any conflicts of interest, policy violations, or ethical issues related to the donation of a dog to the K-9 Unit by a private citizen directly to a K-9 officer without prior Township knowledge.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000151

This Report, and the investigation on which it is based, was triggered by the revelation in November 2023 that Lieutenant Langan knew that Officer Elmore had received a Belgian Malinois (a dog breed used by Fall Township K-9 handlers) as a donation in the summer of 2023 but neither officer ever reported it. It was also clear that Lt. Langan intended to allow Officer Elmore to use the donated canine as a Township police dog to replace Officer Elmore's current K-9 dog (Monty), which, because of the dog's advanced age can no longer perform as a police dog. Both the failure to report the "donation" and the intended use of the "donated" dog as a police K-9 dog are violations of the FTPD policies.[1]

It is important to point out that during their interviews, neither Lt. Langan nor Officer Elmore appreciated that accepting such a donation (or gift) from community members is a potential policy violation. Lt. Langan admitted that he has taken a lot of gifts over the years and did not see an issue with doing so. It is also troubling that Lt. Langan knew or should have known as the K-9 commander that using an uncertified dog from an unverified supplier of police dogs violated the Policy. Yet, he was willing to do so and to keep it from the Chief.

Initially, in an email dated December 15, 2023, Obermayer was asked to investigate the circumstances surrounding the "donation" of the dog to Officer Elmore and whether it violated policies or ethical concerns. On January 5, 2024, Obermayer was instructed to investigate further whether the circumstances surrounding the "donation" of the dog, including the intent to allow Officer Elmore to use it as a replacement for Monty, was an isolated incident or another example of the consistent course of conduct for both Lt. Langan and Officer Elmore.

Given the request to expand the scope of the investigation, it was necessary to review past and current conduct that violated policies and/or impugned Lt. Langan's or Officer Elmore's character as police officers and, in Lt. Langan's case, command staff. The review of past and current conduct confirms that the "donation" is not an isolated incident in that both Lt. Langan and Officer Elmore have previously lied or will ignore policies when it serves their purpose to do so and when

---

[1] The term donation is in quotes because the characterization of how Officer Elmore came into possession of the dogs changed to a gift and then was later characterized as a rescue and that Officer Elmore was doing the donor a favor by taking that dog and another dog (non-police breed) the doner no longer wanted.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                            Elmore_000152

confronted with the violation or untruthful statement will refuse to acknowledge or appreciate the gravity of their misconduct.[2]

The Report covers first the circumstances surrounding the "donation" of the dog to Officer Elmore, that Lt. Langan intended to allow Officer Elmore to use the dog as a K-9 handler, and that the donation and the plan to allow the use of the dog as a K-9 was kept from the Chief. The Report then reviews each officer's past and current incidents for consistency in the course of conduct/behaviors, followed by recommendations and the conclusion.

To better understand the matter under investigation, it is important to consider the dynamics between the Township, the FTPD supervisory employees, and the rank-and-file personnel members of the Police Association of Falls Township ("PAFT"). The brief background outlined below plays an essential role in the recent events involving the donation of a dog to the K-9 Unit and Officer Elmore's and Lt. Langan's association with Bob Kent, who donated the dog.[3]

## II.    K-9 Unit Background and Selection

The FTPD's K-9 Unit was established in 2002 under the supervision of Chief Wilcox. During its inception, Chief Wilcox handpicked the first two (2) canine officers, retired Lieutenant Henry Ward and former Sergeant Sven Beauchmin. Following the original appointment of Lt. Ward and Sgt. Beauchmin, prospective K-9 officers were traditionally selected by an oral board consisting of Township Supervisors and K-9 police officers from surrounding agencies. Currently, the Department is headed by Chief Whitney, and the K-9 Unit includes three (3) officers, each partnered with a dog. The officers, along with their canine partners, are Officer Edward Elmore and "Monty" (eleven (11) years old at the time of donation), Officer Brian Fisher and "Leo" (nine (9) years old), and Officer Thomas Lundquist and "Zico" (eight (8) years old). Lt. Langan was permitted to keep "Max" (six (6) years old) after he was promoted. Prior to the investigation, fellow officers raised concerns about Officer Elmore's future role within the K-9 Unit. In recent years, K-9 Unit officers have been involved in internal investigations for misconduct, including lying, time theft, and unprofessional behavior.

---

[2] Failure to acknowledge or appreciate misconduct militates against rehabilitation.

[3] Bob Kent is the owner of Kent's Quality Tree Service (also known as Kent's Tree Service). It is the Investigators' understanding that Kent's Quality Tree Service contracts with and provides services for Falls Township.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                    Elmore_000153

## III.    Investigation

### A. Complaint Details

- Complainants:          Matthew Takita, Township Manager
                         Nelson Whitney, Chief of Police

- Respondents:           Lieutenant Steven Langan
                         Officer Edward Elmore

- Alleged Misconduct:  Acceptance of a donated dog to be used as a Police
                       K-9 dog

### B. Witness List

#### 1. Bob Kent of Kent's Quality Tree Service[4]

Bob Kent is the owner/operator of Kent's Quality Tree Service. Kent's Quality Tree Service has served Bucks County and the surrounding areas for over twenty-three (23) years. According to the website, the business provides services such as tree removal, stump grinding, and land clearing. The business is located at 1444 S. Pennsylvania Ave. in Morrisville, PA.

#### 2. Chief Nelson Whitney

Chief Whitney is a 33-year veteran of the FTPD. He was appointed the Chief in January 2021, following four (4) months of serving as the Acting Chief. Chief Whitney provided notes and emails he had in his possession on the subject matter of the investigation. The Investigators also interviewed Chief Whitney. The Investigators find the Chief's recitation, chronology, and explanation of the events credible.

#### 3. Lieutenant Christopher Clark[5]

Lieutenant Clark is a 26-year veteran of the FTPD. Lieutenant Clark provided notes, police records, and a video (mainly audio) of the conversation with

---

[4] The Investigators did not interview Mr. Kent during their investigation.  The Investigators relied on the dash-camera video and interview responses provided and notes taken by Sergeant Reeves and Lieutenant Clark and additional available information.

[5] On October 27, 2022, Officer Elmore contacted Township Manager Matthew Takita to raise concerns about then Sergeant Clark's character and presented a ruling from July 5, 2022, where Judge Finley found parts of Sgt. Clark's testimony not to be credible. This ruling resulted in the suppression of certain evidence obtained through an illegal search. Officer Elmore presented this ruling to raise questions about Sgt. Clark's reputation for truthfulness and overall character. In response, First Assistant District Attorney and now District Attorney Jennifer Schorn, issued a letter in support of Sgt. Clark on November 9, 2022, praising his character and integrity.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                      Elmore_000154

Bob Kent. The Investigators also interviewed Lt. Clark. The Investigators find Lt. Clark's recitation, chronology, and explanation of the events credible.

### 4. Sergeant Stephen Reeves

Sergeant Reeves is a 21-year veteran of the FTPD and the current Vice-President of PAFT. Sgt. Reeves was with Lt. Clark when they met and spoke with Bob Kent about the donated dog. Sgt. Reeves corroborated what Lt. Clark provided in his interview about meeting and speaking with Bob Kent. Sgt. Reeves provided additional information concerning the K-9 Unit. The Investigator's overall impression was that Sgt. Reeves was credible.

### 5. Lieutenant Steven Langan

Lieutenant Langan is a 25-year veteran of the FTPD. On February 1, 2024, Lt. Langan's dog retired from service as a canine partner. The Investigators interviewed Lt. Langan. The Investigators find much of Lt. Langan's recitation of events lacks credibility.

### 6. Officer Edward Elmore

Officer Elmore is a 23-year veteran of the FTPD. Officer Elmore's dog, Monty, retired from service as a canine partner in January 2024. The Investigators find much of Officer Elmore's recitation of events lacks credibility.

### C. Interviews

Obermayer attorneys Melissa Atkins, Thomas Hearn, and Brian Rhodes conducted all in-person interviews at the FTPD's temporary headquarters. With the exception of Bob Kent, whom the Investigators did not question, the Investigators met with each witness separately.  Lt. Clark and Sgt. Reeves questioned Bob Kent.

### 1. Chief Nelson Whitney – December 29, 2023

Chief Whitney provided the following chronology of how he learned about Officer Elmore's acquisition of the dogs. On Tuesday, November 21, 2023, Township Supervisor and Chairman Jeffry Dence emailed Matthew Takita, Falls Township Manager, requesting information about the age of the current K-9 dogs, expected retirement, and the next officer in line for a K-9 partner dog. Based on the above inquiry, Township Manager Matthew Takita forwarded the request to Chief Whitney on November 22 and a reminder on November 28.[6] On November 29th, the

---

[6] In the November 22nd email, Mr. Takita explained to Chief Whitney it could wait until after the Holidays.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000155

Chief requested information about the dogs from Lt. Langan and met with him on three (3) separate occasions.

- o First meeting between Chief Whitney and Lt. Langan (November 29, 2023, at 10:30 a.m.)

During the meeting, in addition to obtaining the requested information, the Chief inquired about the suitability of Officer Elmore's dog, Monty, for active duty. Lt. Langan responded that Monty was not fit for active duty but mentioned that Officer Elmore received a dog donation during the summer and was currently training the dog. Lt. Langan suggested using this dog could save the Township approximately eight thousand dollars ($8,000.00). Shocked that he was first learning of this donated dog and the plan to transition from Monty to the new dog, Chief Whitney concluded the meeting. Chief Whitney had serious concerns about how the dog was acquired and why he had not heard about it until now.

- o Second meeting between Chief Whitney and Lt. Langan (November 30, 2023, at 10:25 a.m.)

During the meeting, Lt. Langan informed Chief Whitney that Bob Kent, the owner of Kent's Tree Services, had donated two (2) dogs worth approximately $8,000 each. Chief Whitney questioned the appropriateness of the donation, including the intended use of a donated dog as a K-9 dog. The Chief told Lt. Langan that pursuant to FTPD policy, they were required to report the donations, the specifics of how the dog(s) were acquired, and the whole transaction must be reviewed and approved by him and Township officials. Lt. Langan replied that he was not aware of the specific policies or protocol for procurement. Lt. Langan then explained that there was a "two-dog rule," which he believed entitled Officer Elmore to a second dog after Monty retired. Chief Whitney dismissed the "two-dog rule" as false, pointing out the difficulties they had faced when trying to get Lt. Langan a second dog a few years ago. The Chief also reminded Lt. Langan of the incident where Officer Lundquist's original dog had attacked his girlfriend. That dog was young, taken away from Officer Lundquist, and returned to the breeder. The Township reluctantly allowed Officer Lundquist to have another dog in its place only because Officer Lundquist threatened to sue the Township, claiming he was not properly trained. Furthermore, Chief Whitney had discussed with Lt. Langan several times in the months prior that the intention was to reduce the size of the K-9 Unit through attrition, meaning Officer Elmore's dog would not be replaced. Specifically, the Chief discussed with Lt. Langan the reduction of the K-9 Unit in

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                        Elmore_000156

January, August, and September of 2023. Most recently, on November 7, 2023, weeks before this meeting, the Chief advised Lt. Langan that Bensalem was getting its own dog for SWAT; therefore, FTPD did not need to provide one. The Chief again reiterated that the FTPD K-9 Unit would attrit to two (2) dogs. Lt. Langan did not say anything about the donated dogs on November 7th.

When the Chief discussed the FTPD Policy covering donations with Lt. Langan, he disagreed with the Chief that the donation of the dogs violated the Policy and even referred to the donations as a gift between friends. The Chief clarified that he should have been notified immediately and must approve any such gifts or donations in the future. The Chief instructed Lt. Langan to read the Policy Manual and reminded him that failure to follow the Policies would not be tolerated.

- o Third meeting between Chief Whitney and Lt. Langan (December 1, 2023, at 8:45 a.m.)

Chief Whitney explained to Lt. Langan that whether the dogs were a donation or a gift, they were not approved and that it created the appearance of impropriety. The Chief said that Lt. Langan was surprised that the Chief was so "wound up." Lt. Langan then, for the first time, mentioned that the dogs were of little value. Lt. Langan said that it was only Officer Elmore's training that made the dogs valuable.

The Chief also discussed Lt. Langan's and Officer Elmore's relationship with Bob Kent. Specifically, he recalled an arrest that occurred involving Kent and Officer Elmore. The Chief stated that on or about July 26, 2022, a union organizer named Lawrence Bell (African American) went to Bob Kent's business to discuss organizing his tree and landscaping workers with him. Kent became upset, and an argument ensued between the two men. Kent contacted 911, and Officer Elmore answered the call. Bell also contacted 911. Before Officer Elmore arrived, Kent blocked Bell's car on the property so he could not leave. When Officer Elmore arrived, he met with both Kent and Bell and ultimately arrested Bell and charged him with harassment, physical contact, defiant trespass, simple assault, and terroristic threats. Bell allegedly made a gun gesture with his hand at Bob Kent in front of Officer Elmore, leading to the arrest. The Chief was suspicious about the arrest.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000157

The Chief indicated that Officer Elmore is not known to make many arrests historically.[7] In addition, Officer Elmore failed to include any statement from Bell on the Police Incident Report he submitted about the arrest. Failing to include any information was an omission of potentially exculpatory evidence. For instance, Bell attempted to leave the premises but could not do so because Kent blocked Bell's vehicle with his own. Officer Elmore charged Bell with defiant trespass. It is believed that Kent may have used racial epitaphs, like calling Bell a "gorilla," during the incident, which may have escalated the incident.

## 2. Lieutenant Christopher Clark, December 29, 2023

Lt. Clark has served in the patrol and criminal investigative divisions during his tenure with the Falls Township Police Department. He was promoted to Lieutenant in January of 2023, along with Lt. Langan.

Lt. Clark informed the Investigators that he learned of the dog donations from the Chief. He said the Chief was frustrated and concerned about the donations, especially since Lt. Langan had ample opportunities to tell the Chief about the dogs.

Lt. Clark was instructed to meet with Kent at his business regarding the circumstances of the donation and to ask him about Officer Elmore's arrest concerning Bell. Sgt. Reeves accompanied Lt. Clark. They went to Kent's business on December 1, 2023.

At first, Kent consented to being videoed via the body camera but changed his mind shortly after Lt. Clark started asking questions about his relationships with FTPD officers. Although the body camera was turned off, the car camera continued to operate, capturing some of the conversation. According to Lt. Clark, Kent was agitated during their discussion. He said he "knew what this was about" and kept saying that "Whitney is just cockblocking Elmore" from getting a dog. Kent demanded Whitney be present. Lt. Clark stated that he called the Chief about Kent's demand. The Chief was advised (by Matthew Takita) not to attend but to schedule a meeting if that was something he would typically do.  Kent was uninterested in a meeting by appointment.

---

[7] Officer Elmore made 9 criminal arrests in 2020 (during civil unrest), 3 arrests in 2021, 4 arrests in 2022, and 3 arrests in 2023.

Page **9** of **26**

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000158

Lt. Clark stated that Kent confirmed having a friendly relationship with retired Lt. Henry Ward, Lt. Langan, and Sergeant Brian White, Officer Stephen Lundquist, and Officer Elmore. He stated that Lt. Ward was responsible for introducing him to the breeder through which FTPD used to obtain their Belgian Malinois K-9 dogs. Kent stated that is where he obtained his dogs.

Kent stated that he is "tight" with Lt. Langan and speaks with Lt. Langan often, texting at least 4 to 5 times a week. They also go out for drinks. He does not talk with Officer Elmore as much. He said it was Lt. Langan who told him that the dog donation was a problem, and that is how he knew the Chief was involved. He stated he saved the Township $10,000, that the Township should be happy, and that he gave the dogs to Officer Elmore because he knows the breed and has a lot of land.

Lt. Clark told the Investigators that he also asked Kent about Officer Elmore's arrest of Lawrence Bell. Kent stated that "this black guy" met with his workers at their job site and talked to them about joining the union. At the time, Lawrence Bell was a Business Agent of the International Union of Operating Engineers ("IUOE"), Local 542. The workers directed Bell to go to Kent's office and speak with him. Kent said that when Bell arrived, he yelled at Bell, and Bell yelled at him. Kent referred to Bell as a "gorilla" as he explained the incident and that he told Bell to leave but then blocked Bell's vehicle in with his own, preventing him from leaving. Kent blocked Bell from leaving after he called 911 and then told Bell, "You're not going anywhere."

When Officer Elmore arrived, Kent confirmed that he spoke with Bell for a period of time and that Officer Elmore ultimately told Bell to leave, which he did. Kent confirmed that when Bell drove by his business, Bell yelled, "Hey, Asshole." Kent asked Officer Elmore, "Are you going to do something about that." Officer Elmore arrested and charged Bell thereafter. Kent did not report that Bell pointed his finger like a gun or made a threatening gesture, which Officer Elmore had included in the arrest and charging paperwork.

Lt. Clark provided the Investigators with a copy of the Incident Report Form ("Form") and an unsigned and undated Affidavit of Probable Cause ("Affidavit") completed by Officer Elmore. Although Kent confirmed that Officer Elmore met

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000159

with Bell for a period of time (Officer Elmore estimated between 15 and 20 minutes during his interview), neither the Form nor the Affidavit contains any information from Bell concerning his perspective of what occurred, including Kent preventing Bell from leaving by blocking in his car. However, Officer Elmore included in both documents that Bell made a finger gun motion, which Kent did not mention to Lt. Clark and Sgt. Reeves as having occurred. Officer Elmore also included that Bell asked him several times if it would be legal for him to visit Kent's worksites if they are on a public road (presumably to organize the workers). Officer Elmore "cautioned" Bell that any action to threaten, intimidate, or retaliate against Kent would result in a more serious charge.

Lt. Clark attended Lawrence Bell's preliminary hearing on behalf of the FTPD because, at the time, Officer Elmore was on paid administrative leave for misconduct, which he engaged in November and December of 2022. The hearing occurred on February 28, 2023. Lt. Clark recalled that at the hearing, Bell claimed that Kent used profane, offensive, and racially charged language during the incident that led to his arrest. Bell stated that Kent blocked him in and prevented him from leaving and that he did not threaten Kent as Officer Elmore claimed. At the hearing, Lt. Clark remembered Kent stating that he should have "sicked" his dogs on Bell. The District Attorney overheard Kent's statement about the dogs and commented that not doing so was probably the smartest decision he could make.

### 3.  Sergeant Stephen Reeves, December 29, 2023

Sgt. Reeves accompanied Lt. Clark to Kent's business on December 1, 2023. He confirms Lt. Clark's recital of what occurred that day. Sgt. Reeves advised the Investigators that he was familiar with the policy concerning donations and gifts and knew the dogs would be an issue. Sgt. Reeves also confirmed Kent's description of the incident with Bell, including that he referred to Bell as a "gorilla."

### 4.  Lieutenant Steven Langan, January 2, 2024

The Department hired Lieutenant Steven Langan as a Patrolman in September 1999. He was promoted to Corporal in November 2014 and to Lieutenant in 2023. Lt. Langan was also interviewed at the police headquarters, specifically in the conference room. Upon arrival, Lt. Langan displayed an air of tranquility, considering the seriousness of an investigative interview. While Lt. Langan's demeanor was relaxed throughout the interview, there were certain aspects that

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000160

raised eyebrows. The most notable was his evasiveness when faced with direct questions about the dog and the intention of using the dog as a K-9. Instead of providing clear and straightforward answers, he often skirted around the issues and avoided giving direct responses. This behavior was somewhat unexpected, given his affable and open demeanor otherwise.  At one point, he said if "Nelson doesn't want to use the dog, that's fine," and he implied that he was making a "bigger deal" out of the dog issue than it needed to be. More concerning, Lt. Langan acknowledged his Acceptance of gratuities and admitted to not being fully aware of the policies and requirements for reporting gratuities despite being in a command position. This lack of knowledge is troubling, especially considering his role and responsibilities. He should be well-versed in all relevant policies and procedures as a commanding officer. Lastly, Lt. Langan failed to appreciate the significance of Officer Elmore omitting Bell's statement from his report of the incident between Kent and Bell.

The omission of Bell's perspective of the incident from Officer Elmore's Incident Report Form carries significant implications. By excluding this information, Officer Elmore may be seen as intentionally favoring Kent and his employees, thereby potentially obstructing the criminal investigation, and undermining the integrity of the report. This could raise concerns about Officer Elmore's impartiality and adherence to professional standards, as it leaves open whether the arrest was an attempt to dissuade Bell from meeting with Kent's workers and protect Kent's business from being organized. Such actions can be viewed as unethical and can undermine the trust and transparency expected in law enforcement. Lt. Langan's ignorance on such a crucial matter raises questions about his competence in his role.

Lt. Langan was initially dismissive of the notion that the arrest was in any way connected to the donation of the dog.  When asked if it could be viewed as a message to the union organizer who happened to be African American to leave Kent and his workers alone, Lt. Langan had no response.

During the interview, Lt. Langan provided information regarding his connection with Bob Kent, which he established through retired Lt. Ward. Lt. Langan explained that Lt. Ward and Kent became acquainted because their children were schoolmates at St. Michael's in Tullytown. Lt. Langan shared that Kent previously acquired dogs to protect his equipment yard following several instances of theft. As previously referenced, this transaction was facilitated by Lt.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000161

Ward, who played a role in brokering the sale of two (2) canine dogs from Bottom K-9. Bottom K-9 is a known canine breeder, and the Township utilized its services to purchase and train its first four (4) canine partners.

Lt. Langan explained that Kent currently owns five (5) dogs and occasionally reaches out to Lt. Langan for advice with the dogs. Kent's inquiries typically involve finding prospective dog owners or dog training opportunities. The timing of these interactions remains unclear. In one such interaction, Officer Elmore asked Langan about a particular dog Kent wanted to get rid of. Lt. Langan stated that Kent was facing an issue with one of his dogs, which seemed to have difficulty getting along with his other dogs. In response, Officer Elmore decided to take the dog. After some time, Officer Elmore told Lt. Langan that the dog might have potential, and that it "may be good." Lt. Langan responded, "Okay, let me know." This exchange further evinces an intent to replace Monty. During the interview, Langan initially described the gift of the dog as "just one guy giving a gift," but then corrected himself to say it was "a friend giving a gift." Lt. Langan admitted that he had received many such gifts throughout his career. When asked, Lt. Langan said he did not meet Kent for drinks because Kent doesn't drink. This contradicted the statement Kent provided.

Lt. Langan also emphasized Kent's commitment to saving the Township money, mentioning that "Ed" was supposed to have another dog, but "Nelson" had some concerns about Officer Elmore having a second canine. Regarding training, Lt. Langan explained that Philadelphia K-9 training officers work with the dogs for ten (10) weeks.[8]

Lt. Langan also shared some "unwritten rules" related to the K-9 Unit. He mentioned that it is acceptable for officers promoted to Corporal to have a second dog, but if they are promoted to Sergeant, they are required to ride out with that dog and may not have a second one. Additionally, officers are required to have a fence of at least 6 feet and a kennel. Lastly, Lt. Langan stated that the dogs in the unit are valued between $8,500 and $11,500.

### 5. Officer Edward Elmore, January 2, 2024

On December 29, 2023, Officer Elmore was supposed to have an initial interview scheduled at 1:00 p.m. with investigators. However, the interview was

---

[8] Lt. Langan intended to schedule Oakley and Officer Elmore for canine training with the Philadelphia K-9 Unit.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                    Elmore_000162

postponed as Officer Elmore did not show up due to his confusion about the meeting location. Lt. Clark communicated with Officer Elmore about the date and time of the interview, and the Investigators were puzzled why Officer Elmore did not contact Lt. Clark to clarify the meeting location. Nonetheless, the interview was rescheduled for January 2, 2024, at 10:00 a.m. in the conference room of the temporary FTPD command offices.

Officer Elmore met with the Investigators with several documents in hand that he later referenced to support his position that the specific breed of dog that Kent had given to him (Belgian Malinois) could be acquired for little cost by searching the Internet for agencies that were looking for homes for that breed. Many of the listings were from several years ago, and only one listing advertised the age of the dog (6 months). It was later learned from Officer Elmore and Lt. Langan that the proper age for the Belgian Malinois to begin training with an assigned officer is around 1.5 to 2 years old. The Belgian Malinois he received from Kent was approximately 1.5 years old. Officer Elmore and Lt. Langan also both reported that Kent had a relationship with the Canadian based provider that the Township had previously sourced its dogs and Kent had received his dogs from the same provider.[9]

Kent had named the dog in question Oakley. Officer Elmore kept the name. In addition to Oakley, Kent gave Officer Elmore a second dog named Freya, but Freya is a mixed breed dog. Officer Elmore quickly added that Freya was unsuitable as a police K-9 dog.

In explaining how he came into possession of Oakley, Officer Elmore made a point of explaining his love of dogs and that he did not want to see dogs abused or killed.  He said that he was looking for another dog for his house (his wife had a dog named Chewbacca, and he had Monty) and that Lt. Langan suggested he speak to Bob Kent, which he did. Officer Elmore claimed that by taking possession of Oakley, he was doing Kent a favor because, according to Officer Elmore, Kent was actively trying to find the dog a home because it was drawing complaints from neighboring property owners. Officer Elmore explained that the Belgian Malinois breed is high

---

[9] Retired Lt. Ward further corroborated that Mr. Kent had received Belgian Malinois dogs from the same provider.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000163

energy and demanding, not a typical house pet, and that he did not want to see the dog end up in a kill shelter.[10]

Although he did not say it, Officer Elmore characterized taking Oakley as a "rescue". Officer Elmore's characterization of how he got the dog was the third version the Investigators had heard of how Oakley came to Officer Elmore. Investigators were first told that Kent "donated" a dog to Officer Elmore in the summer of 2023. Then, Investigators were told the dog was a gift. Kent sent a letter to the Township confirming he had made a donation.

In addition to characterizing Oakley as a rescue, Officer Elmore reiterated that a dog like Oakley is of little to no value until it is trained. In short, Officer Elmore implied that there was nothing to report because he rescued Oakley, which was of no value until he trained it. Officer Elmore further tried to convince the Investigators that he was originally not looking at Oakley as a replacement for Monty and that it was only after he had the dog for a short period of time and began to work with Oakley that he could see police dog tendencies. This characterization contradicts what Kent told Lt. Clark and Sgt Reeves, i.e., that giving Officer Elmore Oakley, saved the Township $10,000 and the Township should be grateful. Kent also stated that Chief Whitney "Nelson" should stop trying to "cockblock" Officer Elmore from having a dog. Furthermore, Chief Whitney told Lt. Langan on several occasions (i.e., January, August, September, and November of 2023) that he was going to reduce the size of the K-9 Unit and expected improved performance. Neither Lt. Langan nor Officer Elmore told the Chief about Oakley. Officer Elmore's characterization of how and why he came into possession of the dog and his intentions concerning replacing Monty are not credible.

Although Officer Elmore's possession of Oakley and true intentions concerning replacing Monty are troubling, his handling of the interactions between Bell and Kent is a much more serious issue. Officer Elmore admitted to Investigators that he spoke to Bell for 15 to 20 minutes after he responded to a call initially placed by Kent and yet he failed to include any of Bell's statements in the Incident Report Form. He only included the statement Kent allegedly made. Officer Elmore provided no excuse or answer for not including any of Bell's information.

---

[10] Tucked into the handful of documents he provided were articles supporting his characterization of this breed of dog's temperament.

Page **15** of **26**

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                    Elmore_000164

## 6. Policy Considerations

**Falls Township Police Department Policy # 2.4.18**

This policy states, in its entirety, that:

A.  No member or employee, regardless of position or rank, will accept any bribes (money or gifts) or gratuities that are meant to alter your judgment and conduct, to neglect your duty, resulting in the furtherance of, or overlooking of, any criminal act or acts, or hindering any investigation into criminal activity or further received to give one favored treatment or special attention.

B.  Any member solicited to receive or be given any bribe or gratuity must report that offer or solicitation, in writing, by the filing of a police report to be forwarded promptly to the divisional commander and the Chief of Police/Director.

C.  Any member knowing of another member or employee, sworn or civilian, who has received or accepted any bribe or gratuity or is engaged in any criminal activity, must report those circumstances immediately to the divisional command officer and the Chief of Police/Director.

**Falls Township Police Department Policy # 3.6.1**

Section A.2 states in *relevant* part:

Canines will be obtained from a kennel or other supplier with a verifiable record of satisfactory performance in providing dogs and training to other law enforcement agencies. Any canine that is approved for purchase by the department will, prior to acceptance, have a certificate or letter of good health issued by a licensed veterinarian authorized to conduct examinations and certify the physical and emotional condition of the dog.

Section G.1, states in relevant part:

Certain requirements must be met in order to ensure that the [K-9] team meets a high level of service readiness before a canine team is placed on operational status. The certification process will be conducted by a law enforcement dog trainer with at least three (3) years of experience and having completed a forty-hour course dog training and evaluation. This certification process should be performed at least annually during the service life of the canine team.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                              Elmore_000165

## IV.    Prior Incidents Involving Officer Edward Elmore

### 1.    Theft of Overtime for K-9 Training

On February 25, 2022, Officer Elmore participated in a "scent certification" training with fellow K-9 officers Brian Fisher and Thomas Lundquist. The training was organized by the Bucks County District Attorney's Office and involved K-9 officers across the County. The training began at 9 a.m., and each K-9 officer had to wait their turn to run the course with the instructor. Each run lasted approximately ten (10) to fifteen (15) minutes and officers ran the course only once. All K-9 officers completed the training at 12:20 p.m. Officer Elmore, who typically starts his workday at 7 a.m., removed himself from the dayshift schedule for a "School Day." According to the Collective Bargaining Agreement (CBA), an officer must be in training for a minimum of eight (8) hours to use a School Day and be excused from a twelve (12) hour shift. Officer Elmore and the other FTPD K-9 officers attending the "scent training" session offered by the County claimed eight hours of overtime for their attendance, even though the training only lasted for three and a half hours. As this was a County-sponsored training, Falls Township submitted the overtime costs to the County for reimbursement. However, Bucks County Detectives raised concerns about the overtime claims and contacted Falls Township to investigate the matter. Chief Whitney directed Lt. Ward to open an administrative investigation into the discrepancy in overtime claims by FTPD K-9 officers. The investigation began on March 17, 2022.

Lt. Ward's investigation found that the FTPD K-9 officers arrived at the training facility at 9:01 a.m. and departed together at 12:28 p.m. The FTPD K-9 officers submitted training reports claiming they spent eight (8) hours training. Lt. Ward interviewed Officer Elmore, Officer Fisher, and Officer Lundquist on March 30, 2022.

Lt. Ward's investigative findings were conclusive and unequivocal. It was discovered that the K-9 officers utilized an eight-hour School Day to attend a K-9 training that lasted for a mere four (4) hours, including lunch and break time. In doing so, the K-9 officers intentionally deceived their superiors and shirked their twelve (12)-hour shifts. This unauthorized training did not meet the minimum eight-hour requirement required by the CBA and, thus, could not be considered an adequate substitute for a School Day. As a result, Lt. Ward determined that the K-9 officers lied to their superiors and stole four (4) hours of overtime from the

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                                    Elmore_000166

Township for the time that was not worked.[11] Based on the investigation Lt. Ward recommended dismissal of all three (3) K-9 officers due to the serious breaches of Township policies by the officers in question and their failure to maintain Township standards of honesty and integrity.  The Township's labor counsel agreed with the recommendation of termination.

A final determination of discipline for the K-9 officers was delayed first by the temporary removal of the Chief in April 2022 pursuant to a letter (Vote of No Confidence) authored in major part by Officer Elmore, which was based largely on untruths about Chief Whitney.  The purpose of that letter was to impede and/or prevent the issuance of discipline.

When the Chief returned, he provided the Board of Supervisors with a detailed report supporting the discipline recommended. The Township hired Fred Harran to further investigate the matter, which caused additional delay. After several months, Fred Harran provided a very brief summary recommending that no discipline be imposed on Officer Elmore and only written reprimands for Officer Lundquist and Officer Fisher.  Those recommendations contradicted that of the FTPD command staff and labor counsel.

## 2. Vote of No Confidence Against Chief Whitney Led by Officer Elmore

In April 2022, Officer Elmore was made aware of potential disciplinary action, including possible termination for the K-9 training time theft and lying during the investigation. On April 25, 2022, PAFT submitted a letter to the Township outlining concerns regarding Chief Whitney's alleged misconduct while serving as Chief of Police. The letter is referred to as the Vote of No Confidence Letter. Officer Elmore served as the President of PAFT from February 2022 to February 2023 and was the primary author of the letter.

The Vote of No Confidence Letter resulted in Chief Whitney being placed on administrative leave from April 26, 2022, to September 12, 2022. The law firm of Campbell Durant investigated the allegations concerning Chief Whitney and did not find any wrongdoing.

One allegation in particular made by Officer Elmore is worth pointing out because it further demonstrates conduct unbecoming and what he is capable of

---

[11] It's worth noting that during a staff meeting held on July 7, 2021, K-9 officers were explicitly instructed not to engage in this practice. Overtime is paid at a multiplier rate of 1.5x the officer's hourly rate.

Page **18** of **26**

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                               Elmore_000167

doing to protect his interests. In the vote of no-confidence letter, he alleged that Chief Whitney implemented a traffic ticket quota system. Ultimately, Campbell Durant investigators declined to find any illegal quota system was implemented and stated as follows, *verbatim*:

> This involved a credibility determination, as there were many different interpretations of Chief Whitney's attitude and alleged statements regarding the issuance of tickets. However, based on the credibility of the 22 personnel interviewed, a review of the staff meeting PowerPoint slides, as well as a careful review of traffic citations issued since 2018 reveals that very few officers met the alleged quota of 10 tickets per month in any year, and only two out of 48 officers averaged 10 or more traffic tickets per month in the year 2021. Further, many of the officers issued far less than would be required under the alleged quota. Given the fact that officers in practice were not issuing tickets in compliance with the alleged quota, and the fact that there were no repercussions for the 46 out of 48 officers who failed to reach the alleged quota, the Investigators decline to find that any illegal quota system was implemented by Chief Whitney.

Officer Elmore was the only officer that stated he asked a judge to dismiss a traffic ticket because it was issued under the illegal quota. Officer Elmore told Campbell Durant investigators that other officers have done this too but did not provide specific examples. Campbell Durant recommended that the Township consult with labor counsel on whether to proceed with an investigation of Officer Elmore advising a magistrate judge to dismiss a ticket over a non-existent ticket quota.

Labor counsel was not asked by the Township to investigate Officer Elmore further as recommended by Campbell Durant.

### 3. <u>Officer Elmore's Insubordinate and Inappropriate Conduct</u>

After Chief Whitney returned to duty following administrative leave, several ongoing investigations resumed, including Loudermill hearings for then Corporal Langan and the three (3) K-9 officers (Elmore, Lundquist and Fisher).[12] On November 15, 2022, Chief Whitney emailed Cpl. Langan to schedule his Loudermill hearing for November 21, 2022. The Loudermill hearing for Cpl. Langan concerned

---

[12] Lt. Langan was a Corporal during this time-period and is being addressed as such for historical reference of past conduct when he held that rank.

**CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE**

Exhibit 11                                                                 Elmore_000168

a physical altercation involving Cpl. Langan, now retired Officer Bruce Rhodunda, and Officer George Thomas. Lt. Ward conducted the investigation and determined that Cpl. Langan had repeatedly lied about Officer Thomas' conduct. Lt. Ward recommended that Cpl. Langan be terminated for repeatedly lying during an internal investigation. As referenced above, Lt. Ward also recommended that the K-9 officers be terminated for lying during the internal investigation concerning their theft of time related to K-9 training.

Shortly after the November 15, 2022, email was sent, Officer Elmore contacted Township Manager Matthew Takita, Assistant Township Manager Richard Dippolito, and Board of Supervisors Chairman Jeffry Dence via email. Officer Elmore requested that the Township formally address the credibility, or lack thereof, of Lt. Ward and postpone the Loudermill hearings. Specifically, Officer Elmore alleged that Lt. Ward was not credible because years ago, he committed an unprovoked assault on an African American arrestee in the cell block area and then filed charges against the man for assaulting a police officer. The Bucks County District Attorney's Office investigated that incident, known as the "cell block incident," and found no wrongdoing. Officer Elmore's basis for besmirching Lt. Ward was an attempt to derail the discipline being recommended for him and for the other K-9 officers who had lied during Lt. Ward's investigations of their misconduct.

Cpl. Langan's Loudermill hearing proceeded as planned, and Officer Elmore represented Cpl. Langan wearing a t-shirt he had made with a picture of the Chief next to a picture of Derek Chauvin, side-by-side. Then, on November 23, 2022, Officer Elmore arrived at Department Headquarters for shift change wearing that same t-shirt. Additionally, Officer Elmore was distributing documents that contained emails between the Township's solicitor's office and the Board of Supervisors that Chairman Jeffry Dence emailed to Cpl. Langan. Immediately following this incident, Officer Elmore uploaded video surveillance footage of the "cell block incident" to a Google Drive with a QR code for access to the footage, a picture of the t-shirt, and a post that read "Falls Township Deserves Better." However, after Chief Whitney issued several written orders to remove the video and QR code, Officer Elmore complied and removed it. Later, Chief Whitney charged Officer Elmore with engaging in conduct unbecoming of a police officer, insubordination, and disobedience.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                    Elmore_000169

The Chief recommended that Officer Elmore be terminated. Labor counsel supported the recommendation for termination. The Township ultimately rejected the recommendation and did not impose any discipline.

## V.    Prior Incidents Involving Lieutenant Steven Langan

### 1.  Physical Contact with George Thomas

On October 21, 2021, Officer George Thomas filed a harassment complaint against Officer Rhodunda. The complaint stemmed from an incident during a training seminar in the public meeting room of the Township building. Officer Thomas claimed that as he entered the room, Officer Rhodunda deliberately bumped him with his shoulder. The incident was captured on the video in the meeting room. Based on a video review, Lt. Ward concluded that Officer Rhodunda intentionally made contact with Officer Thomas. Lt. Ward noted that Officer Rhodunda was the instigator of the collision, as evidenced by the smile on his face after the incident. The evidence supported that this was a deliberate act on Officer Rhodunda's part.

On November 4, 2021, Lt. Ward interviewed Cpl. Langan who reported that Officer Thomas yelled at Officer Rhodunda and used profane and threatening language. According to Cpl. Langan, Officer Thomas initiated the altercation with Officer Rhodunda.

Lt. Ward interviewed nineteen (19) police officers, two (2) civilian support staff, and the training instructor from the Bucks County 911 call center, all of whom were present in the meeting room during the alleged incident. All the interviews were recorded. None of them could recall any disturbance, screaming, yelling, or obscene language. Notably, Officer Rhodunda did not report the incident, and the video footage did not show Officer Thomas yelling at anyone. Cpl. Langan was given an opportunity to review the video and recant his recitation of the incident. It was even explained to Cpl. Langan that this opportunity he was being provided would change the severity of discipline being recommended. Despite being afforded the opportunity, he refused to change his position.

Based on the evidence gathered during the investigation, it was clear that Cpl. Langan's recitation of the incident was fabricated as it was in direct conflict with the testimony of the other witnesses. Lt. Ward recommended the termination

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000170

of Cpl. Langan due to providing a false statement during an internal investigation and to prevent similar incidents from occurring.

As referenced above, when the Chief came back from administrative leave, he conducted Cpl. Langan's <u>Loudermill</u> Hearing on November 21, 2022. The <u>Loudermill</u> Hearing was the final opportunity for Cpl. Langan to correct his statements to Lt. Ward about the incident between Officer Rhodunda and Officer Thomas. This is the hearing where Officer Elmore showed up as Cpl. Langan's union representative wearing an inappropriate t-shirt bearing pictures of the Chief and Derek Chauvin. Cpl. Langan did not speak during the <u>Loudermill</u> Hearing. Following the <u>Loudermill</u> Hearing, on November 29, 2022, the Chief recommended to the Board that Cpl. Langan be terminated based on the investigation and his refusal to be truthful in the face of overwhelming evidence. Labor counsel supported the recommendation. The recommendation was rejected. On December 5, 2022, the Board of Supervisors met and decided that Cpl. Langan would not be disciplined and would be promoted to the rank of Lieutenant. In January 2023, the Board promoted Cpl. Langan to Lieutenant.

## 2. <u>Additional Pending Concerns</u>

Additional concerns have emerged regarding Lieutenant Langan's conduct since the inception of this investigation, which calls into question his ability to fulfill his duties as a command staff member. By way of example only, Lt. Langan allowed a citizen and his son access to the impound yard before a crash investigation had been completed. The son, who was involved in the crash, removed an item from his motorcycle. On another occasion, it was discovered that Officer Lundquist had been permitted to use heroin as a scent article during his canine demonstration on the National Night Out Event at the Community Park, where parents and young children were in attendance. Recently, Lt. Langan suggested to a detective that he should grieve a discipline he had not yet received, which Lt. Langan should not have known because he was not part of the discussion about the detective or the discipline. Moreover, although Lt. Langan admitted to Chief Whitney in November 2023 that Officer Elmore's canine, Monty, could no longer perform, he allowed Officer Elmore to continue to attend training, causing the Township to incur unnecessary expense including overtime, which only benefited Officer Elmore.[13]

---

[13] Although the Investigators can provide additional examples, it would be best and make the most sense for the Board to hear from the Chief regarding these issues.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                    Elmore_000171

## VI.    Findings and Recommendations

The evidence gathered from the investigation has brought to light several alarming findings. Firstly, both Lt. Langan and Officer Elmore, who have both been part of the K9 Unit for over ten years, demonstrated a lack of familiarity with the relevant policies, which seems to be a reoccurring pattern.  The relevant policies being Policy #2.4.18, Gratuities and Bribery, and Policy #3.6.1, K-9 Unit. It is worth noting that both officers displayed a dismissive and apathetic attitude when confronted by the Investigators regarding these important FTPD policies. Their attitude suggested a lack of accountability and a failure to recognize the significance of adhering to departmental policies and procedures. It was as though they believed that they were above the policies.

Next, both officers demonstrated a blatant lack of judgment by accepting a direct and substantial gift without informing their commanding officer, Chief Whitney, or seeking approval beforehand. This decision showed a disregard for proper protocol and a failure to consider the potential consequences of accepting such a valuable gift. Both officers knowingly and willingly circumvented established procedures in acquiring a canine to be used as a police dog. This failure to adhere to the proper protocol could have exposed the Township to significant liability if the improperly sourced and obtained canine caused harm to either an officer or a citizen.

It is important to note that Lt. Langan and Officer Elmore intended for Oakley, the "donated" dog, to replace Monty and for Officer Elmore to continue as a K-9 handler, despite Chief Whitney's expressed desire to reduce the size of the K-9 unit to two (2) dogs through attrition.

Lt. Langan was aware of the Chief's vision for the K-9 Unit and deliberately kept the donation and his intentions regarding Oakley as a police K-9 from the Chief until just over a month before Monty's retirement and when asked about Monty's performance. This information was only disclosed to the Chief at the end of November 2023.

It is also worth noting that on November 7, 2023, during a meeting with the Chief, Lt. Langan did not disclose anything about Oakley, despite the Chief informing him that Bensalem was acquiring a dog for SWAT and that the FTPD K-9 Unit would be reduced to two (2) dogs.

By their actions and failure to report, Lt. Langan and Officer Elmore have violated Township Police Department Policies, specifically Policy #2.4.18 on Gratuities and Bribery and Policy #3.6.1 regarding the K-9 Unit.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                         Elmore_000172

Policy #2.4.18, Section B mandates that any member who is solicited to receive or be given a bribe or gratuity must report the offer or solicitation in writing by filing a police report, which should be promptly forwarded to the divisional commander and the Chief of Police/Director.

This implies that if any member of the police department was solicited to receive the dogs as a form of bribe or gratuity, it should have been reported to the appropriate authorities.

Section C further requires that any member who becomes aware of another member who has received or accepted any bribe or gratuity or is engaged in any criminal activity must report these circumstances to the divisional commander and the Chief of Police/Director.

In this case, Lt. Langan was obligated to report Officer Elmore's acceptance of Oakley, which he intentionally failed to do.

Policy #3.6.1, Section A on Administration and Management states that canines should be obtained from a kennel or supplier with a proven track record of providing dogs and training to other law enforcement agencies. Additionally, any canine approved for purchase by the department must have a certificate or letter of good health issued by a licensed veterinarian authorized to conduct examinations and certify the dog's physical and emotional condition.

Both Lt. Langan and Officer Elmore knowingly violated this policy to ensure Officer Elmore could continue as a K-9 handler.

Furthermore, it is important to consider the issue of lying during the investigation. Throughout the investigation, the narrative surrounding how Officer Elmore acquired the dog has continuously changed. Initially, Lt. Langan agreed with Kent's letter to the Township, which stated that the dog was donated. Kent also confirmed this during conversations with Lt. Clark and Sgt. Reeves, affirming that Oakley was indeed a donation with a value between $8,500 and $11,500.

However, as Lt. Langan realized that accepting and not reporting the donation violated policy, he began referring to the dog as a gift to alter the perception.

During Officer Elmore's interview, he characterized Oakley as a rescue for the first time. These shifting explanations and attempts to manipulate the truth demonstrate a pattern of misconduct and deception, which is consistent with past inappropriate behavior.

In light of these findings, appropriate action must be taken to address the serious violations of policy and the lack of transparency demonstrated by Lt. Langan

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                          Elmore_000173

and Officer Elmore. Their actions have undermined the integrity of the Department and compromised the trust placed in them as law enforcement officers. It is crucial that the Board carefully considers these factors and take decisive measures to uphold the highest standards of professionalism, integrity, and accountability within the FTPD. This lack of seriousness and disregard for protocol is concerning and raises questions about their commitment to upholding the standards and regulations of the FTPD. Failure to act sends the wrong message. Based on a comprehensive review of all available information, including witness interviews, documents, video evidence, correspondence, and policy analysis, we **<u>recommend</u>** the following actions be taken:

### <u>Lieutenant Langan:</u>

Based on a thorough examination of Lt. Langan's conduct and performance within the FTPD, the Investigators strongly recommend **demotion**. This recommendation is supported by careful consideration of the totality of his conduct, including his handling of the donation from Kent and his lack of sound judgment in planning to transition an uncertified dog to Officer Elmore surreptitiously. A blatant violation of the Policies. To the extent that Lt. Langan alleges he was unaware of such Policies, that clearly cuts against him continuing to hold a position in command. Those in command are held to a higher standard and are expected to know and enforce the FTPD Policies. Furthermore, as one in charge of the K-9 Unit for years, Langan knew or should have known that the dog Kent provided could not be used by the FTPD and that in trying to do so, he was violating FTPD Policy. Simply because Lt. Langan was stopped from completing the act does not mean that he did not have the intent to do it.

Furthermore, Lt. Langan has failed to exercise appropriate oversight as a supervisor. Despite Officer Elmore's K9 dog being unable to perform, he allowed Officer Elmore to continue attending K9 training at the expense of the Falls Township taxpayers. This may have benefited Officer Elmore, but it did not benefit the Township. The decision reflects poorly on his judgment and accountability.

Lt. Langan's inappropriate disclosure of sensitive information to an officer under consideration for disciplinary action raises serious concerns about his ability to maintain confidentiality and exercise discretion in his role. This breach of trust further demonstrates his lack of professionalism and sound judgment. In addition, suggesting to the officer he should grieve the discipline is not the role of a commanding officer and sends the wrong message in trying to correct bad behavior.

There are other examples of incidents that reflect poorly on Lt. Langan's abilities to continue to perform at his current rank. It is recommended that the Board meet with the Chief as he is in the best position to discuss these incidents.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                          Elmore_000174

These instances of misconduct and poor behavior have significantly eroded the confidence placed in Lt. Langan by Chief Whitney and Township Management. The demotion is necessary to address these concerns and ensure that the FTPD is led by individuals who exemplify the highest standards of professionalism, integrity, and accountability.

**Officer Elmore:**

Considering the comprehensive investigations of instances of Officer Elmore's misconduct, outlined herein, and other investigation reports, which encompass time theft, dishonesty during multiple inquiries, and evasion of policies under the guise of unawareness, we have discovered alarming findings. Among these is the omission of exculpatory evidence pertinent to the arrest of Lawrence Bell, a matter of grave concern. Officer Elmore's behavior, persistently displayed over the past few years, indicates a lack of potential for reform. Considering the seriousness of these offenses, and in the interest of upholding integrity within the FTPD, the recommended course of action is **termination.**

The Township may want to work with the Chief and other available resources to investigate further the incident that occurred between Kent and Bell and whether there existed any behavior that needs to be further addressed.

**Additional Recommendation**:

All officers and command within the FTPD must be well-versed in the FTPD policies, especially the Gratuities and Bribery Policy. This Policy mandates that any significant gifts received by officers must be reported to the Chief and approved by the command. By "significant," the Investigators mean monetary and non-monetary values exceeding a certain threshold. This not only ensures compliance with the law but also maintains the public's trust in the integrity and professionalism of the Department. Therefore, all officers must be trained on the Policy and the consequences of violating it.

## VII.    Conclusion

Based on the evidence presented, the investigators have concluded that Lt. Langan and Officer Elmore violated FTPD Policies #2.4.18 on Gratuities and Bribery and Policy #3.6.1 on K-9 Unit protocol. The manner in which the violations occurred, including the attempt to downplay and/or explain away the violations, and their failure to appreciate the seriousness of their misconduct, is consistent with their past course of bad behavior.  As a result, their actions warrant disciplinary action as recommended.

CONFIDENTIAL - FOR INTERNAL USE ONLY - ATTORNEY/CLIENT PRIVILEGE

Exhibit 11                                                         Elmore_000175