Falls Township Board of Supervisors:
Jeffry E. Dence
Jeffrey M. Boraski
Brian M. Galloway
John W. Palmer
Erin M. Mullen


Township Manager:
Matthew Takita

Assistant Manager:
Rich Dippolito



On behalf of the Police Association of Falls Township (PAFT), we are regretfully compelled to write this letter. Unfortunately circumstances have left us with no other recourse. We have lost all faith and trust in Chief Whitney's ability to lead this department and serve the citizens within Falls Township.


On April 20, 2022 PAFT held our monthly meeting. The membership raised the issue and a unanimous vote was made to proceed with a formal ballot vote of No-Confidence regarding the leadership of Chief Whitney. Issues raised by the body include but are not limited to the following:


When Chief Whiteny was first promoted, the members of PAFT felt a sense of pride that one of our own had been selected to lead the department. Shortly after, a downward spiral began and we find ourselves today in a department that no one could have imagined a few short months ago. Our work environment is absolutely toxic. Morale is not low, it is non-existent. Chief Whitney displays a contempt for the officers under him. He displays an animosity towards our collective bargaining rights that has led to a previously unheard of number of grievances being filed. The contempt is evident in the manner that the complaints are dismissed. Our collective bargaining agreement (CBA) requires us to work together to attempt to resolve issues at the lowest level possible. Nearly every grievance has been denied, even over long settled issues, without any meaningful attempt to resolve them.

Harran_153

Exhibit 34

Where members of PAFT had previously been able to take great pride in the reputation of our department, we now find ourselves being known as a department to avoid. We have recently experienced an inability to attract, hire and retain new members. Recent officers that had successfully passed through a rigorous hiring process quickly became disillusioned with the workplace they had joined and fled back to a local metropolitan city. This city is considered one of the most undesirable places to work at but now is a more attractive option then the Township of Falls. This alone is an indication that we have failed as a police department.

Where recent hires had fled back to previous jobs, we have also found with great disappointment that many of our newer, highly respected officers have also begun to search for new employment opportunities. They expressed that they no longer see the Falls Township Police Department as a place that they can stay for any meaningful career.

Between planned or mandated retirements, the inability to hire new members and the indication of newer officers to seek employment in a less dysfunctional department we could very well find ourselves at a point of complete collapse and unable to provide basic law enforcement services to the citizens within Falls Township.

Perhaps the most telling and alarming indication that we are experiencing a profound failure of leadership comes directly from police administration itself. The only other member of the administration has stated to the PAFT president on 2/21/22 that "The Chief had about 5 people he wanted to target to get rid of and anyone else was collateral damage. He's a dog with a bone and he's not going to let it go" and then on 3/16/22 "Whitney would take out anyone who he had to, to get who he was after" and "Someone should just kill him already"

As a department we have built a relationship of trust with the residents of the township. Policies promoted by the Chief are a betrayal to those citizens and need to be brought to an end. The chief has continued and expanded ticket quotas as a practice within the department. These are explicitly prohibited in Pennsylvania under Title 71 and any such tickets are considered null and void. Quotas include individual traffic details and separate monthly requirements. The Chief has also recently directed that officers structure their tickets evenly over the monthly period to avoid the appearance that officers were scrambling at the end to fill the required quota. This practice delegitimizes the necessary law enforcement function of our department and dehumanizes the citizens within the township. One of the most repugnant aspects was when the Chief offered Wawa gift cards to any officer who could beat his 'high score' with tickets within a given month. This practice has also created an enormous financial liability for the citizens of the township. By statute all such citations are null and void, each may be required to be refunded. This liability increases with each passing day that this practice is not ended.

Harran_154

Exhibit 34

Chief Whitney has also made numerous disturbing statements that his officers need to be 'Hunters' thereby implying that the citizens within the township are to be considered animals or prey. He has made these dehumanizing statements repeatedly at staff meetings. More concerningly he has also posted publicly online on Facebook a video endorsement of a private training company. He identifies himself, as well as our department, and publicly proclaims that his officers are 'Hunters' and that he will be sending his 'Hunters' there for more training. This is at odds with our department mission statement and delegitimizes the work of the professional law enforcement officers of Falls Township.

It is with these issues and others that we, the Police Association of Falls Township, have taken a formal ballot vote of No-Confidence with the leadership abilities of Chief Whitney

The results of a ballot vote by the members of PAFT:

| | |
|---|---|
| No-Confidence | 40 votes |
| Disagree | 8 votes |
| Abstain | 1 vote |

Respectfully,

Edward Elmore
PAFT President

Harran_155

Exhibit 34

PROHIBITING TICKET QUOTAS
Act of Oct. 30, 1981, P.L. 321, No. 114                    Cl. 71
AN ACT

Prohibiting political subdivisions or agencies of the
    Commonwealth from imposing certain quotas on the issuance of
    citations for certain offenses.

    The General Assembly of the Commonwealth of Pennsylvania
hereby enacts as follows:

    Section 1.  No political subdivision or agency of the
Commonwealth shall have the power or authority to order,
mandate, require or in any other manner, directly or indirectly,
suggest to any police officer, State Police Officer, game
commission officer, fish commission officer or any other officer
employed by such political subdivision or agency of the
Commonwealth that said police officer, State Police Officer,
game commission officer, fish commission officer or any other
officer shall issue a certain number of traffic citations,
tickets or any other type of citation on any daily, weekly,
monthly, quarterly or yearly basis.
    Section 2.  Any tickets or citations issued in violation of
this act shall be unenforceable, null and void.
    Section 3.  This act shall take effect immediately.

Harran_156

Exhibit 34

  m.facebook.com/StreetCopTrai    2    ⋮

 Facebook Watch

 **Street Cop Training**
Jan 10, 2021 · 🌐

STREET C🔱P IS THE TRAINING YOU **NEED**
TRAINING

I'll be sending my hunters here.

Harran_157

Exhibit 34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| EDWARD ELMORE | | : | CIVIL ACTON |
| | Plaintiff, | : | |
| vs. | | : | No. 2:25-cv-02076 |
| | | : | |
| FALLS TOWNSHIP, | | : | |
| | Defendant. | : | |
| | | : | JURY TRIAL DEMANDED |
| | | : | |

## DEFENDANT, FALLS TOWNSHIP'S RESPONSES TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

Defendant, Falls Township, by and through the undersigned counsel, Marshall Dennehey, P.C., hereby respond to Plaintiff's First Set of Request for Interrogatories with the responses contained herein. Defendant notes that the below responses are made solely for the purpose of this action and that each response is subject to all objections as to relevance, materiality, admissibility, and to any and all objections on any ground that would require exclusion of any responses if it were introduced in court. No incidental or implied admissions are intended by these responses.

The fact that Defendant has not objected or responded to a request shall not be deemed an admission that Defendant accepts or admits the existence of any facts set forth or assumed by such request or that such objection or response constitutes admissible evidence. The fact that Defendant objects to part or all of any response is not intended to and shall not be construed to be a waiver by Defendant of any part of any response to any request.

### GENERAL OBJECTIONS

1. **Attorney-client/work product privileges.** Defendant objects to Plaintiff's written discovery requests to the extent they seek information and/or documents protected from disclosure by the attorney-client privilege, work product doctrine, the required reports privilege, the trade secrets privilege, the accountant-client privilege, the joint defense

Exhibit 35

doctrine, the peer review privilege, the self-critical analysis privilege or any recognized privilege under the Federal and/or Pennsylvania laws.

2. **Third-party privacy rights**. Defendants objects to Plaintiff's written discovery requests to the extent they seek information and/or documents that would violate any constitutional, statutory, or common law privacy interest or privilege of any current or former employee, representative or agent.

3. **Relevance.** Defendants object to Plaintiff's written discovery requests to the extent they seek information and/or documents that are neither relevant in that there is no legal nexus between the requested information and/or documents and the issues and controversies between Plaintiff's and Defendants with particularity in the pleadings, nor likely to lead to the discovery of admissible evidence.

4. **Undue Burden.** Defendants object to Plaintiff's written discovery requests to the extent that they are unduly burdensome, disproportionate and oppressive in that the burden and expense to Defendants in locating and producing such information and/or documents outweighs its likely benefit, especially with respect to such information and/or documents which may be as readily obtained by Plaintiff's from other sources or from documents already disclosed to Plaintiff.

5. **Scope.** Defendants object to Plaintiff's written discovery requests to the extent they are overly broad and seek information and/or documents without proper limit to their subject matter or time period.

6. **Ambiguity and Vagueness.** Defendants object to Plaintiff's written discovery requests to the extent they are vague and ambiguous, and thus likely to lead to confusing, misleading, inaccurate, or incomplete responses.

7. **Confidentiality**. Defendants object to Plaintiff's written discovery requests to the extent that they seek confidential documents or information, particularly without the existence of a confidentiality agreement and order.

8. **Ultimate Issue and Pure Legal Conclusions.** Defendants object to Plaintiff's written discovery requests to the extent that they seek admissions as to an ultimate issue in the case and/or where any admission or denial would be a pure conclusion of law.

9. **Inconsistencies with Federal Rules of Civil Procedure** Defendants object to Plaintiff's instructions and/or definitions to the extent that they are inconsistent with the Federal Rules of Civil Procedure, or to the extent that they impose obligations on Defendants greater than those provided by the applicable rules.

The responses set forth herein are based upon such information and documents as are presently known and specifically available to Defendant, Falls Township. Further, by responding

Exhibit 35

to a particular Request, Defendant neither admits nor waives the right to dispute or challenge Plaintiff's characterization of the facts contained in such requests.

## INTERROGATORIES

1.      Provide the date of birth of birth, date of hire by the Falls Township Police Department, and total years of experience as police officers for James Szamboti, Ryan Murphy, Nicholas Phillipe, and Alexander Sansone as of June 2023.

**RESPONSE**: Defendant responds as follows: James Szamboti has a Date of Birth ("DOB") of ████████, 1987 and was hired by the Falls Township Police Department on or about July 21, 2014; Ryan Murphy has a DOB of █████, 1993 and was hired on or about May 15, 2017; Nicholas Phillippe has a DOB of ████████ 1990 and was hired on or about September 6, 2013; and Alexander Sansone has a DOB of ████████ 1990 and was hired on or about August 15, 2016.

2.      Identify each person who wrote a performance evaluation for officers James Szamboti, Ryan Murphy, Nicholas Phillipe, and Alexander Sansone in 2023. Include the date the performance evaluation was completed, the rating period, the overall numerical score for each evaluation, the reason the evaluation was written, and what it was used for, such as but not limited to any application for promotion.

**RESPONSE**: Defendant responds as follows: All of the performance appraisals were written and used for (with the exception of Belinsky's appraisal as indicated below) the purpose of the promotional testing in 2023. Regarding Murphy, Sansone, and Szamboti – Sgt. Bryan White wrote a performance appraisal for them. The period was from January 1, 2023 through April 10, 2023. It was completed on April 28, 2023. The final numerical score was 71. Lt. Belinsky also wrote a performance appraisal for Phillippe. The period was from January 1, 2023 through April 10, 2023. The appraisal was completed on June 14, 2023. The numerical score was 82. On the advice of labor counsel, it was not used.

Respectfully submitted,

**MARSHALL DENNEHEY, P.C.**
Jahlee J. Hatchett, Esquire
Attorney ID No.: 313604
Joseph J. Santarone, Esquire
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Email: jjhatchett@mdwcg.com
*Attorney for Defendant*

Dated: July 16, 2026

Exhibit 35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD ELMORE
                    Plaintiff,                    :    CIVIL ACTON
          vs.                                     :
                                                  :    No.  2:25-cv-02076
FALLS TOWNSHIP,                                   :
                    Defendant.                    :
                                                  :    JURY TRIAL DEMANDED
                                                  :

## CERTIFICATE OF SERVICE

I, JAHLEE J. HATCHETT, ESQUIRE, do hereby certify that a true and correct copy of

Defendant's Responses to Plaintiff's First Set of Request for Interrogatories were served on

Plaintiff's counsel of record via electronic mail.

Respectfully submitted,

**MARSHALL DENNEHEY, P.C.**
Jahlee J. Hatchett, Esquire
Attorney ID No.: 313604
Joseph J. Santarone, Esquire
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Email: jjhatchett@mdwcg.com
*Attorney for Defendant*

Dated: July 16, 2026

Exhibit 35

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD ELMORE

               Plaintiff,        :  CIVIL ACTON

     vs.                 :

                          :  No. 2:25-cv-02076

FALLS TOWNSHIP,           :

             Defendant.    :

                          :  JURY TRIAL DEMANDED

                          :

## VERIFICATION

I, NELSON WHITNEY, have reviewed documents and/or have prior knowledge of the claims raised based on my review of pertinent material. Based on my knowledge and/or review of information, I have concluded that the foregoing Responses to Plaintiff's Requests for Interrogatories are truthful and correct to the best of my knowledge, information and belief. I understand that my statements are made subject to the penalties of 18 Pa. Cons. Stat. § 4904 relating to unsworn falsification to authorities.

                                    */s/ Nelson Whitney*

BY:  _____

                                    Nelson Whitney
                                    Chief of Police, Falls Township Police Department

Dated: July 16, 2026

Exhibit 35

 Gmail

Ed Elmore <edinpa84@gmail.com>

## promotional testing performance ratings

**Ed Elmore** <edinpa84@gmail.com>                                      Wed, May 3, 2023 at 2:46 PM
To: Matthew Takita <m.takita@fallstwp.com>, Richard Dippolito <r.dippolito@fallstwp.com>
Cc: j.dence@fallstwp.com

Dear Sirs,

I am writing to you directly with my concerns so that you may have an opportunity to address this issue if you choose.

Last year I came to you in good faith to bring to light the issue of discrimination in our hiring procedures, specifically having been directed by then Sgt. Clark that it was our goal to avoid having to hire any female applicants. I detailed how I was recruited to be a part of the interview process by Sgt. Clark and how applicant evaluation forms were created to provide the desired results. I also detailed how we were instructed at a later date to create new forms with rating scales as Sgt. Clark did not think the original ones would 'hold up in court'. I later learned that this change was not to address a hypothetical future challenge but to be used as rebuttal for current active EEOC complaints filed by our female officers. I informed you that I had spoken to those officers as well as their legal council about these issues that I had first hand participation in at the direction of Sgt. Clark.

As I am sure you are already fully aware, now Lt. Clark was permitted to rescore the performance evaluations of those of us testing in this promotional process. It is my understanding that my most recent immediate supervisor, Sgt. A. Fanelli scored my evaluation at 90% out of 100% but the score was then reduced to 51%, a reduction of 39 points and a full 20 points below the median score.

I don't believe any neutral party observing this could come to any conclusion other than that this was retaliation for having made good faith reports for EEOC violations and cooperating with current EEOC investigations.

I have not yet been provided with a copy of either Sgt. A. Fanelli's original evaluation or Lt. Clarks modified one. I would hope the township would not permit my recent leaves to be used adversely against me including admin leave following my lethal force incident where I was required to save the lives of myself and ofc. MacPherson or following my on duty injury at K9 training.

When I spoke with Mr. Harran I expressed my concerns that I would be subject to retaliation at work and he assured me that this would not be permitted by the township.

Thank you for your time.

Ed Elmore

Exhibit 36                                      Elmore_000063

**Date:**    Thu, 4 May 2023 10:28:14 AM -0400

**Sent:**    Thu, 4 May 2023 10:28:12 AM -0400

**Subject:**    RE: promotional testing performance ratings

**From:**    Matthew Takita

**To:**    Ed Elmore <edinpa84@gmail.com>; Rich Dippolito <r.dippolito@fallstwp.com>;

**CC:**    Jeff Dence <j.dence@fallstwp.com>;

Officer Elmore
Thank you for your email. We will look into this mater.

Matthew K. Takita, AIA, MCP
Township Manager
Zoning Administrator
Director of Code Enforcement

**From:** Ed Elmore <edinpa84@gmail.com>
**Sent:** Wednesday, May 3, 2023 2:47 PM
**To:** Matthew Takita <m.takita@fallstwp.com>; Rich Dippolito <r.dippolito@fallstwp.com>
**Cc:** Jeff Dence <j.dence@fallstwp.com>
**Subject:** promotional testing performance ratings


Dear Sirs,

I am writing to you directly with my concerns so that you may have an opportunity to address this issue if you choose.

Last year I came to you in good faith to bring to light the issue of discrimination in our hiring procedures, specifically having been directed by then Sgt. Clark that it was our goal to avoid having to hire any female applicants. I detailed how I was recruited to be a part of the interview process by Sgt. Clark and how applicant evaluation forms were created to provide the desired results. I also detailed how we were instructed at a later date to create new forms with rating scales as Sgt. Clark did not think the original ones would 'hold up in court'. I later learned that this change was not to address a hypothetical future challenge but to be used as rebuttal for current active EEOC complaints filed by our female officers. I informed you that I had spoken to those officers as well as their legal council about these issues that I had first hand participation in at the direction of Sgt. Clark.

As I am sure you are already fully aware, now Lt. Clark was permitted to rescore the performance evaluations of those of us testing in this promotional process. It is my understanding that my most recent immediate supervisor, Sgt. A. Fanelli scored my evaluation at 90% out of 100% but the score was then reduced to 51%, a reduction of 39 points and a full 20 points below the median score.

I don't believe any neutral party observing this could come to any conclusion other than that this was retaliation for having made good faith reports for EEOC violations and cooperating with current EEOC investigations.

I have not yet been provided with a copy of either Sgt. A. Fanelli's original evaluation or Lt. Clarks modified one. I would hope the township would not permit my recent leaves to be used adversely against me including admin leave following my lethal force incident where I was required to save the lives of myself and ofc. MacPherson or following my on duty injury at K9 training.

When I spoke with Mr. Harran I expressed my concerns that I would be subject to retaliation at work and he assured me that this would not be permitted by the township.

Thank you for your time.

Ed Elmore

Exhibit 36

DEF_ESI_05929

| | |
|---|---|
| **Date:** | Tue, 6 Dec 2022 1:53:00 PM -0500 |
| **Sent:** | Tue, 6 Dec 2022 1:53:45 PM -0500 |
| **Subject:** | Draft Press Release |
| **From:** | Whitney, Nelson |
| **To:** | Hearn, Thomas <Thomas.Hearn@obermayer.com >; Atkins, Melissa <melissa.atkins@obermayer.com >; |
| **Attachments:** | Elmore PDF Press Release.docx; image001.png |

Tom/Melissa,

I attached a draft of a press release for the Township if the media picks up on what Elmore is circulating. Please look it over and let me know what you think. I have not given it to Matt yet.

This is not the type of thing the Township can avoid commenting on. If it goes public and the Township remains silent, it will only increase the likelihood of protests and civil unrest.

Nelson

Nelson E. Whitney, II
Chief of Police
Falls Township Police Department
188 Lincoln Highway
Fairless Hills, PA 19030
EMAIL: n.whitney@fallstwppd.com
OFFICE: (215) 949-9116



**PLEASE NOTE THAT MY EMAIL HAS CHANGED EFFECTIVE 5 OCTOBER 2021**

Exhibit 37

DEF_ESI_04471

# Kent's Lawn & Landscaping, Inc.

1444 S. Pennsylvania Ave.
Morrisville, PA 19067
Phone: 215-547-9744
e-mail: Kents1999@verizon.net
12/08/2023

To Whom it may Concern:

My name is Bob Kent. I own Kent's Quality Tree Service located in Falls Township. On December 5th, 2023, Lieutenant Christopher Clark and Sergeant Steven Reeves came to my place of business to interrogate me on an  allegation of bribery. According to the allegation, I gave Ed Elmore two dogs and in exchange I expected something in return. I am appalled! I am an upstanding, small businessman in the township. I have and will continue to support my community on many different fronts. In the past I have donated to the Falls Township K-9 program. I have supported Pennsbury H.S. baseball and cheerleading programs. I have most recently donated to Wood Services in Langhorne and Bethanna Family Services in Southampton. I have also donated to Penndel Wildcats at the request of Officer Francisco Olmeda. I do not receive or expect ANYTHING in return. I feel it is my responsibility, as a christian, to give back to my community.

Addressing the allegation of bribery; I have had and bred dogs for over fifteen years as a hobby. I have given away approximately thirty dogs over the years. I only give my dogs to people that I personally vet. My requirements are: knowledge of the breed and a large enough property for these high energy dogs. I was looking for a forever home for two of my dogs. Ed was the perfect candidate. He has a very large property and immense knowledge of the breed. I was glad to find them a home. Let me state again: I expect nothing in return.

I would like to conclude that I am both disgusted and appalled that I am subjected to this allegation.  My hope is that this matter be settled and my reputable name be unscathed. Thank you for your time and attention in this very serious matter.

Robert Kent
President/ Kent's Lawn & Landscaping, Inc.

Exhibit 38

Elmore_000301



# FALLS TOWNSHIP POLICE DEPARTMENT

FIRST AND FINEST IN BUCKS COUNTY SINCE 1692

# MEMO

MARCH 29, 2022

**TO:**   CHIEF WHITNEY

**FROM:**   LT. H.WARD

**SUBJECT:**   K-9 UNIT ADMINISTRATION INVESTIGATION 22008-062-I-01

**CC:**

ORIGINAL DETAILS:

On March 16, 2022, at 14:29 hrs., Chief Whitney contacted me via departmental phone and advised me of information that he was given about members, Officer Ed Elmore, Officer Tom Lundquist and Officer Brian Fisher, of our K-9 Unit. This information was given to him by Bucks County Detectives Deputy Chief J. Slattery. I was instructed to call the Deputy Chief back and determine if the information warranted the department looking into it further.

I called The Deputy Chief at 14:35 hrs., and left a message on his voicemail. At 17:01 hrs., the Deputy Chief returned my call and advised me of the following, in summary: On February 25, 2022, our K-9 Unit was at the County required K-9 scent training day which was held at 1 Library Way Levittown, Pa 19055, which is the county evidence warehouse, also known as Thiokol. His concern was he received an overtime request from our department for Officer Lundquist for eight hours, 07:00 hrs., to 15:00 hrs. His concern was based on the fact that the county trainer, Mr. Bob Hart, had only put in for five hours. His question was how our officer could put in for eight hours and the trainer conducting the class only put in for five.

He further advised the way the trainer is paid is from the time he leaves his home, in Doylestown, Pa, approximately 45 minutes from Thiokol, until the time he arrives back at his home. So that would be travel back and forth and the training itself and it was five hours. He sent me via departmental email the request for payment. He also said he would be withholding payment until I could give him better information on the matter. He also stressed he was not saying anybody did anything wrong, and it just maybe a mistake with paperwork. I advised him I would look into the matter.

I called Officer Ed Elmore at 17:38 hrs., via departmental phone. I asked him if he remembered the incident. He said he did remember training at Thiokol but was unsure of the day. I explained the nature of the information and told him I was going to have to speak with the Chief in the morning and he may ask me to open an administrative investigation. I also reminded him of the meeting with the K-9 Unit on July 7, 2021, and that we spoke about a number of issues, one of them being

1                                    Exhibit 39

training time. I continued that if the Chief instructed me to open an administrative investigation that what they tell me had better be the truth. He advised he understood.

On March 17, 2022, I spoke to Chief Whitney and informed him of the information Deputy Chief Slattery gave me and my phone call with Officer Elmore. Chief Whitney informed me to open an administrative investigation into the matter.

ACTION TAKEN:

On March 17, 2022, I received an email from Deputy Chief Slattery with the information we spoke over the phone about.

On March 18, 2022, at 11:44hrs., I called Mr. Karl Machia, evidence custodian for Bucks County at Thiokol, and asked if he remembered the K-9 Units training on February 25, 2022. He said he remembered they were there, but not what date they were there. I asked how long they were there. He said they were gone around lunch time. I asked if there was any video I might be able to see of that day, he said yes.

I responded to Thiokol and watched the video of that day. The video showed that our officers arrived at 09:01 hrs., and departed together at 12:28 hrs. We viewed the tape up to 16:00 hrs., no K-9 Units returned during that time. I requested a copy of that video and Mr. Machia advised he would have to ask his supervisor for permission.

On March 23, 2022, at 15:59 hrs., I received a call from Deputy Chief Slattery who advised they could not give me a copy of the video, but I could view it anytime I wished. I asked if the video could be preserved in case it is needed in the future. He said yes, he would have Lt. Gorman from his office reach out to me to confirm the details.

On March 23, 2022, at 16:34 hrs., I called Mr. Machia and advised we would be requesting the video be preserved. He advised me he would do so.

On March 25, 2022, at 10:52 hrs., I received a phone call from Lt. Gorman who advised me that he had my request, and he would preserve the video. He further said if we needed to see it again, we could go to Thiokol to view it. He also sent me an email at 11:15 hrs., confirming these details.

On March 28, 2022, I received another email from Lt. Gorman stating the video was preserved under incident number 99-22-0312.

Officer Fisher

Due to all three officers being on different squads, regular days off and time taken off, the first officer I could meet with was Officer Fisher, on March 29, 2022, at approximately 11:36 hrs. The interview was held in my office, present were myself, Officer Fisher, and his union representative, Sgt. Belinsky. He was read all departmental forms and signed same.

I asked him if he were at K-9 training on February 25, 2022. He confirmed the training was at the county owned evidence warehouse, known as Thiokol. I was told that County Detective Keddie was the instructor for explosive scent. He informed me that he arrived at Bristol Township K-9 Kennels at approximately 07:00 hrs. I asked what he did while he was there. He said told he let his dog run, if some guys needed work they put hides out, and just basically getting the dog's head right.

He told me they arrived at Thiokol approximately 08:30 hrs., or so. I asked what time he had left Thiokol. He said at approximately 14:30 hrs. I asked what time his certification was completed, he said approximately 13:00 hrs. I asked again, what time training finished up and he said around 14:45 hrs. I asked if he was scheduled to work that day or was he scheduled off, he advised scheduled off. I asked who else was with him from Falls Township, he replied Officer Elmore and Officer Lundquist.

I then asked if he remembered a meeting, we had back on July 07, 2021, that involved myself, Officer Elmore, Officer Lundquist, and himself, he said yes. I went on to say we discussed the eight-hour training day, he said yes. I asked if he recalled me saying eight hours is eight hours of training, no break time, no lunch time. He replied he remembered us talking about it, but not me defining that.

I then told him moving forward from this point on, just so we were clear, eight hours of training is to be eight hours. Also, each officer is going to have to write their own report for the training, each report is to cover start time, location, topic of the training, and end time. I informed him it would be better for everyone moving forward to track their activity. I also suggested that each officer fill out a daily, that way there would be no question about what they did and when they did it.

Officer Fisher then asked if the problem is the days they were training or the hours they were training. I replied it wasn't the choice of which days they were training, it was more where you were, when you arrived there, and when you left training. I further explained that this was brought to our attention because the County asked for an explanation. We then spoke about course outlines and better overall documentation of the training.

We then went over the timeline again he told me he was at Bristol Township at 07:00 hrs., at Thiokol at approximately 08:30 hrs., and his certification was completed around 13:30 hrs. He explained they were using the department's explosives, so he had to wait until approximately 14:30 hrs., when they were done.

At this point Sgt. Belinsky began to ask questions about lunch times and breaks and how and when they are granted, we had an exchange back and forth. I advised we all have to follow the Chief's instructions, we don't have to like them, and they had ways to contest them, but right now this is the way it is.

They were confused as to what the issue here was. I advised I still had two officers to talk to and I can't go into all of the details at this time. I reminded Officer Fisher he could not speak to Officers Elmore or Lundquist about this incident. He then continued is this a paperwork issue, or the eight hours, he felt he was doing the right thing.

We continued to talk about what the issue was and how involved how the overtime was submitted and how payroll was done. Sgt. Belinsky asked why the County hasn't talked to Det. Keddie to clear this up. I said I think they had but we have not yet spoken to him, and we just started looking into this. Officer Fisher then asked there is no problem with my paperwork, right. I said the only thing he turned in was his OT slip for eight hours, I have to go back and confirm all of the time from 07:00 hrs., until the time he left Thiokol.

At 11:59 hrs., the interview was ended.

<u>County Detective Keddie</u>
On March 29, 2022, I spoke to County Detective Keddie who was the explosive scent instructor for February 25, 2022. He advised that training started at 09:00 hrs., and was finished no later than

3                                    Exhibit 39                    FALLS TOWNSHIP POLICE DEPARTMENT | MEMO

Elmore_000007

12:30 hrs. He further stated that our K-9 officers asked if he wanted to go to lunch with them, but he declined because he was going to lunch with Lt. Gorman and Mr. Machia.

<u>Officer Elmore</u>

On March 30, 2022, at 07:39 hrs., I spoke to Officer Elmore in my office. Officer Elmore chose Sgt. A. Fanelli to be his union representative. He was read all departmental forms and signed same. I asked him if the county scent certification was on February 25, 2022, at Thiokol, he said yes. I asked him what the start time at Thiokol was. He responded 09:00 hrs. I then asked if this was a day of work for him, or did he put in for overtime. He advised it was a day of work and that he was called in for OT from 03:00 hrs. to 7:00 hrs. At 07:00 hrs., he started his K-9 training day. I asked if he went anywhere before Thiokol. He replied he went to Bristol Township before he went to Thiokol.

I stated you started at Thiokol at 09:00 hrs., what time did you finish. He asked, 'certification?' I said yes. He replied he did not recall. I asked him what time he was done the detail, he responded 15:00 hrs. I then asked him was he at Thiokol the entire time from 09:00 hrs., to 15:00 hrs., he responded no. I asked where he went and when. He replied he could not remember the exact times, but they went to lunch, and he came back to HQ to put the explosives away, and about 15:00 hrs., he had a meeting with the Chief.

I asked where they went to lunch. He said he thought they went to 'Joe's,' but he is not 100 percent sure. I then asked if he remembered a meeting the K-9 unit had with me on July 7, 2021, where we discussed training days, he replied yes. I asked if he remembered us saying eight hours of training at the Chief's direction was to be training time, not lunch or break time. He replied he remembered talking about past training which was four hours and how they had to 'eat' travel time and lunch time.

I asked what time he broke for lunch, he did not recall and said he would be guessing. He continued say the only times he was sure of was he left his house at 02:30 hrs., and returned 18:00 hrs., February 25, 2022. I asked if he arrived at Thiokol at 09:00 hrs., he responded he arrived before that because he had the explosives for the training. I asked maybe 08:30 hrs., he stated he wasn't sure.

I asked when he broke for lunch, and how much time did he take for lunch. He said he was unsure, but it was toward the end, because he came back here, returned the explosives, gassed the car up, and spoke with the Chief at around 15:00 hrs. He then said he spoke to Sgt. Clark and myself in Sgt. Clark's office. The only times he was sure of is leaving his house at 02:30 hrs., and arriving home at around 18:00 hrs.

I asked who the instructor was that day for explosives. He advised County Detective Keddie. He pointed out at this time that they asked Det. Keddie to schedule the county days on the days they had already chosen for the year so there would not be extra days. I asked him how much time they took for their lunch break. He was unsure but said as long as it takes to order and eat a cheese steak.

I then said moving forward, eight hours of training is eight hours of training. I explained what the Chief wants is training, not lunch, not breaks. We then had a back and forth about lunch times and what happened in the past. I told him he didn't have to like what the Chief was saying, and he had a right to dispute his order, but moving forward this is what is to be done.

Exhibit 39      FALLS TOWNSHIP POLICE DEPARTMENT | MEMO  Elmore_000008

I also told him that each officer is to write their own reports for future trainings and each officer should fill out a daily report to account for their time. I told him the report should be detailed, what time they arrived, topic covered, location, and time completed. I pointed out that if you read the report for this training it appears they were at Thiokol all day. There was no mention of Bristol Township, it made the reader assumed you were at Thiokol all eight hours.

We then discussed future training days and that the County wanted an outline regarding what would be happening in the future. Officer Elmore talked about securing training locations and them being canceled at the last minute. I said I understood, and I think the Chief would also. I said until we hear from the County, all optional scent training is on hold until the Chief tells me. I then corrected myself and said all training for K-9 is on hold until the Chief tells me. He asked if the dogs were out of service. I said no, that he knows there are no standards in PA that cover training, and we go above and beyond when it comes to training, he agreed. There was another discussion about taking lunches and he was given options.

I then went back to the timeline again and asked if he remembered when his certification finished up and when he took his lunch, he said he was unsure of times. I asked what he did after he had his lunch. He said he came back here gassed up his car, put the explosives away, and had a meeting with the Chief around 15:00 hrs., and home at 1800 hrs. I then asked him if he went to lunch at 12:30 hrs., and came back here at 15:00 hrs., that would be a problem, because it is a lot longer than a half hour lunch. He asked are we guessing at the time, I replied I was just asking a question.

We went back and forth about this being a guess and I said okay, you left Thiokol at 12:30 hrs., or so and put into 15:00 hrs., that is a lot longer than a half hour lunch, coming back to HQ gassing up a car and putting things away, that is a problem, 'right?' He responded okay. I said there is missing time, that is a problem, 'right?' He did not respond.

I then put it another way. I said let's say the Chief lets you take lunch, and you take it from 13:00 hrs., until 13:30 hrs., right, that leaves you one and a half hours until 15:00 hrs. I then said it doesn't take that long to fill up your car, put things away. He replied we are arguing semantics here. I said we weren't, I told him the County trainer can not explain how they came up with eight hours. I went on to say the trainer is paid from the time he leaves his house in Doylestown until the time he gets back, and, on this day, he put in for five hours.

The trainer told the County he pulled out of there at approximately 12:15 hrs., and everyone left. Det. Keddie was still there and the last one to leave, at about 12:30 hrs. I then said so there is missing time from 12:30 hrs., until 15:00 hrs. I then said you left Thiokol at 12:30 hrs., he replied I don't know what time I left. I said let's say it was 12:30 hrs., you took a half hour for lunch where is the rest of the time. He replied I don't know what the exact time lunch was. I asked him how much time he gets for lunch, he said half an hour plus coffee breaks. I said okay, half hour lunch, fifteen-minute coffee break, where is the rest of the time. He replied I don't have it written down I don't know how that worked out. I then pointed out you now can see in the future how a daily log would help. We then ended the interview at 08:06 hrs.

<u>Sgt. Gaffney Bristol Township Police</u>
On March 30, 2022, at 10:32 hrs., I called Sgt. Gaffney and asked if he had been at training that day. He said yes. He confirmed our K-9 Officers were at Bristol Twp K-9 Kennels around 07:00 hrs. He also confirmed training was over approximately 12:30 hrs., and everyone departed for the day.

5                              Exhibit 39          FALLS TOWNSHIP POLICE DEPARTMENT | MEMO
Elmore_000009

<u>Officer Lundquist</u>

On March 30, 2022, at 19:16 hrs., I spoke to Officer Lundquist in my office. Officer Lundquist chose Cpl. Piasecki as his union representative. All departmental forms were read and signed. I asked if February 25, 2022, was the County scent day certification. Officer Lundquist responded yes. I asked where it was held, he responded Thiokol. I asked what time he arrived there, he said around 08:30 hrs., or so. I asked if he went anywhere else first. He said every scent day they meet down at Bristol Township first to go over the plan for the day and stuff, he said he got there about 07:15 hrs., or so.

I asked him how many hours of overtime he put in for. He responded our training days are from 07:00 hrs., to 15:00 hrs. I asked once at Bristol Township what did he do. He said they talked about upcoming trainings they have, any problems they are having and how the day's training is going to go. He could not recall the exact issues they talked about.

I asked him if he remembered a meeting I had with the K-9 unit on July 7, 2022. He advised he remembered the meeting, but not the exact date. I asked him if he remembered what we talked about. He replied he remembered that we changed training days from four hours to eight hours, and he did not recall the other issues we discussed. When asked, he does not recall me saying eight hours of training is eight hours, not break time, not lunch time.

I asked him what time he completed his certification. He responded off the top of his head, around 11:30 hrs. I asked him what time he left Thiokol, he replied around 13:30 hrs., or so. I asked him what he did after he left Thiokol, he said he went to lunch. I asked him what he did after lunch, he said went home.

I asked so from 13:30 hrs., you went to lunch, how long did you take. He replied an hour. I told him that is now 14:30 hrs., what did he do then. He replied travel time to lunch and travel time home, cleaned the dog up at home.

We went over the timeline again, at 07:00 hrs., he said he went directly to Bristol Township, at Thiokol at 08:30 hrs., or so. and his certification run was between 11:00 hrs., to 1130 hrs. I asked after your run did you wait for Officer Fisher and Officer Elmore to go to lunch, he said yes. I asked if he remembered where he went, he said Joe's Pizza in Bristol Township. I asked again, so you finished at 11:00 hrs., or 11:30 hrs., and waited until 13:30 hrs., and went to lunch, he said yes. I asked after lunch you went right home, he said if he recalls correctly yes.

We then spoke moving forward from this point on, eight hours of training means eight hours of training, not lunch time, not waiting around time. Each K-9 officer will now have to write their own report detailing arrival time, location, training topic, and departure time. I also suggested that they each fill out a daily so their time could be accounted for. I then explained the County will only pay for four hours of overtime, the other four hours is to be paid by the township. I then explained that he will have to submit two OT forms in the future, four for the County, and four for the township.

I asked him if he had read his report, he did not remember what he wrote. I gave him a copy of his report and told him when I read it that it appears that he went to Thiokol at 07:00 hrs., and left Thiokol at 15:00 hrs. I pointed out it did not say anything about Bristol Township or going to lunch. I explained by also filling out a daily it will account for their time and answer any questions anyone might have.

I also explained if he went to Bristol Township first, they should be recording some type of training, running the dog, etc. I told him that is what the Chief wants to see because that is what he is paying for. I told him as he is waiting for his turn at certification, he should be recording he ran a track,

6          Exhibit 39      FALLS TOWNSHIP POLICE DEPARTMENT | MEMO

Elmore_000010

article searches, something that shows training, the Chief does not want to see lunch. He asked if that is extending his day because they are entitled to a lunch break.

I told him that was what the meeting in July was about eight hours is eight hours it had been increased from four to eight hours. I told him this is what the Chief wants, we don't have to like what the Chief says, we have to listen. I told him if he felt this was wrong, he has a grievance procedure, he can ask to speak to the Chief, there are a number of options, as this is what I was told, and this is what I relayed to them. I told him his timeline is very problematic, it shows there is too much down time.

He responded to that statement by saying he was grooming the dog, running the dog, etc... I asked him if he did any of that this day, he responded I am sure I was, but we don't write that down. I told him that is what he has to document. I brought up the example that was given, that they assumed their cars are GPS'd, he said we do. I told him what that would only show us that a car was in a location, it does not tell us what they are doing, they could be asleep in the car for all we know.

At this time Cpl. Piasecki began to ask some questions of how the training is conducted. I let him ask question and answered a few but we were going far afield of what we were there for. I told him this and said if he would like we can discuss this off tape. We ended the interview at 19:40 hrs.

On April 4, 2022, hrs., at 11:18 hrs., I called Deputy Chief Slattery and asked permission to officially speak with Detective Keddie and to obtain copies of his training forms which may have times on them that I would like to add them to the record. He told me he would call me back. At 17:09 hrs., we spoke again, and he said I could speak to Detective Keddie but they could not give me copies of the reports but copies were sent to our officers, so they should have them in their records. I advised I understood and thanked him.

On April 6. 2022, at 15:49 hrs., I sent an email to Officer Elmore, Officer Lundquist, and Officer Fisher advising them that all K-9 training is still on hold until this matter is resolved. In that email I also detailed what was required of them in the future when training starts again. I also ordered them to provide me a copy of the County certification form they were given no later than 15:00 hrs., on April 9, 2022. I gave them the option to turn it into my mailbox or they could email me a copy.

On April 7, 2022, all the requested documents were turned in by each officer. The documents showed the following:

Officer Fisher made his first and only run at 10:20 hrs., and was completed by no later than 10:36 hrs.

Officer Elmore made his first and only run at 10:36 hrs. and if we assume he took as long as Officer Fisher, he would have been completed at 10:52 hrs.

Officer Lundquist made his first and only run at 11:18 hrs. I assume he was completed by no later than 11:30 hrs.

When they have passed the certification run, they are free to leave. Both Officer Elmore and Officer Fisher said they had to wait until the instructor, Det. Keddie, was done using the department's explosives. As you can see on the video all three of our officers pull out at the same time 12:28 hrs. This leaves two hours, 07:00 hrs., to 09:00 hrs., at Bristol Township, not actively training, and 12:28 hrs., to 15:00 hrs., two and a half hours, at lunch, not actively training. This is a total of four and a half hours Officer Lundquist and Officer Fisher requested overtime pay, knowing that they were not

Elmore_000011

actively training. Officer Elmore leveraged the eight hours of training time to offset his twelve-hour workday knowing he only trained for three and a half hours.

Officer Fisher, Second Interview

On April 11, 2022, at 11:20 hrs., Officer Fisher came into my office with his union representative, Sgt. Belinsky, and wished to clarify his original statement to me. He said when he told me 14:30 hrs., he meant that was the time the day was ended, not the training.

I then told him I had reviewed the surveillance tape for Thiokol, and it showed them pulling in at 09:01 hrs., and leaving at 12:28 hrs., he replied if that is on the tape that is accurate. I also said I had spoken to Det. Keddie who said he was the last one to leave Thiokol, and that was 12:35 hrs., and as he was leaving one of our officers asked him if he wanted to go to lunch with them. He said it was not him (Fisher), but doesn't know if it were one of the guys.

I asked him if he did go to lunch, he said yes. I asked him when he went to lunch, he replied right after we pulled out of Thiokol. I asked him what time he finished lunch, he said around 14:00 hrs., I asked how long he gets for lunch, he replied under an hour. I asked if it is a problem if he took lunch from 12:30 hrs. until 1400 hrs. he answered yes.

We then discussed how this would work in the future, so everyone is clear, and knows what is expected of them. He had some questions that I answered for him, I made it clear that the two hours at Bristol Township was useless and not permitted because they were not training. I also said the two- and half-hour lunch from 12:28 hrs., until 15:00 hrs., was not permitted. He agreed with me and assured me this would not happen again.

Findings/Recommendation:

I find the Officer E. Elmore, Officer T. Lundquist, and Officer B. Fisher violated the following policy and sections:

Policy 2.8.1 Discipline:

Section: 103.111 Failure to cooperate fully in a dept Administrative investigation.

Recommendation: Dismissal.

Section: 103.110 Failure to report to the Chief, knowledge of corruption with the dept. including but not limited to, any illegal acts committed by a member of the dept. and/ or offers and acceptance of bribes or gratuities to permit illegal acts.

Recommendation: Dismissal.

Section: 103.115 Knowing and willfully making false entry in an dept. report or record.

Recommendation: Dismissal. (Officer Lundquist is found to have violated this section twice, one for his police report the other for his overtime slip).

Section: 103.175 Repeated violations of dept rules and regulations and any course of conduct indicating that a member has little or no regard for his responsibilities as a member of the police dept.

Exhibit 39                      Elmore_000012

Recommendation: Dismissal.

Section: 103.301 Refusal to obey proper orders from superior.

Recommendation: Thirty-day suspension.

Section: 103.420 failure to comply with any of the Chiefs orders, directives, regulations, etc., or any oral or written orders of superiors or dept policies.

Recommendation: Five-day suspension.

Section: 103.595 Failure to satisfactorily complete an assigned task, according to established policies and procedures.

Recommendation: Five-day suspension.

Elmore_000013

**MEMORANDUM**

| | |
|---|---|
| **TO:** | Officer Edward Elmore<br>Via E-Mail e.elmore@fallstwppd.com |
| **FROM:** | Chief Nelson Whitney |
| **RE:** | Notice of Potential Discipline & Loudermill Rights |
| **DATE:** | February 20, 2024 |
| **CC:** | Officer George Thomas, PAFT President |

Based on the conduct described below, you may be subject to disciplinary action up to and including termination. The purpose of this letter is to provide you with timely notice of the potential for disciplinary action against you, to describe the evidence obtained during the Township's investigation, and to provide you with an opportunity to offer any and all information which would cause me to reconsider recommending discipline in this case or which would cause me to consider a lesser penalty than the one which is being contemplated.

## SUMMARY OF INVESTIGATION

This investigation was initiated in response to the discovery that in November 2023, a Belgian Malinois was received as a "donation" in the summer of 2023 from civilian and business owner Bob Kent, and this information was not reported. It was also revealed that the intention was to utilize the donated dog as a replacement for the current K-9 partner, Monty, who retired due to advanced age and inability to perform as a police dog. The investigation uncovered repeated violations of Departmental policies and procedures, including engaging in dishonest or deceitful behavior, failures to uphold the highest standards of integrity and professionalism, conduct that brings disrepute to the police department or undermines public trust, behaviors that indicate a lack of respect for the law or the duties of a law enforcement officer, actions that compromise the ethical standards expected of an officer and demonstrate a pattern of behaviors that shows a disregard for the responsibilities associated with your role as a police officer.

1. During the investigation, you presented varying accounts of how you acquired Kent's Belgian Malinois, Oakley. Initially, you stated that Kent donated the dog to the FTPD, then you described it as a gift, and later informed Investigators that the dog was more of a "rescue" taken as a favor due to complaints from Kent's neighbors. Additionally, you indicated that the dog had minimal value until trained, whereas Kent asserted that donating Oakley saved the Township $10,000 and characterized it as a donation. It is noted that you did not report the acquisition of Oakley to me as a gift, donation, or otherwise.

4878-0246-7750 v1

1

Exhibit 40

Elmore_000179

2. As part of the investigation regarding the donation, an analysis of your Police Incident Report in the arrest of Lawrence Bell at Kent's Quality Tree Services uncovered a glaring omission of crucial details, notably the absence of any statement from Bell or that Bell attempted to leave but could not because Kent's vehicle was blocking Bell's vehicle, which could have presented exculpatory evidence. Furthermore, the claim in your Incident Report of Bell making a gun gesture towards Kent, was not supported by Kent during subsequent interviews. During the preliminary hearing on February 28, 2023, Lt. Clark represented you in light of your administrative leave. Bell contended that Kent used offensive language, including racial slurs, during the incident leading to his arrest, refuting the alleged threats against Kent. Your selective inclusion of information in the Incident Report suggests a bias towards Kent and his associates, potentially obstructing the investigative process and compromising the report's integrity and your discretionary use of authority.

3. On January 8, 2024, Levittown Now published an article where the statements you made to the media contradict the facts as stated in your Incident Report concerning an apprehension and arrest and your inclusion in the last round of promotional exams on or about June 2023.

## PRIOR SIMILAR CONDUCT

1. In or around March 2022, Lt. Ward determined that you lied to superiors and stole four (4) hours of straight time from the Township. Lt. Ward recommended dismissal due to your serious breach of Township policies and failure to maintain Township standards of honesty and integrity, even when given a second chance to do so.

2. In or around May 2022, during an investigation into an allegation of a traffic ticket quota system. Investigators declined to substantiate an illegal quota system and found your testimony not credible. Investigators recommended that the Township investigate your statement that you advised a magistrate judge to dismiss a ticket over a non-existent ticket quota. Your statements regarding the existence of a traffic ticket quota system were knowingly false.

3. On or about August 8, 2023, you were counseled on your inappropriate, harassing, insubordinate, and intimidating behaviors and the negative impact these behaviors have on the efficiency and effective functioning of the Department and Township based on your behaviors and insubordinate conduct towards Command Staff. You were further advised to treat your Command and fellow officers with appropriate respect.

## RELEVANT DISCIPLINARY AND POLICY VIOLATIONS

Your conduct violates the following sections of the FTPD Discipline Code and Policies:
1. **Disobedience of Orders – 103.590**: Failure to adhere to Department policies, rules, and regulations, and applicable provisions of the basic labor agreement.
2. **Neglect of Duty – 103.420**: Failure to comply with any of the Chief's orders, directives, regulations, etc., or any oral or written orders of superior or Department policies.

2

4878-0246-7750 v1

Exhibit 40                                                    Elmore_000180

3. **Neglect of Duty – 103.425**: Failure to conduct proper, thorough and complete investigation.
4. **Conduct Unbecoming an Officer – 103.112**: Making a false statement in response to an official department investigation.
5. **Conduct Unbecoming an Officer – 103.111**: Failure to cooperate fully in a department investigation.
6. **Conduct Unbecoming an Officer – 103.115**: Knowing and willfully making a false entry in a department report or record.
7. **Conduct Unbecoming an Officer – 103.175**: Repeated violations of Department rules and regulations and/or any other course of conduct indicating that a member has little or no regard for his responsibility as a member of the police department.

1. **Gratuities and Bribery FTPD Policy #2.4.18**: Failure to report the receipt of gratuities.
2. **K-9 FTPD Policy #3.6.1**: Surreptitiously intending to use an uncertified canine from an unverified source.

## RECOMMENDED DISCIPLINE

Based on the outlined conduct, a pattern of policy violations, a reluctance to acknowledge accountability, and a tendency towards dishonesty when beneficial. This behavior is considered Conduct Unbecoming an Officer, as stipulated in FTPD discipline code section 103.175, for consistent violations of Department regulations and a general disregard for the responsibilities of a police department member.

In line with Article 5, Section 1 of the Collective Bargaining Agreement ("CBA") between Falls Township and the Police Association of Falls Township, the Chief of Police is tasked with formulating disciplinary plans. Pursuant to Article 4, Section 3, the Township Manager retains the authority to discipline employees with just cause, including dismissal. Accordingly, I intend to recommend DISMISSAL to the Township Manager, Matthew Takita, and the Board of Supervisors.

## LOUDERMILL RIGHTS

Prior to making this recommendation, I am requesting that you provide a response to the allegations set forth above for consideration. Your response may be written or presented in-person if you request a meeting with me to provide a response to the charges. By copy of this correspondence, I have advised PAFT of the potential disciplinary action you are facing as well as your right to respond to the charges set forth above and your right to representation. If you agree with the contents of this memorandum and choose to waive your right to a Loudermill meeting or to submit a formal response, you may sign the Waiver Form and return it to me before Friday, February 23, 2024, at 5:00 p.m. **A RESPONSE MUST BE FINALIZED AND RECEIVED BY Friday, February 23, 2024, at 5:00 p.m.** By copy of this correspondence, I have advised the Union of the potential disciplinary action you are facing, your right to respond to the charges set forth above, and your right to representation.

3

## <u>LOUDERMILL MEETING/RESPONSE WAIVER</u>

I received the Loudermill Notice Memorandum and Loudermill Waiver, both explaining my rights, on this date. My signature below signifies a waiver of the Loudermill meeting or submission of a formal response.

_____                    _____
Signature                                                     Date

My signature below is an Acknowledgment that I have received the Loudermill Notice.

_____                    _____
Signature                                                     Date

4878-0246-7750 v1

4

Exhibit 40

Elmore_000182