| | |
|---|---|
| **Date:** | Thu, 1 Jun 2023 3:53:43 PM -0400 |
| **Sent:** | Thu, 1 Jun 2023 3:53:39 PM -0400 |
| **Subject:** | Elmore status |
| **From:** | Matthew Takita |
| **To:** | Jeff Dence <j.dence@fallstwp.com>; Jeff Boraski <j.boraski@fallstwp.com>; John Palmer <j.palmer@fallstwp.com>; Erin Mullen <E.Mullen@fallstwp.com>; Brian Galloway <b.galloway@fallstwp.com>; |
| **CC:** | 'Michael Clarke' <MClarke@rudolphclarke.com>; Lauren Gallagher <LGallagher@rudolphclarke.com>; Hearn, Thomas <Thomas.Hearn@obermayer.com>; Atkins, Melissa <melissa.atkins@obermayer.com>; |
| **Attachments:** | Memo to Ms. Atkins 05.24.23.pdfapproved.pdf |

All

After a review of Mr. Harran's investigation conclusion, attached, it is my recommendation that PO Elmore serve the maximum suspension of five (5) days. Because I am recommending discipline for PO Elmore's inappropriate conduct, he will need to be given a Loudermill notice, I am further recommending that Mr. Harran provide PO Elmore his Loudermill notice. It is likely that PAFT will challenge the discipline since the investigation was not completed within ninety (90) days. Nonetheless, this will serve as a Notice to PO Elmore and other officers that this kind of conduct will not be tolerated in Falls Township.

Matthew K. Takita, AIA, MCP
Township Manager
Zoning Administrator
Director of Code Enforcement

Exhibit 64

DEF_ESI_06073

| Date: | Fri, 2 Jun 2023 4:33:29 PM -0400 |
|---|---|
| Sent: | Fri, 2 Jun 2023 4:33:28 PM -0400 |
| Subject: | Fwd: |
| From: | Jeff Dence |
| To: | Mike Clarke <mclarke@rudolphclarke.com>; Lauren Gallagher <LGallagher@rudolphclarke.com>; |
| Attachments: | FITNESS FOR DUTY EXAM - 5-15-2023 (1).pdf; PAFT and Falls Twp. - Crosier Grievance - Decision and Award.pdf; Ed Elmore Admin Leave Memo 12-13-22 - DRAFT 4853-6674-9507 v.1.pdf |

Jeffry Dence
Falls Township Board of Supervisors
J.dence@fallstwp.com
215.500.5914


 *Warning: I either dictated this to my device, or i typed it clumsily. Consider any typos or weirdness my gift to you.*😁


Begin forwarded message:


**From:** Ed Elmore <edinpa84@gmail.com>
**Date:** June 2, 2023 at 11:59:08 AM EDT
**To:** Matthew Takita <m.takita@fallstwp.com>, Rich Dippolito <r.dippolito@fallstwp.com>
**Cc:** Jeff Dence <j.dence@fallstwp.com>


Dear Sirs,

I am following up with the results from the Fitness for Duty Exam that I was directed to attend and your instruction that I would be permitted to return to full duty after having completed it. (I would also request any report issued by the doctor for my own records.)

I am scheduled for an interview at HQ on Monday June 5th for the promotional testing process. I am trying to clarify my status In that I need to know If I will be permitted to attend this interview at the township building and if during the interview I will be permitted to refer to my 23 years of service to the citizens of Falls Township as a Police Officer.  These are restrictions placed on me when I was placed on leave on 12/12/22

For reference I have attached a copy of the memo detailing my administrative leave that was issued on 12/13/22 having been placed on leave the previous day, 12/12/22.

The 12th of December is now 172 days ago. I have attached a copy of Crosier's arbitration award relating to her grievance of her administrative leave. We are now 82 days past the township's deadline for any investigative or disciplinary action, as per the award I would ask that any material referencing this leave be removed from my personnel file.

Exhibit 65

DEF_ESI_06393

Thank you for your attention to this issue, a timely response is critical.

Ed Elmore

Exhibit 65

DEF_ESI_06394



## Fw: Fwd: Ed Elmore

1 message

**Steven Langan** <oak081@verizon.net>                    Fri, Jun 9, 2023 at 08:17
To: Ed Elmore <edinpa84@gmail.com>

Jeff said I could send this to you.

Sent from the all new AOL app for iOS

Begin forwarded message:

On Thursday, June 8, 2023, 20:32, Jeffry Dence <jeffdence@icloud.com> wrote:

Begin forwarded message:

**From:** Matthew Takita <m.takita@fallstwp.com>
**Date:** June 8, 2023 at 8:29:45 PM EDT
**To:** Jeff Dence <j.dence@fallstwp.com>, Michael Clarke <MClarke@rudolphclarke.com>
**Cc:** Erin Mullen <E.Mullen@fallstwp.com>, Brian Galloway <b.galloway@fallstwp.com>, Jeff Boraski <j.boraski@fallstwp.com>, John Palmer <j.palmer@fallstwp.com>
**Subject: RE: Ed Elmore**

All

It is my understanding the Board has decided Officer Elmore is to be returned to work without any discipline. I will direct Nelson tonight to advise Officer Elmore that he is to return to work tomorrow.

Matthew K. Takita, AIA, MCP

Township Manager

Zoning Administrator

Director of Code Enforcement

**From:** Jeff Dence <j.dence@fallstwp.com>
**Sent:** Thursday, June 8, 2023 5:32 PM
**To:** Matthew Takita <m.takita@fallstwp.com>; Michael Clarke <MClarke@rudolphclarke.com>
**Cc:** Erin Mullen <E.Mullen@fallstwp.com>; Brian Galloway <b.galloway@fallstwp.com>; Jeff Boraski <j.boraski@fallstwp.com>; John Palmer <j.palmer@fallstwp.com>
**Subject: Ed Elmore**

Exhibit 66                                              Elmore_000066

What is the status of Ed Elmore and why has he not been returned to work?

A few weeks ago when we were told Fred completed his investigation, it was said that Fred spoke to several employees who all told him that Ed's demeanor changed after the shooting. Fred also said that we didn't get him any help after the shooting. At that time Fred told us that we should have a fit for duty evaluation and then he could be returned to work once cleared. As far as we know he's been cleared by the doctor but has not been returned to work. This is setting us up for another grievance/lawsuit which we will surely lose. This is exactly what just happened with the Crozier grievance which we lost.

What is the holdup for returning him to work?

Jeffry Dence

Falls Township Board of Supervisors

J.dence@fallstwp.com

215-500-5914

Exhibit 66

Elmore_000067

## Sherry McGovern

| | |
|---|---|
| **From:** | Matthew Takita |
| **Sent:** | Thursday, June 15, 2023 9:59 AM |
| **To:** | Edward Elmore; Ed Elmore |
| **Cc:** | Nelson Whitney; George Thomas; Sherry McGovern; Rich Dippolito |
| **Subject:** | Return to Work |

Officer Elmore

This letter serves as notice regarding your expected return to duty and the conclusion of the Township's investigation initiated by complaints against you. First, it is the Township's understanding that you are cleared to return to full duty by the psychologist following your fitness for duty evaluation and to modified duty by your treating physician/physical therapist concerning your injury. As such, you must report to modified duty for your scheduled shift on Monday, June 19, 2023 at 1900 hours.

In addition, the investigation into the harassment complaints filed against you have concluded. Based on the findings of the investigation and recommendations of the investigator, the Board of Supervisors sustained your violation of section 103.50 of the Falls Township Police Policy 2.8.1, Conduct Unbecoming an Officer. The Board will not tolerate a Falls Township employee conducting themselves as you did and therefore, is imposing the maximum five (5) day suspension. Your harassing, insubordinate and intimidating behaviors have a negative impact on the functioning of the department. There must be decided improvement in your conduct. Specifically, you must treat your command and fellow officers with appropriate respect.

Please be advised that if immediate and sustained improvement in your behavior is not realized, you will be subject to further disciplinary action up to and including termination. In accordance with Article 12, section 4, subsection 3 of the CBA, this suspension shall be served after the determination of an arbitrator.

Matthew K. Takita, AIA, MCP
Township Manager
Zoning Administrator
Director of Code Enforcement


did Return on 8/19/23

1

Exhibit 67

Defense 0009

| Date: | Wed, 14 Jun 2023 1:41:00 PM -0400 |
|---|---|
| Sent: | Wed, 14 Jun 2023 1:41:04 PM -0400 |
| Subject: | RE: draft Elmore email |
| From: | Whitney, Nelson |
| To: | Matthew Takita <m.takita@fallstwp.com>; |
| Attachments: | FTPD Policy 2.8.1a Discipline Code.pdf |

Matt,

I need a little guidance on what section number of the discipline code the Board is sustaining a violation of. 103.5 doesn't fit in the conduct unbecoming section (see attached). The last sentence of paragraph one below should read, "As such, you must report to full duty for your scheduled shift on Monday, June 19, 2023 at 1900 hours."

Nelson

**From:** Matthew Takita <m.takita@fallstwp.com>
**Sent:** Wednesday, June 14, 2023 1:24 PM
**To:** Whitney, Nelson <n.whitney@fallstwppd.com>
**Subject:** draft Elmore email

Nelson
Take a look at this draft. It was already reviewed and revised by Labor. Please confirm the policy/section numbers are correct and also a realistic starting shift.
Thanks!

Officer Elmore

This letter serves as notice regarding your expected return to full duty and the conclusion of the Township's investigation initiated by complaints against you. First, it is the Township's understanding that you are cleared to return to full duty by, both, the psychologist following your fitness for duty evaluation and your treating physician/physical therapist (need to confirm doctor or therapist with Sherry) concerning your injury. As such, you must report to full duty for your next scheduled shift [INSERT SHIFT, DAY AND TIME].

In addition, the investigation into the harassment complaints filed against you have concluded. Based on the findings of the investigation and recommendations of the investigator, the Board of Supervisors sustained your violation of section 103.50 of the Falls Township Police Policy 2.8.1, Conduct Unbecoming an Officer. The Board will not tolerate a Falls Township employee conducting themselves as you did and therefore, is imposing the maximum five (5) day suspension. Your harassing, insubordinate and intimidating behaviors have a negative impact on the functioning of the department. There must be decided improvement in your conduct. Specifically, you must treat your command and fellow officers with appropriate respect.

Please be advised that if immediate and sustained improvement in your behavior is not realized, you will be subject to further disciplinary action up to and including termination. In accordance with Article 12, section 4, subsection 3 of the CBA, this suspension shall be served after the determination of an arbitrator.

Matthew K. Takita, AIA, MCP
Township Manager
Zoning Administrator
Director of Code Enforcement

Exhibit 67

DEF_ESI_02119

# ARTICLE 12

## Discharge and Discipline

<u>Section 1</u>.    No employee shall be suspended, removed, reduced in rank or otherwise disciplined except for just cause.

<u>Section 2</u>.    <u>Determination of Discipline</u>

In the event that the Chief or the Township takes disciplinary action against an employee and advised the employee in writing of the penalty to be imposed, this action shall constitute a determination of discipline imposed upon the employee.

Discipline will be resolved in ninety (90) days from the start of an investigation, unless written notice from the Township Manager or Chief is issued to the subject of the investigation explaining the need for a delay beyond ninety (90) days.

<u>Section 3</u>.    <u>Election of Remedies</u>

An employee subject to disciplinary action, may upon being issued a determination of discipline as enumerated in Section 2 above, choose one of the below listed paths to appeal that discipline which are mutually exclusive.  This election shall be final and binding and must be made within ten (10) calendar days of receiving the written notice of determination of discipline.  (NOTE: This ten (10) day requirement is for electing a path of remedy only and shall not be construed to shorten the time period permitted to file a grievance under Article 30 of this Agreement.  In the event that a grievance is filed, the date of the occurrence for the Step 1 Grievance shall be the date upon which the election of remedy is made).

(1) Notification by employee to Township to proceed under the Police Tenure Act to a hearing before the Board of Supervisors

**OR**

(2) File a grievance in accordance with the provisions of Article 30 of this Agreement.

The choice by the employee of the Police Tenure Act procedure or Grievance procedure shall be exclusive after the determination of discipline has been made and all subsequent proceedings, including appeals, shall be in accordance with the specific election made by the employee.

<u>Section 4</u>.  <u>Serving of Discipline</u>

No suspension or other discipline imposed shall be served except upon:

Exhibit 68                                    Elmore_000115

(1) Failure of the employee to file a written grievance within the time required (thirty (30) days)

**OR**

(2) Failure of the employee to appeal in writing the charges by the Township in accordance with the provisions of the Police Tenure Act (Act of June 15, 1951, P.L. 586, as amended, 53 P.S. 911 et.seq within thirty (30) days

**OR**

(3) The determination of an arbitrator appointed pursuant to the grievance procedure to sustain the penalty or impose such different penalty as the arbitrator determines; or if the employee has elected the Police Tenure Act, the determination made at the conclusion of the Police Tenure Act process, to sustain the penalty or impose such different penalty

**OR**

(4) When an employee is charged with an offense that would prohibit employment under the Confidence in Law Enforcement Act (53 Pa. Stat. Ann. § § 752.1-752.5), the employee shall be immediately suspended from employment until final disposition of the charge or upon acceptance into a program of Accelerated Rehabilitative Disposition, whichever occurs first.

The employee's suspension will be with pay and benefits pending the preliminary hearing or comparable proceeding. If the charges against the employee stand after the preliminary hearing, the employee will be placed on unpaid leave with health and dental benefits pending the employee's criminal trial. The employee will not accrue any pay, benefits, or pension credit during the unpaid leave.

If the employee is acquitted at trial and returns to employment (i.e., the Township determines that termination is not warranted), and the Township determines that a suspension of lesser duration than the employee's unpaid leave of absence should be imposed, the employee will be entitled to back pay for the difference between the employee's leave of absence and the suspension issued by the Township.

Nothing in this section shall impact the Township's rights reserved in Article 4, Section 3.

<u>Section 5</u>.

This Article shall not apply to administrative leave.

Exhibit 68

Elmore_000116

| | |
|---|---|
| **Date:** | Mon, 17 Jul 2023 11:17:19 AM -0400 |
| **Sent:** | Mon, 17 Jul 2023 11:17:18 AM -0400 |
| **Subject:** | Fwd: Grievance |
| **From:** | Jeff Dence |
| **To:** | Michael Clarke <MClarke@rudolphclarke.com>; Hearn, Thomas <Thomas.Hearn@obermayer.com>; |
| **Attachments:** | Grievance Discipline.pdf; Crosier Grievance - Decision and Award (1).pdf; Whitney vs Falls ULP.pdf; 20230707133118719.pdf |

See below and please tell me how we're addressing this .

JD

Jeffry Dence

Falls Township Board of Supervisors

J.dence@fallstwp.com

215-500-5914

*Warning:  I either dictated this to my device, or i typed it clumsily. Consider any typos or weirdness my gift to you.* 😁

---

**From:** Ed Elmore <edinpa84@gmail.com>
**Sent:** Monday, July 17, 2023 10:12:48 AM
**To:** Matthew Takita <m.takita@fallstwp.com>; Jeff Dence <j.dence@fallstwp.com>; Rich Dippolito <r.dippolito@fallstwp.com>
**Subject:** Fwd: Grievance

Dear Sirs,

Please accept this as my request for step 2 consideration of this grievance.

Thank you,

Edward Elmore

---------- Forwarded message ---------
From: **Ed Elmore** <edinpa84@gmail.com>

Exhibit 69

DEF_ESI_06443

Date: Mon, Jul 3, 2023 at 7:22 AM
Subject: Grievance
To: Whitney, Nelson <n.whitney@fallstwppd.com>

## Grievance July 3,2023

To: Chief Whiteny
Fr: Ptlm. Elmore
Re: Grievance / Discipline, Conduct unbecoming an officer

Background:

In March of 2022 I met with Chief Whitney as PAFT president to discuss the misuse of administrative leave and how it was being used as a defacto disciplinary process while denying officers their constitutionally protected rights to due process. Two subsequent arbitration awards sustained this in favor of officers Langan and Crosier.

Crosier's arbitration award addressed the timeline requirements established by CBA and policy:

*"An investigation was initiated for purposes of determining what, if any, discipline should be imposed. Thus, the township was required to adhere to its IA policy and the collective bargaining agreement which required the township to resolve the investigation within (90) days from its inception"*

(award attached)

On December 5, 2022 I was notified by Chief Whitney that he was investigating my actions as union president with the intent to impose disciplinary action. As of June 15, 2023 a total of 192 days have passed, over twice the timeline restrictions imposed by CBA, policy and upheld by the Crosier arbitration decision.

As to the root issue I have also attached a copy of the 2013 ULP decision where it was found that the township had unlawfully discriminated against then Sgt. Whitney by taking an adverse employment action against him (denying a promotion) in retaliation for his activities as union president. At that time, then Sgt. Whitney was advocating for union issues involving promotional processes. One part of this contentious process was recorded as follows:

*(page 5) "On March 16, 2010, Whitney, as the PAFT president, had an hour and a half meeting with Chief Wilcox. Whitney raised, for a second time, the issue of when Lieutenant promotions would take place. (FF 43).....The meeting evolved into an angry exchange between Chief Wilcox and Whitney on the issue......"*

Having been present during these exchanges I recall being alarmed by the process and that a sergeant would confront the chief in such a manner. I learned at that time from union officials including then sgt. Whitney that not only did he have a right to vigorously confront the administration about an issue that it wished not to address but that it was also his duty to do so as PAFT president.

Exhibit 69

DEF_ESI_06444

While the issues I was required to address were a more uncomfortable topic for many involved, at no time did any of these activities reach the level of an hour and a half shouting match in headquarters.

The township has erred in failing to distinguish between the 2 distinct roles filled by the PAFT president. One being that of an officer with a defined place in the chain of command. The other as the PAFT spokesman with the right and obligation to advocate for union issues, even those that the administration and township would rather not address and even in a manner not meeting the approval of administration.

Violation of CBA

ARTICLE 12
Discharge and Discipline

Section 1. No employee shall be suspended, removed, reduced in rank or otherwise disciplined except for just cause.
Section 2. Determination of Discipline
In the event that the Chief or the Township takes disciplinary action against an employee and advised the employee in writing of the penalty to be imposed, this action shall constitute a determination of discipline imposed upon the employee.
*Discipline will be resolved in ninety (90) days from the start of an investigation,* unless written notice from the Township Manager or Chief is issued to the subject of the investigation explaining the need for a delay beyond ninety (90) days.

Remedy:

Rescind any disciplinary action.

Remove any reference to leave / discipline / loudermill from my employee file as per the Crosier arbitration award.

Exhibit 69

DEF_ESI_06445

**To**: Chief Nelson Whitney

**From**: Officer Edward Elmore

**RE**: Formal Response to the Loudermill Notice Dated February 20, 2024

**Date**: February 23, 2024

---

I.  **Non-Compliance with Falls Township Police Department Internal Affairs Policy number 331**

The investigation of the accusations in the Loudermill Notice was not conducted in compliance with the Falls Township Police Department Internal Affairs Policy number 331. The department did not comply with the procedures in section V.

Paragraph A states:

> Officers will be advised immediately of any accusation against them, who the accuser is, and what command officer and supervisor have been assigned to the investigation.

I was not immediately advised of the accusations against me, who was making the accusation, and what command officer and supervisor had been assigned to investigate. Given Mr. Kent's December 8, 2023, statement, Lt. Clark and Sgt. Reeves investigated the allegations brought by Chief Whitney, the same individuals I identified in the Charge of Discrimination I filed with the EEOC on September 20, 2023. The Charge of Discrimination states I was subjected to adverse employment action because I opposed the department's unlawful employment practice committed by Chief Whitney and Lt. Clark.

The Loudermill notice I received on February 20, 2024, states that the investigation was initiated in response to the discovery I received two dogs from Mr. Kent in the summer of 2023. As discussed below, Chief Whitney learned from Lt. Langan on November 30, 2023, that I had the dogs. According to ¶C of Police Department Internal Affairs Policy number 331 the Department must handle an investigation within ten days, but, if necessary, up to 30 days; that would have been December 10, 2023, and at the latest, December 30, 2023. The Department did not comply with this timeline.

If the investigation takes longer than 30 days, the Falls Township Police Department Internal Affairs Policy number 331 states in pertinent part:

> D. Investigations that take longer must be justified in writing to the head of the agency with a copy to the accused officer or employee. In no case should the investigation last longer than 90 days.

I have yet to receive written notice to extend the investigation past 30 days.

Exhibit 70    Elmore_000191

## II.    Response to Allegation No. 1

I rescued two dogs that I believe were bound for a shelter. On two separate occasions, Mr. Kent reached out to me unsolicited and asked me to take a dog because the dog was not getting along with his other dogs. The first dog, Oakley, came to live with my family in late Spring 2023. The second dog, Freya, came to live with my family in July 2023.

My decision to rescue these two dogs did not save the Township $10,000 because when I took these two dogs into my care, there was no indication that either dog had the temperament and skills to become a police dog. I took on these two dogs with no intention of ever becoming police dogs. I rescued these dogs from being sent to a shelter.

When asked how these two dogs came into my possession, I have consistently stated that I rescued both dogs that I believe were bound for a shelter. I have never claimed that Mr. Kent donated the two dogs that I rescued to the FTPD. I also never claimed the two rescue dogs were a gift from Mr. Kent. And I never stated that I took the dogs as a favor due to complaints from Kent's neighbors.

### A.  Oakley

In the late spring of 2023, Mr. Kent contacted me to see if I would be willing and able to help him with a dog, a Belgian Shepherd named Oakley, who had become unmanageable. I understood that the dog, Oakley, at roughly a year and a half old, began to assert himself aggressively. Mr. Kent determined that Oakley could no longer co-exist with his other dogs.

I was not in the market for another dog. I believe from my conversations with Mr. Kent that I was his last-ditch effort before Oakley ended up at a shelter. So, I agreed to take Oakley. I started to train him soon after Oakley came to live with my family. This information was shared with Mr. Hearns and his associate during my recorded interview.

In July 2023, Lt. Steve Langan assessed Oakley and thought that Oakley might have the potential to become a police dog. I continued to train Oakley with no expectation that he would become a police dog.

### B.  Freya

In July 2023, Mr. Kent reached out again and asked me if I could take another dog named Freya. Similarly, I believed that she would be sent to a shelter if I did not adopt Freya. So, I agreed to take Freya as well. Notably, there is no mention in the Loudermill Notice of the other dog I rescued from Mr. Kent because this dog has not shown any potential to be a police dog.

### C.  Five Months Later

On November 29, 2023, I spoke with Lt. Langan. He informed me that the Chief was inquiring about all the K-9 ages, and he believed they intended to retire Monty, my K9 partner. Lt. Langan informed the Chief that I had been working with a dog I had rescued, and I was hopeful that Oakley could replace Monty. It should be noted that there was no guarantee that Oakley would

Exhibit 70

Elmore_000192

qualify as a police K9. He would have to be accepted by the department and into the Philadelphia K9 training program and meet the standards to become a trained police dog.

The Chief asked Lt. Langan to ask me to give up my dog to the Chief so that the Chief could then decide who would end up with the Oakley on the K9 unit. I understand Lt. Langan informed the Chief that I would not be receptive to this proposal.

After Lt. Langan's conversation with the Chief, he called me and told me that Chief Whitney was requesting that I donate my dog to Whitney. At this point, I had worked with this dog for nearly six months. He had made a fantastic turnaround with behavior and was a calm, stable companion with my other dogs and loved by my children. I declined the request.

I also discovered simultaneously that the Department was seeking applicants for a K9 position. **[Attachment A]** I learned that the position being filled was my position on the K9 team at the direction of Chief Whitney. I understood that this selection process was intended to replace me in an action contrary to past practice.

I had served as a K9 officer for nearly ten years. This position included increased guaranteed benefits, including paid time off and overtime opportunities for state-required monthly training. Removing me from the K9 position was retaliation for filing an EEOC Charge of Discrimination.

The next day, November 30, 2023, Lt. Langan informed me that the Chief accused me of bribery, a criminal offense for rescuing Oakley. I felt at the time the Chief's demand for my personal property under the threat of accusing me of a criminal offense constituted an attempted act of extortion.

On December 1, 2023, I submitted a memo requesting to be considered for the next K9 position to take my K9 partner's place after retirement. I understood that I would forfeit the position if I did not submit a memo requesting to remain in my K9 position. I understand that Chief Whitney became livid when he received my memo.

On December 5, 2023, I received a phone call from Mr. Kent. He was distraught. He told me that he had just been visited by Lt. Clark (whom I had reported for unlawful discrimination, evidence tampering, and retaliation) as well as Sgt. Reeves (who had expressed his anger toward me that he could be observed in the video assisting in the brutal beating of the African American prisoner held in our jail cell area). Mr. Kent informed me that they arrived at his business without any warning and began to aggressively accuse him of committing the criminal offense of bribery and that I had received a bribe from him. They did this knowing that this accusation was not true. Mr. Kent says they arrived, began recording him, and had a list of questions for him. He said he directed them to stop recording him and leave his property.

Lt. Clark and Sgt. Reeves, acting in their official capacity and under the color of law in yet another act of unlawful retaliation against me, presumptively at the direction of Chief Whitney,

Exhibit 70                    Elmore_000193

harassed, threatened, and defamed Mr. Kent to manufacture an accusation of bribery against me, knowing it not to be true.

On December 21, 2023, I received an email from Brian Rhodes, Attorney with Obermeyer law firm. The email stated:

> Good Morning Sir- Hope you are well and happy holidays. My name is Brian Matthew Rhodes. I am an attorney at Obermayer and have been retained by the Township to investigate the donation of two dogs to the K-9 Unit. I, and my colleague Raashida Fleetwood, would like the opportunity to interview you regarding the circumstances surrounding the donation. We would need no more than an hour of your time and are willing to come to your office. Next week would be ideal. Please let us know.

In this email, the attorney refers to the two dogs as a "donation." When I met with Mr. Hearns and another attorney from Obermayer, Mr. Hearns informed me they were there to discuss the "two dogs that were donated." I corrected him that the dogs I received from Mr. Kent were not donated but were rescued the dogs. The attorneys began referring to the two dogs as a "donation."

I never considered the two dogs as a "donation." The dogs were not valuable, as I have already demonstrated to Mr. Hearns when I provided him with an extensive list of rescue shelters that try to rescue this breed of dog from being euthanized in large numbers. Rescuing these two dogs was an act of compassion. One that came with a significant financial cost, including purchasing additional kennels, several vet visits, and the daily cost of two more dogs. Taking both dogs was a burden of time and money on my family. There is no way that this burden of time and money can be considered a donation, gratuity, or bribe.

When Oakley came to live with my family in the spring of 2022, he had no training. He was of no value to the Township and had no commercial value due to his age and lack of training. Any value Oakley has now resulted from the training I provided him over the last year.

Both dogs remain with my family, and neither has become a police dog.

The incident with Mr. Kent in the summer of 2022 was resolved in the spring of 2023 while I was on administrative leave. I had nothing to do with the disposition of that case. Therefore, to suggest I received the dogs as a bribe is illogical.

In summary, I rescued two dogs. I prevented the two dogs from going to a shelter. I was not obligated to report to the department that I had rescued two dogs. I had no intention of using these two dogs as police dogs. After months of training, one of the two dogs demonstrated he might have the skills to become a police K9, but first and foremost, this dog was our family's dog. And in the end, I decided that he would remain our family dog.

The allegation that I "surreptitiously intend to use an uncertified canine from an unverified source" is entirely out of left field and never happened.

### III.    Response to Allegation No. 2

The incident involving Bell and Kent occurred on July 26, 2022, over a year and a half before I received this Loudermill Notice.

The incident occurred on Kent's private property. Bell had been kicked off a work site where Kent's employees were working, so Bell then came to his private property to voice his right to be on the work site and recruit crane operators.

When I arrived on the scene, Bell complained that he had a right to be on the property because he was recruiting for the union. The discussion ended with him alluding that he would return to continue recruiting.

As the video demonstrates, Bell was a defiant trespasser on Kent's property. He was charged with defiant trespass, simple assault, and terroristic threats. At the time of the incident, there was no allegation made by Bell that he could not leave the property.

Bell arrived at his first scheduled preliminary hearing with an attorney and had a prepared statement making counterclaims against Kent for the very first time. He asked that the DA's office review his claims. I spoke to the DA assigned to the hearings that day and directed Bell to talk with the DA. I stood there while they spoke, and it was during this conversation that Bell accused Kent of offensive language and not letting him leave the property. The DA suggested continuing the hearing so they could investigate and review the new issues raised by Bell for the very first time.

Bell's statement that he could not leave is false, as shown by video evidence that was viewed that day and is still available. The video shows that Kent's vehicle was initially not blocking Bell's vehicle as they stood in the parking lot for an extended period. Kent was seen gesturing to Bell and the direction of his car. The gestures were consistent with Kent's description of repeatedly telling him to leave his lot. Bell is seen not leaving the lot and continuing to escalate the verbal argument until he strikes Kent. The video received was shortened enough to allow it to be transmitted by email. Bell's vehicle is not blocked the entire time, and Bell refuses to leave. Kent moved his vehicle into the lot after Bell made physical contact.

Even after Bell's vehicle was blocked, Bell was still free to leave and required to do so after having been directed to do so by the property owner. While still on scene with Kent, as he was attempting to save and transmit the video, I observed Bell return. As he drove by, he made a gun gesture over the roof of the car, and someone in the following vehicle yelled out at us. Kent did not see Bell make the gun gesture because he was facing the opposite direction and looking

Exhibit 70    Elmore_000195

at his phone. I turned to him and asked if he had seen that, and he said no. I recognized this as an alarming escalation and feared that Bell would return at a later date.

I never asserted that Kent saw Bell make the gun gesture.

The information in my report was not selective but contained what I had when I wrote the report and the charge. This is the usual process. I had no further involvement in this case. I was out on administrative leave **in February 2023** when this matter was resolved, and Bell pled guilty to harassment – subjecting others to physical contact and disorderly conduct – engaged in fighting.

Over 18 months after this incident, I received this Loudermill Notice accusing me of mishandling this matter. Indeed, had I mishandled this matter, I would have been presented with a Loudermill Notice in February of 2023 when the DA and the Department resolved this case.

## IV.    Response to Allegation No. 3

On January 5, 2024, at the request of the Township, I spoke with Teresa Katalis, a representative of a PR firm hired by the Township, to document and celebrate the successful and tenure career of retiring K9. She and I spoke for 20 minutes, and then she wrote an article condensing what we discussed into a handful of blurbs. The article she wrote was issued as a press release.

I provided Ms. Katalis with vignettes of Monty's career. She included two successful apprehensions Monty made nearly a decade ago in her article. I have no idea what I am being accused of doing. But I am being accused of something – yet unknown- that occurred nearly a decade ago based on an article written by a third party.

Nothing in her article discusses my "inclusion in the last round of promotional exam on or about June 2023." I have no idea what you are referring to with this statement that would support me being disciplined.

## V.    Prior Similar Conduct

Article 12 of the CBA requires discipline to be resolved within 90 days. The prior similar conduct identified in allegations 1 and 2 is beyond 90 days.

### A.  Response to Allegation No. 1

The DA's office investigated this allegation and cleared me of wrongdoing. More specifically, on August 17, 2022, the Bucks County District Attorney informed Acting Chief Ward that I was not stealing time. The letter states:

> Members of the District Attorney's Office Management team
> have had an opportunity to meet, evaluate, and discuss the

matter involving Officers Elmore, Lundquist, and Fisher. After review, we have made a determination that the incidents described do not constitute a Brady/Giglio issue and we consider this particular issue closed.

Despite the DA office's determination, the chief continues to accuse me of time theft. The Chief is committing defamation whenever he accuses me of stealing time in March of 2022.

### B. Response to Allegation No. 2

My statement regarding the traffic ticket quota system was not false. Following staff meetings, my sergeants informed me that each officer must write ten tickets monthly. I admit that I asked a magistrate judge to dismiss a citation issued because of the Township's ticket quota.

### C. Response Allegation No. 3.

On August 8, 2023, I received an email from the Township Manager regarding my Step 2 Grievance for being placed on Administrative Leave in December 2022. Per the last line of the email, "the personnel file of the grieving officer will make no reference to the discipline imposed." By citing this incident in a Loudermill Notice, you are violating the agreement between Officer Elmore and the Township.

### VI.    Summary

On September 20, 2023, I filed a Charge of Discrimination with the EEOC, naming Chief Whitney and Lt Clark as wrongdoers. In early December 2023, at Chief Whitney's direction, Lt. Clark investigated my adoption of two dogs. The subject of this investigation is so preposterous that it is difficult to believe anyone could think that I engaged in wrongdoing when I adopted two dogs that otherwise would have gone to a shelter.

It is apparent that Chief Whitney is looking for a reason to terminate me. Finding no legitimate reason, he is hanging his hat on the fact that I adopted two dogs headed to a shelter.

Edward Elmore

AMERICAN ARBITRATION ASSOCIATION

- - -

Police Association of Falls Township

and

Falls Township

Grievance: Discharge – Officer Edward Elmore

- - -

VOLUME II

- - -

Case Number:  01-24-0007-0321

- - -

Tuesday, July 8, 2025

- - -

ARBITRATION was taken at FALLS TOWNSHIP, 444 Lincoln Highway, Fairless Hills, PA before Julie Kavanaugh, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania, on the above date, commencing at 10:09 a.m.

- - -

LEXITAS LEGAL/PHILADELPHIA
1600 MARKET STREET, SUITE 1700
PHILADELPHIA, PA 19103
(215) 504-4622

Exhibit 71

A  P  P  E  A  R  A  N  C  E  S:

  Arbitrator Robert Gifford, Esquire
  RCGifford_arbitrator@hotmail.com


Representing the Union:


  WILLIS, WILLIG & DAVIDSON
   THOMAS GRIBBIN, JR,  ESQUIRE
   1845 Walnut Street
   Suite 2400
   Philadelphia, PA 19103
   tgribbin@wwdlaw.com
   (215) 656-3600



Representing Falls Township:


   CAMPBELL DURRANT, P.C.
   BENJAMIN PATCHEN, Esquire
   One Belmont Avenue
   Suite 300
   Bala Cynwyd, PA 19004
   Bpatchen@cdblaw.com

Exhibit 71

Page 39

correct?

A    Under the conditions of -- that he go on to handle a call -- I mean, Mr. Kent's yard a year and a half prior?

Q    The condition that he made an arrest at the property of Mr. Kent, yes.

A    With me not knowing the information -- and I don't know exactly what Ed knew when he was dispatched to the call -- I mean, Ed might have been the only officer available and that's why he went to the yard.  I don't know exactly.

Q    I'm not asking about the arrest.  There is a simple fact.  I know you didn't understand this at this time, I know that.  If you had known that Officer Elmore had made an arrest at Mr. Kent's property, you would agree with me you would have advised him not to take the dog, right?

MR. GRIBBIN, JR.:  I'm going to object to the hypothetical.

MR. PATCHEN:  It's not a hypothetical.

MR. GRIBBIN, JR.:  It is, because you are saying he didn't know it at the time.

MR. PATCHEN:  He knows it now.  He's supposed to be the supervisor of the canine unit.

Exhibit 71

Page 40

MR. GRIBBIN, JR.:  He's no longer the supervisor of the canine unit.

MR. PATCHEN:  And that's why we're here.

MR. GRIBBIN, JR.:  So you are asking him a hypothetical and putting him in a situation in which he does not, in fact, have the authority to make a decision on.

MR. PATCHEN:  Well, he just testified that no one's actions violated the gratuities and briberies policy.  He also testified at a previous hearing that he would have advised Elmore not to take the dog under those conditions.  I don't know what we're doing now, I don't know, I can't just ask a question.

MR. GRIBBIN, JR.:  Because I'm objecting to it.

MR. PATCHEN:  You didn't object the first --

ARBITRATOR GIFFORD:  You can ask him if he was asked that question at a previous hearing.

BY MR. PATCHEN:

Q   Do you recall being asked that question at your police tenure hearing?

A   The question that I recall being asked at my Police Tenure Act hearing is would I go to the

Exhibit 71

Page 41

call.

Q    Was what?

A    Would I have gone down to the call and handled it.  What I said was I probably would not have, because I don't know all the information, that's the question I recall being asked, it was about me, not about him.

Q    I would, at this time, move the transcript in as an exhibit for the hearing.  I'll just read this page and we can move on from this.

ARBITRATOR GIFFORD:  Go ahead, you can read the page.

BY MR. PATCHEN:

Q    You don't have a copy of your transcript from the hearing in front of you, do you?

A    No, I don't.

Q    I'm reading off of page 112 of this transcript.  Starting on line six, do you think it's a good idea for police officers to take gifts or donations, or whatever you want to call it, from places where they have made arrests?  You say, it wasn't a gift or a donation, first of all.  He was rescuing a dog that was going to be put down.  Then you say, had I -- without knowing all the details of that case, had I known that had not

Exhibit 71

Page 48

A    Right, and that would have all come out in the second or third part of the evaluation.

Q    Oakley could never have been a Falls Township Police dog?

A    Right, exactly.

MR. PATCHEN:  No further questions.

ARBITRATOR GIFFORD:  Any redirect?

MR. GRIBBIN, JR.:  Yes.

- - - - -

REDIRECT EXAMINATION

- - - - -

BY MR. GRIBBIN, JR.:

Q    Corporal Langan, in your time in the canine unit, were you ever Officer Lundquist's immediate supervisor?

A    No, because I had a police dog before him, so we would have never been able to work with each other.  There are four 12-hour shifts and each canine handler with their dogs are on each shift.

Q    Were you aware, then or even now, whether or not the township has a list of approved canine vendors?

A    No.  We used to get our dogs from Canada, a place called Baden K9.  I mean, I had no idea -- obviously, they were approved, because we bought

Exhibit 71

Page 49

dogs from them, but I don't know the list.

Q    When Chief Whitney asked you to gather the prices of dogs, did he in any way limit your search to a finite group of vendors you would look at for prices?

A    No, he just told me to get prices on canine dogs.

Q    He didn't say to you, this is the list of approved vendors I want you to check with?

A    No.  Again, I called again to different people and asked where they bought their dogs.  Two of three, I have never used before.  I didn't know anything about them, other than they had dogs for sale.

Q    At this time, it's your testimony you didn't know anything about Oakley's medical background, right?

A    Right.

Q    Did it seem odd to you that Officer Elmore suggested that Oakley might be able to become a canine?

A    Did it seem odd to me?

Q    Did you question that, did you think that was in any way odd or inappropriate?

A    No.  I mean, again, early on, he said I

Exhibit 71

Page 50

don't see the aggression Bob was talking about.  I said, yeah, I don't know.  That's what he said.  At some point, after the dog had been living at his house for an extended period of time and Officer Elmore started putting some discipline into him and all that, he said, hey, this dog is a really good dog, he's really smart, he has a good nose, you know, he could potentially be a police dog, I said, okay, let me know.  Months later, he said, yeah, you know, he's really good, I think he can be a police dog.

Q    Corporal Langan, are you familiar with an Officer Jim McCaffrey?

A    Yes.

Q    Was Jim McCaffrey a canine officer for Falls Township?

A    Yes.

Q    Did Officer McCaffrey bring a canine dog with him to the township when he came back to the department?

A    Yes.  He had retired from our department to go work for his family business and then he ultimately, I guess, wasn't satisfied with that line of work, so he went and tried to come back here.  He wasn't able to.  Then he went to -- he was hired by

Exhibit 71

Warminster Police Department.  At that point, working for them is when he became a canine officer.

Q   And he brought his dog with him when he came back to Falls Township, ultimately?

A   Yes.  Warminster, I guess, Township gave him his dog, Thor was his name, and I believe he sold it to Falls Township for a dollar.  Then he became, you know, the property of Falls Township.

Q   Do you know -- is it your understanding that you testified that Mr. Kent had called multiple people?  You don't know where you fell in the line of those phone calls; is that right, that's what you said?

A   Yes.

Q   Is it your understanding that Officer Elmore came after Mr. Kent had reached out to you?

A   Potentially, yes.

Q   Is it your belief that Officer Elmore's receipt of Oakley was a gratuity for the arrest that Officer Elmore had made on Mr. Kent's property a year and a half prior?

A   Not at all.

MR. GRIBBIN, JR.:  No further questions.

ARBITRATOR GIFFORD:  Any recross?

- - - - -

Exhibit 71

AMERICAN ARBITRATION ASSOCIATION

-   -   -

Police Association of Falls Township

and

Falls Township

Grievance: Discharge – Officer Edward Elmore

-   -   -

VOLUME II

-   -   -

Case Number:  01-24-0007-0321

-   -   -

Tuesday, July 8, 2025

-   -   -

ARBITRATION was taken at FALLS TOWNSHIP, 444 Lincoln Highway, Fairless Hills, PA before Julie Kavanaugh, a Court Reporter and Notary Public of the Commonwealth of Pennsylvania, on the above date, commencing at 10:09 a.m.

-   -   -

LEXITAS LEGAL/PHILADELPHIA
1600 MARKET STREET, SUITE 1700
PHILADELPHIA, PA 19103
(215) 504-4622

Exhibit 72

A P P E A R A N C E S:

    Arbitrator Robert Gifford, Esquire
    RCGifford_arbitrator@hotmail.com

Representing the Union:

    WILLIS, WILLIG & DAVIDSON
        THOMAS GRIBBIN, JR,  ESQUIRE
        1845 Walnut Street
        Suite 2400
        Philadelphia, PA 19103
        tgribbin@wwdlaw.com
        (215) 656-3600

Representing Falls Township:

        CAMPBELL DURRANT, P.C.
        BENJAMIN PATCHEN, Esquire
        One Belmont Avenue
        Suite 300
        Bala Cynwyd, PA 19004
        Bpatchen@cdblaw.com

Exhibit 72

Page 16

A    Yes.  I believe he texted me, he wanted to know the dates and births of the canines.

Q    Do you have any understanding why the chief was seeking that information?

A    I don't think I knew then.  I think he told me the township was requesting it.

Q    Did you ultimately gather that information and have an opportunity to speak with Chief Whitney thereafter?

A    I immediately texted him back that day. Then, the following day, he came down to my office and he wanted to discuss the canine unit.

Q    Do you know around what time, the date this may have occurred or an approximation?

A    Yes, it was November 29, 2023.

Q    When you and Chief Whitney spoke, did Chief Whitney discuss reducing the size of the canine unit?

A    Yes.

Q    Was there a discussion about Monty?

A    Yes.  What he wanted to know is he wanted to speak about the dates and births.  I provided the dates.  He wanted to talk about the working life span of the breeds.  We have a German Shepherd and the rest were Belgian Malinois, so I told him, you

Exhibit 72

know, generally speaking, each dog was different. Generally speaking, German Shepherd police dogs usually last between eight to ten years. And Belgian Malinois usually lasts ten to 12 years. I gave him an example of Tank, my partner, I retired him at 12 and a half years.  Each dog was different.

Q    Was there any discussion about replacing Monty as Officer Elmore's canine dog?

A    So, yes, we brought up Monty and I told him that he would be turning 12 in January the following year, which was 2024 at the time.  He said, you know, does he -- can he still perform safely?  I said yes.  I told him how Eddie and I had been monitoring him.  I said, he would need to retire soon, but, like, not that day we were having the conversation.  He said, okay, he would leave it up to me when it was time for him to retire.  So, at that point, I bring up that I would like Eddie to go to canine school in Philly, Philadelphia Police Department, and, you know, get another dog.  Then, from there, I told him about Oakley.

Q    Prior to mentioning Oakley, what was Chief Whitney's reaction to your suggestion that Officer Elmore receive a second dog?

A    He wasn't opposed to it, but he said he

Exhibit 72

Page 18

would like to open it up for other people and to have a new process and Eddie could apply for that process and then go through it like everybody else.

Q    Based on your experience, then, at that point, 17 years into the canine unit, was that different than how it was handled in the past?

A    Yes.

Q    You mentioned you brought up Oakley to the chief.  What was the purpose of that?

A    My discussions with Ed Elmore, prior to my discussions with the chief, sometime between June and November, was, initially, Ed was shocked with Oakley at his house, because he didn't see the aggression that Bob had made to everybody.  I said, I don't know.  I said, that's what he said.  So then I didn't hear from him for, like, you know, months.  Then, at some point, he tells me, hey, this dog is really smart, has a great nose on him, I think maybe he can be a police dog.  I said, okay, let me know.  Then I didn't hear anything from him for a while.  Then he brings it up again, probably in November, that this dog could potentially be a police dog.  At that point, when we're talking about the canine unit with the chief, bringing up Oakley, Ed said he can probably be a police dog and all his attributes.  At

Exhibit 72

Page 19

that time, Chief Whitney said okay, but I still would like Ed to go through the process, but if Ed doesn't become the next canine handler, would Ed be willing to donate that dog to the canine unit, to the township for the next handler. I replied to him, I said, I don't know. At this point, Oakley is Ed's pet, I said, you know, so you'd have to ask him. He said, okay, you know, that's understandable. If not, then we'll just buy one. So, at that point, then he tasked me with getting prices for new canine dogs and put a memo out to the department for anybody that is interested in becoming the next canine handler.

Q    Did he ask any questions about how Ed had received Oakley?

A    Yes.

Q    Do you know if anyone in the department knew that Ed had rescued Oakley at any point prior to November of 2023, besides yourself?

A    I can't speak for anybody. I'm not sure.

Q    Did Chief Whitney raise any concerns to you about the way in which Ed had received Oakley?

A    Not until the following day.

Q    What occurred the following day?

A    The following day, which would have been

Exhibit 72

November 30th, Chief Whitney came down to my office and asked me to come into his office.  He wanted to speak about how Ed obtained this dog.  At that point, he starts accusing me and Ed of accepting a bribe.

Q   Prior to that, did Chief Whitney, in addition to asking you to provide him with information regarding the current canine ages, did he ever ask you to find out information regarding what it would cost for the township to acquire a new canine?

A   Well, I mean, the previous day, yes, he asked me to get prices for new canines, so I called around different vendors and I got prices for him the previous day.

Q   What did you understand that to mean, the price of an untrained dog or the price for a trained canine dog?

A   The price for the trained canine dog.

Q   What did you find that the price of a trained canine dog goes for?

A   The prices, I believe, of three dogs that I got prices for, were between $8,500 and $11,500.

Q   When you say trained canine dogs, these are dogs that have already been through a formal

Exhibit 72

training course, as you mentioned, like the Philadelphia training school?

A     Maybe not to that degree, but they have substantial training, yes.

Q     Training by those that have -- that are certified in training canine dogs?

A     Yes.

Q     Did you provide that information to Chief Whitney?

A     Yes.

Q     Do you recall when you provided him with that information?

A     I believe it was on the 29th, November 29th.

Q     On the 30th, when you had another conversation with Chief Whitney, and as you described there was accusations that you had received a bribe, what was your response?

A     Well, I mean, my response was -- I mean, it wasn't a bribe.  There was no definition of a bribe.  No one got anything from this.  Eddie rescued a dog from a person that is a friend and friend of the department, that he was going to take to the pound and the dog was potentially going to be put down from there.  Eddie didn't want that to

Exhibit 72

has, that's the main purpose of why he would breed his dogs.

Q    I guess, at some point, you told Mr. Elmore that Oakley was not going to be Falls Township police dog, right?

A    We never said Oakley was going to be a Falls Township -- listen, the first step was me bringing up this.  There are several steps for this dog.  It needed to have a medical evaluation, the dog would have had to be evaluated by the Philadelphia Police Department and possibly would have never became a police dog.  What I did tell Officer Elmore is the chief wanted to open it up to the department and that he would have to put in for the selection process for the department.

Q    He was upset, right, when you told him this?

A    Sure.

Q    We talked about it being a guard dog and the policy says guard dogs can't be used by Falls Township Police.  My understanding, at some point, you found out Oakley had three broken teeth, right?

A    That's correct.

Q    If a dog has three broken teeth, he can't be a police dog, right?

Exhibit 72

Page 48

A   Right, and that would have all come out in the second or third part of the evaluation.

Q   Oakley could never have been a Falls Township Police dog?

A   Right, exactly.

MR. PATCHEN:  No further questions.

ARBITRATOR GIFFORD:  Any redirect?

MR. GRIBBIN, JR.:  Yes.

- - - - -

REDIRECT EXAMINATION

- - - - -

BY MR. GRIBBIN, JR.:

Q   Corporal Langan, in your time in the canine unit, were you ever Officer Lundquist's immediate supervisor?

A   No, because I had a police dog before him, so we would have never been able to work with each other.  There are four 12-hour shifts and each canine handler with their dogs are on each shift.

Q   Were you aware, then or even now, whether or not the township has a list of approved canine vendors?

A   No.  We used to get our dogs from Canada, a place called Baden K9.  I mean, I had no idea -- obviously, they were approved, because we bought

Exhibit 72

| | |
|---|---|
| **Date:** | Fri, 10 May 2024 4:50:00 PM -0400 |
| **Sent:** | Fri, 10 May 2024 4:50:18 PM -0400 |
| **Subject:** | FW: K9 |
| **From:** | Whitney, Nelson |
| **To:** | nwhitney2@gmail.com; |
| **Attachments:** | image00001.png; image00001.png; Kent.msg; Canine selection.msg; Fwd: K-9 Selection Process.msg; Falls Township Letter 1.pdf; image00001.png |

Whitney, Nelson has shared a OneDrive for Business file with you. To view it, click the link below.

📄 Fwd K-9 Selection Process.msg

**From:** Hearn, Thomas <Thomas.Hearn@obermayer.com>
**Sent:** Friday, May 10, 2024 3:41 PM
**To:** Whitney, Nelson <n.whitney@fallstwppd.com>
**Subject:** FW: K9

**From:** Matthew Takita <m.takita@fallstwp.com>
**Sent:** Friday, December 15, 2023 12:02 PM
**To:** Hearn, Thomas <Thomas.Hearn@obermayer.com>; Atkins, Melissa <melissa.atkins@obermayer.com>
**Subject:** FW: K9

> **WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Tom/Melissa

Please see the email below which I sent to the BOS as well as the attached. One additional attachment, that was not part of my original email to the BOS, is the PDF titled "Falls Township Letter 1" which is a letter from Kent's tree service to the Board.

I would like to have this matter reviewed by a third party. Specifically, I would like you to review whether there are any conflicts of interest, policy violations or any ethical issues with the donation of the dogs including the concerns raised in Kent's letter and if there are, what is required for us to remedy the situation? Please also let us know whether there are any issues with the CBA regarding the assignment of K9 duties.

Let me know if you have any questions or require additional information.

Thanks

**Matthew K. Takita, AIA, MCP | Township of Falls**
Township Manager
Zoning Administrator
Director of Code Enforcement

450 Lincoln Highway
Fairless Hills, PA 19030
**Office:** 215-949-9000 | **Mobile:** 215-880-6468
**Website:** www.fallstwp.com

THIS ELECTRONIC COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL. IMPORTANT NOTICE TO EMAIL RECIPIENTS: DO NOT read, copy, or disseminate this communication unless you are the intended recipient. Anyone who receives this email by error should treat it as confidential and is asked to delete the message, and immediately call Falls Township at 215-949-9000 or reply by email m.takita@fallstwp.com. This email transmission may not be secure and may be

Exhibit 73

illegally intercepted. Do not forward or disseminate this email to any third party. Unauthorized interception of this email is a violation of federal law.

**From:** Matthew Takita
**Sent:** Tuesday, December 5, 2023 1:43 PM
**To:** Jeff Boraski <j.boraski@fallstwp.com>; Jeff Dence <jeffdence@gmail.com>; John Palmer <j.palmer@fallstwp.com>; Erin Mullen <E.Mullen@fallstwp.com>; Brian Galloway <b.galloway@fallstwp.com>
**Cc:** 'Michael Clarke' <MClarke@rudolphclarke.com>; Lauren Gallagher <LGallagher@rudolphclarke.com>
**Subject:** K9

All

Attached are emails from Nelson concerning the K9 selection process and the donation of two dogs from Kent's tree service. The first email labeled "Kent" summarizes issues surrounding the donation of two dogs from Kent's tree service. Kent's is currently contracted by the Township for tree removal work. The second email labeled "Canine selection" was at my request asking for additional information regarding the selection process. The last email labeled "K9 selection process" is an email from PAFT expressing concerns regarding the process and the individuals involved.

Based on the information provided and the individuals involved, I think it prudent to investigate the matter using a neutral third party to avoid any appearance of impropriety. Using an outside group to look into this will also avoid the standard, inevitable arguments of bias, harassment, and retaliation from various groups. Obermeyer has conducted other investigations for us, and I would recommend using them to conduct this one. It is important to get right to the heart of the matter and move on to more productive work.

If the Board is good with this recommendation, I will reach out to Obermeyer to start the process.

**Matthew K. Takita, AIA, MCP | Township of Falls**
Township Manager
Zoning Administrator
Director of Code Enforcement

450 Lincoln Highway
Fairless Hills, PA 19030
**Office:** 215-949-9000 | **Mobile:** 215-880-6468
**Website:** www.fallstwp.com

THIS ELECTRONIC COMMUNICATION IS PRIVILEGED AND CONFIDENTIAL. IMPORTANT NOTICE TO EMAIL RECIPIENTS: DO NOT read, copy, or disseminate this communication unless you are the intended recipient. Anyone who receives this email by error should treat it as confidential and is asked to delete the message, and immediately call Falls Township at 215-949-9000 or reply by email m.takita@fallstwp.com. This email transmission may not be secure and may be illegally intercepted. Do not forward or disseminate this email to any third party. Unauthorized interception of this email is a violation of federal law.

Exhibit 73

Exhibit 74

# MARSHALL DENNEHEY

620 Freedom Business Center, Suite 405, King of Prussia, PA 19406
(610) 354-8250  Fax (610) 354-8299

Direct Dial:  (610) 354-8261
Email:  ghdadamo@mdwcg.com

December 18, 2023

***VIA EEOC RESPONDENT PORTAL***
Eric Marcanello
U.S. Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street, Suite 1000
Philadelphia, PA 19107-3126

      RE:    Edward Elmore v. Falls Township Police Department
                EEOC No. 530-2023-07610
                Our File No. 20684.00478

Dear Eric:

Please accept this Position Statement submitted on behalf of Respondent, Falls Township Police Department, ("Falls PD") in response to the Charge of Discrimination submitted by Claimant Edward Elmore ("Elmore").[1]

## A. Spring 2021 Hiring Process

In the Spring of 2021, there were five (5) vacancies for patrol officers that the Falls PD was seeking to fill.  Elmore was asked by Sgt. Clark to be a member of the three (3) person interview Board.  The Board was responsible for conducting the oral examination of the application process.  Elmore was asked to a member of the Board because there was a vacancy that needed to be filled and Sgt. Clark wanted to have a rank and file police officer to fill the vacancy.  Elmore has a strong personality and was therefore considered to be useful during interviews.  He was the member designated who would press candidates as did his predecessor on the Board.

The candidates are placed into a pool to be used by local police departments in the area.  The hiring process includes a physical ability test followed by a written examination.  If the candidate passes those two tests, they are eligible to apply to interview with a respective police department.  The passing score for the written test is 70 for overall total performance.  The hiring plan was to initially select those applicants who scored 85 or higher as

---

[1] Falls PD's Position Statement is based upon facts and information presently known and available to it, and the statements made herein are to the best of its current knowledge and information.  Falls PD specifically reserves the right to supplement, amend or otherwise modify the content of this Position Statement.  Further, this Position Statement may not be used for any other purpose other than advising the EEOC and/or PHRC of Falls PD's current position as of the above date.

Exhibit 74

Eric Marcanello
December 18, 2023
Page 2

_____

they are deemed to be most qualified and then select from the pool those who scored between 70-84 if the positions were not filled from the higher scoring bracket. Candidates from both ranges applied for positions with Falls PD.

The hiring plan and process as described in Elmore's Charge regarding the oral or interview portion of the application process is patently false. Sgt. Clark never made any comment to Elmore that he had any intention whatsoever to "skip over all female candidates" in any effort to avoid hiring a female officer. There was never any discussion specific to the hiring process as it relates to female candidates. There were very few applications received from female police officers. Consequently, there were no female candidates hired because the few who did apply did not qualify as a result of the selection process.

Moreover, there was no veto power per se held by any member of the Interview Board. Rather, there is a practice of rejecting candidates if not all members of the Interview Board approve of a candidate. Also, there was no discussion or attempts made to generate any pre-determined outcome as alleged by Elmore. Rather, the process involved taking notes and evaluating the candidates during the interview as there were several interviews conducted consecutively on a given day such that there was not sufficient time to score each candidate immediately following the interview. The Interview Board members would subsequently numerically score the candidates based upon the Board member's assessment from the respective candidate's interview.

The interview forms were revised and updated following consultation with an independent vendor (Strategic Investigative Resources, LLC) which provides guidance to organizations utilizing examinations to asses candidates. The vendor reviewed the interview forms and provided consulting services to permit the Falls PD to more critically assess the candidate. (See, Exhibit "A," Emails and Revised Forms). As stated in the emails, Sgt. Clark was interested in removing as much subjectivity as possible from the oral examination scoring. There was never any discussion and/or representation that the scores of the applicants were arbitrary in any fashion and Elmore did not complain of same.

### B. **Elmore did not make any legitimate complaint of any discrimination in the hiring process**

Most importantly, Elmore participated in this process and never once complained that the process was discriminatory or unfair to any candidate for any reason. It was not until approximately a year after the 2021 hiring process concluded did Elmore allegedly complain to anybody from the Township about the hiring process. During that time, Chief Whitney determined that Elmore was inappropriately getting paid overtime and otherwise stealing time from the Falls PD. (See, Exhibit "B," Chief Whitney Memorandum, November 30, 2022). Sgt. Clark testified in a grievance arbitration in the summer of 2022 and presented testimony not favorable to Elmore. Elmore was also referred to the District Attorney's Office by Chief Whitney as a result of Elmore's misuse of time.

Thereafter, in October 2022, Elmore allegedly spoke with Assistant Township Manager Dippolito and told him that Sgt. Clark vetoed a minority candidate because of his race. This allegation is blatantly false and was known to be false by Elmore at the time the complaint was made. In fact, Elmore was the one who "vetoed" the minority candidate based upon Elmore's concern that the candidate quit the state police academy's training after only 12 days. Sgt. Clark did not object to the candidate and did not say "Fuck that turd we are not going to hire someone like him." Elmore does not provide any documentation to support his incredible claim.

Eric Marcanello
December 18, 2023
Page 3

---

### a.  Light Duty

Elmore was advised by the workers' compensation carrier that he could no longer perform light duty as he admits in his Charge.  Therefore, the Falls PD did not have any involvement or decision making authority as to whether could be provided any work, light duty or otherwise.  Thus, Elmore's claim that this "decision" was done in retaliation for any complaint is self defeating.

### b.  Administrative Leave

In November 2022, there was increasing concern that Elmore would commit workplace violence as a result of his erratic behavior and access to explosives.  (See, Exhibit "C," November 21, 2022 Memorandum).  The erratic and inappropriate behavior initially included harassing Chief Whitney at a public protest in 2020 to compare his appearance to Derek Chauvin.  In an effort to deescalate the harassment, Chief Whitney eventually allowed Elmore to compare his face to a picture of Chauvin.  Chief Whitney did not expect to have his picture taken at that time and did not provide any approval for same.  Elmore's behavior became more erratic when Elmore later made a t-shirt with the picture of Chief Whitney and began wearing it in public as well as the disciplinary hearing for another officer when Elmore was Union President at that time.  (See, Exhibit "B").

On December 13, 2022, Chief Whitney sent an email to Elmore advising him that he was being placed on administrative leave with full pay.  (See, Exhibit "D", December 13, 2022 Memo).   The leave was a result of Elmore's harassing and intimidating behavior to Chief Whitney and other officers and the concern regarding Elmore's mental health and possibility that he may commit an act of workplace violence. Despite Elmore's contentions to the contrary, the leave had nothing to do with any "sexism and racism issues within the department."  Additionally, the redacted email attached as Exhibit D to the Charge does not support Elmore's claim whatsoever and only states that he is being placed on leave.

Moreover, the administrative leave did not constitute disciplinary action because he was denied the right to earn overtime.  In fact, as set forth in Section 5 of the CBA attached to Charge as Exhibit G, Discharge and Discipline policies do not apply to administrative leave.  Therefore, again, Elmore presents documentary evidence to rebut his own allegations.

### c.  Promotion Denied

On January 23, 2023, Sgt. Clark was promoted to Lieutenant.  Pursuant to the CBA, when supervisory openings occur, there is a specific promotional process that must be followed.  During the written exam. Lt. Clark was the co-proctor along with the President of the Police Union and Clark merely sat at his desk and walked the room.  It is denied that he "scowled" or attempted to intimidate Elmore at any time.  Rather, Elmore was treated in the same manner as every other applicant taking the written examination that day and was not harassed by Lt. Clark.  The written examination portion was objectively scored based upon Elmore's answers on the test.

Elmore is correct that Sgt. Fanelli initially provided a performance evaluation score of 90% and that the performance evaluation only comprised 10% of the total overall score.  Per Department practice, Lt. Clark reviews all scores for accuracy and further evaluation as needed.  After speaking with Sgt. Fanelli regarding his score for Elmore, Fanelli confided and admitted to Clark that he gave Elmore a higher score because he was fearful of being a target of vindictive behavior of Elmore given his track record for same.  Lt. Clark thereafter reassessed

Eric Marcanello
December 18, 2023
Page 4

_____

Elmore using the same metrics as he did for the other officers and determined that Elmore should have received a performance valuation score of 51. Specifically, Elmore was given primarily exceeds performance ratings by Sgt. Fanelli whereas the score should have included meets expectation ratings at most based upon Sgt. Clark's observation of Elmore as his supervisor. Sgt. Fanelli only reviewed the time period for when Elmore was out on administrative leave whereas Lt. Clark was able to take a more historical approach and review Elmore's job performance in 2022 prior to the administrative leave. Lt. Clark's evaluation did not take into account the time where Elmore was on IOD status and there is no evidence to support Elmore's baseless contention to the contrary. By comparison, Lt. Clark also reduced the overall score of Officer James Szamboli from 81 to 69 during the same promotional process. (See, Exhibit "E," Szamboli Performance Evaluations). In fact, Lt. Clark reduced all of the performance evaluation scores for each candidate.

The oral examination was conducted by an outside vendor to promote fairness and objectiveness. If Elmore had any concerns regarding the fairness of the test, he was permitted to contact the vendor to discuss his concerns. Elmore did not avail himself of that process. Therefore, Elmore's claims that somehow the oral examination process was biased towards him in some general fashion as alleged also holds no weight.

Accordingly, as a result of Elmore's overall score on the written examination, performance evaluation, and oral examination, Elmore received an overall score of 76.8.. Elmore would not have received a score guaranteeing promotion if he received a 90% score on the performance evaluation. First, Elmore would have added only 3.9 points to his score ((90-51) x 10%) to move him from final score of 76.8 to 81.7, which would have ranked him 8th overall in a field where only 5 candidates were hired. (See, Exhibit "F," Supervisory Promotional Process Final Scores). Moreover, the promotional process only requires that one candidate from the top 3 overall candidates is chosen until 5 are selected. This selection is completed by Chief Whitney and no candidate is guaranteed to be selected regardless of their scores.

## C. Allegations of Age Discrimination

Elmore's claims that Chief Whitney engaged in conduct to promote age discrimination are also without merit. Elmore's bald conclusions on page 5 of his Charge are not supported by any specific evidence and are wholly denied. More specifically, it is denied that Chief Whitney removed senior officers and gave their duties to younger officers, selected junior officers for training, arbitrarily required senior officers to take fitness exams to remove them from the department, and/or made defamatory statements about senior officers. Elmore was provided with every opportunity to receive training and he availed himself of same. (See, Exhibit "G," Training Records). The allegations regarding claims against Elmore regarding dishonesty, criminal behavior, and misuse of "administrative leave" are also denied for the reasons discussed hereinabove. Simply put, it is denied that any senior officers have been treated differently because of their ages and there is no specific allegations to support Elmore's conclusory allegations.

Moreover, Elmore was not targeted regarding his misuse of time as two other officers were also referred to the District Attorney's Office. Furthermore, Chief Whitney is obligated to report any potential Brady/Giglio concerns to the District Attorney's Office pursuant to their Brady/Giglio List. Police departments are required to disclose this information to prosecutors and the prosecutor determines what actions will be taken next.

Exhibit 74

Eric Marcanello
December 18, 2023
Page 5

_____

### D. __Elmore Was Not Discriminated Against Based Upon His Age__

Elmore has brought a claim for age discrimination under the ADEA.  To succeed on an age-based discrimination claim, a plaintiff must demonstrate that his or her age "was the 'but-for' cause of the employer's adverse decision," *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177 (2009), and that it " 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (*quoting Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). In ADEA cases where there is no direct evidence of discrimination, the Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973). *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir.2009).  A failure to promote claim under the ADEA is analogous to a failure to hire claim. *Barber v. CSX Distribution Serv., 68 F.3d 694, 698* (3d Cir.1995).

The McDonnell Douglas framework requires a plaintiff alleging age discrimination to first establish a prima facie case of discrimination. The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's [termination]." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " Id. (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

In order to state a prima facie case of discrimination, a plaintiff must show (1) that he belongs to the protected class; (2) that he applied for and was qualified for the job; (3) that he was rejected despite being qualified; and (4) under circumstances that raise an inference of discrimination, the employer continued to seek out individuals with qualifications similar to plaintiff's or treated more favorably those not in the protected class. *Id.* (citing *Fowle v. C & C Cola,* 868 F.2d 59, 61 (3d Cir. 1989)); *see also Maxwell v. Springer,* 274 Fed.Appx. 186, 188 (3d Cir. 2008). Once the plaintiff makes a prima facie case, the burden shifting framework comes into play. The defendant must articulate a legitimate, non-discriminatory reason for rejecting the plaintiff for the promotion, and if the defendant does so, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's explanation is pretextual. *See Fuentes,* 32 F.3d at 763; *see also Sarullo v. United States Postal Serv.,* 352 F.3d 789, 797 (3d Cir. 2003)

The employer's burden is "relatively light," which can be satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).  "If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." *Smith,* 589 F.3d at 691. In ADEA cases, the plaintiff has the ultimate burden of proving, by a preponderance of the evidence, that age was the "but-for" cause of the challenged employer decision. *See Gross*, 557 U.S. at 177; *Smith*, 589 F.3d at 691.

Here, Falls PD did not discriminate against Elmore when it failed to promote him.  Rather, the decision to not promote Elmore was based upon his performance evaluation, written examination, and oral examination.  The only direct involvement of these factors under which the Falls PD maintained any control was the performance evaluation, which only comprised 10% of the overall score.  The written examination was objectively scored based upon Elmore's responses and the oral examination was scored by an independent vendor.

Exhibit 74

Eric Marcanello
December 18, 2023
Page 6

_____

With respect to the change in score of his performance evaluation by Lt. Clark, Elmore does not allege that that his age caused the change in score. Therefore, it is axiomatic that there is likewise no evidence that Elmore's age was considered by Lt. Clark in making the change. Rather, the change in score was a direct result of Lt. Clark's performance evaluation of Elmore as his supervisor after Elmore was improperly scored by Lt. Fanelli, who advised that he inflated Elmore's score in fear of retaliation. Accordingly, there is no evidence that the change in his performance score, which Elmore claims is the reason his overall score was reduced thereby causing the adverse employment action, was the but-for cause of him failing to be promoted. Moreover, Elmore was not qualified for the promotion for the same reasons and his claims fail on that basis as well.

**E. Elmore was not retaliated against for making a complaint of discrimination.**

To establish a prima facie claim of unlawful retaliation, a plaintiff is required to show that: "(1) he engaged in a [protected activity]; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action." *Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006). Elmore "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The Court examines the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Id*. at 71.

With respect to the causation prong, the Court considers whether a reasonable jury could link the employer's conduct to retaliatory animus. *See Jensen v. Potter,* 435 F.3d 444, 449 n.2 (3d Cir. 2006) (explaining that "[t]he ultimate question in any retaliation case is an intent to retaliate"). In assessing this, the Court considers the "temporal proximity" between Elmore's protected activity and the Falls PD's allegedly retaliatory response, and "the existence of a pattern of antagonism in the intervening period." *Id.* at 450. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist.,* 532 U.S. at 273–74 (2001).

If a prima facie case is established, the burden of production shifts to the employer to present a legitimate, non–discriminatory reason for its actions. *Daniels v. School Dist. of Phila.,* 776 F.3d 181, 193 (3d Cir. 2015). If such a reason is offered, the burden shifts back to the plaintiff to demonstrate that the reason was merely pretext "and that retaliation was the real reason for the adverse employment action." *Id.* Although the burden of production shifts, "the plaintiff has the ultimate burden of persuasion at all times." *Id.*

Initially, it is important to note that the alleged complaint made by Elmore was completely fabricated and done in retaliation to Falls PD's investigation and Lt. Clark's testimony that Elmore was misappropriating regular time and overtime to which he was not entitled. When reviewing the temporal proximity of the complaint to the alleged conduct being complained of, the timing of the complaint is suspect in that it was not made until one year after the hiring process was completed. Elmore did not complain of any discriminatory conduct at the time of the hiring process and only came forward until after he was found to be stealing time from the Township. It is unknown why Elmore did not come forward and complain about the alleged discrimination at the time he had knowledge of same.

Eric Marcanello
December 18, 2023
Page 7

_____

Moreover, the complaint itself was completely contrived and has no basis in fact whatsoever. Lt. Clark emphatically denies that he had any conversation with anybody, including Elmore, that the hiring process would be conducted in such a manner as to prevent the hiring of female candidates. The fact that no female candidates were not hired is a result of only receiving a few applicants and because those candidates were not qualified. It defies common sense in a time where police departments across the country, including Falls PD, are having difficulty recruiting for various reasons that Falls PD would refuse a qualified candidate for any reason.

Furthermore, Elmore's contention that Lt. Clark engaged in racial discrimination is also patently false. Incredibly, Elmore was the member of the Interview Board who "vetoed" the minority candidate based upon the candidates performance or lack thereof during training with the Pennsylvania state police academy. Lt. Clark did not object to the potential hire of the candidate and did not make any derogatory comments about the candidate. Therefore, it is quite obvious that Elmore intentionally falsified these complaints of discrimination for illegitimate purposes.

With respect to the alleged retaliatory conduct, Elmore's claims in a firehouse approach also fall woefully short. First, Elmore was only removed from light duty based upon the decision of his worker' compensation carrier. Second, Elmore was later placed on administrative leave because of his harassing and erratic behavior towards other officers and the potential for workplace violence. The administrative leave is not considered discipline based upon the plain language of the CBA and he was paid during that time. Third, Elmore was not promoted because he was not qualified. There is no evidence that Lt. Clark corrected the performance evaluation score given by Lt. Fanelli or that Chief Whitney did not select Elmore in retaliation for any claim of discrimination made by Elmore, regardless of the ridiculousness of the complaint. Thus, the only reasonable conclusion that can be drawn is that Elmore was not retaliated against for making any complaint of discrimination to the Falls PD or Township.

Accordingly, for the reasons set forth above, Falls PD respectfully requests that this Commission find that Elmore's Charge is lacking in probable cause and dismiss the matter.

Very truly yours,

*s/Gary H. Dadamo*

Gary H. Dadamo

Enclosures